# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NORTHWESTERN CORPORATION, | Case No. 03-12872 (CGC) |
| Debtor. | |
| MAGTEN ASSET MANAGEMENT CORP. | |
| Appellant, | Civil Action No. 04-1279 JJF |
| v. | |
| PAUL HASTINGS JANOFSKY & WALKER LLP, | |
| Appellee. | |

## OPENING BRIEF ON APPEAL OF
## MAGTEN ASSET MANAGEMENT CORPORATION

SMITH, KATZENSTEIN & FURLOW LLP
David A. Jenkins (I.D. No. 932)
Kathleen M. Miller (I.D. No. 2898)
800 Delaware Avenue [19801]
Post Office Box 410
Wilmington, DE 19899-0410
Phone:  (302) 652-8400

*Of Counsel:*
STORCH AMINI & MUNVES PC
Bijan Amini, Esq.
Lita Beth Wright, Esq.
Avery Samet, Esq.
2 Grand Central Tower
New York, New York 10017
Phone: (212) 490-4100

June 28, 2005

## TABLE OF CONTENTS

                                                                    **Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED ON APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.    Nature of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.    The Fraudulent Transfer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        B.    Paul Hastings Came To Its Employment As The
               Debtor's Counsel With A Biased View Of The
               Fraudulent Transfer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    II.    Procedural History Of The Disqualification Motion . . . . . . . . . . . . . . . . 10

        A.    Paul Hastings' Initial Disclosures Were False
               And Misleading . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        B.    Paul Hastings Stubbornly Resists Making Full
               And Complete Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        C.    The Motion To Disqualify . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        D.    Disposition of the Motion Below . . . . . . . . . . . . . . . . . . . . . . . . 16

STANDARD OF REVIEW AND JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . 19

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    I.    The Bankruptcy Court Erred As A Matter Of Law By Holding
        That Magten Could Not Challenge Paul Hastings' Retention . . . . . . . . . 20

    II.    The Bankruptcy Court Erred When It Failed
        To Find Paul Hastings Is Not Disinterested . . . . . . . . . . . . . . . . . . . . . . . 22

    III.    Paul Hastings Should Have Been Disqualified
        For Its Actual Conflict of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IV.    The Bankruptcy Court Abused Its Discretion By
       Refusing To Disqualify Paul Hastings' For Its Deliberate
       Lack Of Candor In Its Employment Application . . . . . . . . . . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

Accardi v. IT Corp. (In re The IT Group, Inc.),
    323 B.R. 578 (D. Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Baron & Budd, P.C., v. Unsecured Asbestos Clmnts. Comm.,
    321 B.R. 147 (D.N.J. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

In re 22 Acquisition Corp.,
    Nos. CIV.A. 03-3059, CIV.A. 02-907,
    2004 WL 870813 (E.D. Pa. Mar. 23, 2004) . . . . . . . . . . . . . . . . . . . . . . . . 22

In re Amadura Corp.,
    121 B.R. 862 (Bankr. D. Colo. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

In re B.E.S. Concrete Products, Inc.,
    93 B.R. 228 (Bankr. E.D. Cal. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

In re BH & P, Inc.,
    949 F.2d 1300 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 19, 24, 26, 27

In re Envirodyne Indus., Inc.,
    150 B.R. 1008 (Bankr. N.D. Ill. 1993) . . . . . . . . . . . . . . . . . . . . . . . . 14, 23

In re Git-N-Go, Inc.,
    321 B.R. 54 (Bankr. N.D. Okla. 2004) . . . . . . . . . . . . . . . . 14, 23, 24, 25, 28

In re Mundo Custom Homes, Inc.,
    214 B.R. 356 (N.D. Ill. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

In re Peregrine Sys., Inc.,
    311 B.R. 679 (D. Del. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

In re Pillowtex, Inc.,
    304 F.3d 246 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 24

In re Statewide Pools, Inc.,
    79 B.R. 312 (Bankr. S.D. Ohio 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

In re The Leslie Fay Cos., Inc.,
    175 B.R. 525 (Bankr. S.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Mellon Bank, N.A. v. Metro Comms., Inc.,
    945 F.2d 635 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

iii

<u>Pressman-Gutman Co. v. First Union Nat'l Bank</u>,
   No.CIV.A. 02-8442, 2004 WL 2743582
   (E.D.Pa. Nov. 30, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## **Statutes and Other Authorities** <span style="float:right">**Page(s)**</span>

11 U.S.C. § 101(14) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

11 U.S.C. § 327(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 22

11 U.S.C. § 1109(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

28 U.S.C. § 158(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Bankr. R. Civ. P. 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Local Rule 2014-1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Appellant Magten Asset Management Corporation ("Magten"), by its undersigned counsel, hereby submits this brief in support of its appeal from the decision (the "Decision") A590-A597[1] entered on July 23, 2004, by the Honorable Charles G. Case, III, denying Magten's motion to disqualify Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings") as counsel to Northwestern Corp., the debtor-in-possession in the above-captioned bankruptcy proceeding ("Northwestern" or the "Debtor"), and the August 19, 2004 order denying Magten's Motion for Reconsideration (the "Order") A653-A654.

## PRELIMINARY STATEMENT

When seeking to be employed as debtor's counsel, the law mandates full and complete disclosure to the bankruptcy court, creditors and other parties in interest for a reason -- to preserve the integrity of the bankruptcy process. The need for complete candor is absolute to root out "any incentive to deprive the debtor of flexibility in formulating a plan of reorganization by introducing a strong bias for a particular treatment of a particular creditor at the expense of other creditors[,]" or any other interest adverse to the debtor's estate. Paul Hastings' deliberate lack of candor about its prepetition role as counsel to both parties to the hotly contested transaction "at the heart of this case" has infected these proceedings with just that kind of bias. As a result, one group of creditors has been favored over another, causing great harm to the latter. If the Decision and Order stands, it will undermine the integrity of the bankruptcy process. The Decision and Order should therefore be reversed.

---

[1] Copies of referenced documents are included in the Appendix filed concurrently with this brief. The Appendix will be cited as "A__."

1

It is undisputed that Paul Hastings played a central role in the Debtor's prepetition transfer of substantially all of the utility assets of its directly owned subsidiary, Northwestern Energy LLC (formerly known as Montana Power LLC and subsequently known as Clark Fork and Blackfoot LLC, hereinafter "Clark Fork"), to itself for vastly less consideration than they were worth (the "Fraudulent Transfer"). In fact, Paul Hastings was the principal architect of the Fraudulent Transfer on behalf of both Northwestern, then insolvent, and Clark Fork, made insolvent by the Fraudulent Transfer. Magten became one of the Debtor's creditors by virtue of the Fraudulent Transfer.

