# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| NORTHWESTERN CORPORATION, | Case No. 03-12872 (CGC) |
| Debtor. | |
| MAGTEN ASSET MANAGEMENT CORP. | |
| Appellant, | Civil Action No. 04-1279 JJF |
| v. | |
| PAUL HASTINGS JANOFSKY & WALKER LLP, | |
| Appellee. | |

### APPENDIX TO
### OPENING BRIEF ON APPEAL OF MAGTEN ASSET MANAGEMENT
### <u>CORPORATION VOLUME I</u>

SMITH, KATZENSTEIN & FURLOW LLP
David Jenkins (I.D. No. 932)
800 Delaware Avenue [19801]
Post Office Box 410
Wilmington, DE 19899-0410
Phone: (302) 652-8400

*Of Counsel:*
STORCH AMINI & MUNVES PC
Bijan Amini, Esq.
Avery Samet, Esq.
2 Grand Central Tower
New York, New York 10017
Phone: (212) 490-4100

{10004226.DOC}

UNITED SATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| Northwestern Corporation, | ) | |
| | ) | Case No. 03-12872(CGC) |
| Debtor. | ) | |

## STATEMENT PURSUANT TO § 328(c)
## REGARDING PAUL HASTINGS JANOFSKY & WALKER LLP

Magten Asset Management Corporation ("Magten") states:

      1.    Under § 328(c) of the Bankruptcy Code, the Court may deny compensation for services and reimbursement of expenses of a professional person employed under §§ 327 and 1103 of the Bankruptcy Code if at any time during that person's professional employment, that person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

      2.    On September 17, 2003, the Debtor applied to retain Paul Hastings Janofsky and Walker LLP ("Paul Hastings"). In connection with that application, Paul Hastings submitted the Affidavit of Jesse Austin III stating, among other things, that Paul Hastings was a disinterested person as defined by §§ 101(14) and 1107(b) of the Bankruptcy Code.

      3.    On October 10, 2003, the Court approved the application to employ Paul Hastings.

      4.    On April 8, 2004, the Court lifted the Automatic Stay to permit Magten and Law Debenture Trust Company of New York to commence an adversary proceeding seeking to avoid certain fraudulent transfers.

**A1**

5.    On April 16, 2004, Magten and Law Debenture Trust Company of New York filed a Complaint to Avoid the Transfer of Assets of Clark Fork and BlackFoot LLC to Northwestern Corporation.

6.    Due to the events, discussed below, Paul Hastings is no longer disinterested.

7.    On February 15, 2002, Paul Hastings served as counsel to the Debtor on the purchase of the Montana Power Company LLC, a subsidiary owning significant energy assets of the Montana Power Company and later renamed Northwestern Energy LLC and then Clark Fork and Blackfoot LLC (hereinafter, "Clark Fork").

8.    On November 15, 2002, Paul Hastings served as counsel to Clark Fork and the Debtor in connection with the Asset Transfer Agreement, which transferred substantially all of the assets of Clark Fork to the Debtor, a transaction which the creditors of Clark Fork claim was fraudulent.

9.    By letter dated March 30, 2004, Magten requested Paul Hastings to withdraw from representing the Debtor in connection with any adversary proceedings concerning the transaction that Paul Hastings structured and effectuated. To date, Paul Hastings has refused to respond to their request (see correspondence annexed hereto as Exhibit A).

10.    On April 8, 2004, Paul Hastings represented the Debtor before this Court in arguing against the lifting of the automatic stay and in favor of preventing the Clark Fork creditors from moving to avoid as fraudulent the very transaction that Paul Hastings structured.

11.    Therefore, not only has Paul Hastings structured and effectuated the very transfer at stake in pending litigation, but it has also argued to prevent the transfer from being attacked.

-2-

**A2**

12.    To date Paul Hastings, has not, despite request, removed itself from representing the Debtor in the Adversary Proceeding to avoid this transfer as fraudulent.

13.    Prior to approving the payment of any further fees, the Court and the United States Trustee should examine Paul Hastings' status as a disinterested party.

14.    Because it is likely that Paul Hastings will be found to be not disinterested, and will be required to disgorge fees received from the Debtor, in the event Paul Hastings does remain counsel to the Debtor, Paul Hastings should be required to either (i) post a bond on an interim basis to secure its ability to satisfy any disgorgement order or (ii) the amount of the hold back under the Order Establishing Procedures for Payment of Interim Compensation and Reimbursement of Expenses to Professionals should be significantly increased.

SMITH, KATZENSTEIN & FURLOW LLP

David A. Jenkins
800 Delaware Avenue [19801]
Post Office Box 410
Wilmington, DE 19899-0410
(302) 652-8400
*Attorneys for Creditor*
*Magten Asset Management Corporation*

May 11, 2004

OF COUNSEL:

STORCH, AMINI & MUNVES, P.C.
Bijan Amini
Avery Samet
405 Lexington Avenue
New York, NY 10174
(212) 490-4100

-3-

**A3**

**UNITED SATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

In re:                                    )
                                          )    Chapter 11
Northwestern Corporation,                 )
                                          )    Case No. 03-12872(CGC)
        Debtor.                           )

**EXHIBIT A TO**
**STATEMENT PURSUANT TO § 328(c)**
**REGARDING PAUL HASTINGS JANOFSKY & WALKER LLP**

**A4**

March 30, 2004


Jesse Austin, III, Esq.
Paul Hastings Janofsky & Walker LLP
600 Peachtree Street, N.W.
Suite 2400
Atlanta, GA 30308

Re:    **In re Northwestern Corporation, Case No. 03-12872 (CGC)**

Dear Mr. Austin:

We have been retained as special conflicts and ethics counsel to Magten Asset Management
Corporation ("Magten"), in connection with Magten's claims against the Debtor in *In re
Northwestern Corporation*, Case No. 03-12872 (CGC).  By reason of your pre-petition
representation of the Debtor in the transactions discussed below, your representation of the
Debtor in connection with all proceedings addressed to those transactions appears to be
prohibited by §§1107 and 327(a) of the Bankruptcy Code as well as Rule 3.7 and Rule 1.7 of the
Model Rules of Professional Conduct adopted by the District of Delaware.

As you know, serious accusations of fraudulent misconduct have been raised by creditors of
Montana Power LLC ("Montana") regarding the November 15, 2002 transfer of substantially all
of Montana's assets to Northwestern (the "Asset Transfer") as well as the December 17, 2002
$390 million senior secured credit agreement (the "New Credit Agreement").  These
transactions, while obviously beneficial to the creditors of Northwestern Corp., appear
detrimental and fraudulent with respect to the creditors of Montana.  To this end, Magten is
currently investigating these transactions for fraud, fraudulent conveyance, breach of fiduciary
duties, and aiding and abetting the breach of fiduciary duties.

As counsel to Northwestern Corp., your firm negotiated and consummated both the Asset
Transfer as well as the New Credit Agreement at stake here.  As such, your firm and your
attorneys will obviously be crucial witnesses in any litigation seeking to uncover the

**A5**

Jesse Austin, III, Esq.
March 30, 2004
Page 2

circumstances in which these transactions occurred.[1]  More importantly, based upon a preliminary review, your firm may very well be subject to liability for aiding and abetting the misconduct undertaken by Northwestern against the creditors of Montana.  Curiously absent from your Affidavit in Support of Application to Employ and Retain Paul Hastings (the "Austin Affidavit") is any reference or even mention of your firm's involvement in the Asset Transfer or the New Credit Agreement which were detrimental and fraudulent as to an entire class of creditors.

Apparently, your firm's exposure to liability has tainted your impartiality in dealing with an entire class of creditors.  On Tuesday, March 16, you argued to the Tribune Capitol Bureau that Magten's position regarding these transactions was "not tenable."  In light of the circumstances, your statement to the press disparaging Magten's claims was inappropriate.  Your potential liability regarding these claims, your lack of impartiality in dealing with them, and your failure to disclose your firm's role in the transactions calls into question your ability to serve professionally as Debtor's counsel.

As you well know, 11 U.S.C. §327(a)'s standard of disinterestedness applies to the employment of professionals by the debtor in possession under §1107 of the Bankruptcy Code.  *See, In re T & D Tool, Inc.*, 125 B.R.116, 119 (E.D.Pa. 1991); *In re Diamond Mortg. Corp. of Illinois*, 135 B.R. 78 (Bankr.N.D.Ill. 1990).  The essence of disinterestedness is that a lawyer be able to make decisions regarding the estate without bias towards his own personal interests.  *See, e.g., In re CVC Invsmt. Corp.*, 192 B.R. 549, 553 (9th Cir. BAP 1996)(a disinterested person must be able to make decisions free of any personal interest or bias); *Matter of Codesco, Inc.*, 18 B.R. 997, 999 (Bankr.S.D.N.Y. 1982)( a "disinterested person should be divested of any scintilla of personal interest.").  Frankly, we fail to see how Paul Hastings can dispassionately navigate between two classes of creditors with conflicting interests when its own liability is at stake.

Your firm clearly holds an interest materially adverse to a class of creditors, the Montana creditors, in contravention of 11 U.S.C. § 101(14)(e) (disinterested person may not hold materially adverse interest to any class of creditors).  It is obviously in Paul Hastings personal interest that the claims of the Montana creditors come up as short as possible; that the Montana creditors' position be found "not tenable."  Furthermore, as you are doubtlessly aware, the Third Circuit has little patience for law firms faced with liability arising out of their activities representing the pre-petition Debtor.  *See, In re Pillowtex, Inc.*, 304 F.3d 246 (3rd Cir. 2002); *In re First Jersey Securities, Inc.*, 180 F.3d 504 (3rd Cir. 1999).

