received for the Transfer was the assumption of approximately $700 million in liabilities, itself illusory.

75.    Prior to the Transfer, Clark Fork was a solvent entity. The transfer of substantially all of Clark Fork's assets to Northwestern caused Clark Fork to become insolvent.

76.    Prior to the Transfer, Clark Fork was a reasonably capitalized entity. The transfer of substantially all of Clark Fork's assets to Northwestern caused Clark Fork to become undercapitalized.

77.    Because the Montana Utility Assets that Northwestern received in the Transfer were worth substantially more than the value of the liabilities that were assumed by the Northwestern, Clark Fork did not receive reasonably equivalent value for the transfer.

78.    Paul Hastings knew or should have known that by structuring the Asset Transfer the way it did, Clark Fork would be rendered insolvent and the QUIPS holders would be hindered, delayed or defrauded.

79.    Paul Hastings knew or should have known that by structuring the Asset Transfer in the way that it did, Clark Fork would transfer assets without receiving a reasonably equivalent value in exchange leaving Clark Fork with unreasonably small remaining assets or without ability to pay its debts as they became due.

80.    Paul Hastings knew or should have known that by structuring the Asset Transfer in the way that it did, Clark Fork would transfer assets without receiving a reasonably equivalent value in exchange leaving Clark Fork insolvent as a result.

81.    Paul Hastings provided substantial assistance to Northwestern and Clark Fork to effect this fraudulent transfer. The Defendant substantially assisted the directors and officers of Clark Fork by structuring and effectively orchestrating the entire Asset Transfer.

## A51

82.     Magten, on its own behalf and on behalf of the Trust, seeks the payments which the Trust should have received had the assets not been fraudulently transferred out of Clark Fork.

## THIRD CAUSE OF ACTION

### Civil Conspiracy to Conduct Fraudulent Transfer

83.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth here.

84.     Paul Hastings and Northwestern intended when fraudulently transferring the Montana Utility Assets of Clark Fork to Northwestern to hinder, delay or defraud the creditors of Clark Fork.

85.     Paul Hastings and Northwestern intended to fraudulently transfer the Montana Utility Assets of Clark Fork to Northwestern without receiving reasonably equivalent value in exchange, rendering Clark Fork engaged in a business or a transaction for which the remaining assets of Clark Fork were unreasonably small.

86.     Paul Hastings and Northwestern intended to fraudulently transfer the Montana Utility Assets of Clark Fork to Northwestern without receiving a reasonably equivalent value in exchange, leaving Clark Fork with only the liability saddled Milltown Dam, and rendering Clark Fork insolvent.

87.     Paul Hastings and Northwestern agreed on a course of action whereby Paul Hastings and Northwestern would enact the requisite agreements in order conduct that fraudulent transfer.

88.     In furtherance of that course of action, Paul Hastings assisted Northwestern and Clark Fork in transferring the Montana Utility Assets out of Clark Fork in violation of the

**A52**

Montana Uniform Fraudulent Transfers Act in order to hinder, delay or defraud the creditors of Clark Fork.

89.    Also, in furtherance of that course of action, Paul Hastings assisted Northwestern and Clark Fork in transferring the Montana Utility Assets out of Clark Fork in violation of the Montana Uniform Fraudulent Transfers Act without receiving a reasonably equivalent value in exchange and Clark Fork became insolvent as a result.

90.    Also, in furtherance of that course of action, Paul Hastings assisted Northwestern and Clark Fork in transferring the Montana Utility Assets out of Clark Fork in violation of the Montana Uniform Fraudulent Transfers Act without receiving a reasonably equivalent value in exchange rendering Clark Fork engaged in a business or transaction for which the remaining assets of Clark Fork were unreasonably small.

91.    As damages, Magten, on its own behalf and on behalf of the Trust, seeks the payments which the Trust should have received had the assets not been fraudulently transferred out of Clark Fork.

## FOURTH CAUSE OF ACTION

### Malpractice
**Magten suing directly, on behalf of the Trust and derivatively on behalf of Clark Fork**

92.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth here.

93.    The Defendant owed a duty of care to Clark Fork.

94.    The Defendant also owed a duty of care to Northwestern.

95.    The Defendant breached its duty to Clark Fork by failing to disclose its conflict of interest to Clark Fork's officers and directors.

## A53

96.    Because Paul Hastings failed to disclose its conflict of interest to Clark Fork and instead structured a transaction for Clark Fork whereby Clark Fork was forced to relinquish substantially all of its assets, Clark Fork and its creditors suffered an amount to be determined at trial.

97.    In as much as Paul Hastings' actions caused Clark Fork to become insolvent, and enter the zone of insolvency, Magten, on its own behalf, on behalf of the Trust and on behalf of Clark Fork, is entitled to recover for Paul Hastings' malpractice.

WHEREFORE, Plaintiff prays for all damages caused by the actions of defendant and enter judgment against defendant as follows:

1.    For Plaintiff's compensatory damages;

2.    An award of punitive damages to punish defendant for its intentional and malicious conduct;

3.    For Plaintiff's costs, attorneys' fees and any other recoverable expenses related to this litigation; and

4.    Such further and additional relief this Court deems just and proper.

DATED this /7th day of May, 2004.

                                    PAOLI & SHEA, P.C.


                                    By: _David R. Paoli_
                                        David R. Paoli
                                        *Attorney for Plaintiff*


**A54**

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues.

DATED this 19th day of May, 2004.

PAOLI & SHEA, P.C.

By: _David R. Paoli_

David R. Paoli
*Attorney for Plaintiff*

**A55**

# Exhibit C

**A56**

Westlaw.

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21507490 (S.D.N.Y.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

Thomas BURKE, Plaintiff,
v.
Walter S. STEINMANN, Jr., and Strafford
Ventures, Inc., Defendants.

**No. 03 Civ.1390 GEL.**

June 30, 2003.

Restaurant manager sued general partner of restaurant's owner and general partner's sole shareholder, officer, and director, alleging breaches of parties' management agreement and stock acquisition agreement. Defendants moved to dismiss for failure to state claim. The District Court, Lynch, J., held that: (1) claim for breach of stock acquisition agreement could not be decided on motion to dismiss; (2) partial dismissal of manager's claim for alleged breaches of management agreement was not warranted; and (3) motion seeking disqualification of manager's counsel, on grounds that counsel would be required to be witnesses at trial, was premature.

Motion denied.

**[1] Federal Civil Procedure** 🔑1831

170Ak1831 Most Cited Cases

Restaurant manager's claim that general partner of restaurant's owner and general partner's sole shareholder, officer, and director breached stock acquisition agreement by which shareholder agreed to transfer controlling interest in general partner to manager could not be decided on motion to dismiss, inasmuch as complaint stated claim for breach of contract and factual issues existed as to whether

manager's actions frustrated attempts to perform by general partner and shareholder and rendered performance impossible. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[2] Federal Civil Procedure** 🔑1729

170Ak1729 Most Cited Cases

Partial dismissal of restaurant manager's claim for alleged breaches of management agreement was not warranted when general partner of restaurant's owner and general partner's sole shareholder, officer, and director did not dispute that, if manager's allegations were true, manager was entitled to salary claimed during both stated term of written agreement and time period between end of that term and his eventual termination, such that it would be more efficient to wait to address until after discovery, as part of motion for summary judgment or trial, manager's further claim, on which partial dismissal was sought, that parties' conduct showed that they had agreed to extend term of management contract and that he therefore was not at-will employee at the time he purportedly was wrongfully terminated, inasmuch as both aspects of claim required essentially same discovery. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[3] Attorney and Client** 🔑22

45k22 Most Cited Cases

Motion seeking disqualification of plaintiff's counsel, on grounds that counsel would be required to be witnesses at trial, was **premature** at motion-to-dismiss stage of proceedings, given that rule of professional conduct underlying motion, which precluded lawyer who should be a witness from serving as counsel at trial, did not require counsel's disqualification from representing plaintiff, conducting discovery or engaging in other pre-trial activities, or advising trial lawyers.
Ted Trief, Trief & Olk, New York, NY, for Plaintiff.

Maryann Peronti, Koerner Silberberg & Weiner, LLP, New York, NY, for Defendants.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21507490 (S.D.N.Y.))

Page 2

## OPINION AND ORDER

LYNCH, J.

**\*1** The plaintiff in this case entered into various agreements with defendants to manage a restaurant and brewery on the east side of Manhattan, and potentially to acquire a significant ownership interest in the business from the defendants. The plaintiff alleges that defendants breached a Stock Acquisition Agreement and a Management Agreement entered into by the parties, and defendants have moved for partial dismissal of the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the motion will be denied.

## BACKGROUND

For purposes of a motion to dismiss, the Court accepts all allegations in the complaint as true. The facts described here are drawn from the pleadings and are presented by way of background. Owing to the present posture of the case, the Court makes no findings of fact in this opinion.

This case concerns the Typhoon Brewery ("Brewery"), a food establishment located on East 54th Street in Manhattan, owned by Stone House, Inc. ("Stone House"). Defendant Strafford Ventures, Inc. ("Strafford") is the sole general partner of Stone House, and Defendant Walter Steinmann, Jr., is the sole shareholder, officer and director of Strafford. In June, 1999, Burke and Steinmann signed a Memorandum of Understanding providing that Burke, who claims experience as a professional restaurateur, would manage the Brewery and eventually potentially acquire 70% of Strafford.

The Memorandum of Understanding was implemented by later agreements. In July 1999, Strafford, Steinmann, Stone House and Burke entered into a contract ("Management Agreement" or "MA") providing that Strafford would employ Burke as the operating manager of the Brewery. On or about November 1, 1999, Burke and Steinmann entered into a Stock Acquisition Agreement ("SAA"), in which Steinmann agreed to transfer a 70% interest in Strafford to Burke, contingent upon certain conditions, including the consent of various parties to the transaction.

Burke alleges that he managed the Typhoon Brewery from June 14, 1999, until September 30, 2002. On that date, Steinmann sent Burke a letter purporting to terminate Burke's employment. Burke claims that the letter was ineffective as a termination notice, and did not constitute valid termination of his employment. (Cmplt. ¶¶ 31-33 .)

Burke filed the complaint in the instant lawsuit on February 27, 2003, alleging that his employment as operating manager of the Brewery was wrongfully terminated, and that he was never paid the agreed-upon weekly management fee of $2,000 during the entire period of his employment. In addition to these alleged breaches of the Management Agreement, Burke maintains that the defendants also breached the SAA. Specifically, Burke claims that instead of using "best efforts" to obtain the required consents to the stock transfer, Steinmann interfered with efforts to obtain the consent of Stone House to the transaction by both his actions and his failures to act.

**\*2** Defendants now move to dismiss the claim for wrongful termination on the grounds that the MA and extensions to that agreement had expired on December 14, 2000. After that date, defendants claim, Burke was an at-will employee, and thus subject to summary dismissal on September 30, 2002, the date of the notice of termination. (D.Mem. ¶ 11.) Defendants also move to dismiss the claim for breach of the SAA on the grounds that Burke's own actions frustrated and made impossible the effort to obtain the required consents to the stock transfer. (*Id.* at ¶ 27.) In addition, defendants interject an argument in their Reply Memorandum to the effect that plaintiff's counsel should be disqualified because they may be called as witnesses in this action, and because defendants paid certain of plaintiff's attorney's fees during the negotiation of the never-consummated stock-transfer.

## DISCUSSION

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept "as true the facts alleged in the complaint," *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697. 699-700 (2d Cir.1994), and may grant the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Thomas v. City*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21507490 (S.D.N.Y.))

Page 3

*of New York*, 143 F.3d 31, 36 (2d Cir.1998) (citations omitted). *See also Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996) (on motion to dismiss, "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim" (internal quotation marks and citations omitted)). All reasonable inferences are to be drawn in the plaintiff's favor, which often makes it "difficult to resolve [the claims] as a matter of law." *In re Independent Energy Holdings PLC*, 154 F.Supp.2d 741, 747 (S.D.N.Y.2001).

