1  succeeded as Property Trustee of the Trust as well as Trustee under the Indenture by the Law

2  Debenture Trust Company of New York ("Law Debenture").

3    15.    The Trust is a special purpose vehicle which, pursuant to the Trust Agreement, issued

4  the Series A 8.45% Quarterly Income Preferred Securities ("QUIPS").

5    16.    The Trust holds 100% of the Junior Debentures, with a total face amount of

6  approximately $67 million, which constitute its sole meaningful asset. The value of the QUIPS is

7  entirely based on the value of the Junior Debentures, and thus on the ability of Clark Fork to pay

8  interest and principal to the Trust. The amounts paid by Clark Fork to the Trust would then in turn be

9  passed on by the Trust to the holders of the QUIPS.

10    17.    The Junior Debentures were not sold directly to investors; rather, purchasing the

11  QUIPS provided investors with substantially the same rights and the same potential investment return as

12  they would have had had they been able to own Junior Debentures directly. The entire structure of the

13  transaction was designed to put investors in the same position as if they had directly purchased the

14  Junior Debentures, while providing Montana Power with a more favorable accounting treatment than

15  would have been possible had the Junior Debentures been sold directly to the investing public.

16    18.    Accordingly, in Section 610 of the Indenture Clark Fork (as successor to Montana

17  Power) expressly acknowledges that the holders of the QUIPS are intended beneficiaries of the

18  Company's obligations with respect to the Junior Debentures and that if the Property Trustee of the

19  Trust (the legal titleholder to the Junior Debentures) fails to act, any holder of the QUIPS can sue

20  directly to enforce the Property Trustee's rights.

21    19.    Magten owns in excess of 33% of the QUIPS.

22    20.    In connection with the Trust Agreement and the Indenture, Montana Power also

23  entered into a Guarantee Agreement with the Bank of New York as Guarantee Trustee (the

24  "Guarantee Agreement"). Pursuant to the Guarantee Agreement, Montana Power, as guarantor,

25  agreed to pay to the holders of the QUIPS certain payments, to the extent such are not paid by the

26  Trust, and to the extent the Property Trustee had funds available in a specified account. As with the

27  Indenture and the Trust Agreement, Clark Fork and Law Debenture have succeeded to the original

28  roles and responsibilities of Montana Power and Bank of New York respectively.

COMPLAINT AND DEMAND FOR JURY TRIAL                                    PAGE 4

1   The Sale of the Montana Power Company's Utility Assets

2       21.     On March 28, 2000, Montana Power announced plans to restructure its business.  This

3   restructuring involved the sale of its energy related assets, including its electric, natural gas, and propane

4   utility assets, in order to allow Montana Power to focus on telecommunications.

5       22.     On September 29, 2000, Montana Power entered into a Unit Purchase Agreement

6   with NorthWestern, pursuant to which NorthWestern agreed to purchase control of the Montana Utility

7   Assets, then owned by Montana Power, in a multi-step transaction.

8       23.     On February 13, 2002, Montana Power merged its energy assets into MPLLC (the

9   "Merger").  As a result of the Merger, MPLLC thereafter held and operated the Montana Utility

10  Assets and succeeded to all of Montana Power's obligations with respect to the Junior Debentures and

11  the QUIPS.

12      24.     Specifically, in connection with the Merger, on February 13, 2002, pursuant to the First

13  Supplemental Indenture, MPLLC assumed the obligations of Montana Power under the Indenture.

14      25.     In addition, in connection with the Merger, on February 13, 2002, pursuant to a letter

15  agreement, MPLLC assumed the obligations of Montana Power under the Guarantee Agreement.

16      26.     On February 15, 2002, NorthWestern purchased 100% of the equity of MPLLC, and,

17  thus, the corresponding control of the Montana Utility Assets, for $478 million in cash.  None of this

18  consideration was received or retained by MPLLC.  It was thus not thereafter available to Clark Fork

19  to assist Clark Fork in meeting its obligations to its creditors.

20      27.     On March 19, 2002, MPLLC was renamed NWE.

21      28.     On August 13, 2002, NorthWestern entered into the Second Supplemental Indenture,

22  whereby it assumed on a joint and several basis with NWE all of NWE's obligations under the

23  Indenture.

24      29.     On August 13, 2002, NorthWestern entered into an Amendment to the Guarantee

25  Agreement, whereby it assumed on a joint and several basis with NWE all of NWE's obligations under

26  the Guarantee Agreement.

27      30.     On August 13, 2002, NorthWestern entered into a letter agreement amending the Trust

28  Agreement, whereby it assumed on a joint and several basis with NWE all of NWE's obligations under

COMPLAINT AND DEMAND FOR JURY TRIAL                                      PAGE 5

the Trust Agreement.

**The Transfer**

31.     On November 15, 2002, defendants, as officers of Clark Fork, carried out a scheme to defraud, injure and deprive Magten of the ability to receive the benefits due to it from Clark Fork in connection with the Junior Debentures and the QUIPS, by, in the Transaction, transferring substantially all of Clark Fork's assets, the Montana Utility Assets, to NorthWestern without receiving adequate consideration in return. Clark Fork received no cash for the Transfer, and the consideration purportedly received was dramatically less than the value of the assets; over $1 billion dollars in assets were transferred to NorthWestern, and only approximately $700 million dollars in Clark Fork liabilities were purportedly assumed by NorthWestern. Indeed, with respect to some if not all of the liabilities purportedly assumed, NorthWestern was already a co-obligor with Clark Fork prior to the Transaction and/or Clark Fork remained obligated jointly and severally with NorthWestern subsequent to the Transaction, thus making any purported assumption of the liabilities in connection with the Transaction valueless.

32.     In particular, NorthWestern was already a co-obligor as to Clark Fork's obligations with respect to the Junior Indentures and QUIPS prior to the transaction, and Clark Fork remained obligated jointly and severally with NorthWestern with respect to the Junior Indentures and QUIPS subsequent to the Transaction. Indeed, Clark Fork requested Bank of New York (at the time still the Trustee under the Indenture) to execute a supplement to the Indenture purporting to release Clark Fork from its continuing obligations under the Indenture, but Bank of New York refused to provide such a release.

33.     As an immediate result of the consummation of the Transfer, Clark Fork was insolvent. Stripped of its assets, Clark Fork was thereafter unable to meet its obligations with respect to the Junior Debentures and QUIPS and did not do so.

34.     Both prior to and following the Transaction, NorthWestern was itself insolvent, making both its August 2002 assumption of liabilities with respect to the Junior Debentures and QUIPS and any purported further assumption of those liabilities in connection with the Transaction of little or no value to the holders of the QUIPS and other creditors of Clark Fork. Even the hundreds of millions of dollars

COMPLAINT AND DEMAND FOR JURY TRIAL                                          PAGE 5

A103

1   by which it was unjustly enriched by the Transaction were insufficient to overcome the massive

2   imbalance between assets and liabilities created by its various other failed business ventures.

3        35.   The defendants all knew, should have known, and/or were reckless with respect to

4   knowing that Clark Fork would be rendered insolvent as a result of the Transaction and that

5   NorthWestern was insolvent both before and after the Transaction.

6        36.   No interest on the Junior Debentures was paid by either NorthWestern or Clark Fork

7   since prior to September 14, 2003.  In excess of $2 million of interest on the Junior Debentures is now

8   past due.  If paid, that interest would have been passed on by the Trust to the holders of the QUIPS

9   such as Magten.  Moreover, the entire principal amount of the Junior Debentures was accelerated

10   pursuant to the terms of the Indenture no later than September 14, 2003.

11        37.   Following the Transaction, Clark Fork retained only the Milltown Dam, a two

12   megawatt hydroelectric dam at the confluence of the Clark Fork and Blackfoot Rivers, under a license

13   that expires in 2007, and the related environmental liabilities.

14        38.   Following the Transaction, NorthWestern operated the Montana Utility Assets as part

15   of NorthWestern's NorthWestern Energy Division.

16        39.   After the Transaction, NWE remained a subsidiary of NorthWestern and on November

17   20, 2002, NWE was re-named Clark Fork.

18        40.   Clark Fork continues to operate the Milltown Dam.

