KPMG partners responsible for the earlier engagement gave depositions, as did personnel from the

Debtors' tax department. Three expert witnesses submitted reports dealing with the intangible asset

licensing program, each of which reviewed and analyzed the extensive, contemporaneous

documentation that KPMG had created. Although the objections of the dissenting creditor groups

were settled before the Court heard testimony on the Royalty Charges, that settlement did not occur

until September 9, 2003 – after the dissenting creditors and the Debtors had filed briefs spelling out

their contentions regarding the validity of the Royalty Charges. There is no record of the States

participating in the deposition or any other discovery during this period.

On July 28, 2003, the State of Oklahoma filed its Limited Objection of States of Oklahoma,

Arkansas, California, Connecticut, Illinois, Louisiana, Massachusetts, Missouri, Montana, New Jersey,

Puerto Rico, South Dakota, Tennessee, and Virginia to Confirmation of Debtors' Amended Joint Plan

of Reorganization Dated July 9, 2003 (the "States' Plan Objection"). As discussed further below, the

States' Plan Objection contained no reference to any of the issues raised in the Disqualification Motion.

The States' Plan Objection was resolved and the Plan subsequently confirmed in a manner that did not

affect the Debtors' retention of KPMG.

On September 2, 2003, the Commissioner of Revenue for the Commonwealth of

Massachusetts (the "Commissioner") filed a Motion on Behalf of Massachusetts, New York,

Connecticut, New Mexico, Iowa, Illinois, Pennsylvania, North Carolina, Virginia, and Other Similarly

Situated States, to Extend the Deadline for Filing Proofs of Claim (the "Bar Date Extension Motion").

In the Bar Date Extension Motion, the Commissioner asked this Court to extend the bar date for filing

pre-petition claims because certain dissenting creditors had allegedly revealed that "royalty charges

-10-

**A200**

totaling approximately $19,000,000,000 incurred by MCI and its subsidiaries were apparently part of a tax avoidance scheme that was intentionally concealed from the State taxing authorities over the three-year pre-petition period [from] 1999-2001." Bar Date Extension Motion at ¶ 5. In support of the Bar Date Extension Motion, the States alleged that "the facts necessary to uncover and identify the tax avoidance aspects of the Debtors' royalty plan and other accounting practices were not known or readily discoverable prior to January 23, 2003." Bar Date Extension Motion at ¶ 20. January 23, 2003 was the Bar Date established by the Court for these cases.

On September 2, 2003, the Commissioner filed a Motion Directing the Debtor, Scott Sullivan, and KPMG LLP to Appear for Rule 2004 Examination and to Produce Documents in Connection Therewith (the "Rule 2004 Motion"). In the Rule 2004 Motion, the Commissioner set forth the allegation that the Debtors' royalty deductions were improper. *See* Rule 2004 Motion at ¶ 11 ("On or about April 14, 2003 . . . the Debtors publicly disclosed for the first time what has become known as a $19 billion sham royalty claim of WorldCom, Inc. against MCI."). On October 15, 2003, this Court entered an order granting the Rule 2004 Motion.

*D. The Plan*

The Plan requires the issuance and listing of New Common Stock (the "New Common Stock") on the NASDAQ National Markets System for trading "on or soon as practicable after the Effective Date." Plan at § 9.05.

The Plan provides that all property of the estate (including causes of action) re-vests in the Debtors and the Reorganized Debtors upon the Effective Date. *See* Plan at § 10.01. Further, the Plan specifically preserves the Debtors' right to assert causes of action. *See* Plan at § 10.08 ("[N]othing

-11-

**A201**

contained in the Plan or the Confirmation Order shall be deemed a waiver or a relinquishment of any

Causes of Action that the Debtors or the Reorganized Debtors may choose to assert on behalf of their

respective estates under any provision of the Bankruptcy Code . . . ."). Further, section 13.14 of the

Plan provides that the Plan shall be binding on all parties to the Debtors' bankruptcy case, including,

without limitation, all holders of Claims against the Debtors. *See* Plan at § 13.14. The Plan and the

Confirmation Order provide that all causes of action re-vest in the Debtors. The States did not object

to these provisions of the Plan and the Confirmation Order, nor did they, or any other party, appeal the

Confirmation Order. The Plan went effective on April 20, 2004. Thus, the Plan vests the Debtors with

the sole discretion to assert causes of action, including any action against KPMG, on behalf of their

estates.

*E. The Examiner's Third And Final Report*

On January 26, 2004, the Examiner filed his Third and Final Report (the "Final

Report"). The Examiner sought to identify the potential causes of action that the Examiner, after

reviewing the applicable facts and law, believed would most likely survive motions to dismiss or for

summary judgment and reach a fact-finder if presented in a lawsuit. *See* Final Report at 9 n.7. In his

Final Report, the Examiner stated that he began to investigate the allegedly improper royalty deductions

after certain dissenting creditors had raised the issue. *See* Final Report at 36 ("The potential issues with

the Royalty Programs came to the Examiner's attention in the summer of 2003."). Despite commenting

on alleged delays in obtaining information relevant to his investigation of the royalty deductions, the

Examiner determined that he was satisfied with the information he received. *See* Final Report at 37

("[T]he Examiner is satisfied that he ultimately interviewed the key persons available to him and with

-12-

**A202**

knowledge relevant of the Royalty Programs and that he has received sufficient information to support

the conclusions reached in this Third and Final Report.").

    After undertaking an investigation of the Royalty Charges, the Examiner made several

conclusions in his Final Report. First, the Examiner concluded that the royalty programs "were not well

conceived or implemented, and are vulnerable to challenge by various states." Final Report at 28.

Second, the Examiner concluded that if the States successfully challenged the royalty deductions, the

Debtors may have a potential claim against KPMG. *See* Final Report at 13 ("To the extent that state

taxing authorities bring actions and prevail, the Examiner believes that WorldCom has claims against

KPMG."). Third, the Examiner identified potential defenses that KPMG would have to such an action.

*See* Final Report at 43 ("It is possible, however, that a state deficiency finding would be founded

instead in whole or in part on the Company's implementation failures . . . . In such an instance, the

Company's claims against KPMG could be reduced or even eliminated."). Finally, the Examiner

recognized that the Debtors possessed the discretion and authority to determine whether or not to bring

a cause of action against KPMG:

> The Examiner recognizes that the WorldCom plan of reorganization assigns any such
> claims to WorldCom and that the Company may have valid reasons, in exercising its
> business judgment, not to pursue particular potential claims . . . . The Examiner
> expresses no opinion as to whether any of the claims should actually be pursued.
> Rather, the Examiner views it as his responsibility to identify potential claims and to
> leave it to the Company to decide which, if any, of the claims to pursue.

Final Report at 5.

    In a press release issued by MCI on January 26, 2004, MCI stated that "KPMG's involvement

in [the tax] program has previously been carefully reviewed by our current Audit Committee of the

-13-    **A203**

Company's Board of Directors and the Company's inside and outside counsel. . . . As a result, the Company has no plans to pursue claims against KPMG.". On March 5, 2004, Anastasia Kelly, Executive Vice President and General Counsel of the Debtors, sent a letter to KPMG regarding the findings contained in the Final Report (the "Letter"). The Letter states that, "the Company does not intend to pursue any claim against KPMG relating to MCI's intangible asset licensing program, the related intercompany transactions, and their associated tax implications." KPMG Response and Objection, Ex. B at 1.

*F. Disqualification Motion And The April 16 Hearing*

On March 17, 2004, the States filed the Disqualification Motion with a return date (i.e. hearing date) for April 13, 2004 ( the "April 13 Hearing"). At the Court's direction, a conference call was held on March 19, 2004 (the "March 19 Conference Call")[3] in which the Court raised the issue of whether, in light of the Disqualification Motion, KPMG was qualified to receive continued payments under the Order Pursuant to Sections 105(a) and 331 of The Bankruptcy Code Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated August 13, 2002, (the "Monthly Compensation Order"). During the March 19 Conference Call, the Court stated its view that the Disqualification Motion should be construed as an objection to KPMG's monthly fees which in turn, under the Monthly Compensation Order, prevents payment by the Debtors to KPMG until the resolution of such objection or further order of the Court. After the Court's comments, the Debtors stated that they would terminate payment of monthly fees to KPMG until further order of the Court.

---

[3]The March 19 Conference Call was not recorded or transcribed.

-14-

**A204**

During the March 19 Conference Call, the amount of time that would be allocated for the April 13 Hearing was raised. The Court stated that it did not know the amount of time that would be allocated because it did not know whether witnesses were going to be presented. The States responded that they were not aware that the April 13 Hearing was evidentiary but instead assumed that the Court would schedule an evidentiary hearing if, following oral argument on the Disqualification Motion, the Court deemed it necessary. The Court instructed the parties that if they decided to present evidence, evidence could be presented at the April 13 Hearing. The Court also directed the parties to discuss the issues amongst themselves and inform the Court accordingly.

In the March 19 Conference Call, the Court recalls that the States argued that Rule 408 of the Federal Rules of Evidence ("Rule 408") prevented the Debtors from referring to the circumstances surrounding the proposed filing of the Disqualification Motion because it had been raised in a settlement conference between the parties. Further, the Court recalls advising the States that it did not believe that Rule 408 applied under the circumstances presented.

