assumed Montana Power's obligations under the Junior Debentures and the guarantee of the Preferred Securities.

4.    On September 29, 2000, Montana Power entered into a Unit Purchase Agreement with NWC, whereby NWC agreed to purchase The Montana Power, LLC ("Montana Power, LLC"), which would hold the assets, liabilities and other commitments related to Montana Power's electric utility businesses.

5.    On February 13, 2002, Montana Power merged into Montana Power, LLC, with Montana Power, LLC as the surviving entity. On February 15, 2002, Montana Power, LLC was acquired by NWC for $602 million in cash and the assumption of $488 million of debt. Montana Power, LLC remained a subsidiary of NWC and on March 19, 2002, Montana Power, LLC was renamed NorthWestern Energy, LLC ("NorthWestern Energy").

6.    On November 15, 2002, NorthWestern Energy transferred (the "Transfer") its utility assets and operations to NWC, which, in turn, assumed certain of the liabilities and guarantees of NorthWestern Energy pursuant to that certain Asset and Stock Transfer Agreement by and between NorthWestern Energy (formerly known as Montana Power, LLC) and NWC (the "Transfer Agreement"). NorthWestern Energy was subsequently renamed Clark Fork and Blackfoot LLC ("Clark Fork") on November 20, 2002. In August 2002, in connection with the Transfer, NWC assumed joint and several liability with NorthWestern Energy (now Clark Fork) for the debt originally issued by Montana Power, thereby making certain NorthWestern Energy creditors also creditors of NWC. Following the Transfer, NWC operated the former Montana Power business as part of the NorthWestern Energy Division of NWC. The Transfer resulted in the outstanding NorthWestern Energy debt (most of which originated with Montana Power) being treated *pari passu* with the like-kind (but more substantial amount of) NWC's debt.

7.    On September 14, 2003, NWC filed with this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code.

8.      Under Montana law, MCA §§ 31-2-326 - 31-2-342, a transfer may be avoided if, among other things, the action is brought within two years after the transfer was made, and the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor. Alternatively, a transfer may be avoided if the debtor received less than reasonably equivalent value and either (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond its ability to pay as the debts became due.

9.      Pursuant to MCA § 31-2-333(2), in determining actual intent to hinder, delay, or defraud any creditor, consideration may be given, among other factors, to whether: the transfer was to an insider; before the transfer was made, the debtor had been sued; the transfer was of substantially all the debtor's assets; and the value of the consideration received by the debtor was reasonably equivalent to the value of the assets transferred.

10.      When these factors are considered in the context of the Transfer, it appears that the Transfer was made with actual intent to hinder, delay, or defraud the Preferred Securities' holders. First, the transferee, NWC, is the parent and in control of NorthWestern Energy, and thus qualifies as "insider" under Montana law. Second, before the transfer was made, NorthWestern Energy had several suits pending against it and incurred a $67 million obligation on account of the Junior Debentures. Third, the transfer was of substantially all NorthWestern Energy's assets. Finally, in accordance with to the Transfer Agreement, in exchange for the transfer of substantially all of NorthWestern Energy's assets to NWC, NWC assumed the liabilities of NorthWestern Energy. The assets that NWC received were the assets of Montana Power, which was a viable, profitable utility business. Since the value of those assets is substantially higher than the relatively small amount of liabilities assumed, NorthWestern Energy did not receive reasonably equivalent value for the Transfer. Thus, the

Transfer was made with actual intent to hinder, delay, or defraud the Preferred Securities' holders.

11.    Additionally, NorthWestern Energy did not receive reasonably equivalent value for the Transfer, and NorthWestern Energy either engaged in a transaction for which its remaining assets were unreasonably small in relation to the transaction, or intended to incur, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due. Clark Fork, the remaining entity, was left only with the Milltown Dam and corresponding environmental liabilities as a result of the Transfer, despite the fact that it was still liable (on a joint and several basis with NWC) for the Montana Power obligations. The assets that remained in Clark Fork after the Transfer were insufficient to pay the debts owed by Clark Fork or continue the operation of the Milltown Dam.

12.    Magten holds a claim against NWC, as the recipient of fraudulent transfer under Montana law, for the damages associated with the fraudulent transfer described above.

13.    Therefore, Magten holds a claim against NWC for the face amount of the Preferred Securities held by Magten.

14.    Because all of the documents supporting Magten's claim are in NWC's possession and are voluminous, they have not been attached hereto.

15.    No judgment has been rendered on this claim.

16.    No part of the claim asserted herein has been paid.

17.    This claim is not subject to any setoff or counterclaim.

18.    Magten does not waive any right to any security held by or for it or any right to claim specific assets or any right or rights of action that Magten has or may have against NWC or any other person or persons.

19.    Nothing in this claim should limit the right of Magten to assert other remedies, including seeking the imposition of a constructive trust, and Magten expressly reserves such rights.

20.    Magten expressly reserves the right to amend and/or supplement this proof of claim in any respect.

21.    In filing this proof of claim, Magten does not submit itself to the jurisdiction of this Court for any purpose other than with respect to such claim.

### ALL NOTICES AND DISTRIBUTIONS WITH RESPECT TO THIS CLAIM SHOULD BE SENT TO:

Fried, Frank, Harris, Shriver & Jacobson LLP
Attorneys for Magten Asset Management Corp.
One New York Plaza
New York, New York 10004
Attn:  Brad Eric Scheler, Esq.
        Gary Kaplan, Esq.

With a copy to:

Magten Asset Management Corp.
410 Park Avenue
New York, NY 10022
Tel: (212) 813-0900
Attn: Talton Embry

---

PENALTY FOR PRESENTING A FRAUDULENT CLAIM:
Fine of up to $500,000 or imprisonment for up to 5 years or both. 18 U.S.C. §§ 152 and 3623.

454735

**A255**

# EXHIBIT "B"

Westlaw.

2004 WL 1459455                                           Page 1
--- B.R. ---
**(Cite as: 2004 WL 1459455 (Bankr.S.D.N.Y.))**

**H**
Only the Westlaw citation is currently available.

United States Bankruptcy Court,
S.D. New York.

In re WORLDCOM, INC., et al., Reorganized Debtors.

**No. 02-13533(AJG).**

June 30, 2004.

**Background:** Motion was filed to disqualify accountants from representing Chapter 11 debtors-in-possession, and to require disgorgement of fees.

**Holdings:** The Bankruptcy Court, Gonzalez, J., held that:
(1) delay by states in prosecuting motion to disqualify accountants, more than ten months after they had learned of possible basis for disqualifying accountants, only when they perceived that prosecution of motion might provide them with tactical advantage in tax litigation with debtors, provided court with independent basis for denying motion;
(2) mere fact that, if tax minimization plan conceived by accountants was successfully challenged by states, and if debtors were found liable for additional tax on that basis, debtors might have cause of action against accountants did not mean that debtors and accountants, both of supported legitimacy of this tax minimization plan, held adverse interests, of kind requiring disqualification of accountants;
(3) accountants' dual role in Chapter 11 case, as both auditor and tax advisor to debtors, did not affect their disinterestedness; and
(4) no appearance of impropriety existed.

Motion denied.

**[1] Bankruptcy** 🔑0

51k0 k.

To qualify for retention by trustee or debtor-in-possession, professional: (1) must not hold an interest adverse to bankruptcy estate; (2) must not represent an interest adverse to estate; and (3) must be disinterested. Bankr.Code, 11 U.S.C.A. § 327(a).

**[2] Bankruptcy** 🔑0
51k0 k.

Professional "represents an interest adverse to the estate," so as not to be eligible for employment by trustee or debtor-in-possession, where professional acts as agent for someone holding an adverse interest. Bankr.Code, 11 U.S.C.A. § 327(a).

**[3] Bankruptcy** 🔑0
51k0 k.

If it is plausible that another interest may cause professional to act any differently than he or she would without that other interest, then professional holds an "interest adverse to the estate," of kind warranting his or her disqualification. Bankr.Code, 11 U.S.C.A. § 327(a).

**[4] Bankruptcy** 🔑0
51k0 k.

Whether professional holds an "interest adverse to the estate," of kind warranting his or her disqualification, is to be determined by court on case-by-case basis. Bankr.Code, 11 U.S.C.A. § 327(a).

**[5] Bankruptcy** 🔑0
51k0 k.

Bankruptcy Rule requiring any professional seeking employment in bankruptcy case to submit a verified statement disclosing his or her connections to debtor, creditors or any other party in interest is designed to provide court, and the United States Trustee, with information to determine whether professional's retention is in best interests of estate, and to maintain integrity of bankruptcy system. Fed.Rules Bankr.Proc.Rule 2014(a), 11 U.S.C.A.

**[6] Bankruptcy** 🔑0
51k0 k.

Professional's Rule 2014 disclosure obligations are strictly construed, and professional must disclose all facts that bear on his or her disinterestedness and cannot usurp court's functions by selectively incorporating only those materials that professional deems important. Fed.Rules Bankr.Proc.Rule 2014, 11 U.S.C.A.

**[7] Bankruptcy** 🔑0
51k0 k.

Professional's failure to disclose all relevant connections to debtor, creditors or any other party in interest is independent basis for disallowance of fees or disqualification of professional. Bankr.Code, 11 U.S.C.A. §§ 327(a), 330; Fed.Rules Bankr.Proc.Rule 2014(a), 11 U.S.C.A.

**[8] Bankruptcy** 🔑0
51k0 k.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

2004 WL 1459455                                                    Page 2
--- B.R. ---
(Cite as: 2004 WL 1459455 (Bankr.S.D.N.Y.))

Delay by states in prosecuting motion to disqualify Chapter 11 debtors' accountants, more than ten months after they had learned of possible basis for disqualifying accountants, only when they perceived that prosecution of motion might provide them with tactical advantage in tax litigation with debtors, provided bankruptcy court with independent basis for denying motion to disqualify. Bankr.Code, 11 U.S.C.A. § 327(a).

**[9] Bankruptcy ☯0**
51k0 k.

Unjustified delay in bringing motion to disqualify professional provides separate ground for denying the relief requested in underlying motion. Bankr.Code, 11 U.S.C.A. § 327(a).

**[10] Bankruptcy ☯0**
51k0 k.

Mere fact that, if tax minimization plan conceived by accountants was successfully challenged by states, and if Chapter 11 debtors were found liable for additional tax on that basis, debtors might have viable cause of action against accountants did not mean that debtors and accountants, both of supported the legitimacy of this tax minimization plan, held adverse interests, of kind requiring disqualification of accountants, especially where debtors had sole discretion under their confirmed plan whether to pursue any causes of action against accountants and had announced their intention, following board meetings attended by corporate monitor, not to pursue such claims. Bankr.Code, 11 U.S.C.A. § 327(a).

**[11] Bankruptcy ☯0**
51k0 k.

Professional is not deemed to hold any "interest adverse to the estate," of kind requiring his or her disqualification, simply because it is possible to conceive of situation in which professional's interests and interests of estate might clash. Bankr.Code, 11 U.S.C.A. § 327(a).

**[12] Bankruptcy ☯0**
51k0 k.

Accountants' dual role in Chapter 11 case, as both auditor and tax advisor to debtors, did not affect their disinterestedness or provide basis for their disqualification. Bankr.Code, 11 U.S.C.A. § 327(a).

**[13] Bankruptcy ☯0**
51k0 k.

No appearance of impropriety, of kind warranting accountants' disqualification, arose from Chapter 11 debtors' employment, as both auditor and tax adviser, of accountants whose tax minimization advice, if ill-founded, might conceivably provide basis for claim by estate against them, given the numerous structural safeguards that were in place, including corporate monitor's attendance at board meetings, to ensure that debtor, in deciding not to pursue such claims, had not shirked their fiduciary duties. Bankr.Code, 11 U.S.C.A. § 327(a).

Commissioner of Revenue, James L. O'Connor, Jr., Esq., Jeffrey S. Ogilvie, Esq., of Counsel, Boston, MA, on Behalf of the Commonwealth of Massachusetts and the States of Alabama, Arkansas, Connecticut, Florida, Georgia, Iowa, Kentucky, Maryland, Michigan, Missouri, New Jersey, Pennsylvania, and Wisconsin.

Weil, Gotshal & Manges LLP, Marcia L. Goldstein, Esq., Lori R. Fife, Esq., Alfredo R. Perez, Esq., Adam P. Strochak, Esq., of Counsel, New York, NY, for Debtors.

McGuirewoods LLP., Anne Marie Whittemore, Esq., H. Slayton Dabney, Jr., Esq., of Counsel, Richmond, VA, Co-Counsel for KPMG LLP.

McGuirewoods LLP, Patrick L. Hayden, Esq., of Counsel, New York, NY, Co-Counsel for KPMG LLP.

Greenberg Traurig, LLP, Thomas J. Weber, Esq., of Counsel, New York, NY, Co-Counsel for KPMG LLP.

**MEMORANDUM DECISION REGARDING MOTION BY THE COMMISSIONER OF REVENUE FOR THE COMMONWEALTH OF MASSACHUSETTS FOR AND ON BEHALF OF MASSACHUSETTS AND THE STATES OF ALABAMA, ARKANSAS, CONNECTICUT, FLORIDA, GEORGIA, IOWA, KENTUCKY, MARYLAND, MICHIGAN, MISSOURI, NEW JERSEY, PENNSYLVANIA, AND WISCONSIN FOR ENTRY OF AN ORDER DISQUALIFYING KPMG LLP FROM SERVING AS ACCOUNTANT, AUDITOR AND TAX ADVISOR TO THE DEBTORS AND DIRECTING DISGORGEMENT OF ALL FEES PAID TO KPMG LLC**

ARTHUR J. GONZALEZ, Bankruptcy Judge.

