1  objection is limited to a claims resolution issue which can be

2  addressed in Touch America's bankruptcy case.  And I think

3  that's their position as well if one reads the substance of the

4  last paragraph of their objection.  Two, the Magten objection

5  on the scope of the releases.  And I think that's a premature

6  issue, Your Honor, that will have to be addressed through the

7  approval of the Final Decree process.  And with that I think I

8  would turn it over to the Department of Justice, Your Honor.

9           MS. SABO:  Your Honor, my name is Kim Sabo.  I'm with

10  the United States Department of Justice, and I represent the

11  United States of America.  I am not a member of the Delaware

12  bar, but I did file certification this morning pursuant to

13  Bankruptcy Court Local Rule 9010, subsection (c)(2), stating

14  that I am an admitted member of another Distrct Court, and I

15  will be subject to the Local Court Rules and any disciplinary

16  hearings or proceedings of this Court.

17           THE COURT:  Thank you.

18           MS. SABO:  I'd like to make a brief statement about

19  first the United States' arguments on the direct liability of

20  Northwestern, and then secondly on why the United States thinks

21  that this stipulation is not premature at this time.  First as

22  far as direct liability, the United States filed a proof of

23  claim stating that there are approximately more than

24  $14,000,000 in past costs, and possibly more than $95,000,000

25  of future response actions that Northwestern would be liable

1  for under the Comprehensive Environmental Response Compensation

2  and Liability Act, CERCLA, Section 107. And in our proof of

3  claim we made various statements as to why the corporate

4  structure of Clark Fork and Blackfoot, LLC does not provide

5  adequate limited liability protection for Northwestern. First,

6  because the LLC is a mere alter ego of Northwestern. And

7  secondly, if the Court were to determine that in fact the LLC

8  and Northwestern are separate entities, the United States would

9  argue in the alternative that the transferred substantial

10  assets on November 15th, 2002 was a fraudulent conveyance under

11  the Federal Debt Collection Procedures Act. And I can go into

12  more detail on those arguments if the Court would like. No,

13  okay.

14      And there is also -- there was a -- there exists a

15  specific exemption that was part of a public law passed in some

16  amendments to the Super Fund Act. It's specifically Section

17  118(g) of CERCLA. And it gives a very narrow area of liability

18  exemption to the owners and operators of the Milltown Dam. The

19  United States does not believe this exemption applies, because

20  the exemption is narrowed to only contaminated hazardous

21  substances that were released upstream of the reservoir, and

22  have come to be located in the reservoir. This exemption does

23  not apply to activities of the LLC's predecessor whereby they

24  bridged the sediments in the reservoir, and disposed of them

25  upon adjacent land into an area known now as the Upland Land

1  Disposal Area, which is going to have to be cleaned up as part

2  of the site.  And thus that relieves -- that exemption is not

3  effective.

4     Finally I'd like to make a statement as to why the United

5  States thinks that the stipulation is not premature as of this

6  time.  Currently negotiations for the Final Consent Decree are

7  proceeding in good faith.  But if the Final Consent Decree is

8  not reached or entered, the stipulation and settlement

9  agreement will be voided, and thus not harm the Creditors.

10 Secondly, if the Creditors, especially Magten, is concerned

11 about the fairness of the releases that will be in this future

12 Consent Decree, there's another forum for them to bring up

13 these concerns, specifically under 28 C.F.R. Section 50.7, the

14 Final Consent Decree will be subject to 30 days public notice

15 and comment, at which time Magten could submit a comment.  The

16 Consent Decree would then be reviewed by the District Court of

17 the District of Montana, under the 9th Circuit standard which

18 requires any Consent Decree -- the Judge to review it for

19 fundamental fairness and to make sure that it's adequate and

20 reasonable.  So we think that there's an adequate forum for

21 Magten's objection in the future.

22     THE COURT:  Walk me through that again, in terms of

23 the process.  Let me just restate it and see if I understand

24 it.

25     MS. SABO:  Right.

34

1          THE COURT:  If I understood what Ms. Denniston

2   correctly, she said some of the parties, who I take to be the

3   United States and/or the State of Montana or its various

4   agencies, are reluctant to continue to the next stage of trying

5   to negotiate the extent of these releases and some of the other

6   final details, in the absence -- because they were dealing with

7   a Chapter 11 Debtor in the absence of in effect an Order from

8   the Bankruptcy Court authorizing them to do so or approving the

9   overall nature of this agreement subject to those releases

10  being approved.  Now, let's say that you negotiate releases

11  that are satisfactory to all the various parties.  How then

12  does -- explain to me again how then does a party to this case

13  who may think that the releases are inadequate for some reason,

14  that they are not sufficient to constitute a global settlement,

15  that there's remaining liability for the Estate that should

16  have been part of the release for example, raise that concern?

17  And how does that then get addressed?

18          MS. SABO:  Okay.  Once a Consent Decree is signed by

19  all of the parties, the Department of Justice is required

20  pursuant to 28 C.F.R. Section 50.7 to publish the Consent

21  Decree, notice of the Consent Decree, in the Federal Registry,

22  and to have a period of 30 days of public notice and comment

23  under which anyone can submit comment.  And that would include

24  Magten or anyone else --

25          THE COURT:  So that --

1          MS. SABO:  -- who had a concern.

2          THE COURT:  Somebody who lives in Milltown, who

3    doesn't like the deal, or --

4          MS. SABO:  Correct.

5          THE COURT:  -- someone who lives somewhere in western

6    Montana, as well as somebody who may have a financial interest

7    in the transaction, such as a Magten or a Harbert or somebody

8    like that.

9          MS. SABO:  Correct.  If comments are submitted, then

10   the United States would provide a response to those comments in

11   its motion to the Court for entry of the Consent Decree,

12   stating why those -- you know, responding as to why those

13   comments are not a reason to bar entry of the C.D.  And the

14   Judge -- the District Court Judge is then supposed to review

15   the Consent Decree under a standard set forth in United States

16   vs. The State of Oregon at 913 F. 2nd. 576 at page 580, in the

17   9th Circuit in 1990, that requires the Judge to find that the

18   Consent Decree is fundamentally fair and adequate and

19   reasonable.  And that would include a review of any of the

20   release provisions.

21         THE COURT:  All right.  Now is there ever any -- is

22   this the one and only approval process that goes on in the

23   Bankruptcy Court?  I'm kind of looking at Ms. Denniston there.

24         MS. SABO:  If I  may, Your Honor, generally after it

25   is approved by the District Court, then we bring it to the

1   Bankruptcy Court for approval. In some cases we've had

2   Bankruptcy Court approval first, and then District Court

3   approval. And I'm not sure if there's a standard method for

4   that.

5           THE COURT: Well, so then after the Consent Decree is

6   approved by the District Court, it comes back here? Or this is

7   the approval, then it goes to the District Court, then its

8   final? I'm just trying to understand the order and the

9   process.

10          MS. DENNISTON: If I may, Your Honor, the procedure

11  that the Debtor is proposing at this juncture is that we could

12  get approval today based on the contingencies set forth in the

13  docket. That we would file the notices -- that when this goes

14  out for public comment that we would file notices in this case,

15  and circulate to those parties copies of the Decree so that the

16  Bankruptcy Estate would have given notice that this was going

17  through the public comment. We expect that the public comments

18  to be made by any of the Creditors to this Estate through that

19  initial process, because it doesn't seem appropriate to burden

20  the Estate twice. In the event that there are issues raised

21  through that public comment, then we would bring this back to

22  the Bankruptcy Court for approval after the Federal District

23  Court had approved it. In other words it's the Debtor's hope

24  that the releases will be satisfactory. And in the event that

25  no one raises objections or comments during the comment period,

37

1   if there are no comments, we wouldn't envision bringing it

2   back.  If there are comments, we would be bringing it back to

3   this Court.

4       THE COURT:  Based on those comments as opposed to

5   based upon objections actually filed in the Bankruptcy Court

6   docket.

7       MS. DENNISTON:  That's correct, Your Honor.  I think

8   that given the work that the Debtor has put into this to be

9   here today with all of these parties, that it would be

10  unnecessarily burdensome to relitigate those issues.

