| Northwestern Corporation Disclosures | | |
| --- | --- | --- |
| Name of Entity Searched | Name of Entity and/or Affiliate of Entity that is a Paul Hastings client | Status of Client Representation |
| | National Amusements Inc. | Active General Representation |
| Pricewaterhousecoopers LLP | Pricewaterhousecoopers LLP | Active General Representation |
| Principal Financial Group | Principal Financial Group | Inactive Client |
| Qwest | Qwest | Active General Representation |
| Qwest Corporation | Qwest Corporation | Active General Representation |
| Qwest Interprise | Qwest Interprise | Active General Representation |
| RIA Group | Thomson Corporation | Inactive Client |
| Richard L. Smith | Richard L. Smith | Active General Representation |
| Richard Shelton | CIT Fund Group | Inactive Client |
| Richards, Layton & Finger | Richards, Layton & Finger | Inactive Client |
| RSM Mcgladrey, Inc. | H&R Block | Active General Representation |
| Russell Reynolds Assoc Inc. | Russell Reynolds Assoc Inc. | Inactive Client |
| Salomon Smith Barney Inc. | Salomon Smith Barney Inc. | Inactive Client |
| | Citigoup Inc. | Active General Representation |
| Servicemaster of Sioux Falls | ServiceMaster Industries | Inactive Client |
| Siemens Power Transmission | Siemens AG | Active General Representation |
| Society for Human Resource Mng | Society for Human Resource Mng | Inactive Client |
| South Carolina Dept of Revenue | State of South Carolina | Inactive Client |
| South Carolina State Treasurer | State of South Carolina | Inactive Client |
| Spherion Corporation | Spherion Corporation | Active General Representation |
| Sprint | Sprint | Inactive Client |
| St Paul Surety Co | St Paul Companies | Inactive Client |
| Standard & Poors Corporation | Standard & Poors Corporation | Inactive Client |
| | McGraw-Hill companies | Active General Representation |
| Standard & Poor's/Platt's/JJ Kenny | McGraw-Hill companies | Active General Representation |
| Star Tribune | McClatchy Newspapers | Inactive Client |
| State of California | State of California | Active General Representation |
| Staybridge Suites Plantation | Six Continents plc | Active General Representation |
| Stinson, Mag & Fizzell | Stinson, Mag & Fizzell | Inactive Client |
| Tech Data Corporation | Tech Data Corporation | Inactive Client |
| Teksystems | Teksystems | Inactive Client |
| Texas State Comptroller | Texas State Comptroller | Inactive Client |
| The Bank of New York | The Bank of New York | Inactive Client |

**A421**

| Name of Entity Searched | Northwestern Corporation Disclosures Name of Entity and/or Affiliate of Entity that is a Paul Hastings client | Status of Client Representation |
|---|---|---|
| The Bureau of National Affairs | The Bureau of National Affairs | Inactive Client |
| The Depository Trust Company | The Depository Trust Company | Inactive Client |
| The Global Consulting Group | The Global Consulting Group | Inactive Client |
| The Kansas City Star | Knight-Ridder | Inactive Client |
| The Ritz-Carlton Golf Resort | Marriott International | Active General Representation |
| The Wall Street Journal | Dow Jones & Co. | Inactive Client |
| Thelen Reid & Priest LLP | Thelen Reid & Priest LLP | Inactive Client |
| Thompson Coburn | Thompson Coburn | Inactive Client |
| Thomson Financial/Carson | Thomson Corp | Inactive Client |
| Thomson West | Thomson Corp | Inactive Client |
| Thomson West Payment Center | Thomson Corp | Inactive Client |
| Tmp Worldwide Executive Search | TMP Worldwide Inc. | Inactive Client |
| Towers Perrin | Towers Perrin | Inactive Client |
| Travelers Insurance | Travelers Insurance | Inactive Client |
| US Bancorp | US Bancorp | Active General Representation |
| UBS Paine Webber Inc. | UBS Paine Webber Inc. | Inactive Client |
| | UBS AG | Active General Representation |
| United Parcel Service | United Parcel Service | Active General Representation |
| Universal Card | AT&T Corp. | Active General Representation |
| Universal Card | AT&T Corp. | Active General Representation |
| UPS Logistics Group | UPS Logistics Group | Inactive Client |
| | United Parcel Service | Active General Representation |
| US Bancorp Card Services Inc. | US Bancorp | Inactive Client |
| US Bank | US BANK | Inactive Client |
| | US Bancorp | Inactive Client |
| US Post Office-Sioux Falls | United States of America | Active General Representation |
| US Postal Service | United States of America | Active General Representation |
| Verizon Wireless | Verizon Wireless | Active General Representation |
| | Verizon Communications | Active General Representation |
| | Vodaphone Group | Active General Representation |
| Vinson & Elkins | Vinson & Elkins | Inactive Client |
| Visa | Visa | Inactive Client |
| Washington Group International Inc. | Washington Group International Inc. | Inactive Client |

**A422**

ATL/967162.11

| Northwestern Corporation Disclosures | | |
|---|---|---|
| Name of Entity Searched | Name of Entity and/or Affiliate of Entity that is a Paul Hastings Client | Status of Client Representation |
| Wells Fargo Bank | Wells Fargo Bank | Active General Representation |
| | Wells Fargo & Co. | Active General Representation |
| Wells Fargo Bank South Dakota | Wells Fargo & Co. | Active General Representation |
| Wells Fargo Card Services | Wells Fargo & Co. | Active General Representation |
| Wells Fargo Corporate Card | Wells Fargo & Co. | Active General Representation |
| Wells Fargo Shareowner Services | Wells Fargo & Co. | Active General Representation |
| West Group | Thomson Corporation | Inactive Client |
| William M Mercer Inc. | William M Mercer Inc. | Inactive Client |
| | Marsh & McLennan | Active General Representation |
| Wilmington Trust Company | Wilmington Trust Company | Active General Representation |
| Xerox Corporation | Xerox Corporation | Inactive Client |
| | | Active General Representation |
| Federal Energy Regulatory Commission | United States of America | Active General Representation |
| Harris Corporation | Harris Corporation | Active General Representation |
| Washington Group International Inc. | Washington Group International Inc. | Inactive Client |
| Ingram Micro Inc. | Ingram Micro Inc. | Inactive Client |
| Verizon Wireless Bellevue | Verizon Communication | Active General Representation |
| XPEDX | International Paper | Inactive Client |
| GE Support Services LP | General Electric Company Inc. | Active General Representation |
| Qwest | Qwest | Active General Representation |
| ADP Investors Communication Service | Automatic Data Processing Inc. | Inactive Client |
| Southern States Inc. | Allied Waste | Inactive Client |
| Wells Fargo Shareowner Services | Wells Fargo & Co. | Active General Representation |
| AT&T Corp. | AT&T Corp. | Active General Representation |
| | | |
| **Section F: Secured Creditors and Lienholders** | | |
| | | |

| Name of Entity Searched | Name of Entity and/or Affiliate of Entity that is a Paul Hastings Client | Status of Client Representation |
|---|---|---|
| Credit Suisse First Boston | Credit Suisse First Boston | Active General Representation |
| | Credit Suisse Group | Active General Representation |
| UBS AG | UBS AG | Active General Representation |
| Foothill Income Trust LP | Foothill Income Trust LP | Inactive Client |
| | Wells Fargo & Co | Active General Representation |
| Ableco Finance LLC | Ableco Finance LLC | Active General Representation |
| | Cerberus Partners LP | Active General Representation |
| Long Lane Master Trust IV | FleetBoston | Active General Representation |
| Canadian Imperial Bank of Commerce | Canadian Imperial Bank of Commerce | Active General Representation |
| Black Diamond Intl Funding, Ltd. | Black Diamond Capital Management | Inactive Client |
| Sunamerica Life Insurance Co | American International Group | Active General Representation |
| Black Diamond 1998-1 | Black Diamond Capital Management | Inactive Client |
| Black Diamond CLO 2000-1 LTD | Black Diamond Capital Management | Inactive Client |
| Syndicated Loan Funding Trust | Northern Trust | Inactive Client |
| Goldman Sachs Credit PTS LP | Goldman Sachs Credit PTS LP | Active General Representation |
| | Goldman Sachs & Co | Active General Representation |
| Elf Funding Trust I | Highland Capital Management | Inactive Client |
| Highland Legacy LTD | Highland Capital Management | Inactive Client |
| **Section G: Significant Professionals of the Debtors** | | |
| Bracewell & Patterson LLP | Bracewell & Patterson LLP | Inactive Client |
| Davis Wright Tremaine LLP | Davis Wright Tremaine LLP | Inactive Client |
| Gray Cary Ware & Freidenrich LLP | Gray Cary Ware & Freidenrich LLP | Inactive Client |
| Gust Rosenfeld P.L.C. | Gust Rosenfeld P.L.C. | Inactive Client |
| Jackson Lewis Schnitzler & Krupman | Jackson Lewis Schnitzler & Krupman | Inactive Client |
| Pillsbury Madison & Sutro LLP | Pillsbury Madison & Sutro LLP | Inactive Client |
| | Pillsbury Winthrop | Active General Representation |
| Preston Gates Ellis LLP | Preston Gates Ellis LLP | Inactive Client |

| Name of Entity Searched | Northwestern Corporation Disclosures | |
| | Name of Entity and/or Affiliate of Entity that is a Paul Hastings client | Status of Client Representation |
| --- | --- | --- |
| Reinhart, Boerner | Reinhart, Boerner | Inactive Client |
| Sidley, Austin | Sidley, Austin | Active General Representation |
| Skadden, Arps, Slate, Meagher & Flom LLP | Skadden, Arps, Slate, Meagher & Flom LLP | Active General Representation |
| Squire Sanders & Dempsey L.L.P. | Squire Sanders & Dempsey L.L.P. | Active General Representation |
| Deloitte & Touche | Deloitte Touche Tohmatsu | Inactive Client |
| Gibson Dunn & Crutcher | Gibson Dunn & Crutcher | Inactive Client |
| PWC | PriceWaterhouseCoopers | Active General Representation |
| D&T | Deloitte Touche Tohmatsu | Active General Representation |
| KPMG | KPMG | Active General Representation |
| Gavin Anderson | Omnicom | Active General Representation |
| Hewitt | Hewitt Associates | Inactive Client |
| Jones Day Reavis & Pogue | Jones Day Reavis & Pogue | Inactive Client |
| Russell Reynolds | Russell Reynolds | Inactive Client |
| Marsh | Marsh | Active General Representation |
| | | |
| **Section H: Investment Bankers for Debtors during last three years** | | |
| | | |
| Bear Stearns | Bear Sterns Companies | |
| Lazard Feres | Lazard Feres & Co. | Inactive Client |
| | | |
| **Section I Parties to Significant Contracts & Leases** | | |
| | | |
| Bonneville Power Administration | United States of America | Active General Representation |
| Colorado Interstate Gas | El Paso Energy | Inactive Client |
| Colstrip Unit 4 Lease Management Division of NorthWestern Energy | Colstrip Energy LP | Inactive Client |
| | Pacific Gas & Electric | Inactive Client |
| Duke Energy Corp. | Duke Energy Corp. | Active General Representation |
| | Duke Energy | Active General Representation |
| Duke Energy Trading & Marketing | Duke Energy Corp. | Active General Representation |

