UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN THE MATTER OF            )
                           )    02-12471
UNIROYAL TECHNOLOGY        )
CORPORATION, ET AL.,       )
                           )    Wilmington, Delaware
          Debtor.          )    October 16, 2002
                           )

TRANSCRIPT OF OMNIBUS HEARING
BEFORE THE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For U.S. Trustee:          DAVID L. BUCHBINDER, ESQUIRE
                           Office of the U.S. Trustee
                           844 King Street
                           Suite 2313
                           Wilmington, Delaware    19801


For the Committee:         MARK J. PACKEL, ESQUIRE
                           Blank, Rome, Comisky & McCauley
                           Chase Manhattan Centre
                           1201 Market Street
                           Suite 800
                           Wilmington, Delaware    19801


For the Debtor:            JEFFREY SCHLERF, ESQUIRE
                           The Bayard Firm
                           222 Delaware Avenue
                           Suite 900
                           Wilmington, DE    19801

                           THOMAS LAURIA, ESQUIRE
                           GERARD UZZI, ESQUIRE
                           White & Case
                           First Union Financial Center
                           200 South Biscayne Boulevard
                           Miami, Florida    33131


For G.E. Capital Corp.:    MARGARET MANNING, ESQUIRE
                           Buchanan, Ingersoll, P.C.
                           1201 North Market Street
                           Suite 1501
                           Wilmington, Delaware    19801

APPEARANCES (continued):

For William Brock Alexander:    WILLIAM BROCK ALEXANDER
                                1220 Astor Commons Place
                                Suite 201
                                Brandon, Florida  33511

Audio Operator:                 SHERRY SCARUZZI

Transcribed by:                 DIANA DOMAN TRANSCRIBING
                                P. O. Box 129
                                Gibbsboro, New Jersey  08026
                                Off: (856) 435-7172
                                Fax: (856) 435-7124

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

**A483**

3

I N D E X

ARGUMENT:

By:  Mr. Lauria            4, 32, 39

By:  Mr. Buchbinder        17

By:  Mr. Packel            40, 43

By:  Mr. Uzzi              41

By:  Ms. Manning           44

By:  Mr. Schlerf           45


THE COURT:

Ruling                     36, 47

**A484**

Lauria - Argument                                   4

1           CLERK:  Please rise.

2           THE COURT:  Please be seated.

3           MR. SCHLERF:  Good afternoon, Your Honor.  Jeffrey

4   Schlerf for the debtors.  Your Honor, we have three matters for

5   consideration today.  Two of the three are definitely

6   contested.  And, with respect to DIP financing, CIT's counsel

7   is waiting to hear back from his client, and we're waiting for

8   Committee counsel to see whether we have a consensual hearing.

9           So, I think it makes sense, Your Honor, if we could

10  start off with White & Case's retention, and that's item number

11  2 on the agenda.

12          THE COURT:  Okay.

13          MR. LAURIA:  Good afternoon, Your Honor.  My name is

14  Thomas Lauria.  I'm with the law firm of White & Case.  We are

15  proposed counsel to the debtors in these Chapter 11 cases.

16  We're here on our application to be retained as counsel under

17  Section 3.7(a) of the Bankruptcy Code.

18          There is one objection which has been filed of

19  record, and that is an objection filed by the U.S. Trustee

20  asserting that White & Case is not disinterested as required

21  under the code.  Our application is supported by two

22  affidavits, both of which were prepared and filed by me.

23          One is the original affidavit that was attached to

24  the application, and the second is a supplemental affidavit

25  which was filed shortly after the commencement of these cases

**A485**

Lauria - Argument                                    5

1   and which was filed in response to certain concerns expressed

2   by the U.S. Trustee and to elaborate on certain disclosures

3   that were contained in my original affidavit.

4            THE COURT:  I don't see the supplemental affidavit.

5            MR. LAURIA:  Your Honor, I have another copy.

6            THE COURT:  Is there any reason why it's not listed

7   on the agenda or included in the binder?

8            MR. LAURIA:  No, Your --

9            MR. SCHLERF:  There's probably not a good reason,

10  Your Honor.

11           MR. LAURIA:  I presume that it was through

12  inadvertence.  I do, however, have a copy, together with the

13  certificate of service attached to it.  If I may approach, Your

14  Honor?

15           THE COURT:  Yes.

16           MR. LAURIA:  The supplemental affidavit in particular

17  focuses on issues regarding the firm's relationship with and

18  representation of Emcore (phonetic), which is a creditor of the

19  debtors and also is a seven percent stockholder of the debtors.

20           Your Honor, there are three provisions of the

21  Bankruptcy Code that I believe are implicated by the

22  application and the objection thereto, 327 --

23           THE COURT:  I'm going to take five minutes and read

24  this first.

25           MR. LAURIA:  I apologize.

**A486**

Lauria - Argument                                6

1          THE COURT:   (Pause).   Okay.   I've read it.

2          MR. LAURIA:   Your Honor, I apologize for not making

3     sure that the supplemental affidavit was part of the submission

4     for the Court's consideration in connection with the hearing.

5     As I had mentioned, I believe there are three statutory

6     provisions that are implicated by the application and the

7     objection thereto, Section 327(a), 327(c), and Section 101(14).

8          Under Section 327(a), the debtor-in-possession is

9     permitted to retain counsel and advisors that do not hold or

10    represent an interest adverse to the estate and that are

11    disinterested persons.

12         Section 327(c) provides that a person is not

13    disqualified for employment under this section solely because

14    of such person's employment by or representation of a creditor,

15    unless there is an objection by another creditor or the United

16    States Trustee, in which case the Court shall disapprove such

17    employment, if there is an actual conflict of interest.

18         The Third Circuit has held that this provision

19    permits discretionary disallowance of retention if there is a

20    potential conflict and should not permit disqualification if

21    there is only an appearance of a conflict.

22         Section 101(14), which I think is particularly

23    important here, given the nature of the Trustee's objection, is

24    the definition of what is a disinterested person.   There are

25    five elements.

**A487**

1        Number one, a person must not be a creditor, equity

2   security holder, or insider.  Number two, the person cannot and

3   was not an in -- cannot be -- is not and was not an investment

4   banker for any outstanding security of the debtor.  Number

5   three, the person is not and has not been, within three years,

6   an investment banker for a security of the debtor or an

7   attorney for such an investment banker in connection with the

8   offer, sale, or issuance of a security of the debtor.

9        Number four, the person is not and was not, within

10  two years, a director, officer, or employee of the debtor or an

11  investment banker mentioned in sections B or C.  And, number

12  five, the person does not have an interest that is materially

13  adverse to the interests of the estate or any class of

14  creditors or equity security holders by reason of a

15  relationship with a director -- by reason of being a director

16  or insider or having a relationship to or in connection with or

17  an interest in the debtor and investment banker or another

18  person.

19       So, breaking it down, there are two -- two hurdles to

20  address here.  Number one is the question of whether or not we

21  hold or represent an interest adverse to the estate.  As

22  disclosed in my affidavit and my supplemental affidavit, White

23  & Case holds neither.

24       We, as disclosed, represent certain creditors of the

25  debtors on matters completely unrelated to the debtors, and we

Lauria - Argument                                    8

1   have, in the past, represented a single creditor, Emcore, which

2   is both a creditor and an equity security holder in the

3   debtors, with respect to both unrelated matters and with

4   respect to certain specified related matters to the debtors,

5   all of which matters had been completed prior to the

6   commencement of not only the Chapter 11 cases, but our

7   representation of the debtors in connection with their

8   preparation for Chapter 11.

9           Those matters related predominantly to the -- a

10  proposed loan that Emcore considered making to the debtors in

11  early 2002, which Emcore did not ultimately make, and also in

12  connection with certain issues related to the formation of a

13  joint venture between the debtors and Emcore and the

14  representation of Emcore with respect to the dissolution of

15  that joint venture.  We are continuing, at this time, to

16  represent Emcore only with respect to unrelated matters.

17          Prior to the commencement of the case, we ceased all

18  representation of Emcore with respect to the related matters

19  and, indeed, none of such matters were ongoing at the time our

20  initial retention commenced approximately six weeks prior to

21  the Chapter 11 case.

22          In order to avoid any potential conflict, in advance

23  of commencing the case, we advised the debtor that we would not

24  represent the debtors with respect to any issues between them

25  and Emcore and suggested that the debtors retain separate

1    counsel for any such matters, if any such issues arose.  And,

2    the debtor agreed to that arrangement.

3         In addition, prior to the commencement of these

4    Chapter 11 cases, we were advised by our client that

5    discussions had been held on a business level pursuant to which

6    conflicts had been waived by both Emcore --

7         MR. BUCHBINDER:  Your Honor, I'm going to object to

8    this, because Mr. Lauria is arguing facts that are not before

9    this Court.  He's making reference to conversations that were

10   allegedly held and that are certainly not evidence before this

11   Court, in his affidavit, his supplemental affidavit, or in any

12   other factual evidence that has been presented in connection

13   with the application.

14        If he wants to argue the law, he may argue the law,

15   and he may argue the facts in his two affidavits.  If he wants

16   to present additional factual evidence, he may call a witness.

17        MR. LAURIA:  If I may respond, Your Honor?  First of

18   all, I am speaking from personal knowledge on these

19   conversations, so I'm competent to testify on the issue, number

20   one.  Number two, yesterday I was deposed by the Office of the

21   United States Trustee on this matter and said exactly what I'm

22   saying to the Court in that deposition.

23        It is my understanding that the United States Trustee

24   this morning filed that deposition transcript with the Court

25   and has presented it to me as one of the things that's going to

**A490**

1    be offered into evidence in connection with the U.S. Trustee's

2    presentation.  If the Court prefer that I rebut and comment on

3    this, I'm happy to do so.

4              THE COURT:  I'd prefer that.

5              MR. LAURIA:  Thank you, Your Honor.  Importantly,

6    Your Honor, our relationships with Emcore, all of them, and our

7    arrangement regarding the debtor's reliance on separate

8    counsel, if any dispute with Emcore were to occur in connection

9    with the Chapter 11 cases, were both fully disclosed in my

10   original affidavit as required by Bankruptcy Rule 2014.

