7

1  Williamson; LaFollette, Godfrey and Kahn, for the Montana
2  Public Service Commission.  I'd also like to note at the
3  outset, Your Honor, the presence of the Commission chairman,
4  Bob Rowe (phonetic), who has appeared before the Court again,
5  and felt it particularly appropriate to be here this morning.

6         The Public Service Commission of Montana has believed
7  from the outset of this case that it has had a significant role
8  to play in the case on behalf of the consumers and the
9  ratepayers of the State.  Indeed, the Commission has believed
10 that the plan could not be implemented without the Public
11 Service Commission, whether it was a matter of loss, State or
12 Federal, or simply as a matter of practicality.

13        As both Mr. Austin and Mr. Coyle have mentioned, over
14 the ten months of this case, the Court has seen flashes of the
15 jurisdictional tension that's inevitable when dealing with the
16 regulated entity in Chapter 11.  And happily, the Court has no
17 need to resolve them.

18        The settlement agreement is 22 single spaced pages.
19 And every party has several points that they might want to
20 particularly note.  I'll simply note two.  The first is that
21 the Commission approved this settlement agreement by a vote of
22 five to nothing on July 8th.  And that, in itself,
23 distinguishes this case from another prominent utility
24 bankruptcy that's taking place on the West coast, where the
25 jurisdictional issues continue to be troublesome.

8

1          I'd also like to note -- reiterate a point Mr. Coyle
2  made, which is that for the Public Service Commission, the
3  structural requirements that are part of this settlement
4  agreement are particularly important, because the Commission
5  believes that they will lead to a single-minded focus on the
6  transmission and distribution of natural gas and electricity
7  and thereby avoid, for the large extent, the problems that led
8  the company into Chapter 11.

9          I want to express the Commission's appreciation for
10 the cooperative approach of the Montana Consumer Council and
11 it's counsel, John Coyle, and the cooperation of the debtor in
12 a long and sometimes difficult negotiation that led to the
13 settlement agreement.  We believe that it is in everyone's best
14 interest, including the ratepayers of Montana.  And we join the
15 debtor, the committee, and the Montana Consumer Council in
16 asking the Court to approve it.  Thank you.

17          THE COURT:  Thank you.  Mr. Kornberg?

18          MR. KORNBERG:  Yes, Your Honor.  The committee has
19 always believed that this company needed to make peace with its
20 regulators.  The company worked hard to do that.  The
21 commission and the consumer counselor worked hard to do that.
22 And the committee supports the settlement that's before the
23 Court today.  We believe it is a fair resolution of some
24 complicated issues, and it will facilitate this company going
25 forward, confirming its Chapter 11 plan, and hopefully, have a

**J&J COURT TRANSCRIBERS, INC.**

**A547**

9

1 more constructive relationship post-reorganization with its
2 principle regulator.

3 　　　　THE COURT:　Thank you.　Is there anyone else who
4 wishes to be heard in connection with this matter?　All right.
5 I've reviewed the motion and the agreement.　And although I
6 don't purport to understand all of it, I get the sense of what
7 this is about.　And I'm aware of no objections.　And based upon
8 that, I will approve the agreement and you can submit an order.

9 　　　　MR. AUSTIN:　I'd like to approach, to submit the
10 proposed order.　One other thing, with respect to the motion,
11 Your Honor.　Last week -- in accordance with the terms of the
12 motion as we filed it -- we filed with the Court and served on
13 the parties the actual stipulation and settlement agreement,
14 itself, as opposed to just the agreement in principle, upon
15 which the motion, itself, is filed.　There was an exhibit -- I
16 believe it was Exhibit A -- to the stipulation of settlement,
17 which was the form of a proposed consent order that would have
18 the stipulation settlement also granted at the Public Service
19 Commission.

20 　　　　Because of some last minute wrangling -- and because
21 frankly, we were in court all day yesterday -- we've been
22 unable to file that form of order heretofore.　We will file the
23 form of that order after the close of today's hearing, just so
24 that the record is complete and people have a complete piece of
25 the record on that.

Amini - Argument                                                    10

1          That concludes the motion, Your Honor, on the

2   settlement.  It takes us to the second item on the agenda,

3   which is the motion of Magten.  With respect to that motion,

4   Your Honor -- under the circumstances -- our firm will not be

5   participating.  Our firm; Paul Hastings, will be represented by

6   the firm of David Finger, of Finger and Slanina, as well as

7   Dennis Glazer and Scott Tucker from Davis, Polk and Wardwell.

8   And the debtor in this particular instance will be represented

9   by Scott Cousins of Greenberg Traurig.

10         THE COURT:  Good morning.

11         MR. AMINI:  Good morning, Your Honor.  May it please

12  the Court, Bijan Amini; Storch, Amini and Munves, for Magten

13  Asset Management.  As you know, Your Honor, we're here on our

14  motion -- our client's motion to disqualify Paul Hastings.  The

15  real reason we're here is because Paul Hastings has been unable

16  or unwilling to consistently and accurately describe its

17  connections with the debtor in this case.  They were required

18  to make certain disclosures, which they didn't, until we

19  appeared before Your Honor some -- approximately three or four

20  weeks ago.

21         The initial affidavit from Mr. Austin in this case --

22  we refer to it as the initial affidavit, filed in connection

23  with the Chapter filing -- and their application to be

24  retained.  It appears, Your Honor, as Exhibit A to our reply.

25  In that affidavit, Mr. Austin made the following statement.  In

Amini - Argument                                                11

1  Paragraph 18 of that affidavit, he stated that Paul Hastings
2  represents the debtor and Clark Fork and Blackfoot, LLC -- a
3  wholly owned subsidiary of the debtor -- in an action entitled
4  McGreevey v. Montana Power Company pending in the United States
5  District Court for the District of Montana, which is related to
6  facts and occurrences which arose prior to Paul Hastings
7  representing the debtor with respect to the corporate matters.

8          The corporate matters are defined in that affidavit.
9  And if you go to Paragraph 13, he states -- in no uncertain
10 terms -- that the corporate matters refer to certain
11 transactional attorneys at Paul Hastings; having represented
12 the debtor in corporate matters from late 2001 to the present,
13 including assisting the debtor and preparing offering documents
14 in connection with certain debt and equity offering in 2002 and
15 associated filings with the Securities and Exchange Commission;
16 assisting the debtor in the preparation of annual and quarterly
17 SEC filings; assisting the debtor in connection with the
18 acquisition and disposition of assets, and advising and
19 counseling debtor with respect to general corporate matters and
20 Sarbanes-Oxley Act of 2002 -- collectively, the corporate
21 matters.

22         The matter at hand in this case -- as Your Honor, I'm
23 sure, is fully aware -- has to do with the representation of
24 Clark Fork in a transaction in which its assets were
25 transferred from Clark Fork to the debtor.   There is no

Amini - Argument                                    12

1  disclosure in that initial affidavit of such representation by
2  Paul Hastings.  In fact, if you look at Paragraph 18, it states
3  just the opposite.  It affirmatively states that they are
4  representing the debtor in <u>McGreevey v. Montana Power Company</u>,
5  pending in the United States District Court of Montana, which
6  is related to facts and occurrences which arose prior to Paul
7  Hastings representing the debtor with respect to the corporate
8  matters.

9       In fact, one of the issues -- and I will come back to
10 that -- in the <u>McGreevey</u> matter was the actual transfer -- as
11 Your Honor, I think is fully aware, also, having had the
12 <u>McGreevey</u> matter before Your Honor -- of those very assets.
13 That statement in Paragraph 18, far from being less than full,
14 is actually false.  At a minimum, Paul Hastings had an
15 obligation to correct that statement during the course of these
16 proceedings.  And it had many opportunities that arose to do
17 so.

18      In December of 2003, Mr. Austin submitted yet a
19 supplemental affidavit in which he made no such disclosure, and
20 concluded with that they would review their files periodically
21 and update them and update their affidavit if they needed.  We
22 had a series of correspondence with Mr. Austin when we were
23 first retained in this matter, seeking to inquire about their
24 relationship.  And in that correspondence, we indicated that we
25 believed that they had represented the debtor in that

Amini - Argument                                    13

1  transaction.  Again, opportunity arose for Mr. Austin to
2  correct his affidavit, and he didn't do so.

3       Finally, after a great deal of stonewalling by Paul
4  Hastings on what their role was in that transaction, we filed a
5  328(c) statement in May of 2004.  In response to that 328(c)
6  statement, Paul Hastings filed a responsive statement, Your
7  Honor, to that -- which I believe is on file with the Court.
8  And in that statement, they said absolutely nothing about their
9  representation of Clark Fork in that transaction.  Indeed, that
10 statement was addressed almost exclusively to their position
11 that merely having been a witness -- a potential witness --
12 should not disqualify them in this case.  There was no
13 corrective action on their part.

14      In the meantime, Your Honor -- as Your Honor is aware
15 -- Paul Hastings appeared, despite its conflict -- which was
16 known to it at this point -- in both the McGreevey matter and
17 in Magten's motions to bring the fraudulent conveyance action.
18 And, in fact, they filed opposition to that.  And they refused
19 to withdraw, and they refused to correct their disclosure.

20      On June 16th, 2004 -- and I believe this is Exhibit H
21 to our reply affidavit, Your Honor -- Mr. Austin filed a second
22 supplemental affidavit in connection with their employment as
23 attorneys.  And for the first time, they acknowledged -- at
24 least in part -- that they might have a conflict.  All they
25 said was, in order to avoid any potential or appearance of any

1  conflict of interest, they were going to withdraw from the
2  Magten adversary proceeding and transfer it to Greenberg
3  Traurig.  They again did not take the opportunity to correct
4  the false statement that was in the initial affidavit.

5       In fact, in his June 2nd -- June 16th affidavit --
6  Mr. Austin went on to say; "Neither I nor Paul Hastings, nor
7  any partner of counsel or associate thereof, as far as I have
8  been able to ascertain, has any connection with the debtor, its
9  creditors, the United States Trustee, or any other party with
10  an actual or potential interest in this Chapter 11 case."  He
11  made the affirmative statement that he had no connection, but
12  he had not disclosed.  And his original affidavit -- the first
13  supplemental affidavit herein -- are as follows.

14       The standard, Your Honor, for this disclosure,
15  incidentally, is not whether there's a conflict or a potential
16  conflict, or whether they knew a potential conflict or they
17  could have figured out a potential conflict.  The standard is
18  in Rule 2014.  And it states, in pretty clear terms, that they
19  are to disclose all connections with the debtor, its creditors,
20  and any parties in interest.

21       We appeared before Your Honor, I believe on June
22  21st.  And at that time -- quite frankly, frustrated by the
23  lack of disclosure -- we asked that they file a supplemental
24  affidavit.  We made that request to the Court.  And before the
25  Court ruled on it, Paul Hastings offered to put in a

1  supplemental affidavit, which they did on July 7th, 2004.  The

2  July 7th, 2004 affidavit is highly instructive.  In it, at

3  Paragraph 11, they finally fess up to the fact that they had

4  represented Northwestern and its subsidiary in the transaction

5  at hand.  Not only do they state that, but they, in fact -- if

6  you go back to Paragraph 8, Your Honor, of that affidavit --

7  they state; "Paul Hastings representation of the debtor began

8  in late December, 1999;" two years before Mr. Austin had stated

9  in his initial affidavit that representation had begun.

10       The firm's initial representation of the debtor was

11 with respect to possible acquisitions by the debtor, either

12 directly or indirectly through wholly owned subsidiary

13 corporations or entities.  Of the various acquisition

14 opportunities evaluated by the debtor, the one acted upon by

15 the debtor was its acquisition of the transmission and

16 distribution regulated utility assets owned by the Montana

17 Power Company -- Montana Power.  So on July 7th, 2004, Mr.

18 Austin put it in an affidavit, stating clearly that we

19 represented the debtor two years before we told you at the

20 beginning of this case that we represented them.  And, in fact,

21 the first matter we ever represented them on is the very matter

22 that all of these inquiries are being made upon, and all of

23 these cases are being filed about.

