**NorthWestern Energy, L.L.C.** (Montana LLC)

Sole Member and Manager – NorthWestern Corporation

| | |
|---|---|
| Michael J. Hanson | President & Chief Executive Officer |
| Dennis Lopach | Senior Vice President – Administrative Services |
| William A. Pascoe | Senior Vice President – Transmission Operations |
| Bart Thielbar | Senior Vice President – Information Technology & Chief Information Officer |
| Glen R. Herr | Vice President – Distribution Operations |
| Gregory Trandem | Vice President – Asset Management |
| David A. Monaghan | Vice President – Financial Planning & Analysis & Treasurer |
| Bobbi Schroeppel | Vice President – Customer Care |
| Jana Quam | Vice President – Human Resources |
| Ernest J. Kindt | Vice President & Chief Accounting Officer |
| Michael Manion | Secretary |
| A. M. Harpell | Assistant Secretary |
| Alan D. Dietrich | Assistant Secretary |
| Michael J. Young | Assistant Secretary |

**Discovery Energy Solutions, Inc.** (Montana)

| | |
|---|---|
| Michael J. Hanson | Vice Chairman & President |
| Eric R. Jacobsen | Director |
| Kipp D. Orme | Director |
| Michael H. Johnson | Director |
| T. L. Loberg | Director |
| David A. Monaghan | Chief Financial Officer |
| Michael J. Young | Assistant Secretary |
| G. A. Hunt | Assistant Secretary |

**One Call Locators, Ltd.** (Montana)

| | |
|---|---|
| Michael J. Hanson | Chairman |
| Ernest J. Kindt | Vice Chairman & Treasurer |
| Eric R. Jacobsen | Director |
| Kipp D. Orme | Director |
| Michael J. O'Neill | Director |
| Michael H. Johnson | Director & CEO |
| S. T. Smith | President |
| David A. Monaghan | Chief Financial Officer |
| Marlys A. Gillen | Secretary |
| J. E. Mintyala | Assistant Secretary |
| Michael J. Young | Assistant Secretary |

**Montana Power Services Company** (Montana)

| | |
|---|---|
| Michael J. Hanson | Chairman of the Board & President |
| Eric R. Jacobsen | Director |
| Kipp D. Orme | Director |
| D. S. Smith | Controller |
| Ernest J. Kindt | Assistant Controller |
| Michael J. Young | Assistant Secretary |

**Colstrip Community Services Company** (Montana)

| | |
|---|---|
| Michael J. Hanson | Chairman of the Board, President & Chief Executive Officer |

A621

B-230110

| David A. Monaghan | Chief Financial Officer |
| D. S. Smith | Controller |
| Michael J. Young | Assistant Secretary |

## Canadian-Montana Pipe Line Company (Canadian Federal)

| Michael J. Hanson | Chairman of the Board |
| Eric R. Jacobsen | Director |
| Kipp D. Orme | Director |
| G. W. Govier | Director |
| D. W. Minion | Director |
| W. Mirosh | Director |
| J. Y. Park | Director & Secretary |
| William A. Pascoe | Vice President – Gas Operations |
| D. S. Smith | Controller |
| Ernest J. Kindt | Assistant Controller |

**A622**

B-230111

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                    )    Chapter 11
                                          )
NORTHWESTERN CORPORATION,                 )    Case No. 03-12872 (CGC)
                                          )
            Debtor.                       )    **Related Docket No.: 1751**
                                          )
_____ )

### MAGTEN ASSETS MANAGEMENT'S REQUEST FOR HEARING ON MOTION FOR RECONSIDERATION OF THE COURT'S ORDER DENYING MAGTEN ASSET MANAGEMENT CORPORATION'S MOTION TO DISQUALIFY PAUL HASTINGS JANOFSKY & WALKER LLP

Magten Asset Management Corporation ("Magten") has filed herewith a motion

pursuant to Federal Rule of Bankruptcy Procedure 9023 seeking reconsideration and/or

amendment or alteration of the Court's Order denying Magten's Motion to Disqualify

Paul Hastings Janofsky & Walker LLP ("Paul Hastings") entered July 23, 2004 [dkt.

1751]. As explained more fully in the attached motion, Magten just learned last week

that certain of the facts relied upon by the Court in the July 23, 2004 order, were incorrect

due to yet further misrepresentations. The next omnibus hearing date in this matter is

September 15, 2004. Magten suggests that these issues should be addressed by the Court

before that date. Accordingly, Magten requests a hearing on this motion at the Court's

earliest opportunity to address the concerns raised by this new information.

August 2, 2004                        SMITH KATZENSTEIN & FURLOW LLP

                                      /s/ Kathleen M. Miller
                                      _____
                                      Kathleen M. Miller (ID No. 2898)
                                      The Corporate Plaza
                                      800 Delaware Avenue, 7th Floor
                                      P.O. Box 410
                                      Wilmington, DE 19899 (Courier 19801)
                                      Telephone: 302-652-8400
                                      Facsimile: 302-652-8405
                                      Email: Kmiller@skfdelaware.com

{KMM4669.DOC}                    **A623**

Bijan Amini (NY Bar. No. 3533)
STORCH AMINI & MUNVES PC
2 Grand Central Tower
New York, New York 10017
(212) 490-4100

Counsel to Magten Asset
Management Corporation

**A624**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NORTHWESTERN CORPORATION, | ) | Case No. 03-12872 (CGC) |
| | ) | |
| Debtor. | ) | |
| | ) | |

## ORDER SETTING MAGTEN ASSET MANAGEMENT CORPORATION'S MOTION FOR RECONSIDERATION OF THE COURT'S ORDER DENYING MOTION TO DISQUALIFY PAUL HASTINGS JANOFSKY & WALKER LLP FOR HEARING

Having considered Magten Asset Management Corporation's ("Magten") request for a hearing on its Motion for Reconsideration of an Order denying Magten's Motion to Disqualify Paul Hastings Janofsky & Walker LLP ("Paul Hastings") entered July 23, 2004 [dkt. 1751],

The request for hearing is HEREBY GRANTED;

A hearing on the Motion for Reconsideration shall be held on _____, 2004 at _____.

Dated:_____        _____
                                            Charles G. Case

**A625**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | Case No. 03-12872 (CGC) |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |

## MEMORANDUM OF LAW IN OPPOSITION TO MAGTEN ASSET MANAGEMENT CORPORATION'S MOTION FOR RECONSIDERATION OF ORDER DENYING MOTION TO DISQUALIFY PAUL, HASTINGS, JANOFSKY & WALKER LLP

Paul, Hastings, Janofsky & Walker LLP ("Paul Hastings"), by its undersigned counsel, hereby submits this memorandum of law in opposition to Magten Asset Management Corporation's ("Magten's") motion for reconsideration of this Court's July 23, 2004 order denying Magten's motion to disqualify Paul Hastings from acting as counsel to NorthWestern Corporation, the debtor-in-possession ("NorthWestern" or "Debtor").

### PRELIMINARY STATEMENT

This Court has held that Magten was not a creditor of Clark Fork and Black Foot LLC ("Clark Fork"), and thus cannot assert that Paul Hastings should be disqualified from representing NorthWestern in this proceeding on the grounds that Paul Hastings had previously represented Clark Fork.

Despite this fact, Magten has seized upon an unrelated factual error in Mr. Austin's affidavit in an effort to relitigate all of the issues related to the denial of

its motion to disqualify Paul Hastings. The motion for reconsideration should be denied for two independent reasons.

First, the factual error at issue – a mistaken reference to Clark Fork's board of directors – does not change the fundamental fact that Clark Fork has not objected to Paul Hastings' representation of NorthWestern in this proceeding. Moreover, the factual error was wholly inadvertent and was subsequently corrected by the affiant, Jesse Austin, during a deposition in this proceeding.

Second, the inadvertent factual error does not have any impact on several other grounds upon which the Court denied Magten's motion to disqualify. These grounds include the Court's holdings that Magten was never a creditor of Clark Fork; that there is no proof of actual injury; and that Paul Hastings does not hold an interest adverse to NorthWestern or any class of NorthWestern's creditors.

In sum, despite the inadvertent factual error, Magten's disqualification motion is still based on "a novel theory that does not withstand scrutiny" (July 23, 2004 Memorandum Decision ("Mem. Dec.") at 7), and therefore the motion for reconsideration should be denied.

## STATEMENT OF FACTS

Magten was never a creditor of Clark Fork and purchased the subordinated debentures at issue after the "going flat" transaction had already been completed. (Id. at 3.) Nevertheless, on June 18, 2004, it filed a motion to disqualify Paul Hastings from representing NorthWestern in this proceeding on the grounds that: (1) Paul Hastings did not disclose the fact that it had represented Clark Fork in the

2

"going flat" transaction; and (2) Paul Hastings' representation of the Debtor and Clark Fork in that transaction created a conflict of interest.

On July 23, 2004, the Court issued a Memorandum Decision denying the motion. The Court held that full disclosure of all of Paul Hastings' connections to the Debtor now had been made, and that, "this is not a case where full disclosure [earlier in the proceeding] would have revealed an actual conflict." (Id. at 6.)

The Court then proceeded to hold that no conflict existed for several independent reasons. These reasons included the fact that "neither the Debtor nor Clark Fork, the two parties directly involved, have complained." (Id. at 7.) They also included the Court's holding that "even if third party creditors were injured by the transaction, Magten was not one of them." (Id.) In addition, the Court held that "there is no present proof of injury in any event; . . . Thus, there is no basis for asserting actual injury that may create an actual conflict." (Id.) Finally, the Court held that "even if actual injury were eventually proven, the fact that Paul Hastings represented the injured party, Clark Fork, would not necessarily mean that it holds an interest adverse to this estate or any class of its creditors." (Id.)

The Court's decision also indicated that "the transaction was approved by the boards of directors of each company." (Id.) This statement was based on paragraph 11 of the July 7, 2004 affidavit submitted by Jesse H. Austin, III, Esq. This statement was partially incorrect since Clark Fork, as a limited liability company, did not have a board of directors. (See Affidavit of Jesse H. Austin, III in Opposition to Magten Asset Management's Motion for Reconsideration of

3

**A628**

Order Denying Motion to Disqualify Paul, Hastings, Janofsky & Walker LLP, dated August 10, 2004, at ¶ 5.) Instead, in accordance with Montana law, it was managed by its sole member and manager, NorthWestern. (Id.)

This factual error in Mr. Austin's affidavit was inadvertent. (Id. at ¶ 8.) During the July 30, 2004 deposition of a witness in this proceeding, Mr. Austin corrected this error on the record by noting that he did not think that Clark Fork, as a limited liability company, had a board of directors. (Id. at ¶ 7.) Mr. Austin has also corrected this error by submitting the above referenced affidavit dated August 10, 2004 in opposition to this motion.

## ARGUMENT

It is well established in this District that, "[a]s a general rule, motions for reconsideration should be granted only 'sparingly.'" ISCO Int'l, Inc. v. Conductus, Inc., No. Civ. A. 01-487-GMS, 2003 WL 881005, *1 (D. Del. March 6, 2003) (quoting Karr v. Castle, 768 F. Supp. 1087, 1090 (D. Del. 1991)). It is also well established that "motions for reconsideration 'should not be used to rehash arguments already briefed.'" Id. (quoting TI Group Automotive Systems (North America), Inc. v. VDO North America L.L.C., 2002 WL 87472 (D. Del. 2002)); see also Hudson United Bank v. Berwyn Holdings, Inc., Nos. Civ. A. 00-4168, Civ. A. 00-4169, 2000 WL 1595961, *1 (E.D. Pa. Oct. 25, 2000).

