the court that says that any motion that's not decided on

within forty-five days of filing must be deemed denied.    And

of course the reason that the state court Judge waited to

rule on the motion is because of the slow service procedures

in insurance coverage cases and of course, I think, it would

come as a surprise to any district court judge anywhere that

even there is a denial, an explicit denial much less a

procedural denial, that they couldn't reconsider any of their

decisions and enter a decision later.    So, we have some

activities done in arbitration.    Northwestern's done its job.

It asked that Mr. Richardson be appointed as its arbitrator

and then went to court to get Mr. Anderson appointed.    Now,

National Union says, Well, we still don't think you,

Northwestern, have a right to arbitrate under this provision

because we don't think you own the right to the policy.    I

respectfully submit that I think they really know better, but

if I have to go through that argument, Montana Power Company

bought this insurance policy in 1990.    Do you want me to skip

over this ownership?

            THE COURT:    Yeah.

            MR. ZOBEL:    Then I'll skip straight to the McKaren

Ferguson (phonetical) argument, and that will be very brief.

Montana has a provision in its arbitration statutes, it says,

No arbitration provision in insurance contracts shall be

enforceable.    However, the FAA, as we know, preempts anything

**A676**

in state law that's contrary to the FAA's provision.   The

Supreme Court has already held that a portion of the Montana

arbitration statute's been preempted.   There is one narrow

slice where the FAA doesn't preempt, and that's if the

McKaren Ferguson Act, which allows states to pass laws to

protect their insurance policyholders, then the state statute

will stand -- the arbitration statute will stand even in the

face of the FAA.   So, states can pass laws that say you can't

force a policyholder to go to arbitration if they don't want

to, and I respectfully submit, Your Honor, that there's

nothing in a state interest in protecting their own

policyholders which would relate to protecting a giant

insurance company from having to live up to its own promises

to arbitrate if that is in fact what the policyholder wants.

And that's all I have to say on the arbitration issue, Your

Honor.

        THE COURT:  Let me hear from Northwestern just

briefly.   I've pretty well gone through all the briefs and so

forth.   I've got my mind made up what I'm going to do, and

because of some of what's transpired since that state court

case has been a number of activities which I think nullify

that state court action.   The principal one is Northwestern

filed a plan of reorganization in which they specifically

contracted with National Union that you preserve all your

rights and remedies and defenses in that policy, which

1   includes your right in the arbitration clause.  And second of
2   all, the Montana arbitration law that was used by -- if it
3   was used, by the state court is no longer involved for this
4   case because we're looking at the federal statute and we're
5   in the federal court.  The simple answer to me to your
6   McKaren Ferguson argument is that -- and it's not in your
7   briefs, but probably you should have looked at the Montana
8   Insurance Code because that's a comprehensive regulation of
9   the Montana insurance industry in Montana on regulated
10  insurers.  And there's a specific provision in that code that
11  provides that the provisions of the insurance code relative
12  to the particular kind of insurance or particular type of
13  insurer or to a particular matter shall prevail over the
14  provisions relating to insurance in general or insurers in
15  general or to such matters in general.  And what that really
16  means is that you have to look at the code itself as to what
17  is being regulated.  And there's nothing in this code that
18  give the Insurance Commissioner of the State of Montana the
19  right to sit and arbitrate or decide a dispute between an
20  insured and a policyholder, the insurer and the policyholder.
21  If there was, you would have been before the Montana
22  Insurance Commissioner in an administrative hearing as to
23  whether or not there's coverage and how much was paid.  So I
24  think that the McKaren Ferguson Act does not trump the FAA.
25  The FAA, however, trumps the Montana code, and because of

