43

1  agreement was reached with Wilmington Trust and Harbert on

2  behalf of the -- as holders for the Toppers which resulted in

3  an amended plan and an increased distribution to the

4  subordinated creditors.  That led us to then put on an all

5  day hearing.  In fact, we had a twelve-hour evidentiary

6  hearing before Judge Case on or about August 24 because we

7  still had objections to the plan from equity holders, and we

8  had objections to the plan from Law Debenture and Magten and

9  also from former CEO, Mr. Richard Hilland.  The settlement

10  that the company did with the Toppers had to require a re-

11  solicitation of the plan, which was completed in fairly

12  record time to where we were able to go back to confirmation

13  and complete the confirmation hearing in early October, where

14  in October, at that hearing, the only real opposition to the

15  plan was by Magten and Law Debenture and to a limited extent

16  Mr. Hilland.  The impact is, Your Honor, this company was

17  able while it received overwhelming support for the plan as

18  ultimately presented by its creditor constituency, that we

19  still had to do a contested hearing which -- and that

20  standpoint, Your Honor, the company was able to confirm with

21  the support of the Creditors Committee, with support of not

22  only the advisors that the company retained but the advisors

23  retained by the Committee, we were able to obtain through a

24  contested confirmation hearing, confirmation of the plan

25  whereby an order was entered on October 19th, and the

**A701**

1    reorganization plan went effective on November 1. I think

2    from that standpoint, Your Honor, the Court should be

3    apprised of what the plan effectively did and where we find

4    ourselves today because the company was able to obtain a new

5    $125 million revolving credit facility. It was able to

6    refinance approximately 325 million -- actually, it was able

7    to refinance over $400 million of debt through a combination

8    of a $325 million credit facility and use of cash which it

9    had on its balance sheet. The effect of that, Your Honor,

10   was to improve the capital structure to where the company's

11   debt maturities were significantly extended from 2006 until

12   almost 2010 and later into the 2012 arena. The company was

13   able to convert by consent, for the most part, $1.2 billion

14   of public bond claims into approximately 35.5 million shares

15   of stock. That stock was forecast to have a value of what we

16   refer to as a plan value of approximately $20 a share. The

17   stock is now freely traded on NASDAQ through the exemption

18   under § 1145 of the Bankruptcy Code, and as of the close of

19   business yesterday, that stock was trading, the Court can

20   take notice by checking in the NASDAQ reports in the Wall

21   Street Journal, that stock had a market share value of $28.70

22   a share. So that's over a 40 percent increase in the value

23   that's been returned to these creditors, and indeed, at that

24   value the senior unsecured Class 7 has received almost if not

25   totally a hundred percent recovery because the limited

1  warrants that the company issued to the subordinated

2  creditors were set at a strike price of approximately $28.70

3  a share to reflect the price that the stock had to get to to

4  return full recovery to the Class 7 creditors.  And all of

5  this, Your Honor, there was no job reduction required by this

6  bankruptcy proceeding.  The employees retained their jobs and

7  returned to their jobs.  In this instance the service was

8  completely maintained and not interrupted and indeed, with

9  the consent and working with the Montana Public Service

10  Commission, an audit was undertaken of the company's

11  operations and they are implementing through the capital

12  expenditure program which they've allocated each year under

13  the financial projections approximately $70 million a year

14  for capital expenditures for build-out and to work and

15  further improve their operational physical plant.  As noted

16  at the very beginning of this preliminary comment, Your

17  Honor, from what we can tell when you compare it to the --

18  certainly when you compare it to the regulated Chapter 11

19  cases of Public Service of New Hampshire, Cagin (phonetical)

20  Electric --

21          THE COURT:  Why don't we mention Pacific Gas &

22  Electric.

23          MR. AUSTIN:  Pacific Gas & Electric, yes.

24          THE COURT:  I'm familiar with that one because I've

25  been down there --

46

1       THE COURT:  Pacific Gas & Electric.  All of those.

2  took way more than I think thirty to thirty-five months to

3  complete.  We're looking at this one being done in

4  approximately thirteen months, and indeed, had we not had to

5  re-solicit the plan following the settlement we reached in

6  August, we certainly believe we could have exited Chapter 11

7  on September 30, which would basically had made a twelve-

8  month deadline.  The financial markets certainly see, and I

9  think the testimony as we put on would demonstrate, that the

10  financial markets certainly see Northwestern as being a

11  strong, viable, desirable investment entity.  That the

12  company is in the best capital structure it's been in in

13  years.  It certainly has some ongoing litigation which it

14  must resolve, but we certainly hope that the Court -- Well,

15  we can understand the Court's concern.  We understand that

16  the Court when it compares, for example, hourly rates of

17  attorneys as one may say east of the Mississippi with some --

18  and areas west of the Mississippi, those rates are higher,

19  but given the work that was required here, given the many

20  disciplines that were required to implement this case from

21  bankruptcy to tax to securities to environmental to energy

22  sources, we certainly believe that subject to the adjustments

23  that people have otherwise agreed to with the fee examiner,

24  that we certainly believe that this case was run efficiently

25  and the services which were rendered by all of the

**A704**

1  professionals in this case were reasonable and necessary and

2  beneficial to the estate.  We understand the Court's concern.

3  We'll try to address those concerns.  We would ask that the

4  Court look -- and when you're reviewing these applications,

5  we ask that the Court look at the backdrop of what we

6  certainly believe was accomplished, and it was accomplished

7  for the most part with the work and cooperation of everyone

8  that resulted in a very successful reorganization as

9  reorganizations go, and that we would ask the Court to review

10 the fee applications against that backdrop.

11         THE COURT:  All right, just a couple of comments:

12 When you talk about success, I haven't spoken to anyone who

13 was a former stockholder of Northwestern, but I wonder

14 whether or not they think -- those 10,300 shareholders that

15 got wiped out, whether they think it was a success, and

16 whether the unsecured class who got discounted $.30 on the

17 dollar and had to take stock in exchange really feels that

18 that was in their best interest for whatever they had to do

19 with that stock.  And while you're talking about the stock,

20 maybe the way to do this, because as you know, we're going to

21 be forced -- you filed some motions with the Court to

22 terminate various pension plans now, and I find it somewhat

23 ironic that in the allegations you made in those motions that

24 you have to significantly reduce your costs by knocking on

25 those pensioners.  And that's what you say in your pleadings,

1   but maybe the way to do this is to take the stock that you

2   say is strong and viable and will continue to be so and pay

3   that out in lieu of some of the cash for the fees.

4          MR. AUSTIN:  We appreciate the Court's concept on

5   that.  At this point we don't have the ability to do that,

6   Your Honor, because we don't have the stock that's authorized

7   for that purpose.  We're not sure within the context of the

8   Bankruptcy Code that professionals are able to receive stock.

9   That's something we'd have to look at, and we'd certainly

10  have to go back to both Montana Public Service Commission and

11  the Federal Energy Regulatory Commission because they are

12  authority over stock issuances about where we are right now.

13  With respect to the Court's two comments relative to

14  stockholders and unsecureds, we are mindful that, yes, if you

15  ask a shareholder today, a former shareholder, what they

16  think of the reorganization, we're quite confident they'll

17  say they're not happy because they ended up getting wiped

18  out.  We wish we could have retained value for those

19  shareholders, but unfortunately when the Court looks at the

20  absolute priority rule and the valuations, it simply wasn't

21  there in the context of being able to get this plan confirmed

22  with the general support of the company's creditors.  With

23  respect to the Court's question about general unsecured

24  creditors that who may have otherwise received stock in

25  return for their claims, we would note to the Court that that

1    class, Class 9 general unsecured creditors, overwhelmingly

2    voted in support of the debtor's reorganization plan. So,

3    from that standpoint, Your Honor, we believe that that class

4    certainly thinks that the reorganization is successful, and

5    indeed, based on the value of the stock that's now where it's

6    trading, those creditors which already received a

7    distribution, and I might add, Your Honor, that to the extent

8    this Court was concerned that in that class is a lot of

9    former trade creditors, the answer to that is, no. There's

10   only approximately, I think, about $2 million or so of one

11   might call general trade creditors which was over $100,000.

12   Effectively, that was in that class and those that otherwise

13   received stock on account of their allowed claims at this

14   point now have receive a hundred -- effectively a hundred

15   percent recovery, but their class as a class overwhelming

16   supported the reorganization plan in voting for the plan.

17   Thank you, Your Honor.

18              THE COURT:   Thank you.

19              MR. AUSTIN:   And, Your Honor, if the Court wants us

20   to address the -- you know, we can either do the liquidity

21   issue now or you can hear the applications. We can put our

22   witness on at that point because it seemed to be when the

23   Court was making its comments there seemed to be some concern

24   that whether or not Northwestern actually had the money to

25   pay these fees. And we've got --

**A707**

50

1    THE COURT:  I think that they had a little loss
2    here in October.  They went from 110 million down to 101.  I
3    don't know if they're on a slide, but --

4    MR. AUSTIN:  We certainly don't think that we're on
5    a slide and --

6    THE COURT:  I know one thing, the $79 million loss
7    through a reorganization -- 69 -- 68 million of that seemed
8    to be associated with reorganization costs, but that still
9    leaves an $11 million drag.  So, no, they've got enough
10   money.  Just hope they can keep having their money.  I'm not
11   here to question the future or the security of the company
12   for service or something of that nature.  Let me put it this
13   way to you:  I don't know how many clients that you bill out
14   and -- your firm, that you list a hundred people who worked
15   on the case.  And that's what you've done, exactly one
16   hundred, and your billing was just under 14 million in that
17   13/14 month period.  I just wonder how many other clients
18   received those same bills from Paul, Hastings during that
19   same period in the marketplace.  I'm not -- I don't think
20   it's a fair question, but --

21   MR. AUSTIN:  Actually, Judge, I think that it's --
22   I don't mind answering the question because to the extent
23   that you're doing a debtor case, the debtor case become very
24   labor intensive and you have to use a lot of different
25   people, and that's where that came in.  Can I say that I sent

1  that level of bills to other clients?  The answer is, no,

2  because, quite honestly, over the course of this past year,

3  approximately ninety percent of my time was focused on

4  working on the Northwestern matter, and I can tell you

5  personally, for example, to give you the level of I know

6  commitment I had to this particular client, through the month

7  of November 1, as they say in the trade, I was running on

8  approximately a 3,000 hour billable hour year.  I ended up

9  this year approximately 2650 because frankly I took a

10 vacation.

