IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | Case No. 03-12872 (CGC) |
| | : | |
| | : | |
| Debtor. | : | |
| | : | |

## SECOND AMENDED AND RESTATED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE FOR THE PLAN OF REORGANIZATION OF THE DEBTOR

**PAUL, HASTINGS, JANOFSKY & WALKER , LLP**
Jesse H. Austin, III
Karol K. Denniston
Carolyn Chayavadhanangkur
600 Peachtree Street, N.E.
Suite 2400
Atlanta, Georgia  30308
Telephone:  (404) 815-2400

Co-Counsel to the Debtor
and Debtor-in-Possession

**GREENBERG TRAURIG, LLP**
Scott D. Cousins
Victoria Watson Counihan
William E. Chipman, Jr.
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone:  (302) 661-7000

Dated:      August 18, 2004
            Wilmington, Delaware

ATL/1053554.14

**A767**

## TABLE OF CONTENTS

Page

| | | | |
|---|---|---|---|
| I | | INTRODUCTION AND SUMMARY | 1 |
| | A. | Overview | 1 |
| | B. | Summary of Classification and Treatment Under the Plan | 4 |
| | C. | Voting and Confirmation Procedures | 12 |
| | D. | Resolicitation Procedures | 13 |
| II | | DESCRIPTION OF DEBTOR AND EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASE | 16 |
| | A. | Overview of the Debtor and its Business Operations | 16 |
| | B. | Pre-Petition Debt Structure of the Debtor | 19 |
| | C. | Current Compensation and Benefits Programs | 20 |
| | D. | Proceedings Before Montana Public Service Commission | 22 |
| | E. | Events Precipitating Chapter 11 Filing | 23 |
| III | | SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE | 28 |
| | A. | Overview of Chapter 11 and Commencement of Chapter 11 Case | 28 |
| | B. | First Day Orders | 29 |
| | C. | Professional Retentions | 29 |
| | D. | Appointment of Creditors' Committee and Professionals | 30 |
| | E. | Post-Petition Financing | 31 |
| | F. | Sale of Expanets Assets | 32 |
| | G. | Sale of Blue Dot Assets | 33 |
| | H. | Extension of Time to Assume or Reject Leases | 33 |
| | I. | Extension of Exclusive Periods | 34 |
| | J. | Claims Process and Bar Date | 34 |
| | K. | Performance Bonuses | 37 |
| | L. | Proposed Equity Committee | 37 |
| | M. | Litigation – Pending and Asserted | 37 |
| | N. | Inquiries to Purchase Debtor's Assets | 45 |
| IV | | OVERVIEW OF THE PLAN | 46 |
| | A. | General | 46 |
| | B. | Classification of Claims and Equity Interests | 46 |

TABLE OF CONTENTS
(continued)

| | C. | Treatment of Claims and Equity Interests Under the Plan | 47 |
| | D. | Description of Means of Execution and Transactions to be Implemented in Connection with the Plan | 59 |
| | E. | Distributions and Treatment of Disputed, Contingent and Unliquidated Claims and Equity Interests | 66 |
| | F. | Executory Contracts and Unexpired Leases; Indemnification Claims; and Retiree Benefits | 69 |
| | G. | Corporate Governance and Management | 72 |
| | H. | Exculpation; Release; Injunctions; and Discharge | 74 |
| | I. | Confirmation and Effectiveness of Plan | 77 |
| | J. | Regulation | 79 |
| | K. | Retention of Jurisdiction | 80 |
| V | | SUMMARY OF CERTAIN MATERIAL DOCUMENTS TO BE EXECUTED OR IMPLEMENTED IN CONNECTION WITH THE PLAN | 81 |
| | A. | Reorganized Debtor Corporate Charter | 82 |
| | B. | The New Incentive Plan | 82 |
| | C. | Registration Rights Agreement | 82 |
| | D. | Public Utility Holding Company Act | 83 |
| VI | | ACCEPTANCE AND CONFIRMATION OF THE PLAN | 84 |
| | A. | Acceptance of the Plan | 84 |
| | B. | Confirmation | 85 |
| VII | | VALUATION OF REORGANIZED DEBTOR | 88 |
| | A. | Overview | 88 |
| | B. | Valuation Methodology | 90 |
| VIII | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 96 |
| | A. | Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Class 7, 8 and 9 Claims | 97 |
| | B. | Certain U.S. Federal Income Tax Consequences of the Plan to Certain Holders of Class 9 Claims and Class 10 Claims that Receive Cash | 100 |
| | C. | Certain U.S. Federal Income Tax Consequences of the Plan to the Holders of Class 12 Claims and Class 15 Claims | 100 |

-ii-

**A769**

## TABLE OF CONTENTS
### (continued)

Page

D.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtor ...... 100

E.    Backup Withholding and Reporting .................................................................. 103

F.    Deloitte & Touche LLP ..................................................................................... 104

IX    RISK FACTORS ............................................................................................... 104

A.    Regulated Industry ............................................................................................ 104

B.    PUHCA Compliance.......................................................................................... 105

C.    Relationship With Montana Public Service Commission and Montana
      Consumer Counsel ............................................................................................. 106

D.    Commodity Price and Supply Risks ................................................................. 108

E.    Seasonal and Quarterly Energy Demand Fluctuations ..................................... 109

F.    Dependence on Key Personnel .......................................................................... 109

G.    Compliance With Environmental Laws.............................................................. 109

H.    Projected Financial Information ........................................................................ 110

I.    Lack of Market for Securities Issued Pursuant to the Plan................................ 110

J.    Delay in Distributing Asset Sale Proceeds to Debtor and Adequate
      Liquidity.............................................................................................................. 110

K.    Fraudulent Conveyance Litigation..................................................................... 111

L.    Disputes Under Certain Insurance Policies........................................................ 111

M.    Cornerstone Asserted Claims............................................................................. 112

N.    Securities Class Action Settlements................................................................... 112

O.    Certain Bankruptcy Related Considerations...................................................... 113

P.    Dividends ............................................................................................................ 114

Q.    Potential Treatment as Public Utility Holding Company ................................... 114

X    EXEMPTIONS FROM SECURITIES ACT REGISTRATION;
      REGISTRATION RIGHTS ............................................................................... 115

A.    Issuance of New Securities Pursuant to the Plan ............................................... 115

B.    Subsequent Transfer of Securities Issued Under the Plan ................................. 116

XI    ALTERNATIVES TO THE PLAN AND CONSEQUENCES OF
      REJECTION ...................................................................................................... 117

A.    Alternative Plans................................................................................................ 117

B.    Chapter 7 Liquidation ....................................................................................... 117

TABLE OF CONTENTS
(continued)

Page

XII        RECOMMENDATION AND CONCLUSION.................................................. 118

## TABLE OF CONTENTS

XIII.  LIST OF EXHIBITS

Exhibit A  Debtor's Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

Exhibit B  Disclosure Statement Approval Order

Exhibit C  Resolicitation Order

Exhibit D  Debtor's Pre-Petition Debt Structure

Exhibit E-1  Proposed Released Parties – Securities Litigation Releases in connection with Class Action

Exhibit E-2  Proposed Released Parties – General Released Parties

Exhibit F-1  Agreement in Principle by and among NorthWestern Corporation, the Montana Public Service Commission and the Montana Consumer Counsel dated May 14, 2004

Exhibit F-2  Stipulation and Settlement Agreement among NorthWestern Corporation, the Montana Public Service Commission and the Montana Consumer Counsel dated July 8, 2004

Exhibit F-3  Bankruptcy Court Order Approving Stipulation and Settlement Agreement among Debtor, Montana Public Service Commission and Montana Consumer Counsel Pursuant to Sections 105(a) and 1129(a)(4) of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules entered on July 15, 2004

Exhibit G  Management

Exhibit H  NorthWestern Corporation Liquidation Analysis

Exhibit I  NorthWestern Corporation 2004-2008 Financial Projections

Exhibit J  NorthWestern Corporation Form 10-Q for the Fiscal Quarter Ended June 30, 2004

Exhibit K  NorthWestern Corporation Form 10-Q for the Fiscal Quarter Ended March 31, 2004

Exhibit L  NorthWestern Corporation Form 10-K, and Accompanying Audited Financial Statements, for the Fiscal Period Ended December 31, 2003

Exhibit M  NorthWestern Corporation Form 10-Q for the Fiscal Quarter Ended September 30, 2003

**A772**

TABLE OF CONTENTS
(continued)

Exhibit N    Reorganized NorthWestern Corporation Charter

Exhibit O    Debtor's Projected Balance Sheet as of September 30, 2004

Exhibit P    QUIPS Litigation Decision

**ARTICLE I**
**INTRODUCTION AND SUMMARY**

A.    **Overview**

NorthWestern Corporation, the above-captioned debtor and debtor-in-possession (the "Debtor"), transmitted its First Amended Disclosure Statement ("First Amended Disclosure Statement") pursuant to Section 1125(b) of Title 11, United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and Rule 3017 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), in connection with its proposed Plan of Reorganization dated May 24, 2004 (the "First Amended Plan"), to provide adequate information to enable holders of Claims and Equity Interests that are impaired and entitled to vote under the First Amended Plan to make an informed judgment in exercising their right to vote for acceptance or rejection of the First Amended Plan.

The Debtor files this Second Amended and Restated Disclosure Statement (the "Disclosure Statement") pursuant to Section 1125(b) of Title 11, United States Code, 11 U.S.C. §§ 101 et seq. in connection with the Second Amended Plan (as the same may be amended, the "Plan"), to provide adequate information to enable holders of Claims and Equity Interests entitled to vote pursuant to the Resolicitation Order to make an informed judgment in exercising their right to vote for acceptance or rejection of the Plan. [1]  A copy of the Plan is attached hereto as Exhibit A.  All capitalized terms used but not defined in this Disclosure Statement shall have the respective meanings ascribed to them in the Plan unless otherwise noted.

The Plan provides a means by which the Debtor will be reorganized under Chapter 11 of the Bankruptcy Code, and sets forth the treatment of all Claims against and Equity Interests in the Debtor.

Also attached as Exhibits to this Disclosure Statement are copies of the following:

1.    Order of the Bankruptcy Court dated May 26, 2004 (the "Disclosure Statement Approval Order"), which among other things, approves the Disclosure Statement and establishes certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan (Exhibit B);

2.    Resolicitation Order (Exhibit C);

---

[1]    Contemporaneous with filing this amended Disclosure Statement the Debtor has also filed (i) Summary Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code (the "Summary Disclosure Statement"), and (ii) Second Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated August 18, 2004 (the "Second Amended Plan").  If you wish to receive a copy of the Second Amended Disclosure Statement or Second Amended Plan, please direct your written request to: *Kurtzman Carson Consultants, LLC*, 12910 Culver Boulevard, Suite I, Los Angeles, California 90066-6709, Attention: Christopher R. Schepper, Telephone: (866) 381-9100.  Alternatively, a copy may be viewed on the Balloting Agent's website at http://www.kccllc.net/northwestern.  In addition, copies of the Second Amended Plan and Second Amended Disclosure Statement may be viewed on the Debtor's website, www.northwestern.com, or hard copies may be requested by contacting Tammy Lydic, Manager-Investor Communications, at 604-782-5345.