After effectuating the Fraudulent Transfer at the "heart of this case," Paul Hastings undertook to represent the Debtor's estate at the outset of the bankruptcy proceedings. As both the Bankruptcy Code and Bankruptcy Rules make clear, Paul Hastings was duty bound, in its application for employment, to candidly reveal to the Bankruptcy Court and all of the Debtor's creditors and parties and in interest <u>all</u> connections to any party in interest or to any transaction that <u>might</u> be at issue in the bankruptcy case, including its dual role as counsel on the Fraudulent Transfer. But it did not do so.

Instead, as shown below, Paul Hastings went to great lengths to deliberately hide its role in the Fraudulent Transfer to avoid disqualification. Only after Magten persisted, and upon orders of the Bankruptcy Court, did Paul Hastings finally confess its dual role in the Fraudulent Transfer. Contrary to the Bankruptcy Court's findings, however, Paul Hastings' belated confession still did not completely reveal the full role which it played in these matters. Worse still, Paul Hastings arrogantly suggests that secret discussions held with the United States Trustee's office can supplant the court's independent duty to inquire into the qualifications of counsel for the debtor under 11 U.S.C. 327(a) and the

independent duty of counsel to make full and open disclosure.  Similarly troubling is the Bankruptcy Court's finding that such secret discussions -- which were not "revealed" until the hearing on the disqualification motion -- evidence a lack of intent to conceal. Actually, as the Third Circuit has found, the opposite is true.

As is obvious, Paul Hastings had no reason to "thoroughly vet[] the dual representation" with the attorney for the United States Trustee in secret unless it was truly concerned that its dual role would come under strict scrutiny by the court or the Debtor's creditors.  In fact, no one actually knows what was said during those secret discussions or in what context.  The United States Trustee's attorney stated for the very first time at the July 15, 2004 disqualification hearing, that nothing Paul Hastings told him about its role in the Fraudulent Transfer raised any red flags about a possible conflict of interest or an interest adverse to creditors of the estate.  Yet, in or about the same time the United States Trustee's office claims that Paul Hastings secretly disclosed its dual role in the Fraudulent Transfer, Magten put the United States Trustee, the Debtor and Paul Hastings on notice of Magten's intention to challenge the Fraudulent Transfer.  Moreover, sanctioning Paul Hastings' suggestion that unilaterally obtaining a secret advisory opinion from the United States Trustee's office on counsel's qualifications as debtor's counsel substitutes for statutorily mandated, public disclosures to the court, the estate's creditors and all parties in interest is unprecedented.  It is also a dangerous precedent to set.

What stands out upon review of the Bankruptcy Court's decision is that it cited no authority to support that finding that there was no conflict.  In truth, the Bankruptcy Court applied "non-existent" legal standards.  In the proceedings below, Magten actually demonstrated Paul Hastings' lack of disinterestedness and, further, that it had an actual

conflict under the appropriate tests.  Moreover, Paul Hastings' lack of candor in and of itself warranted disqualification.  Rather than applying well-established legal tenets, the Bankruptcy Court effectively determined that Magten had no standing because it was not among the creditors that might have been injured by the Fraudulent Transfer.  Next, and again without citing any supporting legal authority, the Bankruptcy Court compounded that error by finding that while Magten has asserted that issue in a pending adversary proceeding, Magten had not yet proved that it was actually injured by the dual representation in the Fraudulent Transfer.  Taking this flawed analysis one step further, the Bankruptcy Court said that even if Magten proved injury that injury would only be "in its non-existent capacity as a creditor of Clark Fork," not the Debtor.  From that it concluded that "[t]he prohibition against counsel holding an 'adverse interest' does not stretch that far."  The Bankruptcy Court was wrong in all respects.

Instead of focusing on whether Magten had proven that it was injured, the Bankruptcy Court should have focused on whether it was <u>likely</u> that Paul Hastings' role in the transaction impaired its ability to serve as the Debtor's counsel with an unbiased, skeptical view of <u>all</u> of the Debtor's prepetition activities, including the Fraudulent Transfer.  With an unbiased, skeptical view, Debtor's counsel would have been capable of forming a plan of reorganization that did not favor one group of creditors over another.  As shown below, Paul Hastings could not, and did not do so, because, as the principal architect of the Fraudulent Transfer, it came into the bankruptcy case having favorably prejudged the validity of its own handiwork.  Paul Hastings has continued to staunchly defend its handiwork in the multitude of proceedings brought to challenge it.  As a result, Paul Hastings' efforts in the bankruptcy proceedings remain open to challenge, as do the substantial legal fees it has charged and has been paid by the estate.  Because of the

magnitude of Paul Hastings' defalcations, not only should the Order therefore be reversed, but all legal fees paid by the estate should be disgorged as well.

## ISSUES PRESENTED ON APPEAL

1.      Whether Magten, as a creditor and party in interest to Northwestern's chapter 11 bankruptcy proceedings, can challenge the retention of Debtor's counsel.

2.      Having represented both the transferor and the transferee to a billion dollar transaction now challenged as fraudulent, and where the outcome of that challenge will necessarily have a substantial, material impact on the administration of the estate, can a law firm serve as Debtor's counsel to the transferee.

3.      Whether Paul Hastings' repeated, defective and misleading disclosures to the Court and other parties in interest regarding a central dispute in the bankruptcy proceedings could have been excused by alleged unsworn and unspecified private disclosure to the United States Trustee, but should have resulted in Paul Hastings' disqualification.

## STATEMENT OF FACTS

### I.    Nature of the Case

#### A.    The Fraudulent Transfer

Paul Hastings represented both sides of a November 15, 2002, billion dollar transfer of the principal assets of Clark Fork to Northwestern, which, according to the Official Committee of Unsecured Creditors (the "Creditors Committee"), formed the heart of these bankruptcy proceedings. See February 10, 2005 hearing transcript at 81 regarding the Final Fee Application of Paul Weiss Rifkind & Garrison LLP, A739 ("With respect to the fraudulent conveyance analysis, your honor, that was at the heart of this case.").[2]  There is no genuine dispute that Northwestern was insolvent at the time of the transfer and that Clark Fork was rendered insolvent due to the transfer.[3]  Nor is there any credible dispute that the assets transferred on that date were exchanged for vastly less consideration than they were worth.    As expected, throughout Northwestern's bankruptcy, many parties challenged this transaction as fraudulent on a variety of

---

[2] While this final fee hearing took place well after the Decision and Order, and thus was not designated for the record on this appeal, this Court may take judicial notice of matters of public record. See In re Peregrine Sys., Inc., 311 B.R. 679, 692 (D. Del. 2004) (taking judicial notice of transcript of hearing before the bankruptcy court).