Finally, you should take cognizance of the fact that when interrelated debtors have claims of pre-petition debt against one another, one law firm may not serve as debtor's counsel to both.  *In re Green Street*, 132 B.R. 460 (Bankr.D.Utah. 1991)(one firm may not represent interrelated debtors having claims for pre-petition debt among one another) *affirmed, In re Interwest Buisiness Equipment, Inc.* 23 F.3d 311 (10th Cir 1994).  The existence of even potential claims

---

[1] *See, e.g.*, In re GHR Energy Corp., 60 B.R. 52 (Bankr.S.D.Tex. 1985)(granting motion to disqualify debtor's counsel where attorney was party who ought to be called as a witness in related litigation).

Jesse Austin, III, Esq.
March 30, 2004
Page 3

within this bankruptcy estate should have raised ethical warning signs for your firm aside from your firm's involvement and liability.

Faced with the conflicts described above, we believe your firm has an ethical obligation to withdraw from representation of the debtor in any adversary litigation involving these transactions including the pending motions to lift the automatic stay and to extend the time within which to file a complaint.

We would appreciate your prompt attention to this matter and notification of your course of action.

Sincerely,


Bijan Amini

cc:     Alan Kornberg, Esq.
        Mr. Talton R. Embry

**A7**

**STORCH AMINI & MUNVES, P.C.**
A NEW YORK PROFESSIONAL CORPORATION
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 490-4100 telephone
(212) 490-4208 facsimile

**Bijan Amini**
Member NY and DC Bars
amini@samlegal.com

Washington, DC
Garden City, New York
South River, New Jersey

April 16, 2004

Jesse Austin, III, Esq.
Paul Hastings Janofsky & Walker LLP
600 Peachtree Street, N.W.
Suite 2400
Atlanta, GA 30308

Re:    **In re Northwestern Corporation, Case No. 03-12872 (CGC)**

Dear Mr. Austin:

We still have not received your response to our March 30th 2004 letter. For your convenience that letter is attached. As you know, last week Judge Case lifted the stay to allow the fraudulent conveyance claims of Magten Asset Management Corp. to proceed. In light of this development, we would like to know how you intend to proceed regarding the issues raised in our letter, and specifically whether you intend to refrain from any representation in connection with this matter. Please contact us within five business days to inform us of your decision. I look forward to your prompt reply.

Sincerely,

Bijan Amini

Enclosure

cc:    Seth M. Zachary, Esq.

**A8**

04/19/2004 15:17 FAX 4048152424          Paul, Hastings 1          ☒002/002

**Paul**Hastings

Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, NE, Ste. 2400, Atlanta, GA 30308-2222
telephone 404-815-2400 / facsimile 404-815-2424 / internet www.paulhastings.com

Atlanta
Beijing
Hong Kong
London
Los Angeles
Orange County
San Diego
San Francisco
Shanghai
Stamford
Tokyo
Washington, D.C.

(404) 815-2208
jessaustin@paulhastings.com

April 19, 2004                                                    38910.00006

**VIA FACSIMILE 212-490-4208**

Bijan Amini, Esq.
Storch Amini & Munves, P.C.
The Chrysler Building
405 Lexington Avenue
New York, New York 10174

Re:    NorthWestern Corporation, Chapter 11 Case No. 03-12872 (CGC)

Dear Mr. Amini:

This letter is in response to your letter of April 16, 2004 which I have only received today, April 19. I have been unable to respond to your prior letter dated March 30 because I have been traveling and out of the office on NorthWestern Corporation matters. I anticipate being able to review your March 30 letter over the next few days; however, I will not be able to respond in the five business days as requested in your April 16 letter.

It is my understanding that Magten Asset Management Corporation has now actually filed its proposed complaint and did so on April 16. As a result, upon issuance and service of the summons and complaint NorthWestern will have 30 days to respond to Magten's adversary proceeding. Accordingly, it would appear that we have plenty of time to respond to your March 30 letter and will do so in due course.

Very truly yours,

Jesse H. Austin, III
of PAUL, HASTINGS, JANOFSKY & WALKER LLP

JHA/ld

cc:    Seth M. Zachary, Esq. (via facsimile)
       Alan W. Kornberg, Esq. (via facsimile)

**A9**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| NORTHWESTERN CORPORATION, | ) |
| | ) |
| Debtor. | ) |

Chapter 11

Case No. 03-12872 (CGC)

**RESPONSE OF PAUL, HASTINGS, JANOFSKY & WALKER, LLP
TO STATEMENT PURSUANT TO 11 U.S.C. §328(c) FILED BY
MAGTEN ASSET MANAGEMENT CORPORATION**

Paul, Hastings, Janofsky & Walker, LLP ("Paul Hastings"), by and through its undersigned

counsel, hereby responds to the Statement pursuant to 11 U.S.C. § 328(c) (the "Statement") filed

by Magten Asset Management Corporation ("Magten"), and states as follows:

**PRELIMINARY STATEMENT**

1.      Magten, a creditor of NorthWestern Corporation (the "Debtor"), evidently dissatisfied

with its treatment under the initial Plan of Reorganization (the "Plan"), filed its Statement

challenging Paul Hastings' right to be compensated for the extensive and productive work it has

done on behalf of the Debtor, on the purported ground that Paul Hastings is no longer "disinterested"

under 11 U.S.C. §101(14). The alleged bases for this claim are that (i) Paul Hastings represented

the Debtor in a transaction which Magten now challenges as a fraudulent conveyance, and (ii)

unidentified lawyers from Paul Hastings might be called to testify in the adversary proceeding

brought by Magten challenging such pre-petition transaction undertaken by Paul Hastings on behalf

of the Debtor, whereby the Debtor acquired substantially all of the assets and assumed some (but not

all) of the liabilities, including the public  debt obligations, of the former Montana Power LLC.

2.      Magten, in its conclusory three-page Statement, does not explain how providing legal

services for a debtor renders the lawyers "interested" when the transaction is challenged; does not

**A10**

identify what testimony Paul Hastings could offer that is not subject to the attorney-client privilege; does not explain how any such testimony would be material to any issue in the litigation; does not explain why any such information cannot be obtained from any other source; does not explain how any such testimony would result in substantial prejudice to the Debtor; and does not explain why, even though Magten was fully aware of Paul Hastings' prior work on the contested transaction, and was aware of such claims at the time the Debtor applied to retain Paul Hastings as its primary bankruptcy counsel, it stood by silently and did not raise this issue before this Court at that time.

3.    Magten's Statement is a transparent and insincere effort to place pressure on the Debtor and its creditors in the hopes of negotiating a more favorable position for Magten under the Plan. As demonstrated below, Magten's objection is without any merit whatsoever, and this Court should not permit its processes to be abused in this manner.

## BACKGROUND FACTS

4.    Beginning in early 2002, Paul Hastings provided, among other legal services, legal services to the Debtor in connection with the acquisition of the transmission and distribution utility assets of the former Montana Power Company. To minimize regulatory and environmental issues, the transaction was structured so that the Debtor assumed all but a discrete class of liabilities. Among the liabilities assumed by the Debtor was $688 million in public debt securities issued by the former Montana Power Company, including the "QUIPS" (8.45% Quarterly Income Preferred Securities) issued by Montana Power Capital I.

5.    Magten did not own any QUIPs at the time the Debtor initially acquired the limited liability interests in Montana Power LLC, which NorthWestern renamed NorthWestern Energy LLC, and Magten did not own any QUIPs at the time the regulated utility assets were transferred to the

2

**A11**

Debtor in the "going flat" transaction in November, 2002; rather, Magten only purchased the QUIPs significantly later thereafter at a discount, presumably for speculative purposes.[1]

6.    Magten was appointed to the Official Committee of Unsecured Creditors (the "Committee") in November, 2003 and, on information and belief, began discussing the issue of an alleged fraudulent conveyance in connection with the going flat transaction at that time.  It did not, however, raise the issue of any conflict as to Paul Hastings with the Court. Prior thereto,  Magten had remained quiescent when the Debtor sought to appoint Paul Hastings as counsel.  It was not until after the Debtor filed the Plan on March 11, 2004, classifying Magten with all other subordinated debt holders (who will receive approximately 4% on their claims), that Magten began a series of actions designed to improve its position.  For example, it filed a motion to modify the automatic stay to file an adversary action asserting fraudulent conveyance claims resulting from the "going flat" transaction.  Yet at the hearing on its lift stay motion on April 8, 2004, Magten said nothing about any supposed conflict as to Paul Hastings.  (D.I. 1317).

7.    Upon receiving approval to initiate an adversary proceeding challenging the "going flat" transaction following the April 8 hearing, Magten filed three separate legal actions as follows:

    a.    On April 16, 2004, Magten, along with Law Debentures Trust Company of New York, filed an adversary proceeding in this Court against the Debtor, styled as Adversary Proceeding No. 04-53324 (CGC) (the "Adversary Proceeding").  On May 14, 2004, the Debtor filed a motion to dismiss that action for failure to state a claim on upon which relief can be granted.  The

---

[1]

    On information and belief, Magten did not acquire any QUIPs until late Summer 2003 or after initiation of the Debtor's Chapter 11 case.