Defendants' motion, which depends on a voluminous submission of affidavits and documents, is more in the nature of a motion for summary judgment than of a proper motion to dismiss. While defendants are correct that the Court may consider documents that are attached to or relied on in the complaint, *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir.1991), defendants' arguments go well beyond materials integral to the complaint and seek resolution of matters that are clearly, at this point in the litigation, disputed questions of fact.

### 1. Breach of Stock Acquisition Agreement

[1] With respect to Count II of the complaint, which alleges breach of the Stock Acquisition Agreement by which defendant Steinmann agreed to transfer a controlling interest in defendant Strafford to plaintiff, defendants essentially argue that they attempted to perform the agreement and were frustrated by actions of the plaintiff. Defendants' arguments rest on factual assertions that are not found in the complaint and that are not drawn from the face of the SAA. These assertions are vigorously disputed by plaintiff. Whether defendants will ultimately be entitled to summary judgment after discovery remains to be seen, but the complaint clearly states a claim for breach of contract. At this stage there appear to be factual disputes as to whether plaintiff will be able to prove that claim. The argument that Burke's alleged actions frustrated the agreement and made it impossible of performance rests on assertions of fact outside the complaint.

*3 Accordingly, the motion to dismiss Count II is denied.

### 2. Breach of Management Agreement

[2] With respect to Count I, defendants move only for "partial" dismissal. It is undisputed that Count I states a claim for breach of the Management Agreement, since plaintiff claims that he was not paid the salary contemplated by that agreement. At most, defendants argue that after the expiration date on the face of the MA and extensions thereto, plaintiff became an employee-at- will, such that his eventual termination was not wrongful. Whatever the merits of this argument, and whether or not certain aspects of that argument could in theory be decided as a matter of law, defendants do not dispute that, if the allegations of the complaint are true, plaintiff would be entitled to payment both during the stated term of the written MA, and during the period between the end of that period and his eventual termination. This aspect of the claim thus would necessarily survive, and would require essentially the same discovery relevant to plaintiff's further claim that the parties' conduct showed an agreement to extend the term of the MA. It is thus more efficient to address the parties' differences about New York contract law after the full development of the facts, as part of a motion for summary judgment or at trial.

### 3. Attorney Disqualification

[3] Finally, defendants' reply memorandum of law includes a brief section arguing that "Plaintiff's Attorneys Should be Disqualified." (R. Mem.7-8.) Defendants suggest first, that plaintiff's counsel will be required to be a witness on behalf of plaintiff, and second, even more cursorily, that counsel may have a conflict of interest because defendants paid certain of plaintiff's legal fees in connection with the underlying transactions and because his lawyers "may have access to privileged information of the Defendants." (*Id.* at 7.) Defendants' first point is premature. The "advocate/witness" rule precludes a lawyer who should be a witness from serving as counsel *at trial. See* ABA Code of Prof. Resp. DR 5-102 (discussing "withdrawal as trial counsel"); *Lamborn v. Dittmer*, 873 F.2d 522, 531-32 (2d Cir.1989); *Paretti v. Cavalier Label Co.*, 722 F.Supp. 985, 986 (S.D.N.Y.1989). That rule will be strictly enforced in this Court. It is important to note, however, that the lawyer-as-witness rule does not require disqualification of the lawyer from representing the client, conducting discovery or engaging in other pre- trial activities, or advising the trial lawyers, but only from appearing as an advocate. *See id.* at 988-89 (discussing solutions to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A59

Not Reported in F.Supp.2d
(Cite as: 2003 WL 21507490 (S.D.N.Y.))

Page 4

lawyer-as-witness problem short of disqualification, and citing cases). Accordingly, any motion based on this rule is entirely premature.

A motion predicated on conflict of interest would be a different matter. However, the materials before the Court suggest at most that defendants paid plaintiff's legal expenses pursuant to a provision of the SAA, not that plaintiff's lawyer ever had, or was understood by defendants to have, any attorney-client relationship with the defendants. It is unclear how any information provided by defendants to the plaintiff's lawyer in connection with a negotiation in which the plaintiff and defendants would appear to have been adversaries could be "privileged" as to defendants, and defendants make no attempt to explain. Any doubts the Court has on this score are not assuaged by the fact that although defendants obviously were aware of all the facts relating to this matter from the outset of the litigation, they chose to raise the issue by way of an informal post-script to their reply papers on a motion addressed to an entirely different subject.

*4 Defendants have not moved for disqualification, or for any other relief concerning this matter, so no action by the Court is required. If defendants believe there is any basis for disqualification, they may advance it by a properly-supported motion. In view of the failure to raise the issue in a timely manner, however, defendants are on notice that any effort to use such a motion to further delay discovery will not succeed.

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss portions of the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) is denied.

SO ORDERED:

2003 WL 21507490 (S.D.N.Y.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

## A60

# Exhibit D

Westlaw.

1997 WL 158280
(Cite as: 1997 WL 158280 (D.Del.))

**H**
Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.

Harold L. LEONARD, Plaintiff,
v.
The UNIVERSITY OF DELAWARE, a
corporation of the State of Delaware, Paul
Mettler and Mary Martin, Defendants.

**Civil Action No. 96-360 MMS.**

Argued Feb. 20, 1997.
Decided March 20, 1997.

Jeffrey K. Martin of Jeffrey K. Martin, P.A.,
Wilmington, DE, for plaintiff.

Kathleen Furey McDonough and Todd L. Goodman
, of Potter Anderson & Corroon, Wilmington, DE,
for defendants.

*OPINION*

MURRAY M. SCHWARTZ, Senior District Judge.

I. INTRODUCTION

*1 Plaintiff Harold L. Leonard ("Leonard") filed
this suit against the University of Delaware ("the
University"), Paul Mettler, and Mary Martin
(collectively, "the University defendants"), alleging
he was wrongfully terminated from the graduate
Physical Therapy program ("the P.T. Program") at
the University of Delaware. He also alleges the
University violated the terms of a 1993 Settlement
Agreement between Leonard and the University
defendants. [FN1] Pending before the Court are:
(1) Leonard's motion to disqualify Kathleen F.
McDonough, Esquire, ("McDonough") as trial
counsel for the University defendants; and (2) the
University defendants' motion for attorneys' fees
pursuant to Rule 26(g)(3) of the Federal Rules of

Civil Procedure. For the reasons that follow: (1)
the motion to disqualify McDonough will be
denied; and (2) the motion for attorneys' fees will
be granted.

> FN1. Mary Martin, one of the University
> defendants in this case, was not a party to
> the 1993 Settlement Agreement. Docket
> Item ("D.I.") 29 at 8. The University, Paul
> Mettler, and Kenneth W. Seaman were the
> "University defendants" for purposes of
> the 1993 Settlement Agreement. *Id.*

I. FACTUAL BACKGROUND
Leonard was a student enrolled in the University's
graduate P.T. Program. Unfortunately, his stint at
the University was pockmarked with rancor and
tumult. In 1992, Leonard sued (in the Middle
District of Pennsylvania) the University, two
members of the P.T. Program faculty, and a clinical
instructor in connection with a clinical affiliation
course he had flunked. In July of 1993, the parties
executed a Settlement Agreement, stipulating to a
dismissal of the suit. Throughout the negotiation
and execution of the Settlement Agreement,
Leonard was represented by James F. Heinly,
Esquire ("Heinly"), a Pennsylvania attorney, and the
University defendants were represented by
McDonough. The Settlement Agreement permitted
Leonard an opportunity to complete the P.T.
program, subject to some conditions. Docket Item
("D.I.") 29 at Exhibit ("Exh.") A-8-14.

But the discord did not end in 1993. In late
September or early October of 1994, Heinly
accompanied Leonard to a meeting with the
University to discuss Leonard's academic status.
D.I. 29 at Exh. C-2. McDonough was among those
present at that meeting. D.I. 38 at Exh. F-75-77.
In an affidavit, Heinly defined the "principal
purpose of this meeting" as "to get together and
discuss the Physical Therapy department's request
that Mr. Leonard undergo psychological or
psychiatric counseling in order to continue to be
enrolled at the University of Delaware's Physical
Therapy Program." D.I. 29 at Exh. C-2.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**A62**

1997 WL 158280
(Cite as: 1997 WL 158280 (D.Del.))

McDonough did not recall discussing psychiatric counseling for Leonard at that meeting, however, D.I. 38 at Exh. F-77, and the University defendants deny ever holding a meeting to insist Leonard undergo psychological or psychiatric counseling.

On February 27, 1995, Leonard was terminated from the program for failure to maintain a minimum 3.0 grade point average. [FN2] Docket Item ("D.I.") 38 at Exhibit ("Exh.") B. After his termination, Leonard challenged several grades he had received in the P.T. Program through an elaborate four-step grievance procedure provided by the University. [FN3] Ms. McDonough, counsel for the University defendants in this matter, also provided legal advice to the University defendants concerning Leonard as he exhausted the University grievance procedures. D.I. 29 at Exh. B-1, 10, 15.

> FN2. The P.T. Program adheres to the University grading system, which is based on the familiar four-point scale--an A in a course is worth 4.0 points per credit, a B is worth 3.0 points, a C, 2.0 points, and a D, 1.0 point. A failure, or an F, is worth no points per credit, of course. D.I. 38 at Exhibit ("Exh.") A-29. There are also gradations within those five basic letter grades; for example, an *A-* is worth 3.67 points per credit, a grade of *B+* is worth 3.33 points per credit, and so on down to a *D-*, which is worth a mere 0.67 points per credit. *Id.* Classes which are graded on a *Pass/Fail* basis are not counted in the computation of a student's cumulative grade point average ("GPA"). To be eligible for a graduate degree, students at the University of Delaware must have a minimum cumulative GPA of 3.0, or a B average. D.I. 38 at Exh. A-14. At the time of his termination, it appears Leonard had a cumulative GPA of 2.906 and could take only Pass/Fail classes to fulfill the requirements of the PT curriculum. D.I. 38 at Exh. B.

> FN3. In Step 1 of the procedure, the faculty member who issued the grade at issue is obligated to meet with the complainant student. If Step 1 does not solve matters, the student is permitted to

appeal to a chairperson in the faculty member's department in Step 2. If still dissatisfied, the student can obtain a hearing before a five-member panel in Step 3. The panel typically includes three faculty members, only one of whom hails from the department involved in Step 2, and two student members. The final step, step Committee of the University Faculty Senate. D.I. 38 at Exh. C-48-50.

**\*2** Several of the grievance hearings are of particular interest for purposes of these motions. In December of 1995, Leonard challenged a grade he had been given for a class with the course number PHYT-621. At this hearing ("the 621 hearing"), Leonard allegedly violated the University Code of Conduct by distributing patient records to the hearing panel without redacting the names of the patients from the records and without the consent of the patients. Apparently, he was successful in his effort to change his grade for PHYT-621. [FN4]

> FN4. As will be shown, Heinly alleges McDonough told him she had "advised the board against making a finding favorable to Dr. Leonard but ... the Board [sic] had obviously disregarded her advice." D.I. 29 at Exh. C-2.

Members of the 621 hearing panel later served on a May 1996 hearing panel assembled to review a grade Leonard received in a course entitled PHYT-619. D.I. 29 at Exh. D. This May 1996 panel ("the 619 panel") ruled against Leonard and refused to alter his grade. Further, members of the 621 panel later acted as witnesses at an ethics hearing ("the ethics hearing") in June of 1996; the ethics panel, after hearing the testimony of members of the 621 panel, ruled Leonard had violated the University Code of Conduct and recommended his dismissal from the University. [FN5]

> FN5. This last ruling--that Leonard be dismissed--seems to have been academic; as of February of 1995, he had already been terminated from the University for his failure to achieve a 3.0 grade point average. D.I. 38 at Exh. B.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**A63**

1997 WL 158280
(Cite as: 1997 WL 158280 (D.Del.))

Page 3

This is where the controversy surrounding the extent of McDonough's involvement reaches its highest pitch. Heinly, again, through affidavit, alleges he engaged in a telephone conversation with McDonough in April of 1996. D.I. 29 at Exh. C-1. According to Heinly, their discourse touched on the 621 hearing, at which Leonard had sought a change in his grade. *Id.* at Exh. C-1, 2. As Heinly tells it, McDonough confided to him in that conversation that "she advised the board against making a finding favorable to Dr. Leonard but that the Board [sic] had obviously disregarded her advice." *Id.* at Exh. C-2. McDonough has denied (1) ever making that statement to Heinly, and (2) advising the 621 panel how to rule. D.I. 38 at Exh. F-100-102. When informed of McDonough's categorical denial, Heinly retorted "[t]here is no question in my mind that Ms. McDonough did make [the statement quoted above] during the course of the telephone conversation in April 1996." D.I. 29 at Exh. C-2.