19        41.   Clark Fork is entirely dependent upon NorthWestern for continued funding of the

20   Milltown Dam and its corporate existence, and NorthWestern is required, under certain agreements

21   with Clark Fork, which require NorthWestern to pay any costs and expenses that arise in connection

22   with the operation of the Milltown Dam.

23        42.   Less than a year later, on September 14, 2003, NorthWestern filed a voluntary petition

24   for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the

25   District of Delaware.

26        43.   The Montana Utility Assets generate approximately 80% of NorthWestern's

27   consolidated EBITDA, although NorthWestern did not pay fair value for those assets, thus injuring

28   Magten and Clark Fork's other creditors.

COMPLAINT AND DEMAND FOR JURY TRIAL                           PAGE 7

Case 2:04-cv-02922-JF   Document 22   Filed 06/28/2005   Page 5 of 51

06/02/2004 16:29 04-302982724JF    Document 22    FINGER SLANINA LLC    PAGE  10/55
06/01/2004 12:33 FAX 4048152424    Paul, Hastings 3                     ☒009

1     44.    The Montana Utility Assets are now available to all creditors of NorthWestern, most of

2  whom were not creditors of Clark Fork and thus had not previously had any claim to Clark Fork's

3  assets. Accordingly, Magten and other QUIPS holders are likely to receive little or no recovery for

4  their claims in NorthWestern's reorganization plan.

5     45.    On April 8, 2004, the United States Bankruptcy Court for the District of Delaware

6  granted Magten's motion in NorthWestern's bankruptcy case for leave to commence an adversary

7  proceeding against NorthWestern seeking to have the Transaction set aside as a fraudulent

8  conveyance.

9                   **STATEMENT OF CLAIM**

10                 **FIRST CAUSE OF ACTION**

11              **(Breach of Fiduciary Duty)**

12     46.    Plaintiff repeats and realleges paragraphs 1-45 and incorporates them herein by

13  reference.

14     47.    Clark Fork was a company within the zone of insolvency on November 15, 2002.

15  Accordingly, defendants, as officers of Clark Fork, owed individual fiduciary duties to Clark Fork's

16  creditors, including without limitation the Trust and all QUIPS holders, including Magten's predecessors

17  in interest, not to engage in any transaction that would make Clark Fork insolvent and thus unable to

18  perform its obligations with respect to the Junior Debentures and QUIPS.

19     48.    The Trust and the QUIPS holders, including Magten's predecessors in interest, were

20  creditors of Clark Fork, and were injured by the Transaction which transferred the Montana Utility

21  Assets to NorthWestern without adequate consideration, thereby rendering Clark Fork insolvent.

22     49.    The Property Trustee has failed to enforce the Trust's rights, so Magten has standing

23  under the Indenture to enforce both the Trust's rights and its own individual rights as successor to the

24  QUIPS holders who were its predecessors in interest.

25     50.    Defendants breached their fiduciary duties to the Trust and Magten's predecessors in

26  interest by willfully and wantonly carrying out the Transaction and transferring the Montana Utility

27  Assets to NorthWestern without adequate consideration, thereby rendering Clark Fork insolvent.

28     51.    Defendants also breached their fiduciary duties to the Trust and Magten's predecessors

COMPLAINT AND DEMAND FOR JURY TRIAL                         PAGE 8

in interest by purporting to assign Clark Fork's obligations with respect to the Junior Debenture and QUIPS to NorthWestern, when they knew NorthWestern was insolvent and would remain insolvent, and would thus be unable to perform those obligations.

52. By reason of the foregoing acts, practices and course of conduct, the defendants have breached their fiduciary duties to the Trust and Magten's predecessors in interest, causing financial loss, in an amount to be proven at trial, but in excess of $20 million.

53. Punitive damages in an amount to be determined at trial should also be awarded due to the willful, malicious, and outrageous nature of these breaches of fiduciary duty.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter judgment against defendants as follows:

1. Awarding plaintiff compensatory and punitive damages, in an amount determined at trial but in excess of $20 million;

2. Awarding plaintiff all allowable costs, attorneys' fees and other litigation expenses to the extent recoverable under law; and

3. Awarding plaintiff such other and further relief as to this Court may be just, proper and equitable.

DATED this 15th day of April, 2004.

GOETZ, GALLIK & BALDWIN, P.C.

By: _____
for: James H. Goetz

ATTORNEYS FOR PLAINTIFF

COMPLAINT AND DEMAND FOR JURY TRIAL                                    PAGE 9

A106

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED this 15th day of April, 2004.

GOETZ, GALLIK & BALDWIN, P.C.

By: _____
        James H. Goetz
ATTORNEYS FOR PLAINTIFF

E:\JIM\Karen\Magten Asset Mgmt Corp 4032\Pleadings\Complaint.4 15 04.wpd

COMPLAINT AND DEMAND FOR JURY TRIAL                    PAGE 10

**EXHIBIT C**

**A108**

David R. Paoli
PAOLI & SHEA, P.C.
P.O. Box 8131
Missoula, Montana 59802
Telephone: (406) 542-3330
Facsimile: (406) 542-3332

Bijan Amini (*Pro Hac Vice* Application forthcoming)
STORCH AMINI & MUNVES, P.C.
405 Lexington Avenue 51st Floor
New York, New York 10174
Telephone: (212) 490-4100
Facsimile: (212) 490-4208

    *Attorneys for Plaintiff*

## MONTANA SECOND JUDICIAL DISTRICT COURT, SILVER BOW COUNTY

| | | |
|---|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION Suing individually and derivatively on behalf of CLARK FORK AND BLACKFOOT, LLC | ) ) ) | Cause No. *DV-04-131* |
| Plaintiff, | ) ) | **SUMMONS** |
| v. | ) ) | |
| PAUL HASTINGS JANOFSKY & WALKER LLP, | ) ) ) | KURT KRUEGER Judge, Dept. 1 |
| Defendant. | ) ) | |

**THE STATE OF MONTANA TO THE ABOVE-NAMED DEFENDANT:**

You are hereby summoned to answer the Complaint in this action which is filed in the office of the clerk of this court, a copy of which is herewith served upon you, and to file your answer and serve a copy thereof upon the Plaintiff's attorney within twenty (20) days after service of this Summons, exclusive of the day of service and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

A109

WITNESS my hand and the seal of said court, this _20_ day of May, 2004.

**LORI MALONEY**
Clerk Of District Court

By: _____
Deputy Clerk

A110

David R. Paoli
PAOLI & SHEA, P.C.
P.O. Box 8131
Missoula, Montana 59802
Telephone: (406) 542-3330
Facsimile: (406) 542-3332

Bijan Amini (*Pro Hac Vice* Application forthcoming)
STORCH AMINI & MUNVES, P.C.
405 Lexington Avenue 51st Floor
New York, New York 10174
Telephone: (212) 490-4100
Facsimile: (212) 490-4208

**FILED**

MAY 20 2004

LORI MALONEY CLERK

By_____
                    Deputy Clerk

*Attorneys for Plaintiff*

## MONTANA SECOND JUDICIAL DISTRICT COURT, SILVER BOW COUNTY

| | |
|---|---|
| MAGTEN ASSET MANAGEMENT CORPORATION Suing individually and derivatively on behalf of CLARK FORK AND BLACKFOOT, LLC | Cause No. _DV-04-131_ |
| Plaintiff, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | |
| PAUL HASTINGS JANOFSKY & WALKER LLP, | |
| Defendant. | |

Magten Asset Management Corporation ("Magten" or the "Plaintiff"), by and through its

attorneys Storch Amini & Munves, P.C., and Paoli & Shea, P.C., as and for its Complaint against

Paul Hastings Janofsky & Walker LLP ("Paul Hastings" or the "Defendant") alleges as follows:

### INTRODUCTION

1.      This complaint involves a scheme to defraud the creditors of Northwestern

Energy LLC, now known as Clark Fork and Blackfoot LLC (herein, "Clark Fork"), and

Defendant's breach of its duties to Clark Fork and its creditors in connection therewith. To

cover up losses from poor investment decisions, the Northwestern Corporation ("Northwestern") decided to strip the assets of Clark Fork, its solvent and profitable subsidiary. In doing so, Northwestern defrauded the creditors of the subsidiary, including a trust that had invested in the subsidiary on the basis of those very same valuable assets.