Shortly thereafter, the States issued discovery requests in connection with the Disqualification Motion. On March 30, 2004 the Debtors and KPMG expressed their objections to the States' requests for discovery and requested a conference with the Court to discuss these objections. *See* LBR 7007-1(b). A conference was held on March 31, 2004, at which time the Court directed the States, the Debtors and KPMG to submit letters setting forth the facts in dispute that may need to be addressed by discovery. On April 9, 2004 the Court presided over a hearing to address the issues raised in the correspondence submitted by the parties (the "April 9 Hearing"). At the conclusion of the April 9 Hearing, the Court informed the parties that it would rule on the States' discovery requests on

-15-

**A205**

April 13, 2004 and adjourned the hearing on the Disqualification Motion until April 16, 2004 if the

discovery requests were denied and to sometime thereafter if the discovery requests were granted. The

Court denied the States' discovery requests on April 13, 2004 by finding, among other things, that the

States' discovery requests were neither warranted, required nor appropriate to resolving the issue

before the Court.          Having denied the States' request for discovery, the hearing on the

Disqualification Motion was held on April 16, 2004 (the "April 16 Hearing"). During the course of the

April 16 Hearing to consider the Disqualification Motion, there was colloquy between the Court and

the States' counsel regarding whether any inferences could be drawn from the fact that the SEC and the

United States Trustee were not taking a position concerning the Disqualification Motion. Thereafter, in

light of what transpired at the April 16 Hearing, the Debtors' counsel notified a member of the Court's

staff that there was an issue regarding the SEC that they believed should be brought to the Court's

attention and requested an *in camera* conference to discuss the matter. The Court was notified of the

request and a recess was taken. The Court then held an *in camera* chambers conference (the "April

16 Conference") where the Debtors first revealed to the Court and the States that the SEC had made a

confidential request for information to the Debtors and KPMG (hereinafter, the "SEC Requests"), in

connection with the issues raised in the Final Report. The Debtors stated that they requested the

conference be held *in camera* because they considered the transmission of the SEC Requests to the

Debtors and KPMG confidential.[4] The Debtors obtained copies of the SEC Requests and indicated to

---

[4]Upon review of the SEC Requests, the Court found that the Debtors' request for *in camera* disclosure of the requests was warranted. The requests provide that they are "confidential and should not be construed as an indication by the Commission or its staff that any violation of law has occurred, nor as an adverse reflection upon any person, entity or security."

-16-

**A206**

the Court that the SEC did not oppose providing copies to the parties to the Disqualification Motion, on

a confidential basis.[5]  The Court called a brief recess to allow the parties time to review the SEC

Requests privately in order to formulate an argument regarding the SEC Requests' relevance to the

Disqualification Motion.

Thereafter, the Court convened the April 16 Hearing, *in camera* (the "April 16 *In Camera*

Hearing") where the States' counsel renewed an earlier request for discovery seeking the documents

requested in the SEC Requests.  The Court denied this request orally at the April 16 *In Camera*

Hearing.  The Court heard further argument from the parties on disqualification related to the SEC letter

requests.  At the end of the April 16 *In Camera* Hearing, the Court directed the parties that the

requests from the SEC were to remain confidential until further order of the Court.

At the conclusion of the April 16 Hearing, the Court informed the parties that by April 20, 2004

the Court would either decide the merits of the Disqualification Motion or otherwise advise the parties

how the Court intended to proceed.  On April 20, 2004, the Court issued an order, among other

things, informing the parties that the Court would first review the transcript of the hearing and then

determine whether further action by the parties would be appropriate in this matter.

*G. SEC Requests And Disclosure Under Rule 2014*

On April 28, 2004, the Court held an *in camera* hearing and ordered a briefing schedule to

address the disclosure of the SEC requests under Rule 2014.  The April 28 Hearing was attended by

---

[5]A representative of the United States Trustee was not present at the April 16 Conference or
the April 16 *In Camera* Hearing.  However, copies of the SEC Requests were given to the United
States Trustee at the April 28, 2004 *in camera* hearing, (the "April 28 Hearing"), at which time, the
events that transpired on April 16, 2004 were conveyed to the United States Trustee.

**A207**

counsel for the States, the SEC, the United States Trustee, the Debtors and KPMG. During the April

28 Hearing, the Court ordered the Debtors and KPMG to submit the documents that each had been

producing to the SEC in response to the SEC Requests for review by the Court (hereinafter, the "SEC

Production"). The Court denied the States' request for access to the SEC Production; however, to the

extent that the United States Trustee's Office sought to review the documents, the Court directed that

the SEC Production could be made available on a confidential basis.[6] The SEC Production consists of

approximately thirty-five boxes of documents and five compact discs containing electronic copies of

documents. The SEC Production has been provided to the Court by the Debtors and KPMG, and the

Court has reviewed the documents.

On May 19, 2004, and pursuant to the briefing schedule set at the April 28 Hearing,[7] the

Debtors filed their Brief Filed Pursuant to the Court's May 7, 2004 Scheduling Order stating their

opposition to the disclosure of the SEC Requests. By letter dated May 18, 2004, the SEC stated that

it would not file any briefs on the issue. Other than this letter dated May 18, 2004, the SEC has not

filed any pleadings regarding the Disqualification Motion. The States filed its Brief in Support of Full

Disclosure of the SEC Letters to the Debtors and KPMG, on June 9, 2004.

---

[6]To the best of the Court's knowledge, the United States Trustee's Office has not requested any of the material in the SEC Production. However, at the April 28 Hearing KPMG represented that the United States Trustee's Office requested certain information from KPMG regarding the matter. Although the United States Trustee has been actively involved in these cases, including the retention of all professionals, the filing of a request for the appointment of an examiner at the outset of the cases, the disclosure and confirmation hearings, and has been present at many of the hearings and has participated in conference calls held regarding the Disqualification Motion, no pleadings have been filed by the United States Trustee regarding any aspect of the Disqualification Motion.

[7]The briefing schedule is embodied in an Order dated May 7, 2004.

-18-

**A208**

On June 4, 2004, the Court was advised by the Debtors that on or about June 1, 2004 one of the Debtors' professionals disclosed in its fee statement, filed with the Court, a reference to the SEC inquiry which should have been redacted from the statement. The Debtors requested that the Court authorize the removal of the fee statement from the Court's docket because of the error. It was expected that a redacted version of the statement would be filed. The Court granted the request in an order dated June 4, 2004 (the "June 4 Order").

Following the June 4 Order, the Court became aware that the information concerning the SEC inquiry was publicly disseminated, presumably prior to the removal of the document from the docket. The Court convened another *in camera* conference on June 10, 2004 (the "June 10 Conference"), to address the necessity of sealing documents in light of the public disclosure. During the June 10 Conference, the Court advised the parties of its belief that, in light of public disclosure of the existence of the SEC Requests, the continued sealing of the record with respect to the Disqualification Motion was no longer necessary. The Court advised the parties that the SEC Production was not to be included in the materials to be unsealed. The Court informed the parties that the sealed documents would be released on June 14, 2004, unless a request for a hearing was made by noon on June 14, 2004.

No request for a hearing was made. Hence, on June 14, 2004, the Court issued an Order Pursuant to Bankruptcy Rule 9018 Lifting Seal as to Certain Transcripts of Proceedings, Orders, Pleadings and Documents in connection with the Disqualification Motion. However, as the Court made clear at the June 10 Conference, the documents that would be released did not include the SEC

-19-

**A209**

Production. The SEC Production was not made available to the States due to the denial of their

discovery requests, as discussed more fully below.

On June 16, 2004, the Debtors and KPMG both filed responses to the States' June 9 brief,

arguing *inter alia,* that the issue of disclosure for purposes of the Disqualification Motion was rendered

"moot" as a result of the disclosures referenced above. The Court held a hearing on June 23, 2004

where the States agreed that under the circumstances as to disclosure under Rule 2014, the issue was

now moot; thereupon the record of the Motion was complete.

## III. Discussion

*A. Legal Standard*

Section 327(a) of the Bankruptcy Code authorizes a trustee or debtor in possession[8] to employ

professionals, with court approval, during the course of a bankruptcy case. *See* 11 U.S.C. § 327(a).

Section 327(a) provides, in pertinent part, that a debtor may retain professionals that do not "hold or

represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the

trustee in carrying out the debtor's duties under this title." 11 U.S.C. § 327(a). According to the plain

language of the statute, in order to qualify for retention under section 327(a) of the Bankruptcy Code a

---

[8] "Upon the filing of a voluntary [C]hapter 11 petition, a debtor automatically becomes a 'debtor in possession' [and] [a]s such occupies the shoes of a bankruptcy trustee in every major way." *Unofficial Committee of Equity Holders v. McManigle (In re Penick Pharmaceutical, Inc.),* 227 B.R. 229, 232 (Bankr. S.D.N.Y. 1998). Section 1107 gives the debtor in possession the powers given to a trustee under Chapter 11. *See* 11 U.S.C. § 1107.

professional: 1) must not hold an interest adverse to the bankruptcy estate; 2) must not represent an interest adverse to the estate; and 3) must be disinterested.[9]

An adverse interest is not defined in the Bankruptcy Code. *See Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 623 (2d Cir. 1999) ("The Bankruptcy Code does not define the phrase 'hold or represent an interest adverse to the estate.'"). The Second Circuit has relied upon the following definition of adverse interest:

> (1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or
> (2) to possess a predisposition under circumstances that render such a bias against the estate.

*In re AroChem Corp*, 176 F.3d at 623. Stated another way, if it is plausible that another interest may cause the professional to act any differently than they would without that other representation, then that professional would have a conflict and an interest adverse to the estate warranting disqualification. *See In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994). The decision whether an adverse interest exists is determined by the court on a case by case basis. *In re AroChem Corp*, 176 F.3d at 623.

---

[9] "By its terms, section 327 distinguishes between 'holding' an interest and 'representing' one." *Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 629 (2d Cir. 1999). Here there is no allegation that KPMG *represents* an interest adverse to the estate. A party represents an interest adverse to the estate when a professional acts as agent for someone holding an adverse interest. *See In re Envirodyne Indus., Inc.*, 150 B.R. 1008, 1016-17 (Bankr. N.D. Ill. 1993) ("To 'represent an adverse interest' means to serve as agent or attorney for any individual or entity holding such an adverse interest."). Because KPMG was not operating as anyone's agent but instead on their own behalf, the only relevant inquiry here is whether KPMG holds an interest adverse to the estate and whether KPMG is disinterested.