*1 Before the Court is the Motion By the Commissioner of Revenue for the Commonwealth of Massachusetts for and on Behalf of Massachusetts and the States of Alabama,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

2004 WL 1459455
--- B.R. ---
(Cite as: 2004 WL 1459455 (Bankr.S.D.N.Y.))

Arkansas, Connecticut, Florida, Georgia, Iowa, Kentucky, Maryland, Michigan, Missouri, New Jersey, Pennsylvania, And Wisconsin (the "States") for Entry of an Order Disqualifying KPMG LLP From Serving as Accountant, Auditor and Tax Advisor to the Debtors and Directing Disgorgement of All Fees Paid to KPMG LLC, filed March 17, 2004 (the "Disqualification Motion"); the Response and Objection of KPMG LLP to Motion by the Commissioner of Revenue for the Commonwealth of Massachusetts for and on Behalf of Certain States Seeking Disqualification of KPMG LLP and Other Relief, dated April 8, 2004 ("KPMG Response and Objection"); the Debtors' Objection to the Motion By the Commissioner of Revenue for the Commonwealth of Massachusetts, on Behalf of Certain States, for an Order Disqualifying KPMG LLP From Serving as Accountant, Auditor and Tax Advisor to the Debtors and Directing Disgorgement of All Fees Paid to KPMG LLP, dated April 8, 2004 ("Debtors' Objection"); the Joinder of the Official Committee of Unsecured Creditors of WorldCom, Inc., et al. to Debtors' Objection to Motion by the Commissioner of Revenue for the Commonwealth of Massachusetts, on Behalf of Certain States, for an Order Disqualifying KPMG LLP from Serving as Accountant, Auditor and Tax Advisor to the Debtors and Directing Disgorgement of All Fees Paid to KPMG LLP, dated April 8, 2004 ("Joinder" and together with the KPMG Response and Objection and the Debtors' Objection the "Objections"); and other briefing. [FN1] In short, the Disqualification Motion seeks the disqualification and disgorgement of KPMG's professional fees. Because the Court concludes that KPMG does not have an interest adverse to the estate and that KPMG is disinterested under section 327 of the Bankruptcy Code, the Objections are sustained and the Disqualification Motion is denied in its entirety.

## I. Jurisdiction

The Court has subject matter jurisdiction under sections 1334(b) and 157(a) of title 28 of the United States Code and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court, dated July 10, 1984 (Ward, Acting C.J.). This is a core proceeding pursuant to section 157(b)(2) of title 28 of the United States Code.

## II. Relevant Background
### A. Case Background

On June 25, 2002, WorldCom, Inc. ("WorldCom" or "Debtors") [FN2] announced that an internal audit had revealed accounting irregularities. After the accounting announcement, WorldCom's board of directors formed a special committee (the "Special Committee") to conduct an independent investigation. The Special Committee included a former United States Attorney General as a member and retained a former head of enforcement at the Securities and Exchange Commission (the "SEC") as its Special Counsel.

On June 26, 2002, in response to the Debtors' June 25, 2002 disclosures, the SEC commenced an enforcement action against WorldCom for violations of various securities laws. The Debtors cooperated with this and other governmental investigations into their affairs. On June 28, 2002, the United States District Court for the Southern District of New York (the "District Court") approved a stipulation and order providing for the appointment of a corporate monitor ("Corporate Monitor"). On July 3, 2002, the District Court appointed Richard C. Breeden, a former chairman of the SEC, as Corporate Monitor with the consent of WorldCom and the SEC. Pursuant to the June 28, 2002 order and subsequent orders entered by the District Court, the Corporate Monitor is responsible for, *inter alia,* overseeing the document retention policies of WorldCom, approving all compensation and similar payments to employees and any outside professionals or advisors, working with the Debtors regarding corporate governance to ensure the highest level of corporate integrity, and attending board meetings.

*2 On July 21, 2002 and November 8, 2002, the Debtors commenced voluntary cases under the Bankruptcy Code. By orders, dated July 22, 2002 and November 12, 2002, the Debtors' Chapter 11 cases were consolidated for procedural purposes and are being jointly administered. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On July 29, 2002, the United States Trustee for the Southern District of New York (the "United States Trustee") appointed the statutory committee of unsecured creditors (the "Creditors' Committee"). No trustee has been appointed in these Chapter 11 cases.

On July 22, 2002, this Court entered its Order Granting the Motion of the United States Trustee for the Appointment of an Examiner. On August 6, 2002, this Court entered its Order Approving Employment of Dick Thornburgh as Examiner (the "Examiner").

On December 17, 2002, all members of the Board of Directors who served prior to the commencement date announced their resignation.

On May 28, 2003, this Court approved the Disclosure Statement for Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Disclosure Statement"). By order entered on October 31, 2003 (the "Confirmation

Westlaw.

2004 WL 1459455
--- B.R. ---
(Cite as: 2004 WL 1459455 (Bankr.S.D.N.Y.))

Order"), this Court confirmed the Debtors' Modified Second Amended Joint Plan of Reorganization (the "Plan"). The Debtors' Plan went effective on April 20, 2004.

*B. KPMG's Retention*

On November 8, 2002, the Debtors filed their Application for an Order Authorizing the Retention and Employment of KPMG LLP as Accountants, Auditors, and Tax Advisors Nunc Pro Tunc to July 21, 2002 (the "Application"). In the Application, the Debtors asked this Court to authorize the employment of KPMG for the purpose of, *inter alia*, auditing the Debtors' financial statements, including restated financials from past years. *See* Application at ¶ 10(a)(i). The Debtors also asked this Court to authorize KPMG to continue to serve as the Debtors' tax advisor, including advising the Debtors regarding the very tax minimization strategies described in the Disqualification Motion. *See* Application at ¶ 10(b)(iii). The Application also requested appointment of KPMG to assist the Debtors in federal and state tax examinations.

As part of the Application, the Debtors submitted the Affidavit of Farrell Malone in Support of the Application for an Order Authorizing the Retention and Employment of KPMG LLP as Accountants, Auditors, and Tax Advisors Nunc Pro Tunc to July 21, 2002 (the "Malone Affidavit"). In the Malone Affidavit, KPMG disclosed that the Debtors had appointed KPMG as auditors in May 2002 and had employed KPMG as tax advisors since 1997. *See* Malone Affidavit at ¶ 4. KPMG also disclosed that it expected to continue providing accounting, auditing and tax services for the Debtors post-petition. *See* Malone Affidavit at ¶¶ 6(a)(i), 6(b)(iii).

*3 Additionally, an exhibit to the Malone Affidavit made a detailed disclosure of the scope of tax services that KPMG would provide to the Debtors and the general conditions applicable to such services. The Application disclosed that KPMG would use its "judgment in resolving questions where the tax law is unclear or where there may be conflicts between taxing authorities' interpretations of the law and other supportable positions." Malone Affidavit, Ex. A (retention letter), at Ex. II thereto (scope of tax services). It further disclosed that, unless instructed otherwise by the Debtors, KPMG would "resolve such questions in the corporation's favor whenever possible." *Id.*

No objections were filed to the Debtors' application to retain KPMG or the terms of the engagement. On December 3, 2002, this Court entered an order authorizing the retention of KPMG, finding that, based on the representations made in the Malone Affidavit, KPMG is a "disinterested person"

as defined in section 101(14) of the Bankruptcy Code.

*C. The Debtors' Intangible Asset Licensing Program And Royalty Charges*

According to the Debtors, they retained KPMG to assist with an internal restructuring program intended to rationalize their corporate structure and, where appropriate, to do so in a way that minimized the Debtors' tax burdens. As a result of the restructuring, a system of intercompany charges was put in place to account for the services and benefits that each entity used or contributed to the enterprise. Among these charges was a royalty for the use of intangible assets. *See* Disclosure Statement at pp. 33-4.

The Debtors further contend that there is no dispute that, since 1998, billions of dollars in royalties have accrued to WorldCom and MCI WORLDCOM Brands, LLC and that other Debtor entities deducted the accrued royalties as expenses on their state income tax returns in states that tax income on a separate legal entity basis (as opposed to a consolidated basis as is the case with federal and many state corporate income tax systems).

These intercompany royalty charges ("Royalty Charges") have been the subject of extensive litigation in these Chapter 11 cases, including voluminous document production and numerous depositions, for nearly a year. The existence of a trillion dollars in intercompany claims, including the Royalty Charges, first received widespread attention in connection with motions of several dissenting creditor groups for appointment of a Chapter 11 trustee filed in April 2003. The existence of the Royalty Charges and KPMG's role in establishing them was the subject of testimony and documentary evidence introduced at the hearing on the trustee motions in May 2003. The subject of intercompany claims was litigated again in connection with the motion for an order directing the appointment of an official committee of creditors for MCI Communications Corp. and its subsidiaries. The motions for the appointment of a trustee and separate committee were ultimately denied.

*4 The Royalty Charges were the subject of dispute in connection with the Disclosure Statement. The Disclosure Statement discussed the existence of intercompany claims, the genesis of those claims in the pre-petition restructuring transactions that the Debtors had undertaken, and KPMG's role in providing tax advice and other services to the Debtors on these matters. At the request of certain dissenting creditor groups, an additional disclosure was added regarding their contentions about the validity of the Royalty Charges:

*Royalty Claim* s. Based upon the Dissenting MCI

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

2004 WL 1459455
--- B.R. ---
(Cite as: 2004 WL 1459455 (Bankr.S.D.N.Y.))

Creditors' review of the FTI [Creditors' Committee forensic accountants] report, the Dissenting MCI Creditors assert that the overwhelming majority of the WorldCom Companies' claims against MCI, almost $20 billion out of $24 billion, are for royalty charges and believe that the royalty claims are not legally cognizable and would not be allowed by the Bankruptcy Court. Disclosure Statement at p. 48. Although, the States, as early as May 13, 2003, filed their respective objections to Motion to Approve/Debtors' Motion for Entry of Order (I) Approving the Disclosure Statement; (ii) Fixing a Record Date; (iii) Approving Solicitation Packages and Procedures for Distribution Thereof; (iv) Approving Forms of Ballots and Establishing Procedures for Voting on the Debtors' Joint Plan of Reorganization; and (v) Scheduling a Hearing and Establishing Notice and Objection Procedures in Respect of Confirmation of the Debtors' Joint Plan of Reorganization filed on April 24, 2003, such objections did not address the Royalty Charges.

During the summer of 2003, the Royalty Charges continued to be the subject of dispute and discovery in connection with confirmation of the Debtor's proposed plan of reorganization. Two KPMG partners responsible for the earlier engagement gave depositions, as did personnel from the Debtors' tax department. Three expert witnesses submitted reports dealing with the intangible asset licensing program, each of which reviewed and analyzed the extensive, contemporaneous documentation that KPMG had created. Although the objections of the dissenting creditor groups were settled before the Court heard testimony on the Royalty Charges, that settlement did not occur until September 9, 2003-- after the dissenting creditors and the Debtors had filed briefs spelling out their contentions regarding the validity of the Royalty Charges. There is no record of the States participating in the deposition or any other discovery during this period.

On July 28, 2003, the State of Oklahoma filed its Limited Objection of States of Oklahoma, Arkansas, California, Connecticut, Illinois, Louisiana, Massachusetts, Missouri, Montana, New Jersey, Puerto Rico, South Dakota, Tennessee, and Virginia to Confirmation of Debtors' Amended Joint Plan of Reorganization Dated July 9, 2003 (the "States' Plan Objection"). As discussed further below, the States' Plan Objection contained no reference to any of the issues raised in the Disqualification Motion. The States' Plan Objection was resolved and the Plan subsequently confirmed in a manner that did not affect the Debtors' retention of KPMG.

*5 On September 2, 2003, the Commissioner of Revenue for the Commonwealth of Massachusetts (the

"Commissioner") filed a Motion on Behalf of Massachusetts, New York, Connecticut, New Mexico, Iowa, Illinois, Pennsylvania, North Carolina, Virginia, and Other Similarly Situated States, to Extend the Deadline for Filing Proofs of Claim (the "Bar Date Extension Motion"). In the Bar Date Extension Motion, the Commissioner asked this Court to extend the bar date for filing pre-petition claims because certain dissenting creditors had allegedly revealed that "royalty charges totaling approximately $19,000,000,000 incurred by MCI and its subsidiaries were apparently part of a tax avoidance scheme that was intentionally concealed from the State taxing authorities over the three-year pre-petition period [from] 1999-2001." Bar Date Extension Motion at ¶ 5. In support of the Bar Date Extension Motion, the States alleged that "the facts necessary to uncover and identify the tax avoidance aspects of the Debtors' royalty plan and other accounting practices were not known or readily discoverable prior to January 23, 2003." Bar Date Extension Motion at ¶ 20. January 23, 2003 was the Bar Date established by the Court for these cases.

On September 2, 2003, the Commissioner filed a Motion Directing the Debtor, Scott Sullivan, and KPMG LLP to Appear for Rule 2004 Examination and to Produce Documents in Connection Therewith (the "Rule 2004 Motion"). In the Rule 2004 Motion, the Commissioner set forth the allegation that the Debtors' royalty deductions were improper. See Rule 2004 Motion at ¶ 11 ("On or about April 14, 2003 ... the Debtors publicly disclosed for the first time what has become known as a $19 billion sham royalty claim of WorldCom, Inc. against MCI."). On October 15, 2003, this Court entered an order granting the Rule 2004 Motion.

*D. The Plan*

The Plan requires the issuance and listing of New Common Stock (the "New Common Stock") on the NASDAQ National Markets System for trading "on or soon as practicable after the Effective Date." Plan at § 9.05.

The Plan provides that all property of the estate (including causes of action) re-vests in the Debtors and the Reorganized Debtors upon the Effective Date. See Plan at § 10.01. Further, the Plan specifically preserves the Debtors' right to assert causes of action. See Plan at § 10.08 ("[N]othing contained in the Plan or the Confirmation Order shall be deemed a waiver or a relinquishment of any Causes of Action that the Debtors or the Reorganized Debtors may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code...."). Further, section 13.14 of the Plan provides that the Plan shall be binding on all parties to the Debtors' bankruptcy case, including, without limitation, all holders of Claims against the Debtors.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

2004 WL 1459455                                                                    Page 6
--- B.R. ---
(Cite as: 2004 WL 1459455 (Bankr.S.D.N.Y.))

*See* Plan at § 13.14. The Plan and the Confirmation Order provide that all causes of action re-vest in the Debtors. The States did not object to these provisions of the Plan and the Confirmation Order, nor did they, or any other party, appeal the Confirmation Order. The Plan went effective on April 20, 2004. Thus, the Plan vests the Debtors with the sole discretion to assert causes of action, including any action against KPMG, on behalf of their estates.