11      THE COURT:  Although what I hear you saying is that --

12  let's say that the scope of the release is not satisfactory to

13  Magten.  Just assume that when we get to the end of the day,

14  they don't think it's a satisfactory release.  So they file a

15  comment that goes to the -- under the C.F.R. provision that

16  then goes to the District Judge, as part of the approval of the

17  Consent Decree.  Let's say hypothetically that the District

18  Judge decides that this is a fundamentally fair provision, the

19  releases are fundamentally fair, and therefore he approves them

20  over the objection of Magten.  My question is then do we have

21  another hearing here where Magten comes back again and says to

22  me, "Well, it was approved by the District Judge.  But now we

23  want to approve it under a different standard in the Bankruptcy

24  Court too."  Yes or no?  I'm just trying to understand.

25      MS. DENNISTON:  I think, Your Honor, I can't speak to

1  whether and what Magten might do under that issue.  But I would

2  tell you that the Debtor's position is that they would have the

3  right to file that motion.  And the Debtor would be arguing

4  squarely that we have to give deference to the findings of fact

5  by the Federal District Court Judge in Montana who has

6  jurisdiction at that point.

7           THE COURT:  We don't really know what's going to

8  happen.  And --

9           MS. DENNISTON:  You're right, Your Honor.  I can't

10  predict the future.

11          THE COURT:  So we're sledding down a somewhat unknown

12  path here.  But the basic premise is that we need to get this

13  ball rolling.  And the way to get the ball rolling so that you

14  can go to the next stage to negotiate the releases is by

15  getting the contingent approval today.

16          MS. DENNISTON:  That's correct, Your Honor.  And I

17  think with the awareness of everyone, particularly the Debtor's

18  willingness to provide notice of when this goes out to comment,

19  that there is a process that provides due process and notice to

20  any Creditor or other party that wants to comment.

21          THE COURT:  All right, thank you.  All right, Ms.

22  Sabo, I'm sorry to interrupt you.  Do you have more?

23          MS. SABO:  No, that was it.

24          THE COURT:  All right, thank you.  Do we have -- who

25  else do we have?  Okay, come forward, counsel, thank you.

1    MR. MONACO: Good afternoon, Your Honor, Frank Monaco

2  for the State of Montana. Your Honor, the State of Montana

3  also supports the settlement motion. We filed a proof of claim

4  asserting theories of direct liability against the Debtor in an

5  amount of $135,000,000. Many of our theories and claims and

6  rights that we assert in the proof of claim overlap or are

7  similar to those the Department of Justice sought. I'll adopt

8  Ms. Sabo's comments with respect to all the reasons why this

9  should be approved. The only thing I would like to add is that

10  the Debtor is going to make a $3.9 million payment, as well as

11  transfer certain land and water rights to the State of Montana

12  in return for a release from this liability subject to the

13  conditions that Ms. Denniston put on the record earlier. Thank

14  you.

15    THE COURT: All right, thank you.

16    MR. CURLEY: Good afternoon, Your Honor, Richard

17  Curley of Holland & Hart in Denver, representing Atlantic

18  Richfield Company. Your Honor, I won't repeat, but will

19  instead adopt the liability arguments described by Ms. Sabo

20  today. I guess I would like to add that as my client as a

21  party that has been in negotiations with Northwestern and its

22  predecessor, the Montana Power Company, for years now, has

23  worked out as of September 10th, 2003 a second settlement

24  agreement. It replaced a prior settlement agreement that was

25  voided by its own terms because of the nature of the remedy

1    that EPA has indicated that it will select.  But it's a party

2    nonetheless that has spent years in negotiations with

3    Northwestern, and has now been in negotiations with the

4    Government parties, including the tribes and Northwestern since

5    late 2002.  It is most anxious to get some indication from Your

6    Honor today that we are on a path that will be acceptable.  And

7    so my client would urge the Court that far from being

8    premature, that some indication is very much necessary.  We're

9    incurring -- my client is incurring very substantial costs in

10   these negotiations of the Consent Decree in Montana, as of

11   course are the other parties.  So we certainly strongly argue

12   that this motion is not premature.  To give you --

13            THE COURT:  Now your client operates the facility in

14   Anaconda.  Is that right?

15            MR. CURLEY:  Well --

16            THE COURT:  And is that where -- and also if I read

17   the papers right, there is a large mine in Anaconda, and that

18   there's also a facility in Butte.  Is that right?

19            MS. CURLEY:  Your Honor, the mine which my client no

20   longer owns is in Butte.  A portion of the mine is currently

21   operated by another party that's not really relevant though to

22   the Milltown matter, which is about 125 miles away.  And there

23   is a smelter -- well there was a smelter, I should say, that

24   was operated in Anaconda until the summer of 1980.  And that's

25   now closed.  My client is in the process of remediating the

1  Butte and Anaconda areas under EPA's oversight and direction,

2  as well as the oversight and direction of the State of Montana,

3  Department of Environmental Quality.

4      At the Milltown site, Your Honor, Atlantic Richfield has

5  spent as of September 2003, as indicated in our proof of claim,

6  approximately $14.2 million on CERCLA response costs.  And they

7  continue to spend substantial sums -- and their insurer, I

8  should say, under a confidential insurance agreement, continues

9  to spend substantial sums on remedial design with respect to

10 the likely remedy to be selected by EPA.  In addition to that,

11 in EPA's April 2003 proposed plan, they indicated that remedial

12 costs for the Milltown site would be between 90 and

13 $150,000,000.  That number is still in flux.  I think in the

14 most recent revised proposed plan issued by EPA about a month

15 ago, that number has come down somewhat.  And my client is

16 certainly hoping to be able to remediate this site for less

17 than 90 to $150,000,000.  But even if it were successful in

18 that attempt, it's going to cost in excess of $50,000,000

19 certainly to remediate this site.  As you may know, Atlantic

20 Richfield filed in January of this year a proof of claim in

21 this matter for between 104,000,000 and $164,000,000 for the

22 Milltown site.

23      I guess the only other thing, Your Honor, is a minor

24 housekeeping matter.  We wanted to point out that in the second

25 sentence of footnote 5 of Northwestern's motion there is an

1  indication that we and the Government agencies, both the EPA

2  and the Montana DQ have agreed to modify the proposed remedy.

3  And although we are in confidential discussions about the

4  integration of certain restoration measures with remediation

5  measures, we have not agreed with the agencies to modify the

6  remedy.  They don't usually make it a practice, frankly, to

7  consult with my client about agreed upon changes to remedies.

8  They're the agencies that decide what the remedy will be.  And

9  as I say, we are in certain discussions about the integration

10 of CERCLA remediation with CERCLA restoration.  But we wanted

11 to on the record state that we have not made any agreements

12 with the Government agencies on that point.  I have nothing

13 further.

14         THE COURT:  All right, thank you.

15         MR. KAPLAN:  Good afternoon, Your Honor, Gary Kaplan

16 of Fried, Frank, Carr, Schreiber & Jacobson on behalf of

17 Magten.  Your Honor, I'll be very brief.  The issues that

18 Magten has, as were stated before by Ms. Denniston, is that the

19 releases are being left to chance.  One of the issues that's

20 being settled right now, as we heard from Ms. Sabo, is the

21 Government's contention that the transfer of assets from Clark

22 Fork up to Northwestern is a fraudulent transfer.  That was one

23 of the claims that was being raised.  We now have as part of

24 this global settlement the Debtor saying, "Well, you know,

25 yeah, we're fighting that issue with Magten.  Now we're going

1  to be fighting that with the grieving Plaintiffs.  Got to

2  settle this issue with the U.S. Government, because it's not a

3  great fact to have the U.S. Government joining in and saying

4  yes it is a fraudulent transfer."  And the problem that that

5  raises for Magten is we now have the Debtor with great

6  incentive to get this issue settled.  They don't want to have

7  that issue see the light of day.  And they're going to settle.

8  And we're being told, "Trust us.  We'll get releases that are

9  acceptable to everybody.  If you don't like it, well there's a

10  Federal Register.  You can file something there and, you know,

11  fight about it in Federal Court in Montana."