## A425

B-14

| Name of Entity Searched | Northwestern Corporation Disclosures Name of Entity and/or Affiliate of Entity that is a Paul Hastings client | Status of Client Representation |
|---|---|---|
|  | Duke Energy Trading & Marketing | Active General Representation |
| NOVA Gas Transmission Ltd. | Alberta Natural Gas | Inactive Client |
| PPL Montana | Pennsylvania Power & Light Co | Inactive Client |
| West Central Electric Cooperative | Rushmore Electric | Inactive Client |
| Western Area Power Administration | United States of America | Active General Representation |
| Xcel Energy Inc. | Xcel Energy Inc. | Inactive Client |
|  |  |  |
| **Section J:  Insurers of the Debtors** |  |  |
|  |  |  |
| AON Risk Services of Minnesota and Financial Service Inc. | AON Corp. | Inactive Client |
| Chubb Corporation | Chubb Corporation | Inactive Client |
| Continental Casualty Company | Loews Corp. | Inactive Client |
| Federal Insurance Company | Chubb Corp. | Inactive Client |
| Greenwich Insurance Company | XL Capital Ltd | Active General Representation |
| Lloyd's of London | Lloyd's of London | Inactive Client |
| Lumbermen's Mutual Casualty Company | Kemper Insurance Companies | Inactive Client |
| The Hartford | Hartford Life Insurance | Active General Representation |
|  | Hartford Financial Services | Active General Representation |
|  | Hartford Financial Services Group | Active General Representation |
| National Union | National Union Fire Insurance | Inactive Client |
|  | American International Group | Inactive Client |
| United States Fidelity and Guaranty Company | St Paul Companies | Inactive Client |
|  |  |  |
| **Section K:  Indenture Trustees** |  |  |
|  |  |  |
| JPMorgan Chase Bank | JP Morgan Chase & Co. | Active General Representation |
| Bank of New York | Bank of New York Company Inc. | Inactive Client |
| US Bank National Association | US Bancorp | Inactive Client |
| First National Bank of Chicago | Bank One Corporation | Inactive Client |
| Wilmington Trust Company | Wilmington Trust Company | Active General Representation |
| Citibank N.A | Citibank N.A | Inactive Client |
|  | Citigroup | Active General Representation |

**A426**

| Name of Entity Searched | Northwestern Corporation Disclosures Name of Entity and/or Affiliate of Entity that is a Paul Hastings client | Status of Client Representation |
|---|---|---|
| **Section L:  Parties to Significant Actual or Known Potential Litigation** | | |
| **Plaintiffs** | | |
| **None.** | | |
| **Defendants** | | |
| A.G. Edwards Investment Management Consulting Services, Inc. | A.G. Edwards Investment Management Consulting Services, Inc. | Inactive Client |
| Credit Suisse First Boston Corporation | Credit Suisse Group | Active General Representation |
| Gary G. Drook | Gary G. Drook | Pro-Bono Representation |
| Goldman Sachs & Co. | Goldman Sachs & Co. | Inactive Client |
| | Goldman Sachs Group Inc. | Active General Representation |
| Goldman Sachs Group Inc. | Goldman Sachs Group Inc. | Active General Representation |
| Merrill Lynch Pierce Fenner & Smith, Inc. | Merrill Lynch Pierce Fenner & Smith, Inc. | Inactive Client |
| | Merrill Lynch & Co. | Active General Representation |
| Milbank Tweed Hadley & McCloy LLP | Milbank Tweed Hadley & McCloy LLP | Inactive Client |
| Montana Power Co. | Northwestern | Active General Representation |
| Montana Power LLC | Northwestern | Active General Representation |
| Morgan Stanley & Co., Inc. | Morgan Stanley & Co., Inc. | Inactive Client |
| | Morgan Stanley | Active General Representation |
| Northern Trust Corporation | Northern Trust Corporation | Inactive Client |
| NorthWestern Capital Financing I | Northwestern | Active General Representation |
| NorthWestern Capital Financing II | Northwestern | Active General Representation |
| NorthWestern Capital Financing III | Northwestern | Active General Representation |
| NorthWestern Energy | Northwestern | Active General Representation |
| PPL Montana LLC | PPL Montana LLC | Inactive Client |
| Prudential Securities, Inc. | Prudential Securities, Inc. | Active General Representation |

**A427**

| Northwestern Corporation Disclosures | | |
| Name of Entity Searched | Name of Entity and/or Affiliate of Entity that is a Paul Hastings Client | Status of Client Representation |
| --- | --- | --- |
| | Prudential Financial Inc. | Active General Representation |
| Salomon Smith Barney, Inc. | Salomon Smith Barney, Inc. | Active General Representation |
| | Citigroup Inc. | Active General Representation |
| UBS Warburg LLC | UBS Warburg LLC | Inactive Client |
| | UBS AG | Active General Representation |
| Wilmington Trust Company 34051 | Wilmington Trust Company | Active General Representation |
| | | |
| **Section M: Other Significant Relationships/Potentially Adverse Parties** | | |
| | | |
| Congress Financial | Wachovia | Active General Representation |
| Lucent Technologies' Enterprise Network Group | Lucent Technologies Inc. | Active General Representation |

**A428**

ATL/967162.11

## EXHIBIT C

Northwestern Corporation

Payments Received June 16, 2003 through Sept. 12, 2003
Our Client Number 31259

| Billing Date | Period of Service | Payment Date | Fees Paid | Costs Paid | Total Paid |
|---|---|---|---|---|---|
| 15-May-03 | April 1 through April 30, 2003 | 31-Jul-03 | $1,175,727.50 | $45,252.25 | $1,220,979.75 |
| 18-Jun-03 | May 1 through May 31, 2003 | 31-Jul-03 | $1,052,991.25 | $60,645.23 | $1,113,636.48 |
| 8-Jul-03 | June 1 through June 30, 2003 | 29-Aug-03 | $1,113,329.10 | $86,877.28 | $1,200,206.38 |
| 18-Aug-03 | July 1 through July 31, 2003 | 10-Sep-03 | $1,299,898.75 | $66,174.64 | $1,366,073.39 |
| 31-Aug-03 | August 1 through August 31, 2003 | 10-Sep-03 | $1,586,582.50 | $43,771.81 | $1,630,354.31 |
| 11-Sep-03 | September 1 through September 14, 2003 | 12-Sep-03 | $698,865.00 | $87,748.83 | $786,613.83 |
| 11-Sep-03 | Retainer | 12-Sep-03 | $500,000.00 | $0.00 | $500,000.00 |
| 11-Sep-03 | Estimates of Time through September 14, 2003 | 12-Sep-03 | $475,000.00 | $0.00 | $475,000.00 |
| | | | $7,902,394.10 | $390,470.04 | $8,292,864.14 |

B-1

**A429**

**EXHIBIT B**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------- x
                                                    :
In re:                                              :        Chapter 11
                                                    :
Northwestern Corporation,                           :
                                                    :        Case No. 03-12872 (CGC)
                            Debtor.                 :
                                                    :
                                                    :
-------------------------------------------------------------- x

## DECLARATION OF TALTON EMBRY

TALTON EMBRY declares as follows:

1.      I am the principal and managing director of Magten Asset Management

Corporation ("Magten"). I submit this declaration (the "Declaration") in support of Magten's

motion to disqualify Paul, Hastings, Janofsky and Walker LLP ("Paul Hastings") as counsel to

the NorthWestern Corporation (the "Debtor").

2.      All facts set forth in this Declaration are based on my personal knowledge, upon

my review of relevant documents, or on my opinion based upon my experience and knowledge

of the above captioned chapter 11 case. If I were called upon to testify, I could and would testify

competently to the facts set forth herein. I am authorized to submit this Declaration.

3.      From the commencement of the Debtor's chapter 11 case, Magten believed that

due to Paul Hastings' role as counsel to the Debtor in connection with the fraudulent transfer of

the Montana Power Company's former electric, natural gas and propane utility assets (the

"Transfer"), to the Debtor by its subsidiary, Clark Fork and Blackfoot, LLC ("Clark Fork"), Paul

Hastings should not act on behalf of any parties in such dispute. In addition, Magten expected

that Paul Hastings, as Debtor's counsel, and Paul, Weiss, Rifkind, Wharton & Garrison LLP

("Paul Weiss"), as counsel to the Official Committee of Unsecured Creditors, should take neutral

1

positions in the intercreditor disputes arising out of the Transfer. When it became clear that Paul Hastings and Paul Weiss were not acting in a neutral fashion, their motives became suspect. In light of both Paul Hastings' role as counsel to the Debtor in connection with the Transfer and Paul Weiss' lack of neutrality in the intercreditor issues, Magten retained Storch Amini Munves PC ("Storch Amini") as conflicts counsel in March 2004.

4.      In or around May 2004, Storch Amini first made Magten aware that it was becoming clear that Paul Hastings not only represented the Debtor in connection with the Transfer, but that Paul Hastings also represented Clark Fork in connection with the Transfer. Before May 2004, Magten believed that Paul Hastings' role in the Transfer was limited to its representation of the Debtor. Had Magten been aware that Paul Hastings represented Clark Fork in the Transfer, Magten would have raised and pursued that conflict. At no time prior to May 2004 did Magten know, or even suspect, that Paul Hastings represented both Clark Fork and the Debtor in connection with the Transfer.

I declare under the penalty of perjury that the above statements are true and correct.