11             As a consequence of this arrangement, not only does

12   White & Case not represent an adverse interest, but there is no

13   potential that White & Case may do so.  Our ongoing arrangement

14   with Emcore is only with respect to matters unrelated to the

15   Chapter 11 case.  All related matters have been terminated.

16             Plus, our arrangement provides that separate counsel

17   will be available to advise the debtors with respect to any

18   disputes that may arise between the debtor and Emcore during

19   the pendency of the case.

20             Plus, we have imposed an ethical screen that

21   prohibits any conversations between attorneys at the firm who

22   represent or are involved in the representation of the debtors

23   in these Chapter 11 cases from having discussions with the

24   attorneys who are involved in the representation of unrelated

25   Emcore matters and vice versa.

**A491**

1          Plus, we have obtained a written waiver of conflicts

2     of interest from both Emcore and the debtors.

3          Importantly, Your Honor, significant independent

4     economic interests exist and are represented by able counsel in

5     these cases to assure the protection of estate interests if

6     disputes do arise in the future with respect to any of Emcore's

7     claims.  Those interests, most notably, are represented by the

8     Committee and protected by counsel to the Creditors Committee

9     in these cases.  In addition, The Bayard Firm is not subject to

10    any limitation with respect to issues that may arise with

11    respect to Emcore.

12          I do underline the word "if" though, and that is

13    important, because, as of this time, there is no dispute

14    regarding any claim of Emcore, most notably because Emcore has

15    yet to file a claim in this case.  Emcore, we are told, has two

16    claims in the case.  One is on the debtor's books and records

17    and is not subject to dispute.

18          Emcore sold equipment to one of the operating

19    companies, Uniroyal Optoelectronics, Inc., prior to the

20    bankruptcy.  That equipment was sold on credit and the full

21    amount has not been paid.  We understand that there is an

22    amount of approximately $1.2M owed with respect to that

23    obligation, and there is no dispute.

24          In addition, Emcore has indicated that it may file a

25    claim arising from the alleged breach of a registration rights

**A492**

1    agreement between it and the debtors.  Importantly, we have not

2    represented either the debtors or Emcore with respect to the

3    alleged breach of the registration rights agreement, and thus

4    are a stranger completely to those facts.

5         Accordingly, Your Honor, I think it's clear that we

6    pass the test -- the first component of the test of Section

7    327(a).  That is that we do not hold or represent an interest

8    adverse to the estate.

9         The second component of the test, that is is White &

10   Case disinterested, which is the focal point of the objection,

11   we also pass.  As previously noted, there are five elements.

12   White & Case is not a creditor, an equity holder, or an insider

13   of the debtors.  White & Case is not an investment banker to

14   the debtors and has never been an investment banker to the

15   debtors in any capacity.

16        White & Case is not an investment bank or an attorney

17   to an investment bank of the debtors with respect to the

18   debtors or any security of the debtors.  And, White & Case is

19   not a director, officer, employee of the debtors, or any

20   prescribed investment banker.

21        Importantly, as previously noted, not only does White

22   & Case not hold an interest that is adverse to the estate,

23   White & Case does not hold an interest that is materially

24   adverse to the estate, which is the requirement of

25   disinterestedness.  So, accordingly, Your Honor, it would

**A493**

1   appear that, on the face of the record, that the elements of

2   Section 327(a) have been satisfied.

3        To the extent that the Court is concerned that --

4   well, as a consequence of the U.S. Trustee's objection, Section

5   327(c) provides explicitly that the mere representation of a

6   creditor does not disqualify counsel unless objected to.  And,

7   in which case, the Court has basically two -- two -- well,

8   three choices it can follow.

9        If there is an actual conflict, then counsel shall be

10  disqualified.  If there's a potential conflict, the Court, in

11  its discretion, may disqualify counsel.  And, if there's no

12  conflict, then counsel is not to be disqualified.

13       Here, there's clearly no actual conflict.  Indeed, it

14  is proscribed by the scope of our representation.  We are not

15  seeking authority to represent the debtors with respect to any

16  matter involving Emcore, and we are not representing Emcore

17  with respect to any matter involving the debtors.  So, not only

18  is there no actual conflict, but even a potential conflict has

19  been proscribed by the scope of the proposed representation.

20       The statute and the case law make clear that the

21  Bankruptcy Code generally, and the professional retention

22  provisions in particular, are not inflexible or impractical and

23  do not foist form over substance.  To the contrary, Chapter 11

24  is widely recognized as flexible, pragmatic -- as a flexible

25  and pragmatic scheme designed to preserve going concern value,

**A494**

1    to maximize creditor recovery, and promote debtor

2    reorganization.  All of those foregoing policies are advanced

3    by the proposed representation of White & Case in the present

4    case.

5         There is, in fact, a special relationship between our

6    firm and the Chapter 11 debtors.  I represented Uniroyal

7    Plastics Company, the predecessor in interest of Uniroyal, 12

8    years ago in its original Chapter 11 case when it reorganized

9    in the Northern District of Indiana successfully.

10        As a consequence of that representation and the

11    ongoing relationship that I have had with Uniroyal, we are

12    intimately familiar with the company's assets, liabilities,

13    operations and, importantly, the management and personnel who

14    are involved in the operation of the business.

15        In connection with preparing for and conducting this

16    Chapter 11 case to this point, we have actively worked with

17    management of the company to develop the formation of a Chapter

18    11 plan which we anticipate filing in the near future.  In our

19    first day papers, we indicated that he debtor's intention was

20    to move swiftly towards a plan of reorganization and, indeed,

21    economic exigencies dictate that must be.

22        The debtors DIP financing facility, which is also

23    before the Court today, specifically is a one-year facility,

24    but requires that a plan must be filed by December 31st of this

25    year in order for the DIP to continue.  The reality, from an

**A495**

Lauria - Argument                                    15

1    economic standpoint, is that this debtor cannot afford to sit

2    and languish in bankruptcy for a long period of time, or its

3    prospect for reorganization will evaporate.

4            In that connection, we have met extensively with

5    management for the company and discussed the various

6    transactions that will likely comprise a plan of

7    reorganization.

8            MR. BUCHBINDER:  Your Honor, I'm going to object to

9    this part of the argument because I do not see how it is in any

10   way relevant to the issue of disinterestedness.

11           THE COURT:  I guess he's arguing that, if they're

12   thrown out of the case at this point, it would be detrimental

13   to the reorganization process.

14           MR. BUCHBINDER:  Well, Your Honor, that may be his

15   argument, but that has no relevance whatsoever to the issue of

16   disinterestedness under 101(14)(e).  There is not one case

17   anywhere that discusses pragmatism or the im -- the alleged

18   importance of counsel to a business deal as an issue that

19   affects on disinterestedness.

20           This is not an application to retain counsel as

21   special counsel, in which case that might be relevant.  This is

22   an application to retain counsel under 327(a), which 101(14)

23   applies to.  And, what counsel may have done or what counsel

24   may do in the future in this case is not at all relevant to the

25   issue of disinterestedness.

**A496**

Lauria - Argument                          16

1           THE COURT:  I agree.  Proceed.

2           MR. LAURIA:  Your Honor, I think what is im -- the

3      reason that the special relationship between the firm and the

4      debtor is relevant is, to the extent that the Court feels that

5      there is a potential conflict of interest here as opposed to an

6      actual conflict or no conflict at all, the issue of retention

7      of counsel is submitted to the discretion of the Court.

8           And, case law suggests that special circumstances

9      that can include the relationship and the ability of the firm

10     to perform in a Chapter 11 case are, in fact, relevant.  And, I

11     would cite the Court to the Third Circuit's decision in Marvel

12     Entertainment for authority for that proposition.

13          Importantly, Your Honor, on this -- on this very

14     topic, we have been actively involved in the negotiation of

15     asset dispositions, developing a strategy for refinancing the

16     DIP facility, and for obtaining a new investment in the debtor

17     that will be the backbone of a Chapter 11 plan.  We've also

18     been involved --

19          MR. BUCHBINDER:  Your Honor, once again, I'm going to

20     raise the same objection.  This is the same statement that

21     counsel was making before.  It is not relevant to

22     disinterestedness and an application under 327(a).

23          THE COURT:  I agree.  Proceed.

24          MR. LAURIA:  Your Honor, are you telling me to stop

25     talk --

**A497**

1       THE COURT:  I agreed with the objection, yes.

2       MR. LAURIA:  Okay.  Notably, Your Honor, no issues

3   exist at this point in time between the debtors and Emcore.

4   Recognizing that the fundamental policy is to make -- of the

5   Bankruptcy Code -- among the fundamental policies of the

6   Bankruptcy Code is to make counsel available to the debtor the

7   same as if these transactions were being conducted without

8   court supervision.

9           In recognizing that an important consideration for a

10  Court in considering whether or not to disqualify counsel is

11  respecting a party's right to be represented by the counsel of

12  its choosing, we would submit, Your Honor, that there is no

13  basis here for the Court to deny the retention of White & Case.

14          There is no actual conflict, there is no potential

15  conflict.  There is merely, in the eyes of the Trustee, an

16  appearance of a conflict, which, as the Third Circuit has

17  specifically held, does not hold water for the purpose of

18  disqualifying counsel.

19      MR. BUCHBINDER:  Good afternoon, Your Honor.  David

20  Buchbinder on behalf of Donald F. Walton, acting United States

21  Trustee.  Your Honor, there are two issues here, because each

22  of the issues I'm about to mention will independently

23  disqualify or result in the denial of White & Case's retention

24  as 327(a) counsel for this debtor.

25          One issue is that, notwithstanding Mr. Lauria's

**A498**

Buchbinder - Argument                                    18

1    assertions to the contrary, there is, in fact, an actual

2    conflict in this case.  We are going to explore how the two

3    affidavits attempt to give lip service to what is an actual

4    conflict, and we're going to explore a historic relationship

5    between Mr. Lauria, White & Case, Emcore, and Uniroyal.

6            This is not a situation where there are several

7    unrelated matters over a period of time and the activities have

8    stopped.  We're going to find in the facts, through Mr.

9    Lauria's own testimony, a historic relationship between all of

10   these parties.