24       I would suggest to Your Honor that that demonstrates

25 a serious lack of candor.  I would also suggest to Your Honor

Amini - Argument                    16

1  that one would expect an explanation.  If one is going to

2  change their testimonial to what their role was -- what their

3  connection was -- and there is none.  They've given none.  They

4  have none to give.  They appeared in adversary proceedings in

5  this case.  They jousted with us right up to June 21st, when we

6  asked Your Honor for that affidavit.  And at no time did they

7  correct that misleading and false statement, until forced to do

8  so.

9           They know they have this conflict.  They've known

10 they've had this conflict from the beginning of this case.

11 They represented both Clark Fork and the debtor in the

12 transaction that has become a central focus of these

13 proceedings.  Although the size of that transaction is not

14 relevant, as Your Honor is aware, I believe, the amount at

15 stake -- the assets that were transferred -- and the interest

16 at stake are more than material.  They are, in fact,

17 substantial.  And they are a substantial part of this estate.

18          Their only defenses that they now give are as

19 follows.  First they say, we had a waiver.  A defense,

20 incidentally, that is inconsistent with their position that

21 there was no conflict.  They say that we had the full consent

22 and knowledge -- I believe, in their brief -- of the board of

23 directors of Clark Fork.  Putting apart for the moment whether

24 there even exists such a board, they haven't stated in the

25 affidavit who they got that consent from.  And I will point out

1 to Your Honor that in a motion to dismiss, an action against
2 those very persons in Montana, the debtor has taken the
3 position that there was nobody there that had any authority to
4 give any consent.  I would suggest to you that in a situation
5 where one party controls the other, there can be no informed
6 consent.

7        Their second defense is the "I didn't anticipate it"
8 defense.  And I couldn't have been asked to -- I failed to
9 anticipate it, and I couldn't have expected to anticipate it.
10 First of all, as I pointed out earlier, that's not the
11 standard.  The standard is that you make disclosure of any
12 connection you have, whether you anticipate a conflict or not.
13 It's for the Court to make that determination, in terms of
14 whether a conflict exists or not.  The "I don't" -- "I couldn't
15 have anticipated it" is again conflicted -- in conflict with
16 the documentary evidence.

17        They represented the debtor in the McGreevey action,
18 as Your Honor may recall.  They appeared before Your Honor at
19 some -- at one point, as I understand it.  I wasn't here, but
20 as I understand it.  And they took the position that even
21 though they had entered into a stipulation with the McGreevey
22 defendants in November, 2002, to permit this transfer to go
23 forward on condition that they preserve the assets and that the
24 McGreevey defendants would be able to subsequently bring a
25 fraudulent transfer case.  They entered into that -- that

1  stipulation was entered while they were counsel.

2          They now say, we could -- it was unreasonable to
3  believe that we could have anticipated that such a conflict
4  would arise.  It was in a -- it's in a document that's -- you
5  know, we've attached the document, Your Honor.  I believe it's
6  Exhibit A to our reply papers.

7          They next defense they raise is that there is no
8  merit to the fraudulent conveyance action.  Again, I would
9  suggest to Your Honor that that is not part of any standard;
10 that whether or not, once a dispute breaks out, there's any
11 merit to it is not the determining factor of whether counsel
12 can continue to represent one party in the action when they
13 were on both sides of the issue.

14         But putting that aside, they tried to bolster it, by
15 then claiming that Clark Fork is solvent.  That's the statement
16 they've now made in their response to our papers.  Your Honor
17 may not recall, but on the first -- in the initial stages of
18 this proceeding, as one of the -- I call them first day motions
19 -- but in the initial motions to enable the debtor to continue
20 their business -- I believe it's Exhibit E to our reply
21 affidavit -- the order authorizing the debtor to continue and
22 maintain its consolidated cash management systems, among other
23 things -- by an interim basis, certain limited inter-company
24 obligations.

25         They pointed out to you, in Paragraph 47, that not

Amini - Argument                                                          19

1   only was Clark Fork unable to pay its trade accounts as they
2   came due, but that the debtor had been paying those trade
3   accounts to the tune of $270,000 a month since the beginning of
4   January of 2003, and was requesting permission from the Court
5   -- which I believe was granted -- to continue paying even a
6   larger sum; $370,000, going forward.  Not only did they know it
7   was insolvent, but they were using the limited assets of this
8   estate to profit up and not file it -- and not file for that
9   entity.

10          Their filed defense, as best I can tell, is the --
11  it's our fault that we didn't tell them defense, or that Magten
12  had knowledge and is late in coming to this table.  Nothing
13  could be further from the truth.  We've placed the affidavit of
14  Mr. Ambry (phonetic), one of -- Magten's principle -- as well
15  as two of his counsel; Ms. Steingard and Mr. Kaplan (phonetic),
16  both of whom are here.  And if Your Honor has any questions of
17  them, we're prepared to bring them forward.  To a person none
18  of them knew.  No one knew, in fact, for certain, until Mr.
19  Austin put in this July 7th affidavit.  We asked.  They
20  stonewalled.  We guessed.  We turned out to be right.  That is
21  not the proper procedure by which counsel get engaged in cases
22  of this nature.

23          It's a substantial case.  It involves a substantial
24  asset.  It has become a central issue in this case.  And they
25  did not handle it properly.  To do anything other than to

Glazer - Argument                                    20

1   disqualify them would be to reward them for their misbehavior.
2   If Your Honor has any questions, I'm prepared to ask any.  I
3   forgot to mention at the beginning that we asked -- well, we
4   filed a motion to file a reply with a lot of the exhibits, in
5   light of the fact that they had put in an affidavit.  I would
6   ask that that motion be granted.  I think most of the other
7   issues are addressed in that.

8           THE COURT:  The motion to file a reply will be
9   granted.

10          MR. FINGER:  Good morning, Your Honor.  David Finger,
11  of Finger and Slanina, Delaware counsel for Paul, Hastings,
12  Janofsky and Walker.  I would like to introduce to the Court
13  Dennis E. Glazer and D. Scott Tucker of Davis, Polk and
14  Wardwell of New York.  Earlier this week, I filed motions for
15  their admission pro hac vice.  I don't know if they have
16  reached Your Honor yet.  I would ask that Your Honor allow Mr.
17  Glazer to present Paul Hastings' disposition.

18          THE COURT:  Motion will be granted.

19          MR. GLAZER:  Thank you, Your Honor.  And once again,
20  I'm Dennis Glazer, from Davis, Polk and Wardwell.  I want to
21  talk for just a minute about the motive that Magten brings to
22  this Court.  It is -- this motion is made as part of a
23  litigation strategy; a tactical ploy.  And it's made at the
24  eleventh hour, with less than six weeks to go before a
25  confirmation date before this Court.

**J&J COURT TRANSCRIBERS, INC.**

**A559**

1      This point was made by us, a first point in our

2  brief.  It was made by the Unsecured Creditors' Committee.  It

3  was made by the debtor.  And in response to that, there is

4  nothing.  The reason there is nothing in response is that it's

5  very obvious what's going on here.  Magten is simply unhappy

6  with what they would receive as part of the plan of

7  reorganization here.  And they are looking to gum up the works

8  in any way they can.  And that seems absolutely clear to all

9  involved, including to them, I believe Your Honor will find.

10     They're looking to cause delay in the confirmation

11  process.  They're looking to deny the debtor its choice of

12  counsel.  And the Court should not countenance such activity on

13  their part.  This is classic strategic abuse that the Court's

14  talked about when dealing with disqualification motions and,

15  frankly, denying them.

16     The papers address a lot of different scattershot

17  issues.  But on argument, Mr. Amini focused on the alleged

18  failure to disclose aspects.  And what he did was, he talked

19  about some issues that, in a perfect world, would have been put

20  in the affidavits earlier.  But then, he tries to bootstrap

21  that into a conflict.  And there is no conflict, and we must

22  make that absolutely clear.

23     There is no conflict of interest.  There was none for

24  Paul Hastings to represent Northwestern -- which at the time

25  was not in bankruptcy -- and its subsidiary in 2002.  This --

Glazer - Argument                          22

1  these transactions that were involved at the time were fully

2  disclosed and approved by each of the board of directors at the

3  time.   Mr. Amini asked who approved it.   It was the board of

4  directors of both Northwestern and of Clark Fork, its

5  predecessor, at the time that these transactions were done and

6  at the time that Paul Hastings was hired to do these

7  transactions.

8          Throughout this case -- from the time of the initial

9  filing -- Paul Hastings has been in continuous communication

10  with the U.S. Trustee.   And at all points in time, the U.S.

11  Trustee has determined and is satisfied that Paul Hastings'

12  disclosure was adequate.   And the U.S. Trustee is here today,

13  and tells me he intends to make that point when he stands up.

14  But it is quite common, and Mr. Amini doesn't seem to want to

15  want to recognize this.   It's very common for a single law firm

16  to represent a parent and its subsidiary in transactions such

17  as were going on in 1999 and 2000.

18          In addition, contrary to Magten's unfounded

19  suggestions -- and they're totally unfounded; they are

20  speculative and pulled completely out of the air -- there was

21  no intentional withholding of information here.   To the extent

22  information was not included in earlier affidavits, that was

23  unintentional and an oversight.   It is not -- the idea that

24  there was somehow or other Paul Hastings was concealing from

25  the Court, or concealing from any party its role is simply --

1   not only is there no evidence of that, it would be foolish,
2   because there were many public documents with regard to the
3   transactions at issue between Northwestern and its subsidiary
4   at the time.

5        So, there was an ample public record of that.  There
6   was nothing to conceal.  And the idea that this was
7   intentionally done is a figment of Mr. Amini's imagination,
8   frankly, and shouldn't be given credit.  We credit his
9   statement that they didn't realize it, although there is some
10  skepticism on our part on that subject about how early Magten
11  realized it.  But we don't attack the bonafides of the
12  statements made.  And Mr. Amini's attempt to attack the
13  bonafides of statement made and to attribute for a motive to
14  people at Paul Hastings and otherwise, I think is contrary to
15  what the Court has seen from Paul Hastings throughout this
16  case.  And I think it's totally unfounded, and there is nothing
17  to support it.

18       Moreover, any alleged failure to disclose Paul
19  Hastings' representation of Clark Fork at the time has been
20  cured.  It's been cured by the filing of a supplemental
21  affidavit by Mr. Austin.  And thus, even assuming that Paul
22  Hastings' original disclosures were not adequate, the Court
23  should still exercise its discretion, and allow the debtor to
24  continue to employ Paul Hastings as its choice of bankruptcy
25  counsel.  And in this regard, I would just point to Mr. Amini's

1 | opening papers -- his original motion papers.

2 |     He says, in closing; "At a minimum, the Court should
3 | order Paul Hastings to finally disclose its role in the
4 | transfer." He cites the rules, and then he said; "The Court
5 | should require Paul Hastings to submit an affidavit." And he
6 | bluntly told the Court today, candidly, that when there were
7 | discussions about this motion, Paul Hastings agreed -- and
8 | readily agreed -- offered, in fact, to file a supplemental
9 | affidavit to make everything entirely clear, both for the Court
10 | and all parties.

11 |     He concludes by saying; "Paul Hastings should have to
12 | disclose their role and involvement in the transfer. There
13 | should be no determination of their disinterestedness without
14 | such disclosure." Now is the time for that finding of
15 | disinterestedness, because it has been disclosed. It hasn't
16 | alarmed anybody else, except perhaps Mr. Amini, who said that
17 | he guessed it earlier on.

18 |     Finally, Your Honor -- well, you know, they tried to
19 | bootstrap this into a conflict. There is no conflict here.
20 | The prior representation of Clark Fork took place two years
21 | ago. Paul Hastings has and had no interest contrary to the
22 | debtor. In fact, Mr. Amini's papers, themselves, point out
23 | that the estate did well in those transactions, and assets were
24 | increased as a result of that; that the transactions benefitted
25 | the debtor.   .

1      Moreover, Clark Fork has never raised -- as an entity

2  or otherwise -- any claim against the debtor with regard to

3  these transactions.  Mr. Amini is an outsider, complaining

4  about a transaction which took place between Clark Fork and

5  Northwestern at the time.  He argues that we say that our

6  position is that nobody has standing to complain about that

7  transaction.  Well, that's not our position at all.  We simply

8  say that Magten doesn't have the ability to do that.  And the

9  cases support that.