Accordingly, the party seeking reconsideration must establish that (1) there has been an intervening change in the law; (2) there is newly discovered evidence; or (3) there is a need to correct a legal or factual error to prevent manifest injustice. See Callaway Golf Co. v. Dunlap Slazenger Group Americas,

4

**A629**

Inc., No. Civ. A. 01-669, 2004 WL 1588127, *1 (D. Del. July 12, 2004). However, even if the party seeking reconsideration can show there was a factual error, "there is no need to grant a motion for reconsideration if [the error] would not alter the court's initial decision." ISCO Int'l, Inc., 2003 WL 881005, at *1 (citing Pirelli Cable Corp. v. Ciena Corp., 988 F. Supp. 424, 455 (D. Del. 1998)). "In other words, if the error of fact has no effect on the Court's decision, reconsideration is inappropriate." Hudson United Bank, 2000 WL 1595961, at *1.

### POINT I

#### The Motion Should Be Denied Because the Error Does Not Change the Fact that Clark Fork Has Not Objected to Paul Hastings' Representation of NorthWestern in this Proceeding

Despite the factual error contained in Mr. Austin's July 7, 2004 affidavit, it remains true that "neither the Debtor nor Clark Fork, the two parties directly involved, have complained" about the fact that Paul Hastings represented both entities in the transaction. (Mem. Dec. at 7.) Furthermore, Clark Fork was and still is a wholly owned subsidiary of NorthWestern, and has not filed for bankruptcy.

This is significant because, as this Court has already recognized, Magten, as a third party, does not have the legal ability to assert a conflict on behalf of Clark Fork, when Clark Fork itself has not objected to Paul Hastings' representation of NorthWestern in this proceeding. (Mem. Dec. at 6-7.) The fact that Clark Fork is wholly owned and managed by NorthWestern does not change this result. To the contrary, it only serves to reinforce the point that the interests

5

**A630**

and governance of NorthWestern and its wholly owned subsidiary were, and are, aligned with one another, and there was nothing unusual, much less improper, about the fact that they were both represented by the same law firm in the "going flat" transaction.

Similarly, the inadvertent error in Mr. Austin's July 7, 2004 affidavit does not impact this Court's holding regarding the disclosure issue because, regardless of the error, this is still "not a case where full disclosure [earlier in the proceeding] would have revealed an actual conflict." (Mem. Dec. at 6.)

## POINT II

### The Error Does Not Have Any Impact on the Several Other Reasons that The Court Denied the Motion to Disqualify

The motion for reconsideration should also be denied because the inadvertent factual error in Mr. Austin's July 7, 2004 affidavit does not have any impact on several other grounds upon which the motion to disqualify was denied.

In particular, the inadvertent factual error does not have any impact on this Court's holding that "Magten was not a creditor of Clark Fork at the time the transaction took place" (Mem. Dec. at 6), and thus, "even if third party creditors were injured by the transaction, Magten was not one of them." (Id. at 7.) The inadvertent factual error also does not have any impact on the Court's holding that "there is no present proof of injury," and therefore, "there is no basis for asserting actual injury that may create an actual conflict." (Id.)

Finally, the inadvertent factual error does not have any impact on the Court's holding that, "even if actual injury were eventually proven, the fact that Paul Hastings represented the injured party, Clark Fork, [in the going flat

transaction] would not necessarily mean that [Paul Hastings] holds an interest adverse to <u>this</u> estate or any class of <u>its</u> creditors." (<u>Id.</u> (emphasis added).) Rather, as this Court recognized, Magten's legal argument ultimately must fail because it is seeking to assert a conflict – not on behalf of NorthWestern or any class of NorthWestern's creditors – but "in its non-existent capacity as a creditor of Clark Fork." (Mem. Dec. at 7-8.)

Since none of these three independent grounds for denying Magten's motion to disqualify Paul Hastings would have been impacted in any way by the factual error discussed in Magten's motion for reconsideration, the motion should be denied because the factual error would not have changed the outcome of the Court's decision. <u>See</u> <u>ISCO Int'l, Inc.</u>, 2003 WL 881005, at *1; <u>Hudson United Bank</u>, 2000 WL 1595961, at *1.

**A632**

CONCLUSION

For the reasons set forth above, Paul Hastings respectfully requests that the Court deny Magten's motion for reconsideration of the order denying the motion to disqualify Paul Hastings from employment as counsel to the Debtor.

Dated: August 10, 2004

Respectfully submitted,

/s/ David L. Finger
David L. Finger (DE Bar ID #2556)
Charles Slanina (DE Bar ID #2011)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155
(302) 884-6766

Dennis E. Glazer, Esq.
D. Scott Tucker, Esq.
Catherine Lifeso, Esq.
DAVIS POLK & WARDWELL
450 Lexington Avenue
New York, New York 10017
(212) 450-4000

Counsel to Paul, Hastings, Janofsky
& Walker LLP

**A633**

## CERTIFICATE OF SERVICE

I, David L. Finger, hereby certify that on this 10th day of August, 2004, I

caused a copy of the foregoing document to be served via first class mail, postage

prepaid, on the below-listed counsel of record, except to the extent that service

was effectuated via CM/ECF:

Scott D. Cousins, Esq.
William Leigh Loftin, Esq.
William E. Chipman, Jr., Esq.
Greenberg Traurig, LLP
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801

Neil B. Glassman, Esq.
Charlene D. Davis, Esq.
Eric M. Sutty, Esq.
The Bayard Firm
P.O. Box 25130
Wilmington, DE 19899-5130

Bijon Amini, Esq.
Storch Amini & Munves PC
2 Grand Central Tower
New York, NYU 10017

Alan W. Kornberg, Esq.
Margaret A. Phillips, Esq.
Ephraim I. Diamond, Esq.
Paul Weiss Rifkind Wharton &
Garrison
1285 Avenue of the America
New York, NU 10019

Kathleen M. Miller, Esq.
Smith Katzenstein & Furlow LLP
P.O. Box 410
Wilmington, DE 19899

 /s/ David L. Finger
David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801-1155
(302) 884-6766

**A634**

9

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| NORTHWESTERN CORPORATION, | : Case No. 03-12872 (CGC) |
| | : |
| Debtor. | : |
| | : |

**AFFIDAVIT OF JESSE H. AUSTIN, III IN OPPOSITION TO MAGTEN ASSET
MANAGEMENT'S MOTION FOR RECONSIDERATION OF ORDER DENYING
MOTION TO DISQUALIFY PAUL, HASTINGS, JANOFSKY & WALKER LLP**

I, Jesse H. Austin, III, being duly sworn, hereby depose and say as follows:

1.    I am a member of the firm of Paul, Hastings, Janofsky & Walker LLP
("Paul Hastings" or the "Firm"), which maintains offices for the practice of law at 600
Peachtree Street, Atlanta, Georgia 30308.  I am admitted to the practice of law in
Georgia, the United States District Courts for the Northern and Southern Districts of
Georgia, and the Eleventh Circuit United States Court of Appeals.  Unless otherwise
stated in this affidavit, I have personal knowledge of the facts set forth herein.  If called
to testify, I could and would, based on the forgoing, testify competently to the facts set
forth herein.

2.    On July 7, 2004, I signed and filed the Affidavit of Jesse H. Austin, III in
Connection with Paul, Hastings, Janofsky & Walker, LLP's Employment as Attorneys
for Debtor and Debtor-in-Possession (the "July 7, 2004 Affidavit") in opposition to
Magten Asset Management Corporation's ("Magten's") Motion to Disqualify Paul

**A635**

Hastings from representing the Debtor and Debtor-in-Possession (the "Debtor" or "NorthWestern") in this proceeding (the "Disqualification Motion").

3.    I submit this Affidavit to supplement my July 7, 2004 Affidavit in support of the Debtor's and Paul Hastings' opposition to the Disqualification Motion and to correct an inadvertent error contained in that affidavit.

4.    In paragraph 11 of my July 7, 2004 Affidavit, I stated that:

> "Thereafter [following the acquisition by NorthWestern of NorthWestern Energy LLC], and with the full consent and knowledge of the Debtor, as sole owner of the limited liability interests in NorthWestern Energy, the Debtor's Board of Directors and NorthWestern Energy's Board of Directors, Paul Hastings represented both the Debtor and NorthWestern Energy with respect to (a) regulatory matters before the Federal Energy Regulatory Commission, (b) certain filings which had to be made with the Securities Exchange Commission concerning exemptions from The Public Utility Holding Company Act of 1935 ("PUHCA"), in coordination with PUHCA counsel, Baker & Botts L.L.P., and (c) the transfer from NorthWestern Energy to the Debtor of the transmission and distribution utility assets previously owned by Montana Power and the assumption of related debt obligations (sometimes referred to as the "going flat" transaction)."

5.    This statement in paragraph 11 was partially inaccurate because NorthWestern Energy LLC, which is a limited liability company organized under Montana law, does not have a Board of Directors. Rather, as provided in the Montana Limited Liability Company Act, Mont. Code Ann. §§ 35-8-101 to 35-8-307, NorthWestern Energy LLC (which is now known as Clark Fork and Black Foot LLC) was, and still is, governed by its sole member and manager, NorthWestern. See Mont. Code Ann. § 35-8-307. Except for the reference to NorthWestern Energy's Board of Directors, the remainder of paragraph 11 and the rest of my July 7, 2004 affidavit is accurate.

2

**A636**

6.    Under Montana law, NorthWestern, as the sole member and manager, had the legal authority to direct and manage the affairs of its wholly owned subsidiary NorthWestern Energy LLC. NorthWestern, in its capacity as the sole member and manager of NorthWestern Energy LLC, approved the "going flat" transaction and also approved Paul Hastings' representation of both NorthWestern and NorthWestern Energy LLC in that transaction.

7.    On July 30th, 2004, I represented William Austin, the chief restructuring officer of NorthWestern, during a deposition conducted in this matter. During the course of that deposition, the witness was questioned about a document indicating that NorthWestern Energy LLC was managed by its sole member and manager, NorthWestern, as opposed to a board of directors. During this portion of the deposition I stated that "I note for the record NorthWestern Energy's an LLC, so I don't think that LLCs have necessarily directors."

8.    The above referenced error in my July 7, 2004 Affidavit was inadvertent. I have subsequently confirmed that NorthWestern Energy LLC was governed by its sole member and manager, NorthWestern, as provided by Montana law, and did not have a Board of Directors because it was a limited liability company. I apologize to the Court for any inconvenience caused by my inadvertent error.

[signatures on next page]

**A637**

Executed this 10th day of August 2004.

Jesse H. Austin, III
Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street
Atlanta, Georgia 30308
Telephone: (404) 815-2400
Facsimile: (404) 815-2424

Subscribed and sworn to before me
this 10th day of August 2004.

Notary Public
My Commission Expires:

Notary Public, Rockdale County, Georgia
My Commission Expires October 4, 2004

**A638**



Not Reported in F.Supp.2d
2003 WL 881005 (D.Del.)
**(Cite as: 2003 WL 881005 (D.Del.))**

Page 1

**H**
Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.

ISCO INTERNATIONAL, INC., Plaintiff
v.
CONDUCTUS, INC., and Superconductor
Technologies, Inc., Defendants.

**No. Civ.A. 01-487-GMS.**

March 6, 2003.

*MEMORANDUM AND ORDER*

SLEET, J.

I. INTRODUCTION

*1 The plaintiff, ISCO International, Inc. ("ISCO"), filed the above-captioned suit against Conductus, Inc. ("Conductus") and Superconductor Technologies, Inc. ("STI") (collectively "the defendants") on July 17, 2001, alleging patent infringement. The parties each filed numerous motions for summary judgment. These included the defendant Conductus' Motion for Summary Judgment of Invalidity of All Asserted Claims for Causes of Action Existing Prior to the Date of Issuance of a Certificate of Correction and of Invalidity of Claim 13 (D.I.205). The court denied that motion by an order entered on February 10, 2003 (D.I.370). The court found, *inter alia,* that the inclusion of the word "planar" in Claim 10 of the patent-in-suit was the result of a clear typographical error, and therefore shall be disregarded. Presently before the court is the defendants' motion for reargument and/or reconsideration of that aspect of the February 10, 2003 order (D.I.375). For the

reasons that follow, the court will deny the motion.