**A678**

1  that, the arbitration, the motion to compel, in the cases I

2  read, even in a non-core matter, I have no discretion.  It's

3  a mandatory motion.  The FAA says "shall".  Once the motion's

4  filed and there's no other defense to it, then the

5  arbitration has to be ordered, and it's going to be ordered

6  pursuant to the terms of the policy.  And that means we've

7  got to start all over.  Northwestern gets to appoint a

8  mediator -- an arbitrator.  National Union will get to

9  appoint an arbitrator, and I assume they'll appoint a third

10  one if they want, I don't know.  I see a bigger problem here,

11  once this arbitration order comes down.  Because we're in a

12  federal court in Delaware, the arbitration act provides that

13  the arbitration must take place in Delaware.  That's the

14  venue, and the cases that I've gone over says that that's not

15  subject to change.  The parties probably could consent to a

16  change, but I see where you have a problem here with regard

17  to the arbitration because all of the underlying facts in

18  this case took place in Montana.  But by happenstance,

19  Northwestern elected to file their Chapter 11 here and this

20  case ultimately ends up here, you've a venue problem.  So,

21  whatever the arbitrators are, whoever they are, will have to

22  hold the arbitration here unless you consent differently.

23  That raises another problem as far as any appeal goes to the

24  arbitration award.  I suspect that by the time this

25  arbitration gets wound through the process, unless there's a

1  settlement and if there's an appeal of that award, this case

2  may well be closed.  Of course you can reopen it and then

3  because we're in a non-core problem, non-core jurisdictional

4  problem, the only thing I can do if you don't consent to a

5  final judgment is send it upstairs with proposed findings of

6  fact.  And that's a cumbersome procedure that you're going to

7  be in down the line.  So, I'll get out an order which will

8  provide for the implementation of the arbitration pursuant to

9  the terms of the policy and give each party the right to

10  select their arbitrator, and I was going to hopefully accept

11  this matter for arbitration in one count but after I looked

12  at the statute I don't have that jurisdiction.  So, I'll just

13  say that the arbitration is going to be held pursuant to 9

14  U.S.C. § 4, and when I've done this before I've always set

15  out the guidelines for compensation of the arbitrators.  I

16  don't know whether, after going through with these fee

17  requests that you might have later on, there's a lot of

18  divergence between the hourly rates of some lawyers in this

19  country and so, if you're going to have the arbitration in

20  Delaware it's going to be more expensive than it will be in

21  Montana, according to what I see here.  But if you want to

22  come to an agreement as to what these arbitrators should be

23  paid on an hourly basis, I think that should go into the

24  order so that these people know what the ground rules are

25  because for them to set their own, I've had some problems

1   with that before.  Does that satisfy your problem about going

2   to arbitration?

3            MR. ZOBEL:  It does, Your Honor, except for one

4   small matter.  We, obviously, don't want any more delays, so

5   if it would be possible to make it clear from the order that

6   the thirty days from our appointment they have to appoint

7   their arbitrator in thirty days from there it goes to

8   arbitrators have to appoint the third arbitrator.

9            THE COURT:  I'll shorten that up if you want.

10           MR. ZOBEL:  The shorter the better, I'm certain,

11   Your Honor.

12           THE COURT:  What about Northwestern?

13           MR. AUSTIN:  Your Honor, this gentleman is

14   Northwestern's counsel.

15           MR. ZOBEL:  Yes, I'm -- yes.

16           THE COURT:  Okay.  What do you want --

17           MR. ZOBEL:  Well, we -- They've also said of our

18   appointment of Mr. Richardson is not proper if --

19           THE COURT:  No, they're -- I've got a problem at

20   the outset.  I understand.  Both of those gentlemen I know

21   very well, Mr. Richardson and Mr. Anderson.  They're very

22   competent attorneys.  But the entire process of the Montana

23   court's vacated, and so you're going to have to select a new

24   arbitrator.  I'll just caution you on one thing.  One of the

25   grounds for appeal of an arbitration award is the lack of

24

1    impartiality of an arbitrator, and I wouldn't want a specter

2    of impartiality laid at the inception of the arbitration.  Do

3    you get what I hear?  -- or do you hear what I get?