11          THE COURT:  I didn't say you didn't do the work.  I

12 don't want to leave that impression.

13          MR. AUSTIN:  Well, and I appreciate Your Honor, but

14 I think that that's where we're trying to go that

15 unfortunately it took a lot of bodies to get this deal done

16 in the process.  Thank you.

17          THE COURT:  Obviously.  All right, thank you.

18          MR. KORNBERG:  Your Honor, if I may, Alan Kornberg

19 of Paul, Weiss, Rifkind, Wharton & Garrison for the Official

20 Creditors Committee.  Your Honor did mention the Houlihan

21 Lokey application and the payment of the transaction fee and

22 of course, Houlihan Lokey was the Official Committee's

23 financial advisor.  I think Mr. Austin was actually incorrect

24 when he spoke about the payment of the transaction fee being

25 authorized by the Chapter 11 plan.  I believe, Your Honor,

1  that the authority to pay that was in the retention letter

2  approved by the Court at the outset of the case which says

3  that they can be paid upon confirmation, but the payment is,

4  of course, subject to a final fee application allowance.

5  That's clear also in the letter and in the order, but the

6  engagement letter that was approved does provide for its

7  payment in cash upon confirmation subject, of course, to the

8  entry of a final --

9       THE COURT:  What's there to decide if it's already

10  -- the transaction fee's already been transacted?

11       MR. KORNBERG:  Well, Your Honor, their engagement,

12  as I recall, was under § 328 of the Bankruptcy Code.

13       THE COURT:  I understand that too, but I'm fully

14  prepared to go ahead with the improvidence issue.

15       MR. KORNBERG:  Your Honor, I'm not Houlihan's

16  counsel, but I just wanted to state for the record I think

17  the basis upon which it was paid was the engagement letter

18  and the accompanying order of the Court at the outset of the

19  case not the Chapter 11 plan.

20       THE COURT:  Thank you.  We'll start now with Frank

21  P. Sabatino.  Is he present?  Probably not.  Anyway, he was

22  hired as a consulting expert, testifying expert.  I don't

23  know if he testified or where.  That's not shown in the

24  application.  His hourly rate was $475.  The fee auditor

25  recommends a reduction of $1,900 in fees for a non-working

**A710**

1  travel time which the local rule provides should be only, you
2  know, fifty percent. The application is missing complete and
3  detailed time entries, and as a matter of fact, he doesn't
4  provide any time entries that are required by local rules.
5  Based upon the information in the fee auditor's report, it
6  appears the applicant billed at a quarter of an hour instead
7  of what the local rules provide, a tenth of an hour. There's
8  a missing itemization of expenses, but they're small, and I'm
9  not going to quibble with them. And it doesn't have the
10  certification on the application which is required by the
11  local rules. So, with that, for those comments, then the fee
12  request of $34,200 is reduced by $1,900, and the fee expenses
13  of $222.79 is granted. The next application I'll take up is
14  John Noyes. Is Mr. Noyes present? Mr. Noyes seeks
15  compensation of $44,331.25 and a tremendous expense item of
16  $4.92. When I saw that I was almost willing to pay it
17  myself. The application does not entirely comply with the
18  local rules. He bills at a quarter of an hour, and the
19  application employs a docket number. It doesn't give any
20  waiver of the local rules, and it too misses a certification.
21  I don't know what Mr. Noyes was retained to do by the debtor
22  and what he performed. That's not shown in the application.
23  His bill for $4,331.25 is approved, and the expenses of $4.92
24  is approved. Houlihan Lokey Howard & Zukin. This advisor to
25  the Committee was retained by the Committee under contract of

1   a monthly fee of $175,000 per month.  And there was
2   associated with a transactions fee of $2,275,000.  The total
3   number of hours billed by Houlihan Lokey were 4,662 hours.
4   Now Houlihan claims that they do not have systems accurately
5   in place to track all the hours that they worked, but that's
6   what they tracked.  And I do note that the retention order
7   waives the local rule regarding the time entries.  The
8   blended rate for the monthly fees is $487.90, and the blended
9   rate for the transaction fee is $432.95 for a blended rate of
10  $920.85.  I don't know how the transaction fee was set and
11  who negotiated it.  That's not shown in the application.
12  He's eligible to receive that transaction fee under a variety
13  of circumstances including reorganization or confirmation,
14  and I do note that one the employees of Houlihan was a
15  witness in the August 24th, 2004 confirmation hearing in
16  which he gave an evaluation of the company which was adopted
17  in part by Judge Case.  There have been no objections by the
18  parties filed as a transition fee, and that's uniform.  There
19  are some questionable expenses such as the pre-retention
20  expenses of $10,991.71.  The auditor notes that cell phone
21  charges are considered to be overhead, and the fee auditor
22  recommends a reduction of $65.09.  I will reduce it by
23  $194.11.  There's a third quarter reduction of $246.48 and a
24  fourth quarter reduction of $109.38.  The meal deductions by
25  the auditor are $56, $368, and $100.  The auditor recommends

1   on the used-car service, they bought a car service instead of
2   using taxis transportation and the cost per day was $890
3   better than the taxi fee.  The auditor recommends we reduce
4   that charge by a third, but I want to reduce it by $109.84.
5   The third quarter reduction is $161.88 and the fifth quarter
6   accordingly is a reduction of $50, and the auditor has
7   unreasonable hotel expenses over $350 a night and reduces
8   those in the second quarter by $1,636.  Third quarter by
9   $289.  Fourth quarter by $79.  The fifth quarter by $403,
10  and I've already in my order at the outset reduced their
11  outside legal services by $2,750.  And their photo copy
12  charges must be reduced by $424 because they exceed the local
13  rate.  The total expenses therefore total $18,775.70, which I
14  reduced from the expense billed.  As far as the transaction
15  fee is concerned, it was reduced under the agreement.
16  There's a credit against it for the last three quarter.  It
17  was reduced to $2,018,750.  If I in fact find that it has
18  been paid without a court order, I'm going to disgorge it and
19  deny it.  I'll leave full hand to the proof.  I don't think
20  that was any -- as I said before, I don't think not having an
21  order authorizes a payment is any different than not even
22  being employed at all.  Otherwise, why have the Court?
23  Russell Reynolds Associates -- Is there someone on the phone
24  with them?

25          MR. BOULBOL:  Yes, Your Honor.

**A713**

1           THE COURT: All right. You have requested fees of

2 $397,800. That's $360,000 flat fee plus $37,800 in flat

3 expenses, as I read it. Other expenses you requested are

4 $21,221.96. The one thing that raises the flag to the

5 auditor and to this Court is the communication charges.

6           MR. BOULBOL: That's correct, Your Honor.

7           THE COURT: The fee auditor recommends disallowing

8 the communication charge and reducing the fees by $37,800.

9 Your argument is that they made hundreds of telephone calls,

10 facsimiles, Federal Express mailings and the like related to

11 this case. They further argue that the communication charges

12 -- that they always charge the communication charges and that

13 it's too difficult for them to track the routine expenses.

14           MR. BOULBOL: There are several components to that,

15 Your Honor. It actually -- our position is the

16 communications charge is a component of the fee, and our fee

17 application actually made that disclosure in advance. There

18 were no objections filed at the time, and also the retention

19 order issued by the Court recognized the unique nature of the

20 services provided by Russell Reynolds such that we were not

21 required to maintain time records. We just maintain what

22 were called summary records of the work that we performed.

23 We provided those summary records to the auditor, and the

24 auditor was quite satisfied with those summary records. In

25 addition, Your Honor, unlike most of the professionals in

1  this case, Russell Reynolds was owed about $180,000 pre-

2  petition --

3          THE COURT:  Oh, were you?

4          MR. BOULBOL:  Yes, we were.  And we waived the

5  $180,000 pre-petition essentially giving a discount to the

6  debtor for the rendition of these services --

7          THE COURT:  In other words, you made it up at the

8  end.

9          MR. BOULBOL:  Well, we didn't exactly make it up,

10 but as Your Honor may note from the proof of claim that we

11 filed, in fact Russell Reynolds had performed two successful

12 executive search services pre-petition for the debtor at a

13 charge of $360,000 of which we were paid about half, a

14 hundred and eighty, and we agreed to do these six executive

15 searches for about the same amount of money --

16         THE COURT:  Did anyone of them get hired?

17         MR. BOULBOL:  All of them are hired, Your Honor.

18 So, actually, we've had a tremendous track record.

19         THE COURT:  Are they all from New York because I

20 see a lot of travel expenses going to New York?

21         MR. BOULBOL:  I don't know that they're all from

22 New York, but I think some of them are, Your Honor.

23         THE COURT:  Now, as I read the retention order, you

24 say that that included the 37,000 in communication fees?

25         MR. BOULBOL:  Yes, it did, Your Honor.  That was

1    disclosed in the retention application and in the retention

2    order that we would be paid in accordance with the fee

3    arrangement.

4        THE COURT:  Well, we're going to have this come up

5    again, so I might as well make the ruling that the retention

6    order governs.  Whatever is in the retention order that

7    governs and trumps the agreement.

8        MR. BOULBOL:  And in that respect I'd say that

9    we're entitled to the 37,800, Your Honor.

10        THE COURT:  Yeah.  That's what I'm just reading

11    here right now that you shall be compensated for its fees and

12    expenses in accordance with the terms and conditions of the

13    letter agreement at the time such fees and expenses become

14    due and without further application to or order of the Court.

15    However, Russell Reynolds shall file a final application for

16    allowance of its compensation and expenses with respect to

17    its services with the Court in accordance with the

18    application provisions of the Bankruptcy Code, the local

19    rules, the Bankruptcy Rules, and any orders of the Court

20    provided, however, that Russell Reynolds may submit records

21    in summary format which will set forth the description of the

22    services provided by Russell Reynolds and will not be

23    required to keep time records, hours spent.  Therefore, the

24    information requirements of Rule 2016 of the Code and 2016(2)

25    of the local rules are hereby modified and waived.

1    MR. BOULBOL:  And if I may, Your Honor, I think the
2  basis upon which the Court requested that a final fee
3  application be provided was of course when Russell Reynolds
4  was retained, we can't guarantee that in fact we are going to
5  successfully recruit six new board members, and perhaps at
6  that point in time if we had failed, which we did not, the
7  Court may say maybe you shouldn't get your entire fee, but in
8  fact, we were successful, and therefore, I submit, Your
9  Honor, we're entitled to the entire fee but for the $3,000 of
10  miscellaneous expenses that we'll be happy to reimburse to
11  the estate.