3.   Debtor's Pre-Petition Debt Structure (Exhibit D);

4.   Proposed Released Parties (Exhibit E);

5.   Agreement in Principle by and among NorthWestern Corporation, the Montana Public Service Commission and the Montana Consumer Counsel dated May 14, 2004 (Exhibit F-1);

6.   Stipulation and Settlement Agreement among NorthWestern Corporation, the Montana Public Service Commission and the Montana Consumer Counsel dated July 8, 2004 (Exhibit F-2);

7.   Bankruptcy Court Order Approving Stipulation and Settlement Agreement among Debtor, Montana Public Service Commission and Montana Consumer Counsel Pursuant to Sections 105(a) and 1129(a)(4) of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules entered on July 15, 2004 (Exhibit F-3);

8.   Management (Exhibit G);

9.   NorthWestern Corporation Liquidation Analysis (Exhibit H);

10.  NorthWestern Corporation 2004-2008 Financial Projections (Exhibit I);

11.  NorthWestern Corporation Form 10-Q for the Fiscal Quarter Ended June 30, 2004 ("June 30 10-Q") (Exhibit J);

12.  NorthWestern Corporation Form 10-Q for the Fiscal Quarter Ended March 31, 2004 ("March 31 10-Q") (Exhibit K);

13.  NorthWestern Corporation Form 10-K, and Accompanying Audited Financial Statements, for the Fiscal Period Ended December 31, 2003 ("10-K") (Exhibit L);

14.  NorthWestern Corporation Form 10-Q for the Fiscal Quarter Ended September 30, 2003 ("Sept. 30 10-Q") (Exhibit M);

15.  Reorganized NorthWestern Corporation Charter (Exhibit N); and

16.  Debtor's Projected Balance Sheet as of September 30, 2004 (Exhibit O);

17.  QUIPS Litigation Decision (Exhibit P)

The Disclosure Statement Approval Order set forth the deadlines, procedures and instructions for voting to accept or reject the First Amended Plan and for filing objections to confirmation of the First Amended Plan, the record date for voting purposes, and the applicable standards for tabulating Ballots. Detailed voting instructions also accompanied

each Ballot. In accordance with Section 1126(b) of the Bankruptcy Code, on or about June 4, 2004, the Debtor commenced the solicitation of the votes of the Impaired Classes of creditors entitled to vote on the First Amended Plan by causing a copy of the First Amended Disclosure Statement, the First Amended Plan and a ballot to be sent to each Impaired Creditor and solicited their votes to accept or reject the First Amended Plan. The Disclosure Statement Order established May 26, 2004 as the Record Date for the solicitation of acceptances and rejections of the First Amended Plan. The voting period ended at 5:00 p.m. (PDT) on August 2, 2004 (the "Voting Deadline").

The result of the solicitation was the overwhelming acceptance of the First Amended Plan by the Impaired Creditors entitled to vote on the First Amended Plan, with respect to both numerosity and amount, except with regard to creditors holding Unsecured Subordinated Note Claims classified in Class 8 under the First Amended Plan. Class 8 voted to reject the First Amended Plan. The Debtor continued to negotiate with Wilmington Trust, as indenture trustee under the TOPrS Indenture and Harbert Management Corporation, on behalf of itself and on behalf of the investors it represents as holders of claims in Class 8, and representatives and counsel for the Official Committee of Unsecured Creditors (the "Creditors' Committee") to facilitate a consensual resolution. The result of these negotiations is a compromise and settlement by and among the parties, which will increase the amount Class 7 and Class 9 will contribute to fund distributions to Class 8 under the Plan, as more fully set forth below. In order to provide adequate information regarding the amendment to the Plan in connection with the compromise and settlement, the Debtor filed this Disclosure Statement and the Summary Disclosure Statement.

The Resolicitation Order approves the Summary Disclosure Statement and this Disclosure Statement and authorizes the Debtor to resolicit votes from holders of Class 7, 8(a) and (b) and 9 Claims.[2] The Resolicitation Order sets forth the deadlines, procedures and instructions for resolicitation, the record date for voting purposes, and the applicable standards for tabulating Ballots. Detailed voting instructions also accompany each Ballot. Each holder of a Claim or Interest entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Resolicitation Order and the instructions accompanying the Ballot in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept or reject the Plan may be made except pursuant to Section 1125 of the Bankruptcy Code.

THE DEBTOR AND THE CREDITORS' COMMITTEE HAVE NEGOTIATED THE TERMS OF THE SECOND AMENDED PLAN AND THE SETTLEMENT WITH WILMINGTON TRUST AND HARBERT. THE DEBTOR AND THE CREDITORS' COMMITTEE STRONGLY URGE ACCEPTANCE OF THE PLAN. WILMINGTON TRUST, ALONG WITH THE DEBTOR AND THE CREDITORS' COMMITTEE, STRONGLY URGE THOSE CREDITORS HOLDING CLAIMS IN CLASSES 7, 8(a) and (b), AND 9 WHICH PREVIOUSLY VOTED TO REJECT THE PLAN TO CHANGE THEIR VOTES FOR ACCEPTANCE OF THE PLAN. ANY HOLDER OF A CLAIM OR INTEREST THAT ACCEPTED OR REJECTED THE

---

[2]      All other votes by Impaired Creditors on the Plan as of the Voting Deadline shall remain unaffected.

**PLAN PREVIOUSLY DISTRIBUTED WILL BE DEEMED TO HAVE ACCEPTED OR REJECTED, AS THE CASE MAY BE, THE PLAN SETTING FORTH THE MODIFICATIONS DESCRIBED IN THIS DISCLOSURE STATEMENT, UNLESS, WITHIN THE TIME FIXED BY THE BANKRUPTCY COURT AS PROVIDED HEREIN, SUCH HOLDER CHANGES ITS PREVIOUS ACCEPTANCE OR REJECTION.**

B.      **Summary of Classification and Treatment Under the Plan**

        In general, and as more fully described herein, the Plan effectuates a restructuring of the Debtor's pre-petition indebtedness and business operations. The Plan: (i) divides Claims and Equity Interests into sixteen (16) classes; (ii) sets forth the treatment afforded to each class of Claims; and (iii) provides the means by which the Debtor will be reorganized under Chapter 11 of the Bankruptcy Code (the Debtor, after such reorganization, being the "Reorganized Debtor"). The following table sets forth a summary classification of each type of Claim and Equity Interest under the Plan (a more detailed description of the Plan and proposed treatment of each type of Claim and Equity Interest is set forth in Section IV of this Disclosure Statement entitled "Overview of The Plan").[3]

| CLASS | DESCRIPTION | STATUS | ESTIMATED RECOVERY |
|---|---|---|---|
| Class 1 | Priority Claims | Unimpaired and not entitled to vote | 100% |
| Class 2 | Unsecured Priority Claims | Unimpaired and not entitled to vote | 100% |
| Class 3 | Bank One DIP Financing Claims | Unimpaired and not entitled to vote | 100% |
| Class 4 | CSFB Financing Claims<br><br>•Portion of financing secured by Montana utility assets under First Mortgage Bonds, Credit Agreement (2002) Series Due 2006: $278,600,000 (plus accrued interest: $5,146,361)<br><br>•Portion of financing secured by South Dakota utility assets under New Mortgage Bonds, Credit Agreement (2002) Series Due 2006: $109,450,000 | Unimpaired and not entitled to vote | 100% |

[3]    This summary contains only a brief and simplified description of the classification and projected recoveries of Claims and Equity Interests under the Plan as of the Petition Date. It does not describe every provision of the Plan. Accordingly, reference should be made to the entire Disclosure Statement (including exhibits) and the Plan for a complete description of the classification and treatment of Claims and Equity Interests.

| CLASS | DESCRIPTION | STATUS | ESTIMATED RECOVERY |
|---|---|---|---|
| | (plus accrued interest: $2,021,785) Total face amount: $388,050,000[4] Total accrued interest: $7,168,146 | | |
| Class 5 | Secured Bondholder Claims | Unimpaired and not entitled to vote | 100% |
| | South Dakota First Mortgage Bond Claims •New Mortgage Bonds, 7.10% Series Due 2005: $60,000,000 (plus accrued interest: $520,667) •First Mortgage Bonds, 7% Series Due 2023: $55,000,000 (plus accrued interest $310,138) Total face amount: $115,000,000[5] Total accrued interest: $830,805[6] | | |
| | Montana First Mortgage Bond Claims •First Mortgage Bonds, 7% Series Due 2005: $5,386,000 (plus accrued interest: $14,767) •First Mortgage Bonds, 7.30% Series Due 2006: $150,000,000 (plus accrued | | |

(...continued)

[4]    The CSFB financing facility provides for amortizing payments of $975,000 due each quarter. The principal amount outstanding on the CSFB facility as of the Petition Date was $388,050,000.

[5]    This face amount is exclusive of the bonds held as security by CSFB, which are included in the claim amount listed in Class 4.

[6]    This interest amount is exclusive of the bonds held as security by CSFB, which are included in the claim amount listed in Class 4.

[7]    This face amount is exclusive of the bonds held as security by CSFB, which are included in the claim amount listed in Class 4.

[8]    This interest amount is exclusive of the bonds held as security by CSFB, which are included in the claim amount listed in Class 4.

| CLASS | DESCRIPTION | STATUS | ESTIMATED RECOVERY |
|-------|-------------|--------|--------------------|
| | interest: $3,166,375) <br><br> •First Mortgage Bonds, 8-1/4% Series Due 2007: $365,000 (plus accrued interest: $3,689) <br><br> •7.25% Secured Medium-Term Notes Due 2008: $13,000,000 (plus accrued interest: $351,081) <br><br> •First Mortgage Bonds, 8.95% Series Due 2022: $1,446,000 (plus accrued interest: $15,854) <br><br> Total face amount: $170,197,000[7] <br><br> Total accrued interest: $3,551,766[8] | | |
| | Montana Pollution Control Bond Claims <br><br> •First Mortgage Bonds, 6-1/8% Series due 2023: $90,205,000 (plus accrued interest: $2,058,083)[9] <br><br> •First Mortgage Bonds, 5.90% Series Due 2023: $80,000,000 (plus accrued interest: $1,364,867)[10] <br><br> Total face amount: $170,205,000 <br><br> Total accrued interest: $3,422,950 | | |
| | South Dakota Pollution Control Bond Claims <br><br> •5.90% Grant County, South Dakota Series 1993A Revenue Bonds Due 2023: $6,400,000 (plus accrued interest: $109,084) | | |

[9]     These bonds secure the Debtor's obligations under a certain indenture and loan agreement with respect to City of Forsyth, Montana Series 1993A Pollution Control Revenue Refunding Bonds Due 2023.

[10]     These bonds secure the Debtor's obligations under a certain indenture and loan agreement with respect to City of Forsyth, Montana Series 1993B Pollution Control Revenue Refunding Bonds Due 2023.

| CLASS | DESCRIPTION | STATUS | ESTIMATED RECOVERY |
|---|---|---|---|
| | •5.90% Grant County, South Dakota Series 1993B Revenue Bonds Due 2023: $3,400,000 (plus accrued interest: $57,951)<br><br>•5.90% City of Salix, Iowa Series 1993 Revenue Bonds Due 2023: $4,000,000 (plus accrued interest $68,178)<br><br>•5.85% Mercer County, North Dakota Series 1993 Revenue Bonds Due 2023: $7,550,000 (plus accrued interest: $127,594)<br><br>Total face amount: $21,350,000<br><br>Total accrued interest: $362,807 | | |
| | Gas Transition Bond Claims<br><br>•MPC Natural Gas Funding Trust 6.2% Transition Bonds Due 2012: $48,318,000 (plus accrued interest: $1,531,982) | | |
| Class 6 | Other Secured Claims<br><br>Capital lease obligations: $9,689,766<br><br>Letters of credit: $13,750,000 | Unimpaired and not entitled to vote | 100% |
| Class 7 | Unsecured Note Claims | Impaired and entitled to vote | Allowed claims converted to 91% of New Common Stock to be shared Pro rata between and among claimants in Class 7 and Class 9.[11] |

---

[11]   The per share price and value of New Common Stock used for purposes of determining recoveries is shown adjusted for dilution resulting from the issuance of Warrants to Class 8 claimants and the 228,320 restricted shares to be issued under the New Incentive Plan to management.