[3] In opposing the disqualification motion, Paul Hastings paid lip service to the notion that the Fraudulent Transfer did not render Clark Fork insolvent.   But the undisputed facts speak otherwise.   In connection with the Fraudulent Transfer, Clark Fork and Northwestern (both represented by Paul Hastings) executed the Maintenance and Operating Costs Support Agreement (the "Cost Support Agreement"), whereby Northwestern would pay Clark Fork $270,000 per month in the event that Clark Fork was unable to pay its accounts in the ordinary course of business.   See A460-A461.   When Northwestern filed for bankruptcy, Paul Hastings filed a motion sought an order to continue making these payments to Clark Fork and represented that Northwestern had been making the requisite payments under the Cost Support Agreement since January 1, 2003.   See id., at ¶ 47.   The very fact that Northwestern has been making those payments under the Cost Support Agreement means that Clark Fork has been insolvent since at least January 1, 2003.

grounds.   The assets transferred during this transaction constituted over 80% of the reorganized Debtor's EBITDA and over 66% of its assets.[4]

**B.    Paul Hastings Came To Its Employment As The Debtor's Counsel With A Biased View Of The Fraudulent Transfer**

The Fraudulent Transfer was supposedly scrutinized at the very beginning of Northwestern's bankruptcy, long before Magten's complaint, by both the Debtor and the Creditors Committee.   By Paul Hastings' own admission, the issue was of critical importance to the Debtor's reorganization because of the significant portion of the estate's assets the transferred assets represented, and the impact on the priorities between the Debtor's creditors.   See Disclosure Statement, dated August 31, 2004 (A890) ("The fraudulent conveyance claims asserted by various parties if successful may effect the priorities between the unsecured creditors of the Debtor and the creditors of Clark Fork as well as distributions under the Debtor's Plan.").[5]   Given the critical nature of the transaction, Paul Hastings' failure to disclose its role on both sides of the transaction was no accident.   Nor was it mere oversight.   Indeed, Paul Hastings was supposedly so concerned about its role that it now belatedly claims it made private disclosure of that role to the United States Trustee at the outset of the bankruptcy case.   However, it failed to make those statutorily required disclosures *to the Bankruptcy Court or any party in interest* in connection with its application for employment.   In fact, as explained below,

---

[4] As a result of the transfer, certain Quarterly Income Preferred Securities ("QUIPS") held by creditors of Clark Fork ceased receiving repayment of interest, and ultimately, principal, they would have recovered  had the Fraudulent Transfer not occurred.   In its fraudulent conveyance action against the Debtor, Magten, also a QUIPS holder, is seeking to recover payment in full to the QUIPS holders which the QUIPS holders would have received had Clark Fork's assets not been fraudulently transferred.

[5] The Disclosure Statement and Plan were also not designated in the record on appeal, but for the same reasons as explained in footnote 2, the Court may take judicial notice of the filings.

its initial disclosures were not only misleading, they were false. Subsequent, supplemental disclosures were equally deficient. For months, Paul Hastings continued its campaign to conceal its role in the Debtor's prepetition transactions until the Bankruptcy Court ordered it to make full disclosure.

Paul Hastings was clearly interested in the transaction at issue. After all, it designed, structured and implemented the Fraudulent Transfer. Paul Hastings has since spent considerable amounts of the Debtor's resources defending the validity of the transaction after it came under attack by a number of the Debtor's creditors, including Magten. Specifically, Paul Hastings has:

- argued, albeit unsuccessfully, against Magten's motion to lift the automatic stay to pursue its fraudulent transfer claim;

- moved to dismiss, unsuccessfully, Magten's Fraudulent Transfer action on the grounds that Magten had no standing due to the way the transaction was structured;

- argued unsuccessfully against the motion of the McGreevey Class Action Claimants (the "McGreevey Class") to challenge the transaction as fraudulent (notwithstanding the fact that Northwestern and Clark Fork had executed a stipulation, the very same day as the Fraudulent Transfer, preserving the claims of the McGreevey class), see McGreevey Decision, A915-A917;

- argued successfully against Comache Park LLC's ("Comache") untimely motion to lift the automatic stay to pursue the same Fraudulent Transfer claim;

- structured and drafted the Debtor's plan of reorganization (the "Plan"), which assigned rights and priorities to the various creditors of Northwestern based upon the results of the Fraudulent Transfer, and favored certain, creditors over others, including Magten and similarly situated creditors, see Disclosure Statement, A890;

- placed, in the Plan, the QUIPS holders in their own separate class of unsecured creditors and forced them to choose between receiving the distribution that other similarly situated creditors would receive under the Plan or continuing with their Fraudulent Transfer claims, see Disclosure Statement, IV(C)(1)(h), A827-A830;

- defended the Plan against Magten's and other's objections that it unfairly favored certain classes of creditors over others and cemented the Fraudulent Transfer; and

- used Magten's appeal of the Plan confirmation to argue that a stay of Magten's fraudulent transfer case was warranted, because the matters were legally and factually intertwined.

In taking these actions to defend and preserve the Fraudulent Transfer, Paul Hastings was not acting purely in its capacity as a fiduciary to the estate and all of its creditors. It was covering its own hide.

## II.    Procedural History Of The Disqualification Motion

### A.    Paul Hastings' Initial Disclosures Were False And Misleading

Northwestern filed for bankruptcy on September 14, 2003. On September 17, 2003, Paul Hastings' applied for employment as counsel to the Debtor and submitted the Affidavit of Jesse Austin III (the "Initial Affidavit") A375-A389. As required by Federal Rule of Bankruptcy Procedure 2014(a), and Delaware Local Rule 2014-1(a), Paul Hastings was required to disclose "all of [its] connections with the debtor, creditors or any other party in interest." Instead, Paul Hastings proffered only the following language about its representation of Clark Fork:

> Paul Hastings represents the Debtor and Clark Fork and Blackfoot, LLC, a wholly-owned subsidiary of the Debtor, in an action entitled <u>McGreevey v. Montana Power Company, et al.</u>, (Case No. CV-03-01-BU-SHE) pending in United States District Court for the District of Montana <u>which is related to facts and occurrences which arose prior to Paul Hastings' representing the Debtor with respect to the Corporate Matters.</u>[6]

---

[6] "Corporate Matters" was defined, in relevant part, as "assisting the Debtor in connection with the acquisition and disposition of assets" beginning in late 2001. Initial Affidavit, A380, at ¶ 13.