3

**A12**

Committee has moved to intervene to also oppose Magten's allegations in the Adversary Proceeding;

b.     On April 19, 2004, Magten by itself filed suit against certain officers and former officers of Clark Fork and Blackfoot, LLC (f/k/a NorthWestern Energy, LLC) in the United States District Court for the District of Montana, Butte Division, styled as Cause No. C0-04-26-BU-RFC, asserting, among other things, breach of fiduciary duties with respect to the "going flat" transaction (the "Officers Montana Action") (Exhibit A attached hereto). The response date to the Officers Montana Action is not until late June.

c.     On May 19, 2004, Magten, by itself, filed suit against Paul Hastings in the Montana Second Judicial District Court, Silver Bow County, styled as Cause No. DV-04-131, alleging that Paul Hastings conspired with and aided and abetted the Debtor in alleged wrongful acts arising from the same "going flat" transaction (the "Paul Hastings Montana Action") (Exhibit B attached hereto).

## ARGUMENT

8.     Pursuant to the Statement, Magten asks the Court to deny payment to Paul Hastings of the fees earned and expenses incurred for work done on behalf of the Debtor due to some alleged conflict of interest. However, the Court may not disqualify or require disgorgement for the mere perception of a conflict. **In re Marvel Entertainment Group, Inc.**, 140 F.3d 463, 476 (3rd Cir. 1998). Nor should it deny fees in the absence of actual prejudice to the estate. **In re American**

4

**A13**

**Metallurgical Products Co., Inc.**, 228 B.R. 146, 160 (Bankr. W.D. Pa.,1998); 2 **Collier on Bankruptcy** ¶328.04 at 328-34 (15th ed. 1994).

9.    As demonstrated below, there is not even the perception of a conflict here, much less prejudice, and Magten's objection, as contained in its Statement, should be overruled.

## I.    MAGTEN HAS FAILED TO ESTABLISH THAT PAUL HASTINGS IS NOT DISINTERESTED WITHIN THE MEANING OF 11 U.S.C. §101(14).

10.    One is "disinterested" when one "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor or an investment bank specified in subparagraph (b) or (c) of this paragraph, or for any other reason." 11 U.S.C. §101(14)(E). A materially adverse interest in this context refers to a competing economic interest, *i.e.,* where counsel has a claim for its own benefit that would impair or otherwise adversely affect any recovery by that class. **In re First Jersey Securities, Inc.**, 180 F.3d 504, 509 (3rd Cir.1999). "[A] person is not disqualified for employment under § 327 of this title by a Debtor in possession solely because of such person's employment by representation of the Debtor before the commencement of the case." 11 U.S.C. § 1107(b).

11.    The burden of proof is on Magten to establish that Paul Hastings is not disinterested. **In re Leslie Fay Companies, Inc.**, 222 B.R. 718, 722 (S.D.N.Y. 1998), *aff'd mem.*, 182 F.3d 899 (2nd Cir. 1999), *cert. denied*, 528 U.S. 1075 (2000). As demonstrated below, Magten does not come close to meeting its burden.

5

**A14**

## A.    REPRESENTING THE DEBTOR'S INTERESTS DOES NOT RENDER PAUL HASTINGS INTERESTED.

12.    Magten suggests that, simply by representing the Debtor in defending against Magten's untenable claims, Paul Hastings is rendered interested because it somehow has an interest adverse to a class of claimants.[2] Not surprisingly, Magten does not cite any legal authority for this proposition. If such were the law, a debtor could never obtain legal counsel, since part of the duties of counsel to a debtor is to advise about and defend against unmeritorious claims, which inures to the benefit of the estate and those creditors holding valid claims.

13.    Magten has not identified any economic interest held by Paul Hastings that threatens any claims of any class, or to which the Debtor is a rival claimant. As such, the mere fact that Paul Hastings is vigorously and ably representing the Debtor is not a ground for deeming Paul Hastings interested.

## B.    MAGTEN HAS FAILED TO IDENTIFY ANY CONFLICT OF INTEREST.

14.    Although not set forth in the body of the Statement, Magten asserts in the correspondence attached to the Statement that Paul Hastings is conflicted because one or more of its 910 attorneys might be called upon to testify in the separate Adversary Proceeding brought by Magten, thereby supposedly violating Delaware Rule of Professional Conduct 3.7.[3]

---

[2]

Given that Magten has accused Paul Hastings in the Paul Hastings Montana Action of conspiring with and aiding and abetting the Debtor, thereby showing that Paul Hastings' interests parallel those of the Debtor, Magten cannot seriously contend here that Paul Hastings has an interest adverse to the Debtor.

[3]

Pursuant to D. Del. Local Rule 83.6(d)(2), adopted July 31, 1992 and made applicable by Del. Bankr. LR 1001-1(b), lawyers appearing in this Court are governed by the Model Rules of Professional Conduct of the American Bar Association, not the Delaware Lawyers Rules of Professional Conduct. Rule 3.7, however, is the same under either set of rules.

6

15.    Assertions of a conflict of interest arising from the potential for counsel for one party testifying at trial are subject to strict scrutiny, as such claims can be misused as techniques of harassment. **In re DeVlieg, Inc.**, 174 B.R. 497, 504 (N.D. Ill. 1994), *app. dismissed*, 56 F.3d 32 (7th Cir. 1995). *See also* **In re Allboro Waterproofing Corp.**, 224 B.R. 286, 296 (Bankr. E.D.N.Y. 1998). The comment to Model Rule 3.7 warns of the danger that the rule can be misused for "tactical abuse." The obvious danger from allowing an adversary to call opposing counsel as a witness and disqualify that counsel is the potential for subterfuge. ABA Model Rule 3.7, comment.

16.    As demonstrated below, the claim of a conflict has been waived, and in any event is premature. Moreover, Magten has not met its burden of showing that any Paul Hastings lawyer will be a necessary witness or why, even assuming that a Paul Hastings lawyer is a necessary witness, the testimony of such lawyer in the Adversary Proceeding precludes the firm from continuing its representation of the Debtor in the Chapter 11 case.

> **1.    Magten's Delay In Raising This Issue Constitutes A Waiver Of Any Claim Of Conflict.**

17.    Magten's unjustified delay in raising the claim of conflict constitutes a waiver of the right to seek disqualification. Counsel must make a motion based upon the likelihood of opposing counsel testifying at trial immediately upon counsel recognizing the potential for such action. Failure to do so constitutes a waiver of the right. **Host Marriott Corp. v. Fast Food Operators, Inc.**, 891 F.Supp. 1002, 1010 (D.N.J. 1995).

18.    Magten was aware of its plan to attack the "going flat" transaction from, at the latest, November 2003, when it was appointed to the Committee, yet it remained silent for months, electing only to raise it when it became dissatisfied with its treatment under the Debtor's Plan.

7

**A16**

19.    Magten's calculated decision to raise this issue not at the outset of this Chapter 11 case, even though Magten had full knowledge of the facts, but at a time disadvantageous to the Debtor, supports the inference that Magten's real concerns are more tactical than ethical. *See* **United Nuclear Corp. v. General Atomic Co.**, 629 P.2d 231, 320 (N.M. 1980) (unjustified delay in making disqualification motion cast "serious doubt on the good faith with which the motion was made").

### 2.    Until Such Time As It Appears That There Will Be A Trial, Magten's Claim Is Premature.

20.    Magten takes the position that Paul Hastings lawyers will be necessary witnesses at trial in the Adversary Proceeding. However, the lawyer-witness rule applies only at trial, and not to pre-trial practice. **Morganrott & Morganrott v. DeLorean**, 213 F.3d 1301, 1309 (10th Cir. 2000). At this point it is uncertain that there will even be a trial. On May 14, 2004, the Debtor filed a motion to dismiss the Adversary Proceeding, raising substantial legal defenses. As such, any effort to disqualify Paul Hastings or have it deemed interested at this stage is premature at best. *See* **Burke v. Steinmann**, No. 03 Civ. 1390 GEL, 2003 WL 21507490, WL Op. at *3, Lynch, J. (S.D.N.Y. June 30, 2003) (Ex. C attached hereto).

### 3.    Magten Has Failed To Establish That Any Paul Hastings Lawyers Will Be Necessary Witnesses In Any Proceeding.

21.    The ethical rule against an attorney for a party also acting as a witness must be balanced against the right of a party to select one's own counsel. In doing so, courts have developed a three part test: (i) does the lawyer have any evidence material to the determination of the issues being litigated, (ii) can the evidence be obtained from other sources, and (iii) is the testimony prejudicial or potentially prejudicial to the testifying attorney's client? **Leonard v. University of Delaware**, C.A. No 96-360 MMS, 1997 WL 158280, WL Op. at *3, Schwartz, J. (D. Del. Mar. 20,

8

**A17**

1997) (Exhibit D attached hereto); **Michel v. B.H. Miller**, C.A. No. 97-2419, 1998 WL 42887, WL Op. at *3, Sear, J. (E.D. La. Jan. 30, 1998) (Exhibit E attached hereto).

22.     Moreover, Model Rule 3.7(a)(3) provides a specific exception to the lawyer-witness prohibition which permits a lawyer to testify if disqualification "would work a substantial hardship on the client." The rule on its face calls for a fact-sensitive balancing between the interests of the client and those of the opposing party. Factors used by courts in applying this exception include the expense and time spent by the client and the loss of extensive knowledge of the case that disqualification would cause. *See* **In re DeVlieg, Inc.**, 174 B.R. at 504 (disqualification not appropriate where counsel does not hold an adverse interest, there is uncertainty as to the application of the attorney-witness prohibition, and the the Debtor would suffer loss of knowledgeable counsel).

23.     There is no showing that Paul Hastings lawyers have any information (not subject to a claim of attorney-client privilege) that is material to the issues raised in the Adversary Proceeding: alleged fraudulent conveyance and constructive fraud. There is no issue regarding interpretation of legal documents. There is no suggestion that any testimony would relate to a contested issue. There is no suggestion that any testimony would relate to anything more than the nature of the legal services provided. *See* Model Rule 3.7(a). As such, Magten's argument falls at the gate.