According to Leonard, McDonough failed in her attempt to thwart him in the 621 hearing. But Leonard implies that her darker purposes were ultimately served. The members of the 621 board to whom McDonough proffered her advice, Leonard notes, ruled against him in the 619 hearing in May of 1996 and later served as the key witnesses against Leonard in the ethics hearing in June of 1996. [FN6] This shows, according to Leonard, that McDonough was a "direct co-conspirator in an effort to terminate [him] from the Physical Therapy Program." D.I. 41 at 1.

> FN6. At this point, a brief chronological recap might be useful:
> 09/94-10/94: Meeting among Leonard and University representatives, allegedly to discuss psychological counseling for Leonard.
> 02/95: Leonard terminated from University for failure to maintain 3.0 GPA.
> 12/95: 621 hearing panel rules in favor of Leonard.
> 04/96: Alleged telephone conversation between Heinly and McDonough.
> 05/96: 619 hearing panel rules against Leonard.
> 06/96: Ethics hearing panel recommends Leonard's dismissal.

### III. DISCUSSION

A. Leonard's Motion to Disqualify McDonough as Trial Counsel

Leonard argues McDonough cannot serve as trial counsel for the University defendants because Rule 3.7 of the Model Rules of Professional Conduct of the American Bar Association ("Rule 3.7") forbids her from doing so. [FN7] Rule 3.7 provides, in general, "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness...." [FN8] Recognizing this prohibition, the University defendants have consistently disavowed any present intention of utilizing McDonough as a trial witness. Therefore, as movant, Leonard bears the burden of establishing disqualification is appropriate. *Kalmanovitz v. G. Heileman Brewing Co., Inc.,* 610 F.Supp. 1319, 1323 (D.Del.1985); *see also World Youth Day. Inc. v. Famous Artists Merchandising Exch.,* 866 F.Supp. 1297, 1299 (D.Colo.1994).

> FN7. Leonard seeks to disqualify McDonough only as trial counsel; he "takes no position" as to McDonough's participation as counsel for the University defendants until trial. D.I. 28 at 3 n. 2.
> Local rules for the District of Delaware incorporate the Model Rules of Professional Conduct of the American Bar Association as governing the conduct of attorneys appearing before this Court. D. DEL. R. Civ. P. 83.6(d)(2) (1995).

> FN8. There are three exceptions to this general rule; none is relevant to this dispute.

*3 Nearly ten years ago, this Court had occasion to visit the standards for disqualification under then-nascent rule 3.7. In *Cannon Airways, Inc. v. Franklin Holdings Corp.,* this Court held that Rule 3.7 "requires the opposing party to bear a higher burden on a disqualification motion, permits the court to delay ruling until it can determine whether another witness can testify, and precludes disqualification if the lawyer's testimony would merely be cumulative." [FN9] 669 F.Supp. 96, 100 (D.Del.1987) (citations omitted); *see also United Food & Commercial Workers Health & Welfare*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1997 WL 158280
(Cite as: 1997 WL 158280 (D.Del.))

*Fund of Northeastern Pa. v. Darwin Lynch Adm'rs. Inc.,* 781 F.Supp. 1067, 1069- 70 (M.D.Pa.1991) (quoting *Cannon* ). These standards still hold true. Other courts have elaborated, refraining from denominating trial counsel as "likely to be a necessary witness" unless shown three things: (1) the attorney will give evidence material to the determination of issues being litigated; (2) the evidence cannot be obtained elsewhere; and (3) the testimony is **prejudicial** or potentially **prejudicial** to the testifying attorney's client. [FN10] *Personalized Mass Media Corp. v. Weather Channel, Inc.,* 899 F.Supp. 239, 243 (E.D.Va.1995) ; *Cottonwood Estates. Inc. v. Paradise Builders. Inc.,* 128 Ariz. 99, 624 P.2d 296, 302 (Ariz.1981) (en banc); *LeaseAmerica Corp. v. Stewart,* 19 Kan.App.2d 740, 876 P.2d 184, 193 (Kan.Ct.App.1994); *Chappell v. Cosgrove,* 121 N.M. 636, 916 P.2d 836, 840 (N.M.1996); *Sargent County Bank v. Wentworth,* 500 N.W.2d 862, 871 (N.D.1993); *Public Util. Dist. No. 1 of Klickitat County v. International Ins. Co.,* 124 Wash.2d 789, 881 P.2d 1020, 1033 (Wash.1994) (en banc) *Smithson v. United States Fidelity & Guar. Co.,* 186 W.Va. 195, 411 S.E.2d 850, 856 (W.Va.1991) (all interpreting state rules patterned, like Delaware's, after Rule **3.7** of the ABA **Model Rules** of Professional Conduct). In short, Rule 3.7 ensures a litigant's choice of trial counsel will not be lightly disturbed.

> FN9. While *Cannon* interpreted Rule 3.7 of the Delaware Lawyers' Rules of Professional Conduct, its status as persuasive authority remains undiminished. The Delaware Rules of Professional Conduct are patterned after the ABA Model Rules of Professional Conduct, *In re Waters,* 647 A.2d 1091, 1095 (Del.1994), and Rule 3.7 of the Delaware Rules is identical to the current ABA progenitor.

> FN10. This third requirement merely reflects the common-sense realization that trial counsel would not ordinarily be called as a witness by an adverse party.

With the above principles in mind, the Court turns to the merits of Leonard's motion. Leonard's

ultimate argument--that McDonough's disqualification as trial counsel is mandated because she will be a "necessary witness" at trial-- is premised on the belief she engaged, along with the University defendants, in a "course of wrongdoing" to prevent Leonard from successfully completing the P.T. program. D.I. 28 at 8. Even accepting Leonard's view of McDonough's actions, however, McDonough's testimony regarding those actions would be either cumulative or beneficial, not antagonistic, to the defense. Accordingly, Leonard's motion to disqualify McDonough as trial counsel for the University defendants will be denied.

McDonough's involvement in this case can be distilled into three discrete areas. First, there is the 1993 Settlement Agreement allegedly breached by the University defendants. At the time, McDonough represented the University defendants. She admits negotiating and helping draft the Agreement. D.I. 38 at Exh. F, p. 22. In his briefing, Leonard does not contend McDonough should be disqualified because of her participation in the 1993 Settlement Agreement. [FN11]

> FN11. Nor should he. To date, Leonard has not pointed to a dispute over the terms of the Settlement Agreement, requiring inquiry into the intent of the drafters. Even if there were a dispute over the meaning of the terms of the Settlement Agreement, however, it is unlikely McDonough would be subject to disqualification under Rule 3.7. See *Cannon,* 669 F.Supp. at 101-02; *Studiengesellschaft Kohle. MBH v. Hercules.* Inc., No. 86-566, slip op. at 8 (D.Del. Sept. 12, 1988).

*4 Second, there is the late September/early October meeting, the purpose of which, according to Heinly, was to request Leonard to undergo "psychological or psychiatric counseling." McDonough recalls attending a meeting at around that time, but does not recall whether psychological or psychiatric counseling was discussed at the meeting. D.I. 38 at Exh. F, pp. 76-78. While Leonard does not explicitly argue McDonough should be disqualified because she is a "necessary witness" to this meeting, the episode could fall within the penumbra of Leonard's broader

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1997 WL 158280
(Cite as: 1997 WL 158280 (D.Del.))

claim—that McDonough was a "direct co-conspirator" with the University defendants in a scheme to sack Leonard from the P.T. Program. D.I. 41 at 1.

The testimony of McDonough is not "necessary" with regard to this meeting, however. Since she does not recall the specifics of the meeting, *see* D.I. 38 at Exh. F, pp. 76-78, her testimony would be unhelpful. Further, and most important, there were other people at the meeting, including Heinly, whom Leonard could call as percipient witnesses. Therefore, any testimony by McDonough, useless as it may be, regarding the late September/early October meeting would be "merely cumulative." *Cannon,* 669 F.Supp. at 100 (citations omitted).

Third, there is Leonard's most serious allegation: that McDonough advised (to no avail) the 621 panel to rule against Leonard in his attempt to change his grade. [FN12] Members of the 621 panel served as witnesses before the ethics panel, of course, which ultimately recommended Leonard's dismissal. [FN13] Leonard's desire is to call McDonough as a witness at trial and ask her about the statement she allegedly made to Heinly, and the advice she allegedly gave to the hearing panel. While acknowledging attorney-client privilege will foreclose much of his questioning, Leonard maintains "the jury should be given an opportunity to draw a negative inference" from the very fact McDonough rendered advice to the '621 panel to find against Leonard. D.I. 28 at 8. For these reasons, Leonard argues, McDonough must be disqualified as the University's trial counsel under Rule 3.7.

> FN12. In the penultimate sentence of his reply brief, Leonard levels a grave charge: that McDonough violated Rule 3.5 of the Delaware Lawyers' Rules of Professional Conduct. D.I. 41 at 2. Rule 3.5 of the Delaware Lawyers' Rules of Professional Conduct provides, in its entirety:
> A lawyer shall not:
> (a) seek to influence a judge, juror, prospective juror or other official by means prohibited by law;
> (b) communicate ex parte with such a person except as permitted by law; or
> (c) engage in conduct intended to disrupt a tribunal or engage in undignified or

discourteous conduct which is degrading to a tribunal.
> Rule 3.5 of the ABA Model Rules, which applies to attorneys appearing in this district, is nearly identical to its Delaware progeny, reproduced above. Leonard's argument seems to be that because McDonough allegedly advised the 621 hearing panel to rule against Leonard, she either: (1) illegally influenced "a judge, juror, prospective juror or other official"; (2) illegally engaged in ex parte communications with a "judge, juror, prospective juror or other official"; or (3) disrupted "a tribunal", in violation of Rule 3.5.
> Leonard has not pointed to any basis in authority or logic to consider a member of a University grade grievance hearing panel the equivalent of a "judge, juror, prospective juror or other official" within the meaning of Rule 3.5. Therefore, the Court discards this argument as meritless.

> FN13. McDonough, although conceding she rendered legal advice to the University regarding Leonard as he pursued various grade grievances, denies advising any hearing panel, whether before, during or after a hearing, regarding action to take against a specific student. D.I. 38 at Exh. F, p. 36.

If each step of Leonard's argument is closely examined, however, it becomes apparent McDonough is not a "necessary witness" as contemplated by Rule 3.7. The University defendants have raised initial questions as to the admissibility of Heinly's affidavit, which alleges McDonough admitted to advising the 621 panel to rule against Leonard. [FN14]

> FN14. As the University defendants point out, Leonard may have trouble squeezing the Heinly affidavit into evidence at trial through the ordinarily porous hearsay exclusion rule.

But even if Heinly's testimony were admitted, or it

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1997 WL 158280
(Cite as: 1997 WL 158280 (D.Del.))

Page 6

is otherwise revealed that McDonough advised the 621 hearing panel to rule against Leonard in his quest to alter his grade, McDonough will not be transformed into a "necessary witness." As the University defendants point out, the 621 hearing panel was comprised of members of the University Faculty Senate. D.I. 38 at Exh. C. Leonard has conceded McDonough was retained to provide legal advice to the University on various matters; that would encompass dispensing counsel regarding decisions in grievance procedures, such as the 621 hearing. Accordingly, McDonough's testimony would be protected by attorney-client privilege. An attorney will not be disqualified as trial counsel merely because she provided legal advice to a client in the past. *See Optyl Eyewear Fashion Int'l Corp. v. Style Co., Ltd.,* 760 F.2d 1045, 1049-50 (9th Cir.1985) (affirming denial of disqualification because testimony concerning prior legal advice given by trial counsel to party-client would be privileged and movant made no showing trial counsel performed role for party-client other than legal advisor); *Studiengesellschaft Kohle, MBH v. Hercules, Inc.,* No. 86-566, slip op. at 10 (D.Del. Sept.12, 1988) (denying disqualification motion and recognizing trial counsel will be able to assert attorney-client privilege to matters regarding legal advice given to party-client).