2.     The chronology of the events in question is stark testimony to the fraudulent nature of the scheme. In September 2000, Northwestern agreed to acquire the profitable transmission assets and the Milltown Dam of the Montana Power Company. By the time the transaction was consummated on February 15, 2002, Northwestern was drowning in red ink from bad investment decisions. A mere nine months later, slowed only by regulatory requirements, Northwestern transferred Clark Fork's profitable assets of between $1.1 and 1.4 billion in value for no payment whatsoever. Consideration supplied in the form of assumption of $700 million in Clark Fork's debt, on its face inadequate, was in fact itself illusory. Northwestern promptly encumbered the assets with new debt to temporarily cover its ineptitude, disenfranchising Clark Fork's creditors altogether. A mere ten months later, Northwestern was bankrupt.

3.     The officers and directors of Clark Fork were fully complicit in placing the company they had a duty to protect into insolvency. They willfully disregarded the fiduciary duties they owed to the creditors of Clark Fork by blindly obeying the orders of their parent.

4.     The Defendant served as counsel to Clark Fork, advising these same officers and directors. While the scheme's premise was simple, the execution of it was quite complex. Paul Hastings' assistance was crucial in guiding Northwestern and Clark Fork through the complex legal and regulatory hurdles necessary to effect Northwestern's desired result.

5.     In reality, Paul Hastings, which was hopelessly conflicted, devised, structured and negotiated the entire scheme. As counsel to Northwestern, the only party that benefited in the

A112

transaction, Paul Hastings not only aided and abetted the Clark Fork officers and directors fiduciary breaches, but breached its own duties to Clark Fork in merely doing whatever it took to aid Northwestern in its fraudulent undertaking.

6.     By this action, Magten, as a creditor of Clark Fork and by virtue of its rights to enforce obligations under the Trust, seeks damages from Paul Hastings for its role in aiding and abetting the breach of fiduciary duties owed to the creditors of Clark Fork, aiding and abetting the fraudulent transfer of Clark Fork's assets to Northwestern, and its malpractice.

## THE PARTIES

7.     The Plaintiff, Magten, is a corporation organized under the laws of the State of Delaware, with its principle place of business in the State of New York.

8.     The Defendant, Paul Hastings, is a limited liability partnership organized under the laws of California. It has significant offices in New York. Many of its partners reside in the state of New York.

9.     Northwestern is a corporation incorporated in the State of Delaware with its corporate headquarters in Sioux Falls, South Dakota.

10.     Clark Fork and Blackfoot LLC is a Montana corporation, with its principal place of business in Montana. The energy assets at stake in this litigation were all situated in Montana.

## JURISDICTION

11.     This Court has jurisdiction over this action pursuant to Rule 4(B) of the Montana Rules of Civil Procedure.

12.     In connection with its representation of Clark Fork, Paul Hastings regularly communicated with and visited Clark Fork at its location in Montana.

**A113**

13.     Additionally, in connection with the transactions complained of, at least throughout 2002, Paul Hastings represented Clark Fork before the Federal Energy Regulatory Commission.

14.     As set forth below, in connection with the acts complained of herein, Paul Hastings caused over $1 billion of Clark Fork's assets located in the State of Montana to be transferred out of Clark Fork and out of the reach of Clark Fork's creditors.

## BACKGROUND

15.     The Montana Power Company was incorporated in 1961, as successor to an energy corporation formed in 1912. It operated as the sole gas and electric utility throughout the state of Montana.

16.     In 1996, the Montana Power Company and the Bank of New York ("BNY") as Trustee entered into an Indenture for the Unsecured Subordinated Debt Securities dated November 1, 1996 (the "Indenture"), pursuant to which the Montana Power Company issued $65 million in 8.45% Junior Subordinated Debentures (the "Junior Debentures").

17.     At or about the same time, pursuant to the Amended and Restated Trust Agreement (the "Trust Agreement") between itself and various other persons, the Montana Power Company created Montana Power Capital I (the "Trust"), a business trust established pursuant to the Delaware Business Trust Act. BNY was designated as the Property Trustee of the Trust as well as serving as Trustee under the Indenture.

18.     As detailed below, as of November 2002, Clark Fork had succeeded to the Montana Power Company's obligations with respect to the Junior Indentures. The BNY has been succeeded as Property Trustee of the Trust as well as Trustee under the Indenture by the Law Debenture Trust Company of New York ("Law Debenture").

### A114

19.     The Junior Debentures were not sold directly to investors. Instead, they were sold to the Property Trustee of the Trust. The Trust holds 100% of the Junior Debentures, with a total face amount of approximately $67 million, which constitute its sole meaningful asset.

20.     The Trust is a special purpose vehicle which, pursuant to the Trust Agreement, issued the Series A 8.45% Quarterly Income Preferred Securities ("QUIPS"). The value of the QUIPS is entirely based on the value of the Junior Debentures, and thus on the ability of Clark Fork to pay interest and principal to the Trust. The amounts paid by Clark Fork to the Trust would, in turn, be passed on by the Trust to the holders of the QUIPS.

21.     The Trust's purpose, structured solely for accounting purposes, is to hold all of the Junior Debentures. Purchasers of QUIPS acquire an indirect undivided beneficial interest in the Junior Debentures and obtain substantially the same rights and the same potential investment return as they would have, had they owned the Junior Debentures directly.

22.     The entire structure of the transaction was designed to put investors in the same position as if they had directly purchased the Junior Debentures, while providing the Montana Power Company with a more favorable accounting treatment than would have been possible had the Junior Debentures been sold directly to the investing public.

23.     In Section 610 of the Indenture, Clark Fork (as successor to the Montana Power Company) expressly acknowledges that the holders of the QUIPS are intended beneficiaries of the Company's obligations with respect to the Junior Debentures and that if the Property Trustee of the Trust (the legal titleholder to the Junior Debentures) fails to act, any holder of the QUIPS can sue directly to enforce the Property Trustee's rights.

24.     Magten owns in excess of 33% of the QUIPS.

**A115**

25.    In connection with the Trust Agreement and the Indenture, Montana Power also entered into a Guarantee Agreement with the BNY as Guarantee Trustee (the "Guarantee Agreement"). Pursuant to the Guarantee Agreement, the Montana Power Company, as guarantor, agreed to pay to the holders of the QUIPS certain payments, to the extent such are not paid by the Trust, and to the extent the Property Trustee had funds available in a specified account. As with the Indenture and the Trust Agreement, Clark Fork and Law Debenture have succeeded to the original roles and responsibilities of the Montana Power Company and BNY, respectively.

## EVENTS LEADING UP TO THE CLAIMS

26.    In 1997, the Montana legislature passed the Energy Deregulation Act, deregulating the administrative controls Montana had put on the Montana Power Company for the better part of a century. Almost immediately, the Montana Power Company began looking for ways to unload its energy assets ("The Montana Power Assets"), its long term debt and its environmental liabilities.

27.    The plan developed as follows: the Montana Power Company transferred the Montana Power Assets into a new, wholly-owned subsidiary to which it also transferred the liability saddled Milltown Dam as well as the obligation to fund the Junior Debentures. Northwestern then purchased the Montana subsidiary and in due turn transferred the assets to itself, leaving the liabilities unfunded. As Northwestern later stated (see below) the sole purpose of structuring the transaction this way was to avoid the liabilities associated with these assets.

28.    On September 29, 2000, the Montana Power Company entered into a Unit Purchase Agreement with Northwestern. The Montana Power Company agreed to create a

**A116**

subsidiary, the Montana Power Company LLC ("MPLLC") to which it would transfer the Montana Power Assets. Northwestern agreed to purchase this subsidiary.

29.     Paul Hastings represented Northwestern in this transaction and was instrumental in structuring and negotiating it. Another of Paul Hastings' clients, Credit Suisse First Boston Corporation ("CSFB"), served as Financial Consultant for Northwestern on the transaction.