-21-

**A211**

A "disinterested person," in contrast, is defined in Bankruptcy Code section 101(14), which

provides, in relevant part, that a disinterested person:

> (A) is not a creditor, an equity security holder, or an insider; . . .
> (D) is not and was not, within two years before the date of filing of the petition, a
> director, officer, or employee of the debtor; . . .and
> (E) does not have an interest materially adverse to the interest of the estate or of any
> class of creditors or equity holders, by reason of any direct or indirect relationship to,
> connection with, or interest in, the debtor.

11 U.S.C. § 101(14). Courts have noted that the materially adverse interest standard incorporated into

the definition of disinterestedness under section 101(14)(E) and the "interest adverse to the estate"

language in section 327(a) overlap and are duplicative, forming a single test to judge conflicts. *See,

e.g., In re Granite Partners, L.P.*, 219 B.R. 22, 33 (Bankr. S.D.N.Y. 1998); *see also In re Enron

Corp.*, No. 01-16034 (AJG), 2002 WL 32034346, at *8 (Bankr. S.D.N.Y. May 23, 2002).

Rule 2014(a) requires a professional seeking an order for employment in a bankruptcy case to

submit a verified statement setting forth the professional's connections to the debtor, creditors, or any

other party in interest, including their counsel and accountants. The purpose of Rule 2014 is to provide

the Court (and the United States Trustee) with information to determine whether the professional's

retention is in the best interests of the estate, *see In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 533

(Bankr. S.D.N.Y. 1994), and to maintain the integrity of the bankruptcy system. *See In re Envirodyn

Indus., Inc.*, 150 B.R. 1008, 1021 (Bankr. N.D. Ill. 1993). Courts have ruled that Rule 2014

disclosures are to be strictly construed, *see In re Leslie Fay*, 175 B.R. at 533, and the professional

must disclose all facts that bear on disinterestedness and cannot usurp the court's functions by

selectively incorporating materials the professional deems important. *See In re Granite Partners,*

-22-

**A212**

*L.P.*, 219 B.R. at 35. Failure to disclose relevant connections is an independent basis for disallowance of fees or disqualification from the case. *See In re Leslie Fay*, 175 B.R. at 533.

## B. Legal Analysis

The Disqualification Motion raises three principal issues not specifically earmarked by the States into the aforementioned legal standard. First, the States argue that as a part of auditing the Debtors' restatement of its financials, KPMG would have to evaluate the soundness of its own tax minimizing strategies and thereby have its own financial interest at stake. The States contend that allowing KPMG to evaluate the soundness of its own strategies plainly demonstrates the existence of a conflict of interest and therefore, KPMG is not disinterested. *See* Disqualification Motion ¶ 33. Second, the States argue that KPMG holds an interest adverse to the estate because the Debtors have a potential cause of action against KPMG in the event that the royalty deductions are ultimately disallowed. *See* Disqualification Motion. ¶ 34. This contention is apparently founded upon the Final Report and based upon the premise that the potential cause of action translates into a financial interest held by KPMG. Finally, the States also contend that the mere appearance of impropriety is enough to warrant KPMG's disqualification.[10]

---

[10] At the April 16 Hearing, the States added an additional argument that implicates KPMG's disclosure obligations under Rule 2014 and the Malone Affidavit. The States contend, principally, that KPMG failed to disclose that an indemnity agreement existed between WorldCom and KPMG in connection with the disputed tax advice. Having considered their contentions, and the appropriate legal standard, *see In re Enron Corp.*, 2002 WL 32034346, at *5 (outlining legal standard), the Court concludes that KPMG complied with its obligations under Rule 2014 regarding the Malone Affidavit and there is no basis to further consider Rule 2014 as grounds for disqualification.

**A213**

In response, KPMG contends that it holds no interest adverse to the estate and, *a fortiori*, is disinterested. KPMG argues that it holds no interest adverse to the estate because both the Debtors and KPMG support the validity of the tax planning that the States claim is invalid. Moreover, KPMG argues that speculation over whether KPMG may be involved in litigation with the Debtors based on uncertain future events is insufficient to warrant disqualification. Finally, KPMG posits that the Debtors are vested under the Plan with the sole discretion and authority to pursue causes of action and the Debtors have determined not to pursue causes of action against KPMG.

In support of KPMG's arguments, the Debtors contend that KPMG does not hold an interest adverse to the estate and is disinterested. The Debtors further argue that there is no actual conflict between the Debtors and KPMG nor is there any appearance of impropriety. Finally, the Debtors argue that the Disqualification Motion should be rejected because the Disqualification Motion is an open and notorious attempt by the States to gain tactical advantage in litigation concerning the States' claims that question the propriety of the Debtors' licensing and royalty program.

### (i) The States Were Dilatory In Prosecuting The Disqualification Motion And The Pursuit Of The Disqualification Of KPMG Was A Litigation Tactic

In April 2003, several dissenting creditor groups filed motions for appointment of a Chapter 11 trustee. In connection with the motions and the hearing on the motions in May 2003, the issues regarding the intercompany charges, including the Royalty Charges and KPMG's role in establishing them were raised and were the subject of testimony and documentary evidence. The Royalty Charges were the subject of dispute in connection with the Disclosure Statement, filed on May 23, 2003 and approved by Court order dated May 28, 2003. As early as May 13, 2003, the States filed their

**A214**

respective objections to the Motion for Entry of an Order Approving Joint Disclosure Statement. During the summer of 2003, the Royalty Charges again were the subject of dispute and discovery in connection with confirmation of the Debtors' proposed plan of reorganization.

Throughout these cases, the States have been actively involved in these Chapter 11 cases. As stated above, the States filed their respective objections, as early as May 13, 2004, to the Motion to Approve/Debtors' Motion for Entry of Order (I) Approving the Disclosure Statement; (ii) Fixing a Record Date; (iii) Approving Solicitation Packages and Procedures for Distribution Thereof; (iv) Approving Forms of Ballots and Establishing Procedures for Voting on the Debtors' Joint Plan of Reorganization; and (v) Scheduling a Hearing and Establishing Notice and Objection Procedures in Respect of Confirmation of the Debtors' Joint Plan of Reorganization, filed on April 24, 2003. The Court notes that such objections did not address the Royalty Charges. However, it is clear that the States were aware that KPMG created the royalty structure, that such structure was being attacked as a sham, and that KPMG was also the auditor for the Debtors. On July 28, 2003 the States filed an objection to the Debtors' Plan containing no references to the Plan's language regarding the causes of action which vested in the reorganized Debtors, including the Royalty Charges. Further, the States concede that the information upon which the Disqualification Motion is based was known for nearly one year. *See* Disqualification Motion at ¶¶ 10, 11. On September 2, 2003, the States filed a motion to extend the deadline for filing proofs of claim related to the royalty deductions. That motion, as well as the States' Plan Objection were resolved by a stipulation dated September 12, 2003, extending the bar date for claims relating to the royalties. Neither the States, nor any other party, appealed the Confirmation Order, which is now final.

-25-

**A215**

At the same time, Massachusetts sought, and was granted, leave to conduct a Rule 2004 examination of KPMG in connection with the Royalty Charges and in its Motion stated that it reviewed the Debtors' royalty deductions. *See* Disqualification Motion ¶ 11 ("On or about April 14, 2003 . . . the Debtors publicly disclosed for the first time what has become known as a $19 billion sham royalty claim of WorldCom, Inc. against MCI."). In response to the States' requests, the Debtors have provided extensive information to the States, as well as to the Multistate Tax Commission, which has conducted an audit of the royalties on behalf of the States. On October 2, 2003, the Debtors sent counsel for Massachusetts two boxes of documents relating to the Royalty Charges, including copies of the contemporaneous supporting documentation that KPMG had prepared. At no time, in spite of the fact the States knew that the structure created by KPMG was alleged to be a "sham," did the States, or any other party, the United States Trustee, the SEC or the Corporate Monitor, raise the issue of KPMG's continuing role in the cases as auditor and tax advisor. Thus, the underlying basis of the Disqualification Motion was present as of April 2003.

The Final Report sets forth the view of the Examiner as to the validity of the royalty program and the potential causes of action that may exist if such program was found to be invalid – recognizing that such causes of action may only be brought by the Reorganized Debtors under the Plan. There was no reason, however, for the States to wait until the Final Report to raise any issue regarding the alleged 'sham' nature of the royalty structure and the possibility of a cause of action commenced by the Debtors, which arguably would warrant the disqualification of KPMG as Debtors' independent auditor. Furthermore, this is especially true for a taxing authority that relies upon an entity's financial statements and representations while carrying out its duties and obligations. The States, as taxing authorities, fully

**A216**

understand the implications of interplay between tax advice and auditing when the tax advice provided by an independent auditor is challenged, as is the case here.

On March 17, 2004, the States brought the Disqualification Motion, as referenced above, only after the Examiner issued his Final Report.[11] An unjustified delay in bringing a motion to disqualify provides a separate ground to deny the relief requested in the underlying motion. *Exco Resources, Inc. v. Milbank, Tweed, Hadley & McCloy L.L.P., et al., (In re Enron Corp., et al.)*, No. 02 Civ. 5638 (BSJ), 2003 WL 223455 at *4 n.2 (S.D.N.Y. Feb. 3, 2003)(holding that the bankruptcy court was correct in finding an unjustified delay in bringing the motion to disqualify provided a separate ground to deny relief, where motion was brought nearly two months after the underlying basis for the Disqualification Motion was known).

Applied here, the States have had access to the information necessary to raise the issues that are the subject of the Disqualification Motion for more than ten months. The grounds on which the Disqualification Motion are based have been ripe since April 2003 and open and notorious since May 2003. It was only after the States decided that such a motion would advance their particular interests that they filed the Disqualification Motion. The States argued that they were not sure how the royalty structure impacted their claims and were not clear whether they had standing. There is no basis for the standing issue: the States were clearly creditors and had actively participated in these cases. There is

_____

[11]Even if the Court were to believe, and this Court does not, that the States may have needed the Final Report to understand the implications of the alleged conflict before they would move for the disqualification of KPMG, nonetheless it took them nearly two months after the Final Report to file the Disqualification Motion.