*E. The Examiner's Third And Final Report*

**\*6** On January 26, 2004, the Examiner filed his Third and Final Report (the "Final Report"). The Examiner sought to identify the potential causes of action that the Examiner, after reviewing the applicable facts and law, believed would most likely survive motions to dismiss or for summary judgment and reach a fact-finder if presented in a lawsuit. *See* Final Report at 9 n. 7. In his Final Report, the Examiner stated that he began to investigate the allegedly improper royalty deductions after certain dissenting creditors had raised the issue. *See* Final Report at 36 ("The potential issues with the Royalty Programs came to the Examiner's attention in the summer of 2003."). Despite commenting on alleged delays in obtaining information relevant to his investigation of the royalty deductions, the Examiner determined that he was satisfied with the information he received. *See* Final Report at 37 ("[T]he Examiner is satisfied that he ultimately interviewed the key persons available to him and with knowledge relevant of the Royalty Programs and that he has received sufficient information to support the conclusions reached in this Third and Final Report.").

After undertaking an investigation of the Royalty Charges, the Examiner made several conclusions in his Final Report. First, the Examiner concluded that the royalty programs "were not well conceived or implemented, and are vulnerable to challenge by various states." Final Report at 28. Second, the Examiner concluded that if the States successfully challenged the royalty deductions, the Debtors may have a potential claim against KPMG. *See* Final Report at 13 ("To the extent that state taxing authorities bring actions and prevail, the Examiner believes that WorldCom has claims against KPMG."). Third, the Examiner identified potential defenses that KPMG would have to such an action. *See* Final Report at 43 ("It is possible, however, that a state deficiency finding would be founded instead in whole or in part on the Company's implementation failures.... In such an instance, the Company's claims against KPMG could be reduced or even eliminated."). Finally, the Examiner recognized that the Debtors possessed the discretion and authority to determine whether or not to bring a cause of action against KPMG:

The Examiner recognizes that the WorldCom plan of reorganization assigns any such claims to WorldCom and that the Company may have valid reasons, in exercising its business judgment, not to pursue particular potential claims.... The Examiner expresses no opinion as to whether any of the claims should actually be pursued. Rather, the Examiner views it as his responsibility to identify potential claims and to leave it to the Company to decide which, if any, of the claims to pursue.
Final Report at 5.

In a press release issued by MCI on January 26, 2004, MCI stated that "KPMG's involvement in [the tax] program has previously been carefully reviewed by our current Audit Committee of the Company's Board of Directors and the Company's inside and outside counsel.... As a result, the Company has no plans to pursue claims against KPMG.". On March 5, 2004, Anastasia Kelly, Executive Vice President and General Counsel of the Debtors, sent a letter to KPMG regarding the findings contained in the Final Report (the "Letter"). The Letter states that, "the Company does not intend to pursue any claim against KPMG relating to MCI's intangible asset licensing program, the related intercompany transactions, and their associated tax implications." KPMG Response and Objection, Ex. B at 1.

*F. Disqualification Motion And The April 16 Hearing*

**\*7** On March 17, 2004, the States filed the Disqualification Motion with a return date (i.e. hearing date) for April 13, 2004 (the "April 13 Hearing"). At the Court's direction, a conference call was held on March 19, 2004 (the "March 19 Conference Call") [FN31] in which the Court raised the issue of whether, in light of the Disqualification Motion, KPMG was qualified to receive continued payments under the Order Pursuant to Sections 105(a) and 331 of The Bankruptcy Code Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals, dated August 13, 2002, (the "Monthly Compensation Order"). During the March 19 Conference Call, the Court stated its view that the Disqualification Motion should be construed as an objection to KPMG's monthly fees which in turn, under the Monthly Compensation Order, prevents payment by the Debtors to KPMG until the resolution of such objection or further order of the Court. After the Court's comments, the Debtors stated that they would terminate payment of monthly fees to KPMG until further order of the Court.

During the March 19 Conference Call, the amount of time that would be allocated for the April 13 Hearing was raised. The Court stated that it did not know the amount of time that would be allocated because it did not know whether

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

2004 WL 1459455                                                                                          Page 7
--- B.R. ---
(Cite as: 2004 WL 1459455 (Bankr.S.D.N.Y.))

witnesses were going to be presented. The States responded that they were not aware that the April 13 Hearing was evidentiary but instead assumed that the Court would schedule an evidentiary hearing if, following oral argument on the Disqualification Motion, the Court deemed it necessary. The Court instructed the parties that if they decided to present evidence, evidence could be presented at the April 13 Hearing. The Court also directed the parties to discuss the issues amongst themselves and inform the Court accordingly.

In the March 19 Conference Call, the Court recalls that the States argued that Rule 408 of the Federal Rules of Evidence ("Rule 408") prevented the Debtors from referring to the circumstances surrounding the proposed filing of the Disqualification Motion because it had been raised in a settlement conference between the parties. Further, the Court recalls advising the States that it did not believe that Rule 408 applied under the circumstances presented.

Shortly thereafter, the States issued discovery requests in connection with the Disqualification Motion. On March 30, 2004 the Debtors and KPMG expressed their objections to the States' requests for discovery and requested a conference with the Court to discuss these objections. See LBR 7007-1(b). A conference was held on March 31, 2004, at which time the Court directed the States, the Debtors and KPMG to submit letters setting forth the facts in dispute that may need to be addressed by discovery. On April 9, 2004 the Court presided over a hearing to address the issues raised in the correspondence submitted by the parties (the "April 9 Hearing"). At the conclusion of the April 9 Hearing, the Court informed the parties that it would rule on the States' discovery requests on April 13, 2004 and adjourned the hearing on the Disqualification Motion until April 16, 2004 if the discovery requests were denied and to sometime thereafter if the discovery requests were granted. The Court denied the States' discovery requests on April 13, 2004 by finding, among other things, that the States' discovery requests were neither warranted, required nor appropriate to resolving the issue before the Court. Having denied the States' request for discovery, the hearing on the Disqualification Motion was held on April 16, 2004 (the "April 16 Hearing"). During the course of the April 16 Hearing to consider the Disqualification Motion, there was colloquy between the Court and the States' counsel regarding whether any inferences could be drawn from the fact that the SEC and the United States Trustee were not taking a position concerning the Disqualification Motion. Thereafter, in light of what transpired at the April 16 Hearing, the Debtors' counsel notified a member of the Court's staff that there was an issue regarding the SEC that they believed should be brought to the Court's attention and

requested an in camera conference to discuss the matter. The Court was notified of the request and a recess was taken. The Court then held an in camera chambers conference (the "April 16 Conference") where the Debtors first revealed to the Court and the States that the SEC had made a confidential request for information to the Debtors and KPMG (hereinafter, the "SEC Requests"), in connection with the issues raised in the Final Report. The Debtors stated that they requested the conference be held in camera because they considered the transmission of the SEC Requests to the Debtors and KPMG confidential. [FN4] The Debtors obtained copies of the SEC Requests and indicated to the Court that the SEC did not oppose providing copies to the parties to the Disqualification Motion, on a confidential basis. [FN5] The Court called a brief recess to allow the parties time to review the SEC Requests privately in order to formulate an argument regarding the SEC Requests' relevance to the Disqualification Motion.

*8 Thereafter, the Court convened the April 16 Hearing, in camera (the "April 16 In Camera Hearing") where the States' counsel renewed an earlier request for discovery seeking the documents requested in the SEC Requests. The Court denied this request orally at the April 16 In Camera Hearing. The Court heard further argument from the parties on disqualification related to the SEC letter requests. At the end of the April 16 In Camera Hearing, the Court directed the parties that the requests from the SEC were to remain confidential until further order of the Court.

At the conclusion of the April 16 Hearing, the Court informed the parties that by April 20, 2004 the Court would either decide the merits of the Disqualification Motion or otherwise advise the parties how the Court intended to proceed. On April 20, 2004, the Court issued an order, among other things, informing the parties that the Court would first review the transcript of the hearing and then determine whether further action by the parties would be appropriate in this matter.

G. SEC Requests And Disclosure Under Rule 2014

On April 28, 2004, the Court held an in camera hearing and ordered a briefing schedule to address the disclosure of the SEC requests under Rule 2014. The April 28 Hearing was attended by counsel for the States, the SEC, the United States Trustee, the Debtors and KPMG. During the April 28 Hearing, the Court ordered the Debtors and KPMG to submit the documents that each had been producing to the SEC in response to the SEC Requests for review by the Court (hereinafter, the "SEC Production"). The Court denied the States' request for access to the SEC Production; however, to the extent that the United States Trustee's

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

2004 WL 1459455
--- B.R. ---
(Cite as: 2004 WL 1459455 (Bankr.S.D.N.Y.))

Page 8

Office sought to review the documents, the Court directed that the SEC Production could be made available on a confidential basis. [FN6] The SEC Production consists of approximately thirty-six boxes of documents and five compact discs containing electronic copies of documents. The SEC Production has been provided to the Court by the Debtors and KPMG, and the Court has reviewed the documents.

On May 19, 2004, and pursuant to the briefing schedule set at the April 28 Hearing, [FN7] the Debtors filed their Brief Filed Pursuant to the Court's May 7, 2004 Scheduling Order stating their opposition to the disclosure of the SEC Requests. By letter dated May 18, 2004, the SEC stated that it would not file any briefs on the issue. Other than this letter dated May 18, 2004, the SEC has not filed any pleadings regarding the Disqualification Motion. The States filed its Brief in Support of Full Disclosure of the SEC Letters to the Debtors and KPMG, on June 9, 2004.

On June 4, 2004, the Court was advised by the Debtors that on or about June 1, 2004 one of the Debtors' professionals disclosed in its fee statement, filed with the Court, a reference to the SEC inquiry which should have been redacted from the statement. The Debtors requested that the Court authorize the removal of the fee statement from the Court's docket because of the error. It was expected that a redacted version of the statement would be filed. The Court granted the request in an order dated June 4, 2004 (the "June 4 Order").

*9 Following the June 4 Order, the Court became aware that the information concerning the SEC inquiry was publicly disseminated, presumably prior to the removal of the document from the docket. The Court convened another *in camera* conference on June 10, 2004 (the "June 10 Conference"), to address the necessity of sealing documents in light of the public disclosure. During the June 10 Conference, the Court advised the parties of its belief that, in light of public disclosure of the existence of the SEC Requests, the continued sealing of the record with respect to the Disqualification Motion was no longer necessary. The Court advised the parties that the SEC Production was not to be included in the materials to be unsealed. The Court informed the parties that the sealed documents would be released on June 14, 2004, unless a request for a hearing was made by noon on June 14, 2004.

No request for a hearing was made. Hence, on June 14, 2004, the Court issued an Order Pursuant to Bankruptcy Rule 9018 Lifting Seal as to Certain Transcripts of Proceedings, Orders, Pleadings and Documents in connection with the Disqualification Motion. However, as the Court made clear at the June 10 Conference, the documents that would be released did not include the SEC Production. The SEC Production was not made available to the States due to the denial of their discovery requests, as discussed more fully below.

On June 16, 2004, the Debtors and KPMG both filed responses to the States' June 9 brief, arguing *inter alia*, that the issue of disclosure for purposes of the Disqualification Motion was rendered "moot" as a result of the disclosures referenced above. The Court held a hearing on June 23, 2004 where the States agreed that under the circumstances as to disclosure under Rule 2014, the issue was now moot; thereupon the record of the Motion was complete.

### III. Discussion

*A. Legal Standard*

[1][2] Section 327(a) of the Bankruptcy Code authorizes a trustee or debtor in possession [FN8] to employ professionals, with court approval, during the course of a bankruptcy case. *See* 11 U.S.C. § 327(a). Section 327(a) provides, in pertinent part, that a debtor may retain professionals that do not "hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the debtor's duties under this title." 11 U.S.C. § 327(a). According to the plain language of the statute, in order to qualify for retention under section 327(a) of the Bankruptcy Code a professional: 1) must not hold an interest adverse to the bankruptcy estate; 2) must not represent an interest adverse to the estate; and 3) must be disinterested. [FN9]

[3][4] An adverse interest is not defined in the Bankruptcy Code. *See Bank Brussels Lambert v. Coan (In re AroChem Corp.)*, 176 F.3d 610, 623 (2d Cir.1999) ("The Bankruptcy Code does not define the phrase 'hold or represent an interest adverse to the estate.' "). The Second Circuit has relied upon the following definition of adverse interest:

   *10 (1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or
   (2) to possess a predisposition under circumstances that render such a bias against the estate.

*In re AroChem Corp.*, 176 F.3d at 623. Stated another way, if it is plausible that another interest may cause the professional to act any differently than they would without that other representation, then that professional would have a conflict and an interest adverse to the estate warranting disqualification. *See In re Leslie Fay Cos., Inc.*, 175 B.R. 525, 533 (Bankr.S.D.N.Y.1994). The decision whether an adverse interest exists is determined by the court on a case

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

2004 WL 1459455                                                  Page 9
--- B.R. ---
(Cite as: 2004 WL 1459455 (Bankr.S.D.N.Y.))

by case basis. *In re AroChem Corp.,* 176 F.3d at 623.

A "disinterested person," in contrast, is defined in Bankruptcy Code section 101(14), which provides, in relevant part, that a disinterested person:
  (A) is not a creditor, an equity security holder, or an insider; ...
  (D) is not and was not, within two years before the date of filing of the petition, a director, officer, or employee of the debtor; ... and
  (E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor.
11 U.S.C. § 101(14). Courts have noted that the materially adverse interest standard incorporated into the definition of disinterestedness under section 101(14)(E) and the "interest adverse to the estate" language in section 327(a) overlap and are duplicative, forming a single test to judge conflicts. *See, e.g., In re Granite Partners, L.P.,* 219 B.R. 22, 33 (Bankr.S.D.N.Y.1998); *see also In re Enron Corp.,* No. 01-16034(AJG), 2002 WL 32034346, at *8 (Bankr.S.D.N.Y. May 23, 2002).