12      Your Honor, that's not the way this Chapter 11 case should

13  run by the Debtors.  We've heard from -- if I understood

14  correctly, what's being said by the other parties here is that

15  they're looking for some comfort from the Debtor.  I didn't

16  hear each one get up and say, "Unless we get blanket approval

17  today for whatever settlement we want -- unless we get that

18  blanket approval, we're walking away."  I heard statements such

19  as, "We need some comfort."  I heard from the U.S. that, "Well,

20  in different cases it's done differently.  Sometimes they do it

21  in the procedure that the Debtors have suggested.  And

22  sometimes they do it where they come back to the Bankruptcy

23  Court later on after approval."  And all we're asking for today

24  is let them come back to the Bankruptcy Court.  Once they've

25  fully negotiated, and they say what the releases are, they can

1  come back.  And maybe as with Harbert -- they've resolved their

2  objection.  Maybe they'll have resolved our objection.  But we

3  should not be prejudiced and have to sit by and our only

4  recourse is to file something on the Federal Register, and then

5  go before a Judge in Montana who's gonna look at us with no

6  understanding of the context of this case, or the fact that

7  Creditors, you know, having rights as the Bankruptcy Court

8  understands, and counsel for the Parties-In-Interest being

9  allowed to be heard.  It's just -- Magten doesn't believe that

10  it's appropriate that we have to go through those hoops.

11       THE COURT:  Okay.  Do you wish to cross examine any

12  witness on behalf of Northwestern?

13       MR. KAPLAN:  Don't wish to cross examine any

14  witnesses.  The one item that we'd like to take representation

15  of counsel on is that Clark Fork is being separately

16  represented in these negotiations.  I'd just ask that they make

17  a representation as to that effect.

18       MS. DENNISTON:  Your Honor, we're not making that

19  representation because right now Clark Fork is being

20  represented by Northwestern.

21       MR. KAPLAN:  I don't need to cross examine him.

22  That's sufficient.

23       THE COURT:  Okay, Ms. Denniston.

24       MS. DENNISTON:  In closing, Your Honor, I think that

25  the Court has an accurate overview of the efforts made by the

1  Debtor and all the other parties to be before the Court today
2  with what is a global settlement.  I think that the comments
3  made by ARCO are particularly telling in terms of its
4  willingness to consider -- or to continue down this track and
5  make the investment of time and money to get to a Final Decree
6  without indication that we have the Bankruptcy Court's approval
7  of the settlement.  As to Magten's comments about jumping
8  through hoops, I don't think any hoops are being required of
9  Magten that it hasn't already availed itself of.  We already
10 know of two instances where Magten has brought and initiated
11 lawsuits in Montana.  It certainly won't be any great
12 difficulty for Magten to respond to or to file any comments to
13 the scope of the releases.  And the Debtor has already
14 undertaken the burden to be sure that the notice goes out when
15 the Final Decree is reached, and that matters can be fully
16 fleshed out with the District Court and with this Bankruptcy
17 Court if and when need be.
18      So with that, Your Honor, unless the Court has questions
19 about the Order being requested today, I would ask the Court to
20 approve the motions with the Debtor to be submitting one joint
21 Order.  We've received some comments during this hearing from
22 Touch America that are going to require the Debtor to
23 recirculate the Form of Order to be sure that it's acceptable.
24 It has to do with the reservation of Touch America's rights in
25 the event that Northwestern were to assert indemnification

1   claims in Touch America's bankruptcy.  It does not impact the

2   sum and substance of the relief being requested by the Debtor.

3            THE COURT:  Let me just ask one more time to make sure

4   that I understand.  Let us assume that the scope of the

5   releases are not satisfactory to Magten, and Magten has a

6   continuing objection.  A notice goes out.  It files its

7   comments that then triggers the proceedings in front of the

8   District Court.  And the District Court resolves it.  Now, of

9   course, the District Court could come to the conclusion that

10  it's not fundamentally fair.  So if that's true, then that

11  solves Magten's problem in the sense that maybe you go back to

12  the drawing board and you try to renegotiate new leases that

13  meet whatever objections are raised.  But let's say that the

14  District Court does approve it.  Now, is it your view that then

15  there would still be a hearing here for me to decide whether or

16  not for purposes of the bankruptcy case I'm going to approve

17  that or not?  And if so, what's the standard that I'm applying

18  at that point?

19           MS. DENNISTON:  In the event -- Your Honor, and again

20  this is kind of predicting the future and speculating as to

21  what issues might be raised as to the releases themselves.  I

22  think that I could see a circumstance where there would be a

23  motion filed by Magten were they unhappy with the result

24  obtained in Montana.  I think at that point this Court would

25  have to look at the record in Montana and the collateral

47

1  estoppel and potential res judicata issues as to the findings

2  of fact, and determine whether or not the scope of those

3  findings is sufficient to meet the findings that this Court

4  would also require.

5  　　　　THE COURT:  Well, it really would be more of a

6  collateral estoppel than a res judicata --

7  　　　　MS. DENNISTON:  Yes, Your Honor, it would be.

8  　　　　THE COURT:  -- issue, since it sounds as if the

9  District Court may not be applying exactly the same standard --

10  　　　　MS. DENNISTON:  That's correct.

11  　　　　THE COURT:  -- that I would be applying.

12  　　　　MS. DENNISTON:  And --

13  　　　　THE COURT:  I mean it's not really deciding the same

14  question as I would be deciding.

15  　　　　MS. DENNISTON:  Well, and without knowing what

16  findings the District Court may or may not make, it's hard for

17  me to predict to this Court what issues might be remaining for

18  this Court to look at, or to speculate as to the strength of

19  the collateral estoppel arguments.  And I think that would be

20  something that would be subject to review.  I can assure the

21  Court that the Debtor would be an active participant in that

22  process, so that we can endeavor to be as efficient as

23  possible.

24  　　　　THE COURT:  Okay, thank you.  So let me ask counsel

25  for the United States and Montana and ARCO the following

1  question.  What happens to these ongoing negotiations if I were

2  not to approve this motion today, on the ground that it was

3  premature because the scope of the releases had not yet been

4  defined?

5       MS. SABO:  I think there would be very serious

6  setbacks.  And I think it might disintegrate negotiations as

7  they're going forward at the moment.  Of course the parties do

8  not have to settle this issue.  The United States could go

9  forth with its proof of claim.  That's all I have to stay.

10  I'll hand it over to the State and Atlantic Richfield.

11       MR. CURLEY:  Your Honor, obviously I obviously can't

12  speak for the Governments, but as an environmental lawyer who

13  specializes in CERCLA matters I'd be very concerned that both

14  the United States and the State would feel very insecure going

15  forward with a very expensive, time consuming negotiation.

16  With preliminary indication from the Court other than that,

17  this settlement is likely to be approved.

18       THE COURT:  I understand the economics of this.  The

19  Debtor has a fixed component that it is bringing to pay.

20  Correct?  And you are in effect assuming the much larger, more

21  open ended component.

22       MR. CURLEY:  That's correct, Your Honor.  The Debtor

23  has agreed to pay $7.5 million to my client, the remaining 2.5

24  million of the original $10,000,000 settlement to the State,

25  and then I believe another $1.4 million to the State on top of

1    that under the agreement contained in the stipulation.  I guess

2    the one thing that I -- as a non-bankruptcy lawyer I feel

3    compelled to point out to the Court that if Magten or some

4    other party doesn't like the covenants not to sue and

5    reservations of rights that Northwestern and Clark Fork's

6    counsel can negotiate on its behalf, and is a party to those

7    negotiations working closely with those other settling or

8    putative settling Defendants, I can tell you their counsel is

9    working very hard, very aggressively to get as good a covenants

10   as they can.  They are represented by two very experienced

11   CERCLA lawyers, one a former DOJ enforcement attorney.  And

12   they are pushing as hard as they can at negotiation to get as

13   good a covenants as they can.  This is not like a normal

14   private party negotiation where either Northwestern or Clark

15   Fork and Blackfoot or myself on behalf of Atlantic Richfield

16   can just make a demand for an absolute release of claims and

17   get what's known as a model consent decree that EPA and DOJ

18   operate under.  And they're willing, if you push hard enough,

19   to make certain changes to it.  There's a lot of history as to

20   what changes they'll make under certain circumstances.  And

21   we're trying to use all of that to Atlantic Richfield's

22   benefit, as their counsel is for Northwestern's and Clark

23   Fork's benefit.

24        If they -- and they'll get as much as they can.  If they

25   don't sign a Consent Decree ultimately, I would assert that

1   what is likely -- and I would myself at that point have to work
2   as hard as I can for Atlantic Richfield, to convince EPA to
3   issue a unilateral Order to Northwestern and Clark Fork and
4   Blackfoot.  If my client can't get them to do their fair share
5   under the settlement and under the stipulation and ultimately
6   under a Consent Decree, then we're going to have to push the
7   agencies.  And I would assume that the agencies themselves
8   would be quite interested, frankly, in issuing a unilateral
9   Order at that point.  And they have, as you may know, Your
10  Honor, under Section 106 of CERCLA, pretty extraordinary powers
11  to force companies like Northwestern or Atlantic Richfield to
12  do their bidding.  And so it's not a happy world, I'd submit,
13  that they would find themselves in at such point as a party
14  like Magten or any other goes in and defeats a Consent Decree.