Dated: New York, New York
       July 13, 2004

By: _____
    Talton Embry

**A432**

2

**EXHIBIT C**

**A433**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------------x
                                          :
In re:                                    :      Chapter 11
                                          :
Northwestern Corporation,                 :
                                          :      Case No. 03-12872 (CGC)
                           Debtor.        :
                                          :
                                          :
-----------------------------------------------------------------x
```

## DECLARATION OF GARY L. KAPLAN

GARY L. KAPLAN declares as follows:

1.    I am an attorney with the firm of Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank"), counsel to Magten Asset Management Corporation ("Magten") in connection with the above captioned chapter 11 case.   I submit this declaration (the "Declaration") in support of Magten's motion to disqualify Paul, Hastings, Janofsky and Walker LLP ("Paul Hastings") as counsel to the NorthWestern Corporation (the "Debtor").

2.    I have been involved in all aspects of Fried Frank's representation of Magten in connection with the above captioned chapter 11 case.  All facts set forth in this Declaration are based on my personal knowledge, upon my review of relevant documents, or on my opinion based upon my experience and knowledge of this case.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Declaration.

**A434**

1

3.     Fried Frank was retained as counsel to Magten in October 2003. Since the date of its retention, Fried Frank has focused on the fraudulent transfer of the Montana Power Company's former electric, natural gas and propane utility assets (the "Transfer"), to the Debtor by its subsidiary, Clark Fork and Blackfoot, LLC ("Clark Fork"), and related issues.

4.     From early in its representation of Magten, Fried Frank expressed its belief that as Debtor's counsel, Paul Hastings should take a neutral role in the intercreditor issues arising out of the Transfer and attempt to foster a compromise among all creditors. When it became clear that Paul Hastings was not acting in a neutral fashion, Fried Frank raised with Paul Hastings and the Official Committee of Unsecured Creditors (the "Committee") a concern that due to Paul Hastings' role as counsel to the Debtor in connection with the Transfer, Paul Hastings had a bias and should not act on behalf of any parties in the Transfer dispute.

5.     Before May 2004, Fried Frank believed that Paul Hastings' role in the Transfer was limited to its representation of the Debtor. For example, in an effort to make sure all parties were aware of the legal and factual basis for Magten's claims, on February 24, 2004, Fried Frank circulated a memo (the "Memo") to the Committee and Paul Hastings describing the Transfer.[1] In the Memo, Fried Frank noted, among other things, that Paul Hastings acted as counsel to the Debtor with respect to the Transfer and, as a result, Paul Hastings would likely be a material witness in an action seeking to avoid the Transfer as fraudulent. Had Fried Frank been aware that Paul Hastings represented Clark Fork in the Transfer, that conflict would have been raised and pursued by Magten.

6.     Because of Paul Hastings' role as counsel to the Debtor, Magten retained Storch Amini Munves PC ("Storch Amini") as conflicts counsel. In or around May 2004, Storch Amini

---

[1]     The Memo was provided in connection with settlement discussions and, therefore, has not been provided to the Court. If the Court would like to review the Memo, a copy will be provided to the Court for *in camera* review.

first made Fried Frank aware that it was becoming clear that Paul Hastings not only represented the Debtor in connection with the Transfer, but that Paul Hastings also represented Clark Fork in connection with the Transfer.  At no time prior to May 2004 did Fried Frank know, or even suspect, that Paul Hastings represented both Clark Fork and the Debtor in connection with the Transfer.

   I declare under the penalty of perjury under the laws of the United States that the above statements are true and correct.

Dated:  New York, New York
        July 13, 2004

                                        By: _____
                                            Gary L. Kaplan

**A436**

**EXHIBIT D**

**A437**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

--------------------------------------------------------------------x
                            :

In re:                                  :        Chapter 11

                            :

Northwestern Corporation,        :

                            :        Case No. 03-12872 (CGC)

                   Debtor.     :

                            :

                            :
--------------------------------------------------------------------x

## DECLARATION OF BONNIE STEINGART

BONNIE STEINGART declares as follows:

    1.    I am an attorney and a member of the firm of Fried, Frank, Harris, Shriver &
Jacobson LLP ("Fried Frank"), counsel to Magten Asset Management Corporation ("Magten") in
connection with the above captioned chapter 11 case. I submit this declaration (the
"Declaration") in support of Magten's motion to disqualify Paul, Hastings, Janofsky and Walker
LLP ("Paul Hastings") as counsel to the NorthWestern Corporation (the "Debtor").

    2.    Since March 2004, I have been involved in all aspects of Fried Frank's
representation of Magten in connection with the above captioned chapter 11 case. All facts set
forth in this Declaration are based on my personal knowledge, upon my review of relevant
documents, or on my opinion based upon my experience and knowledge of this case. If I were
called upon to testify, I could and would testify competently to the facts set forth herein. I am
authorized to submit this Declaration.

**A438**

1

3.      Fried Frank was retained as counsel to Magten in October 2003. Since the date of its retention, Fried Frank has focused on the fraudulent transfer of the Montana Power Company's former electric, natural gas and propane utility assets (the "Transfer"), to the Debtor by its subsidiary, Clark Fork and Blackfoot, LLC ("Clark Fork"), and related issues.

4.      From early in its representation of Magten, Fried Frank expressed its belief that as Debtor's counsel, Paul Hastings should take a neutral role in the intercreditor issues arising out of the Transfer and attempt to foster a compromise among creditors. When it became clear that Paul Hastings was not acting in a neutral fashion, Fried Frank raised with Paul Hastings and the Official Committee of Unsecured Creditors (the "Committee") a concern that due to Paul Hastings' role as counsel to the Debtor in connection with the Transfer, Paul Hastings had a bias and should not act on behalf of any parties in the Transfer dispute.

5.      Before May 2004, Fried Frank believed that Paul Hastings' role in the Transfer was limited to its representation of the Debtor. Had Fried Frank been aware that Paul Hastings represented Clark Fork in the Transfer, that conflict would have been raised and pursued by Magten.

6.      Because of Paul Hastings' role as counsel to the Debtor, Magten retained Storch Amini Munves PC ("Storch Amini") as conflicts counsel. In or around May 2004, Storch Amini first made Fried Frank aware that it was becoming clear that Paul Hastings not only represented the Debtor in connection with the Transfer, but that Paul Hastings also represented Clark Fork in connection with the Transfer. At no time prior to May 2004 did Fried Frank know, or even suspect, that Paul Hastings represented both Clark Fork and the Debtor in connection with the Transfer.

**A439**

2

I declare under the penalty of perjury under the laws of the United States

that the above statements are true and correct.

Dated:  New York, New  York
        July 13, 2004

By: *[signature]*
    Bonnie Steingart

**A440**

3

**EXHIBIT E**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | Case No. 03-12872 ( ) |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |

### MOTION FOR AN ORDER AUTHORIZING DEBTOR TO CONTINUE AND MAINTAIN ITS (A) CONSOLIDATED CASH MANAGEMENT SYSTEM; (B) EXISTING BANK ACCOUNTS; (C) EXISTING BUSINESS FORMS; (D) PUBLIC PURPOSE PROGRAMS; AND (E) TO PAY ON AN INTERIM BASIS CERTAIN LIMITED INTERCOMPANY OBLIGATIONS; AND GRANTING RELATED RELIEF AND SCHEDULING A FINAL HEARING

NorthWestern Corporation, a Delaware corporation ("NOR" or the "Debtor"),

respectfully represents as follows:

### SUMMARY OF RELIEF REQUESTED[1]

1.    The Debtor's ability to continue and maintain its consolidated cash management

system, bank accounts and existing business forms is essential to the efficient administration of

the Debtor's estate and is necessary to prevent inordinate disruption to the Debtor's operations.

Indeed, any disruption in the means by which the Debtor manages its financial affairs and

satisfies its ordinary course post-petition obligations (and certain pre-petition obligations for

which separate approval is being sought)[2] would invariably cause severe disruption, confusion

---

[1]    Facts supporting the relief requested herein are set forth in the Affidavit of William M. Austin in support of First Day Motinos ("Austin Affidavit") filed contemporaenously herewith and the Affidavit of Kendall G. Kliewer attached hereto as Exhibit A (the "Kliewer Affidavit").

[2]    Simultaneously with the submission hereof, the Debtor is seeking, among other things, entry of orders authorizing it to (i) obtain post-petition financing on an interim and permanent basis pursuant to a debtor-in-possession revolving credit facility (the "DIP Credit Facility") and (ii) pay pre-petition payroll and related employee-benefit obligations.

**A442**

and delay in its overall operations, thereby jeopardizing the Debtor's reorganization at its commencement.[3]

2.     Similarly, the Debtor's ability to use the bank accounts set forth on Exhibit A to the Kliewer Affidavit (the "Bank Accounts"), the Debtor's existing checks, stationery and business forms (collectively, the "Business Forms"), and the Debtor's investment practices described more fully herein during the pendency of this Chapter 11 case without alteration or change will prevent inordinate and unnecessary disruption and expense and, thus, is in the best interests of the Debtor's estate and creditors.

3.     Further, in connection with Debtor's DIP financing motion, the Debtor seeks authority to comply with the proposed terms of the DIP Credit Facility to the extent such terms impact Debtor's existing cash management practices.

4.     Accordingly, by this Motion, the Debtor seeks entry of an order[4] pursuant to §§ 105, 362(a), 363(c)(1), 1107 and 1108 of Title 11, United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"):

    (a)     authorizing the Debtor, on the terms set forth below, to continue to consolidate the management of its cash without interruption in the ordinary course of business and to comply with the terms of the DIP Credit Facility as appropriate on an interim and final basis;

    (b)     directing the Banks (as defined below) to transfer daily at the request and direction of the Debtor any funds in the Debtor's operating accounts (collectively, the "Operating Accounts") to the extent set forth herein;

    (c)     authorizing the Debtor to maintain and continue to use, with the same account numbers, its Bank Accounts, and directing that all such accounts be treated for all purposes as accounts of the Debtor as debtor-in-possession;

---

[3]     In preparing for the filing of the petition and commencement of this case, the Debtor stopped issuing checks on September 10, 2003 in an attempt to minimize disruption of payments to vendors and other creditors.

[4]     The Debtor's proposed order (the "Proposed Order") is annexed hereto.

**A443**

2