11           We're also going to find that White & Case has

12   admitted, in a conflict waiver it elicited from Emcore and from

13   Uniroyal, which did not exist in writing until after the date

14   of the supplemental affidavit, that, but for the existence of

15   the conflict waiver, White & Case would not have been able to

16   have undertaken this representation.  We're going to see that

17   the parties have admitted that there is, indeed, an actual

18   conflict.

19           We're also going to find -- and the existence of an

20   actual conflict, as I understand the Third Circuit's most

21   recent pronouncement in the issue is the Pillowtex (phonetic)

22   case, is that, if there is an actual conflict, then counsel is

23   per se disqualified from representing the debtor in the case.

24           This is not a question of a potential conflict which

25   we have to balance the equities and weigh the circumstances.

**A499**

1   This is not a situation of a quixotic search for a possible

2   remote conflict such as was before the Court in the

3   Marvel case.  This is a situation where we're going to see that

4   the facts disclose an actual conflict that was given lip

5   service to in both of the affidavits that have been filed

6   before the Court.

7         In addition to the fact that there is an actual

8   conflict in this case, we are going to find, through an

9   exploration of the same affidavits, that there was a failure to

10  disclose material facts in the original affidavit, and that the

11  supplemental affidavit was less than full in its additional

12  disclosures relating to this particular representation.

13        The supplemental affidavit, the record will show, was

14  not filed with the Court until after the United States Trustee

15  filed its objection to the retention.  The supplemental

16  affidavit was not filed with the Court until after the United

17  States Trustee filed its objection and was required to embark

18  upon discovery to ferret out the facts that had not been

19  disclosed.

20        It is not the responsibility of the United States

21  Trustee or of any other creditor or party in interest to ferret

22  out the necessary facts relating to the qualifications of

23  disinterestedness or an actual conflict.  This was summed up, I

24  think, most eloquently in the Southern District New York case

25  of In re. Granite Partners, at 219 B.R. 22, where, in

1    disqualifying counsel, the Court stated the professional's duty

2    to disclose is self-policing.

3        The Court relies primarily on forthright disclosure

4    to determine qualification.  It should not have to rummage

5    through files or conduct independent fact finding

6    investigations to determine if the professional is

7    disqualified.  With that in mind, Your Honor, let's explore the

8    facts.

9        In the original affidavit that was filed by Mr.

10   Lauria that he mentioned a few moments ago, he did not disclose

11   that Emcore is a 7 percent equity holder in Uniroyal.  He also

12   did not disclose that Emcore's chairman of the board holds

13   another 13 percent of equity in Emcore.

14       We are not contending that those two amounts should

15   be aggregated.  We are not contending that Emcore is an

16   affiliate of the debtor.  I don't want anyone to make that

17   assertion, because we are not making that assertion.  But,

18   those two facts are necessary relevant facts that should have

19   been disclosed in the original 2014 affidavit and that were

20   not.  They were disclosed in the supplemental affidavit.

21       Yesterday, Your Honor, I conducted the deposition of

22   Mr. Lauria.  It has been filed with the Court through

23   electronic case filing.  I've presented counsel with a copy

24   prior to the hearing.  I have a copy available to the Court and

25   for Committee counsel.

**A501**

1    I'm prepared to read excerpts from the deposition.

2    If counsel objects, I'm prepared to have him sworn, and we can

3    have him read his own excerpts from the deposition.  I ask the

4    Court and counsel their preference.

5        MR. LAURIA:  Your Honor, we were provided with a copy

6    of the deposition transcript this morning.  We do not object to

7    its use, however we did reserve my right to read the deposition

8    testimony for accuracy, and I have not had an opportunity to do

9    that.  Indeed, I think counsel for the U.S. Trustee

10   acknowledged that I would not have an opportunity to do that

11   before today's hearing, but that I didn't waive the right to

12   object on the basis of any apparent inaccuracy in the

13   transcription.

14       THE COURT:  How long is the deposition?

15       MR. BUCHBINDER:  I'm -- the entire deposition, Your

16   Honor, is 46 pages with some exhibits.  I'm going to focus on

17   about four of five pages.

18       THE COURT:  Okay.

19       MR. BUCHBINDER:  I have a copy for the Court.  May I

20   approach?

21       THE COURT:  Yes.  (Pause).

22       MR. BUCHBINDER:  With respect to the disclosure of

23   Emcore's interest in equity, Your Honor, I'm going to refer you

24   to page 23, line 16 of the deposition, and I will read from

25   that point.

**A502**

1     "BY MR. BUCHBINDER:

2     Q    Now, in your Exhibit 1, your original affidavit, did you

3     disclose that Emcore holds an approximately seven percent

4     equity interest in Uniroyal?

5     A    I did not.

6     Q    Did you disclose in the supplemental affidavit that Emcore

7     holds approximately seven percent of the stock in Uniroyal?

8     A    I did."

9            MR. BUCHBINDER:   This is on page 24 now.

10    "BY MR. BUCHBINDER:

11    Q    And, can you explain why you failed to make the disclosure

12    in the original affidavit?

13    A    I suppose it was inadvertence.  The fact that Emcore was

14    over a five percent owner was disclosed in Schedule A which was

15    attached to the petition for Uniroyal Technology which we

16    assisted the debtor in preparing.  We had also come to the

17    view, in connection with the development of the case, that it

18    was very unlikely that there would be any recovery to the

19    equity at the parent holding company level.

20           And, so I think that there was a view that the equity

21    interests were not of importance.  Nevertheless, we did, upon

22    further consideration, decide to err on the safe side and make

23    sure to supplement the affidavit when it was brought to our

24    attention that there were these various ownership interests as

25    a particular matter."

**A503**

1        MR. BUCHBINDER:  Now, Your Honor, with respect to the

2   relationship between the parties, I'm going to refer you to

3   page 16 of the deposition, and starting at line 9.  And, this

4   is Mr. Lauria's testimony.

5   "BY MR. BUCHBINDER:

6   A    When I came to White & Case, Uniroyal was a client of

7   mine.  I was introduced to Emcore as a consequence of the

8   relationship between the two companies, and White & Case became

9   counsel to Emcore shortly after I came to White & Case.

10  Q    Thank you.  Okay.  Thank you for that.  But, did you

11  personally or have you personally represented Emcore in one or

12  more or in any matters since you came to White & Case?

13  A    I have been involved in the relationship, but the matters

14  that we have represented Emcore have been -- have not been

15  matters within my area of expertise.  In particular, public

16  offerings, acquisitions, M and A, securities, those types of

17  things which are not my areas.  So, I don't know.  I doubt

18  that I have billed material time to Emcore matters."

19       MR. BUCHBINDER:  I'm on page 17 now, Your Honor.

20  "BY MR. BUCHBINDER:

21  A    I'm sure I have billed some time, but the projects we have

22  done for Emcore just have not been in my area of expertise.

23  Q    When you say that you have been involved in the

24  relationship, can you describe that further --

25  A    Well, it's a pretty general question.

**A504**

Buchbinder - Argument                    24

Q    -- or was your prior answer a basic worthwhile description
of what you meant by involvement?

A    I think so.  I mean, again, when I came to White & Case,
Uniroyal came to me -- with me to the firm and became a firm
client.  The people at Uniroyal had various relationships with
Emcore which, at the time, was a private company.  They
introduced me and the firm to Emcore.  And, as a consequence of
that, you know. we represented both companies during my tenure
at White & Case.

          I guess I should mention one of the connections is
Rubin Richards, who is the chairman -- I'm sorry -- the CEO of
Emcore and was during the Uniroyal original bankruptcy and
outside advisor to Uniroyal.  Rubin Richards was, at the time,
of the firm called Houser and Richards (phonetic), a financial
advisory firm.  I was with Weil, Gotshal.  We were debtor's
counsel and Houser and Richards was the financial advisor to
the debtor in the Uniroyal Plastics bankruptcy.

          So, my relationship really relates back to the
original Uniroyal bankruptcy when Rubin and I were both
advisors to the Uniroyal debtors."

          MR. BUCHBINDER:  Your Honor, elsewhere in the
deposition, Mr. Lauria testified that the Uniroyal bankruptcy
took place in 1991 and 1992 in the Northern District of
Illinois and that he joined White & Case in 1996.  So, in
addition to not having disclosed Emcore's existence as a

1    shareholder, there was no disclosure as to this longstanding

2    historic relationship between Mr. Lauria, Emcore, and Uniroyal.

3             Emcore is a creditor in this case.  Emcore has, as

4    Mr. Lauria has stated, apparently an undisputed, unsecured

5    claim.  But, Emcore also asserts a claim with respect to a

6    failed joint venture.  We have obtained the affidavit of Howard

7    Brody, and the parties have stipulated that the affidavit may

8    be submitted without Mr. Brody being here for cross-

9    examination.

10             The affidavit has been filed with ECF.  Counsel has a

11   copy.  I have another copy for counsel if they don't.  And, I

12   do have the original to present to the Court.  It's a

13   relatively shortly affidavit.  May I approach, Your Honor?

14             THE COURT:  Any objection to the affidavit?

15             MR. LAURIA:  No, Your Honor.

16             MR. BUCHBINDER:  Your Honor, paragraph 2 -- I'll just

17   give the Court an opportunity to review the affidavit.

18             THE COURT:  (Pause).  Okay.

19             MR. BUCHBINDER:  Your Honor, paragraph 2 of the

20   affidavit refers to the joint venture claim that Mr. Lauria

21   referred to in his argument.  I'm not going to further belabor

22   the statements in the affidavit, since the Court has now read

23   it.

24             Additionally, on October 4, there was a 341 meeting

25   held in this case.  It was a short one, because statements and

1    schedules have not been filed.  We did file this morning the

2    transcript of the 341 hearing.  I've provided a copy to

3    counsel, and I have the original transcript to present to the

4    Court.  At this time, I only want to refer to a small part of

5    it.  May I approach, Your Honor?