10      Paul Hasting is, in fact, the disinterested.  It does

11  not hold an interest materially, or even in any way -- adverse

12  -- with regard to the -- a class of creditors or equity

13  holders.  Mr. Amini's papers say that he represents that

14  there's a class of Clark Fork investors who are upset.  In

15  fact, there's one.  There was only one person who filed these

16  complaints all around the country, and that is Mr. Amini's

17  client, Magten.  In fact, Mr. Amini's client is not even -- and

18  never was -- a creditor of Clark Fork, because these

19  transactions concluded before Magten its interest.  Magten is a

20  creditor of the debtor only, and never has been a creditor of

21  Clark Fork.

22      So, all of this is an attempt just to build a lot of

23  noise around a situation where they claim that additional

24  disclosure should have been made by the lawyers earlier on.

25  But I want to be absolutely clear.  There is no conflict here,

1  and Paul Hastings is disinterested, I believe, as an absolute

2  matter of law and fact.

3          THE COURT:  Well, if I understand Mr. Amini's

4  argument about the conflict, it is that Paul Hastings was on

5  both sides of the transaction -- the original transaction --

6  both on behalf of Clark Fork and on behalf of Northwestern, and

7  now is representing Northwestern -- or, was representing

8  Northwestern in connection with challenges to that transaction,

9  and that really could not be -- now should not be on either

10 side of the transaction.

11         MR. GLAZER:  The answer is that as soon as that

12 happened, very soon thereafter, Paul Hastings withdrew from

13 representing the debtor with regard to that matter in the

14 adversary proceeding -- and that the representation there has

15 gone to Greenberg Traurig, and is exclusively Greenberg Traurig

16 now.  So that has been fixed, to the extent that it ever was a

17 problem.   The rest of it is all problems of Mr. Amini's

18 making.  Magten started litigation against the Clark Fork

19 directors and officers in Federal court in Montana.   They

20 started litigation all in the last couple of months against

21 Paul Hastings for aiding and abetting what it says was a

22 fraudulent conveyance.  And they did that in the State court in

23 Montana, although that case has since been removed.   And they

24 started the adversary proceeding, which is now before Your

25 Honor.

Glazer - Argument                                              27

1      So what we have is Magten making much fuss, and then

2  saying, look, Judge.  There's a fuss.  And that makes Paul

3  Hastings, somehow or another, disqualifiable.  And we suggest,

4  Your Honor, that you can't bootstrap your own activity that

5  way, and to thereby deprive the debtor of its choice of

6  bankruptcy counsel, particularly six weeks before confirmation

7  is scheduled.

8      Finally, Your Honor, last point.  Disqualifying Paul

9  Hastings at this point would not serve the interest of the

10  debtor.  It would not serve the interest of its creditors,

11  except perhaps, Magten's interest in delaying and interfering.

12  For this reason, the Official Committee of Unsecured Creditors

13  opposes Magten's motion.  The debtor opposes it.  And the U.S.

14  Trustee, who has yet to file -- did not file a document, but is

15  here today, informs us that he opposes it, as well.  This is a

16  tactical ploy, and nothing more.  We don't think Your Honor

17  should reward it.  And we think, in fact, it would be dangerous

18  to reward it in the context of a bankruptcy case such as this.

19      THE COURT:  All right.  Thank you, counsel.

20      MR. GLAZER:  Thank you.

21      THE COURT:  Before I hear back from Magten, let me

22  hear from any other parties who may be interested in this

23  matter.

24      MR. KENNEY:  Good morning, Your Honor.  Mark Kenney,

25  for the United States Trustee.  Your Honor, I'll stand by what

1  -- most of what Mr. Glazer said. I wouldn't say that the U.S.

2  Trustee opposes this motion, but the United States Trustee

3  certainly does not support the motion in any way. And I think

4  I do need to disclose, for the record, that the relationship, I

5  think, were on the record and open from the very beginning of

6  this case -- and I think, from the very first day. All of the

7  moving parties were explained. And I had an awful lot of

8  conversations with debtor's counsel, getting my arms around

9  this case in the very early days, and getting clarifications of

10 any questions that I had had about how all of the various

11 moving pieces fit together.

12         And you know, perhaps it was a mistake on my part

13 that I, you know, when they explained how the entire

14 acquisition had gone down, maybe I should have said, gee.

15 Clarify that with a further affidavit explaining it, because --

16 I guess it's here now. In my discussions with Carol Dennison

17 -- you know, she had fully explained exactly how the

18 acquisition of the Montana Power assets came down. And it was

19 interesting. I mean, I had never even looked at it as a

20 potential for a conflict, or even a representation of what was

21 truly a separate entity, because it seemed like the way that

22 the acquisition was structured, there was no real going flat

23 transaction.

24         I know that they recently characterized it as a

25 reverse merger. I had looked at it as a single acquisition

1  transaction that took place in several phases, and ever

2  believed -- even with full knowledge -- that Paul Hastings had

3  represented both of the -- you know, represented the -- what

4  I'll call the middle stage entity; Clark, Fork, and Blackfoot,

5  and was representing the debtor.  I just never saw any conflict

6  in that.  It actually would have been something unnatural for

7  them not to be representing.  And I thought it was --

8          THE COURT:  Well, when you said -- I think you may

9  have misspoke.  Did you say you never believed that they did do

10 that, or you never --

11         MR. KENNEY:  No.

12         THE COURT:  -- believed there was a conflict?

13         MR. KENNEY:  I never had any reason to believe --

14         THE COURT:  You knew that they did do that?

15         MR. KENNEY:  -- that they had not done that.  And in

16 fact, when we discussed it, it was like, well, of course you

17 did.  It was perfectly natural.  And had they not represented

18 them -- because they had represented them in connection with

19 the acquisition from Montana Power.  And I think Your Honor is

20 familiar with the way that the entire acquisition transaction

21 was structured; that basically, had Paul Hastings not been

22 involved for all of what I'll call the acquiring entities, that

23 would have seemed unnatural.

24         But I think what's important, Your Honor, is I

25 believe that this was always on the table.  I had --

1          THE COURT:  Well, would you agree that the initial

2   affidavit did not adequately disclose that?

3          MR. KENNEY:  Well, Your Honor, I had asked them

4   questions to clarify the information in there.  And I guess,

5   you know, you could say that any time I called somebody and

6   asked for clarification, maybe the best practice -- looking

7   backward now -- would have been to say to them, you know what?

8   Go ahead and file a supplement, clarifying that.  But I never

9   felt that there was anything that wasn't disclosed.

10          It's a question of, you know, could they have

11   disclosed it more clearly?  Certainly, they could have.  Did I

12   see a conflict in it?  No, I didn't.  Should I have said, well,

13   even though there's no conflict, go ahead and file a

14   supplemental affidavit, clarifying it?  Looking back, yes.  You

15   know, given what we have before us now, I probably would have.

16   But at the same time, at the time that I received these

17   clarifications, I never felt any need to have them file a

18   supplement.  I felt --

19          THE COURT:  But, I think Mr. --

20          MR. KENNEY:  -- that this was on the table at all

21   times.

22          THE COURT:  So, if I can summarize what you're

23   saying.  Mr. Amini's point is that the 2014 obligations to

24   disclose are not only to disclose conflict, but to disclose

25   connections.  And that if, therefore -- and that your view is

1  that these connections were, in fact, disclosed to you during

2  the course of your discussions with them, even though the

3  argument may be made that they were not completely disclosed in

4  the actual 2014 affidavit.

5       MR. KENNEY:  I think that is correct, Your Honor.

6  And I thought that this had also been disclosed in Court early

7  on, in the initial hearings in this case.

8       THE COURT:  Well, this is one of those cases, from my

9  standpoint, where I think I came on on the second hearings.  If

10 I remember correctly, the first day of hearings took place in

11 August.  And I think in September is when I first had hearings

12 in this case, in the -- across the street in the Federal

13 courthouse, with the charts that Mr. Austin had of their

14 explaining the debt structure.  I mean, that's my recollection

15 of my first relationship with this case, which had a lot of

16 continued matters from the first day, over onto that.  But it

17 was not actually the first day.  I don't know whose case this

18 was originally.  Was this Judge Walrath or Judge Walsh?

19      UNIDENTIFIED ATTORNEY:  Judge Walsh, Your Honor.

20      MR. COUSINS:  I think Judge Walsh heard the very

21 first day hearings.  I think it was filed like on September

22 14th or 15th, and we had first day hearings within a couple

23 days of that.  And the Creditors' Committee formation --

24      THE COURT:  Wasn't it filed in August?

25      MR. COUSINS:  September, Your Honor.

1    THE COURT:  Oh, okay.

2    MR. COUSINS:  And yeah, there were --

3    THE COURT:  So, was it October that I first --

4    because I was -- that's right.  I wasn't here until October.

5    So, that's -- my first hearings would have been in October.

6    Okay.

7    MR. COUSINS:  And there were enough moving parts on

8    the table very early in the case, even before I put together

9    the Creditors' Committee, that I was already on the phone with

10   debtor's counsel, getting a lot of the information about the

11   structure of the debtor and the relationships with the debtor.

12   THE COURT:  Okay.

13   MR. COUSINS:  Thank you.

14   THE COURT:  Mr. Kornberg?

15   MR. KORNBERG:  Your Honor, as the Court knows and as

16   Mr. Glazer has cited, the Creditors' Committee does oppose

17   Magten's motion.  This was the subject of a Committee meeting,

18   and the Committee feels strongly about it.  Your Honor, I would

19   agree that the disclosures were not absolutely perfect.  And

20   they weren't perhaps a model of clarity with respect to the

21   multiple roles of the Paul Hastings' firm, with respect to the

22   going flat transaction.  But Your Honor, it is not an unusual

23   event for there to be ongoing disclosure.  This happens all the

24   time.  Lawyers frequently have to file supplemental

25   applications.  We all do it as we learn more facts and

Kornberg - Argument                    33

1 circumstances, and as we understand the relationship to the
2 Chapter 11 case.

3       I don't think there's any question that today we
4 understand what the role was of Paul Hastings. Your Honor, we
5 don't find it shocking that Paul Hastings was representing
6 Northwestern, and also representing a wholly owned subsidiary
7 that was organized, really just as -- well, I shouldn't say it
8 was organized -- but a wholly owned subsidiary, in what was a
9 series of transactions emanating from an acquisition. We don't
10 find that shocking. We all know the facts now. And Your
11 Honor, we just don't see the conflict.

12      Again, there may have been less than perfect
13 disclosure to date. But we now know the roles of the firm. We
14 know that the firm has stepped away from any involvement in the
15 adversary proceeding that challenges the going flat
16 transaction, and whether it's a fraudulent conveyance. We
17 don't see an interest that's adverse to this estate at this
18 point in time, and we don't see how it can be said that Paul
19 Hastings is not disinterested.

20      Your Honor, we think you should see this as a
21 litigation tactic, pure and simple. Frankly, it's a very
22 calculated and cynical motion by Magten. And I want to remind
23 you, Your Honor, it is very hard for us to accept Magten as the
24 party that's looking out for the best interest of this estate.
25 The only conflict of interest that existed in this case was the

1   one that Magten had when it got on the Creditors' Committee;

2   brought the adversary proceedings, seeking to disgorge from the

3   estate its principle assets; refused to get off the Creditors'

4   Committee when that conflict was brought to its attention, and

5   had to be removed by the U.S. Trustee.

6           So for Magten now to come into this Court and try and

7   vindicate the interest of creditors by removing bankruptcy

8   counsel is a bit hard for the Creditors' Committee to take.

9   Your Honor, again, it's a litigation tactic, pure and simple;

10  just very similar to the tactics that are described in the

11  Worldcom case by the State of Massachusetts and others, in

12  seeking to remove the auditors.  That case, we think, is very

13  much on point.  And if Your Honor granted the motion, we

14  believe you'd be substantially harming this estate and its

15  creditors.

16          We're on the eve of confirmation.  This debtor and

17  its counsel have been doing, frankly, a terrific job in putting

18  together the pieces that need to be put together to achieve

19  confirmation.  And they should not be removed.  Again, there is

20  no conflict that we see.  There is no lack of

21  disinterestedness.  And whatever the infirmities were in

22  disclosure, they've been addressed.