II. STANDARD OF REVIEW

As a general rule, motions for reconsideration should be granted only "sparingly." *Karr v. Castle,* 768 F.Supp. 1087, 1090 (D.Del.1991). In this district, these types of motions are granted only if it appears that the court has patently misunderstood a party, has a made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension. *See, e.g., Shering Corp. v. Amgen, Inc.,* 25 F.Supp.2d 293, 295 (D.Del.1998); *Brambles USA, Inc. v. Blocker,* 735 F.Supp. 1239, 1240 (D.Del.1990) (citing *Above the Belt, Inc. v. Mel Bonhannan Roofing, Inc.,* 99 F.R.D. 101 (E.D.Va.1983)); *see also Karr,* 768 F.Supp. at 1090 (citing same). Moreover, even if the court has committed one of these errors, there is no need to grant a motion for reconsideration if it would not alter the court's initial decision. *See Pirelli Cable Corp. v. Ciena Corp.,* 988 F.Supp. 424, 455 (D.Del.1998). Finally, motions for reconsideration "should not be used to rehash arguments already briefed." *TI Group Automotive Systems, (North America), Inc. v. VDO North America L.L.C.,* 2002 WL 87472 (D.Del.2002) (citation omitted); *see also Quaker Alloy Casting v. Gulfco Industries, Inc.,* 123 F.R.D. 282, 288 (N.D.Ill.1988) ("[T]his Court's opinions are not intended as mere first drafts, subject to revision and reconsideration at a litigant's pleasure.").

III. DISCUSSION

The defendants argue that reargument or reconsideration is necessary for several reasons. First, they contend that, contrary to the court's suggestion, the plaintiff does not agree that the term "planar amplifiers" has no meaning to someone skilled in the relevant art. Second, the defendants argue that the error at issue is not "minor," as the court concluded. Third, the movants urge that even if the typographical error is apparent from the patent's file history, that fact does not support a decision by the court to disregard the error. Finally,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**A639**

Not Reported in F.Supp.2d
2003 WL 881005 (D.Del.)
(Cite as: 2003 WL 881005 (D.Del.))

Page 2

the defendants argue that Federal Circuit precedent does not suggest that courts may disregard typographical errors in contexts analogous to the present one. The court will address each of these arguments in turn.

A. ISCO's Position Regarding the Term "Planar Amplifiers"

*2 In its February 10, 2003 order, the court noted that the parties agree "that the term 'planar amplifiers' is senseless to any person skilled in the relevant art" and cited briefing by ISCO and Conductus for support. *ISCO International, Inc. v. Conductus, Inc.*, 2003 WL 276250, at *4 (D.Del.2003). The defendants now object that ISCO does not, in fact, agree that the term "planar amplifiers" has no meaning to someone skilled in the art. The movants cite passages of ISCO's supplemental briefing for support. ISCO, however, reiterates that "the evidence shows that the parties agree that the insertion of the word 'planar' was a clear error which anyone skilled in the art would recognize as such." Pl.'s Answer in Opposition to Def.'s Motion at 3.

The court is of the opinion that the plaintiff consistently has maintained that the phrase "planar amplifiers" is a typographical error obvious to anyone skilled in the art. The fact that ISCO argued otherwise in a supplemental briefing in response to the court's initial claim construction does not alter the parties' otherwise unceasing insistence that the typographical error is a clear mistake and/or that it renders claim 10 senseless to those skilled in the art. Advocates, of course, are permitted to assert inconsistent positions. *See, e.g.,* Fed. R. Civ. P. 8 ("A party may also state as many separate claims or defenses as the party has regardless of consistency...."). Furthermore, as the court's February 10, 2003 order was not grounded in the parties' constructions of the claim, this objection by the defendants is largely irrelevant. Even if ISCO had argued otherwise, the court would have disregarded the error at issue.

B. Nature of the Error

The court distinguished the error at issue in this case--the inadvertent inclusion of a single word--from cases in which, for example, an entire

appendix was mistakenly omitted from a patent application. *See ISCO International, Inc.*, 2003 WL 276250, at *4 n. 4. The defendants object that the *nature* of the error at issue renders it significant, because disregarding the typographical error "would substantially broaden claim 10." Def.'s Opening Brief at 3.

The court is mindful of the significance of the error at issue and the consequences of disregarding it. The court disagrees, however, that disregarding an obvious typographical error would broaden the claim. Disregarding the printing mistake does not change the meaning or scope of the claim at all, but merely recognizes the meaning and scope of the claim as any skilled person in the relevant art would perceive them.

In addition, the court noted in its order that the nature of the correction at issue comported with the policy considerations at issue in Federal Circuit precedent holding that a Certificate of Correction has prospective effect only. The court wrote that its conclusion

does not offend the policy considerations underlying *Southwest* and its progeny, *i.e.,* to allow "reasonable competitors" to "conduct[ ] their affairs" according to a reasonable understanding of the claim terms. Here, the evidence shows that the parties agree that the insertion of the word "planar" was a clear error which anyone skilled in the art would recognize as such, especially because the phrase "planar amplifiers" occurs nowhere else in the patent claims. Thus, a reasonable competitor would know that a mere typographical error had occurred, and would conduct its affairs accordingly. It would be illogical for *reasonable* competitors to rely upon an inadvertent error such as the one at issue here as the sole basis for avoiding a patent infringement lawsuit or a finding of infringement as to that claim.

*3 *ISCO International, Inc.*, 2003 WL 276250, at *5 n. 4 (citing *Southwest Software, Inc. v. Harlequin, Inc.,* 226 F.3d 1280 (Fed.Cir.2000)) (holding that Certificate of Corrections issued pursuant to 35 U.S.C. § 254 have prospective effect only). Thus, the court considered the nature of the error at issue in its original order.

Moreover, the court notes that the significance of

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**A640**

Not Reported in F.Supp.2d
2003 WL 881005 (D.Del.)
**(Cite as: 2003 WL 881005 (D.Del.))**

Page 3

the correction is grounded, too, in the fact that it removes an invalidity challenge from the defendants' arsenal. By disregarding the typographical error, the court renders moot the defendants' assertion that the phrase "planar amplifiers" causes claim 10 to be indefinite. This consequence of the court's ruling, although significant and distasteful to the defendants, does not constitute appropriate grounds for reconsideration of the order.

C. Relevance of the File History

The defendants argue that the determination "as to whether the error is readily apparent must be made with reference only to the patent itself, and not to the prosecution history." Def.'s Opening Brief at 3. Relevant precedent holds otherwise, however. For example, in *Superior Fireplace Co. v. Majestic Prods. Co.,* the court held that "a broadening correction of a clerical or typographical error [is] allowed only where it is clearly evident from the specification, drawings, and prosecution history how the error should appropriately be corrected." [FN1] *Superior Fireplace,* 270 F.3d 1358, 1373 (Fed.Cir.2001). Similarly, in *EMI Group North America, Inc. v. Cypress Semiconductor Corp.,* the court "agree[d] that the claims should be corrected as advocated by EMI" because the "printing error[s] are apparent from the file history." *EMI Group,* 68 F.Supp.2d 421, 438 (D.Del.1999), *aff'd in relevant part,* 268 F.3d 1342 (Fed.Cir.2001). Both of these appeals are post-*Southwest.* Thus, it seems reasonable that the Federal Circuit intended that obvious typographical errors, when apparent from the patent and its file history, may be disregarded or corrected by courts, just as they would be disregarded or corrected by those skilled in the relevant art. As stated in the court's February 10, 2003 order, this approach does not offend the policy considerations which motivated the decision in *Southwest.*

> FN1. The court recognizes that the error at issue in *Superior Fireplace* was corrected by 35 U.S.C. § 255, "Certificate of correction of applicant mistake," whereas in the present case the relevant statute is 35 U.S.C. § 254, "Certificate of correction of Patent and Trademark Office mistake." To

the extent the statutes are analogous, the court believes *Superior Fireplace* is relevant and instructive. In addition, the distinction would tend to support the court's holding, in that it would be illogical for the standard for correcting a mistake of the PTO to be more strict than the standard for correcting an error of the patent applicant himself.

Furthermore, the court relied upon other evidence for its conclusion that the mistake was obvious. For example, it noted that "the term 'amplifier' is introduced in claim 10 without the preceding modifier 'planar' " and that "Claim 10 reads, in relevant part, 'a plurality of amplifiers,' and, later, 'the plurality of planar amplifiers.' " *ISCO International, Inc.,* 2003 WL 276250, at *4, *4 n. 2. The defendants' own argument that the court should look only to the patent in determining whether an error is readily apparent, then, supports the court's conclusion.

The defendants further argue that "even if an error was readily apparent from the patent itself, it is not determinative." Def.'s Opening Brief at 3 n. 4. The movants cite *Southwest* for support, arguing that in that case "the error was readily apparent from the patent, which, in its original form, made reference to, but did not include, the appendix." *Id.* In this aspect, however, *Southwest* is utterly distinguishable from the present case. Although the absence of the appendix may have been apparent from the patent, the correction was not. The appendix constituted 330 pages which contained source code necessary to enable certain calibrations according to the invention. *Southwest,* 226 F.3d at 1291, 1296. Obviously, the patent did not render obvious the contents of the missing 330 pages of source code. Thus, the court, nor the public, nor those skilled in the art, could know how to correct the mistake until the Certificate of Correction issued and the appendix itself was added to the patent. By contrast, in the present case, and in all of the cases which the court has reviewed in which courts have disregarded obvious typographical errors, the mistake as well as the intended meaning were both apparent. In the instant case, it is clear that the word "planar" was inadvertently added before "amplifiers" and that the claim should read simply

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**A641**

Not Reported in F.Supp.2d
2003 WL 881005 (D.Del.)
**(Cite as: 2003 WL 881005 (D.Del.))**

"amplifiers." Thus, the defendants' attempted reliance upon *Southwest* in this context fails to support their appeal for reconsideration.

D. Relevant Federal Circuit Precedent

*4 Finally, the movants argue that "Federal Circuit has not established a rule for disregarding typographical errors." Def.'s Opening Brief at 4. This argument was asserted by the defendants and considered by the court in the course of the disposition of the original summary judgment motion. The court recognizes that, since *Southwest,* there has not been a direct confrontation of the exact question raised in the present case, that is to say, the court's ability to disregard an obvious typographical error, notwithstanding a Certificate of Correction that issued after the lawsuit was initiated. These considerations, however, were addressed in the court's February 10, 2003 order. Thus, the defendants have not shown by this argument that reconsideration is warranted.

IV. CONCLUSION

The defendants fail to raise any significant or relevant argument that was not briefed by the parties and considered by the court in connection with the original motion for summary judgment. The movants have not shown that the court patently misunderstood a party, made a decision outside the adversarial issues presented by the parties, or made an error not of reasoning, but of apprehension. Therefore,

IT IS HEREBY ORDERED that:
1. The defendants' Motion for Reargument and/or Reconsideration (D.I.376) is DENIED.

2003 WL 881005 (D.Del.)

Motions, Pleadings and Filings (Back to top)

• 1:01CV00487  Docket)
                    (Jul. 17, 2001)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**A642**

Westlaw.

Not Reported in F.Supp.2d                                         Page 1
2002 WL 87472 (D.Del.)
**(Cite as: 2002 WL 87472 (D.Del.))**

**H**
Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.

TI GROUP AUTOMOTIVE SYSTEMS, (NORTH
AMERICA), INC. Plaintiff,
v.
VDO NORTH AMERICA L.L.C. Defendant.

**No. C.A. 00-432-GMS.**

Jan. 22, 2002.

*MEMORANDUM AND ORDER*

SLEET, J.