4        MR. ZOBEL:  I hear you loud and clear, Your Honor,

5    and if you're willing to just order arbitration pursuant to

6    the terms that are in the arbitration endorsement written by

7    National Union that's satisfactory to Northwestern.

8        THE COURT:  I don't want to restrict who you want

9    to appoint because I don't think I've got that right, but I

10   just caution you about don't get yourself in a bad ball game

11   before the pitch is even thrown.

12       MR. ZOBEL:  I'm hearing you loud and clear, Your

13   Honor.

14       THE COURT:  So, I'll have an order out to you this

15   afternoon.

16       MR. ZOBEL:  Thank you, Your Honor.

17       THE COURT:  And I won't put in there venue, other

18   than it will be 9 U.S.C. § 4 and I'll -- how about if we set

19   the hourly rate at $450.  National Union, is that all right?

20       MR. KLEIN:  I'd have to check with National Union,

21   Your Honor, but my understanding was that each party would

22   bear the expense of its own --

23       THE COURT:  They are, but --

24       MR. KLEIN:  And for the umpire, we would split it

25   so if it's 450 --

**A682**

1      THE COURT: So, if you want to appoint a more

2  expensive one, you can do so.

3      MR. KLEIN: I hope not, Your Honor. So, if it's

4  just as a matter of the umpire, Your Honor, and we split

5  that, then whatever fee Your Honor deems appropriate is fine

6  with us.

7      THE COURT: All right, then the order will provide

8  that the arbitrator selected by the party will pay their

9  compensation and the umpire will be paid at a rate of $450 an

10  hour.

11      MR. ZOBEL: Thank you, Your Honor. We have -- We

12  had the jurisdiction motion that the Court asked for. Does

13  the Court want to hear anything on that?

14      THE COURT: No, that's not a problem.

15      MR. ZOBEL: Okay.

16      THE COURT: You've got a motion there before me

17  relative to interrogatories --

18      MS. PRESLEY: I believe that would be moot, Your

19  Honor, based on your ruling.

20      THE COURT: And there was a motion for summary

21  judgment just filed, and that's all moot too.

22      MR. ZOBEL: Yes, Your Honor.

23      THE COURT: So, you're starting from scratch. Does

24  that settle everything?

25      MS. PRESLEY: I believe so, Your Honor.

26

1              MR. ZOBEL:  Everything today.

2              THE COURT:  All right.

3              MR. KLEIN:  Thank you, Your Honor.

4              MR. CASSARINO:  Your Honor, those are the only

5  matters we have on for today and may we be excused?

6              THE COURT:  There's what?

7              MR. CASSARINO:  Those are the only matters we have

8  on for today, may we be excused.

9              THE COURT:  Yes.

10             MR. CASSARINO:  Thank you.

11             THE COURT:  I had a motion from Netexit that was

12  filed yesterday for a temporary restraining order?

13             MS. DENNISTON:  Yes, Your Honor, that is correct.

14  Did you want to proceed with that motion at this time?

15             THE COURT:  Right.

16             MS. DENNISTON:  Your Honor, the motion was filed by

17  Netexit as a result of some communications with the Office of

18  the Comptroller for the City of New York.  It relates to the

19  wage an hour dispute, and as we indicated in the pleadings,

20  we laid out for the Court the facts in our efforts to attempt

21  to avoid this duplicative litigation.  In short we're seeking

22  a TRO so that we can have a preliminary injunction hearing to

23  enforce the automatic stay.  We seek this for two primary

24  reasons:  The first being that it's clear from the papers

25  that the Controller is seeking to enforce penalties and fines

1   and also seek a relief that's not appropriate in this case.

2   As this Court well knows, this debtor is a liquidating debtor

3   that has no employees so there's no harm of ongoing and

4   continuing violations to the extent that any such violations

5   did in fact occur.  But more importantly, each of the

6   individuals that are to be impacted by the Controller's

7   activities have also obtained independent counsel, have filed

8   claims in this case, and Northwestern has been in -- or

9   excuse me, Netexit has been in discussions about settlement

10   with their independent counsel.  We believe that because the

11   Controller has filed a claim in this bankruptcy case and each

12   of the individuals have filed claims and are represented by

13   counsel, that it makes no sense and is in fact a violation of

14   the automatic stay for the Controller to initiate this

15   separate proceeding under oath and order Netexit to appear.