12    THE COURT:  I'm going to take the matter under
13  advisement with regard to the retention order and then to
14  give it a little more thought, but you've got excessive air
15  fare in there contrary to the local rules.

16    MR. BOULBOL:  Oh, yeah, and we're agreeing, we're
17  just going to give that back, Your Honor.

18    THE COURT:  And that's $2,897.38, and I'm also
19  going to reduce the expense item by $153.32 for alcoholic
20  beverages.

21    MR. BOULBOL:  Yes, we agree to that, Your Honor.
22  It's the thirty-seven eight that's the issue.

23    THE COURT:  I've got one in here that's coming up
24  that the guy bought a can of Snoose (phonetical).  All right.
25  I'll take this under advisement.  We'll get out an order.

**A717**

1    MR. BOULBOL: Thank you very much, Your Honor.

2    MR. SMITH: There is authority in the district,

3  Your Honor, regarding the fact that while the Court may be

4  bound by what's in a retention order, the Court is not

5  required to read all application documents and that reference

6  to application documents are not binding on the Court.  I

7  could supply that in a letter format for the Court --

8    THE COURT: Yeah, I've read those cases, but I also

9  read the cases the retention order governs.

10    MR. SMITH: I understand, Your Honor, and with that

11  note I would note that the retention order does say that

12  Russell Reynolds will not be required to keep time records.

13  I agree with that.  It doesn't say anything that they need

14  not keep expense records.

15    THE COURT: Yeah.  We're not attacking the flat

16  fee.  What we're attacking is the 37,800.  I don't think that

17  was disclosed at the time of the --

18    MR. SMITH: That's the point I'm trying to make

19  here, Your Honor, and I'm failing to do so, and I apologize.

20  But that's the point I'm trying to make.  Thank you, Your

21  Honor.

22    MR. BOULBOL: Thank you, Your Honor.

23    THE COURT: Thank you.  Deloitte & Touche.

24    MR. GREENBLATT: Good morning, Your Honor.   Steve

25  Greenblatt from Loeb & Loeb in New York representing Deloitte

**A718**

1  & Touche LLP and Deloitte Tax LLP.

2       THE COURT:  The one curious thing at the start I'd

3  like to know is when you split up your organization and you

4  bill separately, is that included in the retention order?

5       MR. GREENBLATT:  Well, in this case, Your Honor, we

6  had a separate retention application and separate retention

7  order for Deloitte Tax when that reorganization occurred.  I

8  believe the reorganization itself took place in August of

9  2004, and this Court signed an order which off the top of my

10  head I believe was November 3rd, 2004 approving the separate

11  retention of Deloitte Tax pursuant to a separate application.

12       THE COURT:  In this application, we have a request

13  for fees of $4,781,665 and expenses of $596,063.48.  Deloitte

14  requests a fixed fee for audit-related services and hourly

15  fees for other services.  The fixed fee is actually an hourly

16  cap; do you agree with that?

17       MR. GREENBLATT:  At this point, Your Honor, we

18  negotiated with the fee auditor that we've accepted that

19  under our conception it was a fixed fee situation.  We had

20  disagreements with that with the fee auditor, but we were

21  able to come to an agreement as to how proper time records

22  should be kept for the case.

23       THE COURT:  The auditor notes that the specific

24  time and expense entries shows that the professional billed

25  an inordinate number of hours over a relatively short time.

**A719**

1    One employee is a $150, billed 67 hours for five days.

2    Another employee at $150, billed 60.5 hours for the four

3    days.  Another employee for $225 an hour, billed 64 hours for

4    four days.  Another employee for $225 per hour, billed 65.5

5    hours for four days.  Another employee at $225 an hour billed

6    60.5 hours in four days, and another employee -- these are

7    all the same four days, billed $225, 62 hours for four days

8    in the month of March 2004.  Deloitte explains that in a

9    reference response that they were the deadline they had to

10   meet, and so they worked long hours, and that became quite

11   obvious to me when I read the application, and in a shorter

12   period of time, eleven days, and they say that all of the

13   number of hours of work per day during the time frame were in

14   some cases more than usual.  They were not inordinate for the

15   type of work product that they must finalize to meet

16   regulatory deadlines.  Which regulatory deadlines are those?

17           MR. GREENBLATT:  I can't answer that, Your Honor,

18   I'm sorry.  I --

19           THE COURT:  Moreover to utilize additional

20   personnel to complete this task by the applicable deadline

21   rather than a required professional's reference in the

22   paragraph to work longer hours for a short period of time

23   would likely decrease the efficiency.  Now, I can't judge

24   what the work they did was efficient or not.  I don't know if

25   they fell asleep on the job over those long hours or they

**A720**

1   kept on going.  Deloitte Touche submits that their

2   professionals provided are subject to the time frames

3   referenced in the fee auditors in this paragraph provided

4   such services are effective -- and I guess what you were

5   working on is the FCC Form 10-K.

6           MR. GREENBLATT:  I believe that's correct, Your

7   Honor.

8           MR. AUSTIN:  Your Honor, may I -- I can confirm

9   that.  One thing that Northwestern did which is somewhat

10  unusual for a debtor, that is a reporting company, one thing

11  Northwestern did during its Chapter 11 proceeding is that it

12  continued to make on a timely basis its SEC filings.  It

13  filed its Qs, it's Ks, its AKs and what have you as necessary

14  and certainly for the quarterly reports and the annual

15  report, Deloitte's assistance was needed.  Unfortunately,

16  during this period, we also fell into the new rules under

17  Sarbaines Oxley (phonetical) so that, for example, the 10-K

18  became an expedited filing where you normally had, I think,

19  until April heretofore where this filing had to be done in

20  March, plus it had to be done in connection with the filing

21  of the reorganization plan and disclosure statement which we

22  came up in May.  So that's why, as it relates to the short

23  time frame for regulatory filings, I believe that's what it's

24  referring to.

25          THE COURT:  All right.  The fee auditor says that

**A721**

1    employing the standards that he believes applicable relative

2    to a number of cases that he cites in the report about the

3    long hour days, which the courts have been critical about,

4    that time in excess of 54 hours in these items should be

5    reduced in item (A) $525, item (B) $487.50, item (C) $1,125,

6    and item (D) $1,293, item (E) $731, and item (F) $900.  These

7    total reductions total $5,062.50, and I'll order a reduction

8    in that amount from the $4,781,665.

9         MR. GREENBLATT:  Your Honor, if I may interject for

10   just one moment.  The fee auditor subsequently filed an

11   amended report in response to Deloitte's provision of

12   additional information on those hours and together, working

13   in conjunction with the fee auditor, Deloitte and the fee

14   auditor agreed to a compromise amount of 20 percent

15   essentially on most of those items, such that the fee

16   auditor's amended report recommends reductions of different

17   amounts from those which Your Honor just read into the

18   record.

19        MR. SMITH:  Your Honor, Warren Smith, the fee

20   auditor.  With all due respect, Your Honor, what happened was

21   that I subsequently got the same explanation that you have

22   just heard.  I came to one conclusion, Your Honor, but you

23   heard the same explanation that I heard, and, yes, I did come

24   to the conclusion that a 20 percent reduction was

25   appropriate, but I'm not going to substitute my judgment for

1  the Court. I think actually the opposite happens, Your

2  Honor.

3      MR. GREENBLATT: And certainly, Your Honor, I'm not

4  trying to suggest anything otherwise, just to point out that

5  the fee auditor has filed an amended report in which the

6  amounts are different from those which Your Honor's just read

7  into the record. Of course, if Your Honor feels that the

8  reductions as initially recommended are appropriate, Deloitte

9  is, of course, going to live with that, but through

10  discussions and through discussions of exactly what services

11  were provided of Deloitte and the fee auditors did come to a

12  compromise that reflects the value of services that

13  essentially -- Well, certainly the Deloitte fees were

14  provided, and apparently the fee auditors was comfortable

15  with it.

16      MR. SMITH: Your Honor, if the Court cares about my

17  reasoning, the reasoning that was just explained in court did

18  provide some additional factual background that was -- that

19  essentially supplemented what was given to me originally, and

20  that's why I altered my opinion. But again, that's just my

21  recommendation, Your Honor.

22      THE COURT: There are questionable expenses on

23  overhead charges, routine tasks taken by a high rank

24  professionals, non-working travel, overcharges, excessive

25  meals, internet access, air fare change fees, excessive

**A723**

1    ground transportation.  I really think that it's calling for

2    a certain type of professional to occasionally put in long

3    hours in order to meet a deadline, and depending on the

4    circumstances, I don't think that there probably should be a

5    question as to the time billed as being productive.  I

6    suppose it's a judgment call one way or the other as to

7    whether these long hours were in fact required and necessary,

8    but I'll assume that they were.  And therefore, the final

9    award will be adjusted by me from the fee auditor's report,

10   and I'll get out an order to that effect.

11             MR. GREENBLATT:  Thank you, Your Honor.

12             THE COURT:  And I was told I just -- on the

13   incidental travel expenses of $5 a day, that just seemed to

14   be an in-house rule?

15             MR. GREENBLATT:  That's my understanding, Your

16   Honor.

17             THE COURT:  And you offered to reduce these by

18   half?

19             MR. GREENBLATT:  That's correct.

20             THE COURT:  I'm going to reduce them by all.

21             MR. GREENBLATT:  That's your prerogative.

22             THE COURT:  Not that big a deal out of $4 million.

23             MR. GREENBLATT:  We agree, Your Honor.

24             THE COURT:  All right.  We'll get out an order.

25             MR. GREENBLATT:  Thank you, Your Honor.

**A724**

1    THE COURT:  Miller, Balis and O'Neil.

2    MR. ELLIOT (TELEPHONIC):  This is Randolph Elliot.

3    I'm on the telephone from Washington, D.C.

4    THE COURT:  All right.  Do you have anything to

5    day?

6    MR. ELLIOT (TELEPHONIC):  Nothing other than what's

7    in my written application, Your Honor.

8    THE COURT:  Well, I must say we went over it, and

9    the law clerk and I agreed that it was well done.

10    MR. ELLIOT (TELEPHONIC):  Thank you.

11    THE COURT:  And so I don't have any problems with

12    the application and final fee report of Balis and O'Neil, and

13    we'll approve that application in the sum of $115,829.75 and

14    expenses of $4,648.47.