**A780**

| CLASS | DESCRIPTION | STATUS | ESTIMATED RECOVERY |
|---|---|---|---|
| | November 1, 1998 Indenture Claims<br><br>•7.875% Senior Notes Due 2007: $250,000,000 (plus accrued interest: $9,789,063)<br><br>•8.75% Unsecured Senior Notes Due 2012: $470,000,000 (plus accrued interest: $20,448,264)<br><br>•6.95% Senior Unsecured Debentures Due 2028: $105,000,000 (plus accrued interest: $2,412,229)<br><br>Total face amount: $825,000,000<br><br>Total accrued interest: $32,649,556 | | Assuming a $19.77 per share price gross recovery is estimated to be $586,249,692 and recovery on claims is estimated to be 68.4%.[12] |
| | December 1, 1989 Indenture Claims<br><br>•7.875% Unsecured Medium-Term Notes due 2026: $20,000,000 (plus accrued interest ($319,375)<br><br>•7.96% Unsecured Medium-Term Notes due 2026: $5,000,000 (plus accrued interest ($801,706)<br><br>•7.07% Unsecured Medium-Term Notes due 2006: $15,000,000 (plus accrued interest ($215,046)<br><br>Total face amount: $40,000,000<br><br>Total accrued interest: $615,127 | | Assuming a $19.77 per share price gross recovery is estimated to be $27,762,628 and recovery on claims is estimated to be 68.4%.[13] |

---

[12]    The per share price and value of New Common Stock used for purposes of determining recoveries is shown adjusted for dilution resulting from the issuance of Warrants to Class 8 claimants and the 228,320 restricted shares to be issued under the New Incentive Plan to management.

[13]    The per share price and value of New Common Stock used for purposes of determining recoveries is shown adjusted for dilution resulting from the issuance of Warrants to Class 8 claimants and the 228,320 restricted shares to be issued under the New Incentive Plan to management.

| CLASS | DESCRIPTION | STATUS | ESTIMATED RECOVERY |
|---|---|---|---|
| Class 8 | Unsecured Subordinated Note Claims | Impaired and entitled to vote | |
| Class 8(a) | August 1, 1995 Indenture Claims[14]<br><br>•8.125% Junior Subordinated Deferrable Interest Debentures Due 2025: $33,360,150 (plus accrued dividends and interest: $1,213,950)<br><br>•7.20% Junior Subordinated Deferrable Interest Debentures Due 2038: $55,633,550 (plus accrued dividends and interest: $1,818,591)<br><br>•8.25% Junior Subordinated Deferrable Interest Debentures Due 2031: $109,011,575 (plus accrued dividends and interest $3,920,501)<br><br>•8.10% Junior Subordinated Deferrable Interest Debentures Due 2032: $111,985,525 (plus accrued dividends and interest: $4,125,557)<br><br>Total face amount: $309,990,800<br><br>Total accrued dividends and interest: $11,078,599 | Impaired and entitled to vote | Allowed claims converted to 6.6% of New Common Stock plus Warrants exercisable for an additional 10.6% of New Common Stock shared Pro Rata between claimants.<br><br>Assuming a $19.77 per share price gross recovery is estimated to be $49,251,775 and recovery on claims is estimated to be 15.3%.[15] |
| Class 8(b) | November 1, 1996 Indenture Claims<br><br>•8.45% Junior Subordinated Debentures Due 2036: $67,010,325 (plus accrued dividends and interest: $2,527,548) | Impaired and entitled to vote. | If Class 8(b) accepts Plan, a holder accepting the Plan may choose to receive either: (i) allowed claims converted to 1.4% of New |

---

[14]     The amounts included are net of TOPrs held by the Debtor in the approximate total principal and interest amount of $4,700,041.

[15]     The per share price and value of New Common Stock used for purposes of determining recoveries is shown adjusted for dilution resulting from the issuance of Warrants to Class 8 claimants and the 228,320 restricted shares to be issued under the New Incentive Plan to management.

**A782**

| CLASS | DESCRIPTION | STATUS | ESTIMATED RECOVERY |
|---|---|---|---|
| | | | Common Stock plus Warrants exercisable for an additional 2.3% of New Common Stock shared Pro Rata between claimants ("Option 1"); or Pro Rata Share of recoveries, if any, from the QUIPS Litigation following final resolution of such litigation where any recoveries will be treated as a Class 9 General Unsecured Claim ("Option 2"). If Class 8(b), as a Class rejects Plan, then any recoveries will be from recoveries, if any, following final resolution of the QUIPS Litigation and treated as a Class 9 General Unsecured Claim, and 1.4% |

(...continued)

[16]    The per share price and value of New Common Stock used for purposes of determining recoveries is shown adjusted for dilution resulting from the issuance of Warrants to Class 8 claimants and the 228,320 restricted shares to be issued under the New Incentive Plan to management.

| CLASS | DESCRIPTION | STATUS | ESTIMATED RECOVERY |
|---|---|---|---|
| | | | of New Common Stock will be allocated Pro Rata to Class 7 and Class 9, and the Warrants allocated to Class 8(b) canceled.<br><br>Assuming Class 8(b) as a Class accepts the Plan and choose Option 1 and a $19.77 per share price, gross recovery is estimated to be $10,667,051 and recovery on claims is estimated to be 15.3%.[16] |
| Class 9 | General Unsecured Claims | Impaired and entitled to vote | Allowed claims converted to 91% of New Common Stock to be shared Pro rata between and among claimants in Class 7 and Class 9 -- assuming a $19.77 per share price gross recovery is estimated to be $31,555,807 and recovery on claims is |

**A784**

| CLASS | DESCRIPTION | STATUS | ESTIMATED RECOVERY |
|---|---|---|---|
| | | | estimated to be 68.4%.[17] |
| Class 10 | Unsecured Convenience Claims each of $20,000 or Less | Unimpaired and not entitled to vote | 100% |
| Class 11 | Environmental Claims | Unimpaired and not entitled to vote | 100% |
| Class 12 | D&O Trust Claims | Impaired and entitled to vote | Unknown at this time; to be channeled to D&O Trust |
| Class 13 | Other Equity and Interest Holder Claims | Impaired and deemed to have rejected the Plan | 0% |
| Class 14 | Securities Claims | Unimpaired and not entitled to vote | 100% |
| Class 15 | Opt-Out Securities Claims | Impaired and deemed to have rejected the Plan | Unknown at this time; to be channeled to D&O Trust |

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT AS CONTAINING INFORMATION OF A KIND, AND IN SUFFICIENT DETAIL, TO ENABLE HOLDERS OF CLAIMS TO MAKE AN INFORMED JUDGMENT IN VOTING TO ACCEPT OR REJECT THE PLAN. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN, THE PLAN DOCUMENTS, AND CERTAIN FINANCIAL INFORMATION. WHILE THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS. FURTHERMORE, ALTHOUGH THE DEBTOR HAS MADE EVERY

---

[17]    The per share price and value of New Common Stock used for purposes of determining recoveries is shown adjusted for dilution resulting from the issuance of Warrants to Class 8 claimants and the 228,320 restricted shares to be issued under the New Incentive Plan to management.

**A785**

EFFORT TO BE ACCURATE, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT, UNLESS OTHERWISE INDICATED, BEEN THE SUBJECT OF AN AUDIT BY AN OUTSIDE ACCOUNTING FIRM. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS IN THE PLAN, THE PLAN DOCUMENTS, OR THE FINANCIAL INFORMATION INCORPORATED THEREIN BY REFERENCE, THE PLAN SHALL GOVERN FOR ALL PURPOSES. ALL HOLDERS OF CLAIMS SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS TO THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND EQUITY INTERESTS, AND OTHER PARTIES-IN-INTEREST REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN UNLESS SO SPECIFIED. WHILE THE DEBTOR HAS MADE EVERY EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE VOTE ON THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT THAT CERTAIN EVENTS, SUCH AS THOSE MATTERS DISCUSSED IN SECTION IX BELOW ENTITLED "RISK FACTORS," DO OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAWS. PERSONS OR ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, OR SECURITIES OF, THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

IN ACCORDANCE WITH THE BANKRUPTCY CODE, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, OR ANY STATE SECURITIES COMMISSION, NOR HAS SUCH APPLICABLE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT AND THE INFORMATION CONTAINED HEREIN SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

**A786**

THE DEBTOR OPERATES ITS UTILITY BUSINESS IN THREE STATES SUBJECT
TO THE REGULATORY JURISDICTION OF EACH STATE. THE DEBTOR AND THE
MONTANA PUBLIC SERVICE COMMISSION DISAGREE ON THE SCOPE OF
MONTANA UTILITY LAW AND THE STATE'S ABILITY TO REGULATE THE DEBTOR
BOTH DURING AND AFTER THE BANKRUPTCY PROCEEDING. TO CREATE SOME
CERTAINTY FOR THE DEBTOR, THE MPSC, AND THE DEBTOR'S CREDITORS, THE
DEBTOR HAS AGREED TO CERTAIN TERMS, REQUESTED BY THE MPSC, THAT
WILL GOVERN THE DEBTOR'S OPERATIONS UPON EMERGENCE FROM
BANKRUPTCY. THESE TERMS ARE SET FORTH IN THE STIPULATION AND
SETTLEMENT AGREEMENT APPROVED BY THE BANKRUPTCY COURT IN AN
ORDER DATED JULY 19, 2004. A COPY OF THE STIPULATION AND SETTLEMENT
AGREEMENT IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT F-2.

## C.    Voting and Confirmation Procedures

Accompanying the First Amended Disclosure Statement in addition to all other
Exhibits, were copies of the following documents:

(i)    the First Amended Plan; and

(ii)    the Disclosure Statement Approval Order, approving (a) the First
Amended Disclosure Statement as containing adequate information pursuant to Section 1125 of
the Bankruptcy Code, (b) the forms of Ballots to be executed by holders of impaired Claims for
voting to accept or reject the First Amended Plan and (c) the notice of and fixing the time for
(1) submitting acceptances of or rejections to the First Amended Plan and making elections
required under the First Amended Plan, (2) the hearing to consider confirmation of the First
Amended Plan and (3) filing objections to confirmation of the First Amended Plan;

The forms of Ballots, and the related materials delivered with the First Amended
Disclosure Statement were furnished for purposes of soliciting votes on the First Amended Plan
to the following holders of impaired claims: Class 7 Unsecured Note Claims, Class 8 Unsecured
Subordinated Note Claims, Class 9 General Unsecured Claims, and Class 12 D&O Trust Claims.
With regard specifically to the Unsecured Notes and the Unsecured Subordinated Notes held by
banks and/or brokers (the "Record Holders") for the beneficial ownership of other entities or
individuals (the "Beneficial Holders"), the Debtor or its balloting agent, Kurtzman Carson
Consultants, LLC (the "Balloting Agent"), provided a sufficient number of copies of the First
Amended Disclosure Statement, the First Amended Plan and the Ballots to the Record Holders
for transmission to each of the Beneficial Holders. The Debtor asked the Record Holders to send
copies of the First Amended Disclosure Statement, the First Amended Plan and the Ballots to the
respective Beneficial Holders, and to collect completed Ballots from such Beneficial Holders on
the Debtor's behalf. The Record Holders were asked to summarize the results of the votes
received from the Beneficial Holders on a summary form, *i.e.*, a master ballot, which was
provided to each Record Holder by the Debtor. In addition, the First Amended Disclosure
Statement was also provided to holders of claims in Classes 1 through 6 and Classes 10, 11 and
14 (who are deemed to accept the Plan), and Class 15 Opt-out Securities Claims and holders of
Equity Interests in Class 13 (who are deemed to reject the Plan), and other entities, solely for
informational purposes.