Initial Affidavit, A382, ¶ 18 (emphasis added).  This disclosure regarding Clark Fork was false and misleading in a number of respects.

First, the Initial Affidavit affirmatively omitted that Paul Hastings represented Clark Fork in connection with the transaction at the heart of this bankruptcy proceeding. Second, the description of the <u>McGreevey</u> lawsuit as only related to events occurring prior to Paul Hastings' assisting the Debtor to acquire and dispose of assets in 2001, was also false and misleading.  That description was false because the purchase of Clark Fork from the Montana Power Company and the ultimate disposition of its assets, in fact, constituted the central matters of contention in the <u>McGreevey</u> lawsuit.  Indeed, in order to avoid the <u>McGreevey</u> Court issuing an injunction against the Fraudulent Transfer, Northwestern and Clark Fork executed a stipulation preserving the McGreevey Class' rights to contest the Fraudulent Transfer.  McGreevey Decision, A915-A917.  Third, that description was false because Paul Hastings claimed that the <u>McGreevey</u> lawsuit concerned events occurring before Paul Hastings began its representation in 2001.  In fact, Paul Hastings began its representation of the Debtor in 1999.

### B.    Paul Hastings Stubbornly Resists Making Full And Complete Disclosure

In response to increased concerns from Magten that Paul Hastings' involvement in the Fraudulent Transfer had gone deeper than it was willing to admit, Paul Hastings continued to remain silent.  Thus, by letter dated, March 30, 2004 (A5-A7), and by follow-up letter dated April 16, 2004 (A8), Magten informed Paul Hastings of its belief that Paul Hastings may have represented both parties in structuring and implementing the Fraudulent Transfer, and repeatedly demanded Paul Hastings make disclosure and withdraw as counsel if it was not in fact disinterested as Magten had come to suspect.

Paul Hastings had shown an irrational bias in dealing with the Fraudulent Transfer in negotiations over any plan of reorganization, thus triggering Magten's concerns. Paul Hastings ignored Magten's demands, and instead successfully petitioned the United States Trustee to remove Magten from the creditors committee on the grounds that *Magten's* challenge to the Fraudulent Transfer presented an impermissible conflict.

Receiving no answer to its repeated requests, on May 11, 2004, Magten filed a statement pursuant to 11 U.S.C. § 328(c) (A1-A9), formally asserting that Paul Hastings was no longer disinterested and that it should be denied fees on account of such lack of disinterestedness. On June 2, 2004, Paul Hastings filed a response to Magten's 328(c) statement (A10-A75), again omitting to disclose its role in the transaction. Instead, Paul Hastings self-servingly asserted that it was still disinterested and staunchly refused to withdraw from representing the Debtor.

Paul Hastings abruptly reversed course one week later with its filing of a Second Supplemental Disclosure which announced that it would be withdrawing from its representation of the Debtor in connection with Magten's Adversary Proceeding to avoid the Fraudulent Transfer. A144-A150. Paul Hastings again failed to disclose its actual role in the transaction, disingenuously claiming it had withdrawn merely to avoid the appearance of impropriety. Id.

Prodded by the Bankruptcy Court at a hearing in June concerning Magten's 328(c) Statement to make full disclosure, Paul Hastings finally admitted not only had it been involved in the Fraudulent Transfer, but that it had represented both parties as the principal draftsman of the transaction. In its supplemental affidavit, which it filed in July 2004 (the "July Affidavit") together with its opposition to the disqualification motion, Paul Hastings revealed that it actually began its representation of the Debtor in December

12

1999 and its very first representation concerned "possible acquisitions by the Debtor, either directly or indirectly through wholly owned subsidiary corporations" resulting in the acquisition of Clark Fork. July Affidavit, A230 at ¶ 8. Additionally, in the July Affidavit, Paul Hastings finally admitted that, in fact

> Paul Hastings represented both the Debtor and [Clark Fork] with respect to (a) regulatory matters before the Federal Energy Regulatory Commission, (b) certain filings which had to be made with the Securities Exchange Commission concerning exemptions from the Public Utility Holding Company Act of 1935 ("PUHCA"), in coordination with PUHCA counsel Baker & Botts LLP, and (c) <u>the transfer from [Clark Fork] to the Debtor of the transmission and distribution utility assets previously owned by Montana Power and the assumption of related debt obligations (sometimes referred to as the "going flat" transaction)</u>.

July Affidavit, A231, ¶ 11. Thus, not only was Paragraph 18 of the Initial Affidavit deliberately designed to obfuscate Paul Hastings' role, but for nine months of the bankruptcy case, Paul Hastings succeeded in hiding the fact that it had represented both Clark Fork and Northwestern on the billion dollar transfer of assets constituting "the heart of this case."

### C.    The Motion To Disqualify

On June 18, 2004, after months of calculated stonewalling from Paul Hastings, its repeated attempts to question Paul Hastings having failed, Magten brought its motion to disqualify. Magten argued that Paul Hastings: (i) was not disinterested and held an interest adverse to at least some of the estate's creditors because it could not scrutinize the disputed transaction in an unbiased fashion for the benefit of all creditors due to its representation of both parties to the disputed transaction; (ii) held an actual conflict because of its previous dual representation of Clark Fork and Northwestern on the disputed transaction; and (iii) had violated its duty of candor to the Court by making

13

repeated, false and misleading disclosures regarding its previous representation of Clark Fork. A76-A89.