24.     Moreover, Magten does not explain how Paul Hastings lawyers would be the sole source of the information sought, or why information obtained from the Debtors' personnel would not be sufficient. It should be, and any testimony from Paul Hastings would be merely cumulative at best. *See* **Leonard**, WL Op. at *3. As such, Magten fails to satisfy this element of the test.

25.     Finally, the burden was on Magten to establish with specificity that testimony by a Paul Hastings attorney would be prejudicial, *i.e.*, that such testimony would be so adverse to the

Debtor that the Debtor might have an interest in discrediting the testimony. **Horaist v. Doctors Hosp. of Opelousas**, 255 F.3d 261, 267 (5th Cir. 2001); **In re Abbotts Dairies of Pennsylvania, Inc.**, 61 B.R. 156, 159 (Bankr. E.D. Pa. 1986) (would testimony be sufficiently adverse to the factual assertions or accounts of events offered on behalf of the client). Magten has not and cannot satisfy this element.

### 4.    There Is No Basis For Disqualifying The Entire Paul Hastings Firm.

26.    Disqualification is a "drastic measure" to be imposed only when "absolutely necessary." **In re DeVlieg, Inc.**, 174 B.R. at 504. In this case, even assuming, for the sake of argument, that Magten were to establish at some point in the future that one or some of Paul Hastings' 910 attorneys were material witnesses, that would not of itself require disqualification of the entire firm, only those specific lawyers who would be called as witnesses. In the absence of any disabling conflict of interest (of which there is none), Paul Hastings lawyers, other than those testifying, can continue to represent the Debtor. ABA Model Rule 3.7(b); **In re American Motor Club, Inc.**, 119 B.R. 394, 399 (Bankr. E.D.N.Y. 1990).

### 5.    Any Claim Of A Conflict Of Interest In A Separate Adversary Proceeding Does Not Justify Withholding Payment Of Fees In The Bankruptcy Proceeding.

27.    Magten's claim of conflict of interest relates to the Adversary Proceeding. An adversary proceeding is a separate action independent of the bankruptcy case. *See* **In re Indian Palms Associates, Ltd.**, 61 F.3d 197, 204 (3rd Cir. 1995); **In re IBIS Corp.**, 272 B.R. 883, 893 n. 13 (Bankr. E.D. Va. 2001); **In re Hilliard Development Corp.**, 238 B.R. 857, 864 (Bankr. S.D. Fla. 1999). Any claimed conflict relates only to the Adversary Proceeding, does not affect the Chapter 11 case, and so does not justify a denial of fees and recovery of expenses in the Chapter 11 case.

28.    Indeed, to the extent the fee request includes time spent on the Adversary Proceeding thus far, there is no basis for disallowance of those fees since the limited attorney-witness prohibition applies only to conduct of counsel at trial, and not to pretrial activity. **Morganrott & Morganrott,** 213 F.3d at 1309.

## CONCLUSION

29.    Magten seeks the draconian sanction of denial of attorneys' fees and expenses for work done in this bankruptcy case based upon speculation that some Paul Hastings lawyers may be called to testify in the Adversary Proceeding. Magten offers only a conclusory assertion of improper interest by Paul Hastings, unsupported by either legal precedent or reasoned analysis.

30.    It is evident, given Magten's delay in raising the issue, the suspect timing, and the lack of legal or factual foundation for Magten's position, that the Statement was offered for no valid purpose, and solely for harassment and tactical advantage. This Court should summarily overrule it.

**[Remainder of page intentionally left blank]**

11

**A20**

WHEREFORE, for the foregoing reasons, Paul, Hastings, Janofsky & Walker, LLP respectfully requests that the Court overrule the Statement and objections of Magten Asset Management Corporation to the payment of fees and expenses incurred on behalf of the Debtor.

Date: June 2, 2004

Respectfully submitted,

/s/ David L. Finger
Charles Slanina (DE Bar ID #2011)
David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155
(302) 884-6766
Attorneys for Paul, Hastings, Janofsky &
Walker, LLP

12

**A21**

# Exhibit A

1   James H. Goetz
  J. Devlan Geddes
2   **GOETZ, GALLIK & BALDWIN, P.C.**
  35 North Grand
3   P.O. Box 6580
  Bozeman, MT 59771-6580
4   Ph:   406-587-0618
  Fax:   406-587-5144
5
  Bonnie Steingart    (*Pro Hac Vice* Application forthcoming)
6   John W. Brewer    (*Pro Hac Vice* Application forthcoming)
  **FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP**
7   One New York Plaza
  New York, New York 10004
8   (212) 859-8000

9   ATTORNEYS FOR PLAINTIFF

FILED

BUTTE, MT

'04 APR 19 AM 10 57

PATRICK E. DUFFY, CLERK

BY _____

DEPUTY CLERK

10             **IN THE UNITED STATES DISTRICT COURT**

11               **FOR THE DISTRICT OF MONTANA**

12                  **BUTTE DIVISION**

13                  * * * * * * * *

14

15   MAGTEN ASSET MANAGEMENT CORPORATION,     )    Cause No. *CV-04-26-BU-RFC*

16               Plaintiff,           )

17           -against-            )    **COMPLAINT AND**
                                     )    **DEMAND FOR JURY TRIAL**

18   MIKE J. HANSON, JACK D. HAFFEY, ERNIE J.    )
  KINDT, and ELLEN M. SENECHAL,          )

19                                        )
                Defendants.        )

20                                          )

21       Plaintiff Magten Asset Management Corporation ("Magten"), by its undersigned attorneys,

22 hereby alleges in support of its Complaint on personal knowledge as to its own acts and on information

23 and belief as to all other matters as follows:

24                               **INTRODUCTION**

25       1.     Magten is a creditor of Clark Fork and Blackfoot, LLC ("Clark Fork"), formerly

26 known as NorthWestern Energy, LLC ("NWE"), and prior to that known as The Montana Power

27 Company LLC ("MPLLC"). Magten brings this lawsuit to obtain redress for the wrongful actions of

28 defendants Mike J. Hanson, Jack D. Haffey, Ernie J. Kindt and Ellen M. Senechal, all of whom were

COMPLAINT AND DEMAND FOR JURY TRIAL                          PAGE 1

1    officers of Clark Fork on November 15, 2002 and enabled the transfer on that date (the "Transaction")

2    of Clark Fork's key assets — electric, natural gas and propane utility assets (the "Montana Utility

3    Assets") — to its corporate parent NorthWestern Corporation ("NorthWestern") without adequate

4    consideration. The Transaction unjustly enriched NorthWestern by hundreds of millions of dollars while

5    destroying Clark Fork's solvency and thus its ability to meet its obligations to Magten and its other

6    creditors. The defendants, as officers of Clark Fork, had a fiduciary duty to Clark Fork's creditors not

7    to engage in transactions that would render Clark Fork insolvent. In connection with the Transaction,

8    Clark Fork purported to have NorthWestern assume Clark Fork's liabilities, but NorthWestern's other

9    liabilities were so massive that, even after paying inadequate consideration to Clark Fork for the

10    Montana Utility Assets, NorthWestern could not pay its own pre-existing creditors, and filed a

11    voluntary petition for relief under Chapter 11 of the Bankruptcy Code. As a result of defendants'

12    actions, Magten is now owed well in excess of $20 million dollars by a company which defendants

13    rendered unable to meet its obligations to Magten. Magten seeks appropriate compensatory and

14    punitive damages, in an amount to be determined at trial.

15    **THE PARTIES**

16    2.    Plaintiff is a corporation validly organized and doing business under the laws of the

17    State of Delaware with its principal place of business in the State of New York and is, therefore,

18    deemed to be a citizen of Delaware and New York pursuant to 28 U.S.C § 1332(c)(1).

19    3.    Defendant Mike J. Hanson is a citizen of the State of Montana and is believed to reside

20    at 1805 C St., Butte, Montana 59701. As of November 15, 2002, Hanson was Chief Executive

21    Officer of Clark Fork.

22    4.    Defendant Jack D. Haffey is a citizen of the State of Montana, and is believed to reside

23    at 2101 Garfield St., Anaconda, Montana 59711. As of November 15, 2002, Haffey was President of

24    Clark Fork.

25    5.    Defendant Ernie J. Kindt is a citizen of the State of Montana, and is believed to reside

26    at 5 Amber Way, Butte, Montana 59701. As of November 15, 2002 Kindt was Vice President and

27    Chief Accounting Officer of Clark Fork.

28    6.    Defendant Ellen M. Senechal is a citizen of the State of Montana, and is believed to

COMPLAINT AND DEMAND FOR JURY TRIAL                                    PAGE 2

**A24**

1  reside at 75 Park Drive, Clancy, Montana 59634. As of November 15, 2002, Senechal was Vice

2  President, Treasurer and Chief Financial Officer of Clark Fork.

3  **JURISDICTION AND VENUE**

4       7.    This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

5  1332, as it is between citizens of different States and the matter in controversy exceeds the sum or

6  value of $75,000, exclusive of interest and costs.

7       8.    Venue is proper pursuant to 28 U.S.C. 1391, because all defendants reside in this

8  judicial district, and a substantial part of the events or omissions giving rise to the claim occurred in this

9  judicial district.

10  **FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS**

11  **The Montana Power Company**

12       9.    The Montana Power Company ("Montana Power") was incorporated in 1961 under

13  the laws of the state of Montana as the successor to a corporation formed in 1912 through the merger

14  of four regional electric companies.