*5 Finally, even were Leonard able to hurdle these evidentiary and privilege obstacles, McDonough would not be a "necessary witness" regarding her alleged advice to the 621 panel. Leonard intends to call Heinly as a witness to McDonough's involvement. D.I. 28 at 4. In addition to Heinly, there are the members of the 621 panel who also served as members of the 619 panel and the witnesses at the ethical hearing; Leonard identifies them as Kathleen Minkey, Reed Geiger, and John Cushman. D.I. 29 at Exh. D. Thus, at least four witnesses, other than McDonough herself, are available to testify to the University's alleged "course of wrongdoing." Any testimony by McDonough, since she denies making an inculpatory statement to Heinly and advising the 621 panel to rule against Leonard, would only serve to undermine Leonard's case. In short, if McDonough were to take the stand and admit she advised the 621 panel against Leonard, her testimony would be cumulative, and if she denied the allegations in Heinly's affidavit, her testimony would not be prejudicial to the University defendants. Under either scenario, McDonough is

not a "necessary witness" and her disqualification is unwarranted under Rule 3.7.

The cases cited by Leonard in support of his disqualification motion are not persuasive. Two of the cases, *Mannhalt v. Reed,* 847 F.2d 576 (9th Cir.1988), and *United States v. Stout,* 723 F.Supp. 297 (E.D.Pa.1989), are criminal cases and scarcely worth mentioning here. Suffice to say that both involved attorneys, accused of wrongdoing, who allowed the accusations to interfere with their efforts to represent their clients adequately. As such both *Mannhalt* and *Stout* present factual scenarios different than in this case. *Mannhalt,* 847 F.2d at 581; *Stout,* 723 F.Supp. at 304-05, 308-10. Leonard also cites an unreported Eastern District of Pennsylvania case, *Second & Ashbourne Associates. v. Cheltenham Township, Inc.,* No. 88-6400, 1989 U.S. Dist. LEXIS 992 (E.D.Pa. Feb. 2, 1989). This case, while closer than *Mannhalt* and *Stout,* in that it is a civil case, does not support Leonard's motion for disqualification. In *Second & Ashbourne,* the court was confronted with various civil rights claims arising from the review and consideration of land development plans. *Id.* at *2. The *Second & Ashbourne* court disqualified trial counsel because, as a partner of the plaintiff association, he had negotiated, drafted, and assigned a crucial document, as well as developed, presented, and discussed the land development plans at issue. *Id.* McDonough's involvement was much less pervasive; nor is she a part-owner of the University.

Leonard's motion to disqualify McDonough as trial counsel for the University defendants will be denied.

B. University Defendants' Motion for Attorneys' Fees

On November 6, 1996, Leonard served the University defendants with 839 requests for admission. *See* University Defendants' Letter Memorandum of 11/21 at Exh. 1. Even this tally of 839 is artificially low, however; many of the requests were compound, containing several assertions and requiring more than one response to a single request. In addition, while many of the requests were simply incomprehensible, others could be interpreted as offensive to one or more of the University defendants. [FN15]

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1997 WL 158280
(Cite as: 1997 WL 158280 (D.Del.))

FN15. For the incomprehensible, see University Defendants' Letter Memorandum of 11/21 at Exh. 1, p. 25 of requests directed to defendant Mary Martin ("The University stated at the level 4 hearing for PHYT-621 that it never assessed any areas to fail Leonard in but professional behavior and attitude, which it admitted were the only areas were it could intervene without allowing Leonard the option to improve and fail him.") and id. at p. 10 of requests directed to defendant University of Delaware ("The University (Stuart Binder-McCloud) indicated at the 611/620 hearing that had reviewed to lend its grading expertise Leonard's papers for those courses, at Paul Mettler's request, between the date of the two grievance hearings.") (all errors in originals). For the offensive, see id. at p. 17 of requests directed to defendant Paul Mettler ("In Patient Management 1, the University instructed Leonard to cross paths with Lynn Synder-Mackler because she is a 'bitch'.").

*6 At a conference in chambers on November 22, 1996, counsel for Leonard admitted his client, Leonard, had drafted the requests, and that counsel had performed some revisions. D.I. 25 at Exh. F-II. After counsel for Leonard promised to limit and restructure the requests for admission, the Court postponed a decision on the University defendants' request for attorneys' fees to give the parties a chance to resolve the issue amicably. Id. This opportunity went unrealized; the University filed a motion for attorneys' fees pursuant to Rule 26(g) of the Federal Rules of Civil Procedure.

Under the Federal Rules of Civil Procedure, an attorney must sign every discovery request made on behalf of his client. Rule 26(g)(2) provides this signature:

constitutes a certification that to the best of the signer's knowledge, information, and belief, formed after a reasonable inquiry, the request ... is:
(A) consistent with [the rules of discovery] and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law;
(B) not interposed for any improper purpose such

as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and
(C) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, and the importance of the issues at stake in the litigation.

If an attorney makes a certification of a discovery request in violation of Rule 26(g) "without substantial justification," the court "shall impose upon the person who made the certification, the party on whose behalf the ... request ... is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee." FED. R. CIV. P. 26(g)(3). [FN16] Rule 26(g) was amended to add a potent instrument of deterrence to the judicial arsenal; the advisory committee found "a need for more aggressive judicial control and supervision." FED. R. CIV. P. 26 advisory committee's note (citation omitted). As the advisory committee further noted: "Rule 26(g) makes explicit the authority judges now have to impose appropriate sanctions and *requires them to use it* .... The new rule *mandates* that sanctions be imposed on attorneys who fail to meet the standards established in the first portion of Rule 26(g)." *Id.* (internal citations omitted) (emphasis added).

> FN16. Pursuant to Rule 37(a)(4), a litigant who successfully moves for a protective order will be awarded attorneys' fees if the opposition to the motion was not substantially justified. At the chambers conference in November 1996, the Court indicated it would grant the University's motion for a protective order if one were brought. D.I. 25 at Exh. F-8.

While the Third Circuit Court of Appeals has not addressed the legal standard applicable to Rule 26(g) motions for sanctions, other courts have evaluated the attorney's conduct under the objective standard of reasonableness used in Rule 11 jurisprudence. *See In re Byrd, Inc.,* 927 F.2d 1135, 1137 (10th Cir.1991) ("When considering sanctions under Rule 11, and therefore Rule 26(g), the court must judge the attorney's conduct under an objective standard of reasonableness."); *Insurance Benefit Adm'rs, Inc. v. Martin,* 871 F.2d 1354, 1360

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1997 WL 158280
(Cite as: 1997 WL 158280 (D.Del.))

(7th Cir.1989); *Chapman & Cole and CCP. Ltd. v. Itel Container Int'l B.V.*, 865 F.2d 676, 685-86 (5th Cir.1989); *Apex Oil Co. v. Belcher Co. of New York. Inc.*, 855 F.2d 1009, 1015 (2d Cir.1988); *TRW Fin. Sys., Inc. v. Unisys Corp.*, No. 90-CV-71252-DT, 1995 WL 545023, at ---- 8-9 (E.D.Mich. Feb.6, 1995); *In re Weinberg*, 163 B.R. 681, 686 (E.D.N.Y.1994). Under the objective standard of reasonableness, inquiry into the subjective intent of a litigant or his counsel is unnecessary; sanctions can be imposed if the person who signed the pleading failed to conduct "a reasonable inquiry into the facts and law supporting the pleading." *United Mo. Bank of Kansas City. N.A. v. Bank of N.Y.*, 723 F.Supp. 408, 415 (W.D.Mo.1989) (interpreting FED. R. CIV. P. 26(g) under Rule 11 standards). This comports with the intention of the advisory committee, which wrote: "The duty to make a 'reasonable inquiry' [under Rule 26(g)(2) ] is satisfied if the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances. It is an objective standard similar to the one imposed by Rule 11." FED. R. CIV. P. 26(g) advisory committee's note. Given the motivation behind the revisions of Rule 26(g), as evidenced in the advisory committee notes, the Court joins the growing swell of jurists adopting an objective standard, and applies it to the University's motion for attorneys' fees.

*7 After reviewing the over-800 requests to admission, the Court concludes they fall well short of this objective reasonableness standard. Counsel for Leonard emphasizes he viewed the 800-some requests as a good-faith effort to narrow issues for trial. He avows he was able to "document the record from the various grievance hearing transcripts to show the basis for each of the initial Requests for Admissions." D.I. 31 at 3. [FN17] He also notes, correctly, that in 1992 the Local Rules for the District of Delaware eliminated a ceiling for the number of requests a litigant could propound. Finally, he alleges the University defendants are also at fault for stonewalling discovery and engaging in various other abusive discovery tactics. [FN18]

> FN17. Counsel for Leonard did not submit this documentation to the Court.

> FN18. At oral argument, counsel for Leonard argued that imposing an award of attorneys' fees against either his client or him might result in the abandonment of Leonard's claim due to their respective financial constraints. While the Court sympathizes with such a plight if it exists, the Court was not provided any documentation upon which it could make a balanced assessment of the potential pecuniary limitations of either Leonard or his attorney. Because of this lack of supporting documentation and because lawyers or litigants are not conferred a right to flout the Federal Rules of Civil Procedure by virtue of their "financially challenged" status, Leonard's eleventh hour argument will not stay the chimes of midnight.

Without delving into the myriad other minor discovery skirmishes in this case, the Court finds the above arguments unavailing. Given the oppressive number of requests, and their often confusing and sometimes incoherent nature, [FN19] an objective attorney would be hard-pressed to quibble with the conclusion that a reasonable inquiry would reveal the requests are "unreasonable or unduly burdensome." Fed. R. Civ. P. 26(g)(2)(C) . Further, the Court recognizes the requests, drafted by Leonard, were likely designed "to harass or to cause unnecessary delay or needless increase in the cost of litigation" in violation of Rule 26(g)(2)(B); counsel for Leonard, had he undertaken a reasonable inquiry, should have realized the requests would at least have that inevitable effect.

> FN19. *See supra* note 15. Other courts have held requests for admission that run into the hundreds and even thousands are abusive, which, when considering the compound nature of the requests, is the case here. *See Misco, Inc. v. United States Steel Corp.*, 784 F.2d 198, 206 (6th Cir.1986); *Phillips Petroleum Co. v. Northern Petrochemical Co.*, No. 84 C2028, 1986 WL 9186 (N.D.Ill. Aug.19, 1996); *Wigler v. Electronic Data Sys. Corp.*, 108 F.R.D. 204 (D.Md.1985); *Krantz v. United States*, 56 F.R.D. 555 (W.D.Va.1972).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1997 WL 158280
**(Cite as: 1997 WL 158280 (D.Del.))**

Page 9

A court is empowered to sanction appropriately either client, counsel, or both, for discovery propounded in violation of Rule 26. *See* Fed. R. Civ. P. 26(g)(3). Both client and counsel are at fault here. The client, Leonard, drafted the requests, which would explain the incomprehensibility and crudity of many of the requests. D.I. 25 at Exh. F-II. Counsel reviewed the requests and signed them. Id. This signature was a certification the requests were reasonable. Fed R. Civ. P. 26(g)(2). As the Court has held, they were not. Accordingly, the Court will grant the University defendants' motion for attorneys' fees in the amount of $ 3,777.25. [FN20] Both Leonard and his counsel will be held jointly and severally liable for the amount ordered.

> FN20. In his brief, Leonard writes: "the time submitted by [counsel for the University defendants] is completely out of proportion with reality." D.I. 31 at 3. This is hyperbole, however; considering the number of requests and their complexity, the Court finds the time and fees spent by counsel for the University defendants reviewing the requests, *see* D.I. 25 at Exh. G, to be reasonable. The Court does not grant the University defendants' request for an additional $ 1,050.00 in fees incurred in the preparation and filing of their motion for attorneys' fees because those expenses were not adequately documented or itemized.

1997 WL 158280, 1997 WL 158280 (D.Del.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**A70**

# Exhibit E

Westlaw.