30.     Over the next two years, Paul Hastings assisted Northwestern in clearing the state and federal regulatory hurdles necessary to consummate the purchase of MPLLC.

31.     However, by October of 2001, Northwestern and Paul Hastings knew that Northwestern was running out of funds. Therefore, Paul Hastings, as counsel to Northwestern, assisted Northwestern in preparing a $720 million securities offering in which Paul Hastings' other client, CSFB, would act as lead initial purchaser and underwriter of $250 million 7 7/8% Five Year Notes and $470 million 8 ¾% Ten Year Notes. That purchase agreement was finally signed March 8, 2002.

32.     To finance the acquisition of MPLLC, on January 14, 2002, Northwestern entered into a $1 billion credit agreement with CSFB and other lenders. The credit facility consisted of a $280 million revolving credit facility and a $720 million acquisition term loan. CSFB, Paul Hastings' client, also served as administrative agent. Paul Hastings represented Northwestern in connection with this credit agreement.

33.     On February 13, 2002, following the clearance of regulatory hurdles, the Montana Power Company merged the Montana Power Assets into MPLLC (the "Merger"). As a result of the Merger, MPLLC thereafter held and operated the Montana Utility Assets and succeeded to all of Montana Power's obligations with respect to the Junior Debentures and the QUIPS.

**A117**

34.    On February 15, 2002, Northwestern purchased 100% of the equity of MPLLC, and, thus, the corresponding control of the Montana Utility Assets, for $478 million in cash. None of this consideration was received or retained by MPLLC. Thus, it was not thereafter available to Clark Fork to assist Clark Fork in meeting its obligations to its creditors.

35.    Paul Hastings represented Northwestern in its purchase of MPLLC. In connection with this purchase, Paul Hastings issued an Opinion Letter to the Securities and Exchange Commission ("SEC") regarding Northwestern's Form U-1 Application. In it, Paul Hastings represented that, among other things, the purchase of MPLLC would "not violate the legal rights of the holders of any securities issued by Northwestern or any 'associate company of Northwestern'.

36.    In its Form U-1Application, Northwestern maintained that it was exempt from the stringent requirements of the Federal Public Utility Holdings Act ("PUHCA") in part on the grounds that its utility interests comprised only a small and not substantial part of Northwestern's business. This statement to the SEC was materially false. Through the purchase of the Montana Utility Assets, Northwestern's most valuable revenue producing arm would be those utility assets. Paul Hastings represented Northwestern on this filing and submitted its Opinion Letter in connection with it.

37.    Furthermore, in its Form U-1 Application, Northwestern revealed that the *sole* purpose of structuring the acquisition so that Northwestern would first purchase a subsidiary and then a few months later transfer the assets to itself was to avoid the liabilities associated with those assets.

A118

38.  On March 19, 2002, MPLLC was renamed Northwestern Energy LLC ("Northwestern Energy"). Northwestern Energy was a duly organized Montana limited liability company. It is now known as Clark Fork.

## THE FRAUDULENT TRANSFER

39.  By the time Northwestern acquired control of Clark Fork in 2002, Northwestern was insolvent. Consequently, Northwestern and its counsel Paul Hastings worked out a plan whereby Northwestern would acquire the assets of Clark Fork for vastly less consideration than they were worth. Then they would immediately apply to borrow additional funds.

40.  On August 13, 2002, in accordance with the plan worked out by Paul Hastings, Northwestern entered into a series of agreements whereby it assumed on a joint and several basis with Clark Fork all of Clark Fork's obligations under the Indenture, the Guarantee Agreement and the Trust Agreement. On information and belief, Paul Hastings structured the transaction, and actually drafted these agreements as counsel to both Northwestern and Clark Fork.

41.  This transfer was illusory in that Northwestern did not have the resources by which to meet the assumed obligations. Northwestern was insolvent both immediately before and immediately after the assumption of these liabilities. Paul Hastings knew or should have known these facts.

42.  On November 15, 2002, in accordance with the prearranged plan worked out by Paul Hastings, Clark Fork and Northwestern entered into the Asset Transfer and Stock Purchase Agreement (the "Asset Transfer"), discussed below. On information and belief, Paul Hastings structured the transaction, and actually drafted the Asset Transfer as counsel to both Northwestern and Clark Fork.

**A119**

43. Through this Asset Transfer, the officers of Clark Fork and Northwestern, carried out a scheme to defraud, injure and deprive the Trust of the ability to receive the benefits due to it from Clark Fork in connection with the Junior Debentures, and consequently holders of the QUIPS, by, in the Transaction, transferring substantially all of Clark Fork's assets, to Northwestern without receiving adequate consideration in return. Clark Fork received no cash for the Transfer, and the consideration purportedly received was dramatically less than the value of the assets; over $1 billion dollars in assets were transferred to Northwestern, and only approximately $700 million dollars in Clark Fork liabilities were purportedly assumed by Northwestern. Indeed, with respect to some if not all of the liabilities purportedly assumed, Northwestern was already a co-obligor with Clark Fork prior to the Transaction and/or Clark Fork remained obligated jointly and severally with Northwestern subsequent to the Transaction, thus making any purported assumption of the liabilities in connection with the Transaction valueless. Northwestern's assumption of the debt was illusory in any event, having already predetermined to encumber the very assets that were available to satisfy them to repay prior losses, effectively leaving Clark Fork's creditors without recourse.

44. In particular, Northwestern was already a co-obligor as to Clark Fork's obligations with respect to the Junior Indentures and QUIPS prior to the transaction, and Clark Fork remained obligated jointly and severally with Northwestern with respect to the Junior Indentures and QUIPS subsequent to the Transaction. Indeed, Clark Fork, through Paul Hastings, requested BNY (at the time still the Trustee under the Indenture) to execute a supplement to the Indenture purporting to release Clark Fork from its continuing obligations under the Indenture, but BNY refused to provide such a release.

**A120**

45.    As an immediate result of the consummation of the Transfer, Clark Fork was insolvent. Stripped of its assets, Clark Fork was thereafter unable to meet its obligations with respect to the Junior Debentures and QUIPS and did not do so.

46.    Under the Asset Transfer, Clark Fork transferred substantially all of its assets, the energy assets from the Montana Power Company, and retained only the Milltown Dam. The Milltown Dam was, and still is, saddled with enormous environmental liabilities. The Milltown Dam operates under a license set to expire in 2007.

47.    Also in connection with the Asset Transfer, and also in accord with the plan devised by Paul Hastings, on November 15, 2002, Northwestern purported to execute a Third Supplemental Indenture, a Guarantee Assumption Agreement, and a Trust Assumption Agreement pursuant to which the Debtor would assume all of Clark Fork's obligations on the Junior Debentures. On information and belief, Paul Hastings structured the transaction, and actually drafted these agreements as counsel to both Northwestern and Clark Fork.

48.    Article Eleven of the Indenture purports to release the Montana Power Company (or its successor in interest) upon the transfer of substantially all of the assets of the Montana Power Company if the successor company, among other things, is a corporation validly organized under or subject to the laws of the United States or any state thereof and assumes the due and punctual payment of the principal, premium (if any) and interest on the securities and the performance of every covenant of the Indenture.

49.    Additionally, notwithstanding any purported release effectuated by the Third Supplemental Indenture, because the Transfer was a fraudulent transfer, no release could have been effectuated solely by the operation of Article Eleven of the Indenture.

**A121**

## EVENTS FOLLOWING THE ASSET TRANSFER

50.     Following the Asset Transfer, Northwestern operated the energy assets it had sought in 2000 and acquired through the assistance of Paul Hastings as part of its Northwestern Energy Division.

51.     On November 20, 2002, Clark Fork became the official name of the subsidiary.

52.     On December 17, 2002, only days thereafter, Northwestern entered into a new $390 million senior secured credit agreement with CSFB and other financial institutions.  This credit agreement was partly secured by $280 million in aggregate principal amount of First Mortgage Bonds, which granted a first mortgage in the energy assets previously held by Clark Fork.

53.     Ten months after the Asset Transfer, on September 14, 2003, Northwestern filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware.

54.     The Montana Utility Assets generate approximately 80% of Northwestern's consolidated EBITDA, although Northwestern did not pay fair value for those assets, thus injuring Magten and Clark Fork's other creditors.