-27-

**A217**

no plausible argument that the States, or any other party in interest, did not have standing to bring a

motion to disqualify KPMG.

As further evidence of the States' motivation behind filing the Disqualification Motion, during a

telephonic conference prior to the filing convened as a settlement conference with the Debtors on the

States' proof of claims, the States raised the issue of filing a motion to disqualify at the conclusion of the

call. *See* April 16 Hearing Tr. 72:21-75:16. A request was made by the Debtors during that

conference call to delay the filing of the Disqualification Motion until the parties could meet in Boston.[12]

*Id.* at 75:7-10. The States acknowledged that the filing of the Disqualification Motion was filed after

the meeting in Boston, but claim that such was not related to the request by the Debtors. Considering

---

[12] The States acknowledged that the Disqualification Motion was raised in the context of settlement negotiations because when first brought to the attention of the Court during the March 19 Conference Call, the Court recalls that the States argued that Rule 408 prevented the Debtors from referring to the circumstances surrounding the proposed filing of the Disqualification Motion because it had been raised in a settlement conference. Thus, even if the discussions between WorldCom and the States can be was not applicable, since there was no allegation that it was raised in the context of settlement discussions regarding issues underlying the Disqualification Motion, but raised in settlement discussions regarding the States' proofs of claims.

In any event, Rule 408 does not exclude all settlement materials from trial. "Evidence of an offer to compromise, though otherwise barred by Rule 408, can fall outside the Rule if it is offered for 'another purpose', i.e., for a purpose other than to prove or disprove the validity of the claim the offers were meant to settle." *Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 510 (2d Cir.1989) (citations omitted). Thus, even if the discussions between WorldCom and the States can be considered conduct made in compromise negotiations under Rule 408, the Court "has broad discretion as to whether to admit evidence of settlement . . . offered for 'another purpose.' In applying the 'another purpose' exception to Rule 408, the trial judge should weigh the need for such evidence against the potentiality of discouraging future settlement negotiations." *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 293 (2d Cir.1999) as cited in *ESPN Inc. v. Office of Com'r of Baseball*, 76 F. Supp. 2d 383, 412 (S.D.N.Y. 1999) (internal quotations and citations omitted). Having considered the prevailing legal standard the Court concludes that the arguments and evidence related to the filing of the Disqualification Motion is admissible for the "other purpose" of highlighting the States alleged improper motive.

-28-

**A218**

all of the aforementioned, the Court finds by filing the Disqualification Motion, the States acted in

connection with a litigation strategy that served their own pecuniary interest. Any argument by the

States that they have pursued the disqualification of KPMG to protect the public interest "rings hollow"

in light of the fact that the very conflict they allege warrants disqualification was known to them for no

less than ten months before they decided to file the Disqualification Motion. There is no doubt that the

validity of the Royalty Charge will be the subject of significant litigation in the context of the claims

allowance process in these cases, but a motion to disqualify is not the proper vehicle to initiate the

litigation process.

The delay in bringing the Disqualification Motion until the eve of the Debtors' emergence from

bankruptcy was potentially disruptive to the Debtors' reorganization; the interests of all creditors in

these Chapter 11 cases would have been hindered by the disqualification, as emergence could have

been delayed without any foreseeable benefit to the Debtors' estates. Specifically, the effect of

disqualification would have been to potentially delay the effective date of the plan while the Debtors

retained new auditors to certify the 2003 financials, delaying resolution of the States' tax claims and

distributions to all creditors, including the States. In addition, had the States raised the issue at an

earlier juncture in the case, the Court could have taken corrective measures to address the States'

concerns, if such were warranted. Therefore, the Court finds that the States, in addition to having filed

the Disqualification Motion as a litigation tactic, were dilatory in the prosecution of the Disqualification

Motion. Although the Court could deny the Disqualification Motion on these grounds, because of the

seriousness of the allegations and their impact on Debtors as well as KPMG, the Court will decide the

Disqualification Motion on the merits.

-29-

**A219**

*(ii) KPMG Holds No Interest Adverse To The Estate,*
*Is Disinterested And There is No Appearance of Impropriety*

In addressing the States' contentions, the Court concludes as follows. As an initial matter, there is no indication that KPMG is a creditor, an equity security holder or an insider. Accordingly, section 101(14)(A) is inapplicable. Moreover, KPMG was and is not a director, officer, or employee of the Debtors, nor do the States make any allegation that KPMG is or has been. Accordingly, section 101(14)(D) is also inapplicable. The Court will devote the remainder of this discussion to whether KPMG holds an adverse interest and whether KPMG is disinterested.

First, the States argue that KPMG holds an interest adverse to the estate because the Debtors have a potential cause of action against KPMG in the event that the royalty deductions are ultimately disallowed. An interest is not considered adverse simply because it is possible to conceive of a situation where interests might clash. *In re Leslie Fay*, 175 B.R. at 532. Here, KPMG does not have an interest adverse to the interests of the estate or of any class of creditors or equity holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors simply because there is a speculative possibility that in the future, some events may render KPMG and the Debtors adverse. By way of illustration, in order for the Debtors to have a claim against KPMG before any court of competent jurisdiction numerous uncertain events would have to transpire. First, a court would have to find that the royalty deductions were inappropriate. As the Final Report noted, a mere finding of invalidity would not be sufficient to establish any liability on the part of KPMG. Rather, a court would have to find that the royalty deductions are invalid based upon the definition of "intangible assets" under section 482 of the Internal Revenue Code, rather than on any other ground. Final Report at 43.

-30-

**A220**

Second, a court would also have to find that the Debtors are liable to the States for additional tax, interest, and penalties – a circumstance the Debtors contend is unlikely even if the royalty deductions are disallowed. Only, in the event that additional tax liabilities are assessed against the Debtors, on the specific ground that the licensed assets do not qualify as "intangible assets," would a *potential* claim against KPMG even exist.[13] And even if all of these events occur, it would still be within the Debtors' discretion as provided for in the Plan whether to commence an action against KPMG. The Debtors, however, already have represented and the Court has relied, that the Debtors have no intention of bringing such a claim based upon their own assessment of its viability.

In any event, since the Debtors and KPMG continue to support the tax planning, KPMG does not possess an economic interest that would tend to lessen the value of the bankruptcy estate. *See In re AroChem Corp.*, 176 F.3d at 623 (defining an element of an interest adverse to the estate as "any economic interest that would tend to lessen the value of the bankruptcy estate"). Additionally, because its continued support for the tax planning is consistent with that of the Debtors, KPMG has no predisposition under the circumstances to render a bias against the estates. *See id.* (defining another element of an interest adverse to the estate as "a predisposition under circumstances that render such a bias against the estate."). "[S]ection 327(a) is phrased in the present tense" and "verb tense is significant in construing statutes." *See In re AroChem Corp.*, 176 F.3d at 623. The current opinions

_____

[13] Furthermore, in connection with the indemnity agreement, KPMG's liability appears to be limited to ten million dollars in cases of ordinary negligence. It was also argued by the Debtors that the limit may be even less if KPMG were to succeed in allocating the limitation among the various tasks it performed. There also may be further restrictions based upon which year is at issue, as there were apparently other engagement letters that concern other years.

-31-    **A221**

shared by KPMG and the Debtors regarding the tax planning demonstrates that KPMG satisfies both prongs of section 327(a) of the Bankruptcy Code pertaining to disinterestedness and lack of adverse interest, and therefore KPMG's continued retention appears to be proper.

Second, the States argue that KPMG is not disinterested because it serves as both auditor and tax advisor to the Debtors. At the hearing on the Disqualification Motion, however, the States seemed to have retreated from this argument by acknowledging that this alleged conflict is not *per se* improper. Indeed, under the applicable statutes and regulations an accounting firm is expressly permitted to act simultaneously as both auditor and tax advisor. For instance, section 10A of the Securities Exchange Act of 1934, as amended by section 201(a) of the Sarbanes-Oxley Act of 2002, specifically addresses the appropriateness of these dual roles and provides in relevant part, that a public accountant "may engage in any non-audit service, including tax services" that is not an otherwise prohibited activity under the statute.[14] There is no indication that KPMG's tax services qualify as a prohibited activity. Thus, the States contention that KPMG is not disinterested because it serves as both auditor and tax advisor to

---

[14] The "prohibited activities" under section 10A of the Securities Exchange Act of 1934, as amended, include:

    (1) bookkeeping or other services related to the accounting records or financial statements of the audit client;
    (2) financial information systems design and implementation;
    (3) appraisal or valuation services, fairness opinions, or contribution-in-kind reports;
    (4) actuarial services;
    (5) internal audit outsourcing services;
    (6) management functions or human resources;
    (7) broker or dealer, investment adviser, or investment banking services;
    (8) legal services and expert services unrelated to the audit; and
    (9) any other service that the Board determines, by regulation, is impermissible.
15 U.S.C. § 78(j)-1(g).

**A222**

the Debtors does not appear to be well-founded and the Court, therefore, resolves this argument in favor of KPMG.

Third, the States argue that there is an appearance of impropriety that warrants KPMG's disqualification. Here, the Court finds no appearance of impropriety for the reasons just stated, as well as the numerous structural safeguards employed in this case designed to insure the integrity of the process. For instance, the active involvement of the District Court, directly and through the participation of the Corporate Monitor, in all facets of the Debtors' corporate governance. The Corporate Monitor's powers include having oversight functions over compensation and document retention issues; the authority to attend board meetings; and the authority to be present at any meeting with the Debtors and any of its outside advisors. The Court views it as implausible that WorldCom could have shirked its fiduciary duties while the Corporate Monitor attended its board meetings, including meetings where WorldCom would have discussed not pursuing KPMG on the issue outlined in the Final Report. In addition to the oversight of the Corporate Monitor and the District Court, the SEC has been actively involved in every aspect of this case dealing with corporate governance including, the actions of the Debtors' board of directors. The Court's review of the SEC Production reveals nothing that would call into question the actions of the MCI board of directors or KPMG with respect to KPMG's independence in their role as an auditor. Further, the SEC was aware, as was the United States Trustee, of accusations about the tax structure as early as April 2003.[15]

---

[15]The Court notes that the United States Trustee did not raise the issue in April 2003, nor has the United States Trustee expressed support for the Disqualification Motion. Further, the United States Trustee has been aware of the issues raised by the Final Report and has not questioned the propriety or independence of KPMG.