[5][6][7] Rule 2014(a) requires a professional seeking an order for employment in a bankruptcy case to submit a verified statement setting forth the professional's connections to the debtor, creditors, or any other party in interest, including their counsel and accountants. The purpose of Rule 2014 is to provide the Court (and the United States Trustee) with information to determine whether the professional's retention is in the best interests of the estate, *see In re Leslie Fay Cos., Inc.,* 175 B.R. 525, 533 (Bankr.S.D.N.Y.1994), and to maintain the integrity of the bankruptcy system. *See In re Envirodyn Indus., Inc.,* 150 B.R. 1008, 1021 (Bankr.N.D.Ill.1993). Courts have ruled that Rule 2014 disclosures are to be strictly construed, *see In re Leslie Fay,* 175 B.R. at 533, and the professional must disclose all facts that bear on disinterestedness and cannot usurp the court's functions by selectively incorporating materials the professional deems important. *See In re Granite Partners, L.P.,* 219 B.R. at 35. Failure to disclose relevant connections is an independent basis for disallowance of fees or disqualification from the case. *See In re Leslie Fay,* 175 B.R. at 533.

*B. Legal Analysis*

*11 The Disqualification Motion raises three principal issues not specifically earmarked by the States into the aforementioned legal standard. First, the States argue that as a part of auditing the Debtors' restatement of its financials, KPMG would have to evaluate the soundness of its own tax

minimizing strategies and thereby have its own financial interest at stake. The States contend that allowing KPMG to evaluate the soundness of its own strategies plainly demonstrates the existence of a conflict of interest and therefore, KPMG is not disinterested. *See* Disqualification Motion ¶ 33. Second, the States argue that KPMG holds an interest adverse to the estate because the Debtors have a potential cause of action against KPMG in the event that the royalty deductions are ultimately disallowed. *See* Disqualification Motion. ¶ 34. This contention is apparently founded upon the Final Report and based upon the premise that the potential cause of action translates into a financial interest held by KPMG. Finally, the States also contend that the mere appearance of impropriety is enough to warrant KPMG's disqualification. [FN10]

In response, KPMG contends that it holds no interest adverse to the estate and, *a fortiori,* is disinterested. KPMG argues that it holds no interest adverse to the estate because both the Debtors and KPMG support the validity of the tax planning that the States claim is invalid. Moreover, KPMG argues that speculation over whether KPMG may be involved in litigation with the Debtors based on uncertain future events is insufficient to warrant disqualification. Finally, KPMG posits that the Debtors are vested under the Plan with the sole discretion and authority to pursue causes of action and the Debtors have determined not to pursue causes of action against KPMG.

In support of KPMG's arguments, the Debtors contend that KPMG does not hold an interest adverse to the estate and is disinterested. The Debtors further argue that there is no actual conflict between the Debtors and KPMG nor is there any appearance of impropriety. Finally, the Debtors argue that the Disqualification Motion should be rejected because the Disqualification Motion is an open and notorious attempt by the States to gain tactical advantage in litigation concerning the States' claims that question the propriety of the Debtors' licensing and royalty program.

*(i) The States Were Dilatory In Prosecuting The Disqualification Motion And The Pursuit Of The Disqualification Of KPMG Was A Litigation Tactic*

[8] In April 2003, several dissenting creditor groups filed motions for appointment of a Chapter 11 trustee. In connection with the motions and the hearing on the motions in May 2003, the issues regarding the intercompany charges, including the Royalty Charges and KPMG's role in establishing them were raised and were the subject of testimony and documentary evidence. The Royalty Charges were the subject of dispute in connection with the Disclosure Statement, filed on May 23, 2003 and approved

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

2004 WL 1459455
--- B.R. ---
(Cite as: 2004 WL 1459455 (Bankr.S.D.N.Y.))

by Court order dated May 28, 2003. As early as May 13, 2003, the States filed their respective objections to the Motion for Entry of an Order Approving Joint Disclosure Statement. During the summer of 2003, the Royalty Charges again were the subject of dispute and discovery in connection with confirmation of the Debtors' proposed plan of reorganization.

*12 Throughout these cases, the States have been actively involved in these Chapter 11 cases. As stated above, the States filed their respective objections, as early as May 13, 2004, to the Motion to Approve/Debtors' Motion for Entry of Order (I) Approving the Disclosure Statement; (ii) Fixing a Record Date; (iii) Approving Solicitation Packages and Procedures for Distribution Thereof; (iv) Approving Forms of Ballots and Establishing Procedures for Voting on the Debtors' Joint Plan of Reorganization; and (v) Scheduling a Hearing and Establishing Notice and Objection Procedures in Respect of Confirmation of the Debtors' Joint Plan of Reorganization, filed on April 24, 2003. The Court notes that such objections did not address the Royalty Charges. However, it is clear that the States were aware that KPMG created the royalty structure, that such structure was being attacked as a sham, and that KPMG was also the auditor for the Debtors. On July 28, 2003 the States filed an objection to the Debtors' Plan containing no references to the Plan's language regarding the causes of action which vested in the reorganized Debtors, including the Royalty Charges. Further, the States concede that the information upon which the Disqualification Motion is based was known for nearly one year. See Disqualification Motion at ¶¶ 10, 11. On September 2, 2003, the States filed a motion to extend the deadline for filing proofs of claim related to the royalty deductions. That motion, as well as the States' Plan Objection were resolved by a stipulation dated September 12, 2003, extending the bar date for claims relating to the royalties. Neither the States, nor any other party, appealed the Confirmation Order, which is now final.

At the same time, Massachusetts sought, and was granted, leave to conduct a Rule 2004 examination of KPMG in connection with the Royalty Charges and in its Motion stated that it reviewed the Debtors' royalty deductions. See Disqualification Motion ¶ 11 ("On or about April 14, 2003 ... the Debtors publicly disclosed for the first time what has become known as a $19 billion sham royalty claim of WorldCom, Inc. against MCI."). In response to the States' requests, the Debtors have provided extensive information to the States, as well as to the Multistate Tax Commission, which has conducted an audit of the royalties on behalf of the States. On October 2, 2003, the Debtors sent counsel for Massachusetts two boxes of documents relating to the Royalty Charges, including copies of the contemporaneous

supporting documentation that KPMG had prepared. At no time, in spite of the fact the States knew that the structure created by KPMG was alleged to be a "sham," did the States, or any other party, the United States Trustee, the SEC or the Corporate Monitor, raise the issue of KPMG's continuing role in the cases as auditor and tax advisor. Thus, the underlying basis of the Disqualification Motion was present as of April 2003.

*13 The Final Report sets forth the view of the Examiner as to the validity of the royalty program and the potential causes of action that may exist if such program was found to be invalid--recognizing that such causes of action may only be brought by the Reorganized Debtors under the Plan. There was no reason, however, for the States to wait until the Final Report to raise any issue regarding the alleged 'sham' nature of the royalty structure and the possibility of a cause of action commenced by the Debtors, which arguably would warrant the disqualification of KPMG as Debtors' independent auditor. Furthermore, this is especially true for a taxing authority that relies upon an entity's financial statements and representations while carrying out its duties and obligations. The States, as taxing authorities, fully understand the implications of interplay between tax advice and auditing when the tax advice provided by an independent auditor is challenged, as is the case here.

[9] On March 17, 2004, the States brought the Disqualification Motion, as referenced above, only after the Examiner issued his Final Report. [FN11] An unjustified delay in bringing a motion to disqualify provides a separate ground to deny the relief requested in the underlying motion. Exco Resources, Inc. v. Milbank, Tweed, Hadley & McCloy L.L.P., et al., (In re Enron Corp., et al.), No. 02 Civ. 5638(BSJ), 2003 WL 223455 at *4 n. 2 (S.D.N.Y. Feb.3, 2003)(holding that the bankruptcy court was correct in finding an unjustified delay in bringing the motion to disqualify provided a separate ground to deny relief, where motion was brought nearly two months after the underlying basis for the Disqualification Motion was known).

Applied here, the States have had access to the information necessary to raise the issues that are the subject of the Disqualification Motion for more than ten months. The grounds on which the Disqualification Motion are based have been ripe since April 2003 and open and notorious since May 2003. It was only after the States decided that such a motion would advance their particular interests that they filed the Disqualification Motion. The States argued that they were not sure how the royalty structure impacted their claims and were not clear whether they had standing. There is no basis for the standing issue: the States were clearly creditors and had actively participated in these cases.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

2004 WL 1459455                                                                    Page 11
--- B.R. ---
**(Cite as: 2004 WL 1459455 (Bankr.S.D.N.Y.))**

There is no plausible argument that the States, or any other party in interest, did not have standing to bring a motion to disqualify KPMG.

As further evidence of the States' motivation behind filing the Disqualification Motion, during a telephonic conference prior to the filing convened as a settlement conference with the Debtors on the States' proof of claims, the States raised the issue of filing a motion to disqualify at the conclusion of the call. *See* April 16 Hearing Tr. 72:21-75:16. A request was made to the Debtors during that conference call to delay the filing of the Disqualification Motion until the parties could meet in Boston. [FN12] *Id.* at 75:7-10. The States acknowledged that the filing of the Disqualification Motion was filed after the meeting in Boston, but claim that such was not related to the request by the Debtors. Considering all of the aforementioned, the Court finds by filing the Disqualification Motion, the States acted in connection with a litigation strategy that served their own pecuniary interest. Any argument by the States that they have pursued the disqualification of KPMG to protect the public interest "rings hollow" in light of the fact that the very conflict they allege warrants disqualification was known to them for no less than ten months before they decided to file the Disqualification Motion. There is no doubt that the validity of the Royalty Charge will be the subject of significant litigation in the context of the claims allowance process in these cases, but a motion to disqualify is not the proper vehicle to initiate the litigation process.

**\*14** The delay in bringing the Disqualification Motion until the eve of the Debtors' emergence from bankruptcy were potentially disruptive to the Debtors' reorganization; the interests of all creditors in these Chapter 11 cases would have been hindered by the disqualification, as emergence could have been delayed without any foreseeable benefit to the Debtors' estates. Specifically, the effect of disqualification would have been to potentially delay the effective date of the plan while the Debtors retained new auditors to certify the 2003 financials, delaying resolution of the States' tax claims and distributions to all creditors, including the States. In addition, had the States raised the issue at an earlier juncture in the case, the Court could have taken corrective measures to address the States' concerns, if such were warranted. Therefore, the Court finds that the States, in addition to having filed the Disqualification Motion as a litigation tactic, were dilatory in the prosecution of the Disqualification Motion. Although the Court could deny the Disqualification Motion on these grounds, because of the seriousness of the allegations and their impact on Debtors as well as KPMG, the Court will decide the Disqualification Motion on the merits.

*(ii) KPMG Holds No Interest Adverse To The Estate, Is Disinterested And There is No Appearance of Impropriety*

In addressing the States' contentions, the Court concludes as follows. As an initial matter, there is no indication that KPMG is a creditor, an equity security holder or an insider. Accordingly, section 101(14)(A) is inapplicable. Moreover, KPMG was and is not a director, officer, or employee of the Debtors, nor do the States make any allegation that KPMG is or has been. Accordingly, section 101(14)(D) is also inapplicable. The Court will devote the remainder of this discussion to whether KPMG holds an adverse interest and whether KPMG is disinterested.

[10][11] First, the States argue that KPMG holds an interest adverse to the estate because the Debtors have a potential cause of action against KPMG in the event that the royalty deductions are ultimately disallowed. An interest is not considered adverse simply because it is possible to conceive of a situation where interests might clash. *In re Leslie Fay, 175 B.R. at 532.* Here, KPMG does not have an interest adverse to the interests of the estate or of any class of creditors or equity holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors simply because there is a speculative possibility that in the future, some events may render KPMG and the Debtors adverse. By way of illustration, in order for the Debtors to have a claim against KPMG before any court of competent jurisdiction numerous uncertain events would have to transpire. First, a court would have to find that the royalty deductions were inappropriate. As the Final Report noted, a mere finding of invalidity would not be sufficient to establish any liability on the part of KPMG. Rather, a court would have to find that the royalty deductions are invalid based upon the definition of "intangible assets" under section 482 of the Internal Revenue Code, rather than on any other ground. Final Report at 43. Second, a court would also have to find that the Debtors are liable to the States for additional tax, interest, and penalties--a circumstance the Debtors contend is unlikely even if the royalty deductions are disallowed. Only, in the event that additional tax liabilities are assessed against the Debtors, on the specific ground that the licensed assets do not qualify as "intangible assets," would a *potential* claim against KPMG even exist. [FN13] And even if all of these events occur, it would still be within the Debtors' discretion as provided for in the Plan whether to commence an action against KPMG. The Debtors, however, already have represented and the Court has relied, that the Debtors have no intention of bringing such a claim based upon their own assessment of its viability.

**\*15** In any event, since the Debtors and KPMG continue to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

2004 WL 1459455                                                      Page 12
--- B.R. ---
(Cite as: 2004 WL 1459455 (Bankr.S.D.N.Y.))

support the tax planning, KPMG does not possess an economic interest that would tend to lessen the value of the bankruptcy estate. *See In re AroChem Corp., 176 F.3d at 623* (defining an element of an interest adverse to the estate as "any economic interest that would tend to lessen the value of the bankruptcy estate"). Additionally, because its continued support for the tax planning is consistent with that of the Debtors, KPMG has no predisposition under the circumstances to render a bias against the estates. *See id.* (defining another element of an interest adverse to the estate as "a predisposition under circumstances that render such a bias against the estate."). "[S]ection 327(a) is phrased in the present tense" and "verb tense is significant in construing statutes." *See In re AroChem Corp., 176 F.3d at 623*. The current opinions shared by KPMG and the Debtors regarding the tax planning demonstrates that KPMG satisfies both prongs of *section 327(a) of the Bankruptcy Code* pertaining to disinterestedness and lack of adverse interest, and therefore KPMG's continued retention appears to be proper.

[12] Second, the States argue that KPMG is not disinterested because it serves as both auditor and tax advisor to the Debtors. At the hearing on the Disqualification Motion, however, the States seemed to have retreated from this argument by acknowledging that this alleged conflict is not *per se* improper. Indeed, under the applicable statutes and regulations an accounting firm is expressly permitted to act simultaneously as both auditor and tax advisor. For instance, section 10A of the Securities Exchange Act of 1934, as amended by section 201(a) of the Sarbanes-Oxley Act of 2002, specifically addresses the appropriateness of these dual roles and provides in relevant part, that a public accountant "may engage in any non-audit service, including tax services" that is not an otherwise prohibited activity under the statute. [FN14] There is no indication that KPMG's tax services qualify as a prohibited activity. Thus, the States contention that KPMG is not disinterested because it serves as both auditor and tax advisor to the Debtors does not appear to be well-founded and the Court, therefore, resolves this argument in favor of KPMG.