15              THE COURT:  All right, thank you.

16              MR. MONACO:  Your Honor, Frank Monaco again for the
17  State of Montana.  Your Honor, one practical problem with not
18  approving the stipulation today is -- and again this relates to
19  Item 16, which is the motion to approve the stipulation between
20  ARCO, the Debtor, and Clark Fork and Blackfoot.  Our -- the
21  stipulation provides that our objections to that motion are
22  resurrected if this isn't approved.  So that's another
23  practical problem if it isn't approved today.  Thank you.

24              THE COURT:  All right, thank you.

25              MS. DENNISTON:  Your Honor, I'll be brief.  Just a

1  couple of closing remarks.  In listening to the comments that
2  have been made to the Court, I wanted the Court to be aware of
3  one thing.  And that is that the negotiation of this
4  stipulation and the settlement were conducted through the
5  witness that we have here today, Michael Young, and through the
6  law firm of -- it's Lee Graves, the Graves law firm.  And that
7  is the special environmental counsel to the Debtor.  To the
8  extent that there has been Paul, Hastings involvement, it has
9  been to be a scrivener to effectuate the bringing of the motion
10 and the orchestration of this hearing.  And the other point
11 that I think that is noteworthy aside from the things the Court
12 has heard from the counsel is that this motion is a win/win for
13 Clark Fork and for the Debtor in that it takes what is fairly
14 extreme liability as evidenced by the assertions in the claims
15 file, caps that, and provides a mechanism for settlement.
16     The scope of the release issue an issue in and of itself
17 that is subject to due process, notice and a hearing, and
18 everybody's rights can be fully protected.  So it's the
19 Debtor's very strong position, and a position supported by the
20 Committee, that this settlement and the stipulation are in the
21 best interest of all the parties involved.  And to jeopardize
22 them because at this point we can't have certainty on the scope
23 of the releases which are subject to an independent judicial
24 process and a thorough betting would be a tragedy for this
25 Bankruptcy Estate as we move to confirmation.  And it would

52

1  force the Estate to deal with a claims estimation process that

2  could be probably described as not being short of horrendous if

3  one looks at all the claims that these parties have filed.  And

4  with that, the Debtor would ask for the Court's approval.

5       MS. CAPDEVILLE:  Your Honor, if I may, this is the

6  State of Montana.  One of the other reasons -- we find this --

7  we've been negotiating this since the Fall of 2002.  And it's

8  turned out to really --

9       THE COURT:  Excuse me.

10      MS. CAPDEVILLE:  -- be difficult to get some movement.

11 And at this time the State of Montana has also been willing to

12 commit 7.6 million of its own money towards this Milltown

13 restoration.  But at that same point we need that commitment

14 from Northwestern that the money from them will be coming as

15 well.

16      THE COURT:  All right.  I'm sorry, I just -- I wanted

17 to interrupt you to make sure that your name was stated for the

18 record.

19      MS. CAPDEVILLE:  It's Mary Capdeville, Your Honor.

20      THE COURT:  All right, thank you.  Anybody else?

21      MS. PHILLIPS:  Your Honor, Margaret Phillips on behalf

22 of the Committee.  We're in support of the comments made by the

23 Debtor.  This has been fully vented in front of the Committee,

24 and they're in support of this Order being entered for quick

25 settlement.  Thank you.

53

1          THE COURT:  All right.  We have Items 16 and 20 on the

2   docket that are up for approval today.  Item 16 was --

3          MS. DENNISTON:  No, I just -- I came up, Your Honor,

4   because I --

5          THE COURT:  You want to listen.

6          MS. DENNISTON:  I'm not interrupting you.

7          THE COURT:  -- was originally an agreement among the

8   Debtor, Clark Fork, and ARCO to resolve certain environmental

9   issues having to do with the Milltown Dam near Missoula,

10  Montana.  This was objected to by the United States and by the

11  State of Montana, among others.  Those objections then were

12  resolved through further negotiation that led then to Item #20,

13  the stipulation that includes barter terms, some more money,

14  and resolves the objections of the entities.  Now, I have not

15  heard from the two tribes that were mentioned.  Are they

16  separately represented or -- in here?

17         MR. HOBENKOTTER:  Your Honor, this is Joe Hobenkotter.

18  I'm the staff counsel for the Confederated Salish and Kootenai

19  Tribes.

20         THE COURT:  All right.  And I take it that your

21  clients are in favor of this agreement.

22         MR. HOBENKOTTER:  Your Honor, I'm not at bar before

23  the Court in Delaware, but I'm sitting in on this phone call

24  today to simply stand and support the United States and State

25  of Montana as our co-trustees for the natural resources.  We

*Writer's Cramp, Inc.*

*Certified Court Transcribers*

*732-329-0191*

**A324**

1 | are in support of the statements that Ms. Sabo put forth today.

2 | THE COURT: All right, thank you. So the objection

3 | process on Item 16 then led to Item 20, which had continuing

4 | objections at this point from Touch America that is being

5 | resolved by reservation language we put in the Order. There

6 | was an opportunity for Harbert, who was an original objector,

7 | to continue to object. But I'm advised by both the Debtor and

8 | Harbert's counsel that following the provision of information,

9 | Harbert elected not to file a further objection to Item #20.

10 | There is a continuing objection by Magten.

11 | The proposed stipulation and settlement provides a cap on

12 | the liability of Northwestern on its liability in connection

13 | with the environmental remediation of the Milltown Dam. The

14 | primary financial obligations under -- as I understand it, then

15 | lie with Atlantic Richfield under this arrangement, and that

16 | Northwestern agrees to pay directly a substantial sum to

17 | Atlantic Richfield, and also to pay sums to the State of

18 | Montana. So the benefits to the Estate here are to resolve --

19 | although it's a substantial number and amount that is

20 | materially less than the claims that have been filed against

21 | the Estate, and to cap those amounts rather than to have those

22 | amounts be of an unlimited nature. On the other hand, there is

23 | the issue of whether or not Northwestern itself has any direct

24 | liability for these claims, which is an issue that would

25 | require substantial litigation to resolve. And all of the

1   objecting governmental agencies have stated on the record their

2   basis for belief as to why it is they think they could in

3   effect hold Northwestern liable under the applicable laws for

4   the remediation costs that are involved here.

5       So this is a settlement where the Debtors are capping

6   their liability, and in exchange in effect agreeing directly to

7   pay and compromising those issues.  I know it's much more

8   complicated than that, but those are a couple of the key

9   points.  Of course one of the key points is that, is the Debtor

10  actually getting out of the deal.  And that's the scope of

11  release issue.  Whether or not it truly is a global settlement,

12  or whether or not there is remaining liability on behalf of the

13  Debtor, that the Debtor should negotiate now so that we know

14  what it is the Debtor is actually paying for.  That's kind of

15  the heart of the Magten objection that this is premature, that

16  the matter ought to be fully negotiated and brought to the

17  Creditors before we get to that point.

18      For those of you who do Chapter 11 work only, you don't

19  probably run into the conflicts that often occur between

20  domestic relations law and bankruptcy law.  That's something

21  where I unfortunately spend a good deal of my time on when I'm

22  back in Arizona.  The conflict between environmental laws and

23  bankruptcy laws is not that different, because basically there

24  are two sets of laws that are designed to achieve different

25  purposes.  And they're both Congressional statutes.  And we

1   have to figure out the best way we can to resolve them and make

2   them fit together in the context of a company that's in Chapter

3   11, and also in the context of the rights and remedies that are

4   given to the governmental agencies that are charged with

5   enforcing environmental laws, particularly in this case CERCLA.

6   So in an ideal world it would be good, I think, to know what

7   the scope of the releases are that are to be obtained by the

8   Debtor.  And in a purely financial context I think that

9   normally is part of any deal that is brought to the Bankruptcy

10  Court.  However, that's not necessarily the same in the case of

11  these environmental enforcement activities where there is in

12  fact a different -- as was suggested by counsel for ARCO,

13  there's certain standard procedures, certain kinds of scopes of

14  the releases, certain kinds of points on which there is a

15  practice of negotiating and so on, and there may not be

16  finality of the kind that we are always used to in the

17  bankruptcy context.