(d)     authorizing and directing the Banks to service and administer the Bank Accounts without interruption and in the usual and ordinary course, and to receive, process, honor and pay any and all checks and drafts drawn on the Accounts; and permitting checks issued but not paid by the Debtor prior to the commencement of this Chapter 11 case to be honored up to the approximate amount of $3.3 Million;[5]

(e)     authorizing the Debtor to use, in their present form, existing checks and other documents, including its existing Business Forms, relating to the Bank Accounts without the designation "Debtor-in-Possession" or "DIP" added thereon;

(f)     authorizing the Debtor to continue uninterrupted its energy efficiency-related programs and related activities (collectively, the "Public Purpose Programs") that are legislatively or regulatorily mandated and that are fully funded by a special surcharge paid by all ratepayers;

(g)     authorizing the Debtor on an interim basis to continue funding certain limited intercompany obligations up to $600,000 per month during the interim period; and

(h)     scheduling a final hearing.

## JURISDICTION

5.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this Chapter 11 case and this Motion are proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A.     Commencement of the Chapter 11 Case

6.     On the date hereof, (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor continues to operate its businesses and manages its properties as a debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

---

[5]     The Debtor intends to provide a list of outstanding checks at the first day hearing. As a regulated utility, the Debtor is concerned that the return of pre-petition checks would disrupt the Debtor's ability to deliver uninterrupted services to its customers.

**A444**

7.    No request has been made for the appointment of a trustee or examiner in this case and no official committee of unsecured creditors has yet been appointed by the Office of the United States Trustee.

**B.    Background of the Debtor**

8.    NOR is a publicly traded Delaware corporation which was incorporated in 1923. NOR and its direct and indirect nondebtor energy subsidiaries comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 598,000 customers throughout Montana, South Dakota and Nebraska.[6]

**MAINTENANCE OF THE DEBTOR'S**
**CASH MANAGEMENT SYSTEM AND BANK ACCOUNTS**

**C.    Overview of Cash Management System**

9.    In the ordinary course of its business, the Debtor, like most large companies, maintains a consolidated cash management system for the receipt and disbursement of cash. As a part of this system, the Debtor has established a centralized account for the concentration of its cash (the "General Corporate Account") maintained by NOR at Wells Fargo Bank ("Wells Fargo") pursuant to a group of agreements[7] with Wells Fargo that are referred to collectively as the "Cash Management Agreement," as well as several Bank Accounts through which funds are received and disbursed.[8]  The principal flow of funds through the cash management system is

---

[6]    A more detailed overview is set forth in the Austin Affidavit.

[7]    The term "Cash Management Agreement" refers to, among other agreements, agreements entitled: (1) "Acceptance of Services and Wire Transfer," (2) a "General Account," (3) "Montana ORCOM," (4) "South Dakota ORCOM," (5) "Payroll," and (6) "BPA," all of which are covered by an Acceptance of Services and Wire Transfer Agreement between NOR and Wells Fargo Bank Montana, N.A.

[8]    A list of the Bank Accounts is set forth on Exhibit A to the Kliewer Affidavit.

**A445**

described in detail below. In addition, attached to the Kliewer Affidavit as <u>Exhibit B</u> is a chart summarizing the flow of funds through the Debtor's cash management system.

**D.    Collections**

10.    The Debtor receives approximately $10 million to $20 million per week in collections from its customers, depending on the season. These funds are received primarily into one of two accounts, the Montana Orcom Depository Account and the South Dakota Orcom Depository (collectively, the "Orcom Accounts"), maintained at Wells Fargo. The Orcom Accounts are swept daily into the General Corporate Account. Additionally, NOR maintains an account (the "CorTrust OrCom Account"), with CorTrust Bank to receive Orcom area deposits in Webster, South Dakota, where Wells Fargo does not have a branch location. The CorTrust Orcom Account is swept into the General Corporate Account on a monthly basis, and accounts for approximately $60,000 of collections monthly.

11.    In addition to the General Corporate Account, the Debtor collects cash deposits relating to the Debtor's purchase of energy from various qualifying facilities (the "Qualifying Facilities"), as defined by the Federal Energy Regulatory Commission ("FERC"), into four accounts that the Debtor maintains with Wells Fargo. Under their respective agreements, the Debtor is authorized to withhold a certain portion of payments made in conjunction with Debtor's purchase of energy from the Qualifying Facilities. Such funds are held on behalf of the Debtor to cover overpayments that may be made to the Qualifying Facilities due to the long term nature of the Qualifying Facility contracts. The funds are used only to fund the payments and deposits that serve as a "true up" mechanism under the Qualifying Facility contracts and the Debtor seeks an order permitting it to retain these accounts.[9]

---

[9]    As of the Petition Date, the four accounts used to collect deposits relating to the Qualifying Facilities hold the following amounts: Wells Fargo Investments Special Funds – South Dry Creek account held $1,014,000, the

5    **A446**

**E.**    **Deposits**

Customer Deposits

12.    A portion of the funds deposited into the Orcom Accounts are deposits made by the Debtor's customers (the "Deposits"). Such Deposits are swept into the General Corporate Account as permitted under applicable state law. [10] As of the Petition Date, the Debtor holds approximately $3.6 million in Deposits. Accrued interest on the Deposits is approximately $200,000.

BPA Credit Account

13.    Pursuant to the Northwest Power Act of 1980, all of NOR's residential and small farm customers are entitled to receive benefits (primarily consisting of power) from the Federal Columbia River Power System ("FCRPS") pursuant to the Residential Exchange Provisions of the Northwest Power Act.

14.    NOR entered into a Settlement Agreement for its customer Residential Exchange rights with the Bonneville Power Administration ("BPA") beginning October 1, 2001 for a ten year term. This Settlement Agreement requires NOR to convert its customers' power benefits into financial benefits with a value equal to the forecast market value of power less the lowest rate BPA charges its customers for power.

15.    NOR has begun accumulating financial benefits for its customers, to be credited in NOR's 2003/2004 fiscal year. The budgeted amount of such credits during the 2003/2004

---

Wells Fargo Bank Special Funds – South Dry Creek account held $236,000, the Wells Fargo Investments Special Funds – Strawberry Creek account held $208,000, and the Wells Fargo Bank Special Funds – Strawberry Creek account held $38,000.

[10]    The applicable state laws governing the treatment of deposits do not require the Debtor to segregate the Deposits from the other funds in the General Corporate Account. Rather, when a customer becomes entitled to the return of its Deposit, the Debtor is obligated to return the dollar amount of the Deposit to the customer along with the payment of the relevant statutory rate of interest, which varies from 3% to 7% per annum.

**A447**

fiscal year is approximately $2,100,000. The benefits are to be distributed, along with the

ongoing monthly benefits, to all of NOR's residential and small farm customers through a credit

to their distribution costs.

### Gas Funding Trust Account

16.    The Montana Power Company ("Montana Power") formed the MPC Natural Gas

Funding Trust (the "Trust") for the purpose of holding all rights to certain revenues from

surcharges paid by NOR's utility customers located in Montana (the "Charges"). NOR, as the

successor to the transmission and distribution business of Montana Power, serves as the servicing

agent for the Trust. In its capacity as servicing agent, NOR collects the Charges on behalf of the

Trust when it collects its Montana customers' normal monthly utility bills. The Charges are a

separate item included in its customers' monthly utility bills. NOR collects an average of

approximately $650,000 in Charges per month[11]. When a Montana customer pays its bill (which

includes the Charges), the funds are deposited into the Montana Orcom Depository Account

which, in turn, is swept daily into the General Corporate Account. From the General Corporate

Account, the funds representing the Charges are sent to a special account (the "Gas Funding

Trust Account") controlled by and maintained at U.S. Bank National Association ("U.S. Bank"),

which serves as the trustee of the Trust. U.S. Bank, not NOR, controls the Gas Funding Trust

Account.[12] NOR is required to remit to the Gas Funding Trust Account funds to make principal

---

[11]    Collections are cyclical, reflecting the nature of a customer's power consumption, ranging from a high of approximately $1.1 million in March, 2003 to a low of approximately $225,000 in September, 2002. Collections are generally higher in the winter and spring and lower in the summer and fall.

[12]    In addition to the Gas Funding Trust Account, U.S. Bank maintains four subaccounts which provide credit enhancement for the Trust. The four subaccounts include a Capital Account (prefunded), an Overcollateralization Account (funded ratably over the life), a Reserve Account (floats on an actual basis) and a Liquidity Account (prefunded).

**A448**

and interest payments on certain outstanding 6.20% transition bonds issued by the Trust which mature in 2012.

## F.    Operating Accounts

17.    Funds received by NOR from collection and deposit activities are disbursed from the General Corporate Account to one of several Operating Accounts for payments to third parties. The Debtor's primary operating accounts are the Payroll Account and the Checking Account.

### Payroll Account

18.    The Debtor's employees are paid from an account NOR maintains at Wells Fargo (the "Payroll Account"). Employees are paid every other Friday. Prior to each pay date, an employee from NOR's Human Resources Department informs an employee from NOR's Treasury Department of the amount necessary to fund the payroll. These funds are then transferred from the General Corporate Account to the Payroll Account to be used to pay employees.[13] The Debtor is seeking an order permitting all of the outstanding payroll account checks to be honored and paid. On September 5, 2003, the Debtor last funded payroll in an amount equal to approximately $3,078,000.[14] As of the Petition Date, approximately $126,000 in payroll checks remained outstanding. The Debtor's next payroll which covers pre-petition services is on September 19, 2003.

---

[13]    As an accommodation to its Blue Dot subsidiary and pursuant to a written reimbursement agreement between the Debtor and Blue Dot, Debtor processes payroll for certain Blue Dot employees. On a monthly basis, the Debtor pays certain Blue Dot employees an aggregate of approximately $150,000 and, in turn, NOR is reimbursed by Blue Dot prior to the next payroll processing. The Debtor seeks an order permitting it to continue to process payroll not to exceed $200,000 for these Blue Dot employees so long as Blue Dot continues to timely reimburse the Debtor.

[14]    On September 12, 2003, the Debtor funded an interim payroll in the approximate amount of $190,000.

**A449**

### Checking Account

19.    The Debtor's operating expenses are generally paid from a checking account (the "Checking Account") maintained by NOR at Wells Fargo.[15]  NOR periodically transfers funds from the General Corporate Account to the Checking Account to provide funds for checks to be written.