6                THE COURT:  Yes.

7                MR. BUCHBINDER:  The witness for Uniroyal at the 341

8    hearing was Howard Curd (phonetic), who is the CEO of Uniroyal

9    Technology Corporation.  At page 3 of the transcript, at line

10   15, I asked, --

11   "BY MR. BUCHBINDER:

12   Q    And, can you briefly describe for us the causes of

13   Uniroyal Technology Corporation seeking Chapter 11 relief?

14   A    The company was in a transition period from an industrial

15   company to a hi-tech company, again, about 24 months ago.

16   During that period of time, we took on a joint venture partner

17   in the development of light omitting diodes.

18                And, in the early part of last year, we were informed

19   by the joint venture partner that they were no longer going to

20   continue funding our joint venture operation.  At that point,

21   their contribution to that partnership was about $20M."

22                MR. BUCHBINDER:  And, then Mr. Curd expanded upon his

23   answer referring to other matters.  At page 5, line 12, I

24   asked, --

25   "BY MR. BUCHBINDER:

**A507**

1   Q    Thank you, Mr. Curd.  You described a joint venture.  With

2   whom was the joint venture between?

3   A    It was with a company called Emcore.

4   Q    And, who was the other joint venture partner, Uniroyal

5   Technology or one of the other debtors?

6   A    Well, it was Uniroyal, Uniroyal Optoelectronics.  It is --

7   basically is sub of Uniroyal Technology.

8   Q    Do you assert, on behalf of Uniroyal, that it may have

9   claims against Emcore with respect to the joint venture

10  agreement at this point in time?

11  A    I think it is still under review."

12          MR. BUCHBINDER:  Now, Your Honor, in connection with

13  the deposition of Mr. Lauria and also attached as a copy -- as

14  an exhibit to the affidavit of Mr. Brody, you will find the

15  alleged conflict waiver that has been entered into or that has

16  been given by Uniroyal and by Emcore to White & Case with this

17  -- in this particular matter.

18          You will note that the preamble to the conflict

19  waiver, on page 2, the top paragraph reads, "The firm

20  recognizes that, in the absence of informed consent by both

21  Emcore and Uniroyal, its representation of Uniroyal in the

22  bankruptcy proceedings would be subject to objection on the

23  grounds that White & Case has conflicting interests under Rule

24  1.7 of the Delaware Rules of Professional Conduct and other

25  applicable rules of professional responsibility."

**A508**

1          In the body of the conflict waiver, paragraph 2 on

2     page 3 of the document contains a provision which reads,

3     "Emcore retains the right to exercise, in its sole discretion,

4     to seek replacement of the firm as counsel to Uniroyal by way

5     of an applic -- by way of application to the bankruptcy court

6     or other court of competent jurisdiction, should Emcore believe

7     that White & Case is, 1, taking a position adverse to Emcore's

8     claims in the bankruptcy proceedings on behalf of Uniroyal or

9     another party; 2, or otherwise acting adversely to Emcore's

10    interest.  That application shall not be prejudiced by the

11    giving of this waiver or consent."

12         Going to the next page, paragraph 6 reads, "At any

13    time, should the management of White & Case or any White & Case

14    attorney working on the Uniroyal matter determine that Emcore's

15    interests could be adversely affected by the firm's

16    representation of Uniroyal in the bankruptcy proceedings,

17    including as a result of any confidential, secret, or

18    privileged information which the firm may learn during the

19    course of its representation, the firm shall withdraw from the

20    bankruptcy proceedings as expeditiously as possible on such

21    terms and conditions as will be approved by the bankruptcy

22    court."

23         Subparagraph 4 of the conflict waiver talks about the

24    ethical barrier which Mr. Lauria mentioned previously, but also

25    indicates that "certain named individuals" -- I'm looking at

**A509**

Buchbinder - Argument                    29

1    the fourth and fifth line of paragraph 4 -- "who perform legal

2    services for Emcore now or in the future" -- and then various

3    individuals are named.

4            The conflict waiver is not consistent with Mr.

5    Lauria's arguments from a few moments ago, because the conflict

6    waiver clearly contemplates that Emcore may continue to have

7    services performed by some members of White & Case during the

8    course of the Uniroyal matter, should White & Case's retention

9    application be approved.

10           With all of those facts in mind, Your Honor, let's

11   take a look at the law.  The parties have admitted in their own

12   conflict waiver that, but for the conflict waiver, there's an

13   actual conflict of interest.  The joint venture matter between

14   Emcore and one of the Uniroyal debtors has been cited by

15   Uniroyal's chairperson at the meeting of creditors as a

16   precipitating factor of this filing.  It is referred to in Mr.

17   Brody's affidavit.  It is certain to be a matter of contention

18   during this case.

19           On top of this all is the failure of White & Case to

20   have disclosed the equity interests of Emcore and of its

21   chairperson in the Uniroyal estate.  Their statement that it

22   was mere inadvertence on their part to have not disclosed this

23   in the original application belies the lengthy and historical

24   relationship between Mr. Lauria and both of these entities.

25           It simply was not disclosed when it should have been.

**A510**

1    That, in and of and by itself, should be sufficient grounds to

2    deny the retention, because neither the Trustee nor any party

3    in interest should be required to ferret these facts out of the

4    record.   They should have been disclosed in the first place.

5          In addition, the fact that there is a conflict waiver

6    is not dispositive of the issue of disinterestedness.   The

7    issue of disinterestedness is somewhat broader than whether

8    there is an actual conflict or whether there is not an actual

9    conflict.   The concept of disinterestedness looks to the

10   ability of the professional as a fiduciary to fairly represent

11   the estate and all of the various interests that may come into

12   play with the estate.

13         The case law is replete with cases where conflict

14   waivers have not been considered dispositive.   I'm happy to

15   provide the Court with some citations, if it desires them this

16   afternoon.   I have them here with me.   But, the case law is

17   also complete in many cases, including one from Delaware where

18   a failure to disclose all of the necessary facts with full

19   candor is grounds for disqualification.

20         In the Southern District of New York case of the

21   Leslie Fay Company's (phonetic) case, the Court noted -- I'm

22   paraphrasing, rather than quoting -- but, the Court noted that

23   it is the responsibility of counsel to disclose all of the

24   facts necessary to the representation.   Mr. Lauria's personal

25   judgment that equity in this case is out of the money and so

**A511**

1   the disclosure was not important belies his knowledge as an

2   expert and belies all of the case law in this area with which

3   all of us in this room are intimately familiar.

4          The conflict waiver, if it is to be given

5   consideration, should be considered to the extent that it is

6   not a conflict waiver.  The two provisions I recited that give

7   Emcore the ability to seek White & Case's withdrawal if it

8   essentially does not like what White & Case is doing and the

9   provision that allows White & Case or may require White & Case

10  to seek withdrawal if it doesn't think Emcore doesn't like what

11  it is doing, mean that this isn't a conflict waiver.

12         White & Case has two masters.  It's had two clients

13  in the past.  It has a historical relationship with both of

14  these entities.  I can cite further cases and read the Court

15  many quotes, with which I am sure the Court is familiar, about

16  the fact that counsel for a  debtor is not going to have two

17  masters and that we must avoid the appearance of impropriety.

18         This is not a situation in which the United States

19  Trustee is Don Quixote pointing a lance at a windmill.  This is

20  not a case where maybe there will be an issue, but maybe there

21  won't.  This is a case where the parties have admitted there's

22  an actual conflict.

23         This is a case where there have been multiple

24  failures to disclose, and this is a case where, if the conflict

25  has any validity at all, it is not a conflict waiver at all,

1    because the creditor has the ability to kick White & Case off

2    of the representation if it doesn't like what White & Case is

3    doing.

4         For all of those reasons, Your Honor, the retention

5    of White & Case in this matter should be denied.  Thank you.

6         THE COURT:  Any response?

7         MR. LAURIA:  I think there are a few points I would

8    like to clarify.  Your Honor, the cases on the disqualification

9    of counsel as a consequence of nondisclosure don't come close

10   to matching the facts we have here.  The fact is that Emcore's

11   status as a five percent shareholder was disclosed with the

12   petition.  That was not a secret.  It was part of the record

13   from the commencement of the case.  Schedule A specifically

14   reflects that Emcore is an over five percent holder.

15        In my original affidavit, we do disclose that we have

16   an ongoing -- a past and an ongoing relationship with Emcore

17   regarding various matters.  I know of nowhere where there is

18   any historic relationship disclosure obligation.  The fact is

19   we also have a historic relationship with Uniroyal.

20        Importantly, I still don't understand the relevance

21   of the 14 percent ownership interest by Emcore's chairman.

22   That really flows from two factors.  Most importantly, we are

23   not counsel nor have we ever been counsel to Emcore's chairman.

24   We have been and we are counsel to Emcore.

25        Related to both issues, however, Uniroyal currently

**A513**

1    has outstanding 26 million shares that have been trading

2    between the prices of one-thousandth of a penny and a penny of

3    late.   Meaning that the aggregate equity value of Uniroyal is,

4    at most, approximately $200,000, and Emcore's seven percent

5    interest is worth $14,000.   Not a material relationship that

6    would motivate Emcore's conduct in this case, I don't think, by

7    any construct.

8           Indeed, I think what the U.S. Trustee has attempted

9    to do is foist form over substance and pin an argument on a

10   number of, quite frankly, inaccurate statements about the

11   record.

12          Inaccuracy number one, counsel for the U.S. Trustee

13   subjects that, in paragraph -- in the lead paragraph on page 2

14   of the waiver letter, that we have admitted that there is an

15   actual conflict of interest.   That's simply incorrect.

16          What the paragraph says is the firm recognizes that,

17   in the absence of informed consent by both Emcore and Uniroyal,

18   its representation of Uniroyal in the bankruptcy proceeding

19   would be subject to objection on the grounds that White & Case

20   has conflicting interests.

21          There's no acknowledgment that that objection would

22   be upheld or that there are conflicting interests, but merely

23   that there would be an objec -- the potential of an objection

24   on the grounds of conflicting interests, far from an admission

25   of an actual conflict, Your Honor.

1          And, indeed, as we have stated, we don't believe that

2     there is an actual conflict here.  We -- in fact, we believe

3     it's impossible for there to be one.