23          MR. COUSINS:  Good morning, Your Honor.  Scott

24  Cousins, from Greenberg Traurig, on behalf of the debtors.

25  Desperate times call for desperate measures.  And that's

1  exactly what we have, Your Honor.  You've heard about the

2  tactical decision, litigation tactics.  And I think if the

3  Court were to countenance the Magten approach, that it would

4  encourage other subordinated creditors to throw a bomb on the

5  eve of confirmation -- a wrench in the engine, as the train is

6  pulling out of the station.

7        As far as the injury to the debtors, let me give you

8  a personal note.  I've been working with Carol and Jess for

9  over a year.  I've known Jess for four years, since he handed

10  me my head in Atlanta.  And these two professionals, by sheer

11  will, are driving this case.  Obviously, the company has a big

12  point.  There's other professionals.  But these two attorneys

13  are professional and diligent.  And the Court's seen this, and

14  I think everybody can confirm this.  If it weren't for the

15  sheer will of Carol and Jess, this case would not be on the

16  track that it is on the eve of confirmation.

17        Finally, with respect to the delay, I have

18  unfortunately -- we represented the auditors in Worldcom, and

19  were involved in the Kaiser (phonetic) case.  But we've seen

20  this before.  As Judge Gonzalez said in Worldcom, fifteen

21  months is too late.  As Judge Walrath said in Mumo (phonetic),

22  almost one year is too late.  And finally, in Kaiser, retired

23  Judge Katz said five months is too late.

24        Your Honor, Magten could have been as diligent as Mr.

25  Kenney was.  It could have asked these questions.  Rather, they

Amini - Argument                                      36

1   laid in wait, and now they're springing us -- this motion --

2   six weeks before confirmation.  The injury to the debtors, if

3   the Court were to disqualify Paul Hastings at this time, would

4   be substantial and horrific.  Thank you.

5              THE COURT:  Okay.  Mr. Amini?

6              MR. AMINI:  If I may, I'd like to address three

7   things; disclosure, the conflict, and the tactic -- if I can

8   put them in those order.  All right.

9              The disclosure -- and I'll respond to the last

10  comment -- we could have been just as diligent.  I believe I

11  wrote letters in February and March.  I believe the answers to

12  my letters were get lost.  We don't have to answer to you.  I

13  believe that it was only when I stood before Your Honor on June

14  21st that I got an answer, and that was after we filed our

15  motion, in which we requested that Your Honor tell them to make

16  disclosure.

17             I find the U.S. Trustee's statement to be

18  frightening.  It's his responsibility, I believe.  It's that

19  office's responsibility to ensure full disclosure.  That's one

20  of my understandings.  What we now hear is, oh, I had full

21  disclosure.  But there wasn't full disclosure in the papers

22  that were filed.  I think that's wrong.

23             I would point out to Your Honor that the BH &P case,

24  which is a Third Circuit case -- one of the ones we have cited

25  -- as a factual matter.  In that case, the U.S. Trustee had

1  full knowledge, and the Third Circuit reversed.  And the Third

2  Circuit -- either a reverse or upheld.  I don't remember,

3  because I don't remember the order of decisions of the

4  bankruptcy district and the Third Circuit.  But, the Third

5  Circuit disqualified counsel well into the case -- long into

6  the case.  To sit here and say, fifteen months is too late or

7  one year is too late, without pointing to a single fact -- they

8  should come forward with a fact of disclosure.  Something along

9  the way, let's say, see.  This is where we've said it.  It's a

10 matter of public record.

11          I can tell Your Honor, I searched all the public

12 records.  I searched the public records in (indiscernible).  I

13 searched the Republic records at the Montana Utility

14 Commission.  I searched everything I could find to see where it

15 was disclosed, whether Paul Hastings had represented these

16 debtors -- Clark Fork -- in this transaction.  And I found

17 none.  There was no public record.  And when we asked, we were

18 told -- literally -- to get lost.

19          In terms of serving the interest of the creditors and

20 the harm that would happen, although that may be a

21 consideration, I don't think that's part of the standard.  I

22 think if they have a conflict, they're disqualified.  In terms

23 of a conflict, I heard Mr. Glazer just say -- to admit -- that

24 there is a conflict; that there was, in fact, a conflict, and

25 that they have withdrawn from the McGreevey case.  They have

Amini - Argument                                    38

1  withdrawn from the Magten case.  All right.

2        And that leaves me -- that leads me into -- having

3  admitted there's a conflict and having withdrawn from those

4  cases, that leads me into the third topic that I said I would

5  discuss with Your Honor, which is the tactical -- the claim

6  that this is a tactical maneuver.

7        THE COURT:  Well, but let's not leave that yet.  Do

8  you assert that there's an ongoing conflict in the general

9  administrative representation, or in the representation by Paul

10 Hastings in any other adversary proceeding?

11       MR. AMINI:  That's what --

12       THE COURT:  In other words, having withdrawn from the

13 fraudulent conveyance case, is there an ongoing conflict?  Mr.

14 Glazer's position is, there is no conflict.  Is your position

15 that there is a current, present conflict?  And if so, what is

16 it?

17       MR. AMINI:  Absolutely.  There's an ongoing conflict.

18 The center -- the main dispute that has arisen is over the

19 treatment of these assets, which are a critical component of --

20 as I understand it; I'm not involved in the reorganization

21 process; I'm only special counsel for this purpose -- but as I

22 understand it, these assets, which are an essential part of the

23 reorganization plan.  In fact, if you heard Mr. Kornberg, he

24 threw Magten off the Committee.  It wasn't the U.S. Trustee who

25 threw it out.  It was at his request, no doubt, that Magten was

**J&J COURT TRANSCRIBERS, INC.**

**A577**

1  thrown off the Committee, because of the conflict that has

2  arisen among two different sets of creditors over how to handle

3  those assets.  As that conflict has become a central issue in

4  this case, there is an ongoing conflict.  Paul Hastings has an

5  ongoing conflict, because it has been on both sides of the

6  issue.

7         THE COURT:  Well, it has not represented the

8  creditors.  It represented Clark Fork.  Clark Fork, itself -- I

9  think, as Mr. Glazer pointed out -- has not raised a conflict;

10  in other words, the actual represented party.  It is always a

11  difficult circumstance in a disqualification motion, from my

12  perspective, to deal with this question of standing and who it

13  is who's raising the issue.  The clients here are not raising

14  the issue.  And now, this is a bankruptcy case.  I understand

15  that.  And in a bankruptcy case, there are somewhat different

16  standards, necessarily, than in the common -- a non-bankruptcy

17  case.

18         But there is no issue being raised by Clark Fork that

19  there is a conflict.  The issue -- you say they're on the --

20  still on both sides of the issue, because you are asserting

21  that Clark Fork was harmed, and that you, as a creditor, was

22  harmed because of Clark Fork being harmed.  And that therefore,

23  because Paul Hastings once represented Clark Fork in this

24  transaction, that they cannot represent Northwestern,

25  generally.     .

Amini - Argument                                      40

1          MR. AMINI:    That's right.

2          THE COURT:    I mean, that's basically your argument.

3   But I don't necessarily see where that puts them on both sides

4   of the transaction.

5          MR. AMINI:    I'll address it in two points.    The

6   standing issue; I think Your Honor recognizes that standing is

7   not an issue -- who can raise the conflict.    Any interested

8   party is entitled to raise the conflict.    And I don't believe

9   they are defending on the grounds of standing.    I haven't seen

10  any opposition to this motion on the grounds that we have no

11  standing to raise the issue.

12          As for the conflict, the standard is what's set in

13  327(a), as defined -- disinterestedness, as defined in 101(14).

14  And the conflict that Paul Weiss -- Paul Hastings -- is -- a

15  creature of habit.    The standard that Paul Hastings has to meet

16  is that it have no conflict with the debtor, its creditors --

17  the debtor.    There are three.    And one of them is class of

18  creditors.    All right.    There's clearly a conflict with one of

19  its class of creditors.    There's a conflict with that class of

20  creditors who would have taken under -- you know, through Clark

21  Fork.    All right?

22          The action that's been brought is a fraudulent

23  conveyance action, Your Honor.    The relief that's sought in the

24  fraudulent conveyance action is that the assets be transferred

25  back to Clark Fork.    All right?    The debtor controls Clark

**J&J COURT TRANSCRIBERS, INC.**

**A579**

1  Fork.  That's -- despite this claim of a waiver -- which we saw

2  for the first time in these papers, and which we, frankly,

3  don't give much credence to -- they've stated in their own

4  papers, in their motion to dismiss, that the officers of Clark

5  Fork in Montana have filed a motion to dismiss, which we've

6  attached, Your Honor, as Exhibit E.  And if one reads Pages 5

7  to 7 of that motion to dismiss, the motion -- that part of the

8  motion is addressed to the fact that the sole member of Clark

9  Fork is the debtor.  And therefore, they have no -- they had no

10  independent role; that the debtor controls Northwestern.

11          In that circumstance, there is clearly a conflict.

12  Paul Hastings represented both the debtor and Clark Fork.  The

13  action is to return assets to Clark Fork on behalf of a group

14  of creditors with which Paul Hastings has a direct conflict.

15  So the rule -- both the rule is met.  And, in fact, if you --

16  even under ordinary principles of conflict law, not without

17  regard to the bankruptcy rule, there exists a conflict in these

18  circumstances.

19          So the conflict is clear.  If there were no conflict

20  with respect to that issue, then there would be no conflict,

21  which they've admitted in the Magten and in the McGreevey

22  action.  You can't have it just -- it can't be, I only have a

23  conflict for the fraudulent conveyance action, itself, but I

24  don't have a conflict in the case, itself, where the assets are

25  what they are.

1          The -- and that brings us back to when -- and that

2     takes me to the tactical issue that they continue to raise.    In

3     fact, as I understand -- and I don't profess to be a bankruptcy

4     practitioner -- but in fact, as I understand the Chapter 11

5     proceeding, the idea is to bring all of the debtors, creditors

6     -- all parties in interest under one roof and to deal with them

7     fairly, and to build -- in a Chapter 11 -- some consensual

8     method of dividing limited resources and allowing the debtor to

9     continue.

10         And this conflict has now pervaded that whole

11    process.    Among other things, at this point, Paul Hastings is

12    seeking releases.    It's seeking releases in the plan for its

13    role.    You know, it's in the disclosure statement that they

14    want a release for their role in these transactions.    That

15    becomes part of their self-interest.    The Creditors' Committee

16    has now become the creditors who are on the other side of that

17    issue, not the creditors who might have a different point of

18    view.    So the conflict is not only apparent, but it has, in

19    fact, infected this process in this very case.    And that drives

20    -- that clearly drives the need to disqualify them and the

21    request to disqualify them.    If Your Honor has any further

22    questions, I'd be happy to answer them.

23         THE COURT:    All right.    I'm going to allow a little

24    surreply.    And then, you can have an opportunity, too, Mr.

25    Amini, if you want.

Glazer - Argument                     43

1       UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

2       THE COURT:  What I'm most interested in is this

3   question of is there a conflict, and if so, what is it -- as to

4   which we seem to have two diametrically opposed points of view.

5       MR. GLAZER:  Well, first of all, if I left Mr. Amini

6   with the impression that I was admitting that Paul Hastings had

7   a conflict, I must have misspoke, because that was certainly

8   not my intention and I do not so admit.

9       THE COURT:  I think he was just seeking -- at least,

10  what I understood him to say was that in connection with the --

11  for example, the Magten fraudulent conveyance lawsuit, if there

12  was a conflict, it was solved by the withdrawal of Paul

13  Hastings.

14      MR. GLAZER:  Right.  I made that point in the

15  conditional, I believe.  And we made clear in our papers the

16  reason why Paul Hastings withdrew from that representation.  It

17  had to do with the fact that Paul Hastings' partners may well

18  be witnesses in that matter.  And it also had to do with the

19  fact that in the interim, Magten had sued Paul Hastings for a

20  malpractice and for aiding and abetting a fraudulent conveyance

21  in the Montana State courts.

22      Given those two events, we thought it appropriate,

23  not because there was necessarily a conflict -- we do not

24  believe there was one -- but because there might have been an

25  appearance issue to instead allow another firm to represent the

**J&J COURT TRANSCRIBERS, INC.**

**A582**

Glazer - Argument                                    44

1  debtor, with regard to that proceeding.  I think that was a
2  good judgment.  But by no means are we admitting a conflict in
3  that situation.