I. INTRODUCTION

**\*1** On December 3, 2001, the court issued a
*Markman* order construing the disputed claim terms
in the above-captioned case. The plaintiff, TI Group
Automotive Systems, (North America), Inc. ("TI"),
filed a motion for reconsideration on December 17,
2001. The court will now deny TI's motion because
it has failed to demonstrate that the court erred in
reaching its decision.

II. DISCUSSION

As a general rule, motions for reconsideration
should be granted only "sparingly." *See Karr v.
Castle,* 768 F.Supp. 1087, 1090 (D.Del.1991). In
this district, motions for reconsideration are only
granted if it appears that the court has patently
misunderstood a party, has made a decision outside
the adversarial issues presented by the parties, or
has made an error not of reasoning, but of
apprehension. *See e.g., Shering Corp. v. Amgen,
Inc.,* 25 F.Supp.2d 293, 295 (D.Del.1998);

*Brambles USA, Inc. v. Blocker,* 735 F.Supp. 1239,
1240 (D.Del.1990). Moreover, even if the court had
committed one of these errors, there is no need to
grant a motion for reconsideration if it would not
alter the court's initial decision. *See Pirelli Cable
Corp. v. Ciena Corp.,* 988 F.Supp. 424, 445
(D.Del.1998).

Furthermore, motions for reconsideration "should
not be used to rehash arguments already briefed."
*See Dentsply Int'l. v. Kerr Mfg. Co.,* 42 F.Supp.2d
385, 419 (D.Del.1999). A guiding principle in
applying the limitations on reargument under Local
Rule 7.1.5 is that a motion for reargument will only
be allowed when it is patently clear the judge has
committed error. Any lesser constraint would only
serve to encourage "a never ending polemic
between litigants and the court." *See Shering Corp.*
25 F.Supp.2d at 295. Thus, "[i]t follows that a
motion for reargument should be denied where the
proponent simply rehashes material and theories
already briefed, argued and decided." *Id.*

A. Claim 2: "Means For Routing"

TI proffers three reasons why it believes
reconsideration is necessary with respect to the
"means for routing" claim limitation: (1) the
claimed function in the "means for routing" clause
was not recited verbatim in the court's claim
construction order; (2) the court's order ignores the
embodiment shown in Figure 1; and (3) the order
improperly identified structures unnecessary to
perform the claimed function.

Insofar as TI requests that the court modify its
order to recite the verbatim function described in
the claim, the court will do so. Accordingly,
Paragraph 6 of the December 3, 2001 order will be
amended to read as follows:
  6. Claim 2: "means for routing a first portion of
  the output of the high pressure fuel to the supply
  port and a second portion of the output of high
  pressure fuel to the pumping means ..."
This language is construed pursuant to 35 U.S.C.
§ 112 ¶ 6. The function is to "route a first

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A643

Not Reported in F.Supp.2d
2002 WL 87472 (D.Del.)
(Cite as: 2002 WL 87472 (D.Del.))

Page 2

portion of the output of high pressure fuel to the supply port and a second portion of the output of high pressure fuel to the pumping means." The structure corresponding to the "means for routing" to perform the function encompasses main housing 140, check valve 38, supply nozzle 134 and the associated structure leading to jet pump 30.

*2 TI's second and third arguments merely reiterate arguments the court has already considered and rejected. Therefore, its motion for reargument of this claim term is denied.

B. Claim 2: "Pumping Means"

TI requests reargument with regard to the "pumping means" construction on four grounds: (1) the court's claim construction did not take into account the structure shown in Figure 1; (2) connecting tube 164 is not part of the pumping means; (3) the court's construction improperly includes structures not necessary to perform the recited function; and (4) "pumping means" is not a means-plus-function claim limitation.

None of TI's arguments demonstrate that the court patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension. *See Shering Corp.,* 25 F.Supp.2d at 295. Instead, TI seeks to reargue points the court has already considered and rejected. Accordingly, TI's motion for reconsideration of the court's "pumping means" construction is denied.

C. Claim 2: "Fuel Reservoir"

TI takes exception with the court's construction of the term "fuel reservoir." Again, TI merely attempts to reargue its original position. Thus, the court finds that this argument is not a proper one on which to base a motion for reargument. TI's motion for reconsideration of the court's "fuel reservoir" construction is denied.

D. Claim 2: "Opening is Located At The Bottom Of The Reservoir"

TI's final argument for reconsideration is that the court's construction of "at the bottom of the

reservoir" is "directly contrary to the only use of this phrase in the '714 patent specification." In support of its argument, TI simply repeats its argument that "at the bottom" should mean "near the bottom." The court rejected that argument in its December 3, 2001 order. Thus, the court will not grant TI's motion for reargument on this ground.

III. CONCLUSION

TI has simply listed a number of reasons of why it disagrees with the court's order. In all of these instances, it has essentially argued that a second look at the facts would convince the court that it has reached the wrong conclusion. However, this is not a proper argument to raise in a motion for reconsideration. Even if it were, the court did not make its decision lightly. It carefully considered the propriety of its ruling before issuing it. While TI may not be pleased with the conclusion which the court reached, its displeasure is not an appropriate ground for reargument.

For these reasons, IT IS HEREBY ORDERED that:
1. The Motion for Reconsideration (D.I.98) filed by the Plaintiff, TI Group Automotive Systems (North America), Inc. is DENIED.
2. The court will issue an Amended Order reflecting the modification to Paragraph 6 of its December 3, 2001 Order (D.I.96).

Motions, Pleadings and Filings (Back to top)

• 1:00CV00432  Docket)

(Apr. 25, 2000)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**A644**



2000 WL 1595961
2000 WL 1595961 (E.D.Pa.)
**(Cite as: 2000 WL 1595961 (E.D.Pa.))**

Page 1

**H**
Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

HUDSON UNITED BANK,
v.
BERWYN HOLDINGS, INC.
HUDSON UNITED BANK,
v.
Harold HENDRICKSON, et al.

**Nos. CIV. A. 00-4168, CIV. A. 00-4169.**

Oct. 25, 2000.

KELLY.

*MEMORANDUM AND ORDER*

**\*1** Before the Court is a Motion for Reconsideration filed by the Plaintiff, Hudson United Bank ("Hudson"). Hudson asks the Court to revisit its September 14, 2000 Order, which compelled the joinder of two separate confessions of judgment pursuant to Federal Rule of Civil Procedure 19. For the following reasons, the motion is denied.

*I. BACKGROUND*

On March 3, 1995, Defendants Harold and Mary Hendrickson ("the Hendricksons") executed a promissory note in the amount of $94,421.39 in favor of Hudson. That promissory note contained a clause that allowed Hudson to seek a confession of judgment if the Hendricksons defaulted on the note. On June 26, 1998, Berwyn Holdings, Inc. ("Berwyn"), in order to induce Hudson to continue dealing with the Hendricksons, guaranteed the full

payment of the note to Hudson. The guaranty and suretyship agreement between Hudson and Berwyn also contained a clause allowing Hudson to seek a confession of judgment if the Hendricksons defaulted.

After the Hendricksons defaulted on the promissory note, Hudson bank sought recourse in federal court. On August 16, 2000, Hudson filed two separate actions, one against the Hendricksons and one against Berwyn. [FN1] Both actions seek a confession of judgment in Hudson's favor in the amount due on the original promissory note, plus accrued interest and fees. By Order of September 14, 2000, this Court ordered the joinder of the two separate actions pursuant to Federal Rule of Civil Procedure 19. On September 25, Hudson filed this Motion for Reconsideration.

FN1. *Hudson United Bank v. Harold Hendrickson, et al.,* Civ. No. 00- 4169 (2000); *Hudson United Bank v. Berwyn Holdings, Inc.,* Civ. No. 00-4168 (2000).

*II. STANDARD OF REVIEW*

Local Civil Rule 7.1(g) of the United States District Court for the Eastern District of Pennsylvania allows parties to file motions for reconsideration. E.D. Pa.R.Civ.P. 7.1(g). These motions should be granted sparingly. A court should only grant such a motion if: (1) there has been an intervening change in controlling law; (2) new evidence has become available; or (3) there is a need to correct a clear error of fact or prevent manifest injustice. *General Instrument Corp. v. Nu-Tek Electronics,* 3 F.Supp.2d 602, 606 (E.D.Pa.1998), *aff'd,* 197 F.3d 83 (3d Cir.1999); *Environ Products, Inc. v. Total Containment, Inc.,* 951 F.Supp. 57, 62 n. 1 (E.D.Pa.1996). Dissatisfaction with the Court's ruling is not a proper basis for reconsideration. *Burger King Corp. v. New England Hood and Duct Cleaning Co.,* 2000 U.S. Dist. LEXIS 1022 (E.D.Pa. Feb. 4, 2000).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**A645**

2000 WL 1595961
2000 WL 1595961 (E.D.Pa.)
(Cite as: 2000 WL 1595961 (E.D.Pa.))

Page 2

### III. DISCUSSION

As there is no new evidence available in this case, and there has been no intervening change in controlling law, the Court can only grant Hudson's Motion for Reconsideration in order to correct a clear error of fact or prevent manifest injustice. Although the Court's September 14, 2000 Order requiring the joinder of Hudson's two separate actions was premised on a minor factual misunderstanding, the Court can only disturb its prior ruling if the newly apparent facts would alter the Court's legal conclusions. In other words, if the error of fact has no effect on the Court's decision, reconsideration is inappropriate. Because joining these actions is proper even under the facts as clarified by Hudson, the Court will not disturb its Order.

First, the Court acknowledges that its September 14, 2000 Order was premised on a mistake of fact. That Order stated that only one instrument of indebtedness existed. Given the pleadings in this case, however, this mistake was not unwarranted; Hudson failed to append the Berwyn guarantee agreement to the Hendrickson Complaint, and appended the Berwyn guarantee to the Berwyn Complaint as Exhibit C while referring to it in the text of that Complaint as Exhibit B. *See* Plf.'s Compl. Against Berwyn Holdings, Inc. at ¶ 7. Accordingly, the Court was only aware of one instrument of indebtedness.

*2 Hudson, in its Motion for Reconsideration, now makes it clear that two instruments of indebtedness existed: the promissory note originally signed by the Hendricksons, and the surety and guarantee agreement signed by Berwyn. Each instrument of indebtedness contained a separate and distinct promise, as well as a clause allowing Hudson to confess judgment in its favor.

Despite the Court's mistaken belief that only one instrument of indebtedness existed, however, joinder of these two claims remains appropriate. Rule 19(a) of the Federal Rules of Civil Procedure reads as follows:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if ... (2) the

person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may ... (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party.

Fed.R.Civ.P. 19(a). The language of Rule 19 is compulsory; the Court must join two actions if a risk of inconsistent obligations exists and joining the new party will not destroy the Court's jurisdiction over the matter.

In the instant case, although there were two separate instruments of indebtedness, there is only one underlying debt. Irrespective of who satisfies the debt, Hudson bank is only owed money by virtue of the original promissory note. The Hendrickson's promised to pay Hudson and Berwyn merely guaranteed that Hudson would be paid that same amount. Allowing Hudson to maintain two separate actions would allow it to conceivably collect twice on the same amount of money owed. [FN2] For example, Hudson could collect the debt from the Hendricksons and then, in a separate action maintained against Berwyn, collect the same amount. Berwyn, not a party to the action against the Hendricksons, would therefore be subject to an inconsistent obligation: paying a debt that has already been satisfied.

> FN2. Moreover, Hudson's counsel could collect attorney's fees twice. Each separate confession of judgment contains language allowing Hudson's counsel to collect an attorney's commission of ten percent of the unpaid principal balance and accrued interest for collection, "but in any event not less than Five Hundred Dollars...." Maintaining two separate confessions of judgment could allow Hudson's counsel to collect this fee twice.