16   So that in short is why we brought this motion because we

17   believe that it would be duplicative and that it impedes this

18   Court's jurisdiction to determine those claims that are

19   already on file.

20         THE COURT:  I don't think that issuing a TRO is the

21   proper procedure.  First of all, it will expire in ten days

22   so we would have to have the hearing within ten days in order

23   to get into the preliminary injunction.  Based upon these

24   pleadings, I'd rather issue an order to show cause directed

25   to the Comptroller to appear at the next March hearing as to

1    why they are not subject to the § 362 provisions.

2            MS. DENNISTON:  Netexit would be pleased with that

3    relief as well, Your Honor.

4            THE COURT:  And that they're to stay all further

5    proceedings until that hearing.

6            MS. DENNISTON:  Thank you, Your Honor.  Can I ask

7    the Court whether that order would be issued today?

8            THE COURT:  Well, I think it might.  It all depends

9    how far we get with the fee applications.

10            MS. DENNISTON:  Would it be of assistance if we

11    prepared an order to deliver to the Court's chambers this

12    afternoon?

13            THE COURT:  Go ahead and do that if you'd like.

14    Just an order to show cause to the Comptroller that he's to

15    appear on March the 8th at 9:30 to show cause why they're not

16    -- should be found not in violation of § 62 and all further

17    proceedings will be stayed until that hearing.

18            MS. DENNISTON:  Thank you, Your Honor.

19            THE COURT:  We'll take up matters now relative to

20    the applications for final award of fees.  Let me preface the

21    start of this hearing with a few comments.

22            MS. HARRIS:  Your Honor, the fee applications are

23    the only things that's left and does not involve Netexit.

24    Rather than waste the debtor's money, I would request to be

25    excused at this time.

**A686**

1          THE COURT:  Sure.

2          MS. HARRIS:  Thank you.

3          THE COURT:  Anyone who wants to leave can leave.

4   It would be better, probably, if everyone did.  Let me just

5   start out by saying that this Court's review, with the

6   assistance of my law clerk, has not been a labor of love.

7   The applications are very big and long and contain in excess

8   of some 120,000 entries.  There are twelve applications which

9   we will hear today, but -- deal with, professionals employed

10  by the debtor.  Those requests total $20,903,266.  The total

11  expenses request is $2,544,165.60.  On the Creditors

12  Committee side we have five professionals seeking fees

13  totaling $7,225,597, and total expenses of $341,068.81.  So

14  the grand total of the applications before this hearing today

15  is $31,014,996.  That does not include, of course,

16  applications that have been pending and are still pending to

17  be heard principally dealing with the lead counsel for the

18  debtor whose application is approximately 14 million.  The

19  Law Debenture and the Magten claims have evidently been

20  settled as to a monetary amount with an exchange of stock.