15    MR. ELLIOT (TELEPHONIC):  Thank you, Your Honor.

16    THE COURT:  What did you have to do with the PFC,

17    Montana PFC?  Anything?

18    MR. ELLIOT (TELEPHONIC):  No.

19    THE COURT:  Good.  All right, that's all.  Thank

20    you, Mr. Elliot.

21    MR. ELLIOT (TELEPHONIC):  Thank you.

22    THE COURT:  All right.  Alvarez & Marsal have --

23    This is a fee application for $1,680,210.  Expenses of

24    $200,988.42, and what they call a success fee of $500,000.

25    The retention order, Docket No. 344 provides that such

1  incentive fee shall not exceed one million and may not be
2  paid without further order of the Court with respect to which
3  all parties have reserved their rights to object to the
4  payment of such incentive fee.  There were no objections by
5  any party to the payment of the excess or success fee.  The
6  total number of hours billed by this firm was 5,563 hours.
7  That's a blended rate of $302 per hour.  If you throw in the
8  success fee, it's another 89.87 for 391.87  As I understand
9  this Alvarez Marsal application, and I'd like some
10 explanation about this to see if I'm correct, it's associated
11 with the sale of one of the debtor's assets; is that correct?

12         MR. AUSTIN:   I'll speak to that, Your Honor.  Again
13 for the record, Jesse Austin.  The answer to that is correct,
14 Your Honor.  Alvarez was retained for a limited purpose, to
15 assist the debtor in (a) completing the sale of the company
16 then known as Expanets as well as to -- in protecting the
17 company's interest with respect to Expanets and also to help
18 establish the company's claims with respect to Expanets.
19 Expanets is now the debtor, as one would say, previously
20 known as Expanets, now known as Netexit, and to put that in
21 perspective, Your Honor, the stalking horse bid which we had
22 on the Expanets company -- I'm probably going to get the
23 number wrong, but I know that it was in the $65- to $70
24 million original price.  We had an active auction with four
25 bidders in October or November of '03, early in the case,

1  which resulted in almost doubling the purchase price to $140-

2  to $150 million range.  Certainly from the debtor's

3  perspective, we think we got good value for the money, and

4  that amount was negotiated down from an original request that

5  Alvarez had made, and we passed it through everybody.  But

6  that's where the work was done.  And I'm also advised, Your

7  Honor, that Alvarez did a fair number of services to the

8  debt, I think working on some aspects of the schedules and

9  statements of affairs and helping to get reports done.  And

10  specially, most importantly, I'm reminded, cash management

11  system.  So there was direct work with respect to the debtor

12  on its operations certainly in the initial stages of the case

13  because during that, Your Honor, we had, as the Court's well

14  aware, a lot more reporting requirements with cash management

15  in general and specifically as it related to one asset which

16  was the cash coming from a lease of a power facility known as

17  Colstrip No. 4.

18          THE COURT:  The Court has already given its opinion

19  relative to the employment of the outside law firm of Cronin

20  & Verez (phonetical) expense item of $20,205, and that's

21  going to be deducted together with additional expenses, and I

22  don't know of $18,072.78 which are included in the auditor's

23  report.  I think some of those included the services for

24  Cronin & Verez, so I'm going to have to go back and put my

25  deduction in and modify his somewhat.

**A727**

1      MR. AUSTIN:  Your Honor, I think that number of the

2  fee examiner did include the number -- the amount for the

3  outside firm to Alvarez, and I'd like to at least make a

4  comment relative to this issue to Alvarez, it will be the

5  same comment I'd like to make as it relates to Lazard, and I

6  know that the Court had previously made a comment relative to

7  Houlihan.  I want to make this comment, because I want the

8  Court -- I don't want to leave the Court with the concern or

9  impression that Lazard or Alvarez or Houlihan, at least in

10  this instance, may have made an intentional violation of

11  § 327 of the Bankruptcy Code.  If the Court goes back and

12  reviews the Lazard engagement letters, the Alvarez engagement

13  letters, and the Houlihan Lokey engagement letters, the

14  engagement letters specifically provide that Lazard as an

15  entity is obviously being retained by the estate.  We've done

16  -- an application was filed too and got approval for that.

17  Alvarez was being retained by the debtor's estate,

18  application filed, order approving that.  Houlihan is

19  retained by the Committee, application filed and order

20  approving that engagement was entered.  Imbedded in the

21  engagement letters themselves was the obligation of the

22  debtor or the debtor's estate to pay to Lazard, to pay to

23  Alvarez, and to pay to Houlihan third party out-of-pocket

24  fees and expenses.  And as it relates to at least -- I'd have

25  to ask the Alvarez people where their fees came from relative

**A728**

1   to the work done.  I know for example from Lazard, the Gibson

2   Dunne amounts, which I think the Court may take up in a few

3   minutes, that was fees incurred where Lazard had to go hire

4   Gibson Dunne.  It was not the debtor hiring Gibson Dunne, but

5   Lazard itself hired Gibson Dunne to comply with subpoenas and

6   document requests that were submitted to Lazard in connection

7   with discovery by Wilmington Trust and Harbert and Magten and

8   others in connection with the confirmation process.  So, at

9   least from the engagement letters, the parties were not of

10  the mind that separate application for engagement had to be

11  filed for Gibson Dunne or for Alvarez's outside counsel, or

12  for example, Houlihan's outside counsel.  That's why they are

13  asked to pass through those expenses because at least on the

14  face of the engagement letters, it provided for the debtor's

15  estate to have to pay those third party out-of-pocket

16  expenses.

17        THE COURT:  Sure.  Sure, as long as it's in the

18  letter, then I can ignore it, nor -- I can ignore 327, that

19  doesn't count even though they're professional fees, I'm not

20  going to do that.  You can take it upstairs, but I don't

21  think you're going to win it.

22        MR. AUSTIN:  Well, I just --

23        THE COURT:  I just am not going to sit in this

24  Bankruptcy Court and just tell -- look at that Code and say,

25  that doesn't mean anything.  It's whatever they write among

1  themselves.  I'm not going to do that, and as far as I'm

2  concerned, the law is very, very strict on this issue.  If

3  those professionals want to be paid by the estate, they have

4  to be employed by the estate under the order of the Court.

5  And if they don't want to be paid, then they do it at their

6  own risk.

7         MR. AUSTIN:  Thank you, Your Honor.

8         THE COURT:  I appreciate your comments about trying

9  to protect what you people made the agreement.  It's just too

10  bad that they didn't come in and get it done.  The first

11  thing I looked at when I had the Lazard thing going through

12  their voluminous file, was that why couldn't the subpoena,

13  which was based upon a request by creditors dealing with the

14  confirmation hearing be handled by counsel that was going to

15  handle the hearing.  I just don't understand why your firm or

16  someone else up there at the Greenberg firm wasn't able to do

17  the legal work on that subpoena if in fact it was going to be

18  materials that were pertinent to Northwestern's financial

19  situation.  And that's all I thought about.

20         MR. AUSTIN:  We understand, Your Honor.

21         THE COURT:  All right.  Thank you.  I'm going to

22  get out an order.  The expense allowance will be $162,710.64.

23  That's deducting the $20,205.  The fee award will be in

24  accordance with the recommendation of the auditor at

25  $1,669,260, zero dollars, plus a unsuccessful fee of $500,000

1    -- I mean a successful fee.

2              MR. AUSTIN:   Thank you, Your Honor.

3              THE COURT:   All right.  Lazard financial advisor

4    and investment banker.  The debtor has a fee request of

5    $2,600,000 and a restructured fee of $5,500,000, and expenses

6    of $158,994.39.  Eligibility as to the award of the

7    restructured fee depends upon the confirmation.  The fee

8    auditor believes the fee satisfies the standards of 328 and

9    330, and I know that there's a pleading in this file relative

10   to the application of 328 viz-a-viz 330, but when you go back

11   and look at the retention order, it very explicitly says that

12   the restructured fee will be approved upon the application

13   filing of § 330(a), and that's what's going to happen.  Now,

14   there have been no objections to any of the fee requests.

15   The total number of hours billed were 3,213.  For the monthly

16   fees, that rate is $809.11 per hour.  For the blended rate

17   for the restructured fee it is $1,711.58.  For a blended rate

18   of $2,520.  I do note that the person who billed the most

19   hours for Lazard was the lowest ranking member of the team.

20   I don't want to give his name, but he was an analyst, and he

21   billed 1,089 hours or one-third of Lazard's hours.  The next

22   highest bidder was Mr. Yearly, I'll give his name as the

23   managing director because he was the gentleman who testified

24   at the confirmation hearing, and his hourly bills were 910

25   hours.   The analyst, according to the application, this was

**A731**

1   his first year on the job.  I also note that Lazard was the
2   debtor's financial expert, billed fewer hours than Houlihan,
3   the Committee's financial expert.  However, Houlihan's
4   monthly fee was $25,000 higher and the questionable expenses
5   for temporary wages for graphics and word processing were
6   $1,909, but I don't understand why they're not considered
7   overhead.  You just bring somebody in to work, and you've got
8   a team of people there to work, regular employees, and you're
9   -- I don't know what they did.  Word processing work sounds
10  like they were just secretaries.  The legal expenses which
11  they incurred total -- one expense is $2,764.77, and the
12  legal fees are $56,169, for a total of $58,993.77, and I've
13  already ordered those to be reduced, the fees to be reduced
14  accordingly.  Lazard, of course, argues that 327 does not
15  apply to their attorneys that they hire, and I reject that
16  argument.  With regard to the restructure fee, I have a
17  little problem with it in light of a decision that was
18  written in August by Judge Walrath dealing with this same
19  thing in -- Well, what's the name of that case -- I'll think
20  of the name of it in a minute, in which she found that an
21  hourly rate, and we are bound by an hourly rate, was about 25
22  -- $1,711 for the restructure fee.  In August, she found for
23  financial advisor, is at the market rate for financial
24  advisors based upon applications and so forth, $700 an hour,
25  and I'm going to look at this restructure fee, and I'm not

**A732**

1  going to award it at this time.  I'm just not settled with

2  it.  I just don't think that you have one financial advisor

3  who contributes to the reorganization process from the

4  Committee that winds up getting $2,018,000, see if it he gets

5  it, and another one that gets 5.5 million and does less work

6  on the job by an hourly computation.  Now it may be that

7  Lazard was involved, and I'm sure they were earlier on in

8  this case, and broadened out more actively, did more

9  activity, other than just the reorganization --

10       MR. AUSTIN:  And that's what I'd like to speak to

11  Your Honor.  Lazard's engagement, I believe, if the Court

12  goes back and looks at the application, I believe that Lazard

13  was initially engaged by Northwestern in April 2003, and so,

14  Lazard was April through the date of the filing to obviously

15  have a head start on a lot of information which it was

16  available, analysis, and getting up to speed, viz-a-viz, the

17  company, which once the bankruptcy case was filed, the

18  Committee was formed and Houlihan then got engaged.  Houlihan

19  had to then kind of run faster where Lazard already had that

20  background.  So to the extent you're looking at that, I think

21  the Court should keep in mind that Lazard had been on the job

22  from April up until September.  The additional thing is, I'd

23  have to double check, but I think that there was -- why there

24  was definitely the test of reasonableness by 330 looking at

25  the success fee that when Lazard was engaged, I believe, and

**A733**

1   I'll double check, Your Honor, and if I'm in error, will also

2   advise the Court, we had some evidence relative to the

3   reasonableness of or the market part of the Lazard success

4   fee in connection with the first day hearings when these

5   retention applications were presented, and I will look for

6   that, Your Honor, to try and submit that.