**A787**

The result of the initial solicitation was the overwhelming acceptance of the Plan by the Impaired Creditors entitled to vote on the Plan, with respect to both numerosity and amount, except with regard to creditors holding Unsecured Subordinated Note Claims classified in Class 8 under the First Amended Plan. Class 8 voted to reject the First Amended Plan.

## D.    Resolicitation Procedures

Accompanying this Disclosure Statement in addition to all other Exhibits, are copies of the following documents:

(i)    the Plan; and

(ii)    the Resolicitation Order, approving (a) the Summary Disclosure Statement and Disclosure Statement; (b) setting a Resolicitation Record Date for Voting Purposes; (c) authorizing resolicitation of votes; (d) scheduling a continued hearing on confirmation of Plan; and (e) establishing notice requirements regarding the continued Confirmation Hearing and approving the form and manner of notice.

Pursuant to the Resolicitation Order, the Debtor shall resolicit acceptances or rejections of the Plan from holders of allowed impaired claims against the Debtor in Class 7, Class 8(a), Class 8(b) and Class 9. The Debtor shall furnish for purposes of such resolicitation to holders of Class 7, Class 8 and Class 9 claims a copy of the Resolicitation Order, the Summary Disclosure Statement and a ballot to each such holder who is eligible to vote on the Plan (the "Resolicitation Package").[18]

The forms of Ballots, and the related materials to be delivered with the Summary Disclosure Statement are furnished for purposes of soliciting votes on the Plan to the following holders of impaired claims: Class 7 Unsecured Note Claims, Class 8(a) Unsecured Subordinated Note Claims represented by TOPrS Notes, Class 8(b) Unsecured Subordinated Note Claims represented by QUIPS Notes and Class 9 General Unsecured Claims. With regard specifically to the Unsecured Notes and the Class 8(a) and Class 8(b) Unsecured Subordinated Notes held by banks and/or brokers (the "Record Holders") for the beneficial ownership of other entities or individuals (the "Beneficial Holders"), the Debtor or its balloting agent, Kurtzman Carson Consultants, LLC (the "Balloting Agent"), provide a sufficient number of copies of the Summary Disclosure Statement and the Ballots to the Record Holders for transmission to each of the Beneficial Holders. The Debtor asks the Record Holders to send copies of the Summary Disclosure Statement and the Ballots to the respective Beneficial Holders, and to collect completed Ballots from such Beneficial Holders on the Debtor's behalf. The Record Holders are

---

[18]    If you wish to receive a copy of any of the following documents, please direct your written request to: *Kurtzman Carson Consultants, LLC*, 12910 Culver Boulevard, Suite I, Los Angeles, California 90066-6709, Attention: Christopher R. Schepper, Telephone: (866) 381-9100: (i) Plan; (ii) Disclosure Statement; (iii) Resolicitation Order; and (iv) Motion for an Order (A) Approving the Debtor's Second Amended Disclosure Statement and Summary Disclosure Statement; (B) Establishing Procedures for Limited Resolicitation and Tabulation of Votes on Debtor's Second Amended and Restated Plan of Reorganization; (C) Approving the Form and Manner of Notice; and (D) Granting Related Relief. Alternatively, copies may be viewed on the Balloting Agent's website at http://www.kccllc.net/northwestern. In addition, copies of the Second Amended Plan and Second Amended Disclosure Statement may be viewed on the Debtor's website, www.northwestern.com, or hard copies may be requested by contacting Tammy Lydic, Manager-Investor Communications, at 604-782-5345.

asked to summarize the results of the votes received from the Beneficial Holders on a summary form, *i.e.*, a master ballot, which was provided to each Record Holder by the Debtor.

### (1)    Who May Vote on the Plan

Pursuant to the provisions of the Bankruptcy Code, <u>only</u> impaired classes of Claims or Equity Interests are entitled to vote to accept or reject a plan of reorganization. A class which is not "impaired" (also referred to as "unimpaired") under a plan is deemed to have accepted such plan and does not vote. The requirements for acceptance and confirmation of the Plan are set forth in Section VI of this Disclosure Statement.

A class is "impaired" under the Bankruptcy Code <u>unless</u> the legal, equitable, and contractual rights of the holders of Claims or Equity Interests in such class are not modified or altered. For purposes of the Plan, holders of Unsecured Note Claims in Class 7, Unsecured Subordinated Note Claims in Class 8(a) and Class 8(b), and General Unsecured Claims in Class 9, and D&O Trust Claims in Class 12[19] are impaired and are entitled to vote on the Plan.[20] Holders of Priority Claims in Class 1, Unsecured Priority Claims in Class 2, Bank One DIP Financing Claims in Class 3, CSFB Financing Claims in Class 4, Secured Bondholder Claims in Class 5, Other Secured Claims in Class 6, Unsecured Convenience Claims of $20,000 or Less in Class 10, Environmental Claims in Class 11 and Securities Claims in Class 14 are unimpaired; therefore, such Classes are deemed to accept the Plan and do not vote. Other Equity and Interest Holders in Class 13 will not receive or retain any property or interest in property under the Plan, and are therefore deemed to accept the Plan and are not entitled to vote. Holders of Opt-Out Securities Claims will not receive or retain any property or interest in property under the Plan, and therefore deemed to reject the Plan and are not entitled to vote.

### (2)    Voting Procedures

All votes to accept or reject the Plan must be cast by using the form of Ballot (or, in the case of a brokerage firm or bank holding Unsecured Notes or Unsecured Subordinated Notes in its own name as a Record Holder on behalf of a Beneficial Holder, on the form of Ballot entitled "Master Ballot") enclosed with the Resolicitation Package. No votes other than ones using such Ballots will be counted except to the extent the Bankruptcy Court orders otherwise. The Bankruptcy Court has fixed 5:00 p.m. (Pacific Standard Time) on May 26, 2004 (the "Voting Record Date") as the time and date for the determination of holders of record of Claims who are entitled to (a) receive a copy of the Summary Disclosure Statement and all of the related materials and (b) where applicable, vote to accept or reject the Plan. After carefully reviewing the Plan and the Disclosure Statement, including the attached Exhibits and the Plan Documents, please indicate your acceptance or rejection of the Plan on the appropriate Ballot and return such Ballot in the enclosed envelope to the Balloting Agent at the following address:

---

[19]    Holders of Claims in impaired Classes are entitled to vote. Pursuant to Section 1129(a)(10) of the Bankruptcy Code, if a class of claims is impaired under the plan, in order to determine if at least one class of claims that is impaired under the plan has accepted the plan, such determination shall be made without including any acceptance of the plan by any Insider.

[20]    Pursuant to the Resolicitation Order, only creditors in Classes 7, 8 and 9 are entitled to vote to accept or reject the Plan as modified. All other votes by Impaired Creditors submitted in connection with the First Amended Plan as of the Voting Deadline shall remain unaffected.

Kurtzman Carson Consultants, LLC
12910 Culver Boulevard, Suite I
Los Angeles, California 90066-6709
Attention: Christopher R. Schepper
Telephone: (866) 381-9100

BALLOTS MUST BE RECEIVED ON OR BEFORE 5:00 P.M. (PACIFIC STANDARD TIME) ON OR BEFORE SEPTEMBER 29, 2004 (THE "RESOLICITATION VOTING DEADLINE"). ANY BALLOT WHICH (I) IS NOT EXECUTED, (II) IS EXECUTED BY THE HOLDER OF AN ALLOWED CLAIM BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN, (III) HAS BOTH THE ACCEPTANCE AND REJECTION BOXES CHECKED OR (IV) IS SENT BY FAX, OR OTHER ELECTRONIC COMMUNICATION SHALL NOT BE COUNTED. IF YOU ARE A BENEFICIAL HOLDER OF A SECURITY HELD BY A NOMINEE, PLEASE NOTE THAT BALLOTS MUST BE RETURNED BY HAND, MAIL, OR OVERNIGHT TRANSMISSION TO YOUR NOMINEE IN SUFFICIENT TIME FOR IT TO BE FORWARDED BY YOUR NOMINEE TO THE DEBTOR'S BALLOTING AGENT BY THE RESOLICITATION VOTING DEADLINE.

### THE BALLOTS ALSO ALLOW YOU TO VOTE TO ACCEPT OR REJECT THE RELEASES OF NONDEBTOR PERSONS OR ENTITIES PROVIDED IN ARTICLE X OF THE PLAN.[21]

If you have any questions regarding the procedures for voting on the Plan, please contact the Balloting Agent at the above address and telephone number.

### ARTICLE II
### DESCRIPTION OF DEBTOR AND EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASE

#### A.     Overview of the Debtor and its Business Operations

The Debtor and its direct and indirect non-debtor energy subsidiaries comprise one of the largest providers of electricity and natural gas in the upper Midwest and Northwest regions of the United States, serving approximately 608,000 customers throughout Montana, South Dakota and Nebraska.

The Debtor has generated and distributed electricity in South Dakota and has distributed natural gas in South Dakota and Nebraska through its energy division, NorthWestern Energy, since the Debtor's formation in 1923. In February 2002, the Debtor completed its acquisition of the electric and natural gas transmission and distribution business of The Montana Power Company (the "Montana Operations") for $478.0 million in cash and the assumption of $511.1 million in existing debt and preferred stock, net of cash received. As a result of the acquisition, from February 15, 2002, the closing date of the acquisition, through November 15,

---

[21]     Exhibit E identifies the individuals to whom the Debtor proposes to provide releases in connection with the Class Action as well as general releases.

2002, the Debtor distributed electricity and natural gas in Montana through its wholly owned subsidiary, NorthWestern Energy, L.L.C. Effective November 15, 2002, NorthWestern Energy, L.L.C. transferred all of the energy and natural gas transmission and distribution operations and assets and all related liabilities except certain designated liabilities to the Debtor and, since that date, the Debtor has operated the Montana Operations through its energy division, NorthWestern Energy. This November 15, 2002 transfer and transaction is generally referred to as the "going flat" transaction.

The acquisition of the Montana Operations has contributed a significant component of the Debtor's revenues and operating income since February 1, 2002. The Debtor's electric and natural gas utility segments, combined, reported 2003 operating income of $144.4 million compared with operating income of $143.6 million in 2002. Revenues for 2003 were $1,017.8 million which represents an increase from revenues of $773.7 million in 2002.

     (1)    Electric Operations

The Debtor operates regulated electric utility businesses in Montana and South Dakota. The Debtor is subject to the jurisdiction of, and regulation by, the Federal Energy Regulatory Commission ("FERC"), with respect to the issuance of securities and setting of wholesale electric rates. The Debtor is not subject to the Public Utility Holding Company Act of 1935 ("PUHCA"). With respect to electric service territorial issues, rates, terms and conditions of service, accounting records and other aspects of its operations, the Debtor's Montana Operations are subject to the jurisdiction of, and regulation by, the Montana Public Service Commission ("MPSC"), and its South Dakota operations are subject to the jurisdiction of, and regulation by, the South Dakota Public Utilities Commission ("SDPUC").

The Debtor's Montana electric utility business consists of an extensive electric transmission and distribution network. The Debtor's Montana service territory covers approximately 107,600 square miles, which represents approximately 73% of Montana's land area. The Debtor delivers electricity to approximately 305,000 customers in 191 communities and their surrounding rural areas in Montana, including Yellowstone National Park. It also delivers electricity to rural electric cooperatives in Montana that serve approximately 76,000 customers. The Debtor's Montana electric distribution system consists of approximately 19,700 miles of overhead and underground distribution lines and approximately 334 transmission and distribution substations. The Debtor purchases substantially all of the power it transmits and distributes to Montana customers from third parties. The Debtor believes that its power purchase arrangements, in conjunction with its ability to make open market purchases, are sufficient to meet its power supply needs through June 30, 2007, the end of the original deregulation transition period in Montana. That transition period has now been extended to the year 2027 in the most recent Montana legislative session.