In opposition, Paul Hastings maintained that it held no interest adverse to Northwestern's estate. A182, A185. Paul Hastings further represented to the Bankruptcy Court that Clark Fork's Board of Directors had approved the Fraudulent Transfer, and consented to the firm's dual representation. A178; July Affidavit, A231 at ¶ 11. Paul Hastings argued that obtaining the Clark Fork Board's consent showed that it had not acted in any way adverse to Clark Fork's interest, A182-A183, and that Paul Hastings could not be disqualified for failing to disclose a non-existent conflict. A187; July Affidavit, A231 ¶ 11. As Paul Hastings should well know as experienced bankruptcy counsel, while conflicts waivers from the parties may suffice in a commercial setting, settled law in the bankruptcy context considers them irrelevant and no substitute for judicial review after full disclosure of all connections to the Debtor and parties in interest and any of the Debtor's prepetition transactions.[7]

Even worse, Paul Hastings' statement to the Bankruptcy Court turned out to be patently false. Paul Hastings admitted a week after the disqualification motion was decided in their favor, that Clark Fork never even had a Board of Directors. See A612;

---

[7] See In re Git-N-Go, Inc., 321 B.R. 54, 60 (Bankr. N.D. Okla. 2004) (holding that the procurement of conflict waivers by debtor's proposed counsel in order to represent both parent and subsidiary was irrelevant in the bankruptcy context because ". . . the Debtor, as a fiduciary, may not waive conflicts on behalf of the estate."), citing In re Environdyne Indus., Inc. 150 B.R. 1008, 1016, 1018 (Bankr. N.D.Ill. 1993); In re Amadura Corp., 121 B.R. 862, 866 (Bankr. D. Colo. 1990)("what may be acceptable in a commercial setting, where all of the entities are solvent and creditors are being paid, is not acceptable when those entities are insolvent and there are concerns about intercompany transfers and the preference of one entity and its creditors at, perhaps, the expense of another")(emphasis added).

infra at 17.[8]  Having represented Clark Fork in the disputed transaction, and ostensibly having received the Clark Fork Board's so-called consent, Paul Hastings had to know that "fact" was false when it put that "fact" before the Court under oath in the July Affidavit.

In a footnote on page 13 of its 16 page memorandum of law opposing the disqualification motion, for the first time in the bankruptcy case, Paul Hastings hinted that it had made "full and complete disclosure" "from the United States Trustee's standpoint. . . ." A187 at n.9.  However, in that carefully crafted footnote at the end of its brief, Paul Hastings never revealed the substance of its alleged communications with the United States Trustee's office, or, more to the point, that it confessed its role as counsel to both sides of the Fraudulent Transfer to the United States Trustee.  All it said was

> [n]otably, Paul Hastings has been in continuous communication with the U.S. Trustee's office regarding Paul Hastings' engagement as the primary bankruptcy counsel for the Debtor.

Id.  "Notably," Paul Hastings did not make this "disclosure" in its sworn July Affidavit, which was submitted together with its memorandum opposing the disqualification motion.

At the July 15, 2004 hearing on the disqualification motion ("Disqualification Hearing"), while proffering the secret disclosure as evidence Paul Hastings had nothing to hide, its counsel virtually parroted the language set forth in footnote 9, but gave no further detail about the substance of the alleged disclosure. See Disqualification Hearing Transcript, A561 ("Throughout this case – from the time of the initial filing – Paul Hastings has been in continuous communication with the U.S. Trustee").  He left that to

---

[8] Paul Hastings produced documents after the disqualification motion was decided that confirmed this as well.  A614-A622.

the U.S. Trustee.    Id.    However, the U.S. Trustee's counsel's account of the communications hardly put the matter to rest.

Instead, as explained further below, his presentation highlighted the fact that he accepted the validity of Paul Hastings' account of the transaction "at the heart of this case" with anything but a critical eye.  He accepted those explanations without question:

> In my discussions with Carol Dennison [co-lead counsel for Paul Hastings] – you know, she had fully explained exactly how the acquisition of the Montana Power assets came down.  And it was interesting.  I mean, I had never even looked at it as a potential for a conflict, or even a representation of what was truly a separate entity, because it seemed like the way the acquisition was structured, there was no real going flat transaction.

A567 (emphasis added).

Under these circumstances, it is simply not possible that experienced, sophisticated bankruptcy counsel like Paul Hastings accidentally or inadvertently failed to make the disclosures it was obligated to make to the Bankruptcy Court and all interested parties.  Even so, the motion to disqualify was denied.

### D.    Disposition of the Motion Below

The Decision dated July 23, 2004 (A590-A597), the Bankruptcy Court denied Magten's motion to disqualify Paul Hastings.  As a threshold matter, the Bankruptcy Court found that Paul Hastings' disclosure was inadequate, (Decision, A594), but relying on the secret disclosure to the United States Trustee's office and the false allegation that Clark Fork's Board had consented to Paul Hastings' dual role, the Bankruptcy Court found that the record did not evidence any intent to conceal on Paul Hastings' part. A595.

Next, the Bankruptcy Court found that Magten was in no position to challenge Paul Hastings' role as counsel for the Debtor based on its dual representation of Clark Fork and Northwestern on the Fraudulent Transfer, at least not yet, if ever.  A596-A597. The Bankruptcy Court based its finding on three factors, none of which were supported by citations to any case law, much less controlling principals of bankruptcy law.

First, it held that Magten was not injured by the Fraudulent Transfer, and therefore could not challenge Paul Hastings representation in connection with it.  A596. Second, it held that no actual conflict existed because Magten's allegations regarding the Fraudulent Transfer had not yet been proven in its Adversary Proceeding.  Id.  Finally, it held that Paul Hastings held no adverse interest to any class of Northwestern's creditors, because Magten did not claim that it was injured in its capacity as a creditor of Northwestern.  A596-A597.

In reaching these conclusions, the Bankruptcy Court specifically relied upon Paul Hastings' sworn representations that "the transaction was approved by the boards of directors of each company and perceived by them to be in the best interests of those companies."  A596.  However, seven days after the Bankruptcy Court ruled on the disqualification motion, and no longer burdened by the threat of disqualification, Paul Hastings produced documents revealing, and then represented at a deposition of Northwestern's Chief Restructuring officer, that Clark Fork did not have any board of directors.  See A604-A622.

On August 2, 2004, based upon the new disclosures, Magten moved for reconsideration of the Bankruptcy Court's Decision.  By Order entered August 19, 2004, the Bankruptcy Court denied the motion for reconsideration on the grounds that Paul

Hastings' incorrect statement did not have a determinative effect on the Decision.  Order,

A654.

     This timely appeal followed by Magten's filing of a Notice of Appeal on August

24, 2004.