15       10.    By the year 2000, Montana Power was engaged in activities related to

16  telecommunications and energy related activities including activities in the fields of oil, coal, natural gas,

17  and electricity.

18       11.    In November 1996, Montana Power and Bank of New York entered into that certain

19  Indenture for Unsecured Subordinated Debt Securities Relating to Trust Securities (the "Indenture").

20       12.    Pursuant to the Indenture, Montana Power issued the Junior Subordinated Interest

21  Debentures (the "Junior Debentures").

22       13.    At or about the same time, pursuant to the Amended and Restated Trust Agreement

23  (the "Trust Agreement") between itself and various other persons, Montana Power created Montana

24  Power Capital I (the "Trust"), a business trust established pursuant to the Delaware Business Trust Act.

25  Bank of New York was designated as the Property Trustee of the Trust as well as serving as Trustee

26  under the Indenture.

27       14.    As detailed below, as of November 2002, Clark Fork had succeeded to Montana

28  Power's obligations with respect to the Junior Indentures. The Bank of New York has been

COMPLAINT AND DEMAND FOR JURY TRIAL              PAGE 3

1   succeeded as Property Trustee of the Trust as well as Trustee under the Indenture by the Law

2   Debenture Trust Company of New York ("Law Debenture").

3        15.     The Trust is a special purpose vehicle which, pursuant to the Trust Agreement, issued

4   the Series A 8.45% Quarterly Income Preferred Securities ("QUIPS").

5        16.     The Trust holds 100% of the Junior Debentures, with a total face amount of

6   approximately $67 million, which constitute its sole meaningful asset. The value of the QUIPS is

7   entirely based on the value of the Junior Debentures, and thus on the ability of Clark Fork to pay

8   interest and principal to the Trust. The amounts paid by Clark Fork to the Trust would then in turn be

9   passed on by the Trust to the holders of the QUIPS.

10       17.     The Junior Debentures were not sold directly to investors; rather, purchasing the

11   QUIPS provided investors with substantially the same rights and the same potential investment return as

12   they would have had had they been able to own Junior Debentures directly. The entire structure of the

13   transaction was designed to put investors in the same position as if they had directly purchased the

14   Junior Debentures, while providing Montana Power with a more favorable accounting treatment than

15   would have been possible had the Junior Debentures been sold directly to the investing public.

16       18.     Accordingly, in Section 610 of the Indenture Clark Fork (as successor to Montana

17   Power) expressly acknowledges that the holders of the QUIPS are intended beneficiaries of the

18   Company's obligations with respect to the Junior Debentures and that if the Property Trustee of the

19   Trust (the legal titleholder to the Junior Debentures) fails to act, any holder of the QUIPS can sue

20   directly to enforce the Property Trustee's rights.

21       19.     Magten owns in excess of 33% of the QUIPS.

22       20.     In connection with the Trust Agreement and the Indenture, Montana Power also

23   entered into a Guarantee Agreement with the Bank of New York as Guarantee Trustee (the

24   "Guarantee Agreement"). Pursuant to the Guarantee Agreement, Montana Power, as guarantor,

25   agreed to pay to the holders of the QUIPS certain payments, to the extent such are not paid by the

26   Trust, and to the extent the Property Trustee had funds available in a specified account. As with the

27   Indenture and the Trust Agreement, Clark Fork and Law Debenture have succeeded to the original

28   roles and responsibilities of Montana Power and Bank of New York respectively.

**COMPLAINT AND DEMAND FOR JURY TRIAL**                        PAGE 4

The Sale of the Montana Power Company's Utility Assets

21.     On March 28, 2000, Montana Power announced plans to restructure its business. This restructuring involved the sale of its energy related assets, including its electric, natural gas, and propane utility assets, in order to allow Montana Power to focus on telecommunications.

22.     On September 29, 2000, Montana Power entered into a Unit Purchase Agreement with NorthWestern, pursuant to which NorthWestern agreed to purchase control of the Montana Utility Assets, then owned by Montana Power, in a multi-step transaction.

23.     On February 13, 2002, Montana Power merged its energy assets into MPLLC (the "Merger"). As a result of the Merger, MPLLC thereafter held and operated the Montana Utility Assets and succeeded to all of Montana Power's obligations with respect to the Junior Debentures and the QUIPS.

24.     Specifically, in connection with the Merger, on February 13, 2002, pursuant to the First Supplemental Indenture, MPLLC assumed the obligations of Montana Power under the Indenture.

25.     In addition, in connection with the Merger, on February 13, 2002, pursuant to a letter agreement, MPLLC assumed the obligations of Montana Power under the Guarantee Agreement.

26.     On February 15, 2002, NorthWestern purchased 100% of the equity of MPLLC, and, thus, the corresponding control of the Montana Utility Assets, for $478 million in cash. None of this consideration was received or retained by MPLLC. It was thus not thereafter available to Clark Fork to assist Clark Fork in meeting its obligations to its creditors.

27.     On March 19, 2002, MPLLC was renamed NWE.

28.     On August 13, 2002, NorthWestern entered into the Second Supplemental Indenture, whereby it assumed on a joint and several basis with NWE all of NWE's obligations under the Indenture.

29.     On August 13, 2002, NorthWestern entered into an Amendment to the Guarantee Agreement, whereby it assumed on a joint and several basis with NWE all of NWE's obligations under the Guarantee Agreement.

30.     On August 13, 2002, NorthWestern entered into a letter agreement amending the Trust Agreement, whereby it assumed on a joint and several basis with NWE all of NWE's obligations under

COMPLAINT AND DEMAND FOR JURY TRIAL                                        PAGE 5

**A27**

1   the Trust Agreement.

2   **The Transfer**

3       31.    On November 15, 2002, defendants, as officers of Clark Fork, carried out a scheme

4   to defraud, injure and deprive Magten of the ability to receive the benefits due to it from Clark Fork in

5   connection with the Junior Debentures and the QUIPS, by, in the Transaction, transferring substantially

6   all of Clark Fork's assets, the Montana Utility Assets, to NorthWestern without receiving adequate

7   consideration in return.  Clark Fork received no cash for the Transfer, and the consideration

8   purportedly received was dramatically less than the value of the assets; over $1 billion dollars in assets

9   were transferred to NorthWestern, and only approximately $700 million dollars in Clark Fork liabilities

10  were purportedly assumed by NorthWestern.  Indeed, with respect to some if not all of the liabilities

11  purportedly assumed, NorthWestern was already a co-obligor with Clark Fork prior to the Transaction

12  and/or Clark Fork remained obligated jointly and severally with NorthWestern subsequent to the

13  Transaction, thus making any purported assumption of the liabilities in connection with the Transaction

14  valueless.

15      32.    In particular, NorthWestern was already a co-obligor as to Clark Fork's obligations

16  with respect to the Junior Indentures and QUIPS prior to the transaction, and Clark Fork remained .

17  obligated jointly and severally with NorthWestern with respect to the Junior Indentures and QUIPS

18  subsequent to the Transaction.  Indeed, Clark Fork requested Bank of New York (at the time still the

19  Trustee under the Indenture) to execute a supplement to the Indenture purporting to release Clark Fork

20  from its continuing obligations under the Indenture, but Bank of New York refused to provide such a

21  release.

22      33.    As an immediate result of the consummation of the Transfer, Clark Fork was insolvent.

23  Stripped of its assets, Clark Fork was thereafter unable to meet its obligations with respect to the Junior

24  Debentures and QUIPS and did not do so.

25      34.    Both prior to and following the Transaction, NorthWestern was itself insolvent, making

26  both its August 2002 assumption of liabilities with respect to the Junior Debentures and QUIPS and any

27  purported further assumption of those liabilities in connection with the Transaction of little or no value to

28  the holders of the QUIPS and other creditors of Clark Fork.  Even the hundreds of millions of dollars

COMPLAINT AND DEMAND FOR JURY TRIAL                                                    PAGE 6

**A28**

1  by which it was unjustly enriched by the Transaction were insufficient to overcome the massive

2  imbalance between assets and liabilities created by its various other failed business ventures.

3      35.    The defendants all knew, should have known, and/or were reckless with respect to

4  knowing that Clark Fork would be rendered insolvent as a result of the Transaction and that

5  NorthWestern was insolvent both before and after the Transaction.

6      36.    No interest on the Junior Debentures was paid by either NorthWestern or Clark Fork

7  since prior to September 14, 2003. In excess of $2 million of interest on the Junior Debentures is now

8  past due. If paid, that interest would have been passed on by the Trust to the holders of the QUIPS

9  such as Magten. Moreover, the entire principal amount of the Junior Debentures was accelerated

10 pursuant to the terms of the Indenture no later than September 14, 2003.

11     37.    Following the Transaction, Clark Fork retained only the Milltown Dam, a two

12 megawatt hydroelectric dam at the confluence of the Clark Fork and Blackfoot Rivers, under a license

13 that expires in 2007, and the related environmental liabilities.

14     38.    Following the Transaction, NorthWestern operated the Montana Utility Assets as part

15 of NorthWestern's NorthWestern Energy Division.

16     39.    After the Transaction, NWE remained a subsidiary of NorthWestern and on November

17 20, 2002, NWE was re-named Clark Fork.

18     40.    Clark Fork continues to operate the Milltown Dam.

19     41.    Clark Fork is entirely dependent upon NorthWestern for continued funding of the

20 Milltown Dam and its corporate existence, and NorthWestern is required, under certain agreements

21 with Clark Fork, which require NorthWestern to pay any costs and expenses that arise in connection

22 with the operation of the Milltown Dam.