1998 WL 42887                                                    Page 1
(Cite as: 1998 WL 42887 (E.D.La.))

**C**
Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.

Glen R. MICHEL
v.
B.H. MILLER, Individually and in His Official
Capacity as the City of Gretna
Police Chief

No. Civ.A. 97-2419.

Jan. 30, 1998.

### MEMORANDUM AND ORDER

SEAR, J.

**Background**

*1 Plaintiff is a retired, disabled police officer of
the City of Gretna Police Department. Defendant
Miller was the City of Gretna Chief of Police and is
being sued individually and in his official capacity
for allegedly refusing to return Plaintiff's police
commission and identification cards. On August 4,
1997, Plaintiff Michel filed a Complaint alleging
1983 violations against Defendant Miller.

According to Plaintiff, retired officers of the City
of Gretna Police Department are entitled to receive
police commission and identification cards. On or
about June 1, 1996, after learning that the City of
Gretna Police Department (herein "Police
Department") was issuing replacement
commissions, identifications and badges for all
officers, including retired and disabled officers,
Plaintiff attempted to have his commission and
identification cards replaced with a new
commission, identification and badge (herein
"cards") Plaintiff contends he alone was denied
such replacement cards.

Plaintiff sued Defendant in a civil rights suit

entitled *Glen R. Michel v. B.H. Miller, Jr.,* Civil
Action No. 96-2785, Section "G". On November
22, 1996, the parties reached a settlement and
Plaintiff was provided new cards.

On February 22, 1997, Plaintiff was arrested in
Orleans Parish for allegedly disturbing the peace
and his cards were confiscated. Plaintiff argues
that other Gretna police officers similarly arrested
did not have their cards withheld. On March 17,
1997, according to Plaintiff, W.J. LeBlanc, the
Gretna City Attorney, corresponded with Plaintiff's
counsel and indicated that Plaintiff's cards would be
returned if the disturbing the peace charge was
dropped or if Plaintiff was found not guilty. On
June 5, 1997, the disturbing the peace charge was
dropped by the City of New Orleans, however,
Defendant failed to return Plaintiff's cards.

Plaintiff alleges that Defendant then tried to
encourage the Orleans Parish District Attorney's
office to charge Plaintiff with a felony based on the
same disturbing the peace incident. The Orleans
Parish District Attorney's Office screened the matter
but also refused the charge.

Plaintiff contends that Defendant's confiscation and
refusal to return his cards as well as Defendant's
attempt to have the Orleans Parish District
Attorney's Office charge Plaintiff with a crime that
had already been dropped by the City of New
Orleans reflect "arbitrary and capricious conduct"
[FN1] engaged in as retaliation for past lawsuits.
[FN2] Plaintiff alleges this conduct was committed
to "willfully and intentionally" [FN3] to deprive
Plaintiff of his First, Fifth and Fourteenth
Amendment rights. In addition, Plaintiff claims
that he has suffered severe mental anguish,
humiliation, emotional stress and embarrassment;
all for which he seeks to be compensated.

> FN1. See Complaint, dated August 4,
> 1997, p. 7.

> FN2. From 1988 until 1996, Plaintiff was
> involved in several lawsuits against

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Defendant including two civil rights actions in this Court, a disability retirement lawsuit in the United States District Court for the Middle District of Louisiana, and a worker's compensation claim.

> FN3. See Complaint, dated August 4, 1997, p. 7.

Defendant does not dispute that the confiscation of the cards occurred, however, Defendant has a different explanation of what later conspired between the parties. Defendant avers that after the Orleans Parish District Attorney's office declined to charge Michel with a criminal offense, Defendant did offer to return the cards. Defendant explains any delay that occurred was due to the fact that while the charges were dismissed by the Orleans City Attorney on June 5, 1997, the Screening Division of the Orleans Parish District Attorney's Office was still investigating Plaintiff's arrest. Shortly after the Orleans Parish District Attorney's Office declined to charge Michel with any offense, Defendant offered to return the cards. Michel, however, refused the cards and filed this civil rights case two days later.

**\*2** On December 1, 1997, Plaintiff filed a Motion to Disqualify Counsel of Record and for Defendant to Waive Conflict of Interest claiming Gretna City Attorney W.J. LeBlanc is a necessary witness in the proceedings and that a conflict of interest exists between Mr. LeBlanc and Defendant Miller. Defendant filed a timely opposition. The question before the Court is whether Mr. LeBlanc should be disqualified as counsel of record for Defendant and whether Defendant should be ordered to either retain separate counsel or sign a waiver of conflict of interest.

**Discussion**

*I. Disqualification of W.J. LeBlanc*

The Fifth Circuit Court of Appeals has held that, "[D]isqualification cases are governed by state and national ethical standards adopted by the Court." [FN4] Accordingly, the following four ethical canons should be consulted with regard to the disqualification issues raised by the parties:

> FN4. *Federal Deposit Ins. Corp. v. United States Fire Ins. Co.,* 50 F.3d 1304, 1311-12 (5th Cir.1995) (herein "F.D.I.C.") *quoting In re American Airlines, Inc.,* 972 F.2d 605, 610 (5th Cir.1992).

(1) the Local Rules;

(2) the Model Rules of Professional Conduct;

(3) the state rules; and

(4) the Model Code. [FN5]

> FN5. *Id.* at 1312

For the Eastern District of Louisiana, the relevant local rules, the Model Rules, and the state rules are identical. [FN6]

> FN6. See RULES OF DISCIPLINARY ENFORCEMENT OF THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA, LOCAL CIVIL RULE 83.2 10E, Rule I(D) (adopting the Rules of Professional Conduct of the Supreme Court of the State of Louisiana); ARTICLES OF INCORPORATION OF THE LOUISIANA STATE BAR ASSOCIATION, Article XVI, Rules 3.7 and 1.7; Model Rules of Professional Conduct, Rules 3.7 and 1.7.

Rule 3.7 of the Rules of Professional Conduct states:
(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
(1) the testimony relates to an uncontested issue;
(2) the testimony relates to the nature and value of legal services rendered in the case; or
(3) disqualification of the lawyer would work substantial hardship on the client.
(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1998 WL 42887                                                      Page 3
**(Cite as: 1998 WL 42887 (E.D.La.))**

Model Rule 1.7, the general rule for attorney conflicts of interest, provides in relevant part that:
> (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's own responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
> (1) the lawyer reasonably believes the representation will not be adversely affected; and
> (2) the client consents after consultation.....

The Comments to Rule 1.7 note that a possible conflict of interest does not by itself preclude representation. Rather, "the appropriate inquiry is whether such conflict will materially interfere with the lawyer's independent professional judgment...." [FN7] Rule 1.9 governs conflicts of interest relating to former clients and is not applicable in this case.

> FN7. Model Rule of Professional Conduct Rule 1.7 cmt. (1983).

Similarly, Disciplinary Rule 5-102 of the Model Code of Professional Responsibility, Model Rule 3.7 's parallel, states in relevant part: Withdrawal as Counsel When the Lawyer Becomes a Witness ...
> (B) If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm may be called as a witness other than on behalf of his client, he may continue the representation until it is apparent that his testimony is or may be prejudicial to his client.

**\*3** DR 5-101(A) further provides that, "[e]xcept with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of the client will be or reasonably may be affected by his own financial, business, property, or personal interests." Like the Model Rules cited above, both of these disciplinary rules also reflect concern with impairment of the lawyer's exercise of independent professional judgment. [FN8]

> FN8. Model Rule of Professional Conduct Rule 1.7 cmt.

While the ethical canons are a "useful guide for adjudicating motions to disqualify," they are not controlling and may not be applied inflexibly. [FN9] Courts must also consider the social interests at stake. [FN10] The right to select one's counsel, for instance, is an important interest that should be considered. [FN11] In sum, "[a]ll of the facts particular to a case must be considered, in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights." [FN12]

> FN9. *F.D.I.C.,* 50 F.3d at 1314.

> FN10. *Id.*

> FN11. *Id.*

> FN12. *Id.*

Here, Plaintiff argues that W.J. LeBlanc, the Gretna City Attorney, should be disqualified pursuant to Rule 3.7 of the Rules of Professional Conduct. The basis for Plaintiff's assertion is the alleged conversation in which Mr. LeBlanc promised, on behalf of Defendant Miller, that Plaintiff's cards would be returned if the arrest charge was dropped or if he was found not guilty. [FN13] After the charge was dropped, Plaintiff avers that Mr. LeBlanc failed to keep his word and lobbied the Orleans District Attorney to prosecute Plaintiff with a felony charge. Thus, Plaintiff suggests that Mr. LeBlanc will be a necessary witness in this case and none of the exceptions of to Rule 3.7 of the Rules of Professional Conduct apply.

> FN13. Plaintiff indicates that if it is learned during discovery that Mr. LeBlanc was acting independently of Chief Miller, Mr. LeBlanc will find himself as a defendant in this case.

When determining whether a lawyer, like Mr. LeBlanc, is "likely to be a necessary witness" courts have required three things to be shown to demonstrate that the "likely to be a necessary witness" factor exists:

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**A74**

1. The attorney will give evidence material to the determination of the issues being litigated;

2. The evidence cannot be obtained elsewhere; and,

3. The testimony is prejudicial or potentially prejudicial to the testifying attorney's client. [FN14]

> FN14. *Lange v. The Orleans Levee District,* 1997 WL 668216 *3 (E.D.La.) *citing Personalized Mass Media Corp. v. Weather Channel,* Inc. 899 F.Supp. 239, 243 (E.D.Va.1995).

These requirements allow a court to balance ethical considerations and societal interests, such as the right of a party to select his counsel. Moreover, this Court is aware that it "must be especially sensitive to the potential for abuse" when, as here, the party seeking disqualification is also the one wanting to call the attorney as a witness. [FN15]

> FN15. *Lange v. The Orleans Levee District,* 1997 WL 668216 (E.D.La.) *citing Chapman Engineers, Inc. v. Natural Gas Sales Co.,* 766 F.Supp. 949, 958 (D.Kan.1991).

Plaintiff suggests that Mr. LeBlanc will be a necessary witness based on the alleged conversation regarding the return of Plaintiff's cards once the arrest charges were dropped. Although it is true that this evidence is relevant and necessary, I do not find the testimony Mr. LeBlanc could offer to be prejudicial or even potentially prejudicial to his client, Defendant Miller. In fact, as Defendant argues in his Opposition to Plaintiff's Motion to Disqualify, the conversation between Mr. LeBlanc and Plaintiff would establish that Plaintiff's cards were not withheld for arbitrary and capricious reasons, but rather rationally based on Plaintiff's arrest and subsequent investigation. [FN16]

> FN16. Defendant's Opposition to Plaintiff's Motion to Disqualify, dated December 29, 1997, p. 3.

*4 Plaintiff also argues that a potential conflict of interest exists in a situation where Mr. LeBlanc serves as Defendant Miller's counsel of record. However, Plaintiff fails to specify where or how Mr. LeBlanc and Defendant Miller's interests might conflict. From the record before the Court thus far, it appears that Mr. LeBlanc and Defendant Miller's interest are very much aligned.

Accordingly,

Plaintiff's Motion to Disqualify Counsel of Record and for Defendant to Waive Conflict of Interest is **DENIED.**

1998 WL 42887, 1998 WL 42887 (E.D.La.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NORTHWESTERN CORPORATION, | ) Case No. 03-12872(CGC) |
| | ) |
| Debtor. | ) **Hearing date: July 21, 2004 @ 3:00 p.m.** |
| | ) **Objection deadline: July 14, 2004** |

## MOTION OF MAGTEN ASSET MANAGEMENT CORPORATION TO DISQUALIFY PAUL, HASTINGS, JANOFSKY & WALKER LLP

Magten Asset Management Corporation ("Magten"), by its undersigned counsel, hereby submits this motion to disqualify Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings") as counsel to the debtor-in-possession (the "Debtor").