55.     The Montana Utility Assets are now available to all creditors of Northwestern, most of whom were not creditors of Clark Fork and thus had not previously had any claim to Clark Fork's assets.  Accordingly, Magten and other QUIPS holders are likely to receive little or no recovery for their claims in Northwestern's reorganization plan.

56.     On April 8, 2004, the United States Bankruptcy Court for the District of Delaware granted Magten's motion in Northwestern's bankruptcy case for leave to commence an adversary

**A122**

proceeding against Northwestern seeking to have the Asset Transfer set aside as a fraudulent transfer.

57.     On April 8, 2004 Magten filed a complaint against Northwestern in the United States Bankruptcy Court for the District of Delaware to avoid the Asset Transfer as a fraudulent transfer.

58.     On April 19, 2004, Magten filed a complaint against the officers and directors of Clark Fork for breach of fiduciary duty in the District Court of Montana, Butte Division.

## FIRST CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duties Owed to Creditors of Clark Fork in the Zone of Insolvency

59.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth here.

60.     Clark Fork was a company within the zone of insolvency on November 15, 2002. Accordingly, the officers of Clark Fork owed individual fiduciary duties to Clark Fork's creditors, including without limitation the Trust and all QUIPS holders, including Magten's predecessors in interest, not to engage in any transaction that would make Clark Fork insolvent and thus unable to perform its obligations with respect to the Junior Debentures and QUIPS.

61.     The Trust and the QUIPS holders, including Magten's predecessors in interest, were creditors of Clark Fork, and were injured by the Transaction which transferred the Montana Utility Assets to Northwestern without adequate consideration, thereby rendering Clark Fork insolvent.

62.     The Property Trustee has failed to enforce the Trust's rights, so Magten has standing under the Indenture to enforce both the Trust's rights and its own individual rights as successor to the QUIPS holders who were its predecessors in interest.

63.    The Defendant aided and abetted the officers of Clark Fork in breaching their fiduciary duties owed to the Trust and Magten's predecessors in interest by willfully and wantonly carrying out the Transaction and transferring the Montana Utility Assets to Northwestern without adequate consideration, thereby rendering Clark Fork insolvent.

64.    The Defendant also aided and abetted the officers of Clark Fork in breaching their fiduciary duties to the Trust and Magten's predecessors in interest by purporting to assign Clark Fork's obligations with respect to the Junior Debenture and QUIPS to Northwestern, when they knew Northwestern was insolvent and would remain insolvent, and would thus be unable to perform those obligations.

65.    Paul Hastings knew or should have known that the conduct of the Clark Fork officers constituted a breach of their fiduciary duties. However, conflicted due to their joint representation of Northwestern, Paul Hastings substantially assisted and encouraged these breaches in order to benefit its long time client, Northwestern.

66.    By reason of the foregoing acts, practices and course of conduct, the Defendant aided and abetted the Clark Fork officers and directors breach of their fiduciary duties to the Trust and Magten's predecessors in interest, causing financial loss, in an amount to be proven at trial.

67.    Punitive damages in an amount to be determined at trial should also be awarded due to the willful, malicious, and outrageous nature of these breaches of fiduciary duty.

### SECOND CAUSE OF ACTION

### Aiding and Abetting Fraudulent Transfer

68.    Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth here.

**A124**

69.    The Montana Uniform Fraudulent Transfer Act § 31-2-333, MCA provides that a transfer made by a debtor is fraudulent as to any creditor where it was made 1) with actual intent to hinder, delay or defraud any creditor of the debtor, or 2) without receiving a reasonably equivalent value in exchange and the debtor was engaged or about to engage in a business for which its remaining assets were unreasonably small or believed, or reasonably should have believed, that the debtor would incur debts beyond the Debtor's ability to pay as they came due.

70.    Pursuant to § 31-2-333, MCA in determining actual intent to hinder, delay, or defraud any creditor, consideration may be given, among other factors, to whether: the transfer was to an insider; before the transfer was made, the debtor had been sued; the transfer was of substantially all the debtor's assets; and the value of the consideration received by the debtor was reasonably equivalent to the value of the assets transferred.

71.    The Montana Uniform Fraudulent Transfer Act § 31-2-334, MCA provides that a transfer made by a debtor is fraudulent as to creditors whose claims arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange and the debtor was insolvent at that time.

72.    Magten was a creditor of Northwestern and of Clark Fork by operation of the Guarantee Agreement and the Indenture.

73.    Northwestern was a parent of Clark Fork and, as such, exercised complete control over Clark Fork. As a result of this relationship, Northwestern qualified as an insider under Montana law.

74.    In connection with the Transfer, Clark Fork transferred assets to Northwestern that are valued between $1.15 billion and $1.4 billion, and the only alleged consideration

**A125**

received for the Transfer was the assumption of approximately $700 million in liabilities, itself illusory.

75.    Prior to the Transfer, Clark Fork was a solvent entity.  The transfer of substantially all of Clark Fork's assets to Northwestern caused Clark Fork to become insolvent.

76.    Prior to the Transfer, Clark Fork was a reasonably capitalized entity.  The transfer of substantially all of Clark Fork's assets to Northwestern caused Clark Fork to become undercapitalized.

77.    Because the Montana Utility Assets that Northwestern received in the Transfer were worth substantially more than the value of the liabilities that were assumed by the Northwestern, Clark Fork did not receive reasonably equivalent value for the transfer.

78.    Paul Hastings knew or should have known that by structuring the Asset Transfer the way it did, Clark Fork would be rendered insolvent and the QUIPS holders would be hindered, delayed or defrauded.

79.    Paul Hastings knew or should have known that by structuring the Asset Transfer in the way that it did, Clark Fork would transfer assets without receiving a reasonably equivalent value in exchange leaving Clark Fork with unreasonably small remaining assets or without ability to pay its debts as they became due.

80.    Paul Hastings knew or should have known that by structuring the Asset Transfer in the way that it did, Clark Fork would transfer assets without receiving a reasonably equivalent value in exchange leaving Clark Fork insolvent as a result.

81.    Paul Hastings provided substantial assistance to Northwestern and Clark Fork to effect this fraudulent transfer.  The Defendant substantially assisted the directors and officers of Clark Fork by structuring and effectively orchestrating the entire Asset Transfer.

82.     Magten, on its own behalf and on behalf of the Trust, seeks the payments which the Trust should have received had the assets not been fraudulently transferred out of Clark Fork.

### THIRD CAUSE OF ACTION

### Civil Conspiracy to Conduct Fraudulent Transfer

83.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth here.

84.     Paul Hastings and Northwestern intended when fraudulently transferring the Montana Utility Assets of Clark Fork to Northwestern to hinder, delay or defraud the creditors of Clark Fork.

85.     Paul Hastings and Northwestern intended to fraudulently transfer the Montana Utility Assets of Clark Fork to Northwestern without receiving reasonably equivalent value in exchange, rendering Clark Fork engaged in a business or a transaction for which the remaining assets of Clark Fork were unreasonably small.

86.     Paul Hastings and Northwestern intended to fraudulently transfer the Montana Utility Assets of Clark Fork to Northwestern without receiving a reasonably equivalent value in exchange, leaving Clark Fork with only the liability saddled Milltown Dam, and rendering Clark Fork insolvent.

87.     Paul Hastings and Northwestern agreed on a course of action whereby Paul Hastings and Northwestern would enact the requisite agreements in order conduct that fraudulent transfer.

88.     In furtherance of that course of action, Paul Hastings assisted Northwestern and Clark Fork in transferring the Montana Utility Assets out of Clark Fork in violation of the

## A127

Montana Uniform Fraudulent Transfers Act in order to hinder, delay or defraud the creditors of Clark Fork.

89.     Also, in furtherance of that course of action, Paul Hastings assisted Northwestern and Clark Fork in transferring the Montana Utility Assets out of Clark Fork in violation of the Montana Uniform Fraudulent Transfers Act without receiving a reasonably equivalent value in exchange and Clark Fork became insolvent as a result.