**A223**

In addition, the issues raised in the Final Report did not rise to a level of concern for the SEC to warrant calling the matter to the attention of the District Court or this Court. *See* April 28 Hearing Tr. 16:19-25, 17:1-4 ("if the [C]ommission had decided that some action was appropriate, we would inform Your Honor very quickly, as well as Judge Rakoff; but we are not in that position"). At the April 28 Hearing, the SEC stated that the letters are preliminary requests and that no inference was to be drawn from their issuance. The SEC emphasized that they are have not taken any position on the Disqualification Motion. April 28 Hearing Tr. 16:7-10. According to the SEC, "[t]he staff of the SEC has reached no definite conclusion one way or another on the issue of whether there is a violation of the Auditor Independence Rules with respect to MCI, and that issue has never been raised with the [C]ommission." *Id.* at 16:10-16. The SEC also stated that if they had concluded there was a violation of the Auditor Independence Rules, they would have "promptly raised the matter with the [C]ommissioners to see whether they thought further action would be appropriate." *Id.* at 16:19-25; 17:1-4. The SEC further stated that there are a number of steps that the SEC takes in private investigations and there is no specific time frame for the inquiry. *Id.* at 17:22-25; 18:1-25; 22:4-19. Here, "[t]here has been no investigation opened, so there are actually at least two more steps. There is the informal document request and formal investigation can be opened, then you can have a Wells process." *Id.* at 22:4-9.

The SEC also addressed the issue of confidentiality and stated that it is generally up to the client's counsel to decide whether to disclose non-public preliminary document requests and that generally, the SEC does not advise the client to do so. *Id.* at 21:13-25; 22:1-4. The SEC stated that the reasons for keeping the SEC Requests confidential were to encourage compliance and not to

-34-

**A224**

unnecessarily upset the public marketplace. *Id.* at 24:3-24. Although, the Court reviewed the SEC

Production out of an abundance of caution, as a factual matter, the business judgment of the Debtors

regarding their determination not to commence an action against KPMG was not raised in the

Disqualification Motion. Nonetheless, the Court has reviewed the SEC Production and has found no

indication that the determination by WorldCom is an improper exercise of its reasonable business

judgment.[16] Accordingly, there is no appearance of impropriety.

*(iii) Denial Of The States' Discovery Requests*

        The States made two sets of requests for discovery regarding the Disqualification Motion. The

initial set of requests was made following the March 19 Conference Call commenced by the Court to

address the continuing payment of KPMG under the Monthly Compensation Order. On March 30,

2004, the Debtors and KPMG objected to the requests and requested an informal conference to

address their concerns. A conference was held on March 31, 2004, where the Court directed the

parties to submit letters setting forth their positions regarding the discovery sought. Initially, after

reviewing the facts surrounding the filing the Disqualification Motion, the allegations and legal theories

expressed therein, and the issues raised in the March 19 Conference Call, it was apparent to the Court

---

[16]Regarding the SEC Requests, the SEC made it clear to the Court at the April 28 Hearing that there may not be a formal investigation commenced or any further steps in its inquiry process by its staff following its review of the SEC Production. Therefore, the Court concluded that it would not be possible for the Court to await any outcome from the SEC before it ruled on the issues raised in the Disqualification Motion. Hence, the Court decided that it should proceed with a resolution of the issues presented in the Disqualification Motion. The Court has made its determination regarding KPMG's status as an "independent auditor" based upon the facts before the Court, as set forth in the record of proceedings of the Disqualification Motion, for the purposes of section 327 of the Code. The Court's decision, therefore, is limited to the Disqualification Motion and is not intended to be a determination for any other purpose.

**A225**

that the States intended to prosecute the Disqualification Motion without discovery and rely predominantly on the Final Report for any factual assertions. Further, upon the Court's review of the SEC Requests and the Disqualification Motion, it concluded that there were no material facts in dispute regarding the grounds argued by the States that supported the contentions and legal arguments in the Disqualification Motion. In addition, the Court considered that the discovery requests made by the States were extremely broad and primarily focused on the litigation over the validity of the Royalty Charges rather than on the Disqualification Motion. If such discovery was appropriate at all, it would be in the context of any litigation regarding the Royalty Charges and not in a motion to disqualify.

The second set of discovery requests were made at the April 16 *In Camera* Hearing following the States' review of the SEC Requests. The Court took the requests under advisement. Thereafter, the Court denied the discovery requests at the April 28 *In Camera* Hearing. At the time, the Court had reviewed the pleadings, the record of the pleadings, and the various conferences and hearings, and concluded that the States brought the Disqualification Motion as a litigation tactic. Therefore, to allow the States to obtain discovery in those circumstances would not be appropriate or warranted. Further, as the Court has previously discussed above, discovery based upon the Disqualification Motion as filed was not justified.

In conclusion, the Court has found that discovery by the States related to the Disqualification Motion and the issues raised therein was not appropriate. In denying the States' requests, the Court concluded that the discovery requests sought focused on material which would assist in the underlying tax controversy and it is the Court's overall view that the States brought this motion as a litigation tactic.

**A226**

Therefore, the denial of discovery for the purposes of the Disqualification Motion, does not affect the rights of the parties to seek or oppose discovery of the same material in other litigation proceedings (i.e. regarding the underlying tax claims).

Regarding the Court's review of the SEC Production, and the availability to the United States Trustee on a confidential basis, the Court did so out of an abundance of caution and did not permit access to the States for reasons set forth above. The SEC Production, although reviewed by the Court, was not necessary to the disposition of the issues raised by the States in the Disqualification Motion. The SEC Production provided a more comprehensive review of issues related to KPMG's independence, not raised by the States in the Disqualification Motion.

### IV. Conclusion

For the foregoing reasons, the Disqualification Motion is denied in its entirety. Further, the Debtors are directed to resume payments to KPMG under the Monthly Compensation Order, including any accrual of payments since March 19, 2004. An order consistent with this decision will be entered simultaneously herewith.

Dated: New York, New York
      June 30, 2004

                          _s/ Arthur J. Gonzalez_
                          UNITED STATES BANKRUPTCY JUDGE

**A227**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|                              |   |                          |
|------------------------------|---|--------------------------|
| In re:                       | : | Chapter 11               |
|                              | : |                          |
| NORTHWESTERN CORPORATION,    | : | Case No. 03-12872 (CGC)  |
|                              | : |                          |
| Debtor.                      | : |                          |
|                              | : |                          |

**AFFIDAVIT OF JESSE H. AUSTIN, III IN CONNECTION WITH PAUL,
HASTINGS, JANOFSKY & WALKER LLP'S EMPLOYMENT AS ATTORNEYS
<u>FOR DEBTOR AND DEBTOR-IN-POSSESSION</u>**

I, Jesse H. Austin, III, being duly sworn, hereby depose and say as follows:

1.     I am a member of the firm of Paul, Hastings, Janofsky & Walker LLP

("Paul Hastings" or the "Firm"), which maintains offices for the practice of law at 600

Peachtree Street, Atlanta, Georgia 30308.  I am admitted to the practice of law in

Georgia, the United States District Courts for the Northern and Southern Districts of

Georgia, and the Eleventh Circuit United States Court of Appeals.  Unless otherwise

stated in this affidavit, I have personal knowledge of the facts set forth herein.

2.     On September 17, 2003, I signed and filed the Affidavit of Jesse H.

Austin, III In Support of Application to Employ and Retain Paul, Hastings, Janofsky &

Walker, LLP as Attorneys For Debtor and Debtor-in-Possession (Docket Number 40)

(the "Original Affidavit") in support of the application of the debtor and debtor-in-

possession (the "Debtor" or "NorthWestern") in the above-captioned Chapter 11 case for

the entry of an order, pursuant to §§ 327(a) and 328(a) of Title 11 of the United States

Code (the "Bankruptcy Code"), authorizing the retention and employment of Paul

**A228**

Hastings as attorneys for the Debtor and to provide the disclosures required under § 329

of the Bankruptcy Code, Rules 2014(a) and 2016(b) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), and the rules of this Court.  Consistent with Paul

Hastings' practices and procedures, I coordinated the gathering of the information for the

Original Affidavit with the Firm's Conflicts Department and Professional Responsibility

Committee.

      3.     On December 19, 2003, I signed and filed the Supplemental Affidavit of

Jesse H. Austin, III In Support of Application to Employ and Retain Paul, Hastings,

Janofsky & Walker, LLP as Attorneys For Debtor and Debtor-in-Possession (Docket

Number 582) (the "Supplemental Affidavit") disclosing additional entities with an actual

or potential interest in the Debtor's case which the Firm has represented and/or continues

to represent in matters unrelated to the Debtor.

      4.     On June 16, 2004 , I signed and filed the Second Supplemental Affidavit

of Jesse H. Austin, III In Support of Application to Employ and Retain Paul, Hastings,

Janofsky & Walker, LLP as Attorneys For Debtor and Debtor-in-Possession (Docket

Number 1488) (the "Second Supplemental Affidavit") disclosing: (i) Paul Hastings'

representation of the Debtor's wholly owned subsidiary Netexit, Inc. (f/k/a Expanets,

Inc.), and its affiliated entities in their recently filed Chapter 11 cases; and (ii) the

complaint Magten Asset Management Corporation ("Magten") filed against Paul

Hastings before the Montana Second Judicial District Court, Silver Bow County.