[13] Third, the States argue that there is an appearance of impropriety that warrants KPMG's disqualification. Here, the Court finds no appearance of impropriety for the reasons just stated, as well as the numerous structural safeguards employed in this case designed to insure the integrity of the process. For instance, the active involvement of the District Court, directly and through the participation of the Corporate Monitor, in all facets of the Debtors' corporate governance. The Corporate Monitor's powers include having oversight functions over compensation and

document retention issues; the authority to attend board meetings; and the authority to be present at any meeting with the Debtors and any of its outside advisors. The Court views it as implausible that WorldCom could have shirked its fiduciary duties while the Corporate Monitor attended its board meetings, including meetings where WorldCom would have discussed not pursuing KPMG on the issue outlined in the Final Report. In addition to the oversight of the Corporate Monitor and the District Court, the SEC has been actively involved in every aspect of this case dealing with corporate governance including, the actions of the Debtors' board of directors. The Court's review of the SEC Production reveals nothing that would call into question the actions of the MCI board of directors or KPMG with respect to KPMG's independence in their role as an auditor. Further, the SEC was aware, as was the United States Trustee, of accusations about the tax structure as early as April 2003. [FN15]

*16 In addition, the issues raised in the Final Report did not rise to a level of concern for the SEC to warrant calling the matter to the attention of the District Court or this Court. *See April 28 Hearing Tr. 16:19-25, 17:1-4 ("if the [C]ommission had decided that some action was appropriate, we would inform Your Honor very quickly, as well as Judge Rakoff, but we are not in that position"). At the April 28 Hearing, the SEC stated that the letters are preliminary requests and that no inference was to be drawn from their issuance. The SEC emphasized that they are have not taken any position on the Disqualification Motion. April 28 Hearing Tr. 16:7-10. According to the SEC, "[t]he staff of the SEC has reached no definite conclusion one way or another on the issue of whether there is a violation of the Auditor Independence Rules with respect to MCI, and that issue has never been raised in the [C]ommission." *Id.* at 16:10-16. The SEC also stated that if they had concluded there was a violation of the Auditor Independence Rules, they would have "promptly raised the matter with the [C]ommissioners to see whether they thought further action would be appropriate." *Id.* at 16:19-25; 17:1-4. The SEC further stated that there are a number of steps that the SEC takes in private investigations and there is no specific time frame for the inquiry. *Id.* at 17:22-25; 18:1-25; 22:4-19. Here, "[t]here has been no investigation opened, so there are actually at least two more steps. There is the informal document request and formal investigation can be opened, then you can have a Wells process." *Id.* at 22:4-9.

The SEC also addressed the issue of confidentiality and stated that it is generally up to the client's counsel to decide whether to disclose non-public preliminary document requests and that generally, the SEC does not advise the client to do so. *Id.* at 21:13-25; 22:1-4. The SEC stated that

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

2004 WL 1459455
--- B.R. ---
(Cite as: 2004 WL 1459455 (Bankr.S.D.N.Y.))

Page 13

the reasons for keeping the SEC Requests confidential were to encourage compliance and not to unnecessarily upset the public marketplace. *Id.* at 24:3-24. Although, the Court reviewed the SEC Production out of an abundance of caution, as a factual matter, the business judgment of the Debtors regarding their determination not to commence an action against KPMG was not raised in the Disqualification Motion. Nonetheless, the Court has reviewed the SEC Production and has found no indication that the determination by WorldCom is an improper exercise of its reasonable business judgment. [FN16] Accordingly, there is no appearance of impropriety.

*(iii) Denial Of The States' Discovery Requests*

The States made two sets of requests for discovery regarding the Disqualification Motion. The initial set of requests was made following the March 19 Conference Call commenced by the Court to address the continuing payment of KPMG under the Monthly Compensation Order. On March 30, 2004, the Debtors and KPMG objected to the requests and requested an informal conference to address their concerns. A conference was held on March 31, 2004, where the Court directed the parties to submit letters setting forth their positions regarding the discovery sought. Initially, after reviewing the facts surrounding the filing the Disqualification Motion, the allegations and legal theories expressed therein, and the issues raised in the March 19 Conference Call, it was apparent to the Court that the States intended to prosecute the Disqualification Motion without discovery and rely predominantly on the Final Report for any factual assertions. Further, upon the Court's review of the SEC Requests and the Disqualification Motion, it concluded that there were no material facts in dispute regarding the grounds argued by the States that supported the contentions and legal arguments in the Disqualification Motion. In addition, the Court considered that the discovery requests made by the States were extremely broad and primarily focused on the litigation over the validity of the Royalty Charges rather than on the Disqualification Motion. If such discovery was appropriate at all, it would be in the context of any litigation regarding the Royalty Charges and not in a motion to disqualify.

*17 The second set of discovery requests were made at the April 16 *In Camera* Hearing following the States' review of the SEC Requests. The Court took the requests under advisement. Thereafter, the Court denied the discovery requests at the April 28 *In Camera* Hearing. At the time, the Court had reviewed the pleadings, the record of the pleadings, and the various conferences and hearings, and concluded that the States brought the Disqualification Motion as a litigation tactic. Therefore, to allow the States

to obtain discovery in those circumstances would not be appropriate or warranted. Further, as the Court has previously discussed above, discovery based upon the Disqualification Motion as filed was not justified.

In conclusion, the Court has found that discovery by the States related to the Disqualification Motion and the issues raised therein was not appropriate. In denying the States' requests, the Court concluded that the discovery requests sought focused on material which would assist in the underlying tax controversy and it is the Court's overall view that the States brought this motion as a litigation tactic. Therefore, the denial of discovery for the purposes of the Disqualification Motion, does not affect the rights of the parties to seek or oppose discovery of the same material in other litigation proceedings (i.e. regarding the underlying tax claims).

Regarding the Court's review of the SEC Production, and the availability to the United States Trustee on a confidential basis, the Court did so out of an abundance of caution and did not permit access to the States for reasons set forth above. The SEC Production, although reviewed by the Court, was not necessary to the disposition of the issues raised by the States in the Disqualification Motion. The SEC Production provided a more comprehensive review of issues related to KPMG's independence, not raised by the States in the Disqualification Motion.

### IV. Conclusion

For the foregoing reasons, the Disqualification Motion is denied in its entirety. Further, the Debtors are directed to resume payments to KPMG under the Monthly Compensation Order, including any accrual of payments since March 19, 2004. An order consistent with this decision will be entered simultaneously herewith.

> FN1. The Court also received the following briefs: Letter to the Honorable Arthur J. Gonzalez from the Securities and Exchange Commission Re: the April 28, 2004 Chambers Conference, dated May 18, 2004; the Reorganized Debtors' Brief Filed Pursuant to the Court's May 7, 2004 Scheduling Order, dated May 19, 2004; Statement of KPMG LLP in to Court's May 7, 2004 Scheduling Order, dated May 19, 2004; the States' Brief in Support of Full Disclosure of the Securities and Exchange Commission Letters to the Debtors and KPMG, dated June 9, 2004; the Reorganized Debtors' Reply Brief Filed Pursuant to the Court's May 7, 2004 Scheduling Order, dated June 16, 2004; and the Supplemental Statement of KPMG LLP in to

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

2004 WL 1459455                                                    Page 14
--- B.R. ---
**(Cite as: 2004 WL 1459455 (Bankr.S.D.N.Y.))**

Court's May 7, 2004 Scheduling Order, dated June 16, 2004. As described *infra*, the issues outlined therein are moot.

FN2. During the course of this litigation, the Debtors emerged from bankruptcy as MCI, Inc. ("MCI"), but for ease of reference within this decision, the Court will refer to MCI as WorldCom or the Debtors.

FN3. The March 19 Conference Call was not recorded or transcribed.

FN4. Upon review of the SEC Requests, the Court found that the Debtors' request for *in camera* disclosure of the requests was warranted. The requests provide that they are "confidential and should not be construed as an indication by the Commission or its staff that any violation of law has occurred, nor as an adverse reflection upon any person, entity or security."

FN5. A representative of the United States Trustee was not present at the April 16 Conference or the April 16 *In Camera* Hearing. However, copies of the SEC Requests were given to the United States Trustee at the April 28, 2004 *in camera* hearing, (the "April 28 Hearing"), at which time, the events that transpired on April 16, 2004 were conveyed to the United States Trustee.

FN6. To the best of the Court's knowledge, the United States Trustee's Office has not requested any of the material in the SEC Production. However, at the April 28 Hearing KPMG represented that the United States Trustee's Office requested certain information from KPMG regarding the matter. Although the United States Trustee has been actively involved in these cases, including the retention of all professionals, the filing of a request for the appointment of an examiner at the outset of the cases, the disclosure and confirmation hearings, and has been present at many of the hearings and has participated in conference calls held regarding the Disqualification Motion, no pleadings have been filed by the United States Trustee regarding any aspect of the Disqualification Motion.

FN7. The briefing schedule is embodied in an Order dated May 7, 2004.

FN8. "Upon the filing of a voluntary [C]hapter 11

petition, a debtor automatically becomes a 'debtor in possession' [and][a]s such occupies the shoes of a bankruptcy trustee in every major way." *Unofficial Committee of Equity Holders v. McManigle (In re Penick Pharmaceutical, Inc.),* 227 B.R. 229, 232 (Bankr.S.D.N.Y.1998). Section 1107 gives the debtor in possession the powers given to a trustee under Chapter 11. *See* 11 U.S.C. § 1107.

FN9. "By its terms, section 327 distinguishes between 'holding' an interest and 'representing' one." *Bank Brussels Lambert v. Coan (In re AroChem Corp.),* 176 F.3d 610, 629 (2d Cir.1999). Here there is no allegation that KPMG *represents* an interest adverse to the estate. A party represents an interest adverse to the estate when a professional acts as agent for someone holding an adverse interest. *See In re Envirodyne Indus., Inc.,* 150 B.R. 1008, 1016-17 (Bankr.N.D.Ill.1993) ("To 'represent an adverse interest' means to serve as agent or attorney for any individual or entity holding such an adverse interest."). Because KPMG was not operating as anyone's agent but instead on their own behalf, the only relevant inquiry here is whether KPMG holds an interest adverse to the estate and whether KPMG is disinterested.

FN10. At the April 16 Hearing, the States added an additional argument that implicates KPMG's disclosure obligations under Rule 2014 and the Malone Affidavit. The States contend, principally, that KPMG failed to disclose that an indemnity agreement existed between WorldCom and KPMG in connection with the disputed tax advice. Having considered their contentions, and the appropriate legal standard, *see In re Enron Corp.,* 2002 WL 32034346, at *5 (outlining legal standard), the Court concludes that KPMG complied with its obligations under Rule 2014 regarding the Malone Affidavit and there is no basis to further consider Rule 2014 as grounds for disqualification.

FN11. Even if the Court were to believe, and this Court does not, that the States may have needed the Final Report to understand the implications of the alleged conflict before they would move for the disqualification of KPMG, nonetheless it took them nearly two months after the Final Report to file the Disqualification Motion.

FN12. The States acknowledged that the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

2004 WL 1459455
--- B.R. ---
(Cite as: 2004 WL 1459455 (Bankr.S.D.N.Y.))

Page 15

Disqualification Motion was raised in the context of settlement negotiations because when first brought to the attention of the Court during the March 19 Conference Call, the Court recalls that the States argued that Rule 408 prevented the Debtors from referring to the circumstances surrounding the proposed filing of the Disqualification Motion because it had been raised in a settlement conference. The Court denied the States' request finding that Rule 408 was not applicable, since there was no allegation that it was raised in the context of settlement discussions regarding issues underlying the Disqualification Motion, but raised in settlement discussions regarding the States' proofs of claims.

In any event, Rule 408 does not exclude all settlement materials from trial. "Evidence of an offer to compromise, though otherwise barred by Rule 408, can fall outside the Rule if it is offered for 'another purpose', i.e., for a purpose other than to prove or disprove the validity of the claim the offers were meant to settle." *Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 510 (2d Cir.1989) (citations omitted). Thus, even if the discussions between WorldCom and the States can be considered conduct made in compromise negotiations under Rule 408, the Court "has broad discretion as to whether to admit evidence of settlement ... offered for 'another purpose.' In applying the 'another purpose' exception to Rule 408, the trial judge should weigh the need for such evidence against the potentiality of discouraging future settlement negotiations." *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 293 (2d Cir.1999) as cited in *ESPN Inc. v. Office of Com'r of Baseball*, 76 F.Supp.2d 383, 412 (S.D.N.Y.1999) (internal quotations and citations omitted). Having considered the prevailing legal standard the Court concludes that the arguments and evidence related to the filing of the Disqualification Motion is admissible for the "other purpose" of highlighting the States alleged improper motive.

FN13. Furthermore, in connection with the indemnity agreement, KPMG's liability appears to be limited to ten million dollars in cases of ordinary negligence. It was also argued by the Debtors that the limit may be even less if KPMG were to succeed in allocating the limitation among the various tasks it performed. There may be further restrictions based upon which year is at issue, as there were apparently other engagement letters that concern other years.

FN14. The "prohibited activities" under section 10A of the Securities Exchange Act of 1934, as amended, include:
(1) bookkeeping or other services related to the accounting records or financial statements of the audit client;
(2) financial information systems design and implementation;
(3) appraisal or valuation services, fairness opinions, or contribution-in-kind reports;
(4) actuarial services;
(5) internal audit outsourcing services;
(6) management functions or human resources;
(7) broker or dealer, investment adviser, or investment banking services;
(8) legal services and expert services unrelated to the audit; and
(9) any other service that the Board determines, by regulation, is impermissible.
15 U.S.C. § 78(j)-1(g).