18       So the issue here is whether or not this deal, imperfect

19  because it's incomplete, is nonetheless in the best interest of

20  the Estates, such that -- about to be approved so that it can

21  go to the next step.  Counsel for Magten has concluded that

22  really it doesn't have a true forum in which to make the kinds

23  of arguments it would make in the Bankruptcy Court, if it were

24  to file its comments in front of the District Court, that the

25  District Judge may not take those into account the same way as

1  in the Bankruptcy Court which is where the District Judge is

2  really looking at it from the CERCLA standpoint, whereas I

3  would be looking at it from the bankruptcy standpoint.  And

4  those are different things.  And to a certain extent I'm

5  sympathetic with that.  But I don't think that that overrides

6  the overall best interest of the Estate.  I do think it's in

7  the best interest of the Estate to move this matter as far as

8  possible toward resolution.  And I am convinced by the

9  presentations of counsel, the availability of the witnesses,

10  and the representations and the avows of what it is that the

11  witnesses would say, that this is in a posture now in a very

12  complicated, long, difficult negotiation over the course of

13  many years, that it's important to move it to the next step,

14  and that in order to move it to the next step this contingent

15  approval by the Bankruptcy Court is required.

16      I am not willing to accept that there is no meaningful

17  forum at the District Court, because I assume that the District

18  Judge will take his or her responsibility very seriously when

19  faced with that issue if in fact there are comments made.  And

20  I'm sure that's true when the District Judge is looking at a

21  matter that is in his or her backyard that is very well known

22  in that part of the country as being a very serious and

23  substantial environmental issue.  So it is not a matter, I

24  think, that will be taken lightly or perfunctorily at that

25  level, if in fact there are legitimate issues that are raised

58

1   to the scope of the releases.  So I am -- I will conclude that

2   the Debtor and the various other proponents have demonstrated

3   that this is in the best interest of the Estate, that this does

4   meet the standards of approval of a settlement, that there are

5   substantial risks involved for the Debtor not to settle, there

6   are issues that the Debtor is in effect giving up by doing

7   this, but that's the essence of a settlement.  And that the

8   other constituencies, including the Creditors Committee and

9   others -- and the lack of objection from other parties indicate

10  that this does have support at least from those entities.

11      So balancing those things together, and dealing as we are

12  here in the difficult intersection between two sets of Federal

13  laws that are not really designed to protect the same interest,

14  the same level of finality and perfection, I think, is not

15  necessary here.  And I am -- or not achievable here.  And I am

16  convinced that there are adequate safeguards that exist down

17  the road, such that once the scope of these releases is in fact

18  finally negotiated, that there will be an adequate opportunity

19  for them to be heard and determined by the Courts of

20  appropriate jurisdiction.  So based upon that I will grant the

21  motion and will sign the Orders.

22      MS. DENNISTON:  Thank you, Your Honor.  We'll submit

23  an Order after we've circulated it to counsel.  With that, Your

24  Honor, we turn to matter #21, which is the 328 notice filed by

25  Magten.

1    MS. MILLER:  Good afternoon, Your Honor, Kathy Miller

2  on behalf of Magten.  I have with me my co-counsel, Bijian

3  Amini of the New York law firm of Storch, Amini & Mundes.  We

4  filed his motion for pro hac admission.  I do not believe it's

5  been signed yet.  And with Your Honor's permission we'd ask

6  that he be able to address the Court today.

7    THE COURT:  So ordered.

8    MR. AUSTIN:  Your Honor, on behalf of Paul, Hastings,

9  we have separately retained counsel who is a member of the

10  Delaware bar, Mr. Charles Sumina, of the firm of Finger &

11  Sumina.  And he will be responding as it relates to Paul,

12  Hastings today.  At some point I think the Court need be aware

13  of at least what Paul, Hastings has done in addition to

14  retaining separate counsel to present the case on that -- this

15  issue today, as to what we've done to at least remove what even

16  may be an appearance of any impropriety since this statement on

17  328(c) was filed.  And I can do it either now or at the

18  conclusion of when anyone else may have made a statement.

19    THE COURT:  All right.  Why don't we let Magten's

20  counsel proceed, and then I'll hear from Paul, Hastings.

21    MR. AMINI:  Good afternoon, Your Honor.  I'm kind of

22  in an odd position, because this is not a motion, Your Honor,

23  and I did not request a hearing.  Paul, Hastings' counsel

24  requested the hearing.  We merely filed an informational notice

25  under 328(c) that we believed circumstances had arisen that

1  raised the question of Paul, Hastings disinterested, at least
2  as regards a specific adversary proceeding.  I think they have
3  since withdrawn as counsel.  In fact, I know they have.  They
4  gave us notice of it.  Even though we asked them about this
5  back in March, they gave us notice of this last week -- I
6  believe Wednesday of last week.  I don't believe that there's
7  an issue today as regards that notice that's ripe for any
8  adjudication.  Our position was simply if you proceed as
9  counsel, you do so at your own risk.  And their position
10  ultimately became after proceeding as counsel for some period
11  of time, "We're withdrawing."  To the extent that there's
12  issues of their compensation, I think that from everything I've
13  seen -- not being a bankruptcy lawyer, but from all the cases
14  I've read, that is better addressed in the context of an actual
15  application for compensation.

16      There is a related issue that I would like to bring to the
17  Court's attention if Your Honor so permits today.  Just in the
18  interest of efficiency in this matter, last Friday we filed a
19  motion to have Paul, Hastings disqualified as counsel for the
20  Debtor in the main case.  The related issue -- and that was
21  noticed, I believe, Your Honor, for the July 21 date, which I
22  understood is being moved back now to July 14.

23      THE COURT:  Well, there never was a July 21 date.
24  That's the problem.  Because I'm not here during the week of
25  July 21.  I'm here during the previous week.  So it was then

61

1    moved to the 15th, and then it was moved to the 14th because we
2    have more time on the 14th because of the cancellation of this
3    trial.
4          MR. AMINI:  Okay.  I have a brief request related to
5    that, that it be moved to the 15th only because I'm in
6    California on a matter that I'm committed to and can't get out
7    of on the 13th, and would have to be on a red eye to be here on
8    the 14th.  But I think I can reserve that to the end.  The
9    issue that I would like to raise with Your Honor today is an
10   issue of disclosure.  I believe that there has never been
11   disclosure under I believe it's Rule 2014, by Paul, Hastings of
12   their role in the transactions, over which we are all -- we all
13   have this dispute, the -- I think it's what Your Honor refers
14   to in some of Your Honor's opinions as the "going flat
15   transaction".  There was an initial --
16         THE COURT:  I didn't come up with that.
17         MR. AMINI:  There was an initial affidavit filed by
18   the Debtor's counsel in support of their retention in
19   September, in which they stated in no uncertain terms that even
20   though they had represented the Debtor and certain of its
21   affiliated non-Debtor entities in other non-bankruptcy related
22   matters -- and then it went on to describe a number of things
23   that do not relate to this one section that I will tell Your
24   Honor -- there's never been any further disclosure.  We have
25   since concluded, based on the circumstantial evidence that

1  we've seen, that in fact they had extensive dealings and

2  representation of not only the Debtor, but Clark Fork, the

3  subsidiary at issue, in a number of different matters, as well

4  as they were also counsel in a number of matters related to the

5  going flat transaction, specifically the lending transactions

6  that came afterwards.  I don't know how familiar Your Honor is

7  with this, but they acquired the assets, I guess formally I

8  believe in August of 2002 in the form of a subsidiary.  They

9  moved the assets from the subsidiary to the parent I believe in

10  November of 2002.  They entered into a lending agreement with

11  the banks in December of 2002, although that agreement was not

12  actually consummated 'til 90 days -- a little bit -- 91 days or

13  90 days after they transferred the assets, in February of 2002.

14        THE COURT:  2003.

15        MR. AMINI:  2003, Your Honor.  I stand corrected.

16  Yes, Your Honor.  And then they announced -- I don't know to

17  what extent this was related, but they announced in April of

18  2003 that some $900,000,000 that had otherwise appeared on

19  their books as assets was no longer there, and had vanished.