### Miscellaneous Specific Purpose Accounts

20.    The Checking Account is also used to fund two "Right-of-Way Accounts"[16] used to reimburse employees for expenses securing easements over property for building pipeline and transmission lines, paying recording fees, and any damage payments related to the construction of such lines.  The average monthly expenditures from the Right-of-Way Accounts are approximately $3,500.  As of the Petition Date, the Right-of-Way Accounts had approximately $5,500 on deposit, with no issued and outstanding checks.  The Debtor is seeking an order permitting all of the outstanding Right-of-Way Account checks to be honored and paid.

21.    In addition to the Checking Account, the Debtor maintains a checking account with Wells Fargo to fund South Dakota sales and use tax payments and COBRA payments for approximately 100 employees (the "South Dakota Checking Account").  This account is also funded by the General Corporate Account.  As of September 12, 2003, the balance of the South

---

[15]    Prior to August 1, 2003, NOR maintained a controlled disbursements account with Wells Fargo (the "Controlled Disbursements Account").  Under the terms of the Controlled Disbursements Account, NOR was not required to maintain sufficient funds in the account to cover all outstanding checks.  In the event of an overdraft, the bank would honor the check, and NOR would later transfer funds into the Controlled Disbursements Account.  On August 1, 2003, NOR discontinued use of the Controlled Disbursements Account and began to use the Checking Account.  Although NOR has discontinued writing checks from the Controlled Disbursements Account, the Debtor is seeking an order allowing the Controlled Disbursements Account to remain open until the first quarter of 2004 so all outstanding checks will clear.  As of the Petition Date approximately $171,000 has not cleared.  The bank automatically debits the General Corporate Account when checks clear.

[16]    A Right-of-Way Account is maintained in Montana with U.S. Bank, and a Right-of-Way Account is maintained in South Dakota with Wells Fargo.

**A450**

Dakota Checking Account was approximately $184,000, with approximately $7,000 in issued and outstanding checks. The Debtor is seeking an order permitting all of the outstanding South Dakota Checking Account checks to be honored and paid.

22.     The Debtor maintains seven accounts (the "Montana Petty Cash and Reimbursement Accounts") with various banks in Montana[17] to fund petty cash and reimbursements to employees for small expenditures. The Montana Petty Cash and Reimbursement Accounts are funded from the General Corporate Account. None of the Montana Petty Cash and Reimbursement Accounts maintain a balance greater than $3,000. The Debtor seeks an order permitting it to maintain the Montana Petty Cash and Reimbursement Accounts.

## G.     Accounts to be Maintained

23.     Set forth below is a table identifying the accounts the Debtor seeks to maintain and the purpose for which such account is maintained:

### Collections Accounts

| Bank | Account # | Purpose of Account |
|------|-----------|--------------------|
| Wells Fargo | 4945053304 | Montana Orcom Depository Account |
| Wells Fargo | 4945053312 | South Dakota Orcom Depository Account |
| CorTrust Bank NA | 62400050 | CorTrust OrCom Account |

### Deposit Accounts

| Bank | Account # | Purpose of Account |
|------|-----------|--------------------|
| US Bank | 33371500 | Gas Funding Trust Account |

---

[17]     The following is a listing of petty cash accounts and their locations: U.S. Bank – Butte Division; Wells Fargo – Helena Division; First Security – Bozeman Division; U.S. Bank – Billings Division; First Interstate – Missoula Division; U.S. Bank – Great Falls Division; and Wells Fargo – Kalispell.

**A451**

### Operating Accounts

| Bank | Account # | Purpose of Account |
|---|---|---|
| Wells Fargo | 4945053296 | General Corporate Account |
| Wells Fargo | 4945053320 | Payroll Account |
| Wells Fargo | 4945080539 | Checking Account |

### Miscellaneous Specific Purpose Accounts

| Bank | Account # | Purpose of Account |
|---|---|---|
| US Bank | 1-500-8007-1825 | Right-of-Way Account |
| Wells Fargo | 0841755119 | Right-of-Way Account |
| Wells Fargo | 1800008803 | South Dakota Checking Account |
| US Bank | 1-562-1000-8470 | Petty Cash Account |
| Wells Fargo | 426-0009-005 | Petty Cash Account |
| First Security | 11353 | Petty Cash Account |
| US Bank | 1-520-1016-3060 | Petty Cash Account |
| First Interstate | 1400010100 | Petty Cash Account |
| US Bank | 1-500-1006-8610 | Petty Cash Account |
| Wells Fargo | 4270011252 | Petty Cash Account |
| GE Capital | CD# 0127566616 | P-Card Account |
| US Bank | 175095012084 | First American Administrator funding account for claims from previous health insurance carrier |
| Wells Fargo | 2391749021 | LC Cash Collateral Account |
| Wells Fargo | 4945060515 | LC Cash Collateral Account |
| Bank of New York | 308340 | Captive Insurance Account |
| Bank of Bermuda | 1000112 | Captive Insurance Account |
| Bank of Bermuda | 808755 | Captive Insurance Account |
| UBS | CP 27984 16 | Investment Account |
| UBS | CP 29119 16 | LC Support Account |
| Solomon Smith Barney | 383-9B889-11829 | Investment Account |
| Wells Fargo Investments Special Funds | W45284802 | Qualifying Facilities Account |
| Wells Fargo Bank Special Funds | 852-0211430 | Qualifying Facilities Account |
| Wells Fargo Investments Special Funds | W45284803 | Qualifying Facilities Account |
| Wells Fargo Bank Special Funds | 852-0214412 | Qualifying Facilities Account |
| Wells Fargo | 4945078863 | BPA Credit Account |
| Wells Fargo | 2391893308 | BPA Collateral Deposit Account (Electric Supply) |
| Wells Fargo | 2391910029 | BPA Collateral Deposit Account (Transmission) |
| US Bank | 33371502 | Gas Funding Trust Account |
| US Bank | 33371504 | Gas Funding Trust Account |
| US Bank | 33371501 | Gas Funding Trust Account |
| US Bank | 33371503 | Gas Funding Trust Account |

**A452**

Intercompany Support Accounts

| Bank | Account # | Purpose of Account |
|---|---|---|
| The First National Bank of Sioux Falls | 30110729 | MFM Account |
| Royal Bank of Canada | 123-551-4 | CMP Account |
| Wells Fargo | 2391911324 | NEM Account |

**H.    Accounts to be Closed**

24.    As of the Petition Date, the Debtor was in the process of closing a number of

Bank Accounts, including the following:

| Bank | Account # |
|---|---|
| Citibank | 0003-9319 |
| United Missouri Bank | 9871047016 |
| United Missouri Bank | 5008007330 |
| US Bank | 150080663316 |
| US Bank | 156210893178 |
| US Bank | 156210000816 |
| US Bank | 156210482899 |
| Wells Fargo | 9600112264 |
| Citibank | 0003-9319 |

25.    As to each such account, Debtor seeks an order allowing all outstanding checks to

be honored and paid and, to the extent necessary, to fund such accounts with amounts sufficient

to cover all outstanding checks.  Each of these accounts are to be closed as soon as all checks

have cleared and in any event on or before November 1, 2003.

**I.    Relief Requested with Respect to Cash Management System and Bank Accounts**

26.    The Debtor hereby seeks authorization to continue utilizing its consolidated cash

management system and Bank Accounts without disruption.  Given the substantial size and

complexity of the Debtor's operations, the Debtor simply cannot successfully preserve

relationships with its employees, vendors and customers if its cash management procedures are

disrupted.  Because any interruption in payments to vendors could cause a delay in the delivery

of power to customers, it is essential that the Debtor be permitted to continue familiar cash

management procedures already in place.  If such relief is not granted, the Debtor will invariably

experience severe operating difficulties which would likely cause serious consequences and repercussions for the Debtor's employee, vendor and, ultimately, customer relationships.[18]

27.    Moreover, to efficiently and expediently implement the Debtor's debtor-in-possession financing arrangements (if such authorization is granted by this Court), the Banks must be authorized and directed to continue to consolidate the Debtor's funds in accordance with pre-petition practices and requirements imposed by the DIP Credit Facility on an interim and final basis, and the automatic stay coupled with the Court's general equitable powers, pursuant to §§ 105 and 362(a) of the Bankruptcy Code, must be reaffirmed so as to preclude the Banks from offsetting, recouping, affecting or otherwise impeding the use or transfer of, or access to, any funds of the Debtor contained or deposited in the Bank Accounts on or subsequent to the commencement of this Chapter 11 case for any reason or on account of any Claim (as defined in § 101(5) of the Bankruptcy Code) of the Banks.

28.    Furthermore, the Banks must be directed to transfer and fund on a daily basis, in accordance with pre-Petition Date practices, the amounts required for the administration of the disbursing activities associated with the Bank Accounts. The Debtor proposes to pay the Banks any reasonable fees and reimbursable expenses that they may incur post-petition pursuant to established pre-petition practices.

29.    In an effort to manage this process efficiently, the Debtor stopped issuing checks on September 10, 2003 and, to distinguish between pre-petition date and post-petition date checks, the Debtor has left a "gap" in its check numbers such that check numbers preceding the gap will be readily identifiable as checks issued pre-petition.

---

[18]    As described above, the Debtor is working diligently to improve and streamline its cash management system and ensure the system continues to function efficiently.

**A454**

**J.    Legal Standard**

30.    Bankruptcy courts routinely grant Chapter 11 debtors authority to continue

utilizing existing cash management systems, treating requests for such authority as relatively

"simple matters." In re Baldwin-United Corp., 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987); In re

UNR Indus. Inc., 46 B.R. 25, 27 (Bankr. N.D. Ill. 1984) (debtor "utilize[d] a court-approved and

common cash management system"). Similarly, Courts in this judicial district have routinely

granted such relief. *See, e.g.*, In re Tandycrafts, Inc. et al., No. 01-1764 (Bankr. D. Del. filed

May 15, 2001); In re MMH Holdings, Inc., et al., No. 00-2027 (Bankr. D. Del. filed May 17,

2000) (order authorizing use of existing cash management system and use of pre-petition bank

accounts); In re London Fog Indus., Inc., et al., No. 99-3446 (Bankr. D. Del. filed Sept. 27,

1999) (same); In re Trism, Inc. et al, No. 99-3364 (Bankr. D. Del. filed Sept. 16, 1999) (same);

In re Philip Services (Delaware), Inc., No. 99-02385 (Bankr. D. Del. June 28, 1999) (same); In re

Ithaca Indus., Inc., No. 96-1583 (Bankr D. Del. filed Oct. 7, 1996). For the reasons set forth

herein, and consistent with the relief granted in the cases cited above, the Debtor submits that it

is in the best interest of its estate, employees, creditors and customers for the Debtor to continue

its pre-petition cash management system.[19]

**MAINTENANCE OF THE DEBTOR'S BANK ACCOUNTS AND BUSINESS FORMS**

31.    The Debtor also seeks a waiver of the United States Trustee's requirement that all

pre-petition bank accounts be closed and that new post-petition bank accounts be opened. The

---

[19]    In another context, the bankruptcy court in the Columbia Gas chapter 11 cases explained that a centralized
cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of
maintaining separate cash accounts for the many different purposes that require cash." In re Columbia Gas Sys.,
Inc., 136 B.R. 930, 934 (Bankr. D. Del. 1991) (examining the validity of certain customer refund claims to funds
maintained in the Debtor's centralized cash management system), *aff'd in part and rev'd in part*, 1992 U.S. Dist.
LEXIS 9460 (D. Del. 1992), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993). The Third Circuit agreed,