4          Second, Your Honor, counsel has indicated that

5     paragraphs 2 and 6 of the waiver letter, which provide that

6     Emcore retains the right, based on subsequent developments, to

7     object to White & Case's service as counsel for the debtor or

8     in paragraph 6 which specifically provides or acknowledges

9     White & Case's right to seek to withdraw, if it believes it has

10    a conflict, is nothing more than a writing reflecting the state

11    of the law.

12          I don't believe that anybody can effectively waive a

13    future unknown conflict, and I don't believe that counsel can

14    be precluded from bringing to the Court's attention, if

15    circumstances come to exist in the future that it believes

16    necessitate its withdrawal, its duty and obligation to do so.

17    We believe that these exist under the applicable ethical

18    provisions and disciplinary rules, and these two provisions in

19    this letter simply recognize what is otherwise the law that we

20    all operate under.

21          Counsel has also suggested that the deposi -- or the

22    transcript of Mr. Curd at the 341 meeting suggests that there

23    is sure to be a claim and that that claim precipitated the

24    bankruptcy.  In fact, Your Honor, when Mr. Curd was directly

25    asked whether or not there were claims against Emcore, his

**A515**

1    response was it's under review.

2          Nowhere in that statement does Mr. Curd suggest that

3    he believes that there was a breach of any obligation by Emcore

4    that has resulted in a claim by the debtors against Emcore.

5    It's not there.  It's not there.  It's simply innuendo.

6          Indeed, the failure of the joint venture was a

7    precipitating factor.  There were other precipitating factors.

8    You'll note that there was the failed sale of the business

9    division.  The fact that the venture didn't work out doesn't

10   mean that it's Emcore's fault.  And, in fact, there's no

11   evidence in this record that Uniroyal takes the position that

12   the failure of that venture was Emcore's fault.

13         Even if a claim does arise between Emcore and

14   Uniroyal as a consequence of the venture, White & Case will be

15   excluded from that dispute, and either The Bayard Firm will

16   represent the estate, counsel for the Committee will represent

17   the estate, or special counsel will be retained, if necessary.

18         I think what the objection -- how the objection can

19   best be characterized as concern, in counsel's own words,

20   regarding an appearance of impropriety.  The Third Circuit has

21   spoken on this topic.  To quote the Third Circuit in the

22   Marvel decision, at page 477, "To allow disqualification merely

23   on the appearance of impropriety indeed would allow horrible

24   imaginings alone to carry the day."

25         Your Honor, here there is no actual conflict.

**A516**

The Court - Ruling                                    36

1    Arguably, there is the potential for one.  At this point in

2    time, it appears to be remote.  And, appropriate protective

3    measures have been put in place to ensure, even if a potential

4    conflict matures into an actual conflict, that the interests of

5    the estate will be fully represented and protected.

6    Accordingly, we would ask that the Court overrule the objection

7    and permit the retention of White & Case.

8              THE COURT:  Okay.  I haven't had much time to spend

9    on this matter, and obviously I saw for the first time, when it

10   came out here, the supplemental affidavit, and the deposition

11   transcript, and the affidavit from Mr. Brody.  But, I'm going

12   to deny the application for retention.  And, I haven't seen a

13   case this strong against such retention in some time.

14             First of all, with respect to the first affidavit

15   that was filed -- and it's quoted by the U.S. Trustee in their

16   objection at paragraph 4.  And, it describes in one paragraph

17   White & Case's relationship with Emcore and the various

18   transactions between Emcore and Uniroyal.

19             And, in my view, that disclosure is only enough to

20   raise questions and elicit more information.  And, in my view,

21   it is less than complete candor as to the nature and scope and

22   quantification in terms of dollar interest that otherwise, I

23   believe, should have been disclosed.

24             And, before I came out here and was exposed to the

25   supplemental affidavit, the Brody affidavit, the transcript, et

**A517**

1  cetera, I had already concluded that, on the basis of that

2  disclosure in the first affidavit, I would certainly not permit

3  the retention to go forward, and I was going to direct that

4  there be an evidentiary hearing exploring in detail the various

5  transactions between Emcore and the debtor.

6  But, I've seen enough and heard enough, based upon

7  the deposition transcript and the affidavits, to conclude that

8  the disclosure was inadequate, to say the least, and was only

9  sufficient to raise more questions.  And, I believe that

10  counsel representing a debtor or any counsel appearing before

11  this Court has a duty of candor dischargeable by an effort much

12  greater than that elicited in the initial affidavit.

13  There are several significant points made in the

14  additional material presented to me.  For example, one of the

15  first questions I had in the affidavit information was what was

16  the nature and magnitude of the transaction out of which the

17  debtor has a potential claim against Emcore, namely the joint

18  venture failure.  And, significantly, in the 341 hearing, the

19  witness testified that it was a $20M transaction.  I think

20  that, by any measure, that's a significant transaction.

21  The most telling -- in my opinion, the most telling

22  bit of adjuration or evidence presented to me this afternoon

23  regarding the conflict is the waiver agreement.  And, it

24  certainly seems to me that paragraph 2 of that waiver agreement

25  which entitles Emcore, in its sole discretion, to seek

1   replacement of White & Case as counsel for Uniroyal, in the

2   event -- and I now quote -- "in the event it finds that White &

3   Case is 'otherwise acting adversely to Emcore's interest'."

4         Given the sharehold interest of Emcore, given

5   Emcore's potential claim arising out the joint venture or

6   conversely the debtor's claim against Emcore arising out of the

7   transaction, given the sale of property interest claim that

8   Emcore has, and given the long history of White & Case in

9   representing Emcore and including its dealings with the debtor

10  and the amount of information, confidential and otherwise,

11  imparted to White & Case in that regard, it certainly seems to

12  me that it would be easy for Emcore to exercise its best --

13  exercise its judgment in its best interest to call upon White &

14  Case to terminate its relationship with the debtor on account

15  of activities adversely affecting Emcore's interests, because

16  those interests are not -- those activities are not limited to

17  the sharehold interest of Emcore and the claim interest of

18  Emcore.  It's Emcore's interest generally in this debtor.

19        And, the fact that the -- Emcore required the waiver

20  agreement to contain a Chinese Wall provision, I think, is only

21  a further acknowledgment that there are very serious problems

22  that would likely result if there were continued representation

23  by White & Case of the debtor.

24        And, while the Chinese Wall may work in some

25  situations, such as where members of the Creditors Committee

**A519**

1    seek to engage in transactions with respect to publicly traded

2    debt of the debtor, I don't think that it is an answer to a law

3    firm's clear and distinct potential conflict of interest to

4    erect a Chinese Wall.  I think that approach is an invitation

5    to some serious problems.

6            So, I've only touched the highlights and, quite

7    frankly, I will, in addition to the highlights I've hit, refer

8    to what I believe to be a -- an effective case put on by the

9    U.S. Trustee in demonstrating that White & Case cannot be

10   labeled a disinterested person under these circumstances, and

11   consequently I will deny the retention application.

12           MR. LAURIA:  Your Honor, we -- in light of the

13   Court's ruling, we have a bit of a quandary.  We would, I

14   presume, like to explore the ability to consider -- to continue

15   as 327(e) counsel, at least with respect to, for immediate

16   purposes, the hearing on the DIP financing, which is scheduled

17   to continue today.

18           And, I think we need to consult with the client and

19   determine if we can fashion an arrangement to come back and to

20   -- in order to minimize any impairment to the estate, to

21   continue on certain things that we have been doing for the

22   debtor and to facilitate a transition to new 327(a) counsel.

23           But, I guess the important issue is -- I guess I'd

24   like to make an orateness (phonetic) request that we be

25   permitted, in light of the Court's ruling, to continue on on

**A520**

1   behalf of the estate with respect to the matters that are

2   before the Court today.

3            THE COURT:  Any response?

4            MR. BUCHBINDER:  Your Honor, since the request is

5   limited to simply continuing this hearing today to conclude

6   today's matters, I will defer to the Court's judgment in that

7   regard.

8            THE COURT:  Well, let me ask -- there's a lot of

9   objections to the DIP facility.  And, has any progress been

10  made in resolving --

11           MR. UZZI:  Yes, Your Honor.

12           THE COURT:  -- any of it?

13           MR. UZZI:  We expect that to be a fully consensual --

14  oh, I'm sorry.  Gerard Uzzi of White & Case.  We expect that to

15  be fully consensual at this point, with the caveat that we

16  reach an arrangement with the parties that we will continue on

17  an interim basis with some modifications to the interim lending

18  arrangement and seek final approval of the DIP financing at the

19  next Omnibus hearing date.

20           MR. PACKEL:  Your Honor, good after.  Mark Packel,

21  Blank, Rome, Comisky & McCauley.  First, let me apologize for

22  my tardiness in arriving at the hearing today.  We are proposed

23  counsel to the Committee in this case.  And, we have been

24  working, over the past several days, well into the evening and

25  starting against early in the mornings, with representatives of

**A521**

1  the debtor and their professionals, including attorneys from

2  White & Case, to try and reach a consensual resolution of the

3  Committee's objection.

4          I think, as has been stated by debtor's counsel, we

5  believe, subject to everybody reviewing a proposed form of

6  second interim order, which CIT's counsel has prepared, that

7  the objection, at least for today, is resolved with the concept

8  being that both the Committee's objection and the only other

9  objection to which we're aware of, which is the objection of

10  G.E., would carry to a final hearing.  And, what we will have

11  today is, in fact, a further interim resolution, but not a

12  final resolution.

13          THE COURT:  All right.  Why don't we then proceed

14  with the DIP facility hearing.  And, for purposes of this

15  hearing only, White & Case can represent -- pursuant to 327(e),

16  can represent the debtor.

17          MR. UZZI:  Thank you, Your Honor.  Again, Gerard

18  Uzzi, White & Case, on behalf of the debtors.  As we just

19  stated, Your Honor, the debtors have engaged in a con -- very

20  constructive dialog with the Committee toward a resolution of

21  their issues on DIP financing, as well as making progress in

22  these cases generally.

23          We believe we've made substantial progress.  We have

24  not been able to resolve all of the Committee's issues with

25  respect to the DIP financing to have a consensual deal for a

**A522**

1    final financing arrangement.  So, at the request of the

2    Committee, the debtors have agreed and CIT has agreed to seek a

3    further interim approval of the financing arrangement subject

4    to a slight increase in the maximum borrowing limit.