4          I want to make one other point, Your Honor, and then
5  I'll get to your question.  And that is that Magten was never a
6  creditor of Clark Fork.  This idea that they can bootstrap
7  their perceived unfairness to Clark Fork in this situation into
8  somehow or another their having a claim that there's a conflict
9  here is silly.  The idea that Paul Hastings has a conflict with
10 the debtor, because Magten is looking to take assets out of the
11 debtor's estate and Paul Hastings is looking to keep them there
12 is just -- falls on its own -- of its own weight.

13         Paul Hastings is clearly representing the interest of
14 the debtor in all respects.  And as you heard from others, it's
15 Magten who is not.  There is no conflict here.  This -- I
16 believe that what Mr. Amini told you is mumbo-jumbo; vis-a-vis
17 conflict issues.  I think Your Honor is right, it looked as
18 though you admitted that you can't find one.  We couldn't find
19 one.  No other party can find one.

20         THE COURT:  Well, there's a conflict in the
21 non-technical sense; in the sense that Paul Hastings is
22 representing a point of view that is contrary to the point of
23 view that is being represented by Magten.  I mean, there
24 certainly is conflict --

25         MR. GLAZER:  To that extent, Mr. Amini and I have a

**J&J COURT TRANSCRIBERS, INC.**

**A583**

45

1  conflict.

2         THE COURT:  Right.  And that there is a conflict.

3  But, of course, we're using conflict in the very technical

4  sense of whether or not a professional has a conflict of

5  interest arising out of that professional's representation.

6  Now, the professional here never represented Magten.  We know

7  that.  Or --

8         MR. GLAZER:  And probably never will.

9         THE COURT:  -- any of the other creditors who may be

10  similarly situated to Magten; these -- the so-called --

11         MR. GLAZER:  The class of one.

12         THE COURT:  -- Clark Fork.  You know, but the

13  so-called Clark Fork creditors.

14         MR. GLAZER:  Right.

15         THE COURT:  Well, wasn't _Comanche_ in that same

16  situation, for example?

17         MR. GLAZER:  Yes, potentially.

18         THE COURT:  But _Comanche_, I was advised yesterday, is

19  now settling up.  But that group -- and _McGreevey_ was, in a

20  sense, in that -- although they weren't creditors, they were,

21  in the sense, people who thought that these assets should be

22  returned for the benefit -- sole benefit -- of a certain

23  constituency, as opposed to being there for the benefit of all

24  of these other constituencies.  So clearly, there is a conflict

25  in the non-technical sense.  And there is this group of

46

1 entities, none of which Paul Hastings has ever represented.

2          MR. GLAZER:  Right.

3          THE COURT:  The one that Paul Hastings represented is

4 the one that those folks claim was harmed, because the assets

5 were taken away from them.

6          MR. GLAZER:  That's right.

7          THE COURT:  And so the precise question, it seems to

8 me, is if you represented the one who claims -- who someone

9 else claims to be harmed, even though --

10          MR. GLAZER:  Right.

11          THE COURT:  -- that entity, itself, does not claim to

12 have been harmed, does that create a conflict now with the

13 party that was on the other side of that transaction, that is

14 taking actions contrary to the interest -- perceived interest

15 -- of the creditor group of the one who they claim was harmed?

16          MR. GLAZER:  Right.  Well stated. I think our brief

17 addresses that.

18          THE COURT:  I'm not sure it was well stated.

19          MR. GLAZER:  Well, I suppose anything stated by the

20 Court is well stated.  Your Honor, the -- I understand your

21 point.  I think it's clear.  We cite in our brief -- it doesn't

22 come to mind immediately -- a case on the subject.  But I want

23 to point out one thing else.  Magten has never been a creditor

24 of Clark Fork.  They bought their interest afterwards.  And so,

25 they are twice removed by marriage.  And the idea that Magten

47

1  can come here and claim for Clark Fork something that Clark

2  Fork doesn't allege for itself -- and never did -- and was

3  fully aware of, and it's board approved, that's why they look

4  to say that Paul Hastings' position is that nobody can have

5  standing.  The answer is, that's not the argument.  If Clark

6  Fork were complaining, we would have a different argument in

7  front of you.  It's Magten who's complaining.  And they don't

8  have any position to complain about that.

9          THE COURT:  All right.  Thank you.

10         MR. GLAZER:  Thank you, Your Honor.

11         THE COURT:  Mr. Amini, isn't it true that I would

12  have to find that the conflict exists not because Paul Hastings

13  ever represented Magten -- ro, similarly situated creditors --

14  but rather, that Paul Hastings represented the entity that

15  Magten claims was harmed to Magten's detriment?

16         MR. AMINI:  Clark Fork.  You would have to find that

17  the -- well, I don't think there's an issue about whether they

18  represented Paul --

19         THE COURT:  No.  What I'm after --

20         MR. AMINI:  -- Clark Fork.

21         THE COURT:  But I'm going to have to say that that is

22  the essence of your alleged conflict.

23         MR. AMINI:  That's right.  But the conflict, I would

24  suggest to Your Honor, is apparent, because --

25         THE COURT:  Even though they never represented you?

**J&J COURT TRANSCRIBERS, INC.**

**A586**

48

1          MR. AMINI:  No.  They never represented us.  But they

2   represented a party that is controlled by the debtor at this

3   point.  There's no -- I don't believe -- I believe that the

4   waiver issue is -- and as I pointed out to Your Honor earlier,

5   if you look at their brief to dismiss for the officers of Clark

6   Fork, their brief says that the only member and the only

7   deciding person of Clark Fork, contrary to the Paul Hastings'

8   brief here, is the debtor.  And so, they have no independent

9   actors.  So, Clark Fork does not stand as an independent entity

10  for that -- of course, Clark Fork doesn't do that, because the

11  parent manipulates that process.

12          But in reality, there is a conflict.  If the debtor

13  were not propping Clark Fork up with that -- one of its early

14  motions, where it's paying $327,000 a month; and it took us a

15  very long time to come to why they were doing that -- but if

16  the debtor were not doing that, and Clark Fork were, itself, a

17  debtor -- as it should be, because it is insolvent at this

18  point -- it would have a claim that it would have to assert

19  against the debtor for all those assets.  In its stead, the

20  creditors are doing that for it.  It's no different than a

21  derivative action -- the fraudulent conveyance action.  You

22  stand effectively in the shoes of Clark Fork, and you say,

23  return those assets to Clark Fork, because those are the proper

24  assets of Clark Fork against which we have a claim.

25          THE COURT:  All right.  Thank you.  Does anybody have

49

1   anything else?  All right.  The matter will be submitted.  I
2   have to advise all of you that this has been a fairly intense
3   week here, not only in this case, but in several others.  And I
4   had suggested yesterday, for example, but I will try to rule
5   today on a couple of the matters that we had yesterday.  And I
6   have not had a moment since then to think about them.  But I
7   expect to do that tomorrow, on my way home.  And I also have a
8   relatively light week next week in Phoenix.

9          So, my goal is to get all of these things out no
10  later than next week, so that we don't hold up the proceedings.
11  At least, everybody knows what the answer is.  Now, with regard
12  to the -- a wholly different issue -- on the MOU question, I
13  understand there is a hearing in South Dakota on Monday.  Is
14  there some requirement that the MOU matter be decided by me
15  prior to that hearing on Monday?

16         MR. ACKERMAN:  As much as we would like to say there
17  is, Your Honor, there is -- I cannot say that.  We can report
18  to the District Court that we have submitted it; that the
19  matter is under advisement.  And we will so do that, with
20  respect to Judge Pierson.

21         THE COURT:  All right.  So next week, you will get
22  orders on Yellowstone, MOU, and the disqualification motion,
23  which I think are the only three things from this case that we
24  have under submission.

25         MR. ACKERMAN:  That is correct, Your Honor.  Those

50

1 are the only three matters.

2          THE COURT:  All right.  If there's nothing else, then

3 we're adjourned.

4                          *  *  *  *  *

5                    C E R T I F I C A T I O N

6          I, Shirley Nenno, court approved transcriber, certify

7 that the foregoing is a correct transcript from the official

8 electronic sound recording of the proceedings in the

9 above-entitled matter.

10

11 _____          DATE: September 3, 2004

12 SHIRLEY NENNO

13 J&J COURT TRANSCRIBERS, INC.

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| NORTHWESTERN CORPORATION, | ) | |
| | ) | Case No. 03-12872 (CGC) |
| Debtor. | ) | |
| | ) | |

## MEMORANDUM DECISION

Jess H. Austin, III
Karol K. Denniston
Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, Suite 2400
Atlanta, GA 30308

David L. Finger
Charles Slanina
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155

- and -

Dennis E. Glazer
D. Scott Tucker
Catherine Lifeso
David Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Attorneys for Paul, Hastings, Janofsky
    & Walker LLP

Kathleen M. Miller
Smith, Katzenstein & Furlow LLP
P.O. Box 410
800 Delaware Avenue
Wilmington, DE 19899

- and -

Bijan Amini
Storch Amini & Munves PC
2 Grand Central Tower
New York, NY 10017

Attorneys for Magten Asset Management
    Corporation

Scott D. Cousins
William E. Chipman, Jr.
Charles Michael Terribile
Greenberg Traurig, LLP
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801

Attorneys for Debtors and Debtors-in-
    Possession

Dated:  July 23, 2004

2

**A591**

CASE, J.

Magten Asset Management Corporation ("Magten") has filed a motion to disqualify

Debtor's counsel, Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings") [Docket No. 1502].

A hearing was held on July 15, 2004, after which the matter was taken under advisement. For

the reasons set forth below, the motion will be denied.

## I.    BACKGROUND FACTS

In 2002, certain power and distribution assets owned by Montana Power Company were

transferred to Montana Power LLC, now known as Clark Fork and Blackfoot, LLC ("Clark

Fork"). The Debtor acquired the equity ownership in Clark Fork. Thereafter, the energy assets

were transferred from Clark Fork to the Debtor; the Debtor assumed certain obligations of Clark

Fork and Montana Power, including approximately sixty-seven million dollars in 8.45% junior

subordinated deferrable interest debentures due 2036. Paul Hastings represented the Debtor and

Clark Fork, its wholly owned subsidiary, in connection with this transfer of assets and

assumption of liabilities, referred to in these proceedings as the "going flat" transaction. The

Debtor has consistently alleged, and Magten has never disputed, that Magten did not own any of

the debentures prior to the time the assets were transferred to the Debtor. Rather, Magten

acquired the debentures after the transaction was complete. Therefore, the Debtor asserts and

Magten has not disputed, that Magten was never a creditor of Clark Fork at a time when Clark

Fork held the disputed energy assets. Rather, Magten became a holder of the debentures only

after the transaction was completed and was a matter of public record.

On September 14, 2003, the Debtor filed a voluntary petition for relief under chapter 11

of the Bankruptcy Code. An application to employ Paul Hastings as counsel for the Debtor and

**A592**

Debtor-in-Possession was filed soon thereafter, accompanied by an affidavit of Jesse H. Austin III, lead counsel for Paul Hastings. An order approving the application was entered in due course thereafter.

On January 14, 2004, (Docket No. 686), Magten filed a notice of appearance and request for service of papers. This motion was filed by Magten on June 18, 2004.

A hearing on confirmation of the Debtor's plan is currently scheduled for August 25, 2004.

Boiled to its essence, Magten argues that Paul Hastings should be disqualified for two reasons:

1.      Paul Hastings did not adequately disclose that it represented both the Debtor and Clark Fork in the "going flat" transaction. It therefore violated its obligations under section 327 of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure to disclose "all connections" that it has with all parties in interest[1]. Because of this inadequate disclosure, Magten argues that Paul Hastings should now be disqualified.

2.      Whether the disclosure was adequate or not, Paul Hastings should be disqualified because it has an actual and irreconcilable conflict of interest resulting from its dual representation of the Debtor and Clark Fork. The basis for this assertion is Magten's contention that the interests of Clark Fork (and its creditors, to whom Magten argues Paul Hastings owed a fiduciary obligation) were harmed because

---

[1]      Paul Hastings filed a supplemental affidavit disclosing this dual representation on July 7, 2004.