Hudson suggests that the potential for tort liability or legal penalties will adequately prevent it from collecting inconsistent judgments against both Berwyn and the Hendricksons because doing so

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**A646**

2000 WL 1595961
2000 WL 1595961 (E.D.Pa.)
**(Cite as: 2000 WL 1595961 (E.D.Pa.))**

"would, at a minimum, subject Hudson to an action of conversion by the defendants" or "serious penalties and/or legal actions." Plf.'s Mot. for Recons. at 4. [FN3] While that may be, the language of Rule 19 is compulsory, requiring the Court to join parties when appropriate. Moreover, penalties and liability for conversion would occur only after Hudson collected duplicative judgments; they would not prospectively prevent Hudson from doing so. Courts apply Rule 19 in order to obviate the need for such penalties in the first place.

> FN3. Hudson's Motion for Reconsideration lacks page numbers. By the Court's count, Hudson's discussion of the propriety of filing the two actions separately can be found on the third page of its motion.

That Hudson could file these confessions of judgment separately under Pennsylvania law is of no moment. *See id.* at 3. Rule 19 does not require joint filings; rather, it requires the joinder of cases filed separately. Thus, irrespective of whether Hudson could have filed two separate actions against the Hendricksons and Berwyn, Rule 19 nonetheless requires their joinder. Joinder is always proper when there is a risk of inconsistent obligations and doing so does not deprive the court of jurisdiction.

*3 Hudson suggests that the Court's refusal to amend its September 14, 2000 Order will cause manifest injustice because, in a consolidated case, one Defendant's defense could preclude Hudson's collecting against both Defendants. *See id.* at 3-4. Hudson offers no case law in support of this proposition and also acknowledges that, at present, neither Defendant has even entered an appearance in this action. *See id.* at 3. Moreover, any possible prejudice to Hudson resulting from a "scrivener error" contained in Hudson's contracts is solely the fault of Hudson and does not result from the Court's joinder of these actions. *See id.* No manifest injustice will result from joining these two actions.

As joining the two actions brought by Hudson does not destroy the Court's jurisdiction over this matter, [FN4] Rule 19 requires the Court to do so. Although the Court was admittedly mistaken about

the facts in its September 14, 2000 Order, that mistake had no bearing on the Court's decision. Joining the two actions brought by Hudson is required by Rule 19 and would serve the interests of justice and judicial economy. Accordingly, Hudson's Motion for Reconsideration is denied.

> FN4. Hudson is a New Jersey state chartered banking institution and a citizen of the State of New Jersey. The Jefferson Bank division of Hudson maintains its principal place of business in Pennsylvania. The Hendricksons reside in and are citizens of Delaware. Berwyn is a Delaware corporation with its principal place of business in Delaware. As complete diversity exists and the amount in controversy here exceeds $75,000, the Court has jurisdiction pursuant to 28 U.S.C. § 1332(a).

### ORDER

AND NOW, this day of October, 2000, in consideration of the Motion for Reconsideration filed by the Plaintiff, Hudson United Bank (Doc. No. 5), it is ORDERED that the Motion for Reconsideration is DENIED.

2000 WL 1595961 (E.D.Pa.)

Motions, Pleadings and Filings (Back to top)

• 2:00CV04168 (Docket)
(Aug. 16, 2000)

• 2:00CV04169 (Docket)
(Aug. 16, 2000)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**A647**



2004 WL 1588127                                                                                    Page 1
--- F.Supp.2d ---
**(Cite as: 2004 WL 1588127 (D.Del.))**

**H**
Only the Westlaw citation is currently available.


United States District Court,
D. Delaware.

CALLAWAY GOLF COMPANY,
Plaintiff/Defendant-in-Counterclaim,
v.
DUNLOP SLAZENGER GROUP AMERICAS,
INC., d/b/a Maxfli, Defendant/Plaintiff-in-
Counterclaim.

**No. CIV.A.01-669-KAJ.**

July 12, 2004.


**Background:** Golf ball manufacturer sued
competitor for patent infringement. Competitor
moved for reconsideration of orders granting
manufacturer summary judgment on competitor's
counterclaims for trade secret misappropriation,
318 F.Supp.2d 205, and negligent hiring,
conversion and unjust enrichment, 318 F.Supp.2d
216.

**Holding:** The District Court, Jordan, J., held that
manufacturer failed to establish competitor's
misappropriation of secret method for making
polyurethane-covered golf ball.

Motions denied.


**[1] Federal Civil Procedure** ☜928

170Ak928 Most Cited Cases

Motion for reconsideration is granted only if it
appears that court has patently misunderstood party,
has made decision outside adversarial issues
presented by parties, or has made error not of
reasoning, but of apprehension.

**[2] Federal Civil Procedure** ☜928
170Ak928 Most Cited Cases

Court should be particularly vigilant that motion for
reargument or reconsideration is not used as means
to argue new facts or issues that inexcusably were
not presented to court in matter previously decided.

**[3] Federal Civil Procedure** ☜2651.1
170Ak2651.1 Most Cited Cases

District court should grant motion for
reconsideration which alters, amends, or offers
relief from judgment only when: (1) there has been
intervening change in controlling law; (2) there is
newly discovered evidence which was not available
to moving party at time of judgment; or (3) there is
need to correct legal or factual error which has
resulted in manifest injustice.

**[4] Torts** ☜10(5)
379k10(5) Most Cited Cases

Proof that defendant made substantially similar
product is not required to establish prima facie case
of misappropriation of trade secrets under
California law. West's Ann.Cal.Civ.Code § 3426.1
et seq.

**[5] Federal Civil Procedure** ☜2651.1
170Ak2651.1 Most Cited Cases

Trade secret misappropriation claimant was not
entitled to reconsideration of order granting
summary judgment for defendant, which had been
based on court's finding that parties' products were
not substantially similar; basis of defendant's
opposition to summary judgment motion had been
that misappropriation was evidenced by substantial
similarity of products.

**[6] Torts** ☜10(5)
379k10(5) Most Cited Cases

Under California law, evidence that defendant's
product bears substantial identity with trade secret

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works


**A648**

2004 WL 1588127
--- F.Supp.2d ---
**(Cite as: 2004 WL 1588127 (D.Del.))**

Page 2

is just one method of proving trade secret misappropriation, but is not exclusive way of doing so. West's Ann.Cal.Civ.Code § 3426.1(b).

**[7] Federal Civil Procedure ⚖2546**
170Ak2546 Most Cited Cases

Mere scintilla of evidence is insufficient to deny motion for summary judgment. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[8] Torts ⚖10(5)**
379k10(5) Most Cited Cases
or

Under California law, unauthorized use of another's trade secret in course of research and development alone is actionable, even if product produced by defendant contains modifications or improvements on original trade secret. West's Ann.Cal.Civ.Code § 3426.1 et seq.

**[9] Torts ⚖10(5)**
379k10(5) Most Cited Cases

Under California law, golf ball manufacturer failed to establish competitor's misappropriation of secret method for making polyurethane-covered golf ball absent evidence competitor used, in any way, manufacturer's allegedly secret combination of ingredients.

**Patents ⚖328(2)**
291k328(2) Most Cited Cases

6,117,024. Cited.
Jack B. Blumenfeld, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Plaintiff and Counter-Defendant.

David J. Ferry, Jr., Ferry, Joseph & Pearce, P.A., Wilmington, DE, for Defendant and Counter-Claimant.

### MEMORANDUM ORDER

JORDAN, District Judge.

**I. Introduction**

*1 Presently before me is a motion (D.I.364) filed by Dunlop Slazenger Group Americas, Inc. d/b/a Maxfli ("Dunlop") seeking reconsideration of the May 13, 2004 Memorandum Opinion and Order (Docket Item "D.I." 358, 359) in which I granted Callaway Golf Company's ("Callaway") motion for partial summary judgment on Dunlop's counterclaim for misappropriation of trade secrets related to Dunlop's polyurethane golf ball technology. In a separately filed motion (D.I 366), Dunlop also seeks reconsideration of the part of my Opinion and Order dated May 18, 2004 (D.I.361, 362) in which I granted Callaway's motion for partial summary judgment on Dunlop's claims for negligent hiring, training, supervision, and/or retention of employees, conversion and unjust enrichment. I have jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1338, and 1367. For the reasons that follow, the motions will be denied.

**II. Background**

Because the factual and procedural history of this case is set forth in several prior rulings, *see* Memorandum Opinion dated May 13, 2004 (D.I.359), Memorandum Opinion dated May 18, 2004 (D.I.362), Memorandum Order dated May 18, 2004 (D.I.360), and Memorandum Order dated May 21, 2004 (D.I.363), it will not be repeated here. Rather, the facts pertinent to the motions currently before me are incorporated in the discussion below.

**III. Standard of Review**

[1][2] Motions for reconsideration should be granted only "sparingly." *Karr v. Castle,* 768 F.Supp. 1087, 1090 (D.Del.1991). In this district, motions for reconsideration are granted only if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension. *Brambles USA, Inc. v. Blocker,* 735 F.Supp. 1239, 1240 (D.Del.1990) (citing *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.,* 99 F.R.D. 99, 101 (E.D.Va.1983)). "Courts should be particularly vigilant that motions for reargument or reconsideration are not used as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**A649**

2004 WL 1588127
--- F.Supp.2d ---
**(Cite as: 2004 WL 1588127 (D.Del.))**

Page 3

decided." *Id.*

[3] Further, a district court should grant a motion for reconsideration which alters, amends, or offers relief from a judgment only when: (1) there has been an intervening change in the controlling law; (2) there is newly discovered evidence which was not available to the moving party at the time of judgment; or (3) there is a need to correct a legal or factual error which has resulted in a manifest injustice. *See Max's Seafood Café by Lou Ann, Inc. v. Quinteros,* 176 F.3d 669, 677 (3d Cir.1999) (citation omitted).

**IV. Discussion**

**A. Reconsideration of the May 13, 2004 Opinion and Order**

Dunlop argues that I should reconsider and vacate the May 13, 2004 Memorandum Opinion and Order (D.I.358, 359) because my decision "was based on a clear error of law and that the decision, unless corrected, would work manifest injustice." (D.I. 365 at 2, 9.) Specifically, Dunlop asserts that I based my decision to grant Callaway's motion for partial summary judgment "on a clearly incorrect view of the test for trade secret misappropriation under the California Uniform Trade Secrets Act." (*Id.*)

*2 Dunlop's argument is not well founded for several reasons. First, Dunlop criticizes me for applying the very standard that Dunlop advocated in its opposition to Callaway's motion for partial summary judgment. In response to Callaway's assertion that it was not liable for trade secret misappropriation because it did not use [FN1] Dunlop's trade secrets regarding polyurethane technology, Dunlop countered that Callaway did use its trade secrets and that the proof of such use is that the RULE 35 golf ball and its progeny bore a "substantial identity" and "substantial similarity" to its polyurethane technology and was a substantial derivation from that technology. [FN2] Dunlop's arguments were unpersuasive, and I held, in part, [FN3] that Callaway did not use, and thus did not misappropriate, Dunlop's polyurethane technology trade secrets, even if they were trade secrets, because no reasonable fact finder could conclude from the available evidence that Callaway's '024 patent and polyurethane golf balls were

substantially derived from the formulas and processes described in the February 1997 patent application and Dewanjee's Dunlop notebooks. (D.I. 359 at 17-18.)

[4][5] Understandably dissatisfied with my ruling, Dunlop now asserts that I applied an incorrect standard. (D.I. 365 at 2.) According to Dunlop, "[n]owhere in [CUTSA] or applicable case law is there any requirement that plaintiff prove that defendant made a substantially similar product." (*Id.* at 3) (citing *Sargent Fletcher, Inc., v. Able Corp.,* 110 Cal.App.4th 1658, 3 Cal.Rptr.3d 279, 283 (2003) (stating that "a prima facie claim for misappropriation of trade secrets requires that the plaintiff demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff")). While I agree that proof that a defendant made a substantially similar product is not required to establish a prima facie case of misappropriation of trade secrets, to claim that I have applied an incorrect standard when it is the very standard that Dunlop presented to me is not a proper use of a motion for reconsideration. A motion for reconsideration should not be "used as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided." *Brambles,* 735 F.Supp. at 1240. Dunlop argued that it was use, evidenced by substantial similarity, that demonstrated misappropriation in this case. (D.I. 338 at 32-33.) They failed to meet Callaway's summary judgment challenge in that regard, but that ought not reopen the entire field of trade secret law for argument.