21  And there are a couple of other small claims outstanding with

22  regard to another professional.  The last report that was

23  filed by Northwestern on October the 31st, 1904 (sic) I think

24  is somewhat indicative of how this Court has to approach this

25  matter.  For the month period of October, the beginning cash

**A687**

1  was $110 million, just over $110 million.   The professional

2  fees were $2,669,000.  By the time we ended up to the bottom

3  line, the total disbursements and the net cash flow was in

4  the negative side of $7,352,000.  And more important, the

5  cumulative income since the filing date shows gross revenues

6  of $1,119,354,561.  And the net profit after total operating

7  expenses and cost of goods sold was $123,519,616, and net

8  profit after -- or before reorganization items was

9  $55,140,000.  The professional fees that were paid during the

10  reorganization to date is $47,883,829.  The other

11  reorganization expenses which are not explained are

12  $20,808,041.  The net loss for the period during

13  reorganization is $79,753,142.  In certain of these

14  applications which we've gone through, it is apparent to the

15  Court that there is a violation of § 327 of the Bankruptcy

16  Code.  That Code provides, except as otherwise provided in

17  the Code, the Trustee, with the Court's approval -- and the

18  Trustee here means the debtor in possession, may employ one

19  or more attorneys, accountants, appraisers, auctioneers, or

20  other professional persons that do not own or represent an

21  interest adverse to the estate and that are disinterested

22  persons to represent or assist the Trustee in carrying out

23  the duties under this title.  Subsection 8 provides the

24  Trustee with the Court's approval may employ for his

25  specified special purpose other than to represent the Trustee

in conducting the case an attorney that is representing the

debtor in the best interest of the estate, such attorney does

not represent or hold an interest adverse to the debtor or to

the estate with respect to the matter to which that special

attorney is to be employed.  Rule 2014 of the Federal Rules

of Bankruptcy Procedure adopted as an inauguration of that

§ 27 providing that an order approving the employment of a

person pursuant to § 327 shall be made only on an application

of the debtor in possession or the Committee.  It provides

that the application shall state the specific facts showing

the necessity for employment, the name of the person to be

employed, the reasons for the selection, the professional

services to be rendered, any proposed arrangement for

compensation, and to the best of the applicant's knowledge,

all of the person's connections with the debtor, creditors,

any other party in interest or respective attorneys and

accountants, the United States Trustee or any person employed

by the Office of the United States Trustee.  All applications

under Rule 2014 must contain a statement verifying any

personal connections to be employed with the debtor,

creditor, or the party in interest.  The burden is on the

professional person as a condition to payment from the estate

to come forward with an application for court approval

showing facts pertinent to eligibility and to make a candid

and complete disclosure.  In a case filed by Chief Judge

1  Walrath of this District in In Re: Flemings Company

2  (phonetical), 305 BR 389, she wrote:  "Generally, the Court

3  must approve a debtor's retention of professionals in advance

4  of services being performed.  This provides notice to all

5  parties in interest and an opportunity to object to the

6  retention on necessity or conflict grounds.  Prior approval

7  insures that the Court knows the type of professional

8  engaged, its integrity, its experience with this type of work

9  and its competency.  Prior approval also insures that the

10  appropriateness of the professional's retention are resolved

11  prior to its provision services."  Judge Walrath concluded in

12  Flemings, "A professional seeking compensation from the

13  bankruptcy estate may not be paid for work done prior to the

14  filing and allowance of his application for employment."

15  Thus, the provisions of the Bankruptcy Code and Rule 2014

16  clearly mandate that before any professional may be

17  compensated from the estate, that professional must follow

18  the dictates of § 327 and Rule 2014.  Failure to do so, leads

19  the Court with no discretion but to deny any request for

20  professional compensation, whether made directly to the Court

21  by the professional or through requests as expenses incurred

22  by professionals who have in fact been employed pursuant to

23  § 327 and 2014.  Control by the Bankruptcy Court is necessary

24  to enable the Court to contain the estate's expenses and

25  avoid intervention by unnecessary participants.  The purpose

1 of a rule requiring prior Court authorization, it is said, of

2 a professional's appointment is to eliminate volunteer-ism

3 and thus aid the Court in controlling estate administrative

4 expenses.  The services for which compensation is requested

5 should be performed pursuant to appropriate authority under

6 the Code and in accordance with the order of the Court.

7 Otherwise, the person rendering the services may be

8 considered an officious intermeddler or a gratuitous

9 volunteer and I underline the word "gratuitous".  A

10 professional cannot emerge out of the blue and receive

11 compensation without having prior Court approval by the

12 Court.  In reviewing the 17 applications which we have set

13 for hearing today, the Court finds that requests for

14 professional persons have been made in applications contrary

15 to § 327 and Rule 2014, by, number one, Lazard Freres for

16 employment of the law firm of Gibson, Dunne & Fletcher at the

17 expense of $58,933.77.  Alvarez & Marshal for employment of

18 the law firm of Cohen and Risk (phonetical) at the expense of

19 $20,205.  Houlihan Lokey for the employment of quote,

20 "outside legal services", at the expense of $2,750.