7        THE COURT:  You may make your comments, the

8   gentleman behind, and just identify yourself for the record,

9   and --

10       MR. YEARLY:  Andrew Yearly with Lazard.  Thank you,

11  Your Honor.  Just a few comments.  We did respond to the fee

12  auditor's interim report on our restructuring fee to provide

13  them data of quote/unquote, "market transactions as

14  investment bankers and financial advisors to the debtors in

15  the marketplace are retained two sets of data."  We provided

16  them, they got them comfortable that this was quote/unquote,

17  "a market fee".  I would also just note that there's been a

18  lot of discussion this morning about hours, too many hours,

19  how are professionals working these long hours and billing

20  such large amounts, and yet Lazard appears to be potentially

21  being penalized for quote/unquote, "not billing enough hours

22  in this case".  I would get away from hours and look at value

23  provided, Your Honor.  Lazard did get involved prior to

24  Houlihan Lokey in April of 2003.  We think this was an

25  extremely successful case given what we all walked into.  Are

1  we happy that equity did not get a recovery?  Certainly not,

2  But given at the end of the day that it looks like unsecured

3  creditors are going to get near a hundred percent recovery

4  today, that none of these creditors have objected to the fees

5  of Lazard, speaks volumes.  I would just highlight a few

6  things that we highlighted in our final application.  We were

7  able to arrange a very attractive debtor in possession

8  financing for the debtor which ultimately resulted in us

9  being able to go out and renegotiate one of their existing

10  financing agreements, which was in the amount of $390

11  million, that financing agreement, and saved nearly $7

12  million a year in annual interest savings.  I think that is

13  substantial, and again, something that Lazard led.  We led

14  that not only with our restructuring group.  We led that with

15  our capital markets expertise so individuals who understand

16  those markets and understand the holders of that paper and

17  were able to play an important role in that.  So, again, the

18  notion of hours with Lazard, I think, is unfair.  Lastly, we

19  again, were the sort of central financial advisor in the

20  negotiation of the Montana settlement.  We thought that was a

21  critical settlement in the overall scheme of the plan of

22  reorganization.  Gave the company some runway coming out of

23  bankruptcy not to face a rate case and not to face an

24  objection by the Montana Commission as part of the

25  confirmation hearing which again, we thought was critical.

1  That was also critical as we went and talked to the rating

2  agencies.  They loved the idea of having a freeze on the

3  rates for a period of time to give this company time to prove

4  itself and this management team time to prove itself, and we

5  thought that was invaluable.  Again, lastly, we were sort of

6  the centerpiece of the negotiations on the plan.  We were the

7  valuation expert.  We prepared the liquidation analysis, and

8  we were day-to-day involved in what we think was a successful

9  outcome.  So, we would just ask you to measure those

10 successes against the success fee, especially in light of the

11 fact that again we believe the fee is a market-base fee.

12 Lazard was hired originally on a competitive basis.  The

13 debtor could have gone out and hired any advisor they chose.

14 They did so, they chose Lazard, they negotiated that fee, and

15 we believe that's a market figure.  Thank  you.

16            THE COURT:  Thank you.

17            MR. AUSTIN:  And, Your Honor, the debtor also would

18 like to make this limited request:  To the extent that the

19 Court still has, after analyzing the situation, questions

20 concerning, for example, whether indeed that success fee is a

21 market-based fee, we would ask rather than the Court

22 ultimately denying that fee or reducing that fee, that we be

23 allowed the opportunity at the March 8th hearing to bring in

24 evidence which unfortunately I do not have today that that

25 fee on behalf of the debtor's financial advisor in this

**A736**

1   context is a reasonable and indeed a market fee.

2          THE COURT:  I'll allow that, and I'll just take

3   this matter under advisement and you can advise me if you

4   want to do it on either the March or April hearing.  I'll

5   hold it until then.

6          MR. AUSTIN:  Thank you, Your Honor.

7          THE COURT:  Paul, Weiss, counsel for the Official

8   Unsecured Creditors Committee, they have requests of

9   $2,075,635.50 and expenses of $161,469.37.  They also request

10  fees under § 503 of the Code for substantial contributions

11  while working, evidently, for the informal official Unsecured

12  Creditors Committee, which they seek a -- said they made a

13  contribution which required expenditure of time, effort at

14  the legal rate of $54,435 for that fifteen day period, and

15  additional expenses at $2,412.60.  I've got a very serious

16  question about the substantial contribution request by this

17  applicant.  According to the reasons that they gave to the

18  auditor when he raised the issue, they said that they had

19  safeguarded the rights of the general unsecured creditors,

20  and they negotiated with debtor's counsel regarding the DIP

21  financing agreement and related order, and they researched

22  potential avoidance actions that still continue to today.  In

23  looking it over, and I went back and looked at each one of

24  your time entries, I really have to say that a lot of it was

25  for your own self improvement in the position because you

1  were doing inventories of creditor lists and computer work

2  and things of that nature, and what really got me is when I

3  went back and looked at the time entries that were put into

4  this file by Paul, Hastings and by the Greenberg firm, and I

5  felt, well, if they were interfacing then with the debtor's

6  counsel regarding DIP financing, it would show up, and by

7  golly gee, there isn't one entry in either one of those

8  applications from that period of time, from 9/14 to 9/29 that

9  shows they had any contact with your firm whatsoever.  There

10 is a lot of entries in there by Paul, Hastings particularly

11 relative to DIP financing, a number of them, and it's obvious

12 that they were working very hard.  But you would think that

13 if this counsel were interfacing and doing their input, that

14 the Paul, Hastings computation particularly give names and

15 places and who they were with.  And no one from your firm

16 ever shows up.  I just don't believe that there was any

17 substantial contribution in that period, and I certainly

18 don't think it would be worth $52,000 for fourteen days, but

19 I can't believe that you research some potential avoidance

20 actions, and I don't know whatever happened to that.  It

21 doesn't say.  I just think that the -- and this is not the

22 only one, we've got another one coming in the same condition,

23 but there is no substantial contribution.  It's a stiff test,

24 and it should be, and maybe there's some small contribution.

25 I couldn't find it in your time entries, I really couldn't.

**A738**

1     MR. KORNBERG:  Your Honor, Alan Kornberg of Paul,

2  Weiss, Rifkind, Wharton & Garrison.  Let me say that I can't

3  speak to what is in or not in the Paul, Hastings application,

4  but I think that the principal objection that we had with

5  respect to the DIP financing was an issue that we negotiated

6  directly with counsel to the DIP lender, and that was, they

7  had a 506(c) waiver that we strenuously objected to.  We

8  negotiated directly with the Chicago firm of Skadden Arps on

9  that issue, and we ultimately did prevail at the final

10  hearing.  So, it may not necessarily show up in the Paul,

11  Hastings application because they didn't represent the DIP

12  lender --

13     THE COURT:  Okay, it doesn't.

14     MR. KORNBERG:  Another firm did.  With respect to

15  the fraudulent conveyance analysis, Your Honor, that was at

16  the heart of this case.  The fraudulent conveyance analysis,

17  of course, is the issue that was being -- that was the issue

18  that was being actively litigated with Magten.  It was an

19  issue that you heard was only -- a settlement was agreed to

20  in principal today.  That is, Magten, as you know, filed an

21  adversary proceeding alleging that the going -- so-called

22  going flat transaction was a fraudulent conveyance.  That is

23  the work that we refer to in the petition.  We started that

24  analysis day one before we were retained as counsel to the

25  Official Committee.  So that -- Your Honor said a moment ago,

1   I don't know what happened to that work.  That work was in

2   fact used by the Official Committee when it was up and

3   running.

4   THE COURT:  You were involved in the Magten and

5   Clark Fork, Black Foot litigation?

6   MR. KORNBERG:  Your Honor, we were very involved in

7   analyzing those issues --

8   THE COURT:  In September of 2003?

9   MR. KORNBERG:  In the period covered by the 503(b)

10  application, yes, Your Honor.  We began analysis of the

11  documents and the facts and started our research and that is

12  described in the application.

13  THE COURT:  My problem is that -- if my memory is

14  correct, and I just reviewed this the other day, I can't find

15  any time entries that even mentions Magten.

16  MR. KORNBERG:  Your Honor, I think when we --

17  THE COURT:  Have you got your substantial time

18  records there?

19  MR. KORNBERG:  The time records are those which

20  appear -- If you look at the far right, there will be a code

21  that says 707.  It's page 9 of our printout.  This is in the

22  503(b) application.  And all of that time relates -- or

23  substantially all of that, relates to two issues:  The

24  fraudulent conveyance work --

25  THE COURT:  We're having trouble finding it.  I

1    don't think it's going to change my mind. I can't understand

2    what possible substantial contribution you'd make on the

3    Magten if it was as ongoing -- I mean, fairly represented and

4    fought by debtor's counsel.

5            MR. KORNBERG: Your Honor, we were -- Frankly, the

6    debtor's counsel -- we took a very independent look at that

7    issue. Of course, one of Magten's allegations was that the

8    debtor's counsel had been involved in the very transactions

9    that were at question here, and as I think Your Honor knows,

10   Magten even eventually sued Paul, Hastings in state court

11   alleging they aided and abetted the fraudulent conveyances.

12   Your Honor, we had a duty on behalf of the Committee to

13   review those issues and form our own view, and that was -- we

14   helped litigate those at confirmation, in fact. We were very

15   active in litigating those.