The Debtor operates in South Dakota as a vertically integrated generation, transmission and distribution utility. The Debtor's electricity revenues in South Dakota are generated primarily through: (i) residential generation, transmission and distribution sales; (ii) commercial and industrial generation, transmission and distribution sales; and (iii) wholesale sales. The Debtor has the exclusive right to serve an assigned service area in South Dakota comprised of 25 counties with a combined population of approximately 99,500 people and provides retail electricity to over 57,600 customers in 108 communities in South Dakota. Residential, commercial and industrial services are generally bundled packages of generation,

transmission, distribution, meter reading, billing and other services. In addition, the Debtor provides wholesale transmission of electricity to a number of South Dakota municipalities, state government agencies and agency buildings. For these sales, the Debtor is responsible for the transmission of contracted electricity to a substation or other distribution point, and the purchaser is responsible for further distribution, billing collection and other related functions. The Debtor also provides sales of electricity to resellers, primarily including power pool or other utilities. The Debtor's transmission and distribution network in South Dakota consists of approximately 3,100 miles of overhead and underground transmission and distribution lines across South Dakota as well as 120 substations. Most of the electricity that the Debtor supplies to customers in South Dakota is generated by three power plants that the Debtor owns jointly with unaffiliated parties. The Debtor also owns several peaking/standby generating units that are installed at nine locations throughout its service territory.

      (2)   <u>Natural Gas Operations</u>

      The Debtor operates regulated natural gas utility businesses in Montana, South Dakota and Nebraska. The Debtor's natural gas services generally include fully bundled services consisting of natural gas supply and interstate pipeline transmission services and distribution services to its customers, although certain large commercial and industrial customers, as well as wholesale customers, may buy the natural gas commodity from another provider and utilize the Debtor's transportation and distribution service. The Debtor's natural gas transportation pipelines are generally not subject to the jurisdiction of the FERC, although they are subject to state regulation. The Debtor conducts limited interstate transportation in Montana that is subject to FERC jurisdiction, but the FERC has allowed the MPSC to set the rates for this interstate service. The Debtor is subject to MPSC jurisdiction when it issues, assumes or guarantees securities and when it creates liens on its Montana properties. Rates for the Debtor's Montana natural gas supply are set by the Montana Public Service Commission. The Debtor is subject to the jurisdiction of the South Dakota Public Utilities Commission with respect to rates, terms and conditions of service, accounting records and other aspects of its natural gas distribution and transmission operations in South Dakota. In Nebraska, the Nebraska Public Service Commission ("NPSC")regulates rates and terms and conditions of service for natural gas companies as of the second quarter of 2003. However, a natural gas company in Nebraska may continue to negotiate rates for natural gas service with the cities which it serves when the natural gas company files an application for increased rates with the Nebraska Public Service Commission.

      The Debtor distributed approximately 55 billion cubic feet of natural gas to nearly 163,000 customers located in 109 Montana communities during 2003. The Debtor's natural gas distribution system consisted of approximately 3,500 miles of underground distribution pipelines as of December 31, 2003. The Debtor also transmits natural gas in Montana from production receipt points and storage facilities to distribution points and other nonaffiliated transmission systems. The Debtor provided natural gas to approximately 82,000 customers in 59 South Dakota communities and 4 Nebraska communities during 2003. The Debtor has approximately 2,100 miles of distribution gas mains in South Dakota and Nebraska with distribution capacity of approximately 15,000 MMBTU per day as of December 31, 2003. The Debtor also transports natural gas for other gas suppliers and marketers in South Dakota and Nebraska. The Debtor's natural gas supply requirements are fulfilled through third party fixed term purchase contracts, natural gas storage services contracts and short-term market purchases. The Debtor believes that

its Montana, South Dakota and Nebraska natural gas supply, storage and distribution facilities and agreements are sufficient to meet its ongoing supply requirements.

(3)    Non-regulated businesses

The Debtor made investments in three primary non-regulated businesses: (a) Expanets, Inc. ("Expanets"), a provider of network communications and data services and solutions to small to mid-sized businesses nationwide; (b) Blue Dot Services Inc. ("Blue Dot"), a nationwide provider of air conditioning, heating, plumbing and related services; and (c) through November 1, 2002, the Debtor held an economic equity interest in a subsidiary that serves as the managing general partner of CornerStone Propane Partners, L.P. ("CornerStone"), a publicly traded limited partnership that is a retail propane and wholesale energy related commodities distributor. In November 2002, the Debtor divested itself of its economic equity interests in Cornerstone and deconsolidated Cornerstone and its affiliates from the Debtor and its affiliates. The Debtor's remaining interest in Cornerstone is evidenced by a note receivable with accrued claims thereon of approximately $27.0 million. On November 25, 2003, Expanets sold substantially all of its assets to Avaya, Inc. (NYSE: AV) ("Avaya"). As of February 6, 2004, Blue Dot had sold 53 of the 62 retail locations it owned or operated on January 1, 2003.

The Debtor maintains its principal offices in Sioux Falls, South Dakota. As of the filing of its petition, the Debtor had approximately 1,400 employees employed in its electric and gas utility business in Montana, South Dakota and Nebraska.

In October 2003, in connection with the filing of the Debtor's petition, the NYSE delisted the Debtor's common stock and all series of its trust preferred securities. The Debtor now participates in the Over-the-Counter Bulletin Board Quotation Service maintained by National Association of Securities Dealers, Inc., or the "OTCBB." The OTCBB is an electronic quotation medium for securities traded outside of the Nasdaq Stock Market and prices for the Debtor's common stock are published on the OTCBB under the trading symbol "NTHWQ.PK". The first trade of the Debtor's common stock on the OTCBB occurred in October 2003.

**B.    Pre-Petition Debt Structure of the Debtor**

The Debtor's outstanding secured debt obligations immediately prior to the Petition Date included approximately $619.0 million in outstanding bonds secured by the Debtor's Montana assets, and approximately $224.0 million in outstanding bonds secured by the Debtor's South Dakota assets.[22] In addition, to secure its obligations with respect to approximately $21.0 million in outstanding county and municipal revenue bonds, the Debtor pledged an interest in three of its electric generating plants as collateral. The Debtor's interest in certain transitional charges collected by the Montana utility operations are pledged to secure approximately $48.0 million in outstanding gas transition bonds issued by a trust. Notwithstanding the foregoing, and exclusive of its debtor-in-possession financing facility with Bank One, N.A., the Debtor has not granted to any lender or indenture trustee a security interest in any of the Debtor's cash collateral and certain other excluded assets. The Debtor also has

---

[22]    Inclusive of the debt claims represented by the Montana and South Dakota bonds is a credit facility in the original principal amount of $390.0 million for which Credit Suisse First Boston, acting through its Cayman Islands Branch, serves as agent. Collateral for the CSFB Facility is $110.0 million of South Dakota first mortgage bonds and $280.0 million of Montana first mortgage bonds.

approximately $9.7 million of capital lease obligations and $13.75 million of outstanding letters of credit as of the Petition Date.

In addition to its secured debt obligations, the Debtor has approximately $865.0 million in outstanding unsecured senior notes and debentures and approximately $377.0 million in outstanding unsecured subordinated debentures issued to five wholly-owned, special-purpose business trusts.[23] The trusts used the interest payments received on the subordinated debentures to make quarterly cash distributions on their preferred securities, although the terms of the subordinated debentures permitted the Debtor to defer interest payments on the subordinated debentures for up to twenty consecutive quarters. The Debtor guarantees payment of the dividends on the preferred securities only to the extent that it has made the corresponding interest payments on the subordinated debentures held by the trusts. These subordinated debentures are unsecured and subordinated to all of the Debtor's senior debt and rank equally with the guarantees related to the other trusts.[24] It is the Debtor's position that the bankruptcy filing automatically constituted a termination event under the terms of the special purpose business trusts. Pursuant to the terms of the various trust documents, the debentures are to be distributed pro rata to all holders of the securities. The Plan proposes to convert the debentures to equity and distribute on a pro rata basis as fully set forth below.

## C.    Current Compensation and Benefits Programs

The Debtor employs approximately 1,400 individuals, of which approximately 1,270 are full-time employees and the remainder are part-time, supplemental, seasonal or temporary employees. As discussed below, the Debtor also retains a number of consultants on a full-time and part-time basis and, except as noted herein, the Debtor is current on all compensation and benefit programs.

In addition, the Debtor is a party to seven collective bargaining agreements (the "CBAs") with the following unions: Local Union No. 44 of the International Brotherhood of Electrical Workers ("IBEW Local 44"), AFL-CIO; Local No. 41 and Local No. 459 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry; Butte Teamsters' Union, Local No. 2; Kalispell Unit of Hourly Gas Employees; Butte Machinists Local Union No. 88, District Lodge No. 86; Paper, Allied Chemical and Energy Workers' International Union, AFL-CIO Local No. 2-493; and System Council U-26 of the International Brotherhood of Electrical Workers representing Local Nos. 690, 706, 754 and 766. Of the approximately 1,400 individuals employed by the Debtor, approximately 600 are union members. The Debtor is actively negotiating with certain unions in connection with the expiration of certain CBA's.

The Debtor and the bargaining committee of IBEW Local 44 reached an agreement on a new CBA for IBEW Local 44 on June 17, 2004. The four-year agreement will be effective from May 1, 2004 through April 30, 2008. The agreement shall remain in full force and effect from May 1 to April 30 of each succeeding year, unless 120 days' written notice be

---

[23]    The subsidiary trusts are: NWPS Capital Financing I, NorthWestern Capital Financing I, NorthWestern Capital Financing II, NorthWestern Capital Financing III and Montana Power Capital I.

[24]    The Debtor's pre-petition debt structure is set forth on Exhibit D.

given by either party to the other prior to April 30, 2008, or April 30 of any succeeding year, of its desire to modify, amend or terminate the agreements.

The various benefit programs of the Debtor as of the Petition Date are summarized as follows:

(1)    Qualified Plans. As of the filing of the petition, the Debtor had actuarially determined liabilities of approximately $142.1 million under qualified pension plans. In addition, the Debtor had actuarially determined liabilities of approximately $41.8 million under qualified postretirement welfare benefit plans. At present the Debtor is current on its obligations under existing qualified plans. The Debtor intends to assume all qualified plans.

(2)    Non-Qualified Compensation and Benefit Plans. At present the Debtor anticipates rejecting and terminating certain non-qualified plans. The Debtor expects to file motions seeking orders to permit these modifications and/or terminations.[25] The non-qualified plans the Debtor intends to reject include, but are not limited to: (i) the Montana Power Benefit Restoration Plan; (ii) the Executive Long Term Incentive Plan; (iii) the Cash Balance Supplemental Executives Retirement Plan; and (iv) the Pension Equalization Plan. As of the date of the Petition, approximately $8.1 million is owed under such plans.