## STANDARD OF REVIEW AND JURISDICTION

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a). When exercising appellate jurisdiction, the District Court must review the Bankruptcy Court's findings of law de novo and reviews its findings of fact under a clearly erroneous standard. See Accardi v. IT Corp. (In re The IT Group, Inc.), 323 B.R. 578, 580 (D. Del. 2005) (Farnan, J.). In reviewing mixed questions of law and fact, this Court must undertake a plenary review of the Bankruptcy Court's "choice and interpretation of legal precepts and its application of those precepts to the historical facts." Accardi, 323 B.R. at 580, *quoting* Mellon Bank, N.A. v. Metro Comms., Inc., 945 F.2d 635, 642 (3d Cir. 1991).

Determinations of disqualification motions are final orders granting this court appellate jurisdiction pursuant to 28 U.S.C. § 158(a)(1). See In re BH & P, Inc., 949 F.2d 1300, 1307 (3d Cir. 1991). The confirmation of Northwestern's Plan of Reorganization does not moot this appeal, as Paul Hastings fees are still subject to disgorgement. See In re Pillowtex, Inc., 304 F.3d 246, 250 (3d Cir. 2002).

Finally, "doubts as to the existence of a conflict of interest should be resolved in favor of disqualification." Pressman-Gutman Co. v. First Union Nat'l Bank, No.CIV.A. 02-8442, 2004 WL 2743582 (E.D.Pa. Nov. 30, 2004) (attached as Ex. A). [9]

---

[9] Note, this case was later vacated to the limited extent necessary to extend, by 30 days, the plaintiff's time to employ new counsel.

**ARGUMENT**

<u>**PAUL HASTINGS SHOULD BE DISQUALIFIED AS DEBTOR'S COUNSEL**</u>

I.    **The Bankruptcy Court Erred As A Matter Of Law By Holding**
      <u>**That Magten Could Not Challenge Paul Hastings' Retention**</u>

"Standing to raise issues before the bankruptcy court, and the question of whether appellees are indeed "parties in interest" under 11 U.S.C. § 1109(b), are questions of law which are reviewed *de novo*." <u>Baron & Budd, P.C., v. Unsecured Asbestos Clmnts. Comm.</u>, 321 B.R. 147, 158 (D.N.J. 2005). Section 1109(b) of the Bankruptcy Code provides that any party in interest, including a creditor, "may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. 1109(b). Moreover, under Section 327(a), any party in interest has standing to challenge the employment of debtor's counsel. <u>See</u> In re Mundo Custom Homes, Inc., 214 B.R. 356, 360 (N.D. Ill. 1997). The basic test governing the right to be heard is whether a party has a sufficient stake in the outcome of the proceeding so as to require representation. <u>Baron & Budd</u>, 321 B.R. at 158 (citation omitted). "A 'sufficient stake' to be considered a party-in-interest can be a pecuniary interest that is directly or adversely affected." <u>Id.</u> (citation omitted). The Bankruptcy Court clearly erred as a matter of law when it held that Magten, which undisputedly holds a pecuniary interest as one of the Debtor's creditors, could not challenge Paul Hastings' retention as Debtor's counsel. Decision, A596.

Quite the contrary, where parties are parties in interest under §1109(b) with respect to plan confirmation, "for the very same reasons, they are also parties in interest with respect to" disclosures required of professionals under the Bankruptcy Rules. <u>Baron & Budd</u>, 312 B.R. at 159-60. Standing is particularly appropriate when a party, who will

suffer under a confirmation plan because of counsel's conflict of interest, raises concerns with that counsel's representation. See id. at 161.

In Baron & Budd, the Court found that non-creditor insurers were parties in interest under the Bankruptcy Code, allowing them to challenge counsel's disclosure, because the Plan at issue there was not "insurance neutral." The district court further found that because "the information sought in the Rule 2019 disclosures[] does indeed bear on the overall fairness of this Plan, it is clear that the Insurers have standing to raise [] Rule 2019 compliance issues." Id. at 160. As explained further below, so does Paul Hastings' failure to disclose its role in the Fraudulent Transfer. See infra at IV.

The Baron & Budd court's analysis is also instructive because it found that all the insurers need do for standing to challenge the Rule 2019 disclosures was "allege an injury in fact." See id. at 161. As even the Bankruptcy Court noted here, Magten has done that in its fraudulent conveyance action. See Decision, A596. As was the case for the insurers in Baron & Budd, the injury the Magten has alleged is "the unfairness of a plan which binds them contractually and which directly impacts their financial interests, unfairness which is traceable to conflicts of interest [and lack of disinterestedness of Paul Hastings]." Id. at 161 (emphasis supplied). Thus, Magten's financial interest at stake in the Plan rendered it precisely the most appropriate party to raise the disqualification issue. And, yet, in contravention of the clear language of the statute, the Bankruptcy Court held that Magten could not challenge Paul Hastings suitability to represent the Debtor. Its finding in this regard should be reversed.

II.    **The Bankruptcy Court Erred When It Failed
       To Find Paul Hastings Is Not Disinterested**

Pursuant to Section 327(a) of the Bankruptcy Code, all persons employed by the

Debtor must be disinterested.  11 U.S.C. § 327(a).  A disinterested person is defined by

Section 101(14) as someone who has no "interest materially adverse to the interest of the

estate or to any class of creditors or equity security holders."  11 U.S.C. §101(14)

(emphasis supplied).  A materially adverse interest is either an economic interest where

the professional could take away value or a bias or predisposition.  See In re 22

Acquisition Corp., No.CIV.A. 03-3059, CIV.A. 02-907, 2004 WL 870813 at *2 (E.D. Pa.

Mar. 23, 2004) (defining materially adverse interest in the context of an interest adverse

to the estate) (attached as Ex. B).[10]  As shown below, Paul Hastings held a material

interest adverse to a class of creditors because of its proprietary view of the Fraudulent

Transfer.

According to the Bankruptcy Court, Magten claims injury in this case, and its

fraudulent conveyance action solely "in its non-existent capacity as a creditor of Clark

Fork." Decision, A596-A597.  From that, the Bankruptcy Court concluded that Magten

could not demonstrate that Paul Hastings had no adverse interest to the estate.  This

makes no sense, and it is belied by the record.  The Bankruptcy Court ignored the fact

that Magten's pecuniary interest arises from substantive financial rights as a QUIPS

holder, which will be adversely affected by a Plan drafted by Paul Hastings.  It also

completely ignored the fact that Paul Hastings' view of the validity of the Fraudulent

Transfer is as tainted as the transaction itself.