23     42.    Less than a year later, on September 14, 2003, NorthWestern filed a voluntary petition

24 for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the

25 District of Delaware.

26     43.    The Montana Utility Assets generate approximately 80% of NorthWestern's

27 consolidated EBITDA, although NorthWestern did not pay fair value for those assets, thus injuring

28 Magten and Clark Fork's other creditors.

COMPLAINT AND DEMAND FOR JURY TRIAL                                          PAGE 7

**A29**

1    44.    The Montana Utility Assets are now available to all creditors of NorthWestern, most of

2   whom were not creditors of Clark Fork and thus had not previously had any claim to Clark Fork's

3   assets. Accordingly, Magten and other QUIPS holders are likely to receive little or no recovery for

4   their claims in NorthWestern's reorganization plan.

5    45.    On April 8, 2004, the United States Bankruptcy Court for the District of Delaware

6   granted Magten's motion in NorthWestern's bankruptcy case for leave to commence an adversary

7   proceeding against NorthWestern seeking to have the Transaction set aside as a fraudulent

8   conveyance.

9                              **STATEMENT OF CLAIM**

10                            **FIRST CAUSE OF ACTION**

11                            **(Breach of Fiduciary Duty)**

12    46.    Plaintiff repeats and realleges paragraphs 1-45 and incorporates them herein by

13   reference.

14    47.    Clark Fork was a company within the zone of insolvency on November 15, 2002.

15   Accordingly, defendants, as officers of Clark Fork, owed individual fiduciary duties to Clark Fork's

16   creditors, including without limitation the Trust and all QUIPS holders, including Magten's predecessors

17   in interest, not to engage in any transaction that would make Clark Fork insolvent and thus unable to

18   perform its obligations with respect to the Junior Debentures and QUIPS.

19    48.    The Trust and the QUIPS holders, including Magten's predecessors in interest, were

20   creditors of Clark Fork, and were injured by the Transaction which transferred the Montana Utility

21   Assets to NorthWestern without adequate consideration, thereby rendering Clark Fork insolvent.

22    49.    The Property Trustee has failed to enforce the Trust's rights, so Magten has standing

23   under the Indenture to enforce both the Trust's rights and its own individual rights as successor to the

24   QUIPS holders who were its predecessors in interest.

25    50.    Defendants breached their fiduciary duties to the Trust and Magten's predecessors in

26   interest by willfully and wantonly carrying out the Transaction and transferring the Montana Utility

27   Assets to NorthWestern without adequate consideration, thereby rendering Clark Fork insolvent.

28    51.    Defendants also breached their fiduciary duties to the Trust and Magten's predecessors

COMPLAINT AND DEMAND FOR JURY TRIAL                                          PAGE 8

**A30**

1    in interest by purporting to assign Clark Fork's obligations with respect to the Junior Debenture and

2    QUIPS to NorthWestern, when they knew NorthWestern was insolvent and would remain insolvent,

3    and would thus be unable to perform those obligations.

4         52.      By reason of the foregoing acts, practices and course of conduct, the defendants have

5    breached their fiduciary duties to the Trust and Magten's predecessors in interest, causing financial loss,

6    in an amount to be proven at trial, but in excess of $20 million.

7         53.      Punitive damages in an amount to be determined at trial should also be awarded due to

8    the willful, malicious, and outrageous nature of these breaches of fiduciary duty.

9

10                       **PRAYER FOR RELIEF**

11

12      ·    WHEREFORE, plaintiff respectfully requests that this Court enter judgment against defendants

13    as follows:

14         1.      Awarding plaintiff compensatory and punitive damages, in an amount

15    determined at trial but in excess of $20 million;

16         2.      Awarding plaintiff all allowable costs, attorneys' fees and other litigation

17    expenses to the extent recoverable under law; and

18         3.      Awarding plaintiff such other and further relief as to this Court may be just,

19    proper and equitable.

20        DATED this 15th day of April, 2004.

21

22                     GOETZ, GALLIK & BALDWIN, P.C.

23

24

25

26                 By: _____

27     ·                 James H. Goetz

28                 ATTORNEYS FOR PLAINTIFF

COMPLAINT AND DEMAND FOR JURY TRIAL             PAGE 9

A31

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED this 15th day of April, 2004.

GOETZ, GALLIK & BALDWIN, P.C.

By: _____
for James H. Goetz

ATTORNEYS FOR PLAINTIFF

E:\JIM\Karen\Magten Asset Mgmt Corp 4032\Pleadings\Complaint.4 15 04.wpd

COMPLAINT AND DEMAND FOR JURY TRIAL                    PAGE 10

A32

# Exhibit B

David R. Paoli
PAOLI & SHEA, P.C.
P.O. Box 8131
Missoula, Montana 59802
Telephone: (406) 542-3330
Facsimile: (406) 542-3332

Bijan Amini (*Pro Hac Vice* Application forthcoming)
STORCH AMINI & MUNVES, P.C.
405 Lexington Avenue 51st Floor
New York, New York 10174
Telephone: (212) 490-4100
Facsimile: (212) 490-4208

  *Attorneys for Plaintiff*

## MONTANA SECOND JUDICIAL DISTRICT COURT, SILVER BOW COUNTY

| | | |
|---|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION<br>Suing individually and derivatively on behalf of CLARK<br>FORK AND BLACKFOOT, LLC | ) )<br>)<br>) | Cause No. *DV-04-131* |
|   Plaintiff, | )<br>) | **SUMMONS** |
|   v. | )<br>)<br>) | KURT KRUEGER |
| PAUL HASTINGS JANOFSKY & WALKER LLP, | )<br>) | Judge, Dept. 1 |
|   Defendant. | )<br>) | |

THE STATE OF MONTANA TO THE ABOVE-NAMED DEFENDANT:

  You are hereby summoned to answer the Complaint in this action which is filed in the office of the clerk of this court, a copy of which is herewith served upon you, and to file your answer and serve a copy thereof upon the Plaintiff's attorney within twenty (20) days after service of this Summons, exclusive of the day of service and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

**A34**

WITNESS my hand and the seal of said court, this _20_ day of May, 2004.

LORI MALONEY
Clerk Of District Court

By:_____
Deputy Clerk

A35

David R. Paoli
PAOLI & SHEA, P.C.
P.O. Box 8131
Missoula, Montana 59802
Telephone: (406) 542-3330
Facsimile: (406) 542-3332

Bijan Amini (*Pro Hac Vice* Application forthcoming)
STORCH AMINI & MUNVES, P.C.
405 Lexington Avenue 51st Floor
New York, New York 10174
Telephone: (212) 490-4100
Facsimile: (212) 490-4208



FILED

MAY 2 0 2004

LORI MALONEY CLERK

By_____ Deputy Clerk

*Attorneys for Plaintiff*

## MONTANA SECOND JUDICIAL DISTRICT COURT, SILVER BOW COUNTY

| | |
|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION Suing individually and derivatively on behalf of CLARK FORK AND BLACKFOOT, LLC | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| PAUL HASTINGS JANOFSKY & WALKER LLP, | ) ) |
| Defendant. | ) ) ) |

Cause No. _DV-04-131_

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Magten Asset Management Corporation ("Magten" or the "Plaintiff"), by and through its attorneys Storch Amini & Munves, P.C., and Paoli & Shea, P.C., as and for its Complaint against Paul Hastings Janofsky & Walker LLP ("Paul Hastings" or the "Defendant") alleges as follows:

### INTRODUCTION

1.    This complaint involves a scheme to defraud the creditors of Northwestern Energy LLC, now known as Clark Fork and Blackfoot LLC (herein, "Clark Fork"), and Defendant's breach of its duties to Clark Fork and its creditors in connection therewith. To

**A36**

cover up losses from poor investment decisions, the Northwestern Corporation ("Northwestern") decided to strip the assets of Clark Fork, its solvent and profitable subsidiary. In doing so, Northwestern defrauded the creditors of the subsidiary, including a trust that had invested in the subsidiary on the basis of those very same valuable assets.

2.      The chronology of the events in question is stark testimony to the fraudulent nature of the scheme. In September 2000, Northwestern agreed to acquire the profitable transmission assets and the Milltown Dam of the Montana Power Company. By the time the transaction was consummated on February 15, 2002, Northwestern was drowning in red ink from bad investment decisions. A mere nine months later, slowed only by regulatory requirements, Northwestern transferred Clark Fork's profitable assets of between $1.1 and 1.4 billion in value for no payment whatsoever. Consideration supplied in the form of assumption of $700 million in Clark Fork's debt, on its face inadequate, was in fact itself illusory. Northwestern promptly encumbered the assets with new debt to temporarily cover its ineptitude, disenfranchising Clark Fork's creditors altogether. A mere ten months later, Northwestern was bankrupt.

3.      The officers and directors of Clark Fork were fully complicit in placing the company they had a duty to protect into insolvency. They willfully disregarded the fiduciary duties they owed to the creditors of Clark Fork by blindly obeying the orders of their parent.

4.      The Defendant served as counsel to Clark Fork, advising these same officers and directors. While the scheme's premise was simple, the execution of it was quite complex. Paul Hastings' assistance was crucial in guiding Northwestern and Clark Fork through the complex legal and regulatory hurdles necessary to effect Northwestern's desired result.

5.      In reality, Paul Hastings, which was hopelessly conflicted, devised, structured and negotiated the entire scheme. As counsel to Northwestern, the only party that benefited in the

**A37**

transaction, Paul Hastings not only aided and abetted the Clark Fork officers and directors fiduciary breaches, but breached its own duties to Clark Fork in merely doing whatever it took to aid Northwestern in its fraudulent undertaking.