### PRELIMINARY STATEMENT

On November 15, 2002, the Debtor transferred substantially all of the utility assets of its directly owned subsidiary, Clark Fork and Blackfoot, LLC ("Clark Fork") to itself for no consideration (the "Transfer"). Though the Clark Fork assets had a value well in excess of $1 billion, the total purported consideration received for the Transfer was the illusory assumption of approximately $700 million of liabilities by the Debtor. As a result of this Transfer, Clark Fork was rendered insolvent. In addition, Clark Fork remained jointly and severally liable for at least a portion of the liabilities assumed by the Debtor.

Almost exactly five months later, on April 16, 2003, the Debtor's reported financial results for the fiscal year ended ("FYE") 2002 included a restatement of the previously unaudited quarterly results for the first three quarters of FYE 2002, and specifically indicated an additional $878.5 million in previously unreported "negative

Docket No: 1502
Date: 6/18/04

charges."[1]  Thus, the Debtor had been insolvent at the time of the Transfer, which, even

despite the magnitude of assets transferred, continued to be true after the Transfer,

leading to filing of the Petition on September 14, 2003, almost five months after the

financial statement irregularities were disclosed.  There is little doubt that the Transfer

was a fraudulent transfer under Montana State law.

        The Transfer, commonly referred to as the "going flat" transaction, and

the assets transferred as part of it, have become the central transaction under dispute in

these proceedings.  The assets transferred are also a central component of the Debtor's

proposed plan of reorganization.

        Paul Hastings represented both parties to the Transfer – the Debtor and

Clark Fork.  This motion is occasioned by Paul Hastings' role as counsel for both sides in

that Transfer, its failure to disclose that role to this date despite the strict requirements

that they do so, and their failure to acknowledge the scope of their conflict in light of the

role they played.

        Paul Hastings contends that merely as counsel to the Debtor they had no

conflict.  That argument conveniently dismisses their role as counsel to Clark Fork, a role

they have failed to disclose to this date.  Paul Hastings also contends that Magten

somehow waived any objection to their conflict by not raising it at the April 8, 2004

conference on Magten's motion to lift the automatic stay to pursue these claims against

Northwestern.  Besides ignoring Magten's earlier demand that Paul Hastings withdraw,

that argument fails to disclose how, in light of Paul Hastings' complete failure to disclose

---

[1] The United States Securities and Exchange Commission (the "SEC") has launched a formal investigation into the Debtor's financial restatements.

its role in the Transfer, Magten can waive its objection to what Paul Hastings was statutorily required to disclose and did not.

The circumstance in which Paul Hastings finds itself is exclusively of its own making.  Had Paul Hastings disclosed its role as counsel to both parties to this the Transfer at the outset of the case (as it was required to do) the matter would have been addressed nearly a year ago.  For the reasons discussed below, Paul Hastings' employment as counsel to the Debtor is clearly prohibited by Sections 1107, 327(a) and 101(14) of Title 11 of the United States Code (the "Bankruptcy Code").  Accordingly Paul Hastings should be disqualified as Debtor's counsel.

## I.    STATEMENT OF FACTS

On June 16, 2004, Paul Hastings, explicitly acknowledging its conflict of interest, withdrew from the adversary proceeding filed by Magten and Law Debenture Trust Company of New York ("Law Debenture") seeking to avoid the Transfer as a fraudulent conveyance (the "Adversary Proceeding").  A brief recounting of the events leading up to that withdrawal follows below.

On November 15, 2002, Paul Hastings represented both the Debtor and Clark Fork on the Transfer.  Although it was only disclosed five months later, the Debtor was insolvent at the time of the Transfer and owed fiduciary duties to both its shareholders and its creditors.  By stripping Clark Fork of substantially all of its assets, the Transfer also rendered Clark Fork insolvent and with fiduciary duties owed to its own creditors.  Notwithstanding the conflicting interests inherent in this transaction, Paul Hastings represented Clark Fork at the same time as its long-standing client, the Debtor.

**A78**

Paul Hastings actually knew that the Transfer would be challenged as fraudulent even before it represented both sides to it. On the same day as it executed the Transfer, Northwestern, by its local Montana counsel, submitted a Substitute Motion for Leave to Add Northwestern Corporation as an Additional Party-Defendant (the "Substitute Motion") to the Court in a class action suit titled McGreevey, et al. v. Montana Power Company, et al., No. DV 01-141, Montana Second Judicial District. The Substitute Motion is attached as Exhibit A. In the Substitute Motion, Northwestern expressly stipulated that 1) the McGreevey class rights to challenge the Transfer as fraudulent would be preserved, and 2) Northwestern would take certain steps to preserve those assets should the McGreevey class one day obtain judgment on its claims. However, as the Debtor's general corporate counsel, Paul Hastings no doubt was involved in this stipulation and knew that the Transfer it orchestrated would likely be challenged. Paul Hastings undertook its representation anyway.

Four weeks after the Transfer, on December 17, 2002, Paul Hastings promptly represented the Debtor in mortgaging these very same assets to Credit Suisse First Boston, another client of Paul Hastings. Paul Hastings has not disclosed the extent of its involvement, if any, in this transaction either.

The Transfer is now the subject of various litigations at different procedural stages. On April 16, 2004, Magten and Law Debenture filed the Adversary Proceeding. On May 14, 2004, Paul Hastings appeared for the Debtor in the Adversary Proceeding by submitting a motion to dismiss.

On April 19, 2004, Magten commenced an action against the former officers of Clark Fork for breaching their fiduciary duty by fraudulently transferring

**A79**

Clark Fork's assets to the Debtor in the United States District Court, District of Montana.

On May 19, 2004, Magten, on its own behalf and on behalf of Clark Fork, brought suit in

the Second Judicial District of Montana against Paul Hastings for aiding and abetting a

fraudulent transfer, conspiracy to effect a fraudulent transfer and malpractice in its

representation of Clark Fork.  Those complaints are attached as Exhibits B and C,

respectively.

At no time in these proceedings has Paul Hastings disclosed its

involvement in the Transfer as required.  On September 17, 2003, the Debtor applied to

retain Paul Hastings.  In connection with that application, Paul Hastings submitted the

Affidavit of Jesse Austin III stating, among other things, that Paul Hastings was a

disinterested person as defined by §§ 101(14) and 1107(b) of the Bankruptcy Code.  This

affidavit purported to disclose all of Paul Hastings' potential conflicts.  However,

nowhere did Paul Hastings disclose that it represented the Debtor and Clark Fork in

connection with the Transfer.  In fact, although Paul Hastings represented both sides of

the transaction resulting in the Debtor's acquiring what turned out to be 80% of the

Estate's assets, it disclosed none of the facts related above.

Paul Hastings suggests that Magten sat on its hands by not raising Paul

Hastings' lack of disinterestedness at the April 8, 2004 hearing on Magten's motion to lift

the stay.  See Paul Hastings' Response to Magten's 328(c) Statement dated June 2, 2004

(the "Response"), ¶ 6.  This statement is disingenuous.  On March 30, 2004, Magten,

through its counsel, warned Paul Hastings that its involvement in the Transfer

jeopardized its status as a disinterested party and subjected it to possible liability.  Paul

Hastings refused to respond.  That letter is attached as Exhibit D.

**A80**

On April 16, 2004, Magten once again, through its counsel, wrote Paul Hastings asking Paul Hastings to respond to the allegations raised against it. Paul Hastings once again refused to respond to the substantive allegations raised, this time claiming that it had no need to respond. Those letters are attached as Exhibits E and F, respectively.

Finally, confronted with Paul Hastings' intransigence, on May 11, 2004, Magten filed a brief 328(c) statement (the "Statement") informing the Court of Paul Hastings' involvement and noticing all parties that Paul Hastings might not be disinterested because of its involvement in the Transfer. The Statement is attached as Exhibit G. Paul Hastings' 12 page Response to the Statement conspicuously fails to address the conflict raised in the Statement. In fact, Paul Hastings has not denied nor shed any light on the facts laid out in the Statement as the basis for Paul Hastings being interested.

Instead, finally acknowledging its precarious position as counsel to the Debtor, on June 16, 2004, just five days before the scheduled 328(c) hearing, Paul Hastings filed a Second Supplemental Affidavit[2] announcing its withdrawal as counsel for the Debtor in the Adversary Proceeding on account of its conflict of interest, but once again failing to disclose the extent of its involvement with the Transfer.

Paul Hastings' belated and half-hearted attempts to take its personal involvement in this bankruptcy seriously should not be countenanced by this Court. They had no business serving as Debtor's counsel in this case to begin with, and they have only

---

[2] The full title of this document is Second Supplemental Affidavit of Jesse Austin, III in Connection with Paul, Hastings, Janofsky & Walker LLP's Employment as Attorneys For Debtor and Debtor-in-Possession (the "Second Supplemental Affidavit"). It is attached hereto as Exhibit H.

delayed the inevitable by failing to disclose their involvement. To this day, they have failed to respond fully and meaningfully to the substantive concerns raised against them.

## II.    DISCUSSIONS OF LAW

### A. PAUL HASTINGS' RETENTION VIOLATES SECTION 327 BECAUSE OF ITS ACTUAL CONFLICT OF INTEREST.

In In re Marvel Entertainment Group, 140 F.3d 463 (3d Cir. 1998) and In re BH & P, Inc., 949 F.2d 1300 (3d Cir. 1991), the Third Circuit laid out the following matrix by which Section 327 of the Bankruptcy Code mandates disqualification. Any attorney holding an actual conflict of interest is *per se* disqualified from employment by a debtor-in-possession; the Court must disqualify him. Marvel, 140 F.3d at 476. If an attorney has even a potential conflict, the Court may disqualify him in its discretion. Id. However, if an attorney's representation bears only the appearance of impropriety, the Court is precluded from disqualifying him. Id.

Where an attorney represents two parties to the same transaction, the attorney may not represent either side if that transaction falls into dispute. See Grynberg v. Burke, 1976 Del. Ch. Lexis 153 (Del.Ch. 1981)[3] (law firm disqualified from defending corporation against fraud suit brought by shareholder, where firm had represented both the corporation and the shareholder on a loan transaction substantially related to the fraud); Gieder v. Waxman, 1983 WL 21397 * 3 (Del.Ch. 1983)("It is a well settled rule that if a lawyer is retained by two clients and they get into a dispute, he cannot ordinarily represent either."). See also, Rule 1.7 of the Model Rules of Professional Conduct. Here, the more Paul Hastings succeeds at marshalling the Clark Fork assets into the Northwestern estate, the more its client Clark Fork, and fiduciaries of its client Clark

---

[3] Because this case is only available through Lexis, the Lexis citation will be provided.

**A82**

Fork, will be stripped of assets which should rightfully be available to Clark Fork, putting the interests of both clients directly in conflict.

Thus, contrary to Paul Hastings' assertions, it has an actual conflict of interest. As counsel to a Chapter 11 debtor-in-possession, Paul Hastings is primarily responsible for designing, drafting and advocating on behalf of the debtor-in-possession's plan of reorganization. In this bankruptcy, the assets acquired as a result of the Transfer comprise the bulk of the assets that support the reorganization. Paul Hastings is not neutral with respect to these assets because it represented both parties to the Transfer. Now that those parties to whom Paul Hastings' clients owed fiduciaries duties have challenged the transaction as fraudulent, it is inappropriate for Paul Hastings to continue advocating for the reorganization of those same assets as part of the Debtor's estate. Paul Hastings should not be an advocate for a reorganization plan based upon the Estate's possession of the Clark Fork assets and continue to argue against various motions to lift the stay to challenge the Transfer.

On June 16, 2004, Paul Hastings purported to supplement its latest affidavit of disinterestedness, admitting that it could no longer represent the Debtor in the Adversary Proceeding due to its conflict of interest. However, Paul Hastings would have this Court believe that the same conflicts which prohibit it from advocating for the Transfer in the Adversary Proceeding do not prohibit it from advocating a reorganization plan based almost entirely on the defense of that Transfer. There is no conceptual distinction between representing the Debtor in the Adversary Proceeding and representing the Debtor in its attempt to reorganize around these particular assets. Indeed, in its general representation of the Debtor, Paul Hastings has already appeared,

**A83**

and continues to appear, on behalf of the Debtor to argue against lifting the stay on claims challenging the Transfer.