90.     Also, in furtherance of that course of action, Paul Hastings assisted Northwestern and Clark Fork in transferring the Montana Utility Assets out of Clark Fork in violation of the Montana Uniform Fraudulent Transfers Act without receiving a reasonably equivalent value in exchange rendering Clark Fork engaged in a business or transaction for which the remaining assets of Clark Fork were unreasonably small.

91.     As damages, Magten, on its own behalf and on behalf of the Trust, seeks the payments which the Trust should have received had the assets not been fraudulently transferred out of Clark Fork.

## FOURTH CAUSE OF ACTION

### Malpractice
**Magten suing directly, on behalf of the Trust and derivatively on behalf of Clark Fork**

92.     Plaintiff repeats and re-alleges the allegations contained in the preceding paragraphs as if fully set forth here.

93.     The Defendant owed a duty of care to Clark Fork.

94.     The Defendant also owed a duty of care to Northwestern.

95.     The Defendant breached its duty to Clark Fork by failing to disclose its conflict of interest to Clark Fork's officers and directors.

## A128

96.    Because Paul Hastings failed to disclose its conflict of interest to Clark Fork and instead structured a transaction for Clark Fork whereby Clark Fork was forced to relinquish substantially all of its assets, Clark Fork and its creditors suffered an amount to be determined at trial.

97.    In as much as Paul Hastings' actions caused Clark Fork to become insolvent, and enter the zone of insolvency, Magten, on its own behalf, on behalf of the Trust and on behalf of Clark Fork, is entitled to recover for Paul Hastings' malpractice.

WHEREFORE, Plaintiff prays for all damages caused by the actions of defendant and enter judgment against defendant as follows:

1.    For Plaintiff's compensatory damages;

2.    An award of punitive damages to punish defendant for its intentional and malicious conduct;

3.    For Plaintiff's costs, attorneys' fees and any other recoverable expenses related to this litigation; and

4.    Such further and additional relief this Court deems just and proper.

DATED this _____ day of May, 2004.

PAOLI & SHEA, P.C.

By: _____
    David R. Paoli
    *Attorney for Plaintiff*

A129

Complaint and Demand for Jury Trial – Page 19

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues.

DATED this _19th_ day of May, 2004.

PAOLI & SHEA, P.C.

By: _[signature]_

David R. Paoli
*Attorney for Plaintiff*

**A130**

**EXHIBIT D**

March 30, 2004

Jesse Austin, III, Esq.
Paul Hastings Janofsky & Walker LLP
600 Peachtree Street, N.W.
Suite·2400
Atlanta, GA 30308

   **Re:**  **<u>In re Northwestern Corporation, Case No. 03-12872 (CGC)</u>**

Dear Mr. Austin:

We have been retained as special conflicts and ethics counsel to Magten Asset Management Corporation ("Magten"), in connection with Magten's claims against the Debtor in *In re Northwestern Corporation*, Case No. 03-12872 (CGC). By reason of your pre-petition representation of the Debtor in the transactions discussed below, your representation of the Debtor in connection with all proceedings addressed to those transactions appears to be prohibited by §§1107 and 327(a) of the Bankruptcy Code as well as Rule 3.7 and Rule 1.7 of the Model Rules of Professional Conduct adopted by the District of Delaware.

As you know, serious accusations of fraudulent misconduct have been raised by creditors of Montana Power LLC ("Montana") regarding the November 15, 2002 transfer of substantially all of Montana's assets to Northwestern (the "Asset Transfer") as well as the December 17, 2002 $390 million senior secured credit agreement (the "New Credit Agreement"). These transactions, while obviously beneficial to the creditors of Northwestern Corp., appear detrimental and fraudulent with respect to the creditors of Montana. To this end, Magten is currently investigating these transactions for fraud, fraudulent conveyance, breach of fiduciary duties, and aiding and abetting the breach of fiduciary duties.

As counsel to Northwestern Corp., your firm negotiated and consummated both the Asset Transfer as well as the New Credit Agreement at stake here. As such, your firm and your attorneys will obviously be crucial witnesses in any litigation seeking to uncover the

**A132**

Jesse Austin, III, Esq.
March 30, 2004
Page 2

circumstances in which these transactions occurred.[1]  More importantly, based upon a preliminary review, your firm may very well be subject to liability for aiding and abetting the misconduct undertaken by Northwestern against the creditors of Montana.  Curiously absent from your Affidavit in Support of Application to Employ and Retain Paul Hastings (the "Austin Affidavit") is any reference or even mention of your firm's involvement in the Asset Transfer or the New Credit Agreement which were detrimental and fraudulent as to an entire class of creditors.

Apparently, your firm's exposure to liability has tainted your impartiality in dealing with an entire class of creditors.  On Tuesday, March 16, you argued to the Tribune Capitol Bureau that Magten's position regarding these transactions was "not tenable."  In light of the circumstances, your statement to the press disparaging Magten's claims was inappropriate.  Your potential liability regarding these claims, your lack of impartiality in dealing with them, and your failure to disclose your firm's role in the transactions calls into question your ability to serve professionally as Debtor's counsel.

As you well know, 11 U.S.C. §327(a)'s standard of disinterestedness applies to the employment of professionals by the debtor in possession under §1107 of the Bankruptcy Code.  *See, In re T & D Tool, Inc.*, 125 B.R.116, 119 (E.D.Pa. 1991); *In re Diamond Mortg. Corp. of Illinois*, 135 B.R. 78 (Bankr.N.D.Ill. 1990).  The essence of disinterestedness is that a lawyer be able to make decisions regarding the estate without bias towards his own personal interests.  *See, e.g., In re CVC Invsmt. Corp.*, 192 B.R. 549, 553 (9th Cir. BAP 1996)(a disinterested person must be able to make decisions free of any personal interest or bias); *Matter of Codesco, Inc.*, 18 B.R. 997, 999 (Bankr.S.D.N.Y. 1982)( a "disinterested person should be divested of any scintilla of personal interest.").  Frankly, we fail to see how Paul Hastings can dispassionately navigate between two classes of creditors with conflicting interests when its own liability is at stake.

Your firm clearly holds an interest materially adverse to a class of creditors, the Montana creditors, in contravention of 11 U.S.C. § 101(14)(e) (disinterested person may not hold materially adverse interest to any class of creditors).  It is obviously in Paul Hastings personal interest that the claims of the Montana creditors come up as short as possible; that the Montana creditors' position be found "not tenable."  Furthermore, as you are doubtlessly aware, the Third Circuit has little patience for law firms faced with liability arising out of their activities representing the pre-petition Debtor.  *See, In re Pillowtex, Inc.*, 304 F.3d 246 (3rd Cir. 2002); *In re First Jersey Securities, Inc.*, 180 F.3d 504 (3rd Cir. 1999).

Finally, you should take cognizance of the fact that when interrelated debtors have claims of pre-petition debt against one another, one law firm may not serve as debtor's counsel to both.  *In re Green Street*, 132 B.R. 460 (Bankr.D.Utah. 1991)(one firm may not represent interrelated debtors having claims for pre-petition debt among one another) *affirmed, In re Interwest Business Equipment, Inc.* 23 F.3d 311 (10th Cir 1994).  The existence of even potential claims

---

[1] *See, e.g.*, In re GHR Energy Corp., 60 B.R. 52 (Bankr.S.D.Tex. 1985)(granting motion to disqualify debtor's counsel where attorney was party who ought to be called as a witness in related litigation).

Jesse Austin, III, Esq.
March 30, 2004
Page 3

within this bankruptcy estate should have raised ethical warning signs for your firm aside from your firm's involvement and liability.

Faced with the conflicts described above, we believe your firm has an ethical obligation to withdraw from representation of the debtor in any adversary litigation involving these transactions including the pending motions to lift the automatic stay and to extend the time within which to file a complaint.

We would appreciate your prompt attention to this matter and notification of your course of action.