      5.  On or about June 18, 2004, Magten filed the Motion of Magten Asset

Management Corporation To Disqualify Paul, Hastings, Janofsky & Walker, LLP

(Docket No. 1502) (the "Disqualification Motion").  I have reviewed the Disqualification Motion and am familiar with the contents thereof.

6.      At the Debtor's June 21, 2004 Omnibus Hearing, I advised the Court that Paul Hastings would be supplementing the Original Affidavit, the First Supplemental Affidavit and the Second Supplemental Affidavit (collectively, the "Paul Hastings Affidavits").

7.      I submit this Affidavit to supplement the Paul Hastings Affidavits and in support of the Debtor's and Paul Hastings' opposition to the Disqualification Motion. Except as otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge, upon a review of the books and records maintained by Paul Hastings, upon information supplied to me by other members and employees of Paul Hastings, and upon my review of relevant documents.  If called to testify, I could and would, based on the forgoing, testify competently to the facts set forth herein.

A.      **Paul Hastings' Representation of the Debtor and Clark Fork and Blackfoot LLC**

8.      Paul Hastings' representation of the Debtor began in late December, 1999. The Firm's initial representation of the Debtor was with respect to possible acquisitions by the Debtor, either directly or indirectly through wholly owned subsidiary corporations or entities.  Of the various acquisition opportunities evaluated by the Debtor, the one acted upon by the Debtor was its acquisition of the transmission and distribution regulated utility assets owned by the Montana Power Company ("Montana Power").

9.      In connection with such acquisition, Paul Hastings represented the Debtor with respect to the Debtor's acquisition of the unit ownership interests in Montana Power

**A230**

LLC ("MP-LLC") (the "MPC Acquisition"), which was the subsidiary limited liability company to which Montana Power had transferred the transmission and distribution assets acquired by the Debtor.  Various books and records show that the MPC Acquisition of the unit ownership interests in MP-LLC was completed in February 2002 following completion of financing and regulatory approval for the transaction.

10.    Upon completion of the MPC Acquisition of MP-LLC, the Debtor changed the name of MP-LLC to NorthWestern Energy LLC ("NorthWestern Energy").

11.    Thereafter, and with the full consent and knowledge of the Debtor, as sole owner of the limited liability interests in NorthWestern Energy, the Debtor's Board of Directors and NorthWestern Energy's Board of Directors, Paul Hastings represented both the Debtor and NorthWestern Energy with respect to (a) regulatory matters before the Federal Energy Regulatory Commission, (b) certain filings which had to be made with the Securities Exchange Commission concerning exemptions from The Public Utility Holding Company Act of 1935 ("PUHCA"), in coordination with PUHCA counsel, Baker & Botts L.L.P., and (c) the transfer from NorthWestern Energy to the Debtor of the transmission and distribution utility assets previously owned by Montana Power and the assumption of related debt obligations (sometimes referred to as the "going flat" transaction).

12.    The "going flat" transaction, was completed in November 2002. Northwestern Energy's name was subsequently changed to Clark Fork and Blackfoot LLC ("Clark Fork").

**A231**

13.     As reflected by the Debtor's various public statements and filings, it was Paul Hastings' understanding that the Debtor prior to and in connection with the MPC Acquisition was planning on effectuating the direct transfer of the transmission and utility assets acquired from Montana Power to Clark Fork. Throughout the MPC Acquisition process, consistent with disclosures in the Debtor's various public filings, the Debtor viewed the "going flat" transaction as completion of the MPC Acquisition process, and nothing more, effectively, than a reverse merger of a subsidiary (e.g., Clark Fork, f/k/a NorthWestern Energy) used for acquisition purposes into its parent (e.g., the Debtor).

14.     Following completion of the "going flat" transaction, other than general incidental representation necessary to preserve and protect the Debtor's ownership interests in Clark Fork, Paul Hastings' direct representation of Clark Fork was limited to defending the Debtor in that certain class action styled as <u>McGreevey, et al v. Montana Power Company, et al</u>, filed in the Montana Second Judicial District Court, Butte-Silver Bow County, Cause No. DV-01-141 (the "McGreevey Litigation"), which representation also included communicating and negotiating with insurers with respect to claims raised against Clark Fork in the McGreevey Litigation. Paul Hastings disclosed the representation of Clark Fork with respect to the McGreevey Litigation in paragraph 18 of the Original Affidavit.

15.     Magten has been aware that Paul Hastings represented both Clark Fork and the Debtor with respect to the "going flat" transaction since the early months of the Debtor's Chapter 11 case. As a member of the Official Committee of Unsecured Creditors (the "Committee"), Magten and other members of the Committee had

**A232**

significant discussions concerning, and charged the Committee's professionals to analyze

issues with respect to, the "going flat" transaction. Magten itself raised the issue of Paul

Hastings' conflict from Magten's perspective at least as early as February 2004 by setting

forth the issues in a memorandum prepared by Magten's counsel to the Committee, a

copy of which memorandum was provided to Paul Hastings by Magten's counsel.

**B.    CSFB Relationship**

16. A number of financings completed by the Debtor to finance, and refinance the

acquisition of Montana Power's transmission and distribution assets were lead and

agented by Credit Suisse First Boston ("CSFB"). The law firm of Battle Fowler LLP,

which combined with Paul Hastings in June 2000, had performed some services for

CSFB.

17.    In connection with the CSFB financings for the Debtor, Paul Hastings

disclosed this representation both to CSFB and the Debtor, and obtained conflict waiver

letters from CSFB and the Debtor to allow Paul Hastings to represent the Debtor with

respect to the CSFB financings. At all times in matters with respect to the Debtor, CSFB

was and has been represented by separate law firms – Dewey Ballantine LLP and

Morrison & Forrester LLP.

18. Paul Hastings representation of CSFB was disclosed in Exhibit B at pp B-2

and B-13 of the Original Affidavit.

## DISINTERESTEDNESS

19.    Neither I, nor Paul Hastings, nor any partner, of counsel, or associate

thereof, as far as I have been able to ascertain, has any connection with the Debtor, its

**A233**

creditors, the United States trustee or any other party with an actual or potential interest in this Chapter 11 case or their respective attorneys or accountants, except as set forth in the Original Affidavit, the First Supplemental Affidavit, the Second Supplemental Affidavit or in this Affidavit.

20.     Paul Hastings will continue to periodically review its files during the pendency of this Chapter 11 case to ensure that no conflicts or other disqualifying circumstances exist or arise.  If any new relevant facts or relationships are discovered or arise, Paul Hastings will use reasonable efforts to identify such further developments and will promptly file a supplemental affidavit in accordance with Rule 2014(a) of the Bankruptcy Rules.

[signatures on next page]

**A234**

Executed this 7th day of July 2004.

Jesse H. Austin, III
Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street
Atlanta, Georgia 30308
Telephone: (404) 815-2400
Facsimile: (404) 815-2424

Subscribed and sworn to before me
this 7th day of July 2004.

Notary Public
My Commission Expires:

Notary Public, Rockdale County, Georgia
My Commission Expires October 4, 2004

**A235**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHWESTERN CORPORATION, | ) | Case No. 03-12872 (CGC) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO MOTION OF MAGTEN ASSET MANAGEMENT CORPORATION TO DISQUALIFY PAUL, HASTINGS, JANOFSKY & WALKER LLP [Re: Docket No. 1525]

The Official Committee of Unsecured Creditors (the "Creditors Committee") appointed in the chapter 11 case of NorthWestern Corporation, as debtor and debtor in possession in the above-captioned case (the "Debtor"), objects to the relief requested by Magten Asset Management Corporation ("Magten") in its Motion to Disqualify Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings"), filed on June 18, 2004 (the "Motion"). The Creditors Committee objects on the basis that Magten has failed to establish that Paul Hastings is not disinterested in violation of sections 101(14), 327(a), and 1107(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). In support of this objection, the Creditors Committee further represents as follows:

## BACKGROUND

1.     On September 14, 2003 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to operate its businesses and manage its properties as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**A236**

2.     On September 17, 2003, the Debtor filed an application for the entry of an order pursuant to sections 327(a) and 328(a) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules") authorizing the retention and employment of Paul Hastings as attorneys for the Debtor in connection with the commencement and prosecution of its chapter 11 case effective as of the Petition Date (the "Application"). In support of the Application, the Debtor filed the affidavit of Jesse H. Austin III, Esq. sworn to on September 17, 2003 and attached to the Application as Exhibit A (the "Initial Affidavit"). The Initial Affidavit, among other things, described Paul Hastings' pre-petition representation of the Debtor and certain affiliated entities. Specifically, the Initial Affidavit advised that Paul Hastings had assisted the Debtor in connection with the "acquisition and disposition of assets." (¶13, Initial Affidavit). Mr. Austin filed supplemental affidavits on December 19, 2003 (Docket No. 582) and June 16, 2004 (Docket No. 1488) (collectively, with the Initial Affidavit, the "Affidavits"). The Application and Affidavits are incorporated by reference herein.

3.     On October 10, 2003, this Court entered an order approving the Application pursuant to section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014(a) (the "Retention Order").

4.     On September 30, 2003, the Office of the United States Trustee for the District of Delaware (the "United States Trustee") appointed the Creditors Committee to serve in this chapter 11 case.

5.     On January 13, 2004, Magten submitted a proof of claim for damages associated with a purported fraudulent transfer with respect to a transaction

**A237**

2

referred to by the parties in this chapter 11 case as the "Going Flat Transaction" (the "Fraudulent Transfer Claim"). A copy of Magten's proof of claim is attached hereto as Exhibit A.

6.    On March 17, 2004, Magten filed a motion for an order granting relief from the automatic stay (the "Stay Relief Motion") to commence an adversary proceeding against the Debtor seeking to avoid the Going Flat Transaction as a fraudulent transfer. At a hearing held on April 8, 2004 to consider the Stay Relief Motion, this Court issued an order granting Magten's request for relief from the stay, and on April 16, 2004, Magten, along with Law Debenture Trust Company of New York, filed an adversary proceeding against the Debtor entitled *Magten Asset Management Corporation & Law Debenture Trust Company of New York, Plaintiffs v. Northwestern Corporation, Defendant*, Adversary Proceeding No. 04-53324-CGC (the "Adversary Proceeding"). Among other claims, Magten asserted the Fraudulent Transfer Claim.