FN15. The Court notes that the United States Trustee did not raise the issue in April 2003, nor has the United States Trustee expressed support for the Disqualification Motion. Further, the United States Trustee has been aware of the issues raised by the Final Report and has not questioned the propriety or independence of KPMG.

FN16. Regarding the SEC Requests, the SEC made it clear to the Court at the April 28 Hearing that there may not be a formal investigation commenced or any further steps in its inquiry process by its staff following its review of the SEC Production. Therefore, the Court concluded that it would not be possible for the Court to await any outcome from the SEC before it ruled on the issues raised in the Disqualification Motion. Hence, the Court decided that it should proceed with a resolution of the issues presented in the Disqualification Motion. The Court has made its determination regarding KPMG's status as an "independent auditor" based upon the facts before the Court, as set forth in the record of proceedings of the Disqualification Motion, for the purposes of section 327 of the Code. The Court's decision, therefore, is limited to the Disqualification Motion and is not intended to be a determination for any other purpose.

2004 WL 1459455 (Bankr.S.D.N.Y.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

FILED

2004 JUL 12 AM 10: 40

U.S. BANKRUPTCY COURT
DISTRICT OF DELAWARE

1

2          UNITED STATES BANKRUPTCY COURT
                DISTRICT OF DELAWARE
3

4    IN RE:                    .      Chapter  11
                               .
5    Northwestern Corporation, .
                               .
6                              .
          Debtor.             .      Bankruptcy #03-12872 (CGC)
7    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

8                       Wilmington, DE
                        June 21, 2004
9                        3:00 p.m.

10             TRANSCRIPT OF OMNIBUS HEARING
         BEFORE THE HONORABLE CHARLES G. CASE, II
11            UNITED STATES BANKRUPTCY JUDGE

12
     APPEARANCES:
13
     For The Debtor:              William E. Chipman, Jr., Esq.
14                                Greenberg, Traurig, LLP
                                  The Brandywine Bldg.
15                                1000 West St.-Ste. 1540
                                  Wilmington, DE 19801
16
                                  Jesse Austin, Esq.
17                                Paul Hastings Janofsky
                                  & Walker, LLP
18                                600 Peachtree St.-24th Fl.
                                  Atlanta, GA  30308
19
                                  Karol Denniston, Esq.
20                                Paul Hastings Janofsky
                                  & Walker, LLP
21                                600 Peachtree St.-24th Fl.
                                  Atlanta, GA  30308
22
     For The Official Creditor's: Neil Glassman, Esq.
23   Committee                    The Bayard Firm
                                  222 Delaware Ave.-Ste. 900
24                                Wilmington, DE 19899

25

**A272**

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*



2

```
 1                              Margaret Phillips, Esq.
                                Paul Weiss Rifkind Wharton
 2                              & Garrison, LLP
                                1285 Avenue of the Americas
 3                              New York, NY 10019

 4   For Deutsche Bank & Trust:  Joseph Koury, Esq.
                                Bifferato Bifferato
 5                              & Gentilotti
                                Bruckner Building
 6                              1308 Delaware Ave.
                                Wilmington, DE 19899
 7
     For Harbert Management:    Christina Thompson, Esq.
 8                              Connolly Bove Lodge & Huth, LLP
                                The Nemours Bldg.
 9                              1007 North Orange Street
                                Wilmington, DE 19801
10
                                James Donnell, Esq.
11   (Via telephone)            Andrews Kurth, LLP
                                Ste. 200
12                              600 Travis
                                Houston, TX   77002
13
                                Jennifer M. Gore, Esq.
14                              Andrews Kurth, LLP
     (Via telephone)            Ste. 200
15                              600 Travis
                                Houston, TX   77002
16
     For Touch America Creditors: Robert S. Brady, Esq.
17   Committee                  Young Conaway Stargatt
                                & Taylor, LLP
18                              1000 West Street-17th Fl.
                                Wilmington, DE 19899
19
                                Athanasios E. Agelakopoulos, Esq.
20                              Young Conaway Stargatt
                                & Taylor, LLP
21                              1000 West Street-17th Fl.
                                Wilmington, DE 19899
22
     For Magten Asset Management: William J. Burnett, Esq.
23                              Blank Rome, LLP
                                Chase Manhattan Centre
24                              1201 Market Street-Ste. 800
                                Wilmington, DE 19801
25
```

**A273**

*Writer's Cramp, Inc.*

Certified Court Transcribers

732-329-0191

| | |
|---|---|
| 1 | Gary Kaplan, Esq. |
| | Fried Frank Harris Shriver |
| 2 | & Jacobson, LLP |
| | One New York Plaza |
| 3 | New York, NY 10004 |
| 4 | Katherine M. Miller, Esq. |
| | Smith Katzenstein & Furlow, LLP |
| 5 | The Corporate Plaza |
| | 800 Delaware Ave. |
| 6 | Wilmington, DE 19899 |
| 7 | Bijan Amini, Esq. |
| | Storch Amini & Munves, PC |
| 8 | 405 Lexington Ave.-51st Fl. |
| | New York, NY 10174 |
| 9 | |
| | For Rory & Theresa Minjares:  Triel D. Culver, Esq. |
| 10 | (Via telephone)    Datsopoulos McDonald & Lind |
| | 201 W. Main-Ste. 201 |
| 11 | Missoula, Montana 59801 |
| 12 | For the State of Montana:   Robert Collins, Esq. |
| | Assistant Attorney General |
| 13 | (Via telephone)    State of Montana |
| | 1701 Prospect Ave. |
| 14 | Helena, MT  59620 |
| 15 | Mary Capdeville, Esq. |
| | Assistant Attorney General |
| 16 | (Via telephone)    State of Montana |
| | 1701 Prospect Ave. |
| 17 | Helena, MT  59620 |
| 18 | Francis Monaco, Esq. |
| | Monzack & Monaco, PA |
| 19 | 400 Commerce Center |
| | 12th & Orange Sts. |
| 20 | Wilmington, DE 19899 |
| 21 | For Montana Public Service:  Katherine Stadler, Esq. |
| | Commission    Lafollette Godfrey & Kahn |
| 22 | (Via telephone)    One East Main street |
| | Madison, WI 53703 |
| 23 | |
| 24 | |
| 25 | **A274** |

4

| | | |
|---|---|---|
| 1 | (Via telephone) | Al Brogan, Esq.<br>State of Montana |
| 2 | | Public Service Commission<br>1701 Prospect Ave. |
| 3 | | Helena, MT  59620 |
| 4 | For MBIA Insurance Corp.: | George South, Esq.<br>King & Spalding, LLP |
| 5 | (Via telephone) | 1185 Ave. of the Americas<br>New York, NY 10036 |
| 6 | | |
| 7 | (Via telephone) | Stefanie Burbrower, Esq.<br>King & Spalding, LLP<br>1185 Ave. of the Americas |
| 8 | | New York, NY 10036 |
| 9 | For RCG Carpathia Master<br>Fund | John A. Morris, Esq.<br>Kronish Lieb Weiner |
| 10 | (Via telephone) | & Hellman, LLP<br>1114 Avenue of the Americas |
| 11 | | New York, NY 10036 |
| 12 | For Condederated Salish:<br>Kootenai Tribes | Joel Hobenkotter, Esq.<br>207 N. Broadway-Ste. BR-2 |
| 13 | (Via telephone) | Billings, MT 59102 |
| 14 | | Charles Slanina, Esq.<br>Finger & Slanina, LLC |
| 15 | | One Commerce Center<br>1201 Orange Street-Ste, 725 |
| 16 | | Wilmington, DE 19801 |
| 17 | For Arco: | William D. Sullivan, Esq.<br>Elzufon Austin Reardon Tarlov |
| 18 | | & Mandell, PA<br>300 Delaware Ave.-Ste. 1700 |
| 19 | | Wilmington, DE 19899 |
| 20 | | Jack L. Smith, Esq.<br>Holland & Hart, LLP |
| 21 | | 555 Seventeenth St.-Ste. 3200<br>Denver, CO 80201 |
| 22 | | |
| 23 | | Richard Curley, Esq.<br>Holland & Hart, LLP<br>555 Seventeenth St.-Ste. 3200 |
| 24 | | Denver, CO 80201 |
| 25 | | **A275** |

5

| 1 | For Wilmington Trust Co.: | John H. Knight, Esq. |
| | as Trustee: | Richards Layton & Finger |
| 2 | | One Rodney Square |
| | | Wilmington, DE 19801 |
| 3 | | |
| | For Richard Hylland: | John D. Demmy, Esq. |
| 4 | | Stevens & Lee, PC |
| | | 300 Delaware Ave.-Ste. 800 |
| 5 | | Wilmington, DE 19801 |
| 6 | For US EPA: | D. Henry Elsen, Esq. |
| | | Asst. Regulatory Counsel |
| 7 | | US EPA |
| | | 1200  6th Ave. |
| 8 | | Seattle, WA |
| 9 | For U.S. Department of: | Kim Sabo, Esq. |
| | Justice | U.S. Department of Justice |
| 10 | | 844 King Street-Ste. 2313 |
| | | Lock Box 35 |
| 11 | | Wilmington, DE 19801 |
| 12 | For Acting U.S. Trustee: | David L. Buchbinder, Esq. |
| | (Roberta A. DeAngelis) | U.S. Trustee's Office |
| 13 | | 844 King Street-Ste. 2313 |
| | | Lock Box 35 |
| 14 | | Wilmington, DE 19801 |
| 15 | Audio Operator: | Brandon McCarthy |
| 16 | Transcribing Firm: | Writer's Cramp, Inc. |
| | | 6 Norton Rd. |
| 17 | | Monmouth Jct., NJ 08852 |
| | | 732-329-0191 |

18

Proceedings recorded by electronic sound recording, transcript
19    produced by transcription service.

20

21

22

23

24

25

**A276**

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

6

1    THE COURT:  Good afternoon.  Please be seated.  Good

2    afternoon.  I will note the appearances on the appearance

3    sheet.  Anybody who wishes to make an appearance who has not

4    made one on the appearance sheet?  Apparently not.  Are we

5    ready to proceed?

6    MR. AUSTIN:  We are ready to proceed, Your Honor.  For

7    the record I'm Jesse Austin, counsel for Northwestern

8    Corporation.  I think before we get into the docket, Committee

9    counsel has a housekeeping matter.  It'd like to move for

10   admission for counsel.

11   MR. GLASSMAN:  Good afternoon, Your Honor, Neil

12   Glassman of The Bayard Firm.  First, this is my first time

13   actually before Your Honor not on a telephonic hearing, so I

14   would like to say thank you, nice to be here.  And I introduce

15   myself so that can introduce somebody else, Margaret Phillips

16   from Paul, Weiss, Rifkind, Ward & Garretson.  We moved her

17   admission pro hac, and she may be in need to speak today.  We'd

18   appreciate if Your Honor would hear her.

19   THE COURT:  All right, thank you.

20   MR. GLASSMAN:  Thank you.

21   THE COURT:  The motion will be granted.

22   MR. AUSTIN:  With that, Your Honor, we will proceed.

23   We're here today, Your Honor, on the June 21st Omnibus Hearing

24   for Northwestern Corporation.  An Agenda of a number of matters

25   had been previously distributed and I believe filed with the

1  Court.  As we have done in the past, I believe we would propose

2  that Ms. Denniston will go through the calendar in a few

3  minutes to at least advise the Court of certain things that

4  have either been resolved or may otherwise need to be rolled to

5  another hearing date.  Before I have Ms. Denniston go through

6  the calendars we have, I would like to announce, however, to

7  the Court that there are two matters on today's calendar which

8  are somewhat substantive in nature, but will not go forward

9  today for reasons which I'll state.  The first is the motion to

10 approve the Memorandum of Understanding as it relates to the

11 Class Action security settlement.  I'm trying to flip through

12 the docket to find out which item number that is.

13         THE COURT:  It's about 19 or 20?

14         MR. AUSTIN:  Nineteen, that's correct.  That's

15 correct, Your Honor, Item 19.  That will not go forward.  The

16 reason that will not go forward is two fold.  First off, Your

17 Honor, we did not finalize the actual stipulation of settlement

18 documents with Plaintiffs and get their signatures so we could

19 file it with the Court until mid to late last week.  In

20 addition, the primary objecting party to that is Harbert

21 Management.  And Harbert had asked that we -- if we could, pull

22 that matter to the next available hearing date, as the parties

23 may otherwise engage in settlement discussions that relate to

24 both that objection as well as to Harbert's issues in the

25 overall Bankruptcy Court.  So we are willing to do that.