20        We believe that in the context of this case, as a

21  preliminary matter, even before we get to the motion which will

22  be on the motion to disqualify, that there has to be

23  disclosure.  And we would like Your Honor to invite them -- I

24  think that's the way it's put in some of the cases I read -- to

25  make that disclosure so that on July 21 or 14 or whatever day

1   it is that we will have this hearing, we do have a full record
2   from which to work on.  And I believe today is probably just
3   turns out by just happenstance -- I mean I didn't think there
4   was -- I don't think that 328(c) is an issue, or should be an
5   issue there.  I thought today would be a good day to actually
6   ask Your Honor if we could get a direction that there be that
7   disclosure.  2014 is pretty clear, you're supposed to disclose.
8   And I can read Your Honor the rule.

9           THE COURT:  Specifically what you're talking about is
10  disclose the extent to which they were involved in rendering
11  legal services in connection with the series of transactions,
12  including the 2003 financing?

13          MR. AMINI:  That's right, as well as I would say all
14  of the services that they have performed for Clark Fork.  I
15  mean I think we heard here today, you know, they're not even
16  giving you a representation that in the context of the matter
17  that was on just before me -- and I don't profess to know the
18  ins and outs of that matter -- but there's no representation
19  that they aren't continuing to represent Clark Fork.  They may
20  have dual representation as we sit here today.  And I think
21  that that is a relevant fact that will be a factor that we
22  would ask Your Honor to consider when we ultimately get to the
23  issue of whether they're qualified to act as counsel for the
24  Debtor or not.  I think it almost goes -- I mean all the cases
25  I read talked about full, candid, complete disclosure.  And

64

1   those were the three words.  And I do not believe there is a

2   single disclosure of actual representation of Clark Fork except

3   in the context of the McGreevy action.  In the McGreevy action

4   I noticed that there was a statement that they had represented

5   McGreevy.

6       And to give you some idea of the difficulty we face in

7   trying to determine what they really did in these transactions

8   -- which is critical to the position we'll take -- I mean they

9   may tell us something that could alter our view of this -- but

10  to give you some -- the McGreevy stipulation that Your Honor

11  issued an opinion on I believe last week, we went immediately

12  to that.  And their name appears nowhere.  But if you go back

13  to their original affidavit, they say they were in fact counsel

14  to Clark Fork on that matter.  So, you know, we're left to

15  travel somewhat in the dark, other than the fact that we know

16  from our allegations that we've made in complaints against them

17  as well -- in a complaint against them, that they represented

18  Clark Fork, and which they've never denied in any of these

19  affidavits, that we're fairly certain that they do have some

20  representation of Clark Fork.  We just don't know the extent of

21  it.  If there's anything else, Your Honor --

22      MR. AUSTIN:  Well, Your Honor, with the comment by

23  Magten's counsel that there's no issue today ripe for

24  adjudication with 328(c), then I think we will save the powder

25  as it relates to our own counsel, and ultimately will be

1  responding to the motion to disqualify.  If what Mr. -- Magten

2  is looking for is a supplemental affidavit, we will file a

3  supplemental affidavit as is relates to the Clark Fork

4  relationship, such as they may otherwise be.

5       THE COURT:  The Clark Fork relationship and the

6  relationship having to do -- I guess anything having to do with

7  this series of transactions, the so-called going flat

8  transactions and the subsequent financing.

9       MR. AUSTIN:  We will file that, Your Honor.  And in

10 fact I think our affidavit already disclosed that we did

11 represent Northwestern as it related to the subsequent

12 financing, because of the fact that there was -- we had to make

13 disclosure that at one point we had some relationship with

14 CSFB.  So there's no question that we've always represented

15 Northwestern with respect to the CSFB financing.  But we will

16 file a supplemental affidavit.  And we'll get that on the

17 record.

18      One point of clarification though is, if I do understand,

19 that there are no objections actually to our fee applications

20 which have been filed.  I would like to make sure then that

21 frankly we could get paid what we have otherwise we've made

22 applications for.  When -- one thing that I was going to advise

23 the Court is that when this 328(c) statement was filed, even

24 though it is not couched in the term of an objection, and even

25 though Magten has never filed an actual objection to our

1  monthly fee applications, until this matter came before the

2  Court, our firm chose not to accept payments from the Debtor

3  under the Case Management Order which would allow the Debtor to

4  pay to our firm 100% of expenses and 80% of fees and expenses

5  which had been incurred.  At this point for fees and expenses

6  incurred in March and April for which we had filed our fee

7  statements, we have received nothing on that.  So that if I'm

8  clear in that there are no objections to that, we will be

9  asking the Debtor to make payments on at least the 100% of the

10  expenses, and 80% of the fees which would be in accordance with

11  the Case Management Order.

12       THE COURT:  Where do we stand now with regard to the

13  review of all of these interim applications by the fee

14  examiner?

15       MR. AUSTIN:  The fee examiner last week, Your Honor,

16  filed statements as relates to a number of the applications.  I

17  know that the Greenberg firm filed it as it relates to Al

18  Resmarcel, Leonard Street, and a few others.  We have been

19  working with the fee examiner to address his comments.  And I

20  believe his report -- and Ms. Denniston may know more -- but I

21  believe it should be filed this week or early next week as it

22  relates to Paul, Hastings.

23       MS. DENNISTON:  Your Honor, that's more or less

24  accurate.  Paul, Hastings has been working with the fee

25  examiner to provide additional detail on the all team

1  conferences.  And that required a fair amount of research.  The

2  fee examiner, I understand, is more or less satisfied.  We're

3  providing our written comments to the report this week.

4           THE COURT:  Thank you.

5           MR. AUSTIN:  Thank you, Your Honor.

6           THE COURT:  Well, excuse me.  You were going to tell

7  me other things.  And I think --

8           MR. AUSTIN:  Well, I think --

9           THE COURT:  -- counsel for Magten may want to --

10 without, you know -- keeping your powder dry, I understand

11 that.  But counsel for Magten said for example that you've

12 withdrawn in the litigation.  Is that in the Magten litigation?

13          MR. AUSTIN:  That's correct.  I think this Court's

14 aware -- and what I was going to advise the Court is that, you

15 know, Magten has asserted claims against Northwestern's

16 transfer of assets from Clark Fork and Blackfoot on what's

17 referred to as the going flat transaction.  And that issue has

18 been joined in an opinion adversary against the Debtor, which

19 this Court has transferred to Judge Lindsay for disposition.

20 There's been a briefing schedule set in that adversary.  What

21 we have done as related to that case, we certainly believe and

22 will ultimately defend that there's no conflict --

23          THE COURT:  Let me just --

24          MR. AUSTIN:  Sure.

25          THE COURT:  -- back up for a minute.  There is the

1  Magten adversary, and then there is the McGreevy case.  So

2  they've filed -- McGreevy filed its case.

3          MR. AUSTIN:  No, Your -- McGreevy has not yet filed

4  its case on asserting fraudulent conveyance, Your Honor.  And

5  one reason it has not is that we are actually engaged in

6  substantive settlement negotiations with McGreevy Plaintiffs at

7  this point, so they've not yet filed that adversary case.

8          THE COURT:  But in any event the Magten case is

9  pending.

10         MR. AUSTIN:  The Magten case is pending.  It's been

11  transferred to Judge Lindsay by your Order.

12         THE COURT:  No.  Right.  Frankly that might have

13  gotten transferred, you know, in a bulk way, because we were

14  transferring adversaries.  If anybody thinks that it's better

15  not to transfer that because it needs to continue in

16  cooperation, so to speak, or in tandem with confirmation, then

17  I'd entertain an Order or I would be happy to talk to Judge

18  Lindsay about that, if that's what you think we ought to do.  I

19  don't think I made a conscious decision, frankly, to transfer

20  that particular adversary to Judge Lindsay, as opposed to a

21  garden variety of, you know, one of 1,000 preference cases that

22  may need to be transferred.  I just certainly notice on that

23  that that's open to dispute, or open to reconsideration if you

24  want to.  If you don't, and you're happy with it, that's fine

25  too.

1    MR. AUSTIN:  We may -- we will evaluate that, Your

2 Honor.  We'll -- in all candor, a number of us were wondering

3 how that case did get transferred with some of the others in

4 connection with the confirmation.  I will note that based on

5 what --

6    THE COURT:  It was just done.  And frankly it was done

7 because it slipped through the cracks.  So if you want me to

8 change that, I'd be happy to do so subject to my talking to

9 Judge Lindsay about it.

10    MR. AUSTIN:  I will note that Judge Lindsay for -- in

11 the matter of full disclosure, Your Honor, Judge Lindsay did

12 schedule -- set a briefing schedule which Magten, I believe,

13 responded to last week.  And we have -- not we -- Northwestern

14 has a response date of the 25th to file a reply brief.  Because

15 what Northwestern had previously done had moved to dismiss that

16 lawsuit on a paid Estate claim.  Be that as it may --

17    THE COURT:  Well, talk about it with Magten, or Magten

18 also has the right to do whatever, and see if it's worth doing

19 something on it.  Just file it if you think that's appropriate.