emphasizing that a requirement to maintain all accounts separately "would be a huge administrative burden and
economically inefficient." Columbia Gas, 997 F.2d at 1061.

**A455**

United States Trustee has established certain operating guidelines for debtors-in-possession

operating their businesses, including the general requirement that a Chapter 11 debtor open new

bank accounts and close its old ones. This requirement is designed to (a) provide a clear line of

demarcation between pre-petition and post-petition transactions and operations and (b) block the

inadvertent payment of pre-petition claims through the payment of checks drawn prior to the

filing of a petition. However, notwithstanding this requirement, compliance would cause the

Debtor undue hardship given the number of special purpose accounts maintained by the Debtor

and the Debtor's need to ensure uninterrupted payments to vendors as well as appropriate

maintenance to a myriad of customer deposits.

   32. For similar reasons, the Debtor believes that its continued use of the existing

checks and other documents, including its existing Business Forms, relating to the Payroll

Account and the other Bank Accounts, without the addition of the designation of "Debtor-in-

Possession" or "DIP," will avoid the adverse effects to the Debtor's operations which would be

expected to occur if the Debtor was required to suspend essential business functions pending the

production of and transition to new forms. Accordingly, such relief will minimize any disruption

the Chapter 11 filing may have on the Debtor's business operations, and thus serves the best

interest of the Debtor's estate, its employees, vendors and customers. As required by Del. Bankr.

L. R. 1007-2, once the Debtor's existing checks have been used, the Debtor shall, when

recordering checks, include the designation of "Debtor-in-Possession" and the bankruptcy case

number on all such checks.

   33. Relief similar to the relief requested herein has been granted in other comparable

Chapter 11 cases in this District. *See, e.g.*, In re USG Corp., No. 01-02094 (Bankr. D. Del. filed

June 27, 2001); In re Pillowtex, Inc., No. 00-04211 (Bankr. D. Del. filed Nov. 14, 2000); In re

**A456**

15

Purina Mills, Inc., No. 99-03938 (Bankr. D. Del. filed Oct. 29, 1999); In re Loewen Group Int'l,

Inc., No. 99-1244 (Bankr. D. Del. filed June 1, 1999); In re Borden Chems. & Plastics Operating

Partnership, No. 01-01268 (Bankr. D. Del. filed Apr. 2, 2001).

### MAINTENANCE OF THE DEBTOR'S PUBLIC PURPOSE PROGRAMS

34.     The Debtor also seeks authorization to continue uninterrupted certain public

purpose programs (the "Public Purpose Programs").[20]  These programs are legislatively

mandated and fully funded by a special surcharge (the "Surcharge") paid by all of the Debtor's

rate paying customers.  Surcharges collected by the Debtor must be turned over to the

appropriate Public Purpose Program and, as such, the Surcharges do not belong to the Debtor

and are not part of the Debtor's Estate.

35.     In connection with its administration of the Public Purpose Programs, the Debtor

incurs certain costs to hire and pay vendors and contractors necessary to fulfill the mandates of

the Public Purpose Programs.

36.     With regard to the Public Purpose Programs, the Debtor seeks authority to

maintain these statutorily required Public Purpose Programs.

**K.**     **Legal Standard**

The Debtor is merely a conduit of the Public Purpose Programs, and funds collected on
its behalf therefore do not constitute part of the bankruptcy estate.

37.     Section 541(d) of the Bankruptcy Code provides in pertinent part:

> Property in which the debtor holds, as of the commencement of the
> case, only legal title and not an equitable interest . . . becomes
> property of the estate . . . only to the extent of the debtor's legal
> title to such property, but not to the extent of any equitable interest
> in such property that the debtor does not hold.

---

[20]     The Public Purpose Programs are identified on Exhibit C to the Kliewer Affidavit.

**A457**

38.    The Debtor is merely a conduit for the Public Purpose Programs to collect and transfer the Surcharges to the designated programs. The Debtor has no equitable interest in funds collected under these programs and, under § 541(d), should therefore be permitted to continue to apply the funds to their legislatively mandated purposes, including the payment of outstanding pre-petition obligations owed to qualifying customers, vendors and contractors on account of the Public Purpose Programs.[21]

> Payment of pre-petition obligations pursuant to the Public Purpose Programs should be authorized pursuant to § 105 of the Bankruptcy Code and the Court's inherent equitable powers.

39.    Section 105 of the Bankruptcy Code authorizes this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The purpose of § 105 is to "assure the bankruptcy court's power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction." 2 Collier on Bankruptcy 105.01 at 105-6 (15th ed. rev. 2000).

40.    It is essential that the Debtor be permitted to carry out the Public Purpose Programs. Customer confidence in both government and public utilities would be seriously eroded if the Debtor is not permitted to turnover the Surcharges assessed by legislatively-mandated programs.

41.    Accordingly, the Debtor requests that, pursuant to the Court's authority under § 105(a) of the Bankruptcy Code, the Court authorize the Debtor to continue with all the legislatively mandated Public Purpose Programs, including bringing current and remaining

---

[21]    *See, e.g.* In Re Columbia Gas Systems, Inc., 997 F.2d 1039, 1054 (3d Cir. 1993). In Columbia Gas, the debtor was permitted to pay certain pre-petition obligations, including refunds collected from upstream suppliers pursuant to a FERC order and owed to the debtor's customers and gas surcharges collected pursuant to federal regulations and owed to a non-profit industry research institute under constructive trust analysis.

current on all obligations to customers, vendors and contractors who qualify for payment from funds assessed and collected for the Public Purpose Programs.

## PAYMENT OF INTERCOMPANY OBLIGATIONS

### L.    Description of Intercompany Obligations

42.    The Debtor seeks interim and final authority pursuant to § 363(b) of the Bankruptcy Code to maintain its practice of paying certain intercompany obligations to four of its wholly-owned non-debtor subsidiaries: The Canadian-Montana Pipeline Company, Montana First Megawatts, LLC, Clark Fork & Blackfoot, LLC and NorthWestern Services Corporation. Section 363(b) provides in relevant part that "the trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." For the reasons stated below, the Debtor's estate will benefit by the continued payment of these sums.

#### CMP Account

43.    The Debtor's General Corporate Account funds a Canadian dollar account with Royal Bank General held by the Canadian-Montana Pipeline Company (the "CMP Account"), a non-debtor affiliate of the Debtor, that is used for disbursing Canadian dollar payments (including taxes, director fees and vendors) on behalf of the Canadian-Montana Pipeline Company. The CMP Account is primarily utilized to make property and income tax payments. As of the Petition Date, the balance of the CMP Account was approximately $79,000. Over the past 12 months, NOR has not transferred any funds into the CMP Account.

#### MFM Operating Account

44.    The Debtor also holds an account for Montana First Megawatts, LLC (the "MFM Account"). This account has not been funded since the project was initiated and bank financing obtained in 2002. The Debtor does not expect to fund this account going forward because the Debtor pays all Montana First Megawatts expenses directly to Montana First Megawatts'

vendors. The annual budget for Montana First Megawatts, LLC is approximately $860,000, or approximately $72,000 per month. As of the Petition Date, the balance of the MFM Account was $15,000. The Debtor seeks an order on an interim basis to fund $72,000 per month.

### Payments to Clark Fork & Blackfoot

45.    The Debtor is party to two agreements[22] with its non-debtor subsidiary, Clark Fork & Blackfoot ("CF&B"), which require the Debtor to pay any costs and expenses that arise in connection with the operation and maintenance of the Milltown Dam.

46.    Under the terms of the Environmental Support Agreement, the Debtor is obligated to make funds available to CF&B in the event that it runs short of cash and other liquid assets it needs in order to meet any obligation to make payments in respect of environmental liabilities. Debtor's liability under the Environmental Support Agreement is capped at $10,000,000. To date, the Debtor has not been required to pay any funds to CF&B under the terms of the Environmental Support Agreement.

47.    Under the terms of the Costs Support Agreement, the Debtor is required to make funds available to CF&B in the event that it is unable to pay its trade accounts arising out of its ordinary course of business, or to pay any other costs and expenses (other than environmental liabilities covered by the Environmental Support Agreement) that arise in connection with the operation or maintenance of the Milltown Dam. Since January 1, 2003, the Debtor has paid approximately $270,000 per month to fulfill its obligations under the terms of the Costs Support Agreement. Debtor reasonably anticipates that under the terms of this agreement it will be

---

[22]    The two agreements are an Environmental Liabilities Support Agreement, (the "Environmental Support Agreement") and a Maintenance and Operating Costs Support Agreement (the "Costs Support Agreement"), (collectively, the "Support Agreements"). Both Support Agreements are dated as of November 15, 2002, and both are between the Debtor and a predecessor-in-interest to CF&B.

**A460**

required to pay the sum of approximately $370,000 per month through December 31, 2003. The Debtor is seeking an order on an interim basis permitting it to pay $370,000 per month.

48.    The property owned by CF&B is the subject of significant environmental liability, and has been the subject of investigation and remediation by the U.S. Environmental Protection Agency, as well as investigation and regulatory action by state environmental authorities. The existence of and sums expended by the Debtor pursuant to the Support Agreements serve to protect the Debtor from additional liabilities from third parties that would accrue to the Debtor if the Support Agreements were not in place. If Debtor were unable to make the payments required by the Support Agreements, the value of Debtor's estate could be exposed to third party claims in excess of amounts required under the Environmental Support Agreement.

49.    Similarly, were CF&B to initiate Chapter 11 proceedings, the Debtor estimates that the costs incurred would significantly exceed amounts to be paid under the Support Agreements.

50.    The Debtor requests that it be permitted to continue its payments on an emergency and interim basis under the Support Agreements so as to minimize third party claims and to cap the Debtor's liability, thus minimizing liability, costs and administrative expense.[23]

### Payments to NorthWestern Services Corporation

51.    The Debtor also seeks authority to continue to make monthly support payments on an interim and emergency basis to its wholly-owned, non-debtor subsidiary, NorthWestern Services Corporation ("NSC") pursuant to written agreements between the Debtor and the predecessor-in-interest to NSC.[24] Pursuant to each of these agreements, the Debtor advances

---

[23]    The proposed DIP lenders have been informed of Debtor's request to continue its past practices under the Support Agreements, and the DIP lenders have consented to same.

[24]    The three agreements are the Management Services Agreement, dated January 1, 2000 (the "MSA"), the