5         The maximum limit is presently $9M.  The debtors are

6    seeking an increase to $10M.  And, that $10M is really to

7    provide a safety net for the debtors over the next period to

8    allow them some room for some contingencies.  It is the

9    debtor's understanding that the Committee consents to the

10   increase to $10M, CIT consents to the increase to $10M.  And,

11   it's also the debtor's understanding that GECC at least doesn't

12   have an objection on a -- going forward on an interim basis

13   with the increase to $10M.

14        The debtors have also -- well, the Committee has

15   asked the debtors to make certain representations on the record

16   as to our relationship going forward.  The debtors have

17   committed to delivery projections hopefully by the -- soon, but

18   by the end of the month that would show what the debtor's

19   performance through June of next year will be.

20        The debtors have represented to the Committee, in

21   fact, that they will attempt to deliver much more than that.

22   But, at the very least, we will get the projections to them as

23   soon as -- debtors will get them as soon as they can.

24        ·The debtors fully anticipate to file their schedules

25   next week, and they -- the Committee has asked that we make

**A523**

1   that representation on the record today.  The Committee has

2   also asked the debtors to engage -- to begin the process of

3   engagement of an investment banker.

4          The debtors have actually begun that process already,

5   and the debtors have committed that they will consult with the

6   Committee in a -- in that -- in the engagement of the

7   investment banker, that once the debtors have selected an

8   investment banker, that they will approach the Committee with

9   their selection and with the terms of the engagement prior to

10  seeking this Court's approval of the engagement of the

11  investment banker.

12         But, that will be without prejudice of the debtors to

13  ultimately seek approval at that time, even in the event that

14  the Committee doesn't approve the engagement.  But, at least we

15  will give the Committee the opportunity to comment on the terms

16  of the engagement, and also the debtors will consider

17  suggestions for the interviewing process.

18         I think that hopefully fairly represents the

19  arrangement of the parties, and I will leave to my colleagues

20  to further supplement the record, if necessary.

21         THE COURT:  Do you have a revised interim order or --

22         MR. UZZI:  The -- I think the problem, Your Honor, is

23  we do -- we'll need to submit the revised interim order.  We

24  were working on it -- and that's why counsel was a little late

25  today -- up until the very last minute.  So, we'll submit that

Packel / Manning - Argument                                    44

1    to chambers after the hearing, if that's okay with the Court.

2              THE COURT:  If the two objectors are on board for

3    that, that's okay with me.

4              MR. PACKEL:  Your Honor, again, Mark Packel for the

5    Committee, and I believe counsel for G.E. is here.  With the

6    representations which were just made on the record by the

7    debtor and having seen a form of order, although it presently

8    lacks a budget, which is a necessary caption to the order, the

9    Committee is prepared to agree to submit the proposed second

10   interim order to the Court with the approval and consent of the

11   Committee, again reserving the objection which we have filed,

12   if necessary, to be heard and argued at the final hearing which

13   will be in November.

14             THE COURT:  Do we have a hearing date?

15             MR. PACKEL:  Yes.  It would be the -- as I understand

16   it, the proposed interim order would run until the next Omnibus

17   hearing date in this case, which is November the 22nd.

18             THE COURT:  Okay.

19             MS. MANNING:  Good afternoon, Your Honor.  Margaret

20   Manning with Buchanan Ingersoll on behalf of G.E. Capital

21   Corporation.  We have no objection to further extension of the

22   interim order with the increase to $10M in the level of

23   borrowing.

24             THE COURT:  Okay.

25             MS. MANNING:  Thank you.

**A525**

Schlerf - Argument                                    45

1      THE COURT:  Yes?

2      MR. UZZI:  Well, I -- so, just to close the record on

3  that matter, we would -- the debtors request that this Court

4  approve the financing on an interim basis, subject to the

5  debtors submitting an order to chambers later this afternoon.

6      THE COURT:  Okay.  That's fine.  I -- obviously

7  subject to my reading it too.

8      MR. UZZI:  Yes, of course, Your Honor.

9      MR. SCHLERF:  Your Honor, Jeffrey Schlerf.  I know

10  we've run over, Your Honor.  So, very quickly, the last matter

11  on the agenda is the debtor's motion to reject certain

12  executory contracts.  Your Honor, there was an exhibit attached

13  to the motion.  They were mostly, if not all, either settlement

14  agreements or employment agreements with former employees.  We

15  received four objections.

16      The first two agreements that were listed on the

17  exhibit, Your Honor. were between the debtors and various

18  retiree groups.  We've determined that it would be best to

19  adjourn those first two objections.  They involve matters that,

20  frankly, can't be taken up in a short amount of time before

21  Your Honor.

22      There were two other objections by individuals, Your

23  Honor.  They're former employees of the company. . I think one

24  of the objecting parties attached the employment agreement, the

25  other one did not.  If you'd like, Your Honor, I can provide an

**A526**

1   employment agreement.  But, the objections are fairly easy to

2   dispose of.  Carlos --

3         THE COURT:  Let me -- I've read your objections.

4   Anyone here representing either of the two individual

5   objectors?

6         MR. ALEXANDER:  I'm Brock Alexander.  I'm

7   representing myself today, so I submitted everything -- I sent

8   them the employment contract for review and several other

9   exhibits.  I guess -- and I'm not an attorney, but my feeling

10  on the executory contracts argument was that my employment

11  agreement was only from -- until August of this year and that

12  my agreement was not executory at this point.

13        And, so, we went through the court system in Florida

14  for the contract, and Judge ordered a ruling in Hillsborough

15  County.  So, I submitted the ruling from that county as well.

16  But, you have all that -- that data already.

17        MR. SCHLERF:  Your Honor, if it would help, we can

18  just -- debtors can stipulate on the record right now that the

19  contract is not executory.  The -- Mr. Alexander will have an

20  opportunity to file a proof of claim, and we can argue for

21  another day on whether he has an allowed prepetition claim and

22  the amount.

23        THE COURT:  Okay.  They're agreeing with you, it's

24  not executory, it's not covered by the order.

25        MR. ALEXANDER:  Okay.

**A527**

1    MR. SCHLERF:  Your Honor, the second objection was by

2    Carlos Orozeo.  I believe he's in the courtroom.  Your Honor,

3    the response is a little bit difficult to follow, but the

4    conclusion seems to challenge the debtor's exercise of its

5    business judgment.  Your Honor, this is a similar situation.

6    It's a former employee -- an employee who's no longer -- a

7    person who's no longer providing services to the debtor.

8        Your Honor, as you know in this circuit, the debtor's

9    ability to file under -- a motion under Section 365 is subject

10   to the business judgment test.  Absent extraordinary

11   circumstances, deference -- great deference is given to the

12   debtor's judgment.  So, we'd seek to have that -- that contract

13   rejected.

14        THE COURT:  Okay.  I'll overrule the objection.

15        MR. SCHLERF:  Your Honor, I have a form of order that

16   has taken off the agreements with the retirees.  And, I'll

17   simply cross out the last agreement with Mr. Alexander.  May I

18   approach, Your Honor?

19        THE COURT:  Yes.  (Pause).  Okay.

20        MR. SCHLERF:  That's all we have for today, Judge.

21        THE COURT:  Okay.  We stand in recess.

22        MR. SCHLERF:  Thank you.

23

24                          * * * * *

25

**A528**

48

<u>C E R T I F I C A T I O N</u>

I, Frances L. Maristch, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_10/21/02_____

DATE

*Frances L. Maristch*

FRANCES L. MARISTCH

**A529**

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | )    Chapter 11 |
| | ) |
| NORTHWESTERN CORPORATION, | )    Case No. 03-12872(CGC) |
| | ) |
| Debtor. | ) |
| | ) |

**MAGTEN ASSET MANAGEMENT CORPORATION'S REPLY IN SUPPORT
OF ITS MOTION TO DISQUALIFY
PAUL, HASTINGS, JANOFSKY & WALKER LLP**

Magten Asset Management Corporation ("Magten"), by its undersigned counsel,
hereby submits this Reply Memorandum in support of its Motion to Disqualify Paul,
Hastings, Janofsky & Walker LLP ("Paul Hastings") (the "Motion") as counsel to the
debtor-in-possession (the "Debtor").

**I.      Paul Hastings Attempts to Rewrite History**

Unhappy with the existing facts in this proceeding, Paul Hastings, in its response,
takes the unusual course of creating a different, more favorable, set of facts with which to
oppose Magten's motion.

**FIRST**, unable to address its failure to disclose directly, Paul Hastings ignores the
misleading representations contained in its initial disclosure statement (the "Initial
Affidavit").[1]    In the Initial Affidavit, Paul Hastings misrepresented that its only
connection with Clark Fork was serving as its counsel in the McGreevey lawsuit, and that

---

[1] The Initial Affidavit is attached as Exhibit A. Its full name is Affidavit Of Jesse H. Austin III In Support
Of Application To Employ And Retain Paul, Hastings, Janofsky & Walker LLP As Attorneys For Debtor
And Debtor-In-Possession, dated September 2003.

that lawsuit had no relationship to work performed by Paul Hastings for the Debtor or

Clark Fork.  Nothing could be further from the truth.

The Initial Affidavit contains one paragraph disclosing Paul Hastings'

representation of Clark Fork  It reads as follows:

> Paul Hastings represents the Debtor and Clark Fork and
> Blackfoot, LLC, a wholly-owned subsidiary of the Debtor,
> in an action entitled <u>McGreevey v. Montana Power
> Company, et al.</u>, (Case No. CV-03-01-BU-SHE) pending in
> United States District Court for the District of Montana
> which is related to facts and occurrences which arose prior
> to Paul Hastings' representing the Debtor with respect to
> the Corporate Matters.