4

**A593**

the assets were transferred for virtually no consideration. Magten argues that it is a creditor of Clark Fork because it holds debt instruments, the junior subordinated debentures, on which Clark Fork was obligated at the time the assets were transferred.

## II.    ANALYSIS

### A.    The Disclosure Issue

It is clear that the initial disclosure by Paul Hastings was inadequate. Although Paul Hastings now argues that there was no conflict because the transaction benefitted both parties, that is not the test for disclosure. Section 327 and Rule 2014 make it clear that *all connections* must be disclosed whether they give rise to an actual conflict of interest or not. Paul Hastings failed to do this.

At the hearing, the attorney for the United States Trustee advised the Court and other parties that he had thoroughly vetted the dual representation with Paul Hastings at the beginning of the case and that he was satisfied with the explanations given. While he stated that he believed the dual representation was a matter of public record, he did not share that information with others nor did he request that Paul Hastings file a supplemental affidavit of disclosure. In retrospect, he acknowledged that this was a mistake. Nevertheless, these representations by the attorney for the United States Trustee support the conclusion that there was no conscious effort by Paul Hastings to conceal its dual representation. This fact is relevant to what remedy, if any, should be imposed for the inadequate disclosure.

As noted above, following a hearing at which counsel for Magten asked the Court to direct Paul Hastings to file a supplement disclosure, and the Court so ordering, Paul Hastings did

5

**A594**

file the July 7, 2004 affidavit. Therefore, as of this time, the matter has been fully and adequately disclosed. The issue presented is whether the previous failure to disclose justifies disqualification at this point.

The answer is no. Inadequate disclosure does not mandate disqualification of counsel. Rather, the appropriate remedy is left to the broad discretion of the court. *See, e.g., In re Best Craft Gen. Contractor and Design Cabinet, Inc.*, 239 B.R. 462 (Bankr. E.D.N.Y. 1999). In this case, the disclosure was made at the outset of the case to the United States Trustee and formal disclosure was later made. Also, as noted, the prior disclosure to the United States Trustee is indicative of a lack of intent to conceal. Further, as discussed in the next session, this is not a case where full disclosure would have revealed an actual conflict. Rather, full disclosure would have alerted all parties to facts that should have been known but which, in the end, do not bear upon Paul Hastings' qualification to serve as counsel. For these reasons, the Court will not now disqualify Paul Hastings for its previous failure to disclose.

B.      Is There a Conflict?

A primary purpose of the disclosure rules is to allow parties in interest, and the Court, to determine whether the proposed counsel is disinterested and whether such counsel holds or represents an interest adverse to the estate. The question presented here, therefore, is whether Paul Hastings prior dual representation meets either of those standards. It does not.

This motion has been brought solely by Magten; no other creditor has joined. As noted above, Magten was not a creditor of Clark Fork at the time the transaction took place. Rather, it only became a creditor of the Debtor after the Debtor assumed the liability associated with the junior subordinated debenture initially issued by Montana Power Company. Thus, Magten is not

6

**A595**

only not a party directly affected by the transaction - such as Clark Fork itself - but it was also not an indirect party at the time the transaction took place. Thus, its relationship to the transaction for the purposes of asserting a disqualification motion is tenuous at best.

Here, neither the Debtor nor Clark Fork, the two parties directly involved, have complained. Indeed, the transaction was approved by the boards of directors of each company and was perceived by them to be in the best interests of those companies.

At bottom, Magten's argument is that Paul Hastings must be disqualified for its dual representation because Magten, as a third party who claims to have been injured by the transaction, is now challenging it. This is a novel theory that does not withstand scrutiny. First, as noted, even if third party creditors were injured by the transaction, Magten was not one of them. Second, there is no present proof of injury in any event; while that issue has been asserted in Adversary Proceeding No. 04-53324, captioned <u>Magten Asset Management Corporation v. NorthWestern Corporation</u>, pending before this Court, no such finding has yet been made. Thus, there is no basis for asserting actual injury that may create an actual conflict. Finally, even if actual injury were eventually proven, the fact that Paul Hastings represented the injured party, Clark Fork, would not necessarily mean that it holds an interest adverse to this estate or any class of its creditors. Clark Fork is not a debtor; therefore, the test is not whether Paul Hastings holds an interest adverse to a class of Clark Fork's creditors but whether it holds an interest adverse to a class of Northwestern's creditors. Yes, Magten is a member of a class of the Debtor's creditors–the subordinated debenture holders–but it asserts it has been injured not in that capacity

7

**A596**

(after all, the Debtor assumed its debt), but in its non-existent capacity as a creditor of Clark

Fork.[2] The prohibition against counsel holding an "adverse interest" does not stretch so far.

## III.    CONCLUSION

For the foregoing reasons, Magten's motion to disqualify is denied.  An order is to be

submitted under certification of counsel.

_Charles G. Case II (signature)_

Charles G. Case, II
United States Bankruptcy Judge

---

[2]    The gist of the fraudulent conveyance claim asserted in Adv. Proc. 04-53324 is that
the utility assets should be returned to Clark Fork to be shared only by its creditors, rather than be
subject to claims of NorthWestern's other creditors whose debts did not originate with Montana
Power.

8

**A597**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| NORTHWESTERN CORPORATION, | ) | Case No. 03-12872 (CGC) |
|  | ) |  |
| Debtor. | ) | **Related Docket No.: 1751** |
|  | ) |  |

## MOTION FOR RECONSIDERATION OF THE COURT'S ORDER DENYING MAGTEN ASSET MANAGEMENT CORPORATION'S MOTION TO DISQUALIFY PAUL HASTINGS JANOFSKY & WALKER LLP

Magten Asset Management Corporation ("Magten") hereby moves this Court for

an order, pursuant to Federal Rule of Bankruptcy Procedure 9023 reconsidering and/ or

amending or altering its order denying Magten's Motion to Disqualify Paul Hastings

Janofsky & Walker LLP ("Paul Hastings") entered July 23, 2004 [dkt. 1751], based on

Paul Hastings' misrepresentations in connection with that motion.

### PRELIMINARY STATEMENT

1.     In opposition to Magten's Motion to Disqualify, Paul Hastings claimed it

had the consent of both Northwestern Corporation ("Northwestern") and Clark Fork to

act for both sides of the disputed transaction. Paul Hastings specifically represented that

(i) "this transaction was approved by Clark Fork's Board of Directors" (Paul Hastings

Opp. Mem. at 9); and (ii) "with the full consent and knowledge of... [Clark Fork's]

Board of Directors, Paul Hastings represented both the Debtor and [Clark Fork]."

(Affidavit of Jesse Austin dated July 7, 2004 (the "July Affidavit") ¶ 11). Counsel for

Magten questioned the existence of such waivers at the July 15th hearing, at which Mr.

Austin and his counsel were present, but neither deigned to correct the record. On July

23, 2004, relying on these facts, this Court denied the motion to disqualify. *See, e.g.,* Order at 7.

2.    On Friday, July 30, 2004, however, at the deposition of William Austin, Chief Restructuring Officer of Northwestern, Jesse Austin, counsel for Northwestern, represented for the first time that Clark Fork, in truth, had no board of directors.[1]  *See,* Deposition Transcript at 154.  Furthermore, documents, procured only last week through document discovery, confirm that Clark Fork did not have any board of directors.  Those documents are attached as Exhibit B.  These admissions fly directly in the face of Mr. Austin's sworn statement that "with the full consent and knowledge of... [Clark Fork's] Board of Directors, Paul Hastings represented both the Debtor and [Clark Fork]."  (July Affidavit ¶ 11).

3.    Based upon these new facts, the presence of additional misrepresentations by Paul Hastings regarding yet another crucial aspect of their representation of Clark Fork and the clearly erroneous findings of fact in the Court's Order, Magten respectfully moves for reconsideration of the Order denying its Motion to Disqualify Paul Hastings.

## ARGUMENT

4.    In the District of Delaware, Courts will only grant motions for reconsideration in one of three circumstances:  1) where there has been an intervening change in the law; 2) where there is newly discovered evidence which was not available to the moving party at the time of judgment; or 3) where there is a need to correct a legal or factual error which has resulted in a manifest injustice.  *See, Callaway Golf Co. v. Dunlop Slazenger Group Americas, Inc.,* 2004 WL 1588127 at *1 (D.Del. July 12, 2004)

---

[1] The relevant section of the transcript of that deposition is attached hereto as Exhibit A (the "Deposition Transcript").

*citing, Max's Seafood Cafe v. Quinteros,* 176 F.3d 669, 677 (3d Cir.1999). Both the second and third circumstances are presented in our case.

5. Where new evidence has arisen altering the veracity of the Court's order, courts in this circuit typically grant the motion for reconsideration. *See, Chase Manhattan Bank v. Iridium Africa Corp.,* 2004 WL 1588295 at *2 (D.Del. July 8, 2004). This is particularly so, where the new evidence, if accurate, would render the Court's analysis untrue. *See, Capricorn Power Co., Inc. v. Siemens Westinghouse Power Corp.,* 2004 WL 1558786 at *4 (W.D.Pa. July 2, 2004).

6. Essentially, Paul Hastings has determined that it can make any statement it wants, whether true or false, as suits its needs at the time. Thus, its claims that "this transaction was approved by Clark Fork's Board of Directors" (Opp. Mem. at 9) and its claims that Paul Hastings obtained waivers of its dual representation from Clark Fork's board of directors (July Affidavit ¶ 11) turned out to be patently false. These falsehoods are particularly egregious, as they were submitted in direct response to a disqualification motion based upon Paul Hastings' previous deficient disclosure, and the Court's invitation to correct its prior "inadequate" disclosure. Order at 5.

7. In deciding the disqualification motion, this Court gave Paul Hastings the benefit of the doubt and ruled that the previous disclosure shortcomings were unintentional. Shockingly, Paul Hastings has repaid the Court's leniency by blithely employing fictions concerning central facts under dispute in the disqualification motion. This Court should not countenance Paul Hastings' cavalier attitude towards its obligations of candor; accordingly, it should revisit that portion of its opinion holding that Paul Hastings lacked any intent to conceal. *See, In re BH&P Inc.,* 949 F.2d 1300, 1317-

18 (3d Cir. 1991)("[the obligation to disclose] certainly compels disclosure where, as here, the party had contemplated and discussed a specific situation involving a potentiality for conflict."); *In re Envirodyne Indus., Inc.*, 150 B.R. 1008, 1021 (Bankr.N.D.Ill. 1993)("Apart from a finding of disinterestedness, strict compliance with the disclosure requirements is necessary to maintain the integrity of the bankruptcy system.").

8.    In addition, this motion for reconsideration should also be granted under the third prong of the rule of *Max's Seafood Café*: due to Paul Hastings' misrepresentation there is now a need to correct a factual error in the Court's Order. As mentioned above, the Court found that Clark Fork's board of directors approved the going-flat transaction, Order at 7, an untrue statement that could be used in outside actions commenced by Magten and others. Therefore, Magten respectfully asks the Court to strike that portion of its Order finding such board approval.

## CONCLUSION

9.    For the reasons stated above, Magten's motion for reconsideration of the order denying the motion to disqualify Paul Hastings should be granted.

August 2, 2004                              SMITH KATZENSTEIN & FURLOW LLP


                                           /s/ Kathleen M. Miller
                                           Kathleen M. Miller (ID No. 2898)
                                           The Corporate Plaza
                                           800 Delaware Avenue, 7th Floor
                                           P.O. Box 410
                                           Wilmington, DE 19899 (Courier 19801)
                                           Telephone: 302-652-8400
                                           Facsimile: 302-652-8405
                                           Email: Kmiller@skfdelaware.com

Bijan Amini (NY Bar. No. 3533)
STORCH AMINI & MUNVES PC
2 Grand Central Tower
New York, New York 10017
(212) 490-4100

Counsel to Magten Asset
Management Corporation

**A602**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this **2nd** day of **August, 2004,** a copy of the foregoing *Motion for Reconsideration of the Court's Order Denying Magten Asset Management Corporation's Motion to Disqualify Paul Hastings Janofsky & Walker LLP* and *Magten Assets Management's Request For Hearing On Motion For Reconsideration Of The Court's Order Denying Magten Asset Management Corporation's Motion To Disqualify Paul Hastings Janofsky & Walker LLP* served on the parties listed below in the manner indicated and on the attached service list by first class mail.