[6][7] Nevertheless, Dunlop argues that evidence that a defendant's product bears a substantial identity with the trade secret is just "one method of proving trade secret misappropriation," but "is not the exclusive way of doing so." (D.I. 365 at 2.) Dunlop claims that a plaintiff may also establish a misappropriation claim by unlawful acquisition or disclosure. (*Id.* at 3.) I agree with this proposition and, indeed, cited the section of CUTSA in the May 13, 2004 Memorandum Opinion, that defines "misappropriation" as the acquisition, use, or disclosure of a trade secret of another by improper means. (D.I. 359 at 14) (quoting Cal.Civ.Code § 3426.1(b)). While I found that a reasonable fact

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**A650**

2004 WL 1588127
--- F.Supp.2d ---
(Cite as: 2004 WL 1588127 (D.Del.))

Page 4

finder could conclude that Dewanjee took some information with him when he left Dunlop (D.I. 359 at 9), the evidence submitted by Dunlop was, at most, a scintilla of evidence that Callaway improperly acquired Dunlop's polyurethane technology trade secrets. [FN4] But, a mere scintilla is insufficient to deny a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

*3 More importantly, on the issue of improper acquisition, Dunlop has not submitted any new evidence that was not available to them at the time of judgment. *See Max's Seafood Café,* 176 F.3d at 677. Moreover, Dunlop has never claimed, either in its pleadings or in its opposition to Callaway's motion for summary judgment, that Callaway improperly disclosed Dunlop's trade secrets to a third party. [FN5] As previously discussed, a motion for reconsideration should not be used to argue new facts. *See Brambles,* 735 F.Supp. at 1240.

[8] Finally, Dunlop argues that there are other ways of proving use of a trade secret than showing that a defendant's product was substantially similar to a plaintiff's trade secret. (D.I. 365 at 4.) For example, Dunlop asserts that it is "well established that use of another's trade secret in the course of research and development alone is actionable, even if the product produced by the defendant contains modifications or improvements on the original trade secret." (*Id.* at 5) (citing *Reingold v. Swiftships,* 126 F.3d 645, 651 (5th Cir.1997), *Mangren Research & Dev. Corp. v. Nat'l Chem. Co., Inc.,* 87 F.3d 937, 944 (7th Cir.1996), Restatement (Third) of Unfair Competition (1995) § 40, comment c.

I do not disagree with that proposition. However, Dunlop has never explained how Callaway could have used its trade secret information, i.e., its unique combination of ingredients, in the course of developing golf ball cover formulas that are not substantially similar to that combination. Instead, Dunlop argues in the abstract that expert testimony is probative on use of trade secrets. (D.I. 365 at 7.) Dunlop also argues that "direct evidence of use of Dunlop's technology (for example, Dewanjee's June 1997 use of Dunlop's confidential patent application)" is probative on Callaway's use of Dunlop's trade secrets. (D.I. 365 at 7.)

[9] While expert testimony may, in fact, be probative on whether trade secrets were used, the testimony of Dr. Klempner, Dunlop's expert, corroborates Callaway's argument that it did not use Dunlop's trade secrets in the course of developing its golf ball covers. The only evidence of a potential trade secret or secrets offered by Dunlop pertains to a combination of E-300, E-100, PTMEG, and TDI. (D.I. 359 at 13 n. 12.) Accordingly, Dunlop was required to offer some proof that Callaway actually used this combination of ingredients. However, it is undisputed that Callaway did not use either E-100 or PTMEG (D.I. 359 at 17), and Dr. Klempner testified that Dunlop did not research whether TDI and E-300, which I found are well known and in the public domain (*Id.* at 16), would work with the other ingredients that Callaway used in its cover formulations. (D.I. 314, Ex. F at 88-89, 97-98, 113-114, 150, 152.) Therefore, as Callaway accurately points out, Dunlop has failed to put forth any evidence that shows that Callaway used, in any way, the combination of ingredients that Dunlop claims are its trade secrets. (D.I. 368 at 13.)

*4 With respect to Dewanjee's use of the formulas and processes described in Dunlop's February 1997 patent application, which covers a "TDI prepolymer cured with a blend of E-300 and E-100 curity," in light of the fact that Callaway did not use E-100 in its final formulations and that the process of blending E-300 and TDI, two commonly known ingredients in the industry, is generally known in the industry, Dunlop has never identified how Callaway used Dunlop's proprietary blend in developing its golf ball covers. *See Pulsecard, Inc. v. Discover Card Svcs, Inc.,* Civ. No. 94-2304-EEO, 1996 WL 137819 (D.Kan. March 5, 1996) (granting summary judgment because plaintiff pointed to no evidence that defendant used the alleged trade secret). Accordingly, Dunlop's motion seeking reconsideration of the May 13, 2004 Memorandum Opinion and Order must be denied.

**B. Reconsideration of the May 18, 2004 Memorandum Order**

Dunlop argues that reconsideration of the May 18, 2004 Memorandum Order "should be granted because the Court's 'substantially similar' determination is based on a clearly incorrect view that a plaintiff whose trade secrets have been stolen

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**A651**

2004 WL 1588127
--- F.Supp.2d ---
**(Cite as: 2004 WL 1588127 (D.Del.))**

may only prove trade secret misappropriation by establishing that the defendant's product is substantially similar to, or substantially derived from, the plaintiff's product." (D.I. 367 at 2.) Because this contention is the same as Dunlop's argument made with respect to the May 13, 2004 Memorandum Opinion, and has been fully addressed above, Callaway's Motion that I reconsider and vacate the May 18, 2004 Memorandum Opinion and Order must also be denied.

**V. Conclusion**

Accordingly, IT IS HEREBY ORDERED that Dunlop's motions for reconsideration (D.I.364, 366) are denied.

> FN1. As discussed in the May 13, 2004 Memorandum Opinion, misappropriation under the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ.Code § 3426.1(b), is defined as "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or "[d]isclosure or use of a trade secret without express or implied consent ...." (D.I. 359 at 14-15.)

> FN2. Dunlop took this position in both its opposition papers and at oral argument. For example, in its brief Dunlop stated, "Under well-established principles, adopted by California, a trade secret misappropriation claim only requires a showing of 'substantial identity' or 'substantial similarity' between the technologies of the plaintiff and defendant at issue." (D.I. 338 at 32) (citing *Integral Systems, Inc. v. Peoplesoft, Inc.*, No. C-90-2598-DLJ, 1991 WL 498874 (N.D.Cal. July 19, 1991)). Dunlop also argued that "whether the Callaway polyurethane technology at issue bears a 'substantial similarity' with Dunlop's polyurethane technology ... is for the jury." (D.I. 338 at 33.) With regard to its claim that the '024 patent was based on its trade

secrets, Dunlop said that "[t]here is substantial similarity between the '024 patent and the proprietary information Dewanjee acquired from Dunlop, such that Callaway is not entitled to summary judgment on the issue." (*Id.* at 31.)

At oral argument, Dunlop's counsel stated "essentially, we believe that the standard before the Court under summary judgment, given the fact that all we have to do is show a substantial derivation, you know, we have competent evidence in the record and circumstantial evidence for a jury to make the determination that this final formula by Callaway [was substantially derived] ...." (D.I. 357 at 19-20.)

> FN3. I also held that, as a matter of law, Dunlop had not established any trade secrets involving PPDI and had not presented any evidence that a three-piece golf ball with a polyurethane cover was its trade secret. (D.I. 359 at 11, 18.) Dunlop does not challenge those rulings in its motion for reconsideration.

> FN4. In its opposition to Callaway's motion for summary judgment, Dunlop did not argue that Callaway improperly acquired its trade secrets. (D.I.338.) Dunlop made some statements in its background section that may imply that Callaway, through Dewanjee, improperly acquired its trade secrets, but once again, that issue was not addressed in Dunlop's argument.

> FN5. Callaway, not Dewanjee, is the target of Dunlop's claims in this case.

2004 WL 1588127 (D.Del.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**A652**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

In re:                                    )
                                          )     Chapter 11
NORTHWESTERN CORPORATION,                 )     Case No. 03-12872 (CGC)
                                          )
            Debtor.                       )
_____  )

## ORDER

On August 2, 2004, Magten Asset Management Corporation ("Magten") filed a Motion

for Reconsideration of the Court's Order Denying Magten Asset Management Corporation's

Motion to Disqualify Paul, Hasting, Janofsky & Walker LLP (the "Motion") (Docket No. 1799).

Paul, Hastings, Janofsky & Walker's filed an opposition on August 10, 2004.

In his original affidavit, Mr. Jesse Austin, counsel for the Debtor, stated that the "going

flat" transaction had been approved by the boards of directors of both NorthWestern and Clark

Fork. In a comment at a deposition, he acknowledged that Clark Fork, as a limited liability

company, had no board of directors. He subsequently filed a correcting affidavit, stating that

Clark Fork was managed through its sole member, NorthWestern and not by a board of directors

(the "Austin Inaccuracy").

Magten's Motion is wholly based upon this misstatement. It claims that the Austin

Inaccuracy wholly undermines the Court's previous decision on the Motion to Disqualify.

Recognizing that motions to reconsider are disfavored, Magten urges that the Austin Inaccuracy

implicates two of the established standards for reconsideration in this District, to wit: 1) there is

newly discovered evidence which was not available to the moving party at the time of judgment;

and 2) there is a need to correct a legal or factual error which has resulted in a manifest injustice.

*See Max's Seafood Cafe v. Quinteros,* 176 F.3d 669, 677 (3d Cir.1999).

**A653**

Magten's position is without merit. First, while the statement was in fact incorrect, it would not have had a determinative bearing on the outcome of the motion. Second, there were several other separate and sufficient grounds for denying the motion. Third, no manifest justice has occurred.

Therefore, Magten's motion to reconsider is denied.

Dated: August 19, 2004

_____

Charles G. Case
United States Bankruptcy Judge

2

**A654**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|                                   |   |                        |
|-----------------------------------|---|------------------------|
| In re:                            | ) | Chapter 11             |
|                                   | ) |                        |
| NORTHWESTERN CORPORATION,         | ) | Case No. 03-12872 (CGC) |
|                                   | ) |                        |
| Debtor.                           | ) |                        |
| _____ | ) |                        |

## MAGTEN ASSET MANAGEMENT CORPORATION'S NOTICE OF APPEAL

PLEASE TAKE NOTICE that Magten Asset Management Corporation ("Magten") hereby appeals under 28 U.S.C. § 158(a) from the Memorandum Decision denying Magten's Motion to Disqualify Debtor's counsel Paul, Hastings, Janofsky & Walker, LLP, issued by the United States Bankruptcy Court for the District of Delaware, Hon. Charles G. Case, dated July 23, 2004 (Docket No. 1750) and the Order denying Magten's Motion for Reconsideration issued by the United States Bankruptcy Court for the District of Delaware, Hon. Charles G. Case, dated August 19, 2004 (Docket No. 1942).