21 Browning, Kaleczye, Berry & Hoven for the employment of

22 appraisers of Avale Consulting at the expense of $32,904.

23 And Graves Law Offices for the employment of environmental

24 consultants, ELM Consulting at the expense of $889,350.72.

25 And Leonard, Street and Deinard for the employment of outside

1  professional services at the expense of $464,939.87.  No

2  prior approval was sought by these applicants to assure them

3  to the requirements of the Code.  And for those expenses,

4  there will be no order approving the compensation.  I

5  understand that there is a filing by Graves and now is joined

6  in by the debtor relative to a nunc pro tunc order to be

7  entered on behalf of Graves for the employment of his

8  company, ELM Consulting, and when we get to that fee

9  application, we'll have a hearing on that matter.  That's the

10 -- One other comment: As to the attorney fee compensation, I

11 can honestly say that the hourly rates that are charging is

12 quite complexing.  For example, in connection with the

13 Leonard, Street application, their hourly rate is $250 an

14 hour and that of the Browning firm is $175 to $120.  By

15 contrast, the Committee's counsel, The Bayard Firm, runs from

16 $450 to $510 an hour.  Paul, Weiss firm from 750 to $375 an

17 hour.  Greenberg from 515 to 500 to 480 to 470 an hour.

18 Vinson & Elkins from 575 to 475 an hour.  Paul, Hastings from

19 595, 540, 490, 465 and 440 an hour.  And, of course, when you

20 get into the consultants for Lazard, who is representing the

21 debtor, their melded rate is $2,520.69.  And for Houlihan

22 Lokey, their melded rate if $920 an hour.  With the status of

23 the company, with the nature of its business, with the cheers

24 that I read in the applications how short a time this was for

25 an effective reorganization, it is somewhat mind boggling to

1    me that the applications for these fees are obviously going

2    to bring in the $50 million mark for a short period of time.

3    I don't think that -- Well, let me put it this way:  It's one

4    of the reasons I moved this back and took it out of Montana,

5    because I've had calls from the press that I don't take, but

6    there's one application in here for your public relations

7    director that I don't think that you should fire him right

8    now.  You might want to put him back on.  It's, to say the

9    least, disturbing.  But we'll go through them all, and we've

10    got some auditor's reports and two of the applications that

11    are relative to the special fees of Lazard for five and a

12    half million, and the special fees for Houlihan for

13    $2,018,000 -- I've got to find it here -- which is -- I might

14    as well bring this up right now.  In the Houlihan

15    application, in the Houlihan's twelfth and final fee

16    application, in Docket No. 2632 entered on February 1, 2005

17    there is a statement by Houlihan, calculation of monthly fees

18    payable, paid, and due, and surprising to me, I see that

19    Houlihan was paid a transaction fee of $2,018,750 before any

20    order of this Court was entered authorizing that fee.  That's

21    grounds in violation of the retention order, and I'm

22    seriously considering entering an order disgorging that fee

23    and denying that compensation for violating that retention

24    order.  It's just as important to follow the order relative

25    to receiving the compensation award as it is to getting

**A693**

1   appointed in the first place.  We'll let Houlihan explain --

2   and Northwestern why they paid these expenses without a court

3   order.  We take up the matter of Sabatino.

4        MR. AUSTIN:  Your Honor, on behalf of Northwestern,

5   may I make a preliminary statement?

6        THE COURT:  Yes.  Go ahead.

7        MR. AUSTIN:  Again, for the record, I'm Jesse

8   Austin, counsel for Northwestern Corporation.  As to the last

9   point which the Court just raised about the Houlihan payment,

10  we will double check, Your Honor, but we believe that that

11  payment was authorized pursuant to the provisions of the

12  reorganization plan and the confirmation order, which

13  obviously came subsequent, but we're going to double check on

14  that.