16           THE COURT: I'll look it over, but I appreciate

17   your explanation. Is that the only explanation you have?

18           MR. KORNBERG: No, Your Honor, I think that with

19   respect to --

20           THE COURT: What I guess I was a little bit mislead

21   by your response to the other report.

22           MR. KORNBERG: I'm sorry, I couldn't hear you.

23           THE COURT: I guess I was a little misled by your

24   response because in your response to the auditor's report,

25   you don't even mention Magten.

**A741**

1    MR. KORNBERG: Well, Your Honor, the auditor's --

2 our application is quite clear, and I think the time records

3 are quite clear that $13,627 was devoted to work that we in

4 essence did on the fraudulent conveyance and other

5 subordination issues. There were contractual subordinations

6 that were a factor in this case as well. And again, as I

7 said, that's on page 9 of our printout. Your Honor, in

8 essence, the reason we filed this 503(b) application is

9 because even though we were only retained sixteen days after

10 the case began because Paul, Weiss was in place actually pre-

11 petition as counsel to the informal Note Holders Committee,

12 we really began our work day one of the case, and the work

13 that we did beginning day one was used by the Committee when

14 it was appointed on day sixteen, and there is authority for

15 granting under 503(b) applications for preformation work.

16 The Bergoin (phonetical) case that we cite is a case that

17 within the Third Circuit that recognizes that that may be the

18 case. So, for example, in connection with the fraudulent

19 conveyance analysis, I don't think we should be penalized

20 because we began early rather than waiting for our

21 appointment as counsel to the official committee, and that is

22 the basis of the application.

23    THE COURT: Okay, I've got it here.

24    MR. KORNBERG: And I think the other areas, as I

25 mentioned, we did successfully oppose the 506(c) waiver that

**A742**

1   the DIP lender had asked for. We studied all the first day
2   motions. We appeared at the first day hearing. There was
3   nobody else to represent unsecured creditors at that hearing,
4   and I think those are the principal categories, Your Honor.

5              THE COURT: Yes, I've got it all here.

6              MR. KORNBERG: And indeed, Your Honor, I might also
7   mention that we had received a retainer pre-petition in
8   connection with our work for the informal committee. There's
9   approximately $50,000 left of that retainer, so, you know, I
10  would also submit that essentially these fees were covered by
11  that retainer. We, of course, couldn't apply the retainer
12  because of the pendency of the Chapter 11 case.

13             THE COURT: Well, you're saying you've already been
14  paid for this work?

15             MR. KORNBERG: No, Your Honor, I said we were given
16  a retainer. We have not been paid for it.

17             THE COURT: Well, how does -- you think that
18  reviewing first day papers, updating first day motions,
19  reviewing first day papers, reading and reviewing first day
20  papers, reviewing comments, reviewing recent e-mails, doing a
21  conflict check, discussion with somebody about general
22  reviewing correspondence, news clips, reviewing news clips,
23  reviewing recent news articles, reviewing the McGreevey
24  litigation, reading the recent NOR articles, do you think
25  that's a substantial contribution?

1    MR. KORNBERG:  Your Honor, I think that obviously

2    there are some administrative matters that probably do not

3    constitute a substantial contribution, but certainly

4    reviewing the first day motions and doing that _de facto_ on

5    behalf of all the unsecured creditors to make sure that they

6    are not overreaching, that they are proper is a service to

7    the unsecured creditors generally, and I would submit, Your

8    Honor, that that is compensable under 503(b).

9         THE COURT:  I'll take this matter under advisement.

10        MR. AUSTIN:  Your Honor, on behalf of Northwestern,

11   may I make a brief comment?

12        THE COURT:  Go ahead.

13        MR. AUSTIN:  While I can't speak directly to why at

14   least during this period there was no reference on the DIP

15   lending, with respect to the interface between our law firm

16   and Paul, Weiss, Mr. Kornberg is correct, the major issue at

17   the time we got to the interim hearing to the final was

18   really whether or not there would be a 506(c) waiver as

19   requested by the DIP lender, and we, the debtor, certainly

20   took the position that to get the DIP loan, the DIP lender

21   was requiring it in the context of debtors always saying that

22   the lender makes the rules, we found ourself with that rule

23   being faced with.  Our position was if the Creditors

24   Committee or the informal committee represented by Paul,

25   Weiss could achieve the result of the 506(c) waiver was not

1   included in the order that was great for us, and they took
2   the lead on addressing that issue.  I will note two other
3   things that I think certainly from the first day:  We did
4   have an objection on the first day of this case to the debtor
5   in possession financing.  And that came from the existing
6   secured lender group led by CSFB.  They were trying to take
7   the position that we should not have done the financing which
8   we were asking for on the theory that they hadn't been asked
9   to drive by the financing and they wanted to look at it.  Mr.
10  Kornberg, on behalf of the informal committee, stood up and
11  supported the debtor to oppose CSFB's objections.  The other
12  thing that I think that is important and is one of the points
13  that this Court asked about in my preliminary statement, is
14  one of the major matters that was addressed in the first day
15  hearings in the first day of this case, was the fact that the
16  debtor assumed all of its energy supply contracts, and by
17  making that assumption of those contracts, two matters are
18  important:  First, from the debtor's standpoint, we obviously
19  assured ourselves that we had an ongoing energy supply.  The
20  major counterpart to that though, Your Honor, is obviously by
21  assuming those contracts, and they are significant contracts
22  representing millions of dollars of obligations to the
23  company that by assuming those contracts in the early stages
24  of the case, we were creating a significant potential
25  administrative claim that there was a subsequent default on

1   those contracts.  It's certainly my recollection that one of

2   the most important things that the informal committee, and

3   specifically Paul, Weiss was looking at, is the propriety of

4   assuming those energy contracts, and I wanted to point that

5   out to the Court.

6   THE COURT:  All right, thank you.  Now, the rest of

7   the matters with regard to Paul, Weiss has to do with

8   questionable fees and expenses which are covered in the

9   auditor's report on excessive interoffice meetings, conflict

10  checks, duplicate time entries, word processing charges,

11  meals, excessive services for over time, ground

12  transportation, air fare tickets that are refundable or non-

13  refundable, senior partner's billing for routine tasks, and

14  discrepancy between the time billed and the amount of time

15  listed.  And there's more than one mistake there.  They sent

16  -- Paul, Weiss submitted a final fee application to include

17  fees and expenses inadvertently excluded from the final

18  application due to a miscalculation, and I guess the fee

19  auditor reviewed all those.  And then we got into the

20  substantial contribution under 503, and the fee auditor

21  recommends the fee request be denied, and I will review that

22  recommendation.  So --

23  MR. KORNBERG:  And, Your Honor, we have agreed to

24  --

25  THE COURT:  And with that, we'll review the expense

**A746**

1   of items that the fee auditor has raised and then we'll get

2   out an order.

3          MR. KORNBERG:  Your Honor, thank you.  I should

4   just point out that we did agree to the --

5          THE COURT:  You did agree to some of the

6   reductions.

7          MR. KORNBERG:  I think we agreed to all of them

8   except for the 506(c) issue.

9          THE COURT:  But you don't agree to the substantial

10  contribution work.

11         MR. KORNBERG:  I'm sorry, the 503 -- I'm confusing

12  my sections, but, Your Honor, yes we did agree to all the

13  other reductions.  Thank you.

14         THE COURT:  All right.  Thank you.

15         MR. KORNBERG:  Oh, Your Honor, can I -- Houlihan

16  Lokey is not represented by counsel, and I know I will get --

17  their counsel will call me the minute I get back to my

18  office.  In connection with the issue that Your Honor raised

19  early on regarding the payment of the transaction fee, can

20  Houlihan Lokey make a submission to the Court for hearing at

21  an upcoming hearing to address that particular issue, the

22  authority by which they receive --

23         THE COURT:  Well, I'm going to get some

24  documentation from Mr. Austin.  You can send me anything you

25  want too.

**A747**

1    MR. KORNBERG:  Okay.  Because that's for Lazard,

2  then I think Houlihan should have the same opportunity.

3    THE COURT:  Well, I thought it was on the

4  transaction fee.

5    MR. KORNBERG:  Yes, Your Honor, but I think it's a

6  different issue with Lazard than it is with Houlihan Lokey.

7    THE COURT:  You can submit anything you wish on the

8  transaction fee for Houlihan; is that what you want to do?

9    MR. KORNBERG:  Yes, Your Honor.

10    THE COURT:  Yeah, fine.

11    MR. KORNBERG:  Thank you very much, Your Honor.

12    THE COURT:  Don't charge the estate any money for

13  it though.

14    MR. KORNBERG:  Your Honor, I'm not their counsel,

15  so that won't happen.

16    THE COURT:  Leonard, Street and Deinard request

17  fees for $3,211,212 and expenses of $549,619.  This is

18  another one of those cases where I think I noted at the

19  outset that Leonard had quoted in their application quote,

20  "outside professional services", unquote, for $464,939.87,

21  and I realize that the explanation you made is that you

22  needed to get all these documents, thousands of them, to be

23  covered and to be put into inventory by two firms, I guess it

24  was.  WS-somebody and MLT or something.

25    MR. STRIKER:  It was primarily the LIT group, yes,

**A748**

1    Your Honor.

2    THE COURT: And that assisted you in the -- and

3    that's where the bulk of this outside professional services

4    come from. If you can convince me that those people are

5    merely clerical people, maybe they ought to take it out of

6    the aegis of professional people, but otherwise, if your

7    report is correct that they're outside professional people,

8    then I'm going to hold to my ruling on 327.

9    MR. STRIKER: Well, Your Honor --

10    THE COURT: So, I'll let you explain.

11    MR. STRIKER: I'm sorry. My name is Robert Striker

12    --

13    THE COURT: Well, one other question while you're

14    at it.

15    MR. STRIKER: Sure.

16    THE COURT: A great bulk of this -- of your

17    request, comes from legal representation in a PPL case --

18    MR. STRIKER: That's correct, sir.

19    THE COURT: -- and probably the bulk of it, and I

20    realize that that case is going on, and I realize that it's

21    got a lot of ramifications, but, you know, when I looked at

22    the disclosure statement, I didn't see that much coverage.

23    MR. STRIKER: Well, I'm sorry about that. I --

24    THE COURT: You didn't write the disclosure

25    statement and they didn't ask you to tell you what you

**A749**

1    thought about it, the litigation.