The Montana Power Benefit Restoration Plan Members ("BRP Members") assert that the BRP Members possess claims in the amount of $3,847,845.73 and that such claims are secured due to the nature of a trust established by operation of The Montana Power Company Benefit Restoration Plan for the Board of Directors (the "BRP").[26] The Debtor disputes the BRP Members' assertions because the nature of the trust created is such that upon the occurrence of certain events the trust corpus reverts to the general fund of the Debtor and is available for payment to Debtor's creditors.[27] As described in greater detail in Section IV(C)(i) of the Disclosure Statement, claims arising from the rejection of non-qualified plans would be included in Class 9, General Unsecured Claims. The Debtor intends to file a motion to terminate the BRP. The Debtor has held discussions with BRP Members regarding an option for such members to (i)

---

[25]    In reviewing the anticipated termination and/or rejection of certain non-qualified plans, the Debtor has determined that approximately ninety (90) directors, officers and retirees are likely to be impacted. Those impacted include, but are not limited to, the following: (i) Randy Darcy; (ii) Gary Drook; (iii) Michael Hanson; (iv) Richard Hylland; (v) Jerry Johnson; (vi) Merle Lewis; (vii) Dennis Lopach; (viii) Larry Ness; (ix) Dan Newell; (x) Marilyn Seymann; (xi) Bruce Smith; (xii) Bart Thielbar; (xiii) Greg Trandem; and (xiv) John Van Camp.

[26]    All directors elected to the Board of Directors of the Montana Power Company (the "MPC Board") prior to January 1, 1998 are eligible to participate in the BRP. Upon the latter of the director reaching age 62 or terminating service on the MPC Board, a participant in the BRP receives a benefit amount specified in the plan document, which is based upon the director's years of service on the MPC Board. A participant receives the benefit in monthly installments over his life. Upon the participant's death, his beneficiary receives the monthly benefit for 180 months, less payments already received by the participants.

[27]    To the extent that there are insurance policies to fund the obligations of the Debtor under the BRP and such policies are not available for other use, these claims may be secured to the extent of those policies.

accept an unliquidated Class 9 claim against the estate of Debtor equal to the present value of the cash surrender value ("CSV") of the underlying insurance policy or (ii) purchase the underlying policy from the Debtor.

(3)    FlexLeave Programs. Pre-petition, the Debtor offered a FlexLeave Program ("FlexLeave") pursuant to which its employees located in Montana received paid time off. Under FlexLeave an employee can opt to cash in a certain amount of hours in his or her FlexLeave bank in lieu of taking time off from work. The Debtor is exploring whether and what modifications to the FlexLeave Program may be appropriate given that the FlexLeave Program is offered to union and non-union employees. As of the filing of the petition, the Debtor had accrued and unpaid liabilities of approximately $2.4 million in connection with the FlexLeave Program.

(4)    Family Protector Plan. By its terms, the Family Protector Plan provides severance benefits to terminated employees or death benefits to the beneficiaries of employees or retirees covered by the plan. Currently, the only individuals receiving benefits under the plan or with vested benefits under the plan are retirees or the beneficiaries of deceased retirees. There are no active employees currently covered by the plan. The Family Protector Plan currently pays benefits to the beneficiaries of 68 deceased retirees, and another 49 retired employees have vested benefits under the plan. Under the Family Protector Plan the beneficiaries of the deceased retirees are entitled to receive monthly payments for 18 years following the death of the retiree. As of the filing of the petition, the Debtor had accrued and unpaid liabilities of approximately $8.6 million in connection with the Family Protector Plan. The Debtor expects to assume its obligations under the Family Protector Plan and does not as of the filing of the Disclosure Statement expect to modify, terminate or reject the Plan.

## D.    Proceedings Before Montana Public Service Commission

The MPSC had before it a proceeding, generally referred to as the Financial Investigation, that it could use to impose structural limitations on the Debtor. The Debtor had always asserted that the Financial Investigation was stayed by Section 362 (a)(1) of the Bankruptcy Code. The Debtor filed a motion with the Bankruptcy Court to enforce the automatic stay as to that proceeding. The Debtor, the MPSC and the MCC entered into a stipulation and settlement agreement resolving the Financial Investigation and the disputes pending before the Bankruptcy Court on July 8, 2004. The stipulation and settlement was approved by the Bankruptcy Court in an order dated July 15, 2004.[28]

On August 22, 2003, the MPSC issued an order  (the "Initial Order") with respect to a petition filed by the Montana Consumer Counsel ("MCC") requesting initiation of an investigation (the "Financial Investigation") into NorthWestern Energy ("NWE"), a division of the Debtor. The Initial Order directed NWE to provide certain information, including information about: (i) debt reduction payments; (ii) sale of non-utility assets; (iii) investments by

---

[28]    A copy of the stipulation and settlement is attached hereto as Exhibit F-2.

the Debtor in its non-utility subsidiaries; (iv) maintenance plan and budget; and (v) compensation and benefits for members of the Debtor's board of directors and certain management positions.

On September 5, 2003, NWE, individually and along with the Debtor, responded to the Initial Order (the "First Response") by providing narrative answers and supporting documents to the information requests in the Initial Order. Furthermore, on September 12, 2003 NWE provided the Commission with additional documents that were responsive to the Initial Order.

On December 30, 2003, the Commission issued a supplemental order (the "Supplemental Order") which modified the information requested in the Initial Order. On January 15, 2004, NWE, individually and along with the Debtor, responded to the Supplemental Order by providing narrative answers and supporting documents to the information requests in the Supplemental Order.

In addition to providing the aforementioned responses, the Debtor and its counsel have provided information to staff of the MPSC and the MCC and have responded to questions from certain staff members of the MPSC and the MCC during numerous teleconferences. For example, the Debtor has provided the staff members of the MPSC and the MCC with (i) weekly cash flow reports, (ii) monthly operating reports, and (iii) copies of the Debtor's schedules and statements of financial affairs filed in the Chapter 11 Case.

Although it has been the Debtor's position that the Financial Investigation was stayed by operation of the automatic stay in the Chapter 11 Case, the Debtor cooperated with the MPSC and the MCC in connection with the Financial Investigation to the extent that it did not interfere with the Chapter 11 Case of the Debtor.

On May 7, 2004, the Debtor filed a motion with the Bankruptcy Court to enforce the automatic stay as to the Financial Investigation. The Debtor took this action because, among other reasons, the Debtor was faced with impending responsive deadlines in the Financial Investigation and the scheduling of a hearing on the Financial Investigation, which would have begun on or about June 16, 2004.

The MPSC and the MCC do not agree that the Financial Investigation is subject to the automatic stay and the MCC seeks broad relief in the Financial Investigations. In the Financial Investigation, the MCC has recommended, among other things, the implementation of specific structural regulatory requirements for the Debtor: (i) establishing a utility-only subsidiary upon emergence from bankruptcy; (ii) regulation of the disposition of utility property; (iii) segregating utility finances from non-utility affiliate risks and operations; (iv) prohibition on inter-corporate relationships between the utility subsidiary and non-utility entities; (v) restrictions on new financing involving the Debtor's Montana utility property; (vi) restriction on the cash management practices of the utility subsidiary; (vii) independent examination and verification of the Debtor's accounting systems; and, (viii) the implementation of operation and maintenance service quality parameters. In addition, the MCC has specifically requested that the MPSC order the Debtor to submit to a rate review shortly after emerging from its Chapter 11 proceeding.

24

**A797**

The MCC filed testimony seeking relief in the Financial Investigation which, if granted, would subject the Debtor and the Reorganized Debtor to post-bankruptcy regulatory controls that are neither contemplated nor addressed in the Plan. For example, the MCC would require the Debtor to reorganize its corporate structure to form a separate subsidiary corporation to hold title to the Debtor's regulated utility assets. The MCC also requested as relief in the Financial Investigation, in the absence of adoption of the regulatory controls requested by the MCC, the initiation of a rate case seeking an adjustment in the Debtor's or Reorganized Debtor's regulated return on common equity to account to Montana consumers for the absence of the regulatory controls sought by the MCC as soon as practicable after the termination of the Debtor's Chapter 11 proceeding.

The "ring fencing" sought by the MCC with respect to the Debtor's regulated utility assets would require the Debtor and the Reorganized Debtor to comply with and otherwise be regulated by the PUHCA. Complying with PUHCA would require the Debtor to reorganize the ownership of its regulated utility assets into numerous subsidiary corporations and to incur substantial capital expenditures to comply with PUHCA's requirement of being an integrated service entity. At this time, the Debtor's South Dakota and Montana electric operations and the Debtor's South Dakota, Montana and Nebraska natural gas operations are not integrated as would be required by PUHCA. The cost for this integration is substantial and is not included in the Debtor's financial projections or capital expenditure budgets.

Further, the Debtor does not believe it is required to file a rate case in Montana because it does not believe it is over earning or that the rates which it charges to Montana consumers are unreasonable and not prudent or otherwise in accordance with Montana regulations. The Debtor's proposed Plan is premised on no rate increase and, thus, the Debtor does not believe it is required to file a rate case either to exit Chapter 11 or any time thereafter until it is ready to do so. The MCC and MPSC disagree. The MPSC contends that it has authority to order rate cases to be filed and the exclusive authority to decide how they are resolved.

The Debtor has articulated its intent to request the MPSC to authorize periodic adjustments to utility rates based upon increases in the Debtor's property tax obligations. Such adjustments could result in rate changes that would require MPSC approval prior to (or following) Plan confirmation.

The Debtor, the MPSC and the MCC conducted, either directly or through representatives, a series of meetings and discussions with respect to the Debtor's Chapter 11 case, the Financial Investigation and the regulatory climate in Montana in which the Reorganized Debtor will operate. The Debtor, the MPSC and the MCC reached an agreement in principle to resolve the issues by and among the Debtor, the MPSC and the MCC. The stipulation and settlement agreement, contemplated by the agreement in principle, resolves both the Financial Investigation and the disputes pending before the Bankruptcy Court, including the Debtor's motion to enforce the automatic stay. See Exhibit F-2. On or about June 4, 2004, the Debtor filed its Motion for Order Approving the Stipulation and Settlement Agreement. On or about July 15, 2004, the Court entered an order approving the stipulation and settlement agreement among the Debtor, the MPSC and the MCC. A copy of the Bankruptcy Court order is attached hereto as Exhibit F-3. On July 20, 2004, the Debtor and the MCC submitted a joint motion to the

MPSC for entry of a Consent Order in the Financial Investigation, pursuant to the Stipulation and Settlement Agreement.

## E.    Events Precipitating Chapter 11 Filing

Several factors contributed to the Debtor's pre-petition financial difficulties. The Debtor incurred a significant amount of debt as a result of the investments it made in Expanets, Blue Dot, and CornerStone, and with respect to the Debtor's purchase of the Montana Operations. The Montana Operations have contributed substantially to the Debtor's revenues and operating income, but Expanets, Blue Dot, and CornerStone performed poorly. The Debtor's non-regulated businesses adversely impacted its overall results of operations, financial condition and liquidity. By late 2002, the Debtor was significantly overleveraged, with current and projected income insufficient to support existing debt levels, and the Debtor determined that it would never recover its investments in Expanets, Blue Dot, and CornerStone, each of which is or was a non-regulated energy business, and that these entities would not generate cash flows in sufficient amounts to provide meaningful contributions to the Debtor's debt service. On December 31, 2002, the Debtor had a common stockholders' deficit of $456.1 million and on September 30, 2003, the common stockholders' deficit was $556.6 million. On the date that the Debtor filed its petition, it had approximately $2.2 billion in debt and trust preferred instruments outstanding.