---

[10] According to the statute, the prohibition against a holding a "materially adverse interest" applies equally
to the estate, any class of creditors and any class of equity holders.  11 U.S.C. §101(14).

Recently, in In Re Git-N-Go, Inc., 321 B.R. 54, 59 (Bankr. N.D. Okla. 2004) the court elaborated on the impropriety of counsel representing the debtor-in-possession after it represented both the subsidiary and the parent on a guarantee agreement in which the Debtor pledged all of its pre-petition assets as security.   Denying the application of Conner & Winters to represent Git-N-Go, the Court reasoned:

> at this early stage, it already appears it will be essential for the debtor-in-possession and its counsel to scrutinize the interrelationship of and recent transactions between the Debtor, [its parent], [its secured creditor], [a sister subsidiary] and [a creditor of the sister sub] to fulfill their fiduciary duties.   Unfortunately, Conner & Winters not only maintains an attorney/ client relationship with many of these parties, but having counseled some of the these parties in the very transactions that deserve examination, Conner & Winters cannot provide the objective and independent advice regarding the validity or propriety of these transaction as is required for the Debtor's performance of its fiduciary obligations.

In re Git-N-Go, 321 B.R. at 59.

Here, Paul Hastings took steps to hide its prior representation of Clark Fork so that no Git-N-Go analysis could ever be performed by the Bankruptcy Court or any parties in interest with an economic stake in the proceedings.   Importantly, the Git-N-Go court noted that having advised both sides of the transactions at issue in the bankruptcy on the merits of those transactions, "Conner & Winters already formed a belief prepetition, which it has carried into its postpetition representation, that the transactions between the Debtor, [the parent] and [the secured creditor] are valid, non-preferential, and in [the secured creditor's case], properly perfected."   Id. at 61.   See also In re Envirodyne Indus., Inc., 150 B.R. 1008, 1016 (Bankr. N.D. Ill. 1993) (counsel was not disinterested where it had prejudged the validity of a leveraged buy-out which it had

helped to draft and where that transaction formed the basis of potential claims against the estate and would necessarily impact any reorganization plan).

Thus, Paul Hastings held an interest adverse to the creditors like the QUIPS holders. It wanted to see their claims fail so as to protect the transaction it had structured, as well as to reduce its own liability and to protect its own handiwork. As explained by the court in In re Git-N-Go, Paul Hastings should never have undertaken that representation due to its inextricable connection to the tainted transaction.

### III.    Paul Hastings Should Have Been Disqualified For Its Actual Conflict of Interest

The Bankruptcy Court incorrectly put the cart before the horse when it found that Magten had to prove that the contested transfer of 66% of the estate reorganization assets constituted a fraudulent transfer before any conflict of interest arose. Decision, A596. There is absolutely no basis in fact or law for the proposition that a party needs to prove actual injury to show a disqualifying conflict. The Bankruptcy Court misapplied Third Circuit law regarding conflict of interests in bankruptcy cases.

In re BH & P, Inc., 949 F.2d 1300, 1315 (3d Cir. 1991) the Third Circuit upheld the Bankruptcy Court's determination that an actual conflict existed which disqualified counsel from representing inter-related corporate debtors, reasoning that "the 'actuality' of the conflict… was the possibility that the parties would favor one estate over the other in their attempt to serve them all." (adopting language of District Court) (emphasis added). Thus, an actual conflict is a situation where counsel would be tempted to show impermissible favoritism. See also In re Pillowtex, Inc., 304 F.3d 246, 251 (3d Cir. 2002) ("we stated that a conflict is actual, and hence per se disqualifying, if it is likely

that a professional will be placed in a position permitting it to favor one interest over an impermissibly conflicting interest.")(emphasis added).

In other words, the Bankruptcy Court's's ruling that Paul Hastings' conflict would not come into existence until the Fraudulent Transfer claims were resolved missed the point entirely.   As long as Paul Hastings was in a position where it <u>was likely</u> to favor the interests of its client Northwestern, or certain of its creditors over creditors of the estate with competing interests, it held an actual conflict.  And it was in such a position.

In its analysis, the Bankruptcy Court gave short shrift to Paul Hastings' conflict of interest due to its multiplicity of roles in Northwestern's bankruptcy.   During the bankruptcy proceedings, Paul Hastings effectively wore four hats:  (1) as Clark Fork's former counsel on the Fraudulent Transfer, with duties to Clark Fork and to Clark Fork's creditors; (2) as Northwestern's counsel on the Fraudulent Transfer, with duties to Northwestern and Northwestern's creditors;  (3) as an individual defendant for having designed and aided the Fraudulent Transfer; and (4) as counsel to the Debtor-in-possession, with duties to the Court and to all creditors of Northwestern (including the Clark Fork Creditors which through Paul Hastings' prepetition  activities had been pulled into the estate).  These four roles were mutually inconsistent and Paul Hastings should never have been allowed to serve as Debtor's counsel.  <u>See</u> <u>In re Git-N-Go</u>, 321 B.R. at 59, 60, 61.  This Court should rule that no single law firm can wear this many hats in a single bankruptcy.

IV.    **The Bankruptcy Court Abused Its Discretion By
Refusing To Disqualify Paul Hastings' For Its Deliberate
<u>Lack Of Candor In Its Employment Application</u>**

Pursuant to Bankruptcy Rule 2014, professionals seeking employment by the
Debtor must disclose "all of the person's connections with the debtor, creditors [or] any
other party in interest." Bankr. R. Civ. 2014. This requirement is strictly construed. <u>See</u>
<u>In re The Leslie Fay Cos., Inc.</u>, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994). ("All facts
that may have any bearing on the disinterestedness of a professional must be disclosed.
Consistent with the duty placed upon a professional it is the responsibility of the
professional, not of the court, to make sure that all relevant connections have been
brought to light."). <u>See</u> <u>also</u> <u>In re B.E.S. Concrete Products, Inc.</u>, 93 B.R. 228, 236
(Bankr. E.D. Cal. 1988) ("It is not sufficient that the information might be mined from
petitions, schedules, section 341 meeting testimony, or other sources. The burden is on
the person to be employed to come forward and make full, candid and complete
disclosure.").