6.    By this action, Magten, as a creditor of Clark Fork and by virtue of its rights to enforce obligations under the Trust, seeks damages from Paul Hastings for its role in aiding and abetting the breach of fiduciary duties owed to the creditors of Clark Fork, aiding and abetting the fraudulent transfer of Clark Fork's assets to Northwestern, and its malpractice.

## THE PARTIES

7.    The Plaintiff, Magten, is a corporation organized under the laws of the State of Delaware, with its principle place of business in the State of New York.

8.    The Defendant, Paul Hastings, is a limited liability partnership organized under the laws of California. It has significant offices in New York. Many of its partners reside in the state of New York.

9.    Northwestern is a corporation incorporated in the State of Delaware with its corporate headquarters in Sioux Falls, South Dakota.

10.    Clark Fork and Blackfoot LLC is a Montana corporation, with its principal place of business in Montana. The energy assets at stake in this litigation were all situated in Montana.

## JURISDICTION

11.    This Court has jurisdiction over this action pursuant to Rule 4(B) of the Montana Rules of Civil Procedure.

12.    In connection with its representation of Clark Fork, Paul Hastings regularly communicated with and visited Clark Fork at its location in Montana.

**A38**

13.    Additionally, in connection with the transactions complained of, at least throughout 2002, Paul Hastings represented Clark Fork before the Federal Energy Regulatory Commission.

14.    As set forth below, in connection with the acts complained of herein, Paul Hastings caused over $1 billion of Clark Fork's assets located in the State of Montana to be transferred out of Clark Fork and out of the reach of Clark Fork's creditors.

## BACKGROUND

15.    The Montana Power Company was incorporated in 1961, as successor to an energy corporation formed in 1912. It operated as the sole gas and electric utility throughout the state of Montana.

16.    In 1996, the Montana Power Company and the Bank of New York ("BNY") as Trustee entered into an Indenture for the Unsecured Subordinated Debt Securities dated November 1, 1996 (the "Indenture"), pursuant to which the Montana Power Company issued $65 million in 8.45% Junior Subordinated Debentures (the "Junior Debentures").

17.    At or about the same time, pursuant to the Amended and Restated Trust Agreement (the "Trust Agreement") between itself and various other persons, the Montana Power Company created Montana Power Capital I (the "Trust"), a business trust established pursuant to the Delaware Business Trust Act. BNY was designated as the Property Trustee of the Trust as well as serving as Trustee under the Indenture.

18.    As detailed below, as of November 2002, Clark Fork had succeeded to the Montana Power Company's obligations with respect to the Junior Indentures. The BNY has been succeeded as Property Trustee of the Trust as well as Trustee under the Indenture by the Law Debenture Trust Company of New York ("Law Debenture").

**A39**

19.    The Junior Debentures were not sold directly to investors. Instead, they were sold to the Property Trustee of the Trust. The Trust holds 100% of the Junior Debentures, with a total face amount of approximately $67 million, which constitute its sole meaningful asset.

20.    The Trust is a special purpose vehicle which, pursuant to the Trust Agreement, issued the Series A 8.45% Quarterly Income Preferred Securities ("QUIPS"). The value of the QUIPS is entirely based on the value of the Junior Debentures, and thus on the ability of Clark Fork to pay interest and principal to the Trust. The amounts paid by Clark Fork to the Trust would, in turn, be passed on by the Trust to the holders of the QUIPS.

21.    The Trust's purpose, structured solely for accounting purposes, is to hold all of the Junior Debentures. Purchasers of QUIPS acquire an indirect undivided beneficial interest in the Junior Debentures and obtain substantially the same rights and the same potential investment return as they would have, had they owned the Junior Debentures directly.

22.    The entire structure of the transaction was designed to put investors in the same position as if they had directly purchased the Junior Debentures, while providing the Montana Power Company with a more favorable accounting treatment than would have been possible had the Junior Debentures been sold directly to the investing public.

23.    In Section 610 of the Indenture, Clark Fork (as successor to the Montana Power Company) expressly acknowledges that the holders of the QUIPS are intended beneficiaries of the Company's obligations with respect to the Junior Debentures and that if the Property Trustee of the Trust (the legal titleholder to the Junior Debentures) fails to act, any holder of the QUIPS can sue directly to enforce the Property Trustee's rights.

24.    Magten owns in excess of 33% of the QUIPS.

**A40**

25.    In connection with the Trust Agreement and the Indenture, Montana Power also entered into a Guarantee Agreement with the BNY as Guarantee Trustee (the "Guarantee Agreement").    Pursuant to the Guarantee Agreement, the Montana Power Company, as guarantor, agreed to pay to the holders of the QUIPS certain payments, to the extent such are not paid by the Trust, and to the extent the Property Trustee had funds available in a specified account. As with the Indenture and the Trust Agreement, Clark Fork and Law Debenture have succeeded to the original roles and responsibilities of the Montana Power Company and BNY, respectively.

## EVENTS LEADING UP TO THE CLAIMS

26.    In 1997, the Montana legislature passed the Energy Deregulation Act, deregulating the administrative controls Montana had put on the Montana Power Company for the better part of a century. Almost immediately, the Montana Power Company began looking for ways to unload its energy assets ("The Montana Power Assets"), its long term debt and its environmental liabilities.

27.    The plan developed as follows: the Montana Power Company transferred the Montana Power Assets into a new, wholly-owned subsidiary to which it also transferred the liability saddled Milltown Dam as well as the obligation to fund the Junior Debentures. Northwestern then purchased the Montana subsidiary and in due turn transferred the assets to itself, leaving the liabilities unfunded. As Northwestern later stated (see below) the sole purpose of structuring the transaction this way was to avoid the liabilities associated with these assets.

28.    On September 29, 2000, the Montana Power Company entered into a Unit Purchase Agreement with Northwestern. The Montana Power Company agreed to create a

### A41

subsidiary, the Montana Power Company LLC ("MPLLC") to which it would transfer the Montana Power Assets. Northwestern agreed to purchase this subsidiary.

29.    Paul Hastings represented Northwestern in this transaction and was instrumental in structuring and negotiating it. Another of Paul Hastings' clients, Credit Suisse First Boston Corporation ("CSFB"), served as Financial Consultant for Northwestern on the transaction.

30.    Over the next two years, Paul Hastings assisted Northwestern in clearing the state and federal regulatory hurdles necessary to consummate the purchase of MPLLC.

31.    However, by October of 2001, Northwestern and Paul Hastings knew that Northwestern was running out of funds. Therefore, Paul Hastings, as counsel to Northwestern, assisted Northwestern in preparing a $720 million securities offering in which Paul Hastings' other client, CSFB, would act as lead initial purchaser and underwriter of $250 million 7 7/8% Five Year Notes and $470 million 8 ¾% Ten Year Notes. That purchase agreement was finally signed March 8, 2002.

32.    To finance the acquisition of MPLLC, on January 14, 2002, Northwestern entered into a $1 billion credit agreement with CSFB and other lenders. The credit facility consisted of a $280 million revolving credit facility and a $720 million acquisition term loan. CSFB, Paul Hastings' client, also served as administrative agent. Paul Hastings represented Northwestern in connection with this credit agreement.

33.    On February 13, 2002, following the clearance of regulatory hurdles, the Montana Power Company merged the Montana Power Assets into MPLLC (the "Merger"). As a result of the Merger, MPLLC thereafter held and operated the Montana Utility Assets and succeeded to all of Montana Power's obligations with respect to the Junior Debentures and the QUIPS.

**A42**

34.     On February 15, 2002, Northwestern purchased 100% of the equity of MPLLC, and, thus, the corresponding control of the Montana Utility Assets, for $478 million in cash. None of this consideration was received or retained by MPLLC. Thus, it was not thereafter available to Clark Fork to assist Clark Fork in meeting its obligations to its creditors.

35.     Paul Hastings represented Northwestern in its purchase of MPLLC. In connection with this purchase, Paul Hastings issued an Opinion Letter to the Securities and Exchange Commission ("SEC") regarding Northwestern's Form U-1 Application. In it, Paul Hastings represented that, among other things, the purchase of MPLLC would "not violate the legal rights of the holders of any securities issued by Northwestern or any 'associate company of Northwestern'.

36.     In its Form U-1Application, Northwestern maintained that it was exempt from the stringent requirements of the Federal Public Utility Holdings Act ("PUHCA") in part on the grounds that its utility interests comprised only a small and not substantial part of Northwestern's business. This statement to the SEC was materially false. Through the purchase of the Montana Utility Assets, Northwestern's most valuable revenue producing arm would be those utility assets. Paul Hastings represented Northwestern on this filing and submitted its Opinion Letter in connection with it.

37.     Furthermore, in its Form U-1 Application, Northwestern revealed that the *sole* purpose of structuring the acquisition so that Northwestern would first purchase a subsidiary and then a few months later transfer the assets to itself was to avoid the liabilities associated with those assets.

**A43**

38.    On March 19, 2002, MPLLC was renamed Northwestern Energy LLC ("Northwestern Energy"). Northwestern Energy was a duly organized Montana limited liability company. It is now known as Clark Fork.

## THE FRAUDULENT TRANSFER

39.    By the time Northwestern acquired control of Clark Fork in 2002, Northwestern was insolvent. Consequently, Northwestern and its counsel Paul Hastings worked out a plan whereby Northwestern would acquire the assets of Clark Fork for vastly less consideration than they were worth. Then they would immediately apply to borrow additional funds.