This conflict is indelible and cannot be smoothed over merely by withdrawing from the Adversary Proceeding. The success of the Debtor's reorganization hinges on the legitimacy of the Transfer. Almost every time Paul Hastings negotiates with creditors, appears to quash motions to lift the stay or advocates in favor of the reorganization plan, Paul Hastings will be taking a position on the disputed Transfer on which it represented both sides. See In re Envirodyne Industries, Inc., 150 B.R. 1008 (Bankr.N.D.Ill. 1993)(disqualifying Cleary Gottlieb as debtor's counsel because of its representation of interested party in central transaction under dispute in the bankruptcy reorganization).

### B. PAUL HASTINGS' RETENTION VIOLATES SECTION 327(A) BECAUSE PAUL HASTINGS HAS AN INTEREST MATERIALLY ADVERSE TO A CLASS OF CREDITORS.

Section 1107, in conjunction with Section 327(a), of the Bankruptcy Code grants the debtor-in-possession power to employ professional persons of its choosing, so long as those persons are disinterested. As defined in Section 101(14), a disinterested person is one who:

> does not have an interest materially adverse to the interest of the estate *or to any class of creditors* or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker…, or for any other reason. (emphasis added).

The Third Circuit has interpreted this section to mean that "one is a disinterested person only if he has no interest that is materially adverse *to a party in interest in the*

**A84**

*bankruptcy.*" (emphasis added). In re Marvel Entertainment Group, 140 F.3d at 476. Such a materially adverse interest may not be waived and mandates disqualification.

*Adverse interest* has been defined in primarily two ways: 1) an economic interest, where the professional could take value away from a party in interest, including where the professional has an actual or potential dispute with a party in interest, or 2) a bias or predisposition against a party in interest. See, e.g., In re First Jersey Securities, Inc., 180 F.3d 504 (3d Cir. 1999); In Matter of 22 Acquisition Corp., 2004 WL 870813 at *2 (E.D.Pa. 2004); In the Matter of Gelsinger, 2000 WL 136812 at *2 (E.D.Pa. 2000); In re Star Broadcasting, Inc., 81 B.R. 835, 838 (Bankr.D.N.J. 1988)(all defining *adverse interest* in situations where the alleged impermissible adverse interest was adverse to the estate).

Paul Hastings fails both tests. Paul Hastings orchestrated the entire Transfer stripping Clark Fork of assets with which to pay its creditors. Due to its involvement with the Transfer, Paul Hastings itself now has an actual dispute with the pre-Transfer creditors of Clark Fork (the "Clark Fork Creditors"),[4] creditors to whom its client, Clark Fork, owed fiduciary duties. Furthermore, due to its involvement with the Transfer, Paul Hastings now has an actual pecuniary interest adverse to the Clark Fork Creditors because of its liability to them for aiding and abetting the fraudulent transfer. Because of its personal interest in seeing the claims of the Clark Fork creditors fail, and in limiting its own liability, Paul Hastings has a strong personal bias against the Clark Fork Creditors.

---

[4] These creditors are now, as a result of the Transfer, creditors of both the Debtor and Clark Fork. However, should the Transfer be avoided as fraudulent, these creditors will remain only creditors of Clark Fork.

**A85**

While cases where professionals have interests adverse to classes of creditors may be rare, courts do not shy away from disqualifying professionals who cannot deal equally with all creditors.  See In re Big Rivers Electric Corp., 355 F.3d 415 (6th Cir. 2004) (disqualifying examiner on the grounds that he was not disinterested where risk existed that he would disfavor certain creditors).

### C.  PAUL HASTINGS FAILED TO COMPLY WITH THE DISCLOSURE REQUIREMENTS OF BANKRUPTCY RULE 2014 AND LOCAL RULE 2014-1.

Professionals seeking to be employed by the debtor-in-possession must disclose "all of the person's connections with the debtor, creditors, [or] any other party in interest." Bankr.R.Civ. Pro. 2014.  Furthermore, Local Rule 2014-1 provides that

> Promptly after learning any additional material information relating to such employment (such as potential or actual conflicts of interest), the professional employed or to be employed shall file and serve a supplemental affidavit setting forth the additional information.

The professional seeking employment bears the burden of coming forward with relevant facts and must "make full, candid and complete disclosure." In re Plaza Hotel Corp., 111 B.R. 882, 883 (Bankr.E.D.Cal. 1990)(disqualifying debtor's counsel for failing to disclose that prepetition retainer was really designed to be paid in part, post-petition). See also BH & P, (holding that trustee's failure to disclose possible conflict mandated the denial of its fees).  Even seemingly trivial connections must be disclosed.  See In re EWC, 138 B.R. 276, 280 (Bankr.W.D.Okla. 1992)(holding that professionals "cannot pick and choose which connections are irrelevant or trivial" and denying compensation) citing In the Matter of Arlan's Department Stores, Inc., 615 F.2d 925, 932 (2d Cir. 1979)(ruling under similar disclosure requirement of old Bankruptcy Act).

**A86**

In its initial disclosure statement, Paul Hastings did not once mention its involvement with the Transfer. Nor did it mention that it represented both sides to a transaction in which the central assets of the Estate were acquired by the Debtor in, at best, dubious circumstances. In its supplemental disclosure statement, filed December 19, 2003, Paul Hastings again failed to disclose this crucial fact. After being advised of its conflict by Magten and after appearing to argue against lifting the stay to allow Magten and Law Debenture's fraudulent conveyance action to proceed, Paul Hastings once again failed to disclose this fact. In its Second Supplemental Affidavit, filed June 16, 2004, Paul Hastings yet again fails to disclose this fact. The only conclusion to be drawn from this behavior is that Paul Hastings has knowingly and intentionally withheld this information from disclosure.

Paul Hastings' involvement on the Transfer was plainly relevant to its employment as Debtor's counsel. As the Court explained in In re Statewide Pools, Inc., 79 B.R. 312, 314 (Bankr.S.D.Ohio 1987)

> an attorney's role in drafting certain of the debtor's documents may give him an interest in preserving the integrity of certain transfers effectuated by these documents. That interest could be adverse to the estate or produce an actual conflict should such transfers be challenged.

Insufficient disclosure of counsel goes to the heart of the bankruptcy system. In re B.E.S Concrete Products, Inc., 93 B.R. 228, 236 (Bankr.E.D.Cal. 1988)("It is not sufficient that the information might be mined from petitions, schedules, section 341 meeting testimony, or other sources. The burden is on the person to be employed to come forward and make full, candid and complete disclosure."). Even up to this late

**A87**

date, Paul Hastings refuses to inform the Court or the Clark Fork Creditors of its role in the Transfer.

### D. AT A MINIMUM, THE COURT SHOULD ORDER PAUL HASTINGS TO FINALLY DISCLOSE ITS ROLE IN THE TRANSFER.

In accordance with Rule 2014 and Local Rule 2014-1, discussed above, this Court should require Paul Hastings to submit an affidavit detailing the services it provided to both Clark Fork and the Debtor in connection with the disposition of these assets. As the Third Circuit has observed, "It is not... the obligation of the bankruptcy court to search the record for possible conflicts of interest. That obligation belongs to the party who seeks employment by the estate." BH & P, 949 F.2d at 1317.

Paul Hastings should not be permitted to defend this motion with the bare statement that "providing legal service for a debtor does not render the lawyers 'interested.'" (328(c) Response, ¶ 2). Instead, Paul Hastings should have to disclose their role and involvement in the Transfer. There should be no determination of their disinterestedness without such disclosure.

**A88**

## CONCLUSION

Wherefore, for the reasons stated above, Magten respectfully requests that the Court disqualify the law firm of Paul Hastings Janofsky and Walker, LLP from its employment as counsel to the Debtor.

June 18, 2004                                      Smith, Katzenstein & Furlow LLP


                                                   Kathleen M. Miller (2898)
                                                   P.O. Box 410
                                                   800 Delaware Avenue
                                                   Wilmington, DE 19899
                                                   302-652-8400

Bijan Amini (NY Bar. No. 3533)
STORCH AMINI & MUNVES PC
2 Grand Central Tower
New York, New York 10017
(212) 490-4100

                                                   Counsel to Magten Asset
                                                   Management Corporation


**A89**

# EXHIBIT A

1   Wayne Harper
    NorthWestern Energy, LLC.
2   40 E. Broadway St.
    Butte, MT 59701-9394
3   (406)497-2257

4   Stanley T. Kaleczyc
    Kimberly A. Beatty
5   BROWNING, KALECZYC, BERRY & HOVEN, P.C.
    139 North Last Chance Gulch
6   Helena, Montana 59601
    (406) 443-6820

7

    Attorneys for NorthWestern Energy, LLC.
8
                MONTANA SECOND JUDICIAL DISTRICT COURT,
9                     BUTTE-SILVER BOW COUNTY

10  ─────────────────────────────────────────────────
    MARGARET A. MCGREEVEY;              )
11  THOMAS G. TAYLOR; JOANNE            )
    BARKELL; PATRICK BURTON;            )
12  ROSALIE BURTON; JAMES               )
    DUDLEY; JOSEPH MARTELLI;            )
13  and LAWRENCE A. LOMBARDO,           )   Cause No. DV-01-141
                                        )
14          Plaintiff,                  )
                                        )
15      v.                              )
                                        )
16  MONTANA POWER COMPANY, a            )   SUBSTITUTE MOTION FOR LEAVE
    Montana Corporation;                )   TO ADD NORTHWESTERN
17  MONTANA POWER, L.L.C.;              )   CORPORATION AS AN
    TOUCH AMERICA HOLDINGS,             )   ADDITIONAL PARTY-DEFENDANT
18  INC.; R.P. GANNON;                  )
    J.P. PEDERSON; M.J.                 )
19  MELDAHL; KAY FOSTER; CARL           )
    LEHRKIND, III; DEBORAH D.           )
20  McWHINNEY; TUCKER HART              )
    ADAMS; ALAN F. CAIN; JOHN           )
21  G. CONNORS; R.D. CORETTE;           )
    JOHN R. JESTER; MICHAEL E.          )
22  ZIMMERMAN; JOHN D. HAFFEY;          )
    NOBLE E. VOSBURG; PPL               )
23  MONTANA, LLC; GOLDMAN,              )
    SACHS & CO.,a Limited               )
24  Partnership;                        )
    THE GOLDMAN SACHS GROUP,            )
25  INC.; PANCANADIAN PETROLEUM         )
    LIMITED, a Canadian                 )
26  Corporation;                        )
                                        )
27                                      )

                                          1

1   WESTMORELAND COAL COMPANY,          )
    a Delaware corporation, and         )
2   its wholly- owned                   )
    subsidiary CES ACQUISITION          )
3   CORP.; MILBANK, TWEED,              )
    HADLEY & McCLOY, LLP; and           )
4   JOHN DOES 3-5

5   Defendant.

6   _____

7       Northwestern Energy, LLC, (NWE) and NorthWestern Corporation

8   (NOR) through their counsel, hereby moves this Court for an order

9   to add NOR as an additional party-defendant in this action in full

10  compliance with this Court's Order of October 23, as reaffirmed by

11  this Court following the hearing on November 4.  In support of this

12  Motion, movants state:

13      1.  This Court, in its Order dated October 23, 2002 stated, in

14  pertinent part as follows:

15          NorthWestern Energy, L.L.C. shall not transfer
            its  utility  business  and  other  interests
16          acquired from the Montana Power Company until
            such  time  as  an  appropriate  entity  has
17          appeared to be substituted for NorthWestern
            Energy,  L.L.C.  with  the  approval  of  this
18          Court.

19  Order at page 2, paragraph 2.

20      2.  This Court in its ruling from the bench on November 4,

21  2002 reaffirmed its October 23 Order.

22      3.  At the November 4 hearing, counsel for NWE represented to

23  the Court that it was and is the intention of NOR to reorganize the

24  manner in which it holds the Remaining Utility Business acquired

25  from Touch America Holdings, Inc. (TA Holdings) and The Montana

26  Power Company (MPC) by converting substantially

27

**A92**

1  all of those holdings from ownership by its subsidiary (NWE) to

2  NOR.

3     4.   This reorganization of the holding of the Remaining

4  Utility Business Assets was contemplated in the Final Order of the

5  Montana Public Service Commission dated January 31, 2002 as

6  explained in the affidavit of Dennis Lopach, Senior Vice President

7  Administrative Services for NWE, which is on file with this Court.

8  Lopach Affidavit at paragraphs 8-10.  Further, NWE and NOR

9  anticipate the approval of the Federal Energy Regulatory Commission

10  for the assumption of the debts of NWE by NOR on or about November

11  15, 2002.