Sincerely,


Bijan Amini

cc:     Alan Kornberg, Esq.
        Mr. Talton R. Embry

**A134**

# EXHIBIT E

A135

**STORCH AMINI & MUNVES, P.C.**

A NEW YORK PROFESSIONAL CORPORATION

The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 490-4100 telephone
(212) 490-4208 facsimile

---

**Bijan Amini**
Member NY and DC Bars
amini@samlegal.com

Washington, DC
Garden City, New York
South River, New Jersey

April 16, 2004

Jesse Austin, III, Esq.
Paul Hastings Janofsky & Walker LLP
600 Peachtree Street, N.W.
Suite 2400
Atlanta, GA 30308

Re:     **In re Northwestern Corporation, Case No. 03-12872 (CGC)**

Dear Mr. Austin:

We still have not received your response to our March 30th 2004 letter. For your convenience that letter is attached. As you know, last week Judge Case lifted the stay to allow the fraudulent conveyance claims of Magten Asset Management Corp. to proceed. In light of this development, we would like to know how you intend to proceed regarding the issues raised in our letter, and specifically whether you intend to refrain from any representation in connection with this matter. Please contact us within five business days to inform us of your decision. I look forward to your prompt reply.

Sincerely,

Bijan Amini

Enclosure

cc:     Seth M. Zachary, Esq.

**A136**

**EXHIBIT F**

**Paul**Hastings

Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, NE, Ste. 2400, Atlanta, GA 30308-2222
telephone 404-815-2400 / facsimile 404-815-2424 / internet www.paulhastings.com

Atlanta
Beijing
Hong Kong
London
Los Angeles
New York
Orange County
San Diego
San Francisco
Shanghai
Stamford
Tokyo
Washington, D.C.

(404) 815-2208
jessaustin@paulhastings.com

April 19, 2004                                           38910.00006

**VIA FACSIMILE 212-490-4208**

Bijan Amini, Esq.
Storch Amini & Munves, P.C.
The Chrysler Building
405 Lexington Avenue
New York, New York 10174

Re:    NorthWestern Corporation, Chapter 11 Case No. 03-12872 (CGC)

Dear Mr. Amini:

This letter is in response to your letter of April 16, 2004 which I have only received today, April 19. I have been unable to respond to your prior letter dated March 30 because I have been traveling and out of the office on NorthWestern Corporation matters. I anticipate being able to review your March 30 letter over the next few days; however, I will not be able to respond in the five business days as requested in your April 16 letter.

It is my understanding that Magten Asset Management Corporation has now actually filed its proposed complaint and did so on April 16. As a result, upon issuance and service of the summons and complaint NorthWestern will have 30 days to respond to Magten's adversary proceeding. Accordingly, it would appear that we have plenty of time to respond to your March 30 letter and will do so in due course.

Very truly yours,

Jesse H. Austin, III
of PAUL, HASTINGS, JANOFSKY & WALKER LLP

JHA/ld

cc:    Seth M. Zachary, Esq. (via facsimile)
       Alan W. Kornberg, Esq. (via facsimile)

**A138**

# EXHIBIT G

A139

# UNITED SATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                              )
                                    )        Chapter 11
Northwestern Corporation,           )
                                    )        Case No. 03-12872(CGC)
        Debtor.                     )

## STATEMENT PURSUANT TO § 328(c)
## REGARDING PAUL HASTINGS JANOFSKY & WALKER LLP

Magten Asset Management Corporation ("Magten") states:

     1.    Under § 328(c) of the Bankruptcy Code, the Court may deny compensation for services and reimbursement of expenses of a professional person employed under §§ 327 and 1103 of the Bankruptcy Code if at any time during that person's professional employment, that person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

     2.    On September 17, 2003, the Debtor applied to retain Paul Hastings Janofsky and Walker LLP ("Paul Hastings"). In connection with that application, Paul Hastings submitted the Affidavit of Jesse Austin III stating, among other things, that Paul Hastings was a disinterested person as defined by §§ 101(14) and 1107(b) of the Bankruptcy Code.

     3.    On October 10, 2003, the Court approved the application to employ Paul Hastings.

     4.    On April 8, 2004, the Court lifted the Automatic Stay to permit Magten and Law Debenture Trust Company of New York to commence an adversary proceeding seeking to avoid certain fraudulent transfers.

**A140**

FILING ID# _/272_

DATE FILED _05/11/04_

5.    On April 16, 2004, Magten and Law Debenture Trust Company of New York filed a Complaint to Avoid the Transfer of Assets of Clark Fork and BlackFoot LLC to Northwestern Corporation.

6.    Due to the events, discussed below, Paul Hastings is no longer disinterested.

7.    On February 15, 2002, Paul Hastings served as counsel to the Debtor on the purchase of the Montana Power Company LLC, a subsidiary owning significant energy assets of the Montana Power Company and later renamed Northwestern Energy LLC and then Clark Fork and Blackfoot LLC (hereinafter, "Clark Fork").

8.    On November 15, 2002, Paul Hastings served as counsel to Clark Fork and the Debtor in connection with the Asset Transfer Agreement, which transferred substantially all of the assets of Clark Fork to the Debtor, a transaction which the creditors of Clark Fork claim was fraudulent.

9.    By letter dated March 30, 2004, Magten requested Paul Hastings to withdraw from representing the Debtor in connection with any adversary proceedings concerning the transaction that Paul Hastings structured and effectuated. To date, Paul Hastings has refused to respond to their request (see correspondence annexed hereto as Exhibit A).

10.    On April 8, 2004, Paul Hastings represented the Debtor before this Court in arguing against the lifting of the automatic stay and in favor of preventing the Clark Fork creditors from moving to avoid as fraudulent the very transaction that Paul Hastings structured.

11.    Therefore, not only has Paul Hastings structured and effectuated the very transfer at stake in pending litigation, but it has also argued to prevent the transfer from being attacked.

**A141**

12.    To date Paul Hastings, has not, despite request, removed itself from representing the Debtor in the Adversary Proceeding to avoid this transfer as fraudulent.

13.    Prior to approving the payment of any further fees, the Court and the United States Trustee should examine Paul Hastings' status as a disinterested party.

14.    Because it is likely that Paul Hastings will be found to be not disinterested, and will be required to disgorge fees received from the Debtor, in the event Paul Hastings does remain counsel to the Debtor, Paul Hastings should be required to either (i) post a bond on an interim basis to secure its ability to satisfy any disgorgement order or (ii) the amount of the hold back under the Order Establishing Procedures for Payment of Interim Compensation and Reimbursement of Expenses to Professionals should be significantly increased.

SMITH, KATZENSTEIN & FURLOW LLP

David A. Jenkins
800 Delaware Avenue [19801]
Post Office Box 410
Wilmington, DE 19899-0410
(302) 652-8400
*Attorneys for Creditor*
*Magten Asset Management Corporation*

May 11, 2004

OF COUNSEL:

STORCH, AMINI & MUNVES, P.C.
Bijan Amini
Avery Samet
405 Lexington Avenue
New York, NY 10174
(212) 490-4100

**A142**

-3-

# EXHIBIT H

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | Case No. 03-12872 (CGC) |
| | : | |
| Debtor. | : | |
| | : | |

**SECOND SUPPLEMENTAL AFFIDAVIT OF JESSE H. AUSTIN, III IN
CONNECTION WITH PAUL, HASTINGS, JANOFSKY & WALKER LLP'S
EMPLOYMENT AS ATTORNEYS FOR DEBTOR AND DEBTOR-IN-POSSESSION**

I, Jesse H. Austin, III, being duly sworn, hereby depose and say as follows:

1.     I am a member of the firm of Paul, Hastings, Janofsky & Walker LLP

("Paul Hastings" or the "Firm"), which maintains offices for the practice of law at 600

Peachtree Street, Atlanta, Georgia 30308. I am admitted to the practice of law in

Georgia, the United States District Court for the Northern and Southern Districts of

Georgia and the Northern District of Texas, and the 11th Circuit United States Court of

Appeals. Unless otherwise stated in this affidavit, I have personal knowledge of the facts

set forth herein.

2.     On September 17, 2003, I submitted an affidavit (the "Original Affidavit")

in support of the application of the debtor and debtor-in-possession (the "Debtor" or

"NorthWestern") in the above-captioned Chapter 11 case for the entry of an order,

pursuant to §§ 327(a) and 328(a) of Title 11 of the United States Code (the "Bankruptcy

Code"), authorizing the retention and employment of Paul Hasting as attorneys for the

Debtor and to provide the disclosures required under § 329 of the Bankruptcy Code,

**A144**

Rules 2014(a) and 2016(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the rules of this Court.