7.    On May 11, 2004, Magten filed a statement pursuant to section 328(c) of the Bankruptcy Code regarding Paul Hastings (the "328(c) Statement") requesting, among other things, this Court and the United States Trustee examine Paul Hastings' status as a disinterested party. On June 2, 2004, Paul Hastings filed a response to the 328(c) Statement.

8.    On May 19, 2004, Magten filed its Complaint and Demand for Jury Trial in the case entitled *Magten Asset Management Corporation, suing individually and derivatively on behalf of Clark Fork and Blackfoot, LLC v. Paul, Hastings, Janofsky & Walker LLP, Cause No. DV-04-131*, Montana Second Judicial District Court, Silver Bow County ("Paul Hastings Litigation"). In connection with the Fraudulent Transfer

**A238**

3

Claim, Magten alleges that Paul Hastings conspired with and aided and abetted the Debtor in alleged wrongful acts arising from the Going Flat Transaction.

9.    On May 26, 2004, the Court entered an order (the "Disclosure Statement Order"), over the objections of certain creditors, including Magten, approving, among other things, the Debtor's First Amended Disclosure Statement (the "Disclosure Statement"), authorizing the Debtor to solicit votes in support of its First Amended Plan of Reorganization dated May 17, 2004 (the "Plan"), and scheduling the hearing to consider confirmation of the Plan for August 25, 2004. In its objection to the Disclosure Statement dated May 3, 2004 (the "Disclosure Statement Objection"), Magten complained about the treatment of its claims under the Plan which provides that Magten, as the holder of certain unsecured subordinated note claims, shall receive its *pro rata* share of 2% of the equity of the reorganized Debtor. As Magten asserts in the Disclosure Statement Objection, it believes that its claims should be treated as senior to all unsecured claims of the Debtor, thereby entitling it to a greater recovery under the Plan.

## ARGUMENT

10.    By its Motion, Magten is attempting to disqualify the Debtor's bankruptcy counsel on the eve of confirmation based on Paul Hastings' purported failure to disclose its pre-petition role in connection with the Debtor's purchase of certain assets from its wholly-owned subsidiary, Clark Fork and Blackfoot, LLC ("Clark Fork"), in the Going Flat Transaction. However, Paul Hastings' representation of the Debtor and Clark Fork in a pre-petition transaction does not warrant disqualification of Paul Hastings under sections 101(14), 327(a) or 1107(b) of the Bankruptcy Code.

11.    In support of its Motion, Magten argues that Paul Hastings' role in the Going Flat Transaction is an "actual conflict" warranting its *per se* disqualification

from representing the Debtor and constitutes a material adverse interest that renders Paul

Hastings "interested" in violation of sections 327(a) and 1107(b) of the Bankruptcy Code.

Magten further argues that Paul Hastings' purported failure to disclose its role in the

Going Flat Transaction violates Bankruptcy Rule 2014 and L.Bankr.Del.R. 2014-1, and

that Paul Hastings must disclose the full extent of its role in the Going Flat Transaction or

otherwise be disqualified. These arguments are without merit, and Magten has failed to

satisfy its burden of demonstrating how Paul Hastings' employment as bankruptcy

counsel to the Debtor is prohibited by any provision of the Bankruptcy Code or

Bankruptcy Rules.

12.    Moreover, the Motion should be denied in light of Magten's

unjustified delay in seeking to disqualify Paul Hastings. Magten was aware of, or could

have ascertained, the facts underlying the "alleged conflict" at a minimum, more than

three months ago when it filed the Stay Relief Motion, and possibly, more than six

months ago when it submitted its proof of claim on January 13, 2004. As a review of the

record of this chapter 11 case indicates, the Motion is yet another litigation tactic by

Magten designed to delay the reorganization process, thereby creating leverage for

Magten to negotiate an improved recovery under the Plan. Magten's unjustified delay

and improper motive in bringing the Motion at the expense of the Debtor's reorganization

process and creditors' recoveries should not be rewarded. Accordingly, the Motion

should be denied.

## A.    Paul Hastings is Disinterested.

13.    Section 327 of the Bankruptcy Code specifies that the debtor in

possession, with the Court's approval, may employ attorneys that do not "hold or

**A240**

represent an interest <u>adverse to the estate,</u> and that are disinterested persons, to represent

or assist the trustee in carrying out the trustee's duties under this title." 11 U.S.C. §

327(a). (emphasis supplied)

   14. A disinterested person is defined in section 101(14) of the

Bankruptcy Code, which provides in pertinent part that a disinterested person:

> (A) is not a creditor, an equity security holder, or an insider;

> (D) is not and was not, within two years before the date of filing of the petition, a director, officer, or employee of the debtor;

> (E) does not have an interest <u>materially</u> adverse to the interest of the estate or of any class of creditors or equity holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor . . .

11 U.S.C. § 101(14) (emphasis supplied).

   15. Specifically, notwithstanding the requirements of section 327(a) of

the Bankruptcy Code, section 1107(b) of the Bankruptcy Code expressly provides that "a

person is not disqualified for employment under section 327 of this title by a debtor in

possession solely because of such person's employment by or representation of the <u>debtor</u>

<u>before the commencement of the case.</u>" 11 U.S.C. §1107(b). (emphasis supplied)

   16. The term "adverse interest" is not specifically defined by the

Bankruptcy Code. When interpreting its meaning, some courts have construed "adverse

interest" in terms of the professional's general motivation, <u>i.e.,</u> whether the circumstances

would "colour the independence and impartial attitude." <u>In re BH& P, Inc.,</u> 949 F. 2d

1300, 1309 (3d Cir. 1991). <u>See also, In re Martin,</u> 817 F. 2d 175, 180 (1st Cir. 1987)

(adverse interest where the professional possesses a meaningful incentive to act contrary

to the best interest of the estate and its sundry creditors); <u>In re Leslie Fay Companies,</u>

Inc., 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994) (adverse interest is one that "may cause the Debtor's attorney to act differently than they [otherwise] would").

17.    Other courts have construed "adverse interest" in terms of a professional's economic incentives: "'To hold or represent an interest adverse to the estate' means (1) to hold or assert any economic interest that would tend to reduce the value of the bankruptcy estate or that would give rise to an actual or potential dispute in which the estate is a rival claimant, or (2) possess a predisposition under the circumstances that render such predisposition a bias against the estate." In re Cleveland Trinidad Paving Co., 218 B.R. 385, 389 (Bankr. N.D. Ohio 1998) (citing In re C.F. Holding Corp., 164 B.R. 799 (Bankr. D. Conn 1994)); TWL Int'l v. Vanguard Oil & Svc. Co., 162 B.R. 672, 674 (S.D.N.Y. 1994).

18.    In applying section 327(a) of the Bankruptcy Code, courts require an actual conflict be established to warrant disqualification of a professional retained pursuant to section 327(a) and refuse to disqualify a professional for the appearance of impropriety alone. In re Marvel Entertainment Group, Inc., 140 3d 463, 476-7 (3d. Cir. 1998). In addition to establishing an actual conflict, an adverse interest must be material to warrant the disqualification of a professional. See e.g. Marvel Entertainment Group, Inc., 140 F.3d at 477 (denial of firm's representation of trustee constituted reversible error where representation of debtor's secured lender amount to .1% of firm's annual revenue); Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 612-13 (2d Cir. 1983) (creditors had not met burden of establishing interestedness in view of professional's five day de minimis representation of bank claimants).

**A242**

19.    Courts have declined to create a bright line test, but look to the totality of circumstances to determine whether a party is actually "disinterested" and does not "hold or represent an interest adverse" to the estate for the purposes of section 327(a) of the Bankruptcy Code. See, Interwest Business Equipment, Ltd. v. United States Trustee (In re Interwest Business Equipment, Ltd.), 23 F.3d 311, 315 (10th Cir. 1994) (bankruptcy court has broad discretion in disqualification cases); Leslie Fay, 175 B.R. at 532-33 (section 327 analysis should be "driven by the facts of each case"). Disqualification of a professional is only warranted when it is the only appropriate means of enforcing the applicable retention and disciplinary rules. See In re Muma Services, Inc., 286 B.R. 583, 588 (Bankr. D.Del. 2002) (bankruptcy court denied a creditor's motion to disqualify a law firm based on its finding that creditor had impliedly waived any conflict based on the law firm's dual representation of the creditor and the statutory appointed creditor's committee by failing to object to the law firm's retention despite having knowledge of the conflict for almost one year). Here, Magten is similarly guilty of unreasonable delay indicating that Magten brings this Motion for a purpose other than enforcement of the applicable retention and disciplinary rules.

20.    Based on a review of the facts and under the totality of the circumstances, Magten has failed to establish that Paul Hastings is not "disinterested" or that Paul Hastings "holds or represents a material interest adverse" to the Debtor's estate sufficient to warrant Paul Hastings' disqualification as counsel for the Debtor in this chapter 11 case. Paul Hastings' pre-petition representation of the Debtor in the Going Flat Transaction does not render Paul Hastings disinterested and such representation is expressly permitted as provided by section 1107(b) of the Bankruptcy Code.

**A243**

21.    Further, if Paul Hastings actually "orchestrated" the Going Flat Transaction, its interest would in fact be in line with the Debtor's estate and not adverse in opposing the Fraudulent Transfer Claim which if proved would result in the loss of substantial assets of the Debtor's estate.  Also, to the extent there was any potential conflict to the Debtor's estate in light of the Paul Hastings Litigation, as disclosed in the supplemental affidavit filed on June 16, 2004, Paul Hastings resolved that issue by ceasing its representation of the Debtor with respect to all matters related to the Adversary Proceeding.