8

1   Secondly, I believe there was on the motion to approve the
2   settlement with the Montana Public Service Commission and the
3   Montana Consumer Counsel.  That matter will not be going
4   forward today because one of the restrictions we put on
5   ourselves, not just the Debtor but the Public Service
6   Commission and Consumer Counsel, was that before that matter
7   would actually come on for substantive hearing, that we would
8   file the actual settlement document rather than just the
9   agreement in principle with at least five days notice.  We are
10  still working through that document as far as the details, Your
11  Honor.  We've exchanged drafts of the documents, and indeed we
12  have a draft and negotiation session tomorrow morning.  So we
13  are going to ask that that matter be rolled over to the next
14  available hearing date.  And I realize from the conversations
15  we had at the prior Net Exit hearing that there may be some
16  confusion from the calendar which we hope that we can clean up.
17      As it relates to the next hearing date, though, I can
18  advise the Court that I believe we had a July 14th hearing date
19  that was going to be an all-day trial for an adversary
20  proceeding initiated against Northwestern by Yellowstone Energy
21  Limited Partnership.  I can advise the Court that last week we
22  finalized settlement documents with Yellowstone Energy.
23  Yellowstone Energy is one of the primary contracting parties on
24  a qualified facility contract.  That amendment, we are
25  proposing to amend the qualified facility power production

9

1   contract, our purchasing agreement, which will lead to the
2   assumption of that agreement.  We have reached agreement on the
3   cure amounts on the assumption of that executory contract.  And
4   we've also reached settlement on an amount in dispute related
5   to an outage of the power production facility in October of
6   2003.  As a result, Your Honor, we will not need that entire
7   day on the 14th.  We will be filing, I believe early this week,
8   a motion to approve the assumption of that agreement as
9   modified, and the settlement as provided for the cure payments.
10  So I wanted to at least advise the Court that we have that
11  settlement in place, which is a major provision of going
12  through confirmation, and that as a result we may have some
13  possible time that was otherwise going to be reserved just for
14  that, that the Court may want to evaluate using to the next
15  hearing date for Northwestern.
16       In addition, Your Honor, I can announce to the Court --
17  which the Court will be seeing papers on this, this week --
18  we've also reached a settlement with the Coal Strip lessees --
19  excuse me, lessors, which will lead to the assumption of the
20  Coal Strip facility.  As the Court may recall, we had to enter
21  into a stipulation of cash collateral use with the Coal Strip
22  parties at the beginning of this case.  We have now reached
23  agreement to do such that we can assume that entire lease, and
24  that will address that transaction on a go forward basis.
25       And lastly, Your Honor, I can announce that we have

1   reached agreement to amend the IPESA credit facility to do a
2   couple of things.  First off is that we are going to reduce and
3   step down the amount of borrowing capability under that credit
4   facility to $50,000,000.  That credit facility we've been
5   slowly reducing it because the company's cash balance has
6   maintained itself, and has been substantial over the
7   $100,000,000 type level, so we're stepping down that credit
8   facility to save cash and basically expenses of the Estate.  We
9   also -- that facility when it was originally put in place was a
10  364 day facility.  We have reached agreement that to the extent
11  that we have not exited Chapter 11 at the maturity date, that
12  facility, that there can be a limited extension.  I believe
13  we've agreed to extend that to October 31 with a subsequent
14  extension from October 31 to December 31 if we need it for just
15  purposes of exiting Chapter 11.  We certainly hope that by the
16  time that the actual maturity date of the D-I-P facility comes
17  around, that we will be either close to exiting or have indeed
18  gotten to an effective date of a confirmed Plan, given that our
19  confirmation hearing is scheduled for August 25, and that at
20  that point we will have entered into a replacement credit
21  facility for exit purposes and working capital purposes on a
22  long-term basis.
23      With those announcements, Your Honor, because those I
24  think are at least from the Debtor's standpoint a fairly
25  substantial, significant developments as we are continuing the

1   process of moving to confirmation and trying to resolve

2   significant claims and Creditors' interest against the Estate,

3   at this point, Your Honor, I think that I'd have Ms. Denniston

4   now go through the calendar.

5       One last thing I'd like to note, Your Honor, is that at

6   the conclusion of today's hearing we would like to address the

7   concept of entering a Scheduling Order for discovery related to

8   confirmation hearing.  We've been having discussion with a

9   number of the interested parties that we've been having

10  discovery ongoing at this point, namely Wilmington Trust,

11  Harbert's counsel, counsel for the equity interest holders who

12  have indicated they still want us to supplement some discovery.

13  And the parties have gotten together and thought that it may

14  well be a good idea to at least set some time deadlines by

15  which people know that they have to respond to existing

16  discovery requests in the form of supplements, that timing --

17  that anyone's going to issue new discovery requests, the timing

18  for example of exchanging expert reports if expert reports are

19  going to be done, given that we have the summer here, and that

20  we have the confirmation hearing coming up on August 25.  So

21  I'd like to at least address the concept of subsequently after

22  today presenting an Order that deals with those type scheduling

23  issues following today's hearing, and upon certification that

24  we have discussed these with the counsel who are most

25  interested in these particular issues.  With that I'd like to

1    turn today's calendar over to Ms. Denniston.

2        THE COURT:  Thank you, Mr. Austin.

3        MS. DENNISTON:  Thank you, Your Honor.  With regard to

4    the amended notice of agenda, we turn to matter #1, the motion

5    of Deutsche Bank Trust Company Americas, as Indenture Trustee,

6    for Relief from Automatic Stay.  As the Agenda notes, we

7    request this matter be continued to July 21, 2004 at 3:00 p.m.

8    And I think we would request that be continued to the revised

9    Omnibus Hearing date.

10        THE COURT:  Which is July 15th at 10:30, I believe.

11        MS. DENNISTON:  That's correct, Your Honor.

12        THE COURT:  Now let's just talk for a moment here

13    about what kind of a calendar you expect on July 15.  The

14    reason I raise that is that if we're not going to have the

15    Yellowstone trial on the 14th, if you anticipate needing more

16    than an hour, we could move it to the 14th and have more time.

17    But if you assume that it will be basically within an hour, we

18    can leave it on the 15th.

19        MS. DENNISTON:  Your --

20        THE COURT:  But we now have options available we

21    didn't have before then.

22        MS. DENNISTON:  If I may, Your Honor, as we move

23    through the Agenda I'd like to note for the Court those matters

24    we think would be appropriate to move to the 14th, as the

25    matters where there's likely to be evidence presented, and

1  leave the other matters for just the standing Omnibus date.

2       (Pause in proceedings)

3       MS. DENNISTON:  Your Honor, Mr. Austin would like to

4  set everything for the 14th.

5       MR. AUSTIN:  If I may, Your Honor.  I think that

6  certainly with respect to the -- in anticipation of objections,

7  first off if we do not resolve the objections of Harbert, we

8  know we have an objection on the Class Action security

9  settlement which we will need to go forward on whatever date it

10  is.  And as it relates to the settlement with respect to the --

11       THE COURT:  Consumer Counsel?

12       MR. AUSTIN:  -- Montana Public Service Commission and

13  the Consumer Counsel, if we get similar objections then we'll

14  need some time.  So I would prefer, if it's acceptable, that we

15  have -- use the 14th for the Omnibus Hearing date, and make

16  adjustments as we need to as it relates to --

17       THE COURT:  So do we need to change the Net Exit one

18  to the same time?

19       MS. DENNISTON:  Yes, Your Honor, that would be --

20  given that there will be at least one motion, it'll be jointly

21  heard.

22       THE COURT:  Right.  What should we say, Rachel, 9:30?

23  Do you want to do it first thing in the morning?  Is that --

24       MS. DENNISTON:  Yes, Your Honor, please.

25       THE COURT:  Okay.  So we'll set then the next Omnibus

14

1  Hearing for July 14th at 9:30.  I'm assuming that the

2  settlement of the Yellowstone matter -- Yellowstone is correct,

3  right --

4          MS. DENNISTON:  That's correct, Your Honor.

5          THE COURT:  I keep thinking like Yellow Jacket or

6  whatever.

7          MS. DENNISTON:  Yellowstone or Yellow have been the

8  two --

9          THE COURT:  That Yellowstone is definitively settled

10  so we're not -- so we can in fact vacate that property.

11          MR. AUSTIN:  And on that, Your Honor, I can state for

12  the record it is definitely settled.  We've actually initialled

13  the settlement agreement, and a side letter.  And we have a

14  Form Motion which we will be filing.  We'll probably have to

15  give them at the hearing date of the 14th, ask for obviously

16  technically a shortening of time for response.  But we are

17  running through this with the Committee.  And the dollars are

18  pretty -- they were as submitted in the Yellowstone claim.  So

19  that's not a major issue.  But we -- that is a definitive

20  settlement.

21          THE COURT:  All right.  So we'll then move the next

22  Omnibus Hearing in the Northwestern matter to 9:30 on July

23  14th.

24          MS. DENNISTON:  Thank you, Your Honor.

25          THE COURT:  And we'll move the Net Exit Omnibus

15

1     Hearing that was set earlier today to the same date and time.

2          MS. DENNISTON:  Would -- just as a housekeeping

3     matter, does the Court want us to submit revised Orders of

4     those, or just bring notice to the Net Exit hearing?

5          THE COURT:  I would just re-notice it.  I don't think

6     you have to submit revised orders.

7          MS. DENNISTON:  Thank you, Your Honor.  Matter #2 then

8     on the Agenda is the Motion for Relief from the Automatic Stay

9     by Hydrodynamics.  We would request that this matter be

10    continued to the next Omnibus Hearing, July 14th at 9:30.

11         THE COURT:  So ordered.

12         MS. DENNISTON:  Matter #3, Your Honor, is the Motion

13    for Order Enforcing the Automatic Stay as against the Montana

14    Consumer Counsel and the Montana Public Service Commission.  As

15    Mr. Austin has indicated, this matter is tied to the proposed

16    settlement with the Public Service Commission and Consumer

17    Counsel.  And we'd ask that this matter be continued to a date

18    to be determined until we see whether or not the settlement is

19    approved at the July Omnibus Hearing.

20         THE COURT:  Well, should we set in effect a status

21    call on this in the July 14th hearing?

22         MS. DENNISTON:  That would be appropriate, Your Honor.

23    And then we can request a further continuance depending on what

24    the status is.

25         THE COURT:  Let's do that so that we keep it on

1  calendar and keep track of it.

2       MS. DENNISTON:  Thank you, Your Honor.  Matter #4 is

3  the Pre-Trial Conference regarding amended verified complaint

4  for declaratory, temporary and permanent injunctive relief.

5  The Debtor is requesting this matter be continued to the July

6  Omnibus Hearing.

7       THE COURT:  So ordered.

8       MS. DENNISTON:  Thank you, Your Honor.  Matter #5 is

9  the Motion for Order declaring the automatic stay inapplicable,

10 or for modification of automatic stay to permit prosecution and

11 payment of Workers' Compensation claim.  The parties are

12 requesting that this be continued to the July Omnibus Hearing.

13 We do have, Your Honor, though two stipulations and orders

14 which have been filed with the Court in connection with this

15 matter.  But the Court's signature is needed on the Orders

16 attached thereto.

17     (Pause in proceedings)

18       THE COURT:  I've signed the Orders.

19       MS. DENNISTON:  Thank you, Your Honor.  Item #6 is the

20 Debtor's Sixth Omnibus Objection to claims.  And we'd like to

21 move all the claims matters to the end of the docket.  And Mr.

22 Chipman will be handling those.

23       THE COURT:  All right.

24       MS. DENNISTON:  Matter #7 is the Debtor's Seventh

25 Omnibus Objection.  Matter #8 is the Eighth Omnibus.  And

17

1  Matter #9 is the Debtor's Objection to duplicative claims.  And

2  we would like to move matters 7, 8 and 9 as well to the end of

3  the docket.

4         THE COURT:  So ordered.

5         MS. DENNISTON:  Thank you, Your Honor.  Matter #10 is

6  the Debtor's Motion for Order pursuant to Bankruptcy Rule 9019

7  approving settlement with American Electric Power Company.  A

8  Certificate of No Objection was filed on June the 14th.  We've

9  received no objections or responses, and we'd request that the

10  Order be entered.

11         THE COURT:  Anyone wish to be heard in connection with

12  Item #10?  Apparently not.  I'll sign the Order.

13         MS. DENNISTON:  Thank you, Your Honor.  Matter #11,

14  Your Honor, is the Motion of the Debtor for an Order pursuant

15  to Federal Rules of Bankruptcy Procedure 1015(b) directing

16  joint administration.  This is the companion Order to the Net

17  Exit joint administration Order.  Certificate of No Objection

18  was filed on June 14th.  And we'd request that the Order be

19  entered at this time.

20         THE COURT:  I'll sign the Order.

21         MS. DENNISTON:  Thank you, Your Honor.  Matter #12 is

22  the Debtor's Motion for an Order pursuant to 11 U.S.C. Section

23  1121(d) extending the exclusivity period.  The Certificate of

24  No Objection was filed on June 14th.  And the Debtor would

25  request that the Order be entered at this time extending

18

1    exclusivity to and including September 30, 2004.

2            THE COURT:  Anyone wish to be heard in connection with

3    the exclusivity motion?  I'll sign the Order.

4            MS. DENNISTON:  Thank you, Your Honor.  Matter #13 is

5    a Motion for an Order authorizing the examination of certain

6    documents pursuant to Bankruptcy Rule 2004, filed by Richard

7    Hylland.  And I believe Mr. Hylland's counsel is here today,

8    Your Honor.

9            MR. DEMMY:  Good afternoon, Your Honor.  John Demmy of

10   Stevens & Lee on behalf of Mr. Hylland.  Your Honor, there is

11   not any opposition to this motion.  I have an Order that I'd

12   like to present to the Court that I've shared with counsel for

13   the Debtor.  This simply grants the motion.  It's extremely

14   vanilla.  I would add, Your Honor, that in addition to that

15   Order we have had discussions, part of which would be

16   implicated by the procedural order that Mr. Austin referred to.

17   Some of the documents that we have requested are similar or the

18   same as some of the other parties that he mentioned.  So we're

19   willing to abide by that Order.  I've seen some drafts of it.

20   I expect we'll see some more perhaps.  There are some other

21   documents that are what we call Hylland specific documents.

22   And I think the Debtors are prepared to produce those by July

23   15th.  This Order does not have any of that in it, but I felt

24   that to keep this Order simple and to make those

25   representations on the record would be the easiest way to deal

19

1   with the issues.

2        THE COURT:  All right.  Let me see the Order.

3        (Pause in proceedings)

4        MR. DEMMY:  And, Your Honor, I would represent that

5   the two-page exhibit, the list of documents, are the same that

6   was attached to the motion.  And it has a date in there, I

7   think, that we've agreed to live by some other dates perhaps,

8   especially for the Hylland specific documents.  But we just

9   took that exhibit unchanged, and put it into he Order.

10       THE COURT:  All right, thank you.  I've signed the

11  Order.

12       MR. DEMMY:  Thank you, Your Honor.

13       MS. DENNISTON:  Matter #14, Your Honor, is the

14  Debtor's Motion for Order approving stipulation and settlement

15  among the Debtor, Montana Public Service Commission and Montana

16  Consumer Counsel.  The Debtor has requested this matter be

17  continued to the next Omnibus Hearing.

18       THE COURT:  All right, July 14th at 9:30.

19       MS. DENNISTON:  Thank you, Your Honor.  Matter #15 is

20  the Committee's application for an Order approving the

21  retention and employment of Russell Reynolds.

22       MS. PHILLIPS:  Good afternoon, Your Honor, Margaret

23  Phillips of Paul, Weiss, Rifkind, Ward & Garretson on behalf of

24  the Committee.  This is an application seeking an Order to

25  retain Russell Reynolds Associate, Inc. nunc pro tunc as search

1 consultants to assist the Committee in identifying and

2 recruiting candidates for the six director positions on the

3 Board of Directors of the Reorganized Debtors, as proposed by

4 the Plan, in accordance with the letter agreement attached to

5 the application as Exhibit B.  There have been no objections.