20    MR. AUSTIN:  Be that as it may, Your Honor, and

21 irrespective of what our own perspective was on conflict, Paul,

22 Hastings has indeed withdrawn as counsel of record in that

23 adversary case against Northwestern.  That case is being

24 handled by co-counsel, Greenberg, Traurig.  In addition, if and

25 when we get to filing claim objections, and Northwestern filed

1  claim objections to Magten, claims objections of Magten will

2  also be handled by Greenberg, Traurig.  As I noted, Your Honor,

3  earlier, we had retained our own counsel, Finger & Sumina, to

4  represent us on the 328 issue.  In addition, this Court I

5  believe is aware from papers that have been filed that Magten

6  as severally filed suit against officers of Clark Fork in

7  Montana, and has severally filed suit against Paul Hastings in

8  Montana.  And we obviously have retained our own counsel to

9  represent us in Montana.  We have a Montana firm, as well as

10  the firm of Davis, Polk & Wardwell representing our interest to

11  defend against the plethora of litigation which Magten has

12  initiated.

13      Those are the things which we have done, Your Honor, to

14  try and make sure where we do not believe, did not believe we

15  had a conflict and we were made disinterested, we've done --

16  irrespective of that, we have done or tried to further shield

17  ourselves to make sure that at least with Magten related

18  matters we don't appear to be inappropriate in how we're trying

19  to interface with them in resolving its claims against the

20  Debtor's Estate.  And indeed I can also state that whenever the

21  U.S. Trustee has raised questions with us about further need

22  for disclosures, and I believe that they can represent on that,

23  we have been cooperative in providing additional disclosure to

24  the U.S. Trustee.  And we will file a supplemental affidavit as

25  has been requested here today.  Thank you.

1    THE COURT: All right. Sorry. I guess I really

2  should have addressed my comments to Greenberg, Traurig with

3  regard to the transfer of the Magten litigation. So proceed

4  however you think is right. I'm just being honest with you.    I

5  think that was not a conscious decision on my part to do that.

6    MR. KAPLAN: Your Honor, just on that litigation from

7  Magten's perspective, because obviously as Your Honor is aware

8  Magten views that as a central issue to the Chapter 11 case and

9  to the Plan. And while Judge Lindsay obviously can address the

10  issues in a vacuum, we think it's important that this Court be

11  able to control the timing of that matter. And we would

12  request, Your Honor, that if that is possible, that it be

13  pulled back into Your Honor's Court as opposed to waiting for

14  timing and trying to develop the issue over the next couple of

15  weeks.

16    MR. CHIPMAN: Your Honor, for the record William

17  Chipman of Greenberg, Traurig. On the Magten issue I'd like to

18  jus take it back to our team, talk to them. We'll talk to

19  counsel for Magten, the Committee, and we'll do what's

20  appropriate.

21    THE COURT: All right. Well I'm here this week, so if

22  something needs to be done this week, then --

23    MR. CHIPMAN: Thank you, Your Honor.

24    THE COURT: -- you can reach me this week.

25    MR. AMINI: Just briefly, two points I'd like to make

1  very briefly.  One is I don't want to leave the Court with the
2  impression that I'm not objecting to at least two things.  One,
3  we asked them repeatedly to withdraw from the litigation.  They
4  took it upon themselves to file applications both against the
5  permission to file this suit in the first case, and also the
6  Motion to Dismiss, as I understand, came from Paul, Hastings.
7  This was well after we had put them on notice.  In fact, the
8  Motion to Dismiss I believe came after our 328(c) notice.
9  That's one.
10      Two, in terms of the fee application I have not seen, and
11  it may well have been filed and I just -- I was not made aware
12  of it, but I have not seen any application related to this
13  particular adversary proceeding.  I mean I haven't seen
14  anything that's carved it out.  And we certainly will reserve
15  on that, as well as once the affidavit is filed we will reserve
16  on Magten's position with respect to the compensation in toto
17  for the Paul, Hastings firm.
18      And finally, very briefly, I have my short scheduling
19  problem, Your Honor.  And I realize it's my problem, but I was
20  wondering if the 14th -- it wasn't clear to me if both those
21  days were being held and it was going to carry over to the
22  15th.  If it's going to carry over to the 15th, I would like to
23  have the disqualification motion teed up for the 15th as
24  opposed to the 14th.  Otherwise you're just going to find a
25  very red-eyed person standing in front of you in the morning.

1    THE COURT:  Well, we have that time at 10:30 on the

2  15th.  Do you have any objection to that, Mr. Austin?

3    MR. AUSTIN:  I don't, Your Honor.  I'd check with my

4  counsel who would otherwise address it.

5    THE COURT:  All right.  So why don't we then -- we'll

6  move the Motion to Disqualify off the Omnibus calendar to the

7  time set previously, which is 10:30 on the 15th.  I don't know

8  what else we have then.  Do you have any idea how much time we

9  will expect this to need?  Mr. Amini, do you know how much time

10 we're talking about?

11   MR. AMINI:  I don't know, Your Honor.  I would imagine

12 about a half an hour or so.

13   THE COURT:  I'm sure we have an hour set aside.  Okay.

14   MR. AMINI:  Thank you, Your Honor.

15   THE COURT:  With regard to the question on the fee

16 applications and the fee procedures, there was a fee procedure

17 that was entered at the beginning of this case that set up a

18 procedure whereby the various professionals would file monthly

19 fee statements and serve them in certain ways.  And failing

20 objection, to be paid 80% of fees, and 100% of expenses.  Then

21 on a periodic basis there would be interim fee applications

22 that would be filed.  The first time we had those come up is

23 when the fee examiner went into place.  I think that was the

24 first time.  Or maybe it was the second time.

25   MR. AUSTIN:  That was correct, Your Honor.  First

1  time.

2       THE COURT:  Yeah.  And so that procedure is now in

3  place.  And even then those were the interim awards.  So I

4  guess my view of this is that the procedures that are in place

5  should remain in place.  And, therefore, in the absence of

6  objection, specifically to the monthly statements, then counsel

7  can be paid.  These are all interim awards.  Actually, they're

8  not even interim awards.  They're interim payments before

9  they're even an interim award.  And if there's a disgorgement

10  order or reduction of fees or whatever, then that's one reason

11  we have the 20% holdback.  And the other reason is of course

12  that the firms are them financially responsible for that.  So

13  it seems to me the system is in place to work, and we don't

14  need to make any specific changes based upon what's happening

15  here.

16       MR. AUSTIN:  Thank you, Your Honor.

17       MS. DENNISTON:  Thank you, Your Honor.  With regard to

18  the Agenda, I believe this leaves the claims matters, beginning

19  with matter #6.  And Mr. Chipman will be handling those.

20       MR. CHIPMAN:  Good afternoon, Your Honor.  For the

21  record, William Chipman of Greenberg, Traurig.  Your Honor,

22  what I propose to do is just go through these in the order of

23  the Agenda, starting with Item #6.  Does that --

24       THE COURT:  All right.

25       MR. CHIPMAN:  -- make sense?

1          THE COURT:  Sure.

2          MR. CHIPMAN:  Your Honor, Item #6 is the Debtor's

3  Sixth Omnibus Objection to Claims.  These are all late-filed

4  claims.  It's a non-substantive objection.  The Debtor has

5  withdrawn the objection with regard to Minerals Management

6  Service.  Therefore, the Order we're seeking to be entered

7  today will not affect their claim at all.  There was an

8  objection filed by Ray Peterson Electric.  It was a letter

9  objection.  It wasn't a formal objection, Your Honor.

10 Basically what Mr. Peterson says in his objection is, "Yes, we

11 filed it late.  But forgive us, Your Honor."  And set forth the

12 reasons therein.  There was also a letter received from South

13 Wire, Your Honor.  And basically South Wire pointed out that

14 their late-filed claim was actually an amended claim, so I have

15 stricken them from the exhibit also.  So really the only

16 objection going forward would be to Ray Peterson Electric.