funds to NSC for the bulk purchases of gas. Upon NSC's sale of the gas, the Debtor is reimbursed for funds advanced under the NSC Support Agreements. In the preceding twelve months, the Debtor has been fully reimbursed for all funds advanced to NSC under the Support Agreements and received revenues of approximately $50,000.

52.    Because the NSC Support Agreements result in positive cash flow to the Debtor, the Debtor seeks authority on an emergency and interim basis to continue to fund approximately $310,000 on a monthly basis to NSC pursuant to the terms of the NSC Support Agreements.

## M.    Legal Analysis

53.    Pursuant to the terms of 11 U.S.C. § 363(b)(1), a court may authorize a debtor to "use" property of the estate pursuant to section 363(b)(1) when such use is an exercise of the debtor's sound business judgment and when the use of the property is proposed in good faith. See, e.g., In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999); see also Stephen Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" standard for sales proposed pursuant to 363(b)); In re Ernest Home Center Inc., 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997).

54.    The debtor has the burden of establishing that a valid business purpose exists for the use of estate property in a manner that is not in the ordinary course of business. See In re Lionel Corp., 722 F.2d 1063, 1070-71 (2d Cir. 1983). Once the debtor has articulated a valid business purpose, however, a presumption arises that the debtor's decision was made on an informed basis, in good faith and in the honest belief that the action was in the best interest of the company. See In re Integrated Resources Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992). The debtor's

---

Gas Supply Sales and City-Gate Management Services Agreement, dated July 24, 1997 (the "Gas Supply Agreement"), and the Aberdeen City-Gate Transportation Services Agreement, dated October 30, 1996 (the "Transportation Services Agreement") (collectively, the "NSC Support Agreements").

good faith business judgment under such circumstances should not be disturbed absent a showing that the transaction constitutes an abuse of discretion or is contrary to the interests of the creditors. *See* <u>Abbotts Dairies of Pa. Inc.</u>, 788 F.2d 143, 149-50 (3d Cir. 1986), <u>In re Johns-Manville Corp.</u>, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decision.").

## NOTICE

55.     Notice of this Motion has been given by fax, hand delivery or overnight mail to (i) the Office of the United States Trustee, (ii) counsel for the Debtor's Pre-Petition Lenders; (iii) counsel for the Debtor's proposed Post-Petition Lenders; (iv) counsel for the Informal Committee, (v) the 20 largest unsecured non-insider creditors; (vi) the Securities and Exchange Commission; (vii) the Federal Energy Regulatory Commission; (viii) the Montana Public Service Commission; (ix) the South Dakota Public Utilities Commission; and (x) the Nebraska Public Service Commission. As this Motion is seeking first day relief, notice of this Motion and any Order entered hereon shall be served as required by Del. Bankr. L.R. 9013-2(d). The Debtor respectfully submits that such notice is sufficient, and requests that this Court find that no further notice of the relief requested herein is required.

56.     Nothing in this Motion should be contrued as (a) an admission as to the validity or priority of any claim against the Debtor; (b) a waiver of the Debtor's rights to dispute any claims; or (c) an approval or assumption of any agreement, contract or lease, pursuant to Section 365 of the Bankruptcy Code.

57.     The Debtor also requests that this Court retain jurisdiction to hear and determine all matters arising from or related to this Motion.

**A463**

## **PRIOR RELIEF**

58.    No previous motion for the relief herein requested has been made to this or any other Court.

[CONCLUDED ON NEXT PAGE]

**A464**

WHEREFORE, the Debtor respectfully requests that the Court enter an order, in the form annexed hereto, granting the relief requested herein and such other and further relief as the Court may deem appropriate.

Dated: Wilmington, Delaware
      September 14, 2003

Respectfully submitted,

PAUL, HASTINGS, JANOFSKY & WALKER LLP
600 Peachtree Street
Suite 2400
Atlanta, GA 30308
Jesse H. Austin, III
Karol K. Denniston
Telephone: (404) 815-2400

And

GREENBERG TRAURIG, LLP

  /s/ Scott D. Cousins
Scott D. Cousins (No. 3079)
Victoria Watson Counihan (No. 3488)
William E. Chipman, Jr. (No. 3818)
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone: (302) 661-7000

*Proposed Co-Counsel for the Debtor and Debtor-in-Possession*

**A465**

24

**EXHIBIT F**

**A466**

1   Stanley T. Kaleczyc
    Kimberly A. Beatty
2   BROWNING, KALECZYC, BERRY & HOVEN, P.C
    139 North Last Chance Gulch
3   P.O. Box 1697
    Helena, MT 59624
4   Phone: (406) 443-6820
    Fax: (406) 443-6883

5   Attorneys for Defendants.

6

7                   IN THE UNITED STATES DISTRICT COURT
                         DISTRICT OF MONTANA
8                          BUTTE DIVISION

9   MAGTEN ASSET MANAGEMENT            )   Case No.: CV-04-26-BU-RFC
    CORPORATION,                       )
10                                     )
              Plaintiff,               )
11                                     )
          vs.                          )
12                                     )   MEMORANDUM IN SUPPORT OF
    MIKE J. HANSON, and ERNIE J. KINDT,)   MOTION TO DISMISS
13                                     )
              Defendant                )
14  _____ )

15        On or about April 19, 2004 Plaintiff Magten Asset Management Corporation ("Magten")

16  filed a complaint against Mike J. Hanson, Jack D. Haffey, Ernie J. Kindt and Ellen Senechal

17  alleging that they breached a fiduciary duty to Plaintiff because Clark Fork and Blackfoot, LLC

18  ("Clark Fork") (f/k/a NorthWestern Energy, LLC and Montana Power, LLC), a wholly owned

19  subsidiary of NorthWestern Corporation, ("NorthWestern") transferred certain assets and

20  liabilities of Clark Fork (the "Montana Utility Assets and Liabilities") to its corporate parent and

21  sole owner, NorthWestern. These particular Defendants were named by Magten because at

22  various times they hold or held the title of "officers" of Clark Fork.[1]

23

24  _____

[1] Both Jack Haffey and Ellen Senechal retired prior to the transfer of assets and liabilities complained of by
Magten. Magten has stipulated to a dismissal of Mr. Haffey and Ms. Senechal, which Stipulation and Proposed
Order are currently pending before this Court.

                            - 1

1    Defendants Hanson and Kindt have now moved to dismiss the complaint against them

2    since (1) as a matter of law, only the member of a limited liability company, in this case

3    NorthWestern, has the legal authority to order the transfer of assets and liabilities out of a limited

4    liability company; (2) as a matter of law, the Defendants owed no fiduciary duty to Magten; and

5    (3) in any event, the terms of the relevant documents on which Magten bases its claim permitted

6    the transfer of the Montana Utility Assets and Liabilities from Clark Fork to NorthWestern.

7                                **STANDARD OF REVIEW**

8    A claim may be dismissed either because it asserts a legal theory that is not cognizable as

9    a matter of law or because it fails to allege sufficient facts to support a cognizable legal claim.

10   See, SmileCare Dental Group v. Delta Dental Plan of Cal., Inc., 88 F.3d 780, 783 (9th Cir. 1996).

11   The court presumes that all well-pleaded allegations are true, resolves all doubts and inferences

12   in the pleader's favor, and views the pleading in the light most favorable to the non-moving

13   party. Associated General Contractors of America v. Metropolitan Water Dist. of So. Calif., 159

14   F.3d 1178, 1181 (9th Cir, 1998). Furthermore, when deciding a motion to dismiss, the court may

15   consider the complaint and documents whose contents are alleged in a complaint and whose

16   authenticity no party questions, but which are not physically attached to the pleading. In re

17   Syntex Corp. Securities Litigation, 95 F.3d 922, 926 (9th Cir. 1996). See also, 2 Moore's Federal

18   Practice ¶ 12.34 (2000); GFF Corp v. Associated Wholesale Grocers, 130 F.3d 1381, 1384 (10th

19   Cir. 1997); Branch v. Tunnell, 14 F.3d 449, 453-54 (9th Cir. 1994). As indicated in Branch,

20   "documents whose contents are alleged in a complaint and whose authenticity no party

21   questions, but which are not physically attached to the pleading, may be considered in ruling on a

22   Rule 12(b)(6) motion to dismiss. Such consideration does not convert the motion to dismiss into

23   a motion for summary judgment." Id., 14 F.3d at 454. Therefore, it is appropriate to discuss

24   with the Court in the Motion, the Indenture, Guarantee Agreement, and amendments thereto

- 2    **A468**

1  (collectively referred to herein as the "QUIPS Trust Documents")which form part of the basis of

2  Plaintiff's Complaint and which form at least one basis for dismissal of this action.

3  ## STATEMENT OF FACTS

4  On February 15, 2002, pursuant to the terms of a Unit Purchase Agreement ("UPA")

5  entered into between NorthWestern, as purchaser, and The Montana Power Company ("MPC")

6  and Touch America Holdings, Inc. ("TAH") as sellers, NorthWestern acquired the sole unit

7  interest in Montana Power, LLC, a Montana limited liability company. Two days previously, as

8  part of a corporate reorganization of MPC into TAH, the electric and natural gas transmission

9  and distribution assets of MPC, as well as MPC's interest in the Milltown Dam, were transferred

10  from MPC to MPLLC.

11  Among the assets and liabilities transferred to MPLLC were certain 8.45% Junior

12  Subordinated Debentures due in 2036 (the "Junior Debentures") which had been issued by MPC

13  in or about 1996. The interest paid on these Junior Debentures created the cash flow to make

14  dividend payments on certain Series A 8.45% Quarterly Income Preferred Securities ("QUIPS")

15  which had previously been issued by Montana Power Capital I (The "Trust"). The Trust is a

16  business trust established pursuant to the Delaware Business Trust Act. The sole assets of the

17  Trust are the Junior Debentures. Plaintiff Magten is currently a holder of some but not all the

18  QUIPS.

19  When NorthWestern acquired the unit interest in MPLLC, NorthWestern became the sole

20  Member of MPLLC and named itself as the Manager of MPLLC pursuant to applicable

21  provisions of Montana Limited Liability Company Act. NorthWestern, as sole Member and

22  Manager, appointed certain individuals, including the Defendants, as "officers" of its wholly

23  owned subsidiary, MPLLC, although Montana statutes do not specifically provide that a limited

24  liability company have officers.

**A469**

- 3

1        In August 2002, almost six months after NorthWestern acquired MPLLC (whose name

2    by that time had been changed to NorthWestern Energy, LLC), NorthWestern authorized and

3    directed the transfer of the electric and natural gas transmission and distribution assets and

4    liabilities held by its subsidiary to it, the parent corporation. The transfer was effected on

5    November 15, 2002. The Montana Utility Assets and Liabilities transferred included the

6    obligations associated with the Junior Debentures and QUIPS. Other assets and liabilities

7    remained with the limited liability company, whose name was subsequently changed to Clark

8    Fork and Blackfoot, LLC. Pursuant to the operation of the QUIPS Trust Documents, as amended

9    on or about August 13, 2002, upon the closing of the transfer, Magten ceased to be a creditor of

10    Clark Fork and became a creditor only of NorthWestern.

11        On September 14, 2003, ten (10) months after the transfer of the Montana Utility Assets

12    and Liabilities, NorthWestern filed a voluntary petition for reorganization in bankruptcy pursuant