Initial Affidavit, ¶ 18.  "Corporate Matters" is defined, in part, as "assisting the Debtor in

connection with the acquisition and disposition of assets" beginning in late 2001.  <u>Id</u>. at ¶

13.  The Initial Affidavit's disclosure regarding Clark Fork is, therefore, deficient in

several significant regards.  Most importantly, the Initial Affidavit affirmatively omitted

what Paul Hastings has only now admitted: that it represented Clark Fork in connection

with the transaction at the heart of this bankruptcy proceeding.  Also, Paul Hastings

description of the <u>McGreevey</u> lawsuit, as only related to events occurring prior to Paul

Hastings' assisting the Debtor to acquire and dispose of assets in 2001 and beyond, was

false and misleading.

That description was false because the purchase of Clark Fork from the Montana

Power Company and the ultimate disposition of its assets, in fact, constitute the central

matters of contention in the <u>McGreevey</u> lawsuit.  Indeed, at one point in the lawsuit, the

McGreevey class claimants had enjoined Northwestern and Clark Fork from executing

the going-flat transaction.  That description was also false because Paul Hastings claimed

that the <u>McGreevey</u> lawsuit concerned events occurring before Paul Hastings began its

representation in 2001. In its most recent affidavit (the "July Affidavit"[docket no. 1625]), Paul Hastings reveals that it began its representation of the Debtor in December, 1999 and its very first representation concerned "possible acquisitions by the Debtor, either directly or indirectly through wholly owned subsidiary corporations" resulting in the acquisition of Clark Fork. July Affidavit at ¶ 8. Read in the context of these disclosures, Paragraph 18 of the Initial Affidavit seems to have been deliberately designed to throw victims of the going-flat transaction off track.

**SECOND**, Paul Hastings alleges that Magten knew about the dual representation of the Debtor and Clark Fork "since the early months of the Debtor's Chapter 11 case." (July Affidavit, ¶ 15).[2] Again nothing could be further from the truth. As set forth by the affidavit of Tally Embry, principal of Magten, and the affidavits of Gary Kaplan and Bonnie Steingart, Magten's attorneys at Fried Frank Harris Shriver & Jacobson LLP ("Fried Frank"), Magten did not know the extent of Paul Hastings involvement until Paul Hastings disclosed it at the 11th Hour at the prodding of Magten. *See*, Exhibits B, C and D. The July Affidavit disingenuously relies upon a February 24, 2004 memo, prepared by Fried Frank, for its contention that Magten knew of Paul Hastings' dual representation. The full text of the paragraph dealing with Paul Hastings' conflict reads in its entirety:

> In addition, it is our understanding that Paul, Hastings, Janofsky & Walker LLP ('Paul Hastings') acted as counsel to NWC [Northwestern] with respect to the transactions resulting in the fraudulent transfer. As a result, Paul Hastings will likely be a material witness in the fraudulent

---

[2] Paul Hastings seems to have some confusion as to what this phrase might mean. In its Memorandum of Law, Paul Hastings suggests that Magten knew as early as the Petition Date: "[Magten] waited for more than nine months after the filing." (Paul Hastings Mem. at 3). However, the July Affidavit traces Magten's alleged knowledge only back to February 2004. (July Affidavit at ¶15).

> transfer action and will not be able to act for any parties in
> this dispute.[3]

Far from evidencing any knowledge of Paul Hastings' dual representation, this memo actually reveals that both Magten and its attorneys were laboring under the understanding that Paul Hastings represented only the Debtor. *See*, Exhibit C at ¶ 5 and Exhibit D at ¶ 5. After receiving this memo, Paul Hastings remained silent and refused to correct Magten's understanding.

**THIRD**, Paul Hastings diverges from reality by claiming that Clark Fork is currently solvent, and, therefore, not a Debtor with claims pending against Northwestern. (Paul Hastings Mem. at 9, 10, n.5). Again, nothing could be further from the truth. On September 14, 2003, Paul Hastings, acting on behalf of the Debtor, moved this court for an order approving, in part, the Debtor making payments of $370,000 per month to Clark Fork "in the event that it is unable to pay its trade accounts arising out of its ordinary course of business or to pay any other costs and expenses . . . that arise in connection with the operation or maintenance of the Milltown Dam." *See*, Exhibit E, at ¶ 47. In fact, in that motion, Paul Hastings also explained that since January 1, 2003, Northwestern had been paying Clark Fork $270,000 per month so that Clark Fork could operate its sole asset, the Dam, and pay its accounts in the ordinary course. Id. Regardless of Northwestern's tactical choice to keep Clark Fork out of this reorganization process, Clark Fork is in all respects insolvent.

---

[3] While this memo was prepared for settlement purposes only, Magten will provide the full memo to the Court for *in camera* review at the Court's request.

## II. Paul Hastings Attempts To Change The Law

Not satisfied with creating facts, Paul Hastings seeks to create new law, as the existing authority squarely prohibits its conduct.

**FIRST**, Paul Hastings argues that no one has standing to raise its conflict of interest before this tribunal. This statement is simply not the law. As a threshold matter, this argument evidences Paul Hastings' utter disregard for its affirmative duty to make full disclosure of all facts concerning its relationships with the Debtor and the Debtor's assets at the outset of this Bankruptcy, as well as on an ongoing basis. Moreover, any party in interest to a bankruptcy has standing to raise issues concerning the conduct and administration of the estate. *See*, *e.g.*, 11 U.S.C. § 1109; In re Mundo Custom Homes, Inc., 214 B.R. 356, 360 (Bankr.N.D.Ill. 1997)("Under §327(a) any party in interest may object to the appointment of counsel."). Furthermore, not only Magten, but other parties to this bankruptcy, including the holders of QUIPS who held throughout and the McGreevey class, were injured by the going-flat transaction and Paul Hastings' non-disclosure.

**SECOND**, Paul Hastings argues that because Clark Fork's Board of Directors approved Paul Hastings' dual representation in connection with the going-flat transaction, Paul Hastings is now free to represent the interests of one party to that transaction against the other party's. Again, nothing could be further from the truth. As the Bankruptcy and Disciplinary Rules make clear, a law firm may not represent both parties to a transaction once that transaction comes under dispute. *See*, Rule 1.7 of the Model Rules of Professional Conduct; *see also*, In re Tidewater Mem. Hosp., Inc., 110 B.R. 221, 228 (Bankr.E.D.Va. 1989)("In bankruptcy, there is an inherent conflict in the representation

5

**A534**

of both sides to an acquisition of the debtor's assets."). The Court should also note that the former officers of Clark Fork have moved to dismiss the claims pending against them on the grounds that Northwestern exercised near total control over them. *See*, Exhibit F. *See also*, In re Digex, Inc. S'holders Litig., 789 A.2d 1176, 1211 (Del. Ch. 2000)(finding that it was not reasonably likely that board of directors could satisfy the 'entire fairness' test regarding their waiver, where "intense pressure [was] placed on Digex by its corporate parent to get the WorldCom deal done as quickly as possible."); Charles W. Wolfram, Modern Legal Ethics (Practitioners Ed. 1986) ("Courts have been understandably reluctant to permit consent to cure a conflicting representation when the people who actually make the decision to consent are the same individuals whose interest are in conflict with the organization. Several shareholder-derivative cases have held that no consent would be availing in such cases.") (citing Messing v. FDI, Inc., 439 F. Supp. 776 (D.N.J. 1977); Cannon v. United States Acoustics Corp., 398 F. Supp. 209, 216 (N.D. Ill. 1975), modified 532 F.2d 1118 (7th Cir. 1976)).

**THIRD**, Paul Hastings argues that this disqualification motion should be rejected because the motion assumes the merits of the Adversary Proceeding. This is nonsense. Conflicts issues always arise at the outset of a dispute between contracting parties, before the merits are addressed. The conflict rules preclude a lawyer who has represented both sides in a transaction from making his own choices about whom to support when the interests of two clients fall into dispute. Thus, counsel to both buyer and seller on a contract cannot represent the buyer when the seller sues for breach just because it thinks that the buyer's case is more meritorious. This principle has special significance here in the bankruptcy context. Because Debtor's counsel holds conflicting loyalties regarding

**A535**

the central assets of the reorganization process it may not represent the Debtor, regardless of the ultimate resolution of the claims asserted.

### III.    Paul Hastings Attempts To Persuade The Court That They Have Disclosed What They Have Attempted To Hide

Most egregiously, Paul Hastings (i) tries to persuade this Court that they have actually disclosed something which they have gone out of their way to hide, and (ii) fails to address or even recognize its affirmative duty to disclose at the outset and throughout these proceedings.

**FIRST**, Paul Hastings suggests that its dual representation of the Debtor and Clark Fork in the going-flat transaction was disclosed in the Initial Affidavit. However, as described above, Paul Hastings purported original disclosure actually obscured this fact. Not only did Paul Hastings <u>not</u> disclose the dual representation, Paul Hastings affirmatively mischaracterized its representation of Clark Fork by claiming that the issues in the <u>McGreevey</u> lawsuit concerned matters arising before Paul Hastings undertook its representation in late 2001. The Court and the creditors, including Magten, were entitled to rely on Paul Hastings disclosure as a complete and accurate description of Paul Hastings involvement.

**SECOND**, Paul Hastings' response to the correspondence sent by Storch Amini & Munves PC ("SAM") on March 30, 2004 and April 16, 2004 was also designed to shield the truth from exposure. In those letters, SAM specifically asked Paul Hastings to resign based upon their status as potential witnesses, not yet being aware of Paul Hastings' dual representation. *See*, Exhibits D and E to the Motion. However, because Paul Hastings seemed to be stonewalling instead of responding to those letters, *see*, Exhibit F to the Motion, suspicions were raised that the conflicts were more extensive

**A536**

than SAM and Magten had thought them to be at the time. Thus, notwithstanding the direct questions about the propriety of Paul Hastings' representation, Paul Hastings affirmatively kept its dual role quiet.

**THIRD**, on June 2, 2004, Paul Hastings responded to the 328(c) papers filed by Magten, papers which had publicly questioned Paul Hastings disinterestedness. Magten filed these papers at the beginning of May because counsel determined it was appropriate to present the question before the Court in light of Paul Hastings' stonewalling. In order to have the manner clearly addressed, counsel included in paragraph 8 the direct accusation that Paul Hastings had represented both sides. Based on Paul Hastings' conduct up to that point, counsel suspected that that was indeed the case. Instead of responding directly, Paul Hastings affirmatively withheld critical information from the Court and parties in interest.