**VIA HAND DELIVERY**
Scott D. Cousins, Esq.
Monica Leigh Loftin, Esq.
William E. Chipman, Jr., Esq.
Greenberg Traurig, LLP
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801

**VIA HAND DELIVERY**
David L. Finger, Esquire
Charles Slanina, Esquire
Finger & Slanina
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801

**VIA HAND DELIVERY**
Neil B. Glassman, Esq.
Charlene D. Davis, Esq.
Eric M. Sutty, Esq.
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

**VIA FACSIMILE**
Alan W. Kornberg, Esq.
Margaret A. Phillips, Esq.
Ephraim I. Diamond, Esquire
Paul Weiss Rifking Wharton & Garrison
1285 Avenue of the Americas
New York , NY 10019
Facsimile: 215-757-3990

**VIA FACSIMILE**
Dennis E. Glazer, Esquire
D. Scott Tucker, Esquire
Catherine Lifeso, Esquire
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
Facsimile: 212-450-3800

**VIA FACSIMILE**
Jesse H. Austin, III
Karol K. Denniston
Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, Suite 2400
Atlanta, GA 30308
Facsimile: 404-815-2424

/s/ Kathleen M. Miller
Kathleen M. Miller

**A603**

**EXHIBIT A**

1

```
 1
 2
 3
         IN THE UNITED STATES BANKRUPTCY COURT
 4       FOR THE DISTRICT OF DELAWARE
         Case Nos. 03-12872 (CGC)
 5       -----------------------------------------x
 6       In Re
 7       NORTHWESTERN CORPORATION,
 8                        Debtor.
 9       -----------------------------------------x
10
11
12              DEPOSITION of WILLIAM AUSTIN, held at
13       the offices of Kramer Levin Naftalis & Frankel LLP,
14       919 Third Avenue, New York, New York 10022, on the
15       30th day of July 2004, commencing at 10:15 a.m.,
16       before Morene Korenman-Bangel, a Shorthand Reporter
17       and Notary Public of the State of New York, pursuant
18       to Notice and Agreement.
19
20
21
22
23
24
25
```

A605

2

```
 1

 2    A P P E A R A N C E S :

 3

 4        PAUL, HASTINGS, JANOFSKY & WALKER LLP
                  Attorneys for Debtor
 5                600 Peachtree Street, NE, Suite 2400
                  Atlanta, Georgia 30308-2222
 6
          BY:  JESSE H. AUSTIN, III, ESQ.
 7

 8        KRONISH LIEB WEINER & HELLMAN LLP
                  Attorneys for RCG Carpathia Master
 9                Fund, Ltd. and Kellogg Capital
                  Group, LLC
10                1114 Avenue of the Americas
                  New York, New York 10036-7798
11
          BY:  SCOTT J. PASHMAN, ESQ.
12

13        PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
                  Attorneys for Creditors Committee
14                1285 Avenue of the Americas
                  New York, New York 10019-6064
15
          BY:  EPHRAIM DIAMOND, ESQ.
16

17        KRAMER LEVIN NAFTALIS & FRANKEL LLP
                  Attorneys for Wilmington Trust
18                919 Third Avenue
                  New York, New York 10022
19
          BY:  PHILIP BENTLEY, ESQ.
20

21        FRIED FRANK HARRIS SHRIVER & JACOBSON LLP
                  Attorneys for Magten
22                One New York Plaza
                  New York, New York 10004-1980
23
          BY:  GARY L. KAPLAN, ESQ.
24

25
```

**A606**

3

```
 1
 2    A P P E A R A N C E S:  (Continued)
 3    ALSO PRESENT:
 4         DAVID W. PRAGER,
                Goldin Associates, LLC
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**A607**

4

1

2    W I L L I A M    M.    A U S T I N,

3         having been first duly sworn by the Notary

4         Public, was examined and testified as

5         follows:

6              THE COURT REPORTER:  Would you state your

7    full name for the record, please.

8              THE WITNESS:  William M. Austin.

9    DIRECT EXAMINATION

10   BY MR. BENTLEY:

11        Q    Good morning, Mr. Austin.

12        A    Good morning.

13        Q    For the record, my name is Phillip

14   Bentley.  I'm a member of the Kramer Levin law firm

15   representing Wilmington Trust in these bankruptcy

16   proceedings.

17              I understand you have been deposed

18   before.

19        A    I have.

20        Q    I think you know the drill pretty well.

21        A    I've been deposed enough times, I think I

22   do.

23        Q    If I say anything that you don't

24   understand, please let me know and I'll try to

25   clarify.

**A608**

5

```
 1              William M. Austin
 2         And if you need to take a break at any
 3    time, please let me know.
 4         A    Sure.
 5         Q    And I'll be happy to accommodate you.
 6         And I will do my best to get you out of
 7    here in advance of your flight this afternoon.
 8         A    I appreciate that.
 9         Q    Mr. Austin, please tell me your current
10    position at NorthWestern Corp.
11         A    I'm the chief restructuring officer at
12    NorthWestern Corp.
13         Q    Have your responsibilities recently
14    changed at NorthWestern?
15         A    They've not, but they will in the very
16    short future.
17         Q    Tell me how they will change.
18         A    I will go from a full-time employee to a
19    consultant, working part time for the company.
20         Q    You were hired by NorthWestern in April
21    2003?
22         A    That is correct.
23         Q    As chief restructuring officer?
24         A    That's correct.
25         Q    Who first approached you about that
```

**A609**

152

 1                    William M. Austin

 2        A     My understanding is, we have basic

 3    agreement with a group of banks and investment banks

 4    for our exit financing, some of which will be this

 5    line of credit.

 6        Q     Do you know who's the lead bank in that

 7    group?

 8        A     Lehman -- there are three banks

 9    involved:  Lehman, Deutsche Bank, and Credit

10    Suisse.

11        Q     Are you familiar with the corporate

12    structure of NorthWestern and its subsidiaries?

13        A     In general.  Just fairly generally.

14        Q     Are you generally familiar with the

15    officers, with who is an officer and who is a

16    director of various subsidiaries?

17        A     I know some, but not all.

18        Q     When you say some, do you know Expanets,

19    for example, do you know the officers and directors

20    of Expanets?

21        A     I do.

22        Q     Do you know the officers and directors of

23    Clarkfork and Blackfoot?

24        A     I do not.

25        Q     Do you know if Clarkfork has directors?

**A610**

153

```
 1                    William M. Austin
 2        A    I believe they do.
 3        Q    But you don't know who they are?
 4        A    I don't know all of them.
 5        Q    I am going to hand you a document.
 6             MR. KAPLAN:  I would ask you to mark this
 7   as 6.
 8             (Marked for identification.)
 9             (Discussion off the record.)
10        Q    What I have handed to you as Exhibit 6
11   has got a Bates stamp on the bottom of B 230103, and
12   at the top it says NorthWestern Corporation board of
13   directors and officers August 2002.
14        A    Yes.
15        Q    Are you familiar with this?
16        A    This is the first time I've seen it,
17   so...
18        Q    Do you know what this document is
19   intended to show?
20        A    I assume on the top, it's the board of
21   directors as of August 2002.
22        Q    But you're not --
23        A    No.
24        Q    -- otherwise familiar with the document?
25        A    No.
```

154