The names of the parties to the orders appealed from and the names, addresses and telephone numbers of their respective attorneys are as follows:

<u>Attorneys for Northwestern Corporation</u>

Scott D. Cousins, Esq.
Greenberg Traurig, LLP
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone: 661-7000

**A655**

{KMM4710.DOC}

Jesse H. Austin, III
Karol K. Denniston
Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, Suite 2400
Atlanta, GA 30308
Telephone: 404-815-2400

<u>Attorneys for the Official Committee of Unsecured Creditors</u>

Alan W. Kornberg, Esq.
Paul Weiss Rifking Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019
Telephone: 212-373-3000

Neil B. Glassman, Esq.
Charlene D. Davis, Esq.
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801
Telephone: 429-4224

<u>United States Trustee</u>

Mark Kenney, Esq.
844 King Street
Suite 2313, Lockbox 35
Wilmington, DE 19801-3519
Facsimile: 573-6497
Telephone: 573-6491

<u>Attorneys for Paul Hastings Janofsky & Walker LLP</u>

Dennis E. Glazer, Esquire
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
Telephone: 212 450 4000

David L. Finger, Esquire
Charles Slanina, Esquire
Finger & Slanina
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801
Telephone: 234-1605

{KMM4710.DOC}                    2

**A656**

August 24, 2004

SMITH KATZENSTEIN & FURLOW LLP


/s/ Kathleen M. Miller
Kathleen M. Miller (ID No. 2898)
The Corporate Plaza
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899 (Courier 19801)
Telephone:  302-652-8400
Facsimile:  302-652-8405
Email:  Kmiller@skfdelaware.com

Bijan Amini (NY Bar. No. 3533)
STORCH AMINI & MUNVES PC
2 Grand Central Tower
New York, New York 10017
(212) 490-4100

Counsel to Magten Asset
Management Corporation

**A657**

{KMM4710.DOC}                    3

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this **24th** day of **August, 2004,** a copy of the foregoing *Magten Asset Management Corporation's Notice of Appeal* was served on the following parties and the attached 2002 list by first class mail:

Scott D. Cousins, Esq.
Monica Leigh Loftin, Esq.
William E. Chipman, Jr., Esq.
Greenberg Traurig, LLP
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801

David L. Finger, Esquire
Charles Slanina, Esquire
Finger & Slanina
One Commerce Center
1201 Orange Street, Suite 725
Wilmington, DE 19801

Neil B. Glassman, Esq.
Charlene D. Davis, Esq.
Eric M. Sutty, Esq.
The Bayard Firm
222 Delaware Avenue, Suite 900
Wilmington, DE 19801

Mark Kenney, Esq.
844 King Street
Suite 2313, Lockbox 35
Wilmington, DE 19801-3519

Alan W. Kornberg, Esq.
Margaret A. Phillips, Esq.
Ephraim I. Diamond, Esquire
Paul Weiss Rifking Wharton & Garrison
1285 Avenue of the Americas
New York , NY 10019

Dennis E. Glazer, Esquire
D. Scott Tucker, Esquire
Catherine Lifeso, Esquire
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Jesse H. Austin, III
Karol K. Denniston
Paul, Hastings, Janofsky & Walker LLP
600 Peachtree Street, Suite 2400
Atlanta, GA 30308

/s/ Kathleen M. Miller
Kathleen M. Miller

**A658**

{KMM4710.DOC}                              4

1

2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

3  IN RE:                                    .    Chapter 11
                                            .
4  NORTHWESTERN CORPORATION,                .    Case No. 03-12872(JLP)
                                            .
5          Debtor.                          .    Feb. 10, 2005 (9 a.m.)
                                            .    (Wilmington)

6

7

8

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOHN L. PETERSON
UNITED STATES BANKRUPTCY COURT JUDGE

9

10

11

12

13

14

15

16

17

18

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

19

20

21

22

23

24

25

**A659**



2

1    THE COURT:  Has everyone signed the sign-in sheet?

2    MR. KENNEY:  No.  There may still be people in

3    security.  It seems like it takes about five minutes for each

4    piece of electronics that somebody might be carrying.

5    THE COURT:  Who do we have appearing here by phone?

6    MR. ELLIOT (TELEPHONIC):  My name is Randolph

7    Elliot.  I'm at the law firm of Miller, Balis and O'Neil from

8    Washington, D.C.

9    MR. BROGAN (TELEPHONIC):  My name is Al Brogan.

10    I'm staff attorney with the Montana Public Service

11    Commission.

12    MR. LAYNE (TELEPHONIC):  Eliot Layne of Vinson &

13    Elkins.

14    THE COURT:  All right, thank you.  This is in the

15    matter of Northwestern Corporation, Cause 03-12872, and we

16    also have a matter with regard to Netexit, Inc., Cause 04-

17    11321.  With regard to the calendar, items 1 and the final

18    fee applications, I'll take a little later.  We're going to

19    go through item -- start with item 12 -- or item 13.  Item 4

20    through 11 have been continued.  Item 12 on the nunc pro tunc

21    application of ELM Incorporated will be taken up at the time

22    we take up the fees, and so we'll set off, start off with

23    number 13 and Netexit's request for reconsideration of the

24    Court's order of December 7, 2004.  Who's going to handle

25    that?

**A660**

1        MS. HARRIS:  Good morning, Your Honor.  Donna

2  Harris from Cross & Simon here representing the Netexit

3  Committee.  Your Honor, I don't want to take a lot of the

4  Court's time.  I think our rationale was in the papers.  The

5  Committee's concern is that there appeared in the rationale,

6  the Court's rationale, a distinction between those employees

7  that were subsumed by the Northwestern benefits plan and

8  those employees that were not.  We do understand that the

9  last line, the ultimate ruling of the order was that the

10  motion was denied, however, there were many lines within the

11  order that said that Netexit, for example, is liable with

12  respect to those employees who did not elect to the

13  continuation coverage with NOR as well as the fact that

14  Netexit remains liable from its assets when and if claims are

15  made by non-covered employees.  And we understand that if

16  there are non-covered employees that Netexit may be liable,

17  but with respect to those employees that were subsumed by the

18  Northwestern plan is the Netexit Committee's position that

19  Northwestern is liable for those, and in fact, the

20  Committee's motion requested reimbursement because Netexit

21  assets are being used to pay for those employees' benefits

22  that were subsumed by the Northwestern plan, and it is in

23  fact those employees that we're seeking reimbursement with

24  respect to.

25        THE COURT:  So what's the dispute?  I thought

1    that's just what I decided.

2            MS. HARRIS:  Well, Your Honor, if that's the case,

3    then that's fine, and we'll accept that, but the lines --

4            THE COURT:  If you've got a contribution coming

5    back into Netexit from Northwestern, all you have to do is

6    file a motion.  We'll have a hearing on that.

7            MS. HARRIS:  Well, that --

8            THE COURT:  Is that what you're saying?

9            MS. HARRIS:  Well, Your Honor, that's what the

10    original motion was for, to get Northwestern to reimburse

11    Netexit --

12            THE COURT:  And I thought I split the blanket off

13    pretty well that whoever joined the Northwestern Company plan

14    were not covered by Netexit, but those that did not were

15    Netexit's problem.

16            MS. HARRIS:  That's right, Your Honor, and that's

17    exactly how we viewed it except that the last line of the

18    order said the motion was denied, which said to us that the

19    motion was denied even with respect to those employees that

20    Northwestern subsumed.

21            THE COURT:  That's not the intent of the order.

22            MS. HARRIS:  Thank you, Your Honor.  Would it be

23    possible to get an order that specifies that?

24            THE COURT:  Well, I think the way to cover it is

25    just file a motion and see if there's a contribution back,

1    and we can have that hearing and decide how much Northwestern

2    owes Netexit.

3            MS. HARRIS:  So you'd like us to file a motion

4    asking for a specific amount?

5            THE COURT:  Well, have you made the demand on

6    Northwestern for those monies?

7            MS. HARRIS:  Well, Your Honor, we believed that we

8    did that with the first motion, but if Your Honor --

9            THE COURT:  Okay, well, I don't --

10           MS. HARRIS:  -- doesn't believe that that happened

11   we will do --

12           THE COURT:  All right.

13           MS. HARRIS:  -- whatever the Court seeks.

14           THE COURT:  Why don't you resurface that issue with

15   another motion.

16           MS. HARRIS:  We will, Your Honor, thank you.

17           THE COURT:  Motion for reconsideration is denied.

18   We have a report on the matters dealing with cases that were

19   set for this Monday on Northwestern vs. Magten, and I wanted

20   to get a status report from counsel because, based on that

21   settlement, I understand, the PR application of Paul,

22   Hastings has been withdrawn.

23           MR. AUSTIN:  It's at least being continued over,

24   Your Honor.  For the record, I'm Jesse Austin, counsel for

25   Northwestern Corporation, and I am with the firm of Paul,

1   Hastings, Janofsky & Walker.  The Court is correct that this

2   past Monday, February 7th, there was supposed to be the

3   beginning of a trial on the adversary proceeding which had

4   been initiated by Northwestern against Magten and Mr. Talton

5   Embry seeking to either reduce Magten's claims to the price

6   it paid for its Quips securities or subordinate its claims to

7   all other Quips and other creditors' claims.  During the

8   course of litigation, over the course of the month of January

9   and as a result of some other developments which will become

10  evident once we file a motion to seek approval of the

11  proposed settlement, Northwestern along with Magten and Law

12  Debenture Trust Company of New York, which is the Indenture

13  Trustee and is also co-plaintiffs in what we may well refer

14  to as the penultimate piece of litigation which is the

15  adversary case filed seeking to either set aside or to

16  recover damages on an asserted fraudulent conveyance action

17  for -- generally referred to as a going flat transaction.

18  The parties reached an agreement in principal concerning the

19  settlement of the claims of Law Debenture as the Indenture

20  Trustee, Magten as a holder of the Quips securities, and the

21  non-accepting holders of the Quips securities.  Under the

22  debtor's reorganization plan, Your Honor, there was set up --

23  by way of background, under the debtor's reorganization plan,

24  the holders of the Quips securities was placed in Class 8(b),

25  and those holders were given a choice of accepting a

1    distribution of both a limited amount of stock and some

2    warrants, and if they did that then they would release their

3    claims under the fraudulent conveyance action initiated by

4    Magten and Law Debenture.  If they did not accept then their

5    claim became a Class 9 litigation claim which prior to the

6    effective date, Northwestern established a claim reserve in

7    the face amount of $25 million.  The impact is that the

8    actual stock at plan value were set a side was approximately

9    $17.1 million with a plan value of something like $20 a

10   share.  During the course, we had under the reorganization

11   plan approximately the amount of the Quips total, principal

12   and interest, pre-bankruptcy was roughly $70 million.  The

13   company had roughly $20 million of Quips holders that

14   accepted the plan which so they chose as referred to under

15   the Plan Option 1, and we had $50 million worth of claims

16   that effectively rejected the plan or were deemed to have

17   rejected the plan, and as a result, ended up with Option 2

18   and fell to the litigation plan.  In the process of

19   litigating, as I noted, Your Honor, we received a settlement

20   proposal from Magten on behalf of itself and all of the non-

21   accepting Quips holders which as a result we entered into

22   negotiations as well as while we were preparing for trial

23   that ultimately resulted in an agreement in principal which

24   has been evidenced now by a settlement letter which we will

25   ultimately file with the Court, but the general terms of that

1  settlement are as follows -- and before I get into the

2  general terms, I think it's also important that the Court

3  knows that Law Debenture as the Indenture Trustee for the

4  Quips had filed an initial claim in the case for its

5  Indenture Trustee's fees of roughly $900,000 to a million

6  dollars and during the course of the -- Northwestern had

7  filed an objection to that on the issue relative to whether

8  it made a substantial contribution under § 503 of the

9  Bankruptcy Code.  During the course of the litigation and the

10  settlement discussions, we became aware that Law Debenture

11  was going to be increasing its claim as a result of

12  additional costs that it incurred by almost another 3- to

13  $400,000.  So it was ultimately going to be asserting a claim

14  against the debtor's estate which would have been, had

15  prevailed, a cash payment claim in the roughly $1.4-, $1.5

16  million range.  The general outline of the settlement are

17  quite simple.  Northwestern will cause to be distributed to

18  the Indenture Trustee for its own benefit and on behalf of

19  Magten and the non-accepting Class 8(b) Quips holders the

20  382,732 shares of common stock at the reorganization plan

21  value of $20 a share, and the 710,449 warrants not yet

22  distributed to the Class 8(b) claimants that would have been

23  distributed to Magten and the non-accepting Class 8(b) Quips

24  holders had they accepted the plans.  So essentially, we're

25  going to give them the option that had they accepted they

1    would have received under Class 8(b).  In addition,

2    Northwestern will distribute to the Indenture Trustee for its

3    own benefit and on behalf of Magten and the other non-

4    accepting Class 8(b) Quips holders those shares of common

5    stock of reorganized Northwestern set aside in the Class 9

6    reserve which have a plan value of approximately $17.1

7    million, plus we will distribute an additional $300,000 of

8    common stock at plan value out of that reserve.  From these

9    distributions, Your Honor, the first and foremost that will

10   be used is to pay the Indenture Trustee's fees.  So, the

11   Indenture Trustee will then sell some of the stock, we

12   presume, on the open marketplace to pay whatever fees it's

13   asserted under its charging lien.  To the extent there's an

14   agreement with the Indenture Trustee and the other Quips

15   holders for payment of some portion of any fees incurred by

16   Magten in the litigation, then that will also come out of

17   these dollars, and the net amount of the stock would then be

18   distributed to the Quips holders.  At this point, we do not

19   know what is the net amount that will be distributed to the

20   Quips holders because we do not know what the general

21   provisions are, have not studied the general provisions or

22   what will be the division relative to any fees and expenses

23   paid to Magten and its counsel for the litigation costs.