15       THE COURT:  It's in their application for payment.

16  It's in their fourth report for payment, for an order, a

17  requiring order, and this was the subject of the auditor's

18  report relative to its ability to pay this, and it shows on

19  their own form that they've been paid.

20       MR. AUSTIN:  And, Your Honor, I think the reason at

21  least Northwestern paid it was because -- we'll double check,

22  that it was otherwise provided for in the plan and --

23       THE COURT:  What page?

24       MR. AUSTIN:  I don't have that, Your Honor.  I'll

25  have to get it.  We're looking into that and we'll give you a

**A694**

1   report.

2       THE COURT:  The only compensation that I saw going

3   through the plan that was approved was the two million, two

4   hundred-some thousand dollars to the Montana Public Service

5   Commission attorneys and SAP for expenses.  I don't think I

6   missed it, but if I did, I'd like you to point it out because

7   --

8       MR. AUSTIN:  And we're going to look for that, Your

9   Honor.  There's also approval in there for payment, I

10  believe, of the fees and expenses for a certain amount to

11  Wilmington Trust in connection with the settlement done with

12  the Toppers for another $2,250,000, but we will look at that,

13  and I think that's why that dollar amount was paid, Your

14  Honor, but I just wanted to note that, and we're checking

15  into that at the moment.

16      THE COURT:  And if it's not in there, what's your

17  response then?

18      MR. AUSTIN:  Then I think it shouldn't have been

19  paid, and I do not know the answer to why it was paid at that

20  time.  Your Honor, let me offer just, you know, we appreciate

21  that this Court has spent some time in looking at these fee

22  applications, and we appreciate that this Court has been

23  asked to take on a burden that is often not asked of

24  bankruptcy courts because you did not have the benefit or the

25  burden, as the case may be, of being with this case from the

1    beginning through the confirmation process. We have a

2    witness that at some point we'd like to put on before the

3    conclusion of the hearing on the fee applications that will

4    at least describe the company's liquidity, where it is today,

5    and where it was during the bankruptcy case. One thing that

6    that testimony will present is that at no time during the

7    bankruptcy case was there a negative cash flow of

8    Northwestern, and indeed, at all times it had significant

9    positive cash close to a $100 million when we were at the

10   confirmation hearing, and at this point, I believe the

11   testimony will show that Northwestern, with a combination of

12   cash and availability under its exit credit facility has over

13   $75 million in liquidity. While yes, these dollar amounts

14   are large, we certainly believe -- Northwestern believes,

15   subject to the Court's comments on certain of these items,

16   which you've noted as it relates to payment of out-of-pocket

17   fees and expenses on behalf of certain entities, that for the

18   most part this case was one that while it was completed in a

19   thirteen month period, it was not one where it was just eight

20   hour days. This was a regulated utility company that we were

21   able to complete. It's one of the largest and, in fact, may

22   be the only regulated utility company where the

23   reorganization was indeed completed on a fairly consensual

24   basis within a twelve to thirteen month period. And that in

25   the context of this, some of the bench marks and milestones

1  that were accomplished during this case was that in the first

2  thirty days the company was able to obtain approximately a

3  $70 million DIP loan to sure up its liquidity.  It was able

4  to stabilize all energy sources within thirty days of the

5  petition filing so there was absolutely no interruption of

6  services and energy being provided to its customers,

7  especially in the State of Montana.  A key matter was it was

8  able to pay within the first thirty days all property tax

9  claims to primarily the State of Montana, which was a fairly

10 significant payment.  The company was able to develop with

11 the assistance of the Unsecured Creditors Committee, who were

12 very active in this process, the structure of the

13 reorganization plan and a supporting business plan by

14 December of 2003 where the petition had been filed in mid-

15 September, and indeed, that led to the filing of the initial

16 reorganization plan and disclosure statement by March 11th

17 within only the first extension of the exclusivity period.