2         MR. STRIKER:  That's correct.

3         THE COURT:  All right.  Go ahead.

4         MR. STRIKER:  Well, Leonard, Street's position is

5    that the work that was performed by the LIT group was merely

6    clerical or mechanical.  The work was primarily just taking

7    the documents that were produced by each of the sides in the

8    litigation and scanning them and entering them -- entering

9    basic information into a data base.  They were not taking any

10   discretionary action or reviewing or analyzing any of the

11   documents themselves.  That work was done by Leonard, Street

12   personnel.  And so, we, quite frankly, didn't believe that

13   they even met the definition of professional, and it

14   certainly wasn't an intentional violation of § 327 by not

15   submitting any sort of an application on their behalf or

16   urging for them to do that.  The Court had seen these -- at

17   least two of these applications before, and we were under the

18   impression that that was the position of the Court as well.

19   It seems to be the position of the fee auditor and our

20   discussions with the US Trustee, they didn't have any

21   objection to that.

22         THE COURT:  All right, thank you very much.  I'll

23   take it under advisement.  I think I've already ruled though.

24   The matter of Vinson & Elkins fee request $167,205, expenses

25   of $2,375.  Special counsel to the debtor related to the

**A750**

1    cornerstone issues in the securities litigation.  The auditor

2    suggests that the $132 fee reduction relating to some

3    discrepancy between the time entry and the time billed.  I

4    don't think that's significant, so I will approve the fee

5    request of $167,205 and the expenses of $2,375 for Vinson &

6    Elkins.  The Bayard Firm.

7            MR. GLASSMAN:  Good morning, Your Honor.  Neil

8    Glassman from The Bayard Firm.

9            THE COURT:  The fee request by The Bayard Firm as

10   co-counsel to the official Unsecured Creditors Committee.

11   The fees request is $342,582.  Expenses are $30,398.  And of

12   course this includes another one of those 503 substantial

13   contribution problems with Bayard requesting $12,376.80.

14   Bayard explains how it has substantially contributed to the

15   debtor's estate by an attachment to the fee auditor's report,

16   and the fee auditor does not believe that Bayard's activities

17   during this period transcended self interest, and Bayard,

18   naturally, disagrees.  I'm going to take -- I really don't

19   think there was any substantial contribution, and you can

20   tell me why I'm wrong.

21           MR. GLASSMAN:  First, Your Honor, with respect to

22   the numbers that you first quoted, the fee request with

23   respect to our retention as Committee counsel is not $342-

24   plus, it's $341,000 plus --

25           THE COURT:  No, your total fee request for working

1    as co-counsel for the Committee was 342,582, and on top of

2    that you want $12,376.80.

3        MR. GLASSMAN: Yes, Your Honor. I was trying to

4    make a slight correction of that. We had already agreed

5    prior to the subject quarterly applications to a reduction of

6    $1,113. It's just that the 342,000 is really 341.

7        THE COURT: I understand that, but I'm just talking

8    about the what the request was.

9        MR. GLASSMAN: Yes, Your Honor.

10       THE COURT: Yeah.

11       MR. GLASSMAN: With respect to the 503(b) request,

12   I have to be candid. If you don't find that Paul, Weiss met

13   the burden, then we didn't because we only supported Paul,

14   Weiss through this whole project through this case. I mean,

15   in large measure, that's what we were here for. So, if you

16   don't find that Paul, Weiss contributed, then we didn't

17   either most likely.

18       THE COURT: What did you do?

19       MR. GLASSMAN: What did I do or what did the firm

20   do? I'm sorry.

21       THE COURT: No, the firm.

22       MR. GLASSMAN: The firm during the 503(b) period --

23       THE COURT: Yeah.

24       MR. GLASSMAN: Like Paul, Weiss read the first

25   days, got to know the case, got to know some of the issues

1   that were coming, told Paul, Weiss about local practice.  So,

2   you know, our argument is, is that most if not all of what we

3   did would have had to have been done any way once we were

4   Committee counsel.  And that, you know, the bottom line, the

5   bottom line is, is that's the argument for our firm.

6           THE COURT:  All right.  I appreciate your candor.

7           MR. GLASSMAN:  Thank you, Your Honor.

8           THE COURT:  I'll take this under advisement with

9   the other one.  We've got that second application for

10  Deloitte Tax, LLP for $314,658 and expenses of $24,390.58

11  due to their business reorganization.  A couple of the

12  projects went above the estimates and the fee cap contained

13  in the engagement letter, but for the most part the auditor

14  has no problem with the estimate except that we get back to

15  the non-working meal situation again.  But, I'll get out an

16  order on Deloitte Touche with this when I get out the order

17  on their other fee application.  Browning, Kaleczye, Berry &

18  Hoven seeks fees of $358,297 and expenses of $136,615.  They

19  too are included in the 327 problem by hiring appraisers  to

20  appraise the Colstrip lines at an expense of $32,904.  When I

21  went through the Browning application, I thought that it was

22  professionally done.  I was impressed with the fact that

23  their fee schedule was the lowest of all the other

24  professionals that had submitted applications.  And other

25  than the 327 issue for Apple (phonetical) Consulting of

1    $32,904, I don't have any problem with the fee application.

2         MR. AUSTIN:  Your Honor, can you -- I don't have it

3    in front of me, but is that $32,000 related to the engagement

4    of Avale?

5         THE COURT:  Yes.

6         MR. AUSTIN:  We will search the records, Your

7    Honor, but our recollection is that we actually did indeed

8    file an application on behalf of the Browning firm for the

9    engagement and got the approval of the engagement of the

10   Avale firm.

11        THE COURT:  All right, I'll wait for that.

12        MR. AUSTIN:  And we will search and try to provide

13   that information to you, Your Honor.

14        THE COURT:  I was going to give them a fee

15   enhancement anyway because they were so low on their hourly

16   rate that it might have made it up.

17        MR. AUSTIN:  We understand.  We'll see if we can

18   get it directly, Your Honor.

19        THE COURT:  We ought to take care of those boys

20   sometime.

21        MR. AUSTIN:  We're trying, Your Honor.

22        THE COURT:  All right.  I'll take that matter of

23   the costs to Avale under consideration, and if you'll supply

24   me just the docket number I can look it up.

25        MR. AUSTIN:  Thank you, Your Honor.

1    THE COURT: Gavin Anderson, have fees request of

2    $334,708.50. Expenses of $15,797.08. The questionable fees

3    that are covered in the auditor's report for expensive meals

4    and travel expenses, and I can tell you that the application

5    does not comply with the local rules. And it could be that

6    the application is going to have to be redone. These are

7    public relation people to the consultants to the debtor, and

8    I suspect that they haven't been through this ringer before

9    on knowing the local rules, but that's not an excuse. I just

10   note that one of the judges in this district has refused to

11   grant a fee application when the local rules have not been

12   followed. I will -- with that note, I will approve the fee

13   of $334,708.50 and expenses of $15,797 with the deductions

14   that were covered in the auditor's report.

15   MR. AUSTIN: Your Honor, on behalf of Gavin

16   Anderson, I know that those reductions included in the

17   auditor's report were acceptable.

18   THE COURT: Very good. The next application is

19   Greenberg Traurig, counsel for the debtor. Fees request for

20   $1,224,872.25, expenses are $340,557.96. The auditor's

21   recommendation says that some of the time is incorrectly

22   billed to this case instead of to the Netexit, and there are

23   duplicate billing, clerical overhead and secretarial work are

24   included in the fees. He thinks there's expensive meals and

25   hotel charges together with ground transportation and a

**A755**

1    security guard charge.  I don't know whether that is an

2    overhead and as is the time spent notarizing documents,

3    secretarial time -- I don't know, do you bill for secretarial

4    time to your non-bankruptcy clients in addition to your legal

5    time?

6             MR. CHIPMAN:  Your Honor, I believe in the

7    application it disclosed that if it was over time we would,

8    and we do it to all the clients.

9             THE COURT:  If it's secretarial over time.

10            MR. CHIPMAN:  It's secretarial or clerical over

11   time, I believe, Your Honor.  If they need to stay late past

12   their normal time then it was in the application.  I believe

13   it was approved by this Court that we could bill for that.

14            THE COURT:  I think one of the problems we had in

15   going through your application through that day, you simply

16   didn't provide enough information that we think should have

17   been provided relative to the expenses that are required by

18   the local rules.  There are some expense items in there.  You

19   just marked American Express.  I don't know what it's for.

20   That's all it says.

21            MR. CHIPMAN:  Your Honor, I believe we addressed

22   any issues that the fee auditor had raised on the expenses,

23   and we have agreed to a reduction for certain expenses, but I

24   believe that the fee auditor was okay with the expenses.

25            THE COURT:  All right, all right.  I'm going to

1    take the expense items under advisement, and I'll approve the

2    fees for $1,224,872.25.

3           MR. CHIPMAN:  Thank you, Your Honor.  Does Your

4    Honor need a form of order or will you be providing one?

5           THE COURT:  Why don't -- Well, why don't you submit

6    an order to us and then we can review it with regard to these

7    expenses.  Leave that blank.

8           MR. CHIPMAN:  Leave the expenses blank?

9           THE COURT:  Yeah.

10           MR. CHIPMAN:  Thank you, Your Honor.

11           THE COURT:  It can go anywhere from zero to

12    $340,000.

13           MR. CHIPMAN:  Thank you, Your Honor.

14           THE COURT:  The last application is Graves Law

15    Office, special environmental counsel to the debtor.  The fee

16    requests for Graves is $191,908.75.  The expenses are

17    $950,121.33.  Of course the big item for expenses comes from

18    the ELM Incorporated expense item of $889,353.72.  At the

19    outset I have to tell you quite frankly that this application

20    even for the fees of 191 do not comply with the local -- It

21    does not comply with the local rules.  They're not

22    characterized.  They're not set up by category and who did

23    what when, and you've got non-working travel time, it's not

24    billed at 50 percent.  The time spent for initial conflict

25    check is billed out, the fee.  You have administrative

**A757**

1  secretarial fees for billing matters.  In other words, you
2  sent a bill, and that's supposed to be legal work, I guess.
3  And this is the case where we found that someone was buying
4  Snoose at $4.29 a can.  I think you can get it a lot cheaper
5  in Montana.  And there are also some alcoholic beverage
6  charges in this expense item.  But, I think the big issue
7  here is the ELM consulting thing.  I know we've got a
8  application here for nunc pro tunc review -- or application
9  for nunc pro tunc to back this thing back up to September of
10 -- and as soon as I can find it in this mass of paper -- You
11 may proceed with that matter.