Expanets was a nationwide provider of networked communications and data services and solutions to small to mid-sized businesses. Expanets' business and financial condition was severely and adversely impacted by the downturn in the economy that began in 2000 and performance problems with its "EXPERT" enterprise system. The Debtor recorded losses before minority interests with respect to Expanets of $19.8 million, $87.0 million and $445.6 million in fiscal 2000, 2001 and 2002, respectively. As of December 31, 2003, after impairment charges and recognition of net losses, the net recorded book value of the Debtor's aggregate $364.1 million equity investment in Expanets and $225.7 million of intercompany advances to Expanets was reduced to $49.8 million. Expanets sold its assets to Avaya on November 25, 2003. Avaya paid Expanets (n/k/a Netexit, Inc.) ("Netexit") cash of approximately $50.8 million and assumed debt of approximately $38.1 million. In addition, Avaya deposited approximately $13.5 million and $1.0 million into escrow accounts to satisfy certain specified liabilities that were not assumed by Avaya, and certain indemnification obligations of Expanets, respectively. Avaya also reduced cash paid at closing by $44.6 million as a working capital adjustment, pending the determination of a final closing balance sheet. On February 24, 2004, Avaya submitted its proposed final calculation of the working capital adjustment asserting that there was a working capital shortfall at Expanets of approximately $48.8 million at closing, and claiming that Avaya should retain the entire holdback amount plus an additional $4.2 million. Netexit disputed this calculation and believed that pursuant to the terms of the asset purchase agreement Netexit is owed additional cash ranging from $10 million to $20 million.

Netexit and Avaya have settled the dispute over the working capital adjustment. The settlement provided that Netexit was paid an additional $17.5 million and that the Debtor would have continuing indemnification obligations as provided for in the closing documents and as approved by the Court in that certain Order Authorizing the Debtor to Incur and Perform Obligations under the Expanets, Inc. Asset Purchase Agreement and all Ancillary Documents and Granting Related Relief entered on November 24, 2003. The Reorganized Debtor intends to

assume the indemnification obligations owed to Avaya and remain obligated thereon following the Effective Date. Pending resolution of open claims owed to or asserted by Netexit creditors, the proceeds from the sale remain at Netexit. On May 4, 2004, Netexit and its subsidiaries filed for protection under Chapter 11 of the Bankruptcy Code.[29] The Debtor does not believe that the bankruptcy filing of Netexit will have a material effect on the Debtor's Plan. Because significant third-party creditor and other claims remain unresolved at Netexit (see, Art. III. F., infra), the Debtor can give no assurance when or if it will receive distributions from Netexit on account of the Debtor's claims against Netexit.

The Debtor's claims against Netexit are in the form of general unsecured claims represented by, among other claims, approximately $171.0 million in principal amount of promissory notes, plus $13.5 million in accrued interest on promissory notes, plus $53.14 million representing intercompany payables. The Debtor also asserts claims and interests against Netexit in the form of approximately $363.6 million of preferred stock investment and $500,000 of common stock investment.

All proceeds received by Netexit will be administered under the supervision of the Bankruptcy Court. If and when the Debtor receives any distribution on account of the Debtor's claims and interests against Netexit, such distribution shall be used to reduce the Debtor's secured debt.

Blue Dot provides heating, ventilating, and air conditioning (or HVAC) services; plumbing services; and, related services through its direct and indirect subsidiaries. Blue Dot rapidly expanded following its inception in 1997, eventually providing services from over 60 subsidiary entities in or near major metropolitan areas across the United States by the end of 2002. Blue Dot's business and financial condition was negatively impacted by the failure to achieve expected efficiencies of scale. In many cases, Blue Dot determined that products and services may be obtained at more competitive terms on a local or regional basis than could be obtained on an enterprise basis. The Debtor recorded losses before minority interests with respect to Blue Dot of $2.3 million, $13.6 million and $320.7 million in fiscal 2000, 2001 and 2002, respectively. As of December 31, 2003, after impairment charges and recognition of net losses, the net recorded book value of the Debtor's aggregate $384.8 million equity investment in Blue Dot and $17.3 million of intercompany advances to Blue Dot was reduced to $11.9 million. As of February 6, 2004, Blue Dot had sold 53 of the 62 retail locations it had on January 1, 2003. If and when the Debtor receives any distribution from Blue Dot, such distribution shall be used to reduce the Debtor's secured debt.

Effective November 1, 2002, the Debtor relinquished its direct and indirect equity interests in CornerStone Propane Partners, L.P. and Cornerstone Propane, L.P. (collectively,

---

[29]    The following Netexit entities filed Chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware: (i) Netexit, Inc., Case no. 04-11321; (ii) ATS Financial Services, Inc., Case No. 04-11323; (iii) Netexit of California Construction, Inc., Case No. 04-11325; (iv) Netexit of California, Inc., Case No. 04-11328; (v) Netexit of Indiana, LLC, Case No. 04-11329; (vi) Netexit of Indiana, Inc., Case No. 04-11331; (vii) Netexit of North America, LLC, Case No. 04-11333; (viii) Netexit of Tennessee, Inc., Case No. 04-11335; (ix) Netexit of Pacific Northwest, Inc., Case No. 04-11336; (x) Netexit of Oklahoma, Inc., Case No. 04-11337; (xi) Netexit of New York, Inc., Case No. 04-11338; (xii) Netexit of Mississippi, Inc., Case No. 04-11339; (xiii) Netexit of Hawaii, Inc., Case No. 04-11340; and (xiv) Eagle, a Netexit Company, Inc., Case No 04-11341.

**A800**

"Cornerstone"). During 2002, the Debtor recorded charges totaling $101.7 million for the write down of the value of its investment and financial arrangements in CornerStone and its share of net operating losses. The Debtor's remaining economic interest with respect to CornerStone is in the form of a promissory note in the principal amount of $26 million held by the Debtor and owed by CornerStone Propane, L.P. As of December 31, 2003, the net recorded value of this note receivable was $11 million. The Cornerstone entities have filed three claims, one of which seeks damages to unwind the deconsolidation. The Debtor asserts Cornerstone is not entitled to unwind the deconsolidation and strongly disagrees with Cornerstone's allegations. If all the Cornerstone claims with respect to unwinding the deconsolidation and/or capital account deficiency claims were to be allowed in their full amount, it would add approximately $130 million to Class 9 – Unsecured Claims and dilute the recovery of Classes 7 and 9 full face amount by approximately 15%. The Debtor intends to object to these claims of Cornerstone. In addition, until the Debtor's disputes with Cornerstone are resolved, the Debtor may have to reserve a sufficient number of shares to address the approximately $130 million claim of Cornerstone.

        The Debtor's consolidated revenues in 2002 were $2 billion, approximately $775 million of which was generated by the Debtor's core electric and natural gas utility business. The poor performance of the Debtor's non-energy businesses and its significant indebtedness negatively affected the Debtor throughout 2002. In 2002, the Debtor reported consolidated losses of $892.9 million.

        In February 2003, the Debtor obtained funding on a new $390 million senior secured financing (the "CSFB Facility" or the "Pre-petition Credit Facility") from a syndicate of banks led by Credit Suisse First Boston (the "CSFB Secured Lenders") to refinance a $280 million revolving credit facility incurred in connection with the acquisition of the Montana Operations and to provide additional liquidity for operations. Under the terms of the CSFB Facility, the CSFB Secured Lenders made loans and advances to the Debtor, $280 million of which was secured by first mortgage bonds relating to the Debtor's Montana assets and $110 million of which was secured by first mortgage bonds relating to the Debtor's South Dakota assets.

        To address further the developing financial drain on the Debtor, in late Spring and early Summer 2003, the Debtor implemented a series of cost reduction measures. These measures included a reduction in the Debtor's salaried and wage workforce, elimination of certain benefit programs for salaried employees, and other measures. The Debtor also suspended dividend payments on its common stock and payments on its subordinated debentures. Regardless of these efforts, financial pressure on the Debtor continued through Summer 2003.

        In May 2003, the Debtor also deferred interest payments on the subordinated debentures of all series of its trust preferred securities. As a result, cash distributions on all series of the trust preferred securities issued by the Debtor's affiliated trusts were deferred.

        Prior to the issuance of the Debtor's quarterly report on Form 10-Q for its fiscal quarter ended June 30, 2003, the Debtor determined based on its liquidity situation that it may not be able to meet its interest and tax obligations due during the next six (6) months and consequently, all of the Debtor's long term debt obligations were classified as current. As a result of this development and previous publicly announced events, the Debtor lost its investment grade credit rating, and counterparties on energy contracts demanded enhancements in the form of deposits and letters of credit to collateralize the Debtor's performance under energy purchase

contracts with such counterparties. These demands resulted in further erosion of the Debtor's liquidity.

In an effort to address its liquidity needs, the Debtor deferred payments on account of real property taxes owing of approximately $24.3 million and the Debtor negotiated to enter into a $50 million accounts receivable securitization facility with General Electric Capital Corporation ("GE Capital"). Had the Debtor been able to close such facility, it may have been able to sustain its operations through Fall 2003. However, the requisite lenders under the CSFB Credit Facility did not consent to the Debtor entering into the accounts receivable securitization facility with GE Capital and thus, this source of liquidity was unavailable to the Debtor.

In addition, throughout Summer 2003 the Debtor was actively exploring implementation of a debt-for-equity exchange with respect to some of its outstanding unsecured debt obligations, and to issue additional stock both for the debt-for-equity exchange and by way of a private issuance in an effort to address its over-leveraged situation and to raise additional capital. To implement either or both of these actions required approval by the Debtor's stockholders to amend the Debtor's corporate charter to increase the number of shares which could be issued and outstanding and to also allow a debt-for-equity exchange. The Debtor was unable to obtain approval by the requisite number of stockholders for these actions at its annual shareholders meeting held in August 2003.

During Summer 2003, the Debtor was also actively in negotiations to dispose of non-core assets such as its Expanets and Blue Dot subsidiary operations. The disposition of these assets, especially Expanets' assets, was delayed such that the Debtor could not avail itself of the liquidity which might otherwise be available to it from the sale of these assets.

During late Summer 2003 an informal committee of senior unsecured bondholders (the "Informal Committee") was formed and sought to engage the Debtor in discussions concerning financial restructuring and liquidity issues facing the Debtor.

The members of the Informal Committee were Angelo Gordon & Co. ("Angelo Gordon"), Oaktree Capital Management, LLC ("Oaktree Capital"), Franklin Mutual Advisor, LLC ("Franklin Mutual") and MW Post Advisory Group, LLC ("MW Post"). Affiliates of Angelo Gordon and Franklin Mutual are current members of the Creditors' Committee. To assist it in its discussions with the Debtor, the Informal Committee retained Houlihan, Lokey, Howard & Zukin Financial Advisors, Inc. ("Houlihan Lokey") as its financial advisors and Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") as its legal counsel.[30] During this pre-petition period, the Debtor agreed to pay the fees and expenses of the Informal Committee.

Prior to the Petition Date, the Debtor engaged in substantive negotiations with the Informal Committee and other interested parties in an effort to develop a plan for an out-of-court restructuring with respect to the Debtor's indebtedness and liabilities. However, faced with tightening liquidity and the failure of the Debtor's stockholders to approve necessary amendments to its corporate charter to implement an out-of-court restructuring, the inability to timely complete asset sales of non-core assets from subsidiaries, and the inability to close on the accounts receivable securitization facility with GE Capital, the Debtor chose not to make a

---

[30]    The same professionals were retained by the Creditors' Committee.

**A802**

scheduled $31 million interest payment with respect to the Debtor's outstanding unsecured senior indebtedness due September 15, 2003 and to seek relief under Chapter 11 of the United States Bankruptcy Code. At the Petition Date, the Debtor was not in default under any of its senior secured credit facilities.