Here, the Bankruptcy Court abused its discretion by failing to disqualify Paul
Hastings for its admittedly "inadequate" disclosure, even after finding that Paul Hastings
was so concerned about its conflict that it discussed it secretly with the United States
Trustee. Decision, A594-A595. In the BH & P Bankruptcy proceedings, the trustee and
the trustee's counsel also secretly discussed the question of their conflicts with the United
States Trustee arising out of the existence of inter-corporate claims, <u>In re BH&P</u>, 949
F.2d at 1317, just as Paul Hastings claims it did here. In that case, the Third Circuit held
that the obligation to disclose even possible conflicts

> belongs to the party who seeks employment by the estate,
> and although it may not be so onerous as to require the
> party to raise with the court every imaginable conflict

26

> which may occur in a bankruptcy, <u>it certainly compels
> disclosure where, as here, the party had contemplated and
> discussed a specific situation involving a potentiality for
> conflict.</u>

<u>Id</u>. at 1317-18 (adopting the language of the District Court) (emphasis supplied).  Thus,

in the face of controlling authority, the Bankruptcy Court should have held that Paul

Hastings' alleged contemplation and discussion of its conflict <u>compelled</u> its disclosure to

the Bankruptcy Court and all parties in interest to this case.  Instead, the Bankruptcy

Court wrongly held that such contemplation and discussion <u>excused</u> its disclosure.

Permitting Debtor's counsel to make secret disclosure to the United States Trustee

in lieu of the disclosures mandated under the Bankruptcy Code seriously undermines the

purpose of the disclosure requirements.  Here, neither the Court, Magten nor any other

creditor know precisely what Paul Hastings disclosed to the U.S Trustee.  They still do

not.  Indeed, even the representations offered by the U.S. Trustee at the Disqualification

Hearing do not specifically describe what Paul Hastings secretly disclosed to the U.S

Trustee.  <u>See</u> Disqualification Hearing Tr., A567-A569.  Remarkably, to this day, Paul

Hastings has never disclosed the substance of these private communications.  The most

Paul Hastings has committed to is that they were in "constant communication" with the

U.S. Trustee's office "regarding Paul Hastings' engagement as the primary bankruptcy

counsel for the Debtor." A187, n.9.

Moreover, the U.S. Trustee's statements at the Disqualification Hearing

underscore why secret disclosure can never replace the safeguard of full disclosure to all

parties with a stake in the outcome of the bankruptcy case and the Court.  According to

the U.S. Trustee's attorney, he was only exposed to Paul Hastings' account of the

Fraudulent Transfer – that the Fraudulent Transfer was actually one stage in a single

acquisition of assets and thus could not be challenged. Disqualification Hearing Tr., A567-A568. Thus, the U.S. Trustee accepted Paul Hastings' version of the Fraudulent Transfer as a facially valid transaction as a *fait accompli*. Disqualification Hearing Tr., A567 ("I mean, I had never even looked at it as a potential for conflict . . . ."). As a corollary, the U.S. Trustee also accepted the propriety of Paul Hastings' employment without question, having gained its understanding of the transaction through the lens of Paul Hastings' view of events. That the U.S. Trustee's office may have given Paul Hastings its blessing to proceed as Debtor's counsel is beside the point. This is precisely the reason that the Bankruptcy Code requires disclosure to all parties in interest and the employment of completely unbiased counsel who will examine all of the debtor's prepetition acts with a fresh, untainted eye. See In re Git-N-Go, 321 B.R. at 61.

At the very least, Paul Hastings had a responsibility to disclose its involvement with all transactions likely to come under dispute during the bankruptcy. As the In re Git-N-Go court explained,

> Conner & Winters [proposed Debtor's counsel] cannot perform an unbiased, fresh review of transactions between the Debtor and [the parent], and among the Debtor, [the parent], and [the secured creditor] in which Conner & Winters advised the parties.

Id.; accord In re Statewide Pools, Inc., 79 B.R. 312, 314 (Bankr. S.D. Ohio 1987) ("An attorney's role in drafting certain of the debtor's documents may give him an interest in preserving the integrity of certain transfers effectuated by these documents. That interest could be adverse to the estate or produce an actual conflict should such transfers be challenged."). There is no question that Paul Hastings was on notice as early as the very same day that the transaction took place that multiple parties would challenge the Fraudulent Transfer. See McGreevey Decision, A915-A917.

The fact that Paul Hastings allegedly made secret disclosure to the U.S. Trustee, and that this only came to light on the disqualification motion, only strengthen the conclusion that they knew all along that their dual role in the Fraudulent Transfer presented a problem that should have been "vetted" publicly in a forum where their self-serving explanations could be viewed with a jaundiced eye.  So does the fact that Paul Hastings apparently felt the need to say, also for the first time in connection with the disqualification motion, that it obtained consent from the non-existent Board of Directors of Clark Fork to undertake a role as counsel to both sides of the Fraudulent Transfer.  In fact, if one accepts the fact that, at the time of the transaction, Paul Hastings obtained consent from anyone for the dual representation, it had to be then fully cognizant of the conflict it has fought so hard to deny in these proceedings.

Thus, the conclusion is inescapable that Paul Hastings knowingly withheld full disclosure from the Court and from the creditors.  On this record, Paul Hastings' characterization of its obstructionist conduct – i.e., ignoring Magten's direct inquiries over a number of months, admittedly improper omissions from its omissions from its retention application and supplemental affidavits and flat-out misrepresentations to the Bankruptcy Court – as "inadvertent" is simply not credible.

## CONCLUSION

For all of the foregoing reasons, appellant Magten Asset Management Corporation respectfully requests that this Court reverse the Bankruptcy Court's August 19, 2004 Order denying Magten's motion to disqualify Paul Hastings as counsel to the Debtor in this bankruptcy case, and enter an Order disqualifying Paul Hastings from representing the Debtor in this bankruptcy case, together with such other and further relief as this Court deems just and proper.

Dated: June 28, 2005                              SMITH, KATZENSTEIN & FURLOW LLP


                                                  David A. Jenkins (I.D. No. 932)
                                                  Kathleen M. Miller (I.D. No. 2898)
                                                  800 Delaware Avenue [19801]
                                                  Post Office Box 410
                                                  Wilmington, DE 19899-0410
                                                  Phone: (302) 652-8400

*Of Counsel:*
STORCH AMINI & MUNVES PC
Bijan Amini, Esq.
Lita Beth Wright, Esq.
Avery Samet, Esq.
2 Grand Central Tower
New York, New York 10017
Phone: (212) 490-4100