40.    On August 13, 2002, in accordance with the plan worked out by Paul Hastings, Northwestern entered into a series of agreements whereby it assumed on a joint and several basis with Clark Fork all of Clark Fork's obligations under the Indenture, the Guarantee Agreement and the Trust Agreement. On information and belief, Paul Hastings structured the transaction, and actually drafted these agreements as counsel to both Northwestern and Clark Fork.

41.    This transfer was illusory in that Northwestern did not have the resources by which to meet the assumed obligations. Northwestern was insolvent both immediately before and immediately after the assumption of these liabilities. Paul Hastings knew or should have known these facts.

42.    On November 15, 2002, in accordance with the prearranged plan worked out by Paul Hastings, Clark Fork and Northwestern entered into the Asset Transfer and Stock Purchase Agreement (the "Asset Transfer"), discussed below. On information and belief, Paul Hastings structured the transaction, and actually drafted the Asset Transfer as counsel to both Northwestern and Clark Fork.

**A44**

43.    Through this Asset Transfer, the officers of Clark Fork and Northwestern, carried out a scheme to defraud, injure and deprive the Trust of the ability to receive the benefits due to it from Clark Fork in connection with the Junior Debentures, and consequently holders of the QUIPS, by, in the Transaction, transferring substantially all of Clark Fork's assets, to Northwestern without receiving adequate consideration in return. Clark Fork received no cash for the Transfer, and the consideration purportedly received was dramatically less than the value of the assets; over $1 billion dollars in assets were transferred to Northwestern, and only approximately $700 million dollars in Clark Fork liabilities were purportedly assumed by Northwestern. Indeed, with respect to some if not all of the liabilities purportedly assumed, Northwestern was already a co-obligor with Clark Fork prior to the Transaction and/or Clark Fork remained obligated jointly and severally with Northwestern subsequent to the Transaction, thus making any purported assumption of the liabilities in connection with the Transaction valueless. Northwestern's assumption of the debt was illusory in any event, having already predetermined to encumber the very assets that were available to satisfy them to repay prior losses, effectively leaving Clark Fork's creditors without recourse.

44.    In particular, Northwestern was already a co-obligor as to Clark Fork's obligations with respect to the Junior Indentures and QUIPS prior to the transaction, and Clark Fork remained obligated jointly and severally with Northwestern with respect to the Junior Indentures and QUIPS subsequent to the Transaction. Indeed, Clark Fork, through Paul Hastings, requested BNY (at the time still the Trustee under the Indenture) to execute a supplement to the Indenture purporting to release Clark Fork from its continuing obligations under the Indenture, but BNY refused to provide such a release.

**A45**

45.     As an immediate result of the consummation of the Transfer, Clark Fork was insolvent.  Stripped of its assets, Clark Fork was thereafter unable to meet its obligations with respect to the Junior Debentures and QUIPS and did not do so.

46.     Under the Asset Transfer, Clark Fork transferred substantially all of its assets, the energy assets from the Montana Power Company, and retained only the Milltown Dam.  The Milltown Dam was, and still is, saddled with enormous environmental liabilities.  The Milltown Dam operates under a license set to expire in 2007.

47.     Also in connection with the Asset Transfer, and also in accord with the plan devised by Paul Hastings, on November 15, 2002, Northwestern purported to execute a Third Supplemental Indenture, a Guarantee Assumption Agreement, and a Trust Assumption Agreement pursuant to which the Debtor would assume all of Clark Fork's obligations on the Junior Debentures.  On information and belief, Paul Hastings structured the transaction, and actually drafted these agreements as counsel to both Northwestern and Clark Fork.

48.     Article Eleven of the Indenture purports to release the Montana Power Company (or its successor in interest) upon the transfer of substantially all of the assets of the Montana Power Company if the successor company, among other things, is a corporation validly organized under or subject to the laws of the United States or any state thereof and assumes the due and punctual payment of the principal, premium (if any) and interest on the securities and the performance of every covenant of the Indenture.

49.     Additionally, notwithstanding any purported release effectuated by the Third Supplemental Indenture, because the Transfer was a fraudulent transfer, no release could have been effectuated solely by the operation of Article Eleven of the Indenture.

**A46**

## EVENTS FOLLOWING THE ASSET TRANSFER

50.    Following the Asset Transfer, Northwestern operated the energy assets it had sought in 2000 and acquired through the assistance of Paul Hastings as part of its Northwestern Energy Division.

51.    On November 20, 2002, Clark Fork became the official name of the subsidiary.

52.    On December 17, 2002, only days thereafter, Northwestern entered into a new $390 million senior secured credit agreement with CSFB and other financial institutions. This credit agreement was partly secured by $280 million in aggregate principal amount of First Mortgage Bonds, which granted a first mortgage in the energy assets previously held by Clark Fork.

53.    Ten months after the Asset Transfer, on September 14, 2003, Northwestern filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware.

54.    The Montana Utility Assets generate approximately 80% of Northwestern's consolidated EBITDA, although Northwestern did not pay fair value for those assets, thus injuring Magten and Clark Fork's other creditors.

55.    The Montana Utility Assets are now available to all creditors of Northwestern, most of whom were not creditors of Clark Fork and thus had not previously had any claim to Clark Fork's assets. Accordingly, Magten and other QUIPS holders are likely to receive little or no recovery for their claims in Northwestern's reorganization plan.

56.    On April 8, 2004, the United States Bankruptcy Court for the District of Delaware granted Magten's motion in Northwestern's bankruptcy case for leave to commence an adversary

**A47**

proceeding against Northwestern seeking to have the Asset Transfer set aside as a fraudulent transfer.

57.    On April 8, 2004 Magten filed a complaint against Northwestern in the United States Bankruptcy Court for the District of Delaware to avoid the Asset Transfer as a fraudulent transfer.

58.    On April 19, 2004, Magten filed a complaint against the officers and directors of Clark Fork for breach of fiduciary duty in the District Court of Montana, Butte Division.

### FIRST CAUSE OF ACTION

**Aiding and Abetting Breach of Fiduciary Duties Owed to Creditors of Clark Fork in the Zone of Insolvency**

59.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth here.

60.    Clark Fork was a company within the zone of insolvency on November 15, 2002. Accordingly, the officers of Clark Fork owed individual fiduciary duties to Clark Fork's creditors, including without limitation the Trust and all QUIPS holders, including Magten's predecessors in interest, not to engage in any transaction that would make Clark Fork insolvent and thus unable to perform its obligations with respect to the Junior Debentures and QUIPS.

61.    The Trust and the QUIPS holders, including Magten's predecessors in interest, were creditors of Clark Fork, and were injured by the Transaction which transferred the Montana Utility Assets to Northwestern without adequate consideration, thereby rendering Clark Fork insolvent.

62.    The Property Trustee has failed to enforce the Trust's rights, so Magten has standing under the Indenture to enforce both the Trust's rights and its own individual rights as successor to the QUIPS holders who were its predecessors in interest.

63.    The Defendant aided and abetted the officers of Clark Fork in breaching their fiduciary duties owed to the Trust and Magten's predecessors in interest by willfully and wantonly carrying out the Transaction and transferring the Montana Utility Assets to Northwestern without adequate consideration, thereby rendering Clark Fork insolvent.

64.    The Defendant also aided and abetted the officers of Clark Fork in breaching their fiduciary duties to the Trust and Magten's predecessors in interest by purporting to assign Clark Fork's obligations with respect to the Junior Debenture and QUIPS to Northwestern, when they knew Northwestern was insolvent and would remain insolvent, and would thus be unable to perform those obligations.

65.    Paul Hastings knew or should have known that the conduct of the Clark Fork officers constituted a breach of their fiduciary duties. However, conflicted due to their joint representation of Northwestern, Paul Hastings substantially assisted and encouraged these breaches in order to benefit its long time client, Northwestern.

66.    By reason of the foregoing acts, practices and course of conduct, the Defendant aided and abetted the Clark Fork officers and directors breach of their fiduciary duties to the Trust and Magten's predecessors in interest, causing financial loss, in an amount to be proven at trial.

67.    Punitive damages in an amount to be determined at trial should also be awarded due to the willful, malicious, and outrageous nature of these breaches of fiduciary duty.

## SECOND CAUSE OF ACTION

### Aiding and Abetting Fraudulent Transfer

68.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth here.

**A49**

69.    The Montana Uniform Fraudulent Transfer Act § 31-2-333, MCA provides that a transfer made by a debtor is fraudulent as to any creditor where it was made 1) with actual intent to hinder, delay or defraud any creditor of the debtor, or 2) without receiving a reasonably equivalent value in exchange and the debtor was engaged or about to engage in a business for which its remaining assets were unreasonably small or believed, or reasonably should have believed, that the debtor would incur debts beyond the Debtor's ability to pay as they came due.

70.    Pursuant to § 31-2-333, MCA in determining actual intent to hinder, delay, or defraud any creditor, consideration may be given, among other factors, to whether: the transfer was to an insider; before the transfer was made, the debtor had been sued; the transfer was of substantially all the debtor's assets; and the value of the consideration received by the debtor was reasonably equivalent to the value of the assets transferred.

71.    The Montana Uniform Fraudulent Transfer Act § 31-2-334, MCA provides that a transfer made by a debtor is fraudulent as to creditors whose claims arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange and the debtor was insolvent at that time.

72.    Magten was a creditor of Northwestern and of Clark Fork by operation of the Guarantee Agreement and the Indenture.

73.    Northwestern was a parent of Clark Fork and, as such, exercised complete control over Clark Fork. As a result of this relationship, Northwestern qualified as an insider under Montana law.

74.    In connection with the Transfer, Clark Fork transferred assets to Northwestern that are valued between $1.15 billion and $1.4 billion, and the only alleged consideration

**A50**