12     5.  As Mr. Lopach also explained in his affidavit, this

13  reorganization is in the best interest of the shareholders,

14  customers and ratepayers of NOR. Lopach Affidavit at paragraphs

15  12-15.

16     6.   NOR desires to proceed with the restructuring and

17  reorganization of the assets on or about November 15, 2002.

18  Restructuring by this date is anticipated by the financial markets,

19  the Securities and Exchange Commission and the shareholders of NOR.

20  As a result of such reorganization, substantially all of the assets

21  and liabilities of the Remaining Utility Business will be

22  transferred to NOR; however, certain of the assets and liabilities

23  will remain with NWE.

24     7.   In order to give effect to the Court's order of October

25  23, 2002, NWE requests and NOR stipulates and represents to this

26  Court that NOR may be added as an additional party-defendant to

27  these proceedings subject to the personal jurisdiction of this

3

109549

**A93**

1  Court. NOR further stipulates and represents to this Court that it
2  will be responsible for any judgment which might be entered in
3  these proceedings against NWE to the extent that NWE might not have
4  sufficient assets to satisfy such judgment and that NOR is subject
5  to the procedures for all forms of pre- and post-judgment relief
6  and execution procedures under applicable Montana Law.  NWE and NOR
7  shall retain any and  all defenses or claims which NWE and NOR, or
8  either of them, may have with respect to the matters which are or
9  may be pending in these proceedings.

10      8.    NOR stipulates that it has no present plans to spin
11  off, merge or reorganize any of the utility business assets which
12  are to be transferred from NWE to NOR in the reorganization
13  contemplated herein.  NOR will include the Plaintiffs' counsel on
14  the service list for all filings with the Federal Energy Regulatory
15  Commission (FERC) and the Montana Public Service Commission (MPSC)
16  which relate to the issuance of securities, incurrence of debt, any
17  pledge, lien, security interest or other encumbrance or the
18  transfer of utility assets of  NOR.  NOR represents that it will
19  not object to Plaintiff's assertion of standing in the dockets
20  established by the filings described above.  NOR represents it can
21  not pledge, incur a security interest, lien, assume additional
22  indebtedness except such that matures one year or less after the
23  date of such issue, renewal, or assumption as provided for in 18
24  C.F.R. § 34.3C2, or transfer utility assets within the State of
25  Montana, or transfer utility assets as provided in 16 U.S.C. §
26  842b, which provides in part a public utility can not transfer all
27  or any part of a public utility's facilities with a value in excess

4                                    169549

**A94**

1 of $50,000, that are subject to the jurisdiction of FERC or MPSC

2 without the prior approval of FERC and MPSC.

3     9.   NOR further stipulates and represents to the Court it

4 will not take any action intentionally designed to frustrate the

5 ability of Plaintiffs to obtain the utility business assets if

6 there is a judgment entered in this case.

7     10.   It is stipulated by NOR and NWE that Plaintiffs,

8 including the Plaintiff Class, retain all rights and remedies to

9 hereafter challenge the transfer of assets from NWE as a fraudulent

10 transfer. NOR and NWE reserve any and all defenses or claims which

11 NOR and NWE or either of them may have with respect to any claim by

12 Plaintiffs regarding fraudulent transfer.

13     11.   Based on these understandings and stipulations,

14 Plaintiffs' counsel have been contacted and state that they have no

15 objection to the addition of NOR on the basis described above and

16 that Plaintiffs' counsel agree that the transfer described

17 satisfies the requirements of the Court's October 23, 2002 and

18 November 4, 2002 Orders.

19     DATED this _15th_ day of November, 2002

20               BROWNING, KALECZYC, BERRY & HOVEN, P.C.

23           By _Kimberly Beatty_
             Stanley T. Kaleczyc
24              Kimberly A. Beatty

25           Counsel for NorthWestern Energy, LLC and
26           NorthWestern Corporation

5

**A95**

1

CERTIFICATE OF SERVICE

2    I hereby certify that on the 15th day of November, 2002, a
true copy of the foregoing was faxed and mailed by first-class
3    mail, postage prepaid, addressed as follows:

4    Dana L. Christensen
Christensen, Moore, Cockrell,
5    Cummings & Axelberg, P.C.
P.O. Box 7370
6    160 Heritage Way
Kalispell, MT 59904-0370
7

Robert M. Murdo
8    Jackson, Murdo, Grant
& McFarland, P.C.
9    203 North Ewing
Helena, MT 59601
10

R. Keith Strong
11   Dorsey & Whitney
8 Third St. North
12   Davidson Building
Great Falls, MT 59403
13

Steven J. Harman
14   Scott G. Gratton
Brown Law Firm, P.C.
15   315 N. 24th St.
Billings, MT 59107-0849
16

John L. Warden
17   John Hardiman
Sullivan & Cromwell
18   125 Broad Street
New York, NY 10004
19

20

21

22

23

24

25

26

27

Stephen H. Orel
Michael Lesch
Leboeuf, Lamb, Greene
& MacRae, LLP
125 West 55th Street
New York, NY 10019

Patrick T. Fleming
General Counsel
130 North Main
Butte, MT 59701-9332

Wade J. Dahood
Knight, Dahood, McLean
& Everett
113 East Third Street
Anaconda, MT 59711

Frank B. Morrison, Jr.
Morrison Law Offices, P.C.
341 Central Avenue
Whitefish, MT 59937

Dale L. McGarvey
Roger M. Sullivan
McGarvey, Heberling, Sullivan
& McGarvey, P.C.
745 S. Main
Kalispell, MT 59901

Milton Datsopoulos
Datsopoulos, MacDonald
& Lind, P.C.
201 W. Main, Ste. 201
Missoula, MT 59802

_Jennifer Dalslaf_
BROWNING, KALECZYC, BERRY & HOVEN, P.C.

**A96**

6

189549

**EXHIBIT B**



James H. Goetz
J. Devlan Geddes
GOETZ, GALLIK & BALDWIN, P.C.
35 North Grand
P.O. Box 6580
Bozeman, MT 59771-6580
Ph: 406-587-0618
Fax: 406-587-5144

Bonnie Steingart (*Pro Hac Vice* Application forthcoming)
John W. Brewer (*Pro Hac Vice* Application forthcoming)
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP
One New York Plaza
New York, New York 10004
(212) 859-8000

ATTORNEYS FOR PLAINTIFF

FILED
BUTTE, MT
'04 APR 19 AM 10 57
PATRICK E. DUFFY, CLERK
BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BUTTE DIVISION

* * * * * * * *

| | |
|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION, | Cause No. CV-04-26-BU-RFC |
| Plaintiff, | |
| -against- | COMPLAINT AND DEMAND FOR JURY TRIAL |
| MIKE J. HANSON, JACK D. HAFFEY, ERNIE J. KINDT, and ELLEN M. SENECHAL, | |
| Defendants. | |

Plaintiff Magten Asset Management Corporation ("Magten"), by its undersigned attorneys, hereby alleges in support of its Complaint on personal knowledge as to its own acts and on information and belief as to all other matters as follows:

## INTRODUCTION

1.      Magten is a creditor of Clark Fork and Blackfoot, LLC ("Clark Fork"), formerly known as NorthWestern Energy, LLC ("NWE"), and prior to that known as The Montana Power Company LLC ("MPLLC"). Magten brings this lawsuit to obtain redress for the wrongful actions of defendants Mike J. Hanson, Jack D. Haffey, Ernie J. Kindt and Ellen M. Senechal, all of whom were

COMPLAINT AND DEMAND FOR JURY TRIAL                          PAGE 1

A98

1  officers of Clark Fork on November 15, 2002 and enabled the transfer on that date (the "Transaction")

2  of Clark Fork's key assets — electric, natural gas and propane utility assets (the "Montana Utility

3  Assets") — to its corporate parent NorthWestern Corporation ("NorthWestern") without adequate

4  consideration. The Transaction unjustly enriched NorthWestern by hundreds of millions of dollars while

5  destroying Clark Fork's solvency and thus its ability to meet its obligations to Magten and its other

6  creditors. The defendants, as officers of Clark Fork, had a fiduciary duty to Clark Fork's creditors not

7  to engage in transactions that would render Clark Fork insolvent. In connection with the Transaction,

8  Clark Fork purported to have NorthWestern assume Clark Fork's liabilities, but NorthWestern's other

9  liabilities were so massive that, even after paying inadequate consideration to Clark Fork for the

10  Montana Utility Assets, NorthWestern could not pay its own pre-existing creditors, and filed a

11  voluntary petition for relief under Chapter 11 of the Bankruptcy Code. As a result of defendants'

12  actions, Magten is now owed well in excess of $20 million dollars by a company which defendants

13  rendered unable to meet its obligations to Magten. Magten seeks appropriate compensatory and

14  punitive damages, in an amount to be determined at trial.

15

### THE PARTIES

16    2.    Plaintiff is a corporation validly organized and doing business under the laws of the

17  State of Delaware with its principal place of business in the State of New York and is, therefore,

18  deemed to be a citizen of Delaware and New York pursuant to 28 U.S.C § 1332(c)(1).

19    3.    Defendant Mike J. Hanson is a citizen of the State of Montana and is believed to reside

20  at 1805 C St., Butte, Montana 59701. As of November 15, 2002, Hanson was Chief Executive

21  Officer of Clark Fork.

22    4.    Defendant Jack D. Haffey is a citizen of the State of Montana, and is believed to reside

23  at 2101 Garfield St., Anaconda, Montana 59711. As of November 15, 2002, Haffey was President of

24  Clark Fork.

25    5.    Defendant Ernie J. Kindt is a citizen of the State of Montana, and is believed to reside

26  at 5 Amber Way, Butte, Montana 59701. As of November 15, 2002 Kindt was Vice President and

27  Chief Accounting Officer of Clark Fork.

28    6.    Defendant Ellen M. Senechal is a citizen of the State of Montana, and is believed to

COMPLAINT AND DEMAND FOR JURY TRIAL          PAGE 2

**A99**

1  reside at 75 Park Drive, Clancy, Montana 59634. As of November 15, 2002, Senechal was Vice
2  President, Treasurer and Chief Financial Officer of Clark Fork.
3                              JURISDICTION AND VENUE
4       7.    This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §
5  1332, as it is between citizens of different States and the matter in controversy exceeds the sum or
6  value of $75,000, exclusive of interest and costs.
7       8.    Venue is proper pursuant to 28 U.S.C. 1391, because all defendants reside in this
8  judicial district, and a substantial part of the events or omissions giving rise to the claim occurred in this
9  judicial district.
10              FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS
11 The Montana Power Company
12      9.    The Montana Power Company ("Montana Power") was incorporated in 1961 under
13 the laws of the state of Montana as the successor to a corporation formed in 1912 through the merger
14 of four regional electric companies.
15      10.   By the year 2000, Montana Power was engaged in activities related to
16 telecommunications and energy related activities including activities in the fields of oil, coal, natural gas,
17 and electricity.
18      11.   In November 1996, Montana Power and Bank of New York entered into that certain
19 Indenture for Unsecured Subordinated Debt Securities Relating to Trust Securities (the "Indenture").
20      12.   Pursuant to the Indenture, Montana Power issued the Junior Subordinated Interest
21 Debentures (the "Junior Debentures").
22      13.   At or about the same time, pursuant to the Amended and Restated Trust Agreement
23 (the "Trust Agreement") between itself and various other persons, Montana Power created Montana
24 Power Capital I (the "Trust"), a business trust established pursuant to the Delaware Business Trust Act.
25 Bank of New York was designated as the Property Trustee of the Trust as well as serving as Trustee
26 under the Indenture.
27      14.   As detailed below, as of November 2002, Clark Fork had succeeded to Montana
28 Power's obligations with respect to the Junior Indentures. The Bank of New York has been

COMPLAINT AND DEMAND FOR JURY TRIAL                                    PAGE 3

A100