3.  On December 19, 2003, I submitted a supplemental affidavit (the "First Supplemental Affidavit") disclosing additional entities with an actual or potential interest in the Debtor's case which the Firm has represented and/or continues to represent in matters unrelated to the Debtor.

4.  This affidavit supplements the Original Affidavit and the First Supplemental Affidavit with respect to the disclosures set forth herein.

A.  <u>NorthWestern's Claims against Netexit, Inc. and its Subsidiaries</u>

5.  On May 4, 2004 (the "Netexit Petition Date"), Netexit, Inc. ("Netexit") and its subsidiary debtors (collectively, the "Netexit Debtors") filed voluntary Chapter 11 petitions with this Court. The Netexit Debtors are directly and indirectly owned by the Debtor through preferred and common stock investments.

6.  Paul Hastings seeks to be retained in the Netexit Debtors' Chapter 11 cases as their counsel. A hearing with respect to Paul Hastings' retention application is scheduled in the Netexit cases for June 21, 2004.

7.  I am informed and believe that Expanets, Inc., the predecessor in interest to Netexit, executed certain promissory notes in favor of NorthWestern as follows: (i) a promissory note dated June 3, 2003 executed by Expanets which had a balance of principal and accrued interest as of the Netexit Petition Date of $10,177,753; (ii) a demand promissory note dated October 13, 2003 executed by Expanets which had a balance of principal and accrued interest as of the Netexit Petition Date of $117,955,856;

**A145**

(iii) a demand promissory note also dated October 13, 2003 executed by Expanets which had a balance of principal and accrued interest as of the Netexit Petition Date of $56,561,099; and (iv) intercompany accounts payable of $52,525,567. I am informed and believe that as of the Netexit Petition Date the aggregate indebtedness of Netexit to NorthWestern pursuant to the foregoing promissory notes and accounts payable was approximately $237,220,000. Additionally, NorthWestern asserts equity interests in Netexit by way of a $363,627,003 preferred stock investment and a $500,000 common stock investment. There are also certain indemnification obligations that NorthWestern assumed in connection with the sale of substantially all of the assets of Expanets to Avaya, Inc. (the "Avaya Sale").

    a)    <u>Separate Counsel for Inter-Estate Claims</u>

    8.    As detailed above there are certain claims which NorthWestern asserts against the Netexit Debtors and certain indemnification obligations that NorthWestern assumed in connection with the Avaya Sale. In addition, I am informed and believe that Netexit is included as a beneficiary under certain of NorthWestern's insurance policies. In connection with its retention by the Netexit Debtors, Paul Hastings does not propose to represent the Netexit Debtors in connection with any claims that they may hold against NorthWestern. Similarly, pursuant to its existing retention by NorthWestern, Paul Hastings does not propose to represent NorthWestern in connection with any claims that it holds against the Netexit Debtors. The Official Committee of Unsecured Creditors in NorthWestern's Chapter 11 case (the "NorthWestern Creditors' Committee") is playing an active and vigorous role in the NorthWestern case. An Official Committee of

Unsecured Creditors has also been constituted in the Netexit Chapter 11 case (the "Netexit Creditors' Committee") and has retained counsel. To the extent any conflicts arise as between NorthWestern and the Netexit Debtors, the NorthWestern Creditors' Committee and the Netexit Creditors' Committee can, with the assistance of counsel, address any claims of NorthWestern against the Netexit Debtors and adequately represent the interests of the NorthWestern estate with respect to claims against the Netexit Debtors.

B.    **Magten Asset Management Corporation's Statement**

9.    On or about April 16, 2004 Magten Asset Management Corporation ("Magten"), along with Law Debenture Trust Company of New York, filed an adversary proceeding against the Debtor styled as Adversary Proceeding No. 04-53324-CGC, and therein asserted various claims with respect to that transaction generally referred to as the "going flat" transaction (the "Magten Adversary Proceeding").

10.    On or about May 11, 2004, Magten filed its Statement pursuant to Section 328(c) regarding Paul, Hastings, Janofsky & Walker LLP (the "Magten Statement") asserting that Paul Hastings was no longer disinterested.

11.    On or about May 19, 2004, Magten filed its Complaint and Demand for Jury Trial in the case styled Magten Asset Management Corporation, suing individually and derivatively on behalf of Clark Fork and Blackfoot, LLC v. Paul, Hastings, Janofsky & Walker LLP, Cause No. DV-04-131, Montana Second Judicial District Court, Silver Bow County (the "Magten Paul Hastings Litigation") alleging that Paul Hastings

conspired with and aided and abetted the Debtor in alleged wrongful acts arising from the "going flat" transaction.

12.    On or about May 14, 2004 the Debtor filed a motion to dismiss the Magten Adversary Proceeding for failing to state a claim upon which relief can be granted.  On or about June 2, 2004, Paul Hastings filed its Response to the Magten Statement.

a)    <u>Separate Counsel with Respect to the Magten Adversary Proceeding</u>

13.    As a result of the filing of the Magten Paul Hastings Litigation and in order to avoid any potential or appearance of any conflict of interest, all matters relating to the Magten Adversary Proceeding have been transferred to Greenberg Traurig LLP. Paul Hastings is no longer handling matters related to the Magten Adversary Proceeding.

## DISINTERESTEDNESS

14.    Neither I, nor Paul Hastings, nor any partner, of counsel, or associate thereof, as far as I have been able to ascertain, has any connection with the Debtor, its creditors, the United States trustee or any other party with an actual or potential interest in this Chapter 11 case or their respective attorneys or accountants, except as set forth in the Original Affidavit, the First Supplemental Affidavit, herein or as follows:  prior to the Debtor's Chapter 11 filing the Firm represented Cornerstone Propane L.P. ("Cornerstone") in connection with two arbitration proceedings, the Richard D. Nye arbitration and the William Woods arbitration, and also provided Cornerstone with limited general corporate counseling services.

## PROFESSIONAL COMPENSATION

15.    In connection with its representation of Cornerstone, Paul Hastings during the year preceding the Debtor's bankruptcy filing received approximately $180,327.90 in payment from Cornerstone. This payment included an advance payment in connection with the arbitrations. Since January 2004, no additional services have been provided in connection with the arbitrations. Approximately $51,406.43 remained of the advance payment. As the Cornerstone matters are currently inactive and Paul Hastings no longer represents Cornerstone in any capacity, Paul Hastings returned the remaining portion of the advance payment in the approximate amount of $51,406.43 to Cornerstone immediately prior to Cornerstone filing its own Chapter 11 case..

16.    Paul Hastings will periodically review its files during the pendency of this Chapter 11 case to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, Paul Hastings will use reasonable efforts to identify such further developments and will promptly file a supplemental affidavit in accordance with Rule 2014(a) of the Bankruptcy Rules.

Executed this _16_ day of June 2004.

Jesse H. Austin, III
Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, N.W., Suite 2400
Atlanta, GA 30308
Telephone: (404) 815-2400
Facsimile: (404) 815-2424

Subscribed and sworn to before me
this _16_ day of June 2004.

Notary Public
My Commission Expires:

Notary Public, Rockdale County, Georgia
My Commission Expires October 4, 2004

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHWESTERN CORPORATION, | ) | Case No. 03-12872 (CGC) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## ORDER GRANTING MAGTEN ASSET MANAGEMENT CORPORATION'S
## MOTION TO DISQUALIFY PAUL, HASTINGS, JANOFSKY & WALKER LLP

This matter coming before the Court on Magten Asset Management Coroporation's Motion to Disqualify Paul, Hastings, Janofsky & Walker LLP (the "Motion"); the Court having reviewed and considered the Motion; and, the Court finding that just cause exists for granting the Motion; it is hereby

ORDERED that the law firm of Paul, Hastings, Janofsky & Walker LLP is disqualified from its representation of the Debtor-in-Possession.


Date:_____        _____
                                    Charles G. Case
                                    United States Bankruptcy Judge


**A151**

{KMM4562.DOC}