**B.    The Motion Should Be Denied Because Magten Has Acted with Unjust Delay and Improper Motives**

22.    In deciding whether to disqualify a professional retained pursuant to section 327(a) of the Bankruptcy Code, as separate grounds to deny disqualification, courts consider the acts and motives of the party moving for disqualification, and will deny relief if the court determines the movant has acted with unjustified delay or has brought the motion to disqualify a professional as a litigation tactic.  In re Worldcom, Inc., No. 02-13533 (AJG), 2004 WL 1459455, at *13 (Bankr. S.D.N.Y. June 30, 2004) (attached hereto as Exhibit B); see also In re Enron Corp., No. 02 Civ. 5638 (BSJ), 2003 WL 223455, at *4 n. 2 (S.D.N.Y. 2003) (bankruptcy court was correct in finding an unjustified delay in bringing the motion to disqualify provided a separate ground to deny relief, where motion was brought nearly two months after the underlying basis for the motion to disqualify was known).

23.    In Worldcom, the bankruptcy court denied a motion to disqualify the debtors' auditors, KPMG, brought by certain state authorities (the "States") on the eve of the debtors' emergence from bankruptcy.  In re Worldcom, 2003 WL 223455, at

**A244**

9

*14. The States sought to disqualify KPMG because the debtor had a potential cause of action against KPMG in connection with certain pre-petition services KPMG had provided to the debtors. In addition to rejecting the States' argument that KPMG did not hold an adverse interest as a result of the debtors' potential cause of action, the bankruptcy court denied the States' request to disqualify KPMG on the separate ground that the States were "dilatory" in prosecuting the disqualification motion and that the States were using the disqualification motion as a litigation tool. In re Worldcom, 2003 WL 223455, at *13. In support of its findings that the States' motives were improper, the court pointed out that the States had been very actively involved in the debtors' chapter 11 cases as evidenced by the various objections filed by the States in connection with the debtors' plan and disclosure statement. The court found that the States were aware of the underlying facts that were the basis for their disqualification motion at the time their objections were filed more than 10 months prior to the filing of the disqualification motion, yet failed to raise the issue of disqualification until the eve of the debtor's emergence from bankruptcy. In re Worldcom, 2003 WL 223455, at *12.

24.    Likewise, here Magten has acted both with unjustified delay and improper motive in bringing the Motion. Similar to the circumstances in Worldcom, Magten has been very active in the Debtor's chapter 11 case as evidenced by its various objections to relief requested by the Debtor and its initiation of litigation against the Debtor and Paul Hastings with respect to the Fraudulent Conveyance Claim. Further, based on a review of the Stay Relief Motion, the Adversary Proceeding, the Paul Hastings Litigation, the Disclosure Statement Objection, and the 328(c) Statement, Magten had access to the information necessary to raise the issues that are the subject of

**A245**

the Motion for more than three months at a minimum, and possibly, as early as January

13, 2004, when it filed its proof of claim based on the Fraudulent Transfer Claim.

Similar to the "dilatory" tactics of the States in <u>Worldcom</u>, instead of challenging Paul

Hastings' employment in this case as a result of its purported "conflict" in connection

with the Stay Relief Motion, the Disclosure Statement Objection, or even the Paul

Hastings Litigation, Magten waited until after the commencement of the Plan solicitation

process before it brought the Motion.

   25. Disqualification of Paul Hastings at this critical juncture in the

chapter 11 process, if granted, would cause irreparable harm to the Debtor's estate by

jeopardizing or substantively delaying confirmation of the Plan and adversely affecting

creditors' recoveries. Accordingly, similar to the circumstances in <u>Worldcom</u>, the

Motion is nothing more than an "open and notorious litigation tactic" designed to

increase Magten's recovery under the Plan, and Magten should not be permitted at this

late hour to now complain that there is a conflict sufficient to disqualify Paul Hastings'

retention as Debtor's counsel pursuant to section 327(a) of the Bankruptcy Code.

**C. Paul Hastings' Pre-Petition Role In**
** the Going Flat Transaction Does not Warrant**
** Disqualification Pursuant to**
** <u>Bankruptcy Rule 2014 and L.Bankr. Del. R. 2014-1</u>**

   26. Bankruptcy Rule 2014(a) and L.Bankr.Del.R. 2014-1 require a

professional seeking an order for employment pursuant to section 327 to submit a

verified statement setting forth the professional's connection to the debtor, creditors, or

any other party in interest, including such parties' counsel and accountants. The purpose

of Bankruptcy Rule 2014(a) is to provide the court with information to determine

whether the professional's retention is in the best interest of the estate and to maintain the

integrity of the bankruptcy system. In re Worldcom, 2004 WL 1459455, at 10 citing In re Leslie Fay Cos., Inc., 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994) and In re Envirodyn Indus., 150 B.R. 1008, 1021 (Bankr. N.D.Ill.1993). See also, In re Sound Radio, Inc., 145 B.R. 193, 202 (purpose of requiring court approval of employment is to enable the court to control administrative expenses and to prevent those performing work without the necessary authority from being "gratuitous volunteers".)

27.    In these circumstances, this Court has more than sufficient information to assess whether it is in the best interest of the Debtor's estate to allow Paul Hastings to continue in its representation of the Debtor based on the level of success the Debtor has achieved, with the assistance of Paul Hastings, in the reorganization process thus far.  What appears certain, is that it is not in the best interests of this estate and its creditors to disqualify Paul Hastings at this point in the reorganization process based on Magten's allegations that Paul Hastings has not fully complied with Bankruptcy Rule 2014.

For the foregoing reasons, the Creditors Committee requests that this Court (i) deny the relief requested in the Motion and (ii) grant such other and further relief as this Court deems just and appropriate.

Dated: July 9, 2004                              THE BAYARD FIRM

Neil B. Glassman (No. 2087)
Charlene Davis (No. 2336)
Eric M. Sutty (No. 4007)
222 Delaware Avenue, Suite 900
Wilmington, DE  19801
(302) 655-5000

-and-

**A247**

12

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Alan W. Kornberg
Margaret A. Phillips
Ephraim I. Diamond
Talia Gil
1285 Avenue of the Americas
New York, New York  10019
Telephone No.:  (212) 373-3000
Facsimile No.:  (212) 757-3990

Attorneys for the Official Committee of
Unsecured Creditors Committee

**A248**

# EXHIBIT "A"

# 842

Form B10 (Official Form 10) (12/03)

## United States Bankruptcy Court for the District of Delaware

**PROOF OF CLAIM**

| Name of Debtor | Case Number |
|---|---|
| NorthWestern Corporation | 03-12872 (CGC) |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request for payment" of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):

   Magten Asset Management Corp.

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

Name and address where notices should be sent:

Magten Asset Management Corp.    Fried, Frank, Harris, Shriver & Jacobson LLP
410 Park Avenue          One New York Plaza
New York, NY 10022   - and -   New York, New York 10004
Tel: (212) 813-0800        Tel: (212) 859-8000
Attn: Talton Embry         Attn: Brad Eric Scheler, Esq.
                    Gary Kaplan, Esq.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor.

Check here if this claim ☐ replaces ☐ amends a previously filed claim, dated:_____

**1. Basis for Claim:**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☒ Other      See attached Addendum

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)
Last four digits of SS #:_____
Unpaid compensations for services performed
from _____ to _____
         (date)           (date)

**2. Date Debt Was Incurred:**
   See attached Addendum

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:** $  See attached Addendum
        (unsecured)     (secured)     (priority)     See attached Addendum (Total)

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate   ☐ Motor Vehicle
☐ Other

Value of Collateral: $ _____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $ _____

**6. Unsecured Nonpriority Claims** $  See attached Addendum
☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $ _____
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,650)* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier -- 11 U.S.C. § 507(a)(3)
☐ Contributions to an employee benefit plan -- 11 U.S.C. § 507(a)(4)
☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use -- 11 U.S.C. § 507(a)(6)
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child -- 11 U.S.C. § 507(a)(7)
☐ Taxes or penalties owed to governmental units -- 11 U.S.C. § 507(a)(8)
☐ Other -- Specify applicable paragraph of 11 U.S.C. § 507(a) (___)

  * Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9. Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

RECEIVED

JAN 1 4 2004

KURTZMAN CARSON

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|---|---|
| January 13, 2004 | Magten Asset Management Corp. <br> By: _____ <br> Talton Embry <br> Chairman |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.



03128720401140000000000172

**A250**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------x
                                          :
In re:                                    :        Chapter 11
                                          :
Northwestern Corporation,                 :
                                          :        Case No. 03-12872 (CGC)
                         Debtor.          :
                                          :
                                          :
------------------------------------------------------------------x

ADDENDUM TO PROOF OF
CLAIM OF MAGTEN ASSET MANAGEMENT CORP.

        Talton Embry, Chairman of Magten Asset Management Corp. ("Magten"), whose business address and mailing address is 410 Park Avenue, New York, NY 10022, says:

        1.     I, Talton Embry, am the Chairman of Magten. I am authorized to execute this proof of claim on behalf of Magten.

        2.     Magten holds in excess of 33% of the Series A 8.45% Cumulative Quarterly Income Preferred Securities ("Preferred Securities") issued by Montana Power Capital I ("Montana Capital"). Montana Capital is a business trust, which exists for the sole purpose of issuing the common securities and the Preferred Securities (together the "Trust Securities") and investing the proceeds in the Junior Subordinated Interest Debentures 8.45% Series due 2036 ("Junior Debentures"), that were issued by The Montana Power Company ("Montana Power"). Montana Power owns all the common securities of Montana Capital, which represents 3% of the aggregate liquidation amount of the Trust Securities and is also the owner of all of the beneficial interests represented by the Trust Securities. In addition, Montana Power guaranteed payment of the Preferred Securities.

        3.     In a series of transactions, detailed in sections 4 to 6 below, Montana Power was merged into the above captioned debtor and debtor in possession ("NWC") and NWC

**A251**