6 The U.S. Trustee has raised some concerns with respect to

7 filing a fee application.  And the parties have agreed to do

8 so.  And I have revised the Order to reflect that.  Does the

9 Court have any questions?

10        THE COURT:  I have no questions.  Anybody else wish to

11 be heard?

12        MR. AUSTIN:  Your Honor, just for the record, the

13 Debtor supports the retention by the Committee of Russell

14 Reynolds for the purposes of helping to determine the list of

15 new directors on a go forward basis.  As the Court may be aware

16 in our Reorganization Plan the Debtor is actually required to

17 file -- I can't remember the exact dates -- but we were

18 required to file notice of who those directors are irrespective

19 of the requirements under 1129(a).  So that we encourage the

20 Committee to engage Russell Reynolds and to move expeditiously.

21        THE COURT:  All right, thank you.  Do you have a Form

22 of Order?

23        MS. PHILLIPS:  Your Honor, I've included a blackline

24 to reflect the changes.  It's different than the Order that had

25 been filed with the application.

21

1    (Pause in proceedings)

2    THE COURT:  I've reviewed the blacklined Order, and

3    I've signed the original.

4    MS. DENNISTON:  Thank you, Your Honor.  Matter #16 is

5    the Debtor's Motion for an Order pursuant to Rule 9019

6    approving settlement agreement among Debtor, Clark Fork and

7    Blackfoot, and Atlantic Richfield Company.  This matter is

8    related to Matter #20 on the docket.  And we would like to come

9    back to that, Your Honor, after we've finished with running

10   through the docket.

11   THE COURT:  Okay.

12   MS. DENNISTON:  Matter #17 is the Debtor's First

13   Omnibus objection to claims.  And Matter #18 is the Debtor's

14   Second Omnibus objection.  We would like to continue to the end

15   of the docket matters related to claims.

16   THE COURT:  So ordered.

17   MS. DENNISTON:  Matter #19 is the Motion to Approve

18   Memorandum of Understanding pursuant to Bankruptcy Rule 9019.

19   This matter the Debtor has requested be continued to the July

20   Omnibus Hearing.

21   THE COURT:  So ordered.

22   MS. DENNISTON:  Thank you, Your Honor.  Matter #20 is

23   related to Matter #16.  And we would request that we continue

24   that 'til we've completed running through the docket.

25   THE COURT:  All right, so ordered.

1    MS. DENNISTON:  Thank you, Your Honor.  Matter #21 is

2    a standard pursuant to Section 328(c) regarding Paul, Hastings,

3    Janofsky & Walker, filed by Magten.  We'd like to put that at

4    the end of the docket, Your Honor.

5    THE COURT:  All right.

6    MS. DENNISTON:  Matter #22 is the Debtor's Fifth

7    Omnibus Objection.  Matter #23 is the Debtor's Ninth Omnibus

8    Objection.  We'd like to move matters 22 and 23 to the end of

9    the docket when all of the claims will be -- matters relating

10   to claims will be addressed.

11   THE COURT:  So ordered.

12   MS. DENNISTON:  Thank you, Your Honor.  Matter #24 is

13   the joint motion for an Order pursuant to Section 105 of the

14   Bankruptcy Code directing that certain orders entered in the

15   Chapter 11 case of Northwestern be made applicable in the Net

16   Exit bankruptcy case.  This is the companion order to the Order

17   the Court recently entered, or just entered in the Net Exit

18   case.  There were no objections filed, and we would request

19   that the Order be entered at this time.

20   THE COURT:  Anybody wish to be heard in connection

21   with Item #24?  Apparently not.

22   MS. DENNISTON:  The last matter, Your Honor, on the

23   Agenda is the status conference regarding confirmation hearing

24   that Mr. Austin referred to in his introductory remarks.  We'd

25   ask at the end of the hearing that we be able to give an

1  overview of that proposed Order so that it could be hopefully

2  circulated.  And with that, Your Honor, that concludes the

3  Agenda but for two minor housekeeping details.  At some point

4  in March, a matter identified as <u>Northwestern Energy, LLC,</u>

5  <u>formerly Montana Power Company vs. The National Union Fire</u>

6  <u>Insurance Company of Pittsburgh</u> was transferred to this Court.

7  And the Debtor was just made aware of that transfer.  We have

8  pulled a copy of the docket showing that the Order of Transfer

9  from the U.S. Bankruptcy Court in Montana was signed on March

10  18, 2004.  Since this matter has laid dormant, and the Debtor

11  has just learned of it, we would ask the Court if it would be

12  appropriate for us to provide a Scheduling Order or inquire as

13  to the Court's preference as to how the Debtor would proceed.

14      THE COURT:  What about the other parties?

15      MS. DENNISTON:  I wish I had an answer for Your Honor,

16  but in all candor I have a docket and the notice of transfer.

17  I have not spoken with the other parties yet.

18      THE COURT:  What is this case exactly again?

19      MS. DENNISTON:  That, Your Honor, I would have to

20  defer to our counsel in Montana who is actually an in-house

21  company lawyer who unfortunately I didn't have the benefit to

22  speak with him other than to get a question, could we find out

23  about whether the transfer had been effectuated.

24      THE COURT:  So why don't we put this on for a -- this

25  is an adversary proceeding.  Correct?

24

1    MS. DENNISTON: Yes, Your Honor, it would take the
2  nature of an adversary proceeding.

3    THE COURT: Let's put it on for a Rule 16(b)
4  conference next time.

5    MS. DENNISTON: Okay.

6    THE COURT: You can meet with counsel between now and
7  then, and come up with a proposal. Also part of the proposal
8  should also be whether this is a case that I should keep, or
9  this is a case that I should transfer to Judge Lindsay, as
10  that's who is handling most of the adversary proceedings that
11  arise, or whether this is integral to the confirmation of the
12  Plan, so it's something that I ought to keep here. I'd like to
13  have advice on that too once you've had a chance to consult.

14    MS. DENNISTON: Thank you, Your Honor. The other
15  housekeeping details is with regard to the Motion to Lift Stay
16  filed by Mr. Hylland that was heard at the May Omnibus Hearing.
17  It's come to our attention that the Order for whatever reason
18  denying the motion was not submitted. And we would like just
19  to hand up the Order at this time.

20    (Pause in proceedings)

21    THE COURT: All right. Has this been shared with Mr.
22  Hylland's counsel?

23    MS. DENNISTON: Yes, Your Honor.

24    THE COURT: I've signed the Order.

25    MS. DENNISTON: Thank you, Your Honor. With that,

25

1  going back to the docket just to summarize for the record, we

2  have Matters 16 and 20 which relate to Milltown Dam that we'd

3  like to turn to next.  That would leave Matter 21, which is the

4  328 notice filed by Magten, and the following matters which

5  relate to claims that will be handled by Mr. Chipman, Matter 6,

6  7, 8 and 9, 17 and 18, and 22 and 23.

7         THE COURT:  Okay, let's move to the Milltown Dam

8  matters then.

9         MS. DENNISTON:  Thank you, Your Honor.  There are two

10 motions related to issues surrounding Milltown Dam, Your Honor.

11 They've been the initial motion which was the settlement

12 between the Debtor and ARCO that was filed months and months

13 ago.  And there were a number of objections as the amended

14 notice of agenda reflects to that motion.  And reviewing those

15 objections, the Debtor determined that it was in the Bankruptcy

16 Estate's best interest to see if a number of those objections

17 could be resolved by reaching what the Debtor has referred to

18 as a global settlement.  That global settlement was

19 subsequently reached, which resulted in the subsequent matter,

20 which is Matter #20 on the docket, which is the stipulation of

21 settlement between ARCO, the Department of Justice, and the two

22 Indian tribes.  And it is the Debtor's position as supported by

23 all the parties to the second motion that this is or

24 constitutes what is the closest thing to a global settlement on

25 these environmental issues for Milltown Dam as the Debtor can

1  effectuate at this time.

2      Throughout the settlement papers that have been presented

3  it's important to note that this is a process that has to be

4  brought in tandem and in parallel with other statutes that

5  impact what's known as the Final Decree.  And keeping in mind

6  that we had a bit of a chicken and egg problem in resolving a

7  fairly complicated dispute that involves a number of parties,

8  the Debtor, along with the support of the parties that are

9  before the Court today on this motion, needed to get Bankruptcy

10  Court approval in order to proceed to the Final Decree.  And

11  the papers reflect -- the actual agreement in the settlement

12  and the stipulation reflect that this proposal being made

13  today, and that we seek the Court's approval -- and we'll get

14  into the details in just a bit -- is contingent upon the

15  Debtor's ability to get acceptable releases.  And those would

16  be releases for all of the parties in the Final Decree.  I have

17  Mike Young here on behalf of the company, who will testify to

18  the factual statements made in the Debtor's pleadings regarding

19  the terms of the settlement, the financial and other

20  accommodations being made to ARCO, the negotiations that have

21  gone on in terms of dealing with a multi-faceted dispute.

22  Counsel for the Department of Justice is here, Your Honor, to

23  speak to the claim filed in the Debtor's Estate, the Debtor's

24  direct liability from the Department of Justice's perspective,

25  and why the settlement is an appropriate settlement for this

1  time.  And ARCO's counsel is here to speak on ARCO's position

2  regarding the settlement, and the claims ARCO filed.

3      What we would propose to do, Your Honor, is to do a brief

4  overview.  And then if the Court were inclined or counsel that

5  have filed objections are inclined, present the testimony of

6  Northwestern's witness, Mr. Michael Young, and then proceed

7  there with argument.  But I think the Court would benefit from

8  an overview from the parties to the settlement.  I know that we

9  also have on the telephone counsel for the State of Montana and

10 the two Indian tribes.  Suffice it to say, Your Honor, the

11 Debtor is seeking a combined Order today approving both the

12 stipulation of settlement and the underlying settlement

13 agreement, so that it can proceed to the next phase, which

14 would be the Final Decree.  The Final Decree is subject to a

15 whole series of rules that require public notice, and a

16 hearing, and review by Federal District Court with the

17 opportunity for parties to object to those documents.  So

18 there's full notice and then hearing on the last phase of this.

19 But in order to get to that phase, the parties were unwilling

20 to continue to proceed with the Debtor in the absence of a

21 Bankruptcy Court Order saying if you can get to acceptable

22 releases, both for the Debtor and Clark Fork, then this Final

23 Decree would be appropriate.

24      So we have decided that in the interest of time and

25 looking at the magnitude of the claims asserted in this

Bankruptcy case by ARCO, the Department of Justice, the State
of Montana, and the Indian tribes, that this was the most
efficient and effective way to proceed.  All the parties to the
stipulation of settlement are committed to moving as quickly as
possible through the Final Decree process.  A Final Decree is
being circulated between and among the parties, but has not
been finalized.  And as soon as it is and is prepared to go
through that process, it will of course be filed, and notice
will be given.

The relief today we seek is the relief simply to approve
these with the contingency that the Final Decree has to meet
the requirements of the Debtor and Clark Fork, as well as all
of the other parties thereto.  And that when that Final Decree
is filed, there would be a notice filed in the Bankruptcy case,
but that we be allowed to proceed on that basis.  With that, I
think it would be appropriate, unless the Court would request
otherwise, that we at least let opening statements be made by
ARCO and the Department of Justice, as well as the State of
Montana.  And then we can proceed with the evidence as the --
deems appropriate.

THE COURT:  What are the live objections that are
left?

MS. DENNISTON:  Your Honor, the live objections that
are left, if we turn to Matter #20 you'll see that we have an
objection that was filed by Magten.  And I have spoken to the

1    substance of Magten's objection, which is the scope of the

2    releases.  And that is an objection that is a bit untimely, and

3    also ties to the gating issue that I refer to, simply this.

4    The scope of those releases that are going to be in the Final

5    Decree are the subject of extensive negotiation between and

6    among all the parties to the Final Decree.  And the Debtor made

7    the motions and the orders contingent upon those releases being

8    acceptable.  We can't circulate information about that until

9    the Final Decree has been negotiated.  So again we're back to

10   the chicken and egg problem.  The limited response of Touch

11   America is -- paragraph 10 of their limited response is to

12   preserve substantive and procedural rights and defenses that

13   may ultimately -- that might be asserted in a defense against a

14   separate claim for indemnification.  Those are issues that can

15   be more appropriately addressed in the context of the claims

16   that Northwestern has filed in the Touch America bankruptcy

17   case, as opposed to having any direct impact on this motion

18   today.  As well as the other sentence that I think is telling

19   is that they do not otherwise take a position with the

20   underlying benefit or merits on the stipulation.  The

21   stipulation is the document that ties this together and creates

22   what we're viewing as a global settlement.  So I think that

23   that kind of addresses Touch America's earlier objection, which

24   is identified on the docket on Matter #16.  They filed also a

25   limited response.

1    On the earlier matter, we received objections from the

2 United States, the State of Montana.  And those objections have

3 been resolved as a result of reaching agreement on stipulation

4 of settlement.  And the last one is we received an objection by

5 Harbert Management which in sum and substance of that objection

6 was the fact that this was not a global settlement.  And until

7 there was a global settlement, the benefit of the Estate

8 couldn't be appropriately analyzed or ascertained.  In

9 connection with Harbert's earlier objection, the Debtor

10 produced telephone interviews with Mr. Young who will be

11 testifying today if needed, and also provided documents.  And

12 Harbert did not file an objection to the motion to approve the

13 stipulation, which is the master settlement.  So it's the

14 Debtor's position that that objection has now been deemed moot.

15 And that's it.

16    MR. DONNELL:  Your Honor, this is Jim Donnell for

17 Harbert.  I can substantiate that we did engage in discussions

18 with the Debtor prior to the time that the global settlement

19 was reached.  The Debtor during those discussions extended the

20 deadline.  We did not file any objection to the global

21 settlement, and have no objection at this time.  So that is

22 resolved from Harbert's standpoint.

23    THE COURT:  All right, thank you.

24    MS. DENNISTON:  To summarize, Your Honor, I think that

25 leaves one live objection, assuming that the Touch America