17 And, Your Honor, the facts of that, the claim was filed on

18 4/15/04, several months after the bar date.  They admit in

19 their letter that this was filed late.  They do not argue in

20 there that they didn't receive the objection.  And, Your Honor,

21 they ignore the _Pioneer_ factors in the 3rd Circuit for

22 excusable neglect in their response.  With that, Your Honor,

23 I'll leave it to Your Honor whether or not -- I'll leave it

24 actually -- I'll cede the podium to Ray Peterson Electric if

25 they're here today to argue their objection.

76

1    THE COURT:  Is there anybody here on behalf of Ray

2  Peterson Electric?  Or on the telephone?

3    (Pause in proceedings)

4    THE COURT:  I've reviewed the letter from Ray Peterson

5  Electric on the circumstance of this case.  I think it shows

6  good cause to allow the late filed claim, so I'll overrule the

7  objection and allow the claim to be filed.

8    MR. CHIPMAN:  Okay.  Your Honor, if I may, I'll just

9  interlineate the Form of Order and hand it up.

10    THE COURT:  All right, thank you.

11    MR. CHIPMAN:  May I approach?

12    THE COURT:  Please.

13    (Pause in proceedings)

14    THE COURT:  I've signed the Order and initialed the

15  exhibit.

16    MR. CHIPMAN:  Thank you, Your Honor.  Item #7 on the

17  Agenda, Your Honor, is the Seventh Omnibus Objection to Claims.

18  This is on amended, non-substantive objection.  No responses

19  were received, Your Honor.  We filed a CNO on 6/14, and the

20  Debtor respectfully requests that Your Honor enter the Order

21  that was attached to the motion.  And I do have a Form of

22  Order.

23    THE COURT:  Anyone else wish to be heard in connection

24  with Item #7?  Hearing no one, I'll sign the Order.

25    MR. CHIPMAN:  Your Honor, the next item on the Agenda

1   is #8.   It's the Eighth Omnibus Objection to Claims.   These

2   were claims filed against the wrong party -- the incorrect

3   party.   It's a non-substantive objection.   A Certificate of No

4   Objection was filed on 6/14, Your Honor.   We have not received

5   any objections, and we respectfully request that Your Honor

6   enter the Form of Order that was attached to the objection.

7        THE COURT:   Anyone else wish to be heard in connection

8   with Item #8?   Hearing no one, I'll sign the Order.

9        MR. CHIPMAN:   Thank you, Your Honor.   Your Honor, Item

10  #9 on the Agenda is the Debtor's Objection to Duplicative Claim

11  #1041 of Arizona Department of Revenue.   Certificate of No

12  Objection on this was filed on 6/14, Your Honor.   There were no

13  objections, and I do have a Form of Order.   It's the same Form

14  of Order that was attached to the objection.

15       THE COURT:   All right.   Anyone else wish to be heard

16  in connection with Item #9?

17       MR. CHIPMAN:   May I --

18       THE COURT:   Hearing no one, I'll sign the Order.

19       MR. CHIPMAN:   Thank you, Your Honor.   Your Honor,

20  jumping ahead to Item #17 on the Agenda, we're going back to

21  the Debtor's First Omnibus Objection.   If Your Honor recalls,

22  we continued three objections from the May hearing to today.   I

23  have resolved the Estate of Orwell Meyers objection, Your

24  Honor.   Basically what that's going to allow for -- it actually

25  resolves the First Omnibus Objection and the Second Omnibus

1  Objection.  What this does as I just clarified for counsel for

2  Orwell Meyers that Claim #955 and Claim #1021 were objected to

3  as being late, and they were objected to as being duplicates.

4  Both of these orders will allow Claim #944 to survive.  So in

5  essence what this does is it gets rid of the duplicates and the

6  lates, and just allows the legitimate claim to be filed.

7       We put on the hearing for today the objection of -- or the

8  response of Sandra Sage, Claim #912.  This was filed a day

9  late.  And given Your Honor's previous ruling, I probably

10 should remove this from the exhibit.  However, I would point

11 out that this claim is for a -- basically Sandra Sage has filed

12 a proof of claim for her interest in the Debtor.  She owns

13 stock.  So it was filed late, but in any event if Your Honor

14 does allow us to expunge that claim, it's not impacting her

15 rights as an interest holder.  And if you look at the claim and

16 the attachment to the claim, it's basically for an investment

17 in Northwestern stock.  So I'll defer to Your Honor on that

18 issue.

19      The third item, third objection that's still outstanding

20 on the First Omnibus is the Car Wash Guys objection.  And that

21 also was filed late.  And I would, given Your Honor's prior

22 ruling on the late filed claims, I'll defer to Your Honor

23 whether to strike that.

24      THE COURT:  Well, with regard to the claim that is

25 solely based upon the equity interest, I don't think it would

79

1  further the case to deny your Motion to Expunge now, and then

2  expunge it later, because I'm not sure the Claimant would

3  understand that.  And it would probably be more bureaucracy

4  than it's worth.  Now, I don't have that right here in front of

5  me.  I was just looking for it.  Which tab should I be looking

6  at?

7          MR. CHIPMAN:  Your Honor, if I could have a moment, I

8  have to go to my binders.

9          THE COURT:  Oh, I think my binders -- I'm not sure --

10  I didn't --

11          MR. CHIPMAN:  I think there's four --

12          THE COURT:  -- bring those binders.

13          MR. CHIPMAN:  -- of them.

14          THE COURT:  No, I understand.  And I think I left them

15  back in my chambers.  So let me take a -- the ones on the

16  claims objections.  I don't need to see them if you can just --

17  I would just like to look briefly at that to convince myself

18  that she has a purely equity claim.

19          MR. CHIPMAN:  That's fine.  The reason we know that,

20  Your Honor, is that she's attached attachments.  And it was --

21  she sent it through the depository trust company, which all the

22  claims that came in for equity holders came through depository

23  trust companies.  So does Your Honor want to hold off on that?

24          THE COURT:  And then the second one was the Car Wash

25  Guys.

80

```
1          MR. CHIPMAN:  The Car Wash Guys.

2          THE COURT:  Did they have --

3          MR. CHIPMAN:  They filed a late claim.

4          THE COURT:  -- a similar story to the electrical

5   company?

6          MR. CHIPMAN:  Yeah, that they just --

7          THE COURT:  He had a pretty long --

8          MR. CHIPMAN:  -- missed the deadline.

9          THE COURT:  -- you know.

10         MR. CHIPMAN:  I think they said that the mail out

11  there is not too --

12         THE COURT:  All right.  Why don't we -- we'll expunge

13  the equity claim, and we'll allow the Car Wash Guys.  How does

14  that sound?

15         MR. CHIPMAN:  Thank you, Your Honor.

16         THE COURT:  How much are the Car Wash Guys?

17         MR. CHIPMAN:  I think it's a small claim, $1,500,

18  thereabouts, Your Honor.  Your Honor, may I approach?

19         THE COURT:  Please.

20         MR. CHIPMAN:  Thank you.  And, Your Honor, I already

21  told you about the resolution of the Second Omnibus Objection.

22  May I hand up the Order on that?

23         THE COURT:  Please.

24         MR. CHIPMAN:  Thank you.

25     (Pause in proceedings)
```

1    THE COURT:  All right, I've signed the Orders.

2    MR. CHIPMAN:  Your Honor, the next item is Agenda Item

3  #22.  It's the Fifth Omnibus Objection to Claims, books and

4  records claims.  Exhibit A to the motion was reduce and allow,

5  and Exhibit B was expunge.  There were two responses filed, and

6  a whole host of objections that by agreement have been

7  continued.  We have continued the Rory and Theresa Minjares

8  response to the next hearing.  And we've also agreed to

9  continue the Rohr claim response.  In addition as indicated in

10  the Agenda, Claim numbers 736, 756, 763, 818, 820, 821, 836,

11  862, 864, 866, 427 filed by Comanche Park, and again 793 by the

12  Rohrs, and Claim #835 have all been continued to a later date.

13  And I have amended the Form of Order to remove those claims

14  from the objection.  And I do have a Form of Order unless

15  anyone wants to be heard.

16    THE COURT:  Anyone wish to be heard in connection

17  with --

18    MR. CULVER:  Your Honor, this is Triel Culver on

19  behalf of Rory and Theresa Minjares.  Just a point of

20  clarification.  I'd like to know what date the hearing is going

21  to be continued to.

22    THE COURT:  July 14th at 9:30.

23    MR. CULVER:  Thank you, Your Honor.

24    MR. CHIPMAN:  May I approach, Your Honor?

25    THE COURT:  Please.