13    to Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in Delaware.

14        Magten has filed an adversary proceeding against NorthWestern in the bankruptcy

15    proceeding in which it alleges, among other things, that the November 15, 2002 transfer of the

16    Montana Utility Assets and Liabilities from its wholly owned subsidiary limited liability

17    company was a fraudulent conveyance. Magten seeks the rescission of the transfer.

18        Not satisfied with pursuing its claims against the sole Member and Manager of the

19    limited liability company in bankruptcy court, Magten has also filed this action against the

20    "officers" of Clark Fork, asserting that they breached a fiduciary duty allegedly owed to creditors

21    when the sole Member and Manager transferred the Montana Utility Assets and Liabilities to

22    itself.

23        Plaintiff's complaint, however, fails as a matter of law and thus this action should be

24    dismissed with prejudice.

**A470**

- 4

## ARGUMENT

**I.**    **As a Matter of Law, Only NorthWestern Corporation and Not the Named Defendants Had the Legal Authority to Order the Transfer of Certain Assets and Liabilities from its Wholly Owned Subsidiary to the Corporate Parent.**

Pursuant to the provisions of the Montana Limited Liability Company Act, only the members, upon the unanimous consent of the members, have the legal authority to transfer all or substantially all of the limited liability company's assets. *See*, Mont. Code Ann. §35-8-307(3)(l).

At all times material to Magten's Complaint, NorthWestern was and is the sole Member and Manager of Clark Fork. Section 35-8-102(20) defines a "Member" as a person who has been admitted to membership in a limited liability company. As the sole Member, NorthWestern was (and is) the sole owner of Clark Fork. Further, Mont. Code Ann § 35-8-301(1) provides in pertinent part:

> Except as provided in subsection (2), a member is an agent of the limited liability company for the purpose of its business or affairs and the act of a member, including but not limited to the execution of any instrument in the name of the limited liability company for apparently carrying on in the usual way the business or affairs of the limited liability company binds the limited liability company, unless the member so acting has, in fact, no authority to act for the limited liability company in the particular matter and the person with whom the member is dealing has knowledge of the fact that the member has no such authority.

Thus, as a matter of law, NorthWestern as the sole Member of Clark Fork, has the authority to act for and bind Clark Fork, its wholly owned subsidiary.

Section 35-8-102(18) defines a "Manager" as a person who is vested with authority under § 35-8-301. Subsections (2) and (3) of section 301 provide:

> (2)    If the articles of organization provide that management of the limited liability company is vested in a manager or managers:
>
> (a)    a member, acting solely in the capacity as a member, may not be an agent of the limited liability company; and

**A471**

– 5

1

(b)    a manager is an agent of the limited liability company for the purpose of its business or affairs and the act of a manager, including but not limited to the execution of any instrument in the name of the limited liability company for apparently carrying on in the usual way the business or affairs of the limited liability company binds the limited liability company, unless the manager so acting has, in fact, no authority to act for the limited liability company in the particular matter and the person with whom the manager is dealing has knowledge of the fact that the manager has no such authority.

(3)    An act of a manager or a member that is not apparently for carrying on in the usual way the business of the limited liability company does not bind the limited liability company, unless authorized in accordance with the articles of reorganization or the operating agreement, at the time of the transaction or at any other time.

Thus, as a matter of law, NorthWestern as the Manager of Clark Fork[2] has the authority to act for and bind Clark Fork.

Section 35-8-107(10) provides that a limited liability company may transfer or otherwise dispose of all or any part of its property and assets. Sections 35-8-702(1) and (5) provide that title to property of the limited liability company that is held in the name of the limited liability company may be transferred only by an instrument of transfer executed by any member or manager in the name of the limited liability company. Section 35-8-307(3)(l) provides that a transfer or other disposition of all or substantially all of a limited liability company assets requires the unanimous consent of the Members of the company. Therefore, as the sole Member and Manager of Clark Fork, NorthWestern had the <u>exclusive</u> power to act and direct the transfer, sale, or other distribution of the assets and liabilities of the limited liability company. Any "officers" of Clark Fork could merely carry out the directives of the sole Member and Manager, and had no individual authority or power to bind or prevent Clark Fork from transferring the Montana Utility Assets and Liabilities from Clark Fork to NorthWestern.

[2] None of the Defendants were "Managers" of Clark Fork as defined by 35-8-102(18) and Magten has not alleged they were at any time the statutory "Managers" of Clark Fork.

- 6

**A472**

1    Moreover, in contrast to the Montana Business Corporation Act, the Montana Limited

2    Liability Company Act does not require that the limited liability company even have officers.

3    Compare e.g. § 35-1-222(1)(a) ("After incorporation . . . the initial directors shall . . . complete

4    the organization of the corporation by appointing officers . . ."); § 35-1-441 ("A corporation has

5    the officers described in its bylaws or appointed by the board of directors in accordance with the

6    bylaws"). The Montana Limited Liability Company Act makes absolutely no reference to

7    "officers." The legal significance of this omission, alone and when read together with Sections

8    301, 307, 107 and 702 of the Montana Limited Liability Company Act, is that as a matter of law

9    the "officers" of Clark Fork have no ability to unilaterally bind Clark Fork in the transfer of the

10   Montana Utility Assets and Liabilities; only the sole Member and Manager of Clark Fork

11   (NorthWestern) had the legal capacity to order the transfer of the Montana Utility Assets and

12   Liabilities from Clark Fork to itself, Clark Fork's sole corporate parent. *See,* Mont. Code Ann. §

13   35-8-307(3)(1); and §§ 35-8-702(1) and (5). Therefore, as a matter of law, the named

14   Defendants may not be held liable for a transfer of assets and liabilities which they could neither

15   order nor prevent.

16
17   **II.    As a Matter of Law, The Named Defendants Owed No Fiduciary Duty to Magten or Any Other Holder of QUIPS Which Were General Creditors of the Limited Liability Company.**

18

19   At all times material to this Complaint, either Clark Fork or NorthWestern had a liability

20   to pay interest on the Junior Debentures to the Trust pursuant to the terms and conditions of the

21   various trust documents as amended. The Trust, in turn, had an obligation to pay quarterly

22   dividends to the holders of the QUIPS. Assuming facts as alleged in Plaintiff's complaint,

23

24   **A473**

- 7

1    Magten, as a holder of some of the QUIPS, was a general unsecured creditor.[3] Assuming,

2    arguendo, that Magten was an unsecured creditor of Clark Fork, the "officers" of Clark Fork did

3    not owe any fiduciary duty to any general unsecured creditor, including Magten, either prior to or

4    as of the effective date of the transfer of the Montana Utility Assets and Liabilities to

5    NorthWestern.

6        First, as discussed in the preceding section, the statutory powers and obligations of a

7    limited liability company rest with the members and managers of that limited liability company.

8    Section 35-8-310 discusses the general standards of a member's and of a manager's conduct.

9    The only fiduciary duties owed by a member or a manager of a limited liability company are the

10   duty of loyalty and the duty of care. Those duties are only owed to the limited liability company

11   and to the other members. See §§35-8-310(1) and (8). Under the statutory provisions of the

12   Montana Limited Liability Company Act, no fiduciary duties are owed to a creditor of the limited

13   liability company.

14       NorthWestern was and is the sole Member and Manager of Clark Fork. Therefore, it is

15   NorthWestern, as either the Member or the Manager, who owes the fiduciary duties of loyalty

16   and care to Clark Fork. The "officers" of Clark Fork have no duties or obligations conferred

17   upon them by the Montana Limited Liability Company Act. At most, they function solely as

18   agents of the limited liability company, and then only within the scope of the agency conferred

19   upon them by the principal, which in this case is NorthWestern in its capacity as Manager of

20   Clark Fork.

21

22   ───────────────

[3] There is no dispute that Magten is an unsecured creditor. The Junior Debentures are unsecured. The QUIPS by
23   their very nature are in the form of preferred securities which are not secured but whose cash flow originates from
     the unsecured debt instruments, the Junior Debentures. However, it is Defendants contention that by operation of
     the QUIPS trust documents, upon the transfer of the Montana Utility Assets and Liabilities, Magten ceased to be a
24   creditor of Clark Fork and became the creditor of NorthWestern.

**A474**

1    Even if it could be argued that the "officers" do have statutory fiduciary duties, such

2  duties would be limited to the same duties owed by the members and managers of the limited

3  liability company: the duties of loyalty and care, as provided in Mont. Code Ann. §§ 35-8-

4  310(1), (2) and (3). Importantly, and as noted above, these duties are owed <u>solely</u> to the limited

5  liability company and to the members of the limited liability company. No where in Montana's

6  Limited Liability Company Act do agents of the limited liability company owe a duty to general

7  creditors, either secured or unsecured, of the limited liability company. Therefore, even if the

8  Defendants here as "officers" of Clark Fork owed the fiduciary duties of loyalty and care, those

9  duties were owed only to Clark Fork and its sole Member, NorthWestern. The Defendants as

10  "officers" simply did not owe any fiduciary duty to Magten as a general unsecured creditor of

11  Clark Fork.

12    Second, even if the status of Defendants here as "officers" of a limited liability company

13  were analogous to the duties of officers of a for-profit corporation organized under Montana's

14  Business Corporation Act, Mont. Code Ann. § 35-1-101  et seq., even traditional corporate

15  officers do not owe a fiduciary duty to general creditors of the corporation. *See*, Mont. Code

16  Ann. §§ 35-1-416: requirement for and duties of board of directors; 35-1-418: general standards

17  for directors; 35-1-442: duties of officers; 35-1-443 standards of conduct for officers.

18    Moreover, the rights of Magten are controlled by the QUIPS Trust Documents, including

19  all amendments thereto, under the terms of which the Junior Debentures and QUIPS were issued.

20  *See, e.g.*. Mann v. Oppenheimer & Co., 517 A. 2d 1056, 1061 (Del. 1986) ("The rights of

21  debenture holders are controlled by the terms of the indenture under which the securities are

22  issued."); Katz v. Oak Industries, Inc., 508 A. 2d 873, 879 (Del. CH. 1986) ("The terms of the

23  contractual relationship agreed to and not broad concepts such as fairness define the

24  corporation's obligation to bond holders.") Montana law is consistent with this proposition; the