**FOURTH**, throughout this Bankruptcy, Paul Hastings has taken it upon itself to argue against motions for adversary proceedings brought by Magten, the McGreevey class, and others. All of these hearings concerned assets transferred in the going-flat transaction. Yet, at none of them, did Paul Hastings reveal to the Court its dual representation in acquiring those assets for the Debtor from Clark Fork. At the very least, Paul Hastings had an obligation in each of these proceedings to disclose its role and recuse itself. By appearing and keeping silent each time, Paul Hastings affirmatively misled the Court.

**A537**

**IV.    Paul Hastings Argues That Notwithstanding Its Failures, The Court Should Exercise Its Discretion To Allow It To Continue To Represent The Debtor**

Finally, Paul Hastings has the temerity to raise questions as to whether the Bankruptcy Court and the bankruptcy process permit it to profit from its intentional non-disclosure, delay and misleading statements. The answer is overwhelmingly no. See, In re BH&P, 949 F.2d 1300, 1317-1318 (3d Cir. 1991); In re Uniroyal Tech., Corp., No. 02-12471 (Bankr.D.Del. Oct. 16, 2002)(hearing transcript at 36-39)(Ex. G); see also, In re Glenn Electric Sales Corp., 99 B.R. 596 (D.N.J. 1988); In re Filene's Basement, Inc., 239 B.R. 845, 850 (Bankr. D.Mass. 1999); In re Tinley Plaza Assocs., L.P., 142 B.R. 272 (Bankr. N.D.Ill. 1992). It is beyond dispute that Paul Hastings had an affirmative obligation to voluntarily and fully disclose; instead, it waited until the 11th hour, when it was cornered. And, as discussed throughout, even when cornered, the disclosures made by Paul Hastings were still designed to mislead the Court. In light of its active efforts to mislead, Paul Hastings cannot plausibly argue that other parties in interest should have raised their concerns earlier.

Interestingly, Counsel for the Unsecured Creditors' Committee ("Committee Counsel") has submitted a brief, also claiming that Magten knew of Paul Hastings' dual representation in either April or January 2004. See, Comm. Obj. at 10-11. Committee Counsel's position is quite disturbing. To the extent, Committee Counsel learned of Paul Hastings' involvement earlier in the bankruptcy and failed to disclose it to either the Court or to the QUIPS Holders, it is complicit in the wrongdoing of Paul Hastings. Furthermore, to the extent Committee Counsel garnered this information during the period when Magten and Law Debenture Trust Company of New York were members of

**A538**

the Creditors Committee, Committee Counsel may have violated its fiduciary duties by failing to apprise both the Court and the Committee of this information.

## CONCLUSION

For the reasons stated above, Magten's motion to disqualify Paul Hastings as counsel to the Debtor should be granted.

Dated: July 13, 2004                    SMITH KATZENSTEIN & FURLOW LLP


                                        /s/ Kathleen M. Miller
                                        Kathleen M. Miller (ID No. 2898)
                                        The Corporate Plaza
                                        800 Delaware Avenue, 7th Floor
                                        P.O. Box 410
                                        Wilmington, DE 19899 (Courier 19801)
                                        Telephone:  302-652-8400
                                        Facsimile:  302-652-8405
                                        Email:  Kmiller@skfdelaware.com

Bijan Amini (NY Bar. No. 3533)
STORCH AMINI & MUNVES PC
2 Grand Central Tower
New York, New York 10017
(212) 490-4100

                                        Counsel to Magten Asset
                                        Management Corporation


*A539*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                              .  Case No. 03-12872
                                    .
  NORTHWESTERN CORPORATION,         .
                                    .
                                    .
         Debtor.                    .
                                    .  July 15, 2004
. . . . . . . . . . . . . . . . .   .  10:56 a.m.

TRANSCRIPT OF MOTION HEARING
BEFORE HONORABLE CHARLES G. CASE, II
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:              Paul, Hastings, Janofsky &
                                Walker, LLP
                             By: JESSE H. AUSTIN, III, ESQ.
                             600 Peachtree Street N.E.
                             24th Floor
                             Atlanta, GA  30308

For Montana Consumer         Duncan & Allen
Council:                     By:  JOHN P. COYLE, ESQ.
                             1575 Eye Street N.W.
                             Washington, DC  20005

For Montana Public           LaFollette, Godfrey & Kahn
Service Commission:          By:  BRADY C. WILLIAMSON, ESQ.
                             One East Main Street
                             Madison, WI  53703

For the Committee:           Paul, Weiss, Rifkind, Wharton
                                & Garrison, LLP
                             By:  ALAN W. KORNBERG, ESQ.
                             1285 Avenue of the Americas
                             New York, NY  10019

Audio Operator:              Brandon J. McCarthy


Proceedings recorded by electronic sound recording, transcript
            produced by transcription service

---



**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

2

APPEARANCES: (Cont'd.)

For the Debtor:                    Davis, Polk & Wardwell
                                   By:  DENNIS E. GLAZER, ESQ.
                                        D. SCOTT TUCKER, ESQ.
                                   450 Lexington Avenue
                                   New York, NY   10017

                                   Greenberg Traurig, LLP
                                   By:  SCOTT D. COUSINS, ESQ.
                                   The Brandywine Building
                                   1000 West Street, Suite 1540
                                   Wilmington, DE   19081

For Magten Asset                   Storch, Amin & Munves, PC
Management:                        By:  BIJAN AMINI, ESQ.
                                   2 Grand Central Tower
                                   140 East 45th Street, 25th Floor
                                   New York, NY   10017

For the U.S. Trustee:              Office of the U.S. Trustee
                                   By:  MARK S. KENNEY, ESQ.
                                   844 King Street
                                   Wilmington, DE

3

# I N D E X

**MOTION**

| **ARGUMENT** | **PAGE** |
|---|---|
| By Mr. Amini | 10 |
| By Mr. Glazer | 20 |
| By Mr. Kenney | 27 |
| By Mr. Kornberg | 32 |
| By Mr. Cousins | 34 |
| By Mr. Amini | 36 |
| By Mr. Glazer | 43 |

**J&J COURT TRANSCRIBERS, INC.**

**A542**

4

1              THE COURT:  Are we ready to proceed?

2              MR. AUSTIN:  We're ready to proceed, Your Honor.  For

3    the record, I'm Jess Austin, on behalf of Northwestern

4    Corporation.  Today's agenda is limited.  There are two matters

5    on the agenda.  The first is the matter of the debtor's motion

6    for order approving stipulation settlement agreement among the

7    debtor, Montana Public Service Commission, and the Montana

8    Consumer Council, pursuant to the appropriate provisions of the

9    Bankruptcy Code and Rule 9919.

10             And the second matter is the motion of Mackie, an

11   asset management corporation, to disqualify Paul Hastings,

12   Janofsky and Walker, LLP as primary counsel to the debtor.  I

13   propose that we take these matters in order, as they appear on

14   the docket, if that is acceptable to the Court.

15             THE COURT:  Sure.

16             MR. AUSTIN:  We'll proceed with the first matter,

17   Your Honor.  That is the debtor's motion to approve the

18   stipulation of settlement.  We had previously announced that

19   the debtor -- through extensive negotiations among the debtor,

20   the Montana Public Service Commission representatives, and

21   Montana Consumer Council representatives -- had reached an

22   agreement that addresses a number of concerns that the Consumer

23   Council had raised, and what we refer to as a financial

24   investigation docket that was pending before the Public Service

25   Commission at the time that this bankruptcy case was initiated.

5

1          As this Court is aware, there was an issue that
2   raised that we have -- because of the settlement -- obviated
3   the need to have this Court address, which was the
4   jurisdictional tug between what this Court would have
5   jurisdiction over and what the Public Service Commission would
6   otherwise have jurisdiction over.  This settlement, as with
7   other settlements which we've presented before the Court, is
8   integral to the Court, to the company, and hopefully exiting
9   Chapter 11 expeditiously.  And we are presenting this motion
10  today for this Court's approval, and to present an order having
11  it approved.

12          At this point, I am pleased to announce that there
13  are no objections to this motion.  We ran this motion, and we
14  ran the terms and conditions of the settlement by the Official
15  Committee of Unsecured Creditors, and they are supportive of
16  that.  Mr. Kornberg can speak to that, if otherwise necessary.
17  But at this point, Your Honor, we have no objections.  I do
18  believe that Mr. Coyle would like to -- on behalf of the
19  Consumer Council -- would like to make a comment.  And possibly
20  Mr. Williamson, on behalf of the Public Service Commission,
21  would like to make a comment.  But at the conclusion of their
22  comments, if there are no other statements that need to be
23  made, the debtor would move for approval of this settlement.
24  And we have an order to present, granting the motion.
25          THE COURT:  All right.  Mr. Coyle?

6

1      MR. COYLE:  Good morning, Your Honor.  May it please

2  the Court?  John Coyle, from the firm Duncan and Allen, on

3  behalf of Montana Consumer Council.  I'd just like to note our

4  support of -- for the motion and for the settlements for which

5  the Court's approval is sought.  I think I'd like to make a

6  couple of brief points.

7      As Mr. Austin suggested, the settlement resolves a

8  number of difficult jurisdictional issues that often accompany

9  utility bankruptcies.  I wish I could say this was the first

10  one I've ever been in, but it's certainly been one of the

11  smoothest; at least from the perspective of resolving those

12  jurisdictional issues.

13      The second point that I'd like to make is that the

14  settlement involves the imposition of a number of regulatory

15  controls with the company's consent that, in our view, go a

16  long way toward obviating the possibility of a recurrence of

17  the circumstances that led to this bankruptcy.  And that, at

18  least in our understanding, tend to be viewed with favor by the

19  financial markets.  We look at that as representing,

20  fundamentally, a win/win situation, both for the company and

21  for the consumers of Montana.  And for that reason in

22  particular, Consumer Council urges the Court's approval of the

23  settlement.  Thank you.

24      THE COURT:  Thank you.

25      MR. WILLIAMSON:  Good morning, Your Honor.  Brady

**J&J COURT TRANSCRIBERS, INC.**

**A545**