```
 1                    William M. Austin
 2         Q    So you couldn't tell me whether or not
 3    the information contained herein is accurate?
 4         A    I can't.
 5         Q    If you turn to Bates stamp B 230110.
 6              MR. KAPLAN:  For the record, this was a
 7    document produced by NorthWestern.  I note the Bates
 8    stamp is just the letter B.
 9         Q    The top one is NorthWestern Energy LLC.
10    Is that what's also known as Clarkfork and
11    Blackfoot?
12         A    I believe that's right.
13         Q    Does this chart list any directors?
14         A    It does not.
15         Q    Do you have any reason to believe that
16    this chart is wrong?
17         A    As I say, this is the first time I've
18    seen this chart.  I don't know whether it's right or
19    wrong.
20              MR. JESSE AUSTIN:  I note for the record
21    NorthWestern Energy's an LLC, so I don't think that
22    LLCs have necessarily directors.
23              MR. KAPLAN:  Okay.  I just wanted to
24    clarify that point.
25              Thank you.
```

**A612**

**EXHIBIT B**

**A613**

### NorthWestern Corporation
### Board of Directors and Officers
### August 2002

**NorthWestern Corporation** (a Delaware corporation – 11/27/23; formerly NorthWestern Public Service Company)

| | |
|---|---|
| Randy G. Darcy | - Director |
| Gary G. Drook | - Director |
| Jerry W. Johnson | - Director |
| Larry F. Ness | - Director |
| Lionel L. Nowell, III | - Director |
| Marilyn R. Seymann | - Director |
| Bruce I. Smith | - Director |
| Merle D. Lewis | - Chairman & Chief Executive Officer |
| Richard R. Hylland | - Director, President & Chief Operating Officer |
| Daniel K. Newell | - Senior Vice President |
| Eric R. Jacobsen | - Senior Vice President, General Counsel, Chief Legal Officer & Assistant Corporate Secretary |
| Michael J. Hanson | - President & CEO of NorthWestern Public Service division |
| Walter A. "Trey" Bradley, III | - Vice President & Chief Information Officer |
| Kipp D. Orme | - Vice President & Chief Financial Officer |
| John R. Van Camp | - Vice President – Human Resources |
| Paul H. Wyche, Jr. | - Vice President – Communications & Chief Communications Officer |
| Alan D. Dietrich | - Vice President – Legal Administration & Corporate Secretary |
| Kurt D. Whitesel | - Treasurer & Controller |
| Michael J. Young | - Assistant Corporate Secretary |

A614

B-230103

**NorthWestern Corporation**
**Partner Businesses and Subsidiaries**
**Boards of Directors and Officers**

**NorthWestern Growth Corporation** (a South Dakota corporation – 1994)

A wholly owned subsidiary, acts as the strategic development and investment capital arm of NorthWestern. NGC seeks to: (i) acquire and develop new businesses to further NorthWestern's strategic vision to be America's premiere service and solutions company, (ii) partner with entrepreneurial and proven, results oriented management teams that are committed to a growth strategy, and (iii) maximize the growth and financial performance of Partner Entities leading to the expansion of our customer base and the creation of superior shareholder value. NGC has been the driving force in the initiation and implementation of the Blue Dot, CornerStone and Expanets investment strategies.

| | |
|---|---|
| Merle D. Lewis | - Chairman |
| Richard R. Hylland | - Vice Chairman |
| Daniel K. Newell | - Director, Managing Director & CEO |
| Eric R. Jacobsen | - Director & Chief Operating Officer |
| Kipp D. Orme | - Director, Vice President & CFO |
| G. Mark Mickelson | - Principal |
| Daniel L. Rausch | - Vice President |
| Alan D. Dietrich | - Secretary |
| Kurt D. Whitesel | - Treasurer |
| Michael J. Young | - Assistant Secretary |

**Blue Dot Services Inc.** (subsidiary of NGC; a Delaware corporation – 1997)
(formerly ServiCenter USA, Inc.)

A leading full-service provider of air conditioning, heating, plumbing and related services.

| | |
|---|---|
| Merle D. Lewis | - Chairman |
| Richard R. Hylland | - Vice Chairman |
| Daniel K. Newell | - Director, President & CEO |
| Robert E. Kennedy | - Director, Executive Vice President, Chief Financial Officer, Treasurer & Assistant Secretary |
| Kipp D. Orme | - Director |
| G. Mark Mickelson | - Vice President – Operations |
| Mark D. Snider | - Vice President - General Counsel & Secretary |
| Frank Pronesti | - President - Commercial Division |
| Theodore Ferrara | - President – Residential Division |
| Michele M. Voecks | - Vice President - Human Resources |
| Alan D. Dietrich | - Assistant Secretary |
| Michael DeVoe | - Assistant Secretary |
| Kurt D. Whitesel | - Assistant Treasurer |

A615

**Cornerstone Propane GP, Inc.** (a California corporation)

Managing general partner of CornerStone Propane Partners, L. P., the nation's fourth largest retail propane marketer to residential and business customers. CornerStone's wholesale division, Coast Energy Group, is a leading purchaser, processor and marketer of propane, crude, natural gas and other natural gas liquids.

| | |
|---|---|
| Merle D. Lewis | - Chairman |
| Richard R. Hylland | - Vice Chairman |
| Paul R. Christen | - Director |
| Kurt Katz | - Director |
| Daniel K. Newell | - Director |
| Gary Olson | - Director |
| Charles J. Kittrell | - Executive Vice President, COO & Secretary |
| Alan Movson | - Vice President - Human Resources |
| Richard D. Nye | - Vice President – Finance & Administration & Acting CFO |
| Steven M. Chodes | - Assistant Secretary |
| Alan D. Dietrich | - Assistant Secretary |
| Robert Ellington | - Assistant Secretary |
| Robert Goodwin | - Assistant Secretary |
| Kurt D. Whitesel | - Assistant Treasurer |

**Expanets, Inc.** (subsidiary of NGC; a Delaware corporation – 1-27-98)
(formerly Communications Systems USA, Inc.)

| | |
|---|---|
| Merle D. Lewis | - Chairman |
| Richard R. Hylland | - Vice Chairman |
| James R. Walker | - Director, President & CEO |
| Daniel K. Newell | - Director |
| Christopher J. Younger | - Director, Chief Operating Officer & Assistant Secretary |
| John C. Charters | - Director |
| Kipp D. Orme | - Director |
| Eric R. Jacobsen | - Director |
| Larry R. Holt | - Executive Vice President – Service Operations |
| Vel Johnson | - Executive Vice President – Sales Operations |
| Alan D. Dietrich | - Secretary |
| David A. Monaghan | - Assistant Treasurer |

**NorthWestern Energy** (division of NorthWestern Corporation)

| | |
|---|---|
| Merle D. Lewis | - Chairman |
| Richard R. Hylland | - Vice Chairman |
| Michael J. Hanson | - President & CEO |
| Glen R. Herr | - Senior Vice President - Operations |
| David A. Monaghan | - Vice President – Finance & Treasurer |
| Curtis T. Pohl | - Vice President – Energy Operations |
| Bart A. Thielbar | - Vice President – Communication Solutions |
| Gregory G. A. Trandem | - Vice President – Operations |
| Jana L. Hanson | - Controller & Assistant Treasurer |
| Alan D. Dietrich | - Secretary |
| Michael J. Young | - Assistant Secretary |

B-230105

**NorthWestern Services Group, Inc.** (a South Dakota corporation – 2000)

A wholly owned subsidiary, works with NorthWestern Energy, a division of NorthWestern Corporation, and NSG's divisions: NorthWestern Consumer Services, NorthWestern Energy and NorthWestern Communication Solutions to offer customers an expanding array of products and services designed to enhance the comfort, safety and convenience in their homes and the productivity of their businesses. From energy and related services to telecommunication services, NSG is well positioned to deliver America's Best Service Experience.

| | |
|---|---|
| Michael J. Hanson | – Director, President & CEO |
| Glen R. Herr | – Director & Vice President |
| Curtis T. Pohl | – Director & Vice President |
| Kurt D. Whitesel | – Treasurer |
| Dale Norton | – Assistant Treasurer |
| Alan D. Dietrich | – Secretary |
| Michael J. Young | – Assistant Secretary |

**Coast Energy Capital Corporation** (subsidiary of NGC; a Delaware corporation – 1998)

A wholly owned subsidiary of NGC, CECC is engaged in wholesale transactions involving propane, crude, natural gas and natural gas liquids.

| | |
|---|---|
| Daniel K. Newell | – Director & President |
| David A. Monaghan | – Director & Vice President |
| Alan D. Dietrich | – Secretary |

**Grant, Inc.** (a South Dakota corporation – 1972)

To own and develop real estate for commercial and private use. Primarily holds real estate owned by the organization in South Dakota and Nebraska which is not used in the gas and electric utility business, including transactions in homes of employees relocating to other offices of the Company.

| | |
|---|---|
| Michael J. Hanson | – Director, President & CEO |
| Glen R. Herr | – Director & Vice President |
| Curtis T. Pohl | – Director & Vice President |
| Kurt D. Whitesel | – Treasurer |
| Dale Norton | – Assistant Treasurer |
| Alan D. Dietrich | – Secretary |
| Michael J. Young | – Assistant Secretary |

**Nekota Resources, Inc.** (subsidiary of NEC; a South Dakota corporation – 1996)

To operate facilities for the delivery and sale of energy. Holds title to and contracts for the use of pipeline facilities used to market natural gas, expanding to electric facilities in the future.

| | |
|---|---|
| Michael J. Hanson | – Director, President & CEO |
| Glen R. Herr | – Director & Vice President |
| Curtis T. Pohl | – Director & Vice President |
| Kurt D. Whitesel | – Treasurer |
| Dale Norton | – Assistant Treasurer |
| Alan D. Dietrich | – Secretary |
| Michael J. Young | – Assistant Secretary |

B-230106

**NorthWestern Capital Corporation** (a Delaware corporation – 9-30-99)

An 85% subsidiary of NGC and a 15% subsidiary if NorthWestern Capital Partners LLC, NCC holds NGC's common stock investments in Blue Dot, Expanets and CornerStone Propane GP, Inc. and selected new ventures, redemption gains attributable to preferred stock investments in the aforementioned entities, and NGC's subordinated unit investment in CornerStone Propane Partners, L.P. and CornerStone Propane, L.P.

| | |
|---|---|
| Merle D. Lewis | - Chairman |
| Richard R. Hylland | - Vice Chairman |
| Daniel K. Newell | - Director, President & CEO |
| Eric Jacobsen | - Director & Chief Operating Officer |
| Kipp D. Orme | - Director, Vice President & CFO |
| Alan D. Dietrich | - Secretary |
| Kurt D. Whitesel | - Treasurer |
| Michael J. Young | - Assistant Secretary |

**NorthWestern Networks, Inc.** (a South Dakota corporation – 1989)

To provide entertainment services to the lodging industry and other markets, principally through television programming services. Holds investment in LodgeNet Entertainment Corporation.

| | |
|---|---|
| Daniel K. Newell | - Director, President & CEO |
| Kipp D. Orme | - Director & Vice President |
| Eric R. Jacobsen | - Director & Vice President |
| Kurt D. Whitesel | - Treasurer |
| Dale Norton | - Assistant Treasurer |
| Alan D. Dietrich | - Secretary |
| Michael J. Young | - Assistant Secretary |

**NorthWestern Systems, Inc.** (a South Dakota corporation – 1986)

To develop and market computer software (NorthWestern's customer information system) and formerly managed investment in Lucht, Inc.

| | |
|---|---|
| Daniel K. Newell | - Director, President & CEO |
| Kipp D. Orme | - Director & Vice President |
| Eric R. Jacobsen | - Director & Vice President |
| Kurt D. Whitesel | - Treasurer |
| Dale Norton | - Assistant Treasurer |
| Alan D. Dietrich | - Secretary |
| Michael J. Young | - Assistant Secretary |

**SYN INC.** (subsidiary of Cornerstone Propane GP, Inc.; a Delaware corporation - 1995)

The retail sale and delivery of propane to residential and business customers. One of the holders of partnership interest in CornerStone.

| | |
|---|---|
| Merle D. Lewis | - Chairman |
| Richard R. Hylland | - Vice Chairman |
| Daniel K. Newell | - Director & President |
| Alan D. Dietrich | - Secretary |
| Kurt D. Whitesel | - Treasurer |
| Dale Norton | - Assistant Treasurer |

**A618**

B-230107

**Claremont Gas Corporation** (subsidiary of SYN; a New Hampshire corporation – 1995)

| | |
|---|---|
| Kurt D. Whitesel | - Director & President |
| Daniel L. Rausch | - Director & Vice President |
| Alan D. Dietrich | - Director, Vice President & Secretary |
| Dale Norton | - Treasurer |
| Michael J. Young | - Assistant Secretary |

**NorCom Advanced Technologies, Inc.** (a South Dakota corporation – 1997)

Offers as array of voice, video and data networks and systems to customers seeking a one-stop communications solution.

| | |
|---|---|
| Michael J. Hanson | - Director, President & CEO |
| Glen R. Herr | - Director & Vice President |
| Curtis T. Pohl | - Director & Vice President |
| Kurt D. Whitesel | - Treasurer |
| Dale Norton | - Assistant Treasurer |
| Alan D. Dietrich | - Secretary |
| Michael J. Young | - Assistant Secretary |

**NorthWestern Energy Corporation** (a South Dakota corporation – 1996)

Extend their expertise and resources to commercial, industrial and large end users by offering energy packaging, marketing alternatives and consultative and management services.

| | |
|---|---|
| Michael J. Hanson | - Director, President & CEO |
| Glen R. Herr | - Director & Vice President |
| Curtis T. Pohl | - Director & Vice President |
| Kurt D. Whitesel | - Treasurer |
| Dale Norton | - Assistant Treasurer |
| Alan D. Dietrich | - Secretary |
| Michael J. Young | - Assistant Secretary |

**NorthWestern Services Corporation** (a South Dakota corporation – 1997)

Offers a portfolio of services to residential customers, including home monitoring systems, carbon monoxide detectors and appliance maintenance contracts. They also offer products to the business community.

| | |
|---|---|
| Michael J. Hanson | - Director, President & CEO |
| Glen R. Herr | - Director & Vice President |
| Curtis T. Pohl | - Director & Vice President |
| Kurt D. Whitesel | - Treasurer |
| Dale Norton | - Assistant Treasurer |
| Alan D. Dietrich | - Secretary |
| Michael J. Young | - Assistant Secretary |

## LLCs

**NorthWestern Capital Partners LLC (NCP)** (a Delaware LLC – 1999)
Long-term private equity investment partnership in which certain executives and key employees are investors. Participates in gains at NCC.

Managing Member – NorthWestern Growth Corporation

**A619**

B-230108

Non-Managing Members:
    Merle D. Lewis
    Richard R. Hylland
    Daniel K. Newell
    Eric R. Jacobsen
    G. Mark Mickelson
    Christopher J. Younger
    Gregory T. Cox
    Daniel L. Rausch
    Kipp D. Orme
    Michael L. Nieman
    Mark A. Luecke
    Elizabeth A. Evans

**NorthWestern Capital Ventures LLC** (a Delaware LLC – 2001)
Subsidiary LLC of NCC designed to hold passive development investments.

Sole Member – NorthWestern Capital Corporation

**NorthWestern Energy Development, LLC (NED)** (a Delaware LLC – 2001)
Subsidiary LLC of NGC designed to be investment vehicle for unregulated energy investments.

Managing Member – NorthWestern Growth Corporation
Non-Managing Members: (None currently)
Officers:

| | |
|---|---|
| Eric R. Jacobsen | President & Chief Executive Officer |
| Michael L. Young | Senior Vice President |
| Kipp D. Orme | Vice President & Treasurer |
| Alan D. Dietrich | Secretary |
| David A. Monaghan | Assistant Treasurer |

**NorthWestern Energy Marketing, LLC (NEM)** (a Delaware LLC – 2001)
Subsidiary LLC of NED formed to develop power marketing activities.

Managing Member – NorthWestern Energy Development, LLC
Non-Managing Members: (None currently)
Officers:

| | |
|---|---|
| Eric R. Jacobsen | President & Chief Executive Officer |
| Michael L. Young | Senior Vice President |
| Kipp D. Orme | Vice President & Treasurer |
| Alan D. Dietrich | Secretary |
| David A. Monaghan | Assistant Treasurer |

**NorthWestern Generation I, LLC** (Delaware LLC – 2001)
Subsidiary LLC of NED formed to develop generation project in Montana and holds LLC interest in
MontanaMegawattsI, LLC which was formed to acquire GE turbines from Enron North America.

Sole Member – NorthWestern Energy Development, LLC
Officers:

| | |
|---|---|
| Eric R. Jacobsen | President & Chief Executive Officer |
| Michael L. Young | Senior Vice President |
| Kipp D. Orme | Vice President & Treasurer |
| Alan D. Dietrich | Secretary |
| David A. Monaghan | Assistant Treasurer |

**A620**