24   That will be disclosed when we file a motion to seek approval

25   of all this.  In addition, what Northwestern receives from

1 all of this, Your Honor, is there will be mutual releases

2 between and among all of the parties, as broad as possible,

3 except to all of the non-accepting Quips which will dismiss

4 with prejudice all pending litigation, objections, and

5 appeals. And to put that in perspective, Your Honor, there

6 are approximately ten matters which are currently being

7 contested. There's Magten's appeal of the order confirming

8 Northwestern's second amended and restated plan which will be

9 dismissed, withdrawn with prejudice. There's Magten's appeal

10 of the order approving the memorandum of understanding with

11 respect to the settlement of the securities class action.

12 There's Magten's appeal of the order denying its motion to

13 disqualify Paul Hastings as general bankruptcy counsel to

14 Northwestern. There's a Magten adversary -- the Magten and

15 Law Debenture adversary proceeding seeking to set aside the

16 going-flat transaction as a fraudulent conveyance. There's

17 Magten's action against Mike Hanson and certain other

18 officers of Clark Fork and Black Foot LLC for breach of

19 fiduciary duty with respect to the going-flat transaction.

20 There's Magten's action against Paul Hastings for aiding and

21 abetting the going-flat transaction. There's Northwestern's

22 adversary proceeding against Magten and Talton Embry to

23 reduce or subordinate the claims of Magten. There's Magten's

24 motion to withdraw the reference from the Bankruptcy Court to

25 the District Court as to the fraudulent conveyance adversary

1   proceeding and also as to the adversary proceeding for the
2   subordination matter.  There's Magten's objection to the
3   final fee application of Paul Hastings, and then there's
4   Northwestern's objections to payment of Indenture Trustee's
5   fees with respect to Law Debenture.  Your Honor, the
6   procedure that the company now has to go through and as a
7   result of, in part, we were -- because of a development this
8   week, we had to get somewhat out of sync with the process,
9   but technically the company will be submitting a letter to
10  the Plan Committee and its counsel (a) giving them a copy of
11  the settlement letter, which we've already provided by way of
12  electronic means but to then seek a meeting with the Plan
13  Committee to say this is a settlement which the management of
14  the company is recommending.  We anticipate that we then will
15  file a motion under Rule 9019 to seek approval of this
16  settlement.  Because of the nature of the notice that has to
17  be given and how the Quips are held, we anticipate that we're
18  going to need an extended notice period because we certainly
19  intend to publish notice of this settlement in newspapers as
20  we publish notice of other settlements and certainly the
21  confirmation process, so as broad a distribution as possible
22  as well as to provide as much time as possible for those
23  parties that may want to object to the settlement.  I can
24  advise the Court that the reason things kind of got ahead of
25  the game a little bit this week is that while the company was

1  still in the process of finalizing the letter agreement for

2  the settlement in principal, news was leaking into the

3  marketplace of the terms of the settlement.  Because

4  Northwestern is now clearly a public company, it issued a

5  press release late Tuesday afternoon after the close of the

6  markets which generally outlined the terms of the settlement.

7  Unfortunately, we did not have an opportunity, because of

8  those developments, to speak with the Plan Committee in full

9  and have a fulsome discussion with it before we had to issue

10 that press release.  We're going to have to do a little

11 backtracking, we recognize, with the Plan Committee, and I

12 think Mr. Kornberg can deal with those particular issues

13 because we are well aware that certain Class 7 holders or

14 certain holders of the company's common stock they received

15 that stock as a result of holding Class 7 claims are, to say

16 the least, not happy with this settlement, and we anticipate

17 we may receive some objections to the settlement, but at

18 least, Your Honor, that is the general outline.  As a result

19 of the settlement, the parties, as we advised the Court,

20 requested a rolling over effectively or continuing to a later

21 date the adversary case that was supposed to start on this

22 Monday as well as the objections to Paul Hastings' final fee

23 application, which were to be heard today, and the objections

24 which Northwestern had filed with respect to the Law

25 Debenture fee application with the understanding that those

**A670**

1    matters will be continued until such time as this matter, the

2    settlement matter, can be brought on for hearing.  If the

3    settlement is ultimately approved by the Bankruptcy Court,

4    then those matters will all be dismissed, withdrawn with

5    prejudice.  If the settlement is ultimately not approved,

6    then we will go back to addressing both the objections and

7    the litigation as needed at that time.  That's the report I

8    can give you on this particular settlement.

9        THE COURT:  So, the bottom line is that you're

10   making an amendment to the plan?

11       MR. AUSTIN:  We're not making an amendment to the

12   plan per se, Your Honor.  Because we have a pending adversary

13   proceeding, we think we can do this under a 9019 settlement.

14   We don't think it relates to a plan amendment because we had

15   actually under the plan reserved a significant amount of

16   stock for the Class 9 potential claimants as contingent

17   unliquidated claims in connection with going effective.  So

18   that matter had ultimately been disclosed relative to the

19   potential for settling claims.

20       THE COURT:  All right.  How about this time frame

21   that -- get your advertising out and we'll set all matters

22   for -- what's that April date?

23       MR. AUSTIN:  Your Honor, I know there's an April

24   date.  We're going to have to look into -- We have one

25   somewhat complicating factor that's somewhat unrelated to the

**A671**

1   settlement.  Unfortunately, a lot of the company's

2   securities, Quips as well as -- as we refer to it as the

3   Toppers and even some of the senior unsecured notes, were

4   held in street name as is referred to in the trade, and one

5   has to go through DTC, Depository Trust Corporation, to try

6   and find out who these particular holders are.  The Quips

7   securities were more impacted by this type of arrangement

8   than anything else, and we're having difficulty at this

9   moment with DTC and having DTC actually give us the names of

10  who they have registered as beneficial holders.  We are going

11  to be filing, which we will want to bring on at either the

12  March or April date, a hearing relative to an order to

13  require DTC to provide us that information.  Depending on

14  when we get that information is what's going to impact

15  whether we can have a hearing on this at the April date or

16  whether it may have to be at a later date just because of the

17  appropriate notice provision.  At least pre-bankruptcy a

18  significant amount of the Quips were held by, as one would

19  say, individual holders.  We believe that most of that has

20  traded into institutional distress trader's hands, if you

21  will at this point, but that's something we don't

22  particularly know, and we need to get that information from

23  DTC so we would have to ask the Court some indulgence as to

24  try and work with the Court and set the appropriate hearing

25  date for the motion to approve this settlement.

1          THE COURT:  Do you have to notice the date of the

2    hearing in the advertisement?

3          MR. AUSTIN:  Yes, Your Honor, we think we do.

4          THE COURT:  All right.

5          MR. AUSTIN:  Thank you, Your Honor.

6          THE COURT:  We'll take up now the 14th matter in

7    the adversary proceeding of Northwestern Energy versus

8    National Union Fire Insurance Company.  The pending motion

9    before the Court is a motion of Northwestern Corporation

10   pursuant to 9 U.S.C. § 4 to compel arbitration.  Are the

11   parties ready?  Someone's requested oral argument on this, I

12   don't know who it was.  I must have had a weak moment.  By

13   the way, let me advise that I've read all the briefs and the

14   exhibits that have been attached to the briefs and the

15   memorandums, and so we don't have to rehash everything that

16   you put in those memorandums.

17         MR. ZOBEL:  Understood, Your Honor.  Your Honor,

18   co-counsel here opposite counsel who wants to introduce his

19   counsel, and before he does so, I want to -- if it please the

20   Court, my name is Steve Zobel.  I'm from Leonard, Street &

21   Deinard, Minneapolis, and I represent the plaintiff in this

22   matter, Northwestern Corporation.

23         THE COURT:  All right.

24         MR. CASSARINO:  Good morning, Your Honor, Marc

25   Cassarino.  I'm local counsel for National Union Fire

1   Insurance Company.  I have with me in the courtroom today
2   Larry Klein and Anne Presley of the Sedgewick, Dedert firm.
3   They're going to be taking a lead in argument today.  They've
4   already been admitted pro hac vice, Your Honor.  If I may
5   cede the podium to them?

6           MR. ZOBEL:  Your Honor, just for the record, it
7   wasn't Northwestern Corporation that requested oral argument,
8   but it is in fact our motion.  We are here today, Your Honor,
9   because Northwestern Corporation has brought a motion to
10  compel arbitration, but the real reason we're here today is
11  because National Union needs this Court's help.  It needs
12  this Court's help in two things:  To help it avoid keeping
13  its promise to arbitrate coverage disputes that was entered
14  into this policy as an endorsement, written by and insisted
15  by National Union, and also needs this Court's help to avoid
16  the consequences of its failure to follow the procedures that
17  were set forth in the arbitration endorsement written by and
18  insisted upon by National Union.  Now, I'm not going to bore
19  the Court by going over all the things that were written, but
20  I do want to hit, with the Court's indulgence, some of the
21  highlights of what has happened in this long, long process in
22  trying to enforce our right to arbitrate coverage disputes
23  under this policy.  The policy arbitration endorsement says
24  that either party can initiate the arbitration procedure by a
25  writing.  The other party has one month to respond to that

1  writing, and if they don't, the party making the initial

2  demand can go to the Court and get an arbitrator appointed

3  for the other party, the non-responding party.  On September

4  16th, 2002, two and a half years ago, Northwestern sent its

5  demand for arbitration by Federal Express to National Union.

6  Rather than respond as required by their own endorsement,

7  they simply ignored that demand for arbitration.  So,

8  pursuant to the way National Union set up the procedure,

9  Northwestern went to court in Montana, filed an action, and

10 made a motion to have an arbitrator appointed for National

11 Union.  Although it takes a little while because of the

12 serving procedures that have to go through the Montana

13 Commissioner of Insurance, there is no question that National

14 Union received the motion papers and the request as well as

15 the earlier ignored demand for arbitration by December 20th.

16 And again, National Union chose the course to deliberately

17 ignore the court proceeding.  Consequently, the Judge, the

18 Montana state court Judge, about three and a half weeks

19 later, an ample amount of time for them to do something if

20 they wanted to, appointed Mr. Anderson as National Union's

21 arbitrator.  Now, National Union seeks to avoid that

22 appointment on kind of an unusual basis.  They don't argue

23 that it's unfair.  They don't argue that Northwestern somehow

24 didn't follow the procedures that National Union required for

25 setting up arbitration, they say, Oh, there's a local rule in