18 And followed on that, the approval of the disclosure

19 statement by May 21.  At least in national cases which we

20 would certainly deem this to be a national case, that type of

21 speed where you did not have effectively a pre-agreed upon

22 plan pre-bankruptcy completely is a very, very fast track and

23 required unfortunately a lot of work.  We were able to then

24 begin soliciting acceptances, and one of the then major

25 developments that occurred and in fact even prior to the

1  completion of the disclosure statement, the company in

2  February was able to reach an agreement in principal to

3  settle the securities class action litigation which resulted

4  in no payment by the debtor's estate.  Following the

5  distribution of the disclosure statement, the company was

6  able to reach a settlement with the Montana Public Service

7  Commission and the Montana Consumer Council which effectively

8  freezes rates for Montana consumers through 2006.

9  Thereafter, the company was able to --

10       THE COURT:  Let me interrupt you there because I

11  have an inquiry about that regarding some of the dialogue I

12  read in these applications.  Who negotiated that settlement?

13       MR. AUSTIN:  That settlement was primarily

14  negotiated -- from the legal point or the professional point,

15  that settlement on behalf of Northwestern was negotiated by

16  myself and by Mr. Andrew Yearly from Lazard, with interface

17  with company's advisors.  We were negotiating directly with

18  the consumer counsel's outside counsel out of Washington,

19  D.C., and we were negotiating directly with the Montana

20  Public Service Commission's outside counsel, Mr. Brady

21  Williamson from Wisconsin.  The company had, obviously,

22  inside people that we were working with as we were drafting.

23  As we were going through that process, we were also closely

24  communicating with counsel for the Creditors Committee,

25  Houlihan Lokey's advisors to the Creditors Committee, and the

**A698**

1  Chair of the Creditors Committee and indeed, my understanding

2  is, Your Honor, they had independent meetings with both the

3  Montana Consumer Council and the Montana Public Service

4  Commission as well as joint meetings that included all three

5  entities for purposes of trying to work through and get to a

6  settlement with the Public Service Commission and the

7  Consumer Council because both of them were raising extensive

8  issues relative to jurisdictional questions, the ability to

9  continue financial investigation, and most importantly

10  whether and to what extent there were any rate issues that

11  would impact the reorganization plan, and I think as the

12  Court is aware, the Bankruptcy Code provides it so long as a

13  reorganization plan does not provide for a change in the

14  rates of a regulated -- from regulated situations then

15  technically one may not need approval of the regulators.  In

16  this particular instance, there was issues about that, but

17  through that settlement we were able to reach agreement to

18  where they effectively -- they supported the plan by not

19  filing objections which given where we were with government

20  entities, is where one needed to be.  But that was --

21        THE COURT:  Did you get a freeze under that

22  agreement from your power suppliers?

23        MR. AUSTIN:  At the very beginning, Your Honor, we

24  had actually locked up for the most part long-term

25  agreements.  We assumed most of our power -- long-term power

1   supply agreements so at least we had long-term contracts so

2   we don't -- To the extent we have variations, it's in the

3   variations that is already provided for under the Montana

4   Public Service rules relative to the extent we're having to

5   buy natural gas at market rates, whether that can still be

6   passed on or not.  But at least with the electricity, that

7   was one of the major things that was accomplished when I

8   referenced Your Honor at the very beginning of the case, the

9   stabilization of energy sources, the company went in and

10  assumed most of those contracts at the very beginning so that

11  we could indeed lock in those powers supplies.  Following the

12  settlement with the Montana Public Service Commission, Your

13  Honor, we also reached an agreement in principal to settle

14  the other major class action case which is generally referred

15  to as the McGreevey case, which we're still in the process of

16  documenting.  We reached an agreement on one of the largest

17  claims against the estate that would result only in about a

18  ten to $11 million payment that's referred to as the Milltown

19  Dam environmental settlement.  That in and of itself involved

20  negotiations with the State of Montana, two Indian tribes,

21  and the Federal Environmental Protection Agency to come to

22  terms on that agreement.  Subsequent to all that, Your Honor,

23  as we were going into the contested -- now I think it's

24  important to understand it was clearly a heavily contested

25  case up until approximately the middle of August, an