12        MS. DENNISTON:  Your Honor, if the debtor could be
13 heard just briefly?

14        THE COURT:  I don't care who handles it.  You've
15 got an uphill road.

16        MS. DENNISTON:  Your Honor, we recognize that
17 there's some fundamental issues about the applications, but I
18 also wanted to apprise the Court of the importance of the
19 services provided to the estate, and I think in light of the
20 introductory comments by the Court on the record and the
21 comments of the Court just now, what may make more sense and
22 be more equitable for all the parties involved is if we could
23 continue this matter so that we can bring the witnesses at
24 Northwestern to provide this Court with the testimony about
25 the services provided and the specific motions and the impact

1    that the analysis done by this law firm as well as the

2    consulting firm on the plan of reorganization, analysis and

3    environmental claims and the like. I think if the Court were

4    to hear that testimony from the people at Northwestern that

5    managed that process and managed these professionals, it

6    might assist the Court in both considering the application

7    for the nunc pro tunc order as well as the Graves Law Firm.

8        THE COURT: I don't have any problem with that --

9    having an evidentiary hearing on it. I think it's probably

10   desirable. There are a number of items that are going to

11   surface with regard to the billings that have been made by

12   ELM. The nunc pro tunc application has attached to it a

13   letter or a contract agreement between Graves and ELM that's

14   dated back in 2001. It deals with ELM's work for

15   Northwestern prior to the acquisition of Northwestern -- or

16   Montana Power's P&D properties. It has to do with

17   environmental work relative to Milltown and the bar graph in

18   there and what happens at the final application, and I don't

19   understand how a letter of that kind can possibly have any

20   relevance to being hired in a Chapter 11 bankruptcy

21   proceeding.

22       MS. DENNISTON: With the Court's assistance, I'd

23   like to continue this matter to the April hearing. I think

24   we're going to need a full evidentiary hearing in terms of

25   not only the benefit to the estate but that the issue the

1    Court has raised.  The reason I'm asking to put it on the
2    April calendar is so that to the extent that the fee examiner
3    and the law firm can work through the deficiencies and the
4    application can be amended and supplemented, we would be
5    having a hearing on a better application, if you will, that
6    has addressed some of the Court's concerns.

7         THE COURT:  One of the things that triggered my
8    interest in all these bills that were sent under the billing
9    of ELM Consulting -- I've got to find it here.  What it does
10   is, it sets them out without any explanation.  It's just, we
11   were there, we did it, and then added to it every item.  It's
12   a 1.1 multiplier.  So, if they charged $248, for example, for
13   a meal expense, that was 1.1 times 48 and that runs all the
14   way through this billing, and I suspect it's some kind of a
15   -- that's the final bill.  But you can address that issue
16   too.  I mean, you see, that's the reason that we like to
17   follow the 327 applications and that's the reason why we have
18   to have applications that are brought in here before so they
19   know what the rules are.  And there is no excuse for anyone
20   to come in here and not follow those local rules.

21        MS. DENNISTON:  Your Honor, if the Court were to
22   permit the amendment of the application, I think that we can
23   work with the Graves Law Firm and ELM to make the adjustments
24   that the Court has outlined and perhaps proceed on an
25   application that is more compliant with the local rules.

**A760**

1   The debtor, of course, appreciates the Court's concern about

2   compliance, but at the same time, the debtor reaped

3   significant benefits from access to these professionals

4   during the life of this case.

5       THE COURT:  Let me give you another example.

6       MS. DENNISTON:  All right, thank you, Your Honor.

7       THE COURT:  Fourteen meals on 10/22/04.  I don't

8   know who they were feeding.

9       MS. DENNISTON:  There were a lot of us --

10      THE COURT:  Fourteen of them, and unit cost 1.1

11  multiplier.  So, that's on all expenses.  Airfare to Aberdeen

12  was $525 and return -- it's obviously a full bill.  It's

13  probably the full boat.  There's no 50 percent application

14  there.  This is just rampant through the whole thing.  So

15  you've got a big chore about -- here's the two books, and all

16  of it's with ELM.

17      MS. DENNISTON:  We appreciate that, Your Honor.  If

18  we could resubmit and set it for a hearing in April, we will

19  be -- the debtor will bring the witnesses that are necessary

20  to set the stage and provide the background and in the

21  interim work with the fee examiner on an amended application.

22      MR. SMITH:  Your Honor, if I could address that,

23  because this is the first time that --

24      THE COURT:  Address what?  The continuance?

25      MR. SMITH:  No, Your Honor.  I have no problem with

**A761**

1    the continuance. My name is Warren Smith. I'm the fee

2    auditor. I've been practicing law for 25 years, and I've

3    been reviewing a lot of fees, okay? But the implication is

4    that they will be working with the fee auditor in the

5    interim, and, Your Honor, if you've looked at the billing

6    documentation from ELM Consulting, it's nothing we can work

7    with, Your Honor.

8                THE COURT:  I understand that.

9                MR. SMITH:  Okay.

10               THE COURT:  No, I understand that.

11               MR. SMITH:  I don't want anyone to assume that I'm

12   going to be able to --

13               THE COURT:  There's no way you can.

14               MR. SMITH:  Okay, thank you, Your Honor, thank you.

15               THE COURT:  That's the very point I raise. There's

16   no way you can judge what's going on with this outfit.

17               MS. DENNISTON:  Your Honor, based on the debtor's

18   representation to this Court, the debtor will work with the

19   professionals involved to redo the application, submit it to

20   the fee examiner, hopefully be able to provide the fee

21   examiner with something that he can work with along with the

22   evidentiary proof that we intend to present to the Court at

23   the April hearing.

24               THE COURT:  Did I overlook the fee application for

25   the auditor?

1      MR. SMITH:  Your Honor, it was not set on this

2  hearing.  There's some other matters that are being set over,

3  Your Honor.  I'm afraid our work isn't done.  Unless you want

4  to free me, Your Honor.

5      THE COURT:  Most of them come in and get an

6  application.  I'll leave it up to you.

7      MR. SMITH:  We were going to be set on the March

8  date.

9      THE COURT:  All right.

10      MR. SMITH:  Thank you, Your Honor.

11      MS. DENNISTON:  So what the Court -- the record

12  will reflect this will be continued to the April hearing?

13      THE COURT:  Yes.

14      MS. DENNISTON:  Thank you, Your Honor.

15      THE COURT:  What date do we have there.

16      THE CLERK:  April 5 at 9:30.

17      THE COURT:  Okay, you've got that?

18      MR. KAZEUSE:  Yes, Your Honor.  Jonathan Kazeuse on

19  behalf of Graves Law Offices, and as far as the fee

20  application of Graves Law Offices we have agreed with the

21  reductions that have been recommended by Mr. Smith.  So we do

22  not have a problem with the reductions as to the fees.  So,

23  if --

24      THE COURT:  All right.  You know what the problems

25  are.

**A763**

1      MR. KAZEUSE:  I do know where the problems are,

2   Your Honor.  Are we resetting the application of Graves Law

3   Offices and the application for ELM Consulting for April 5th?

4      THE COURT:  Do what?

5      MR. KAZEUSE:  Are we resetting the application for

6   the fees of Graves Law Offices as well?

7      THE COURT:  We're setting the entire Graves matter

8   for April.  That includes the application, the nunc pro tunc

9   order, the clean-up, everything that has to do with Graves

10  and ELM.

11     MR. KAZEUSE:  Thank you, Your Honor.

12     THE COURT:  Is there anything else?

13     MS. DENNISTON:  Yes, Your Honor, there is one minor

14  matter.  We had asked for a brief status conference on claim

15  objections, and I understand that we have a hearing date in

16  April at which time the debtor would like to set what it had

17  identified in the submission to the Court as the second and

18  third group of claims for hearing, and we would get notices

19  out.

20     THE COURT:  Oh, let me ask.  How many objections --

21  I'm glad you brought that up.  How many objections to claims

22  -- Nancy got an e-mail from somebody about thirty or forty or

23  something?·

24     MS. DENNISTON:  That's roughly correct, Your Honor.

25  But what the debtor is doing is that the debtor has set them

**A764**

1    up in waves.  We are in settlement discussions with 70

2    percent of the claimants, and we'd like to set for the April

3    hearing the second and third waves because we believe those

4    will either be resolved or ready for a hearing.

5        THE COURT:  I don't have -- Judge Sullivan is going

6    to handle some of those objections if they go to hearing.

7    They've already arranged it for him, and we're going to try

8    and wipe them out within the next two months.  If we know

9    what they're all about, we can get the notices out and get

10   them at issue.  And as to some of those claimants, I believe

11   we're going to have to have some hearings in Montana on it

12   because -- particularly on those pensions and --

13       MS. DENNISTON:  As to those, Your Honor, if I could

14   just give the Court a brief update.  There are ongoing

15   settlement discussions with a number of the Montana claimants

16   both through their counsel and individually, and that's why

17   the debtor is not seeking to set those for a hearing because

18   we believe that through the settlement discussions that there

19   is a good chance that a significant number of those are going

20   to be resolved on an amicable basis.  Contrary to, I think,

21   what the supposition has been, a proposal there is not to

22   wipe those out without any benefit to those claimants, and as

23   the -- I think, the level of understanding is what the

24   debtor's proposing, negotiations are on the way.  So, we

25   really hope to avoid a contested hearing on those matters,

**A765**

1  and that's why we'd like to leave those to follow and give us

2  the next sixty days to see if we can work out the issues that

3  the claimants and their counsel have.

4          THE COURT:  All right then.  Notify the Court if

5  there is a requirement for a hearing, and we can get some

6  suitable date out there.

7          MS. DENNISTON:  Thank you, Your Honor.  And would

8  it be amenable for the Court for the debtor to notice the

9  claim objection hearings for the April 15 date for what we

10  identified as the second and third group of objections?

11          THE COURT:  Right.

12          MS. DENNISTON:  Thank you, Your Honor.

13          THE COURT:  Thank you.  All right, the Court will

14  be adjourned.

15          (Whereupon at 12:05 p.m. the hearing in this matter

16  was concluded for this date.)

17

18

19          I, Elaine M. Ryan, approved transcriber for the

20  United States Courts, certify that the foregoing is a correct

21  transcript from the electronic sound recording of the

22  proceedings in the above-entitled matter.

23

24  _Elaine M. Ryan_                          2-14-05
   Elaine M. Ryan
25  2801 Faulkland Road
   Wilmington, DE 19808
   (302) 683-0221

**A766**