## ARTICLE III
## SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

### A.    Overview of Chapter 11 and Commencement of Chapter 11 Case

On September 14, 2003 (the "Petition Date"), the Debtor filed the instant Chapter 11 Case. The Debtor's Chapter 11 Case was initially assigned to the Honorable Peter J. Walsh, Bankruptcy Judge for the District of Delaware. On October 6, 2003, the case was reassigned to the Honorable Charles G. Case, II, Bankruptcy Judge for the District of Arizona, sitting by special designation in Delaware. Since the Petition Date, the Debtor has continued to operate its business and manage its properties as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and equity interest holders. In addition to permitting rehabilitation of a debtor, another goal of Chapter 11 is to promote the optimization of the debtor's assets and equality of treatment for similarly situated creditors and equity interest holders with respect to the distribution of the debtor's assets.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing of the debtor's bankruptcy petition. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a debtor-in-possession.

The consummation of a plan of reorganization is the principal objective of a Chapter 11 reorganization case. Confirmation of a plan of reorganization by a bankruptcy court makes such plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan. Before soliciting acceptances of the proposed plan, however, Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtor is submitting this Disclosure Statement to holders of Claims against and Equity Interests in the Debtor as required by Section 1125 of the Bankruptcy Code.

The following is a brief description of some of the more material events that have occurred to date during the Chapter 11 Case.

### B.    First Day Orders

On the Petition Date or shortly thereafter, the Bankruptcy Court entered several orders authorizing the Debtor to pay various pre-petition claims and granting other relief

necessary to help the Debtor stabilize its day-to-day business operations. These orders were designed to allow the Debtor to continue business operations with minimum disruption and to ease the strain on the Debtor's relationships with its employees, vendors, customers and other parties. Included among the orders entered by the Court on or shortly after the Petition Date were orders authorizing the Debtor to: (i) pay pre-petition payroll, business expenses and other employee-related obligations; (ii) continue and maintain its pre-petition consolidated cash management system, pre-petition bank accounts, and to use pre-petition business forms; (iii) continue its insurance programs; (iv) retain a claims agent; (v) continue to perform under certain post-petition forward contracts and assume those contracts; (vi) obtain post-petition secured credit card financing; and, (vii) obtain post-petition DIP financing.

## C.    Professional Retentions

The Bankruptcy Court entered orders authorizing the Debtor to retain, among others: (i) the law firms of Paul, Hastings, Janofsky & Walker, LLP, 600 Peachtree Street, N.E., Atlanta, Georgia 30308, (404) 815-2400, Attn: Jesse H. Austin, III, Esq. and Karol K. Denniston, Esq., as bankruptcy and reorganization counsel; and Greenberg Traurig, LLP, the Brandywine Building, 1000 West Street, Suite 1540, Wilmington, Delaware 19801, (302) 661-7000, Attn: Scott D. Cousins, Esq. and William E. Chipman, Jr., Esq., as local Delaware bankruptcy counsel; and (ii) the firm of Lazard Fréres & Co., LLC ("Lazard"), 30 Rockefeller Plaza, New York, New York 10020, (212) 632-6000, Attn: David Kurtz and Andrew Yearley, as financial and restructuring advisors.

Pursuant to an order of the Bankruptcy Court dated October 10, 2003, the Debtor also was authorized to retain and employ certain professionals in the ordinary course of business. Pursuant to an order of the Bankruptcy Court dated November 6, 2003, the Debtor was authorized to retain Alvarez and Marsal ("A&M") as advisors to the Debtor. On December 11, 2003, the Bankruptcy Court entered an order authorizing the retention of Deloitte & Touche LLP ("DT") as auditors and accountants, and tax service providers to the Debtor. In addition, on April 8, 2004, the Bankruptcy Court entered an order authorizing the retention of Pricewaterhouse Coopers LLP as business consultants to the Debtor.

## D.    Appointment of Creditors' Committee and Professionals

On October 2, 2003, the United States Trustee appointed a nine (9) member Creditors' Committee in the Chapter 11 Case pursuant to Section 1102 of the Bankruptcy Court to represent the interest of all holders of unsecured claims. The members of the Creditors' Committee were: (i) OCM Opportunities Fund IV, LP; (ii) Law Debenture Trust Company of New York, as successor Indenture Trustee to The Bank of New York; (iii) Franklin Templeton Mutual Series Fund; (iv) Wilmington Trust Co.; (v) HSBC Bank USA; (vi) Rocky Mountain Contractors, Inc.; (vii) Avenue Capital Management; (viii) AG Capital Recovery Partners III, LP; and (ix) Comanche Park, LLC. Thereafter, the Court entered orders authorizing the Creditors' Committee to retain: (i) the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, (212) 373-3000, Attn: Alan W. Kornberg, Esq. and The Bayard Firm, 222 Delaware Avenue, Suite 900, P.O. Box 25130, Wilmington, Delaware 19899, (302) 655-5000, Attn: Neil B. Glassman, Esq. and Charlene D. Davis, Esq., as co-counsel; and (ii) the firm of Houlihan, Lokey, Howard & Zukin Financial Advisors, Inc., 225 S. Sixth Street, Minneapolis, MN 55402, Attn: P. Eric Seigert, as financial

advisors.[31] By notice dated November 25, 2003, the United States Trustee added Magten Asset Management Corp. to the Creditors' Committee following Rocky Mountain Contractors, Inc. declining to serve on the Creditors' Committee. By notice dated May 6, 2004, the United States Trustee removed Magten Asset Management Corp. and Law Debenture Trust Company of New York from the Creditors' Committee. By notice dated May 7, 2004, the United States Trustee removed Comanche Park, LLC from the Creditors' Committee.

As of May 17, 2004, the interests represented by the members of the Creditors' Committee are as follows: (i) OCM Opportunities Fund IV, L.P. holds Class 7 Unsecured Note Claims; (ii) Franklin Templeton Mutual Series Fund holds both Class 7 and Class 8 Claims, of which the amount of its Class 7 Unsecured Note Claims exceed the amount of its Class 8 Unsecured Subordinated Note Claims; (iii) Wilmington Trust Company is indenture trustee for certain of the Class 8 Unsecured Subordinated Notes; (iv) HSBC Bank USA is indenture trustee for all of the Class 7 Unsecured Notes; (v) Avenue Capital Management holds both Class 7 and Class 8 Claims, of which the amount of its Class 7 Unsecured Note Claims exceeds the amount of its Class 8 Unsecured Subordinated Notes Claims; and (vi) AG Capital Recovery Partners III, L.P. holds Class 7 Unsecured Note Claims.

## E.    Post-Petition Financing

As noted above, operation of the Debtor's business was hampered by, among other things, substantial declines in operating income and increasingly restricted liquidity. Accordingly, following the Petition Date, an important issue addressed by the Debtor was obtaining access to an adequate post-petition working capital facility to enable it to continue to operate its businesses on a competitive basis and, thus, to successfully reorganize.

In that regard, on the Petition Date, the Debtor filed a motion for orders (A) authorizing the Debtor to obtain post-petition financing from Bank One, N.A., on an interim and permanent basis, with superpriority over administrative expenses and secured by senior liens pursuant to sections 103(a), 364(c) and 364(d) of the Bankruptcy Code, (B) authorizing adequate protection payments to senior secured claimants, (C) scheduling final hearing and establishing notice requirements and (D) granting related relief. The Bankruptcy Court entered *nunc pro tunc* to November 7, 2003, a final Order (the "Final DIP Order") (i) granting adequate protection in connection therewith and (ii) approving an $100 million secured revolving credit facility pursuant to the DIP Loan Agreement. The obligations of the Debtor under the DIP Loan Agreement are secured by valid, binding, enforceable and perfected first priority liens on and security interest in substantially all of the Debtor's pre-petition unencumbered assets with priority over all administrative expense and subject only to the Carve-Out and the Senior Liens (as defined in the Final DIP Order), and junior liens and security interests on all other

---

[31]    Prior to the Petition Date, the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss") and the firm of Houlihan, Lokey, Howard & Zukin Financial Advisors, Inc. ("Houlihan Lokey") represented the Informal Committee. The United States Trustee's committee selection process took almost a full day. After the United States Trustee appointed the initial Creditors' Committee members, the newly formed Creditors' Committee interviewed legal and financial advisors ultimately selecting Paul Weiss and Houlihan Lokey. The Creditors' Committee then filed applications to retain Paul Weiss and Houlihan Lokey to represent the Creditors' Committee. None of the members of the Creditors Committee objected to the retention and the Bankruptcy Court entered orders approving the retentions of Paul Weiss and Houlihan Lokey nunc pro tunc to September 30, 2003.

**A805**

encumbered property of the Debtor. Additionally, the Debtor was authorized to make adequate protection payments and to continue paying principal, non-default interest and other recoverable costs and expenses on the obligations secured by the Senior Liens as such amounts become due and payable in the ordinary course. In addition, in order to protect against actual diminution in value of the collateral securing the Senior Liens, the holders of Senior Liens were granted replacement liens on all replacement collateral of the Debtor of the same nature, extent and priority as the Senior Liens that existed on the Petition Date.

On or about October 29, 2003, the Debtor filed a motion pursuant to 11 U.S.C. §§ 105, 362, 363 and 364 for entry of an order (A) amending the CSFB Facility, (B) providing protections under Section 364(c)(1), on an interim and permanent basis, (C) scheduling hearings and establishing notice requirements and (D) granting related relief. On or about January 13, 2004, the Bankruptcy Court entered a final order (the "CSFB Final Order") authorizing the amendment of the CSFB Facility and granting protection in connection therewith. The obligations of the Debtor under the CSFB Facility are secured by the CSFB Facility Montana First Mortgage Bonds and the CSFB Facility South Dakota First Mortgage Bonds (both as defined in the Plan). The primary purposes of amending the CSFB Facility were to continue the facility and to reduce the interest rate paid on the facility, and, so long as there were no non-consensual modifications to the facility and the facility remained current during the Chapter 11 Case, to allow the continuation of the CSFB Facility upon the Debtor's exit from Chapter 11.

On or about December 11, 2003, the Court approved the Stipulation and Order: (I) Authorizing and Restricting Use of Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2)(A) and Bankruptcy Rules 4001(b) and (d); and (II) Scheduling a Final Hearing, if necessary, Pursuant to Bankruptcy Rules 4001(b), (c) and (d) (the "Colstrip Stipulation"). Pursuant to the Colstrip Stipulation, the Debtor is authorized to use cash collateral subject to the terms and conditions of the Colstrip Stipulation including the Debtor's obligation (i) to maintain the funds in a segregated account (the "Colstrip 4 Security Account"), (ii) to promptly deposit all revenues generated from the operation of the power-generation facility generally known as Colstrip 4 (the "Colstrip 4 Facility") into the Colstrip 4 Security Account, (iii) to restrict expenditures from the Colstrip 4 Security Account in accordance with the budget, and (iv) to make prepayments of Excess Cash Amounts (as defined in the Colstrip Stipulation). The Colstrip Stipulation granted the Secured Lease Financing Parties (as defined in the Colstrip Stipulation) a first priority lien and security interest in and to the proceeds of the Colstrip 4 Security Account and certain replacement liens and administrative claims as described in the Colstrip Stipulation.

## F.    Sale of Expanets Assets

By Order dated October 10, 2003, the Debtor was authorized to proceed with implementing whatever action was required of it to complete the sale of Expanets' assets. By a certain contract dated September 14, 2003, Expanets had entered into an asset purchase agreement to sell all or substantially all of Expanets' assets, along with the assumption of designated liabilities, to Cerberus California, Inc. ("Cerberus"). While Expanets itself has not filed a Chapter 11 case, the sale of Expanets' assets occurred in a manner similar to a Section 363 sale of assets under the Bankruptcy Code. An active solicitation for sale of the assets and due diligence thereon had occurred from about July 1, 2003 through October 29, 2003, with a public auction and sale of Expanets' assets occurring on October 29, 2003. At the auction, active bidding among four qualified bidders (including Cerberus) ensued. Avaya was the successful

**A806**