purchaser of Expanets' assets for a gross purchase price of $152 million, which included the assumption of certain liabilities and the payment of a $4 million "topping fee" to Cerberus.

   The closing of the sale to Avaya occurred on November 25, 2003. Avaya paid Expanets (n/k/a Netexit) cash of approximately $50.8 million and assumed debt of approximately $38.1 million. In addition, Avaya deposited approximately $13.5 million and $1.0 million into escrow accounts to satisfy certain specified liabilities that were not assumed by Avaya, and certain indemnification obligations of Expanets, respectively. Avaya also reduced cash paid at closing by approximately $44.6 million as a working capital adjustment, pending the determination of a final closing balance sheet. On February 24, 2004, Avaya submitted its proposed final calculation of the working capital adjustment asserting that there was a working capital shortfall at Expanets of approximately $48.8 million at closing, and claiming that Avaya should retain the entire holdback amount plus an additional $4.2 million. Netexit disputed this calculation and believed that pursuant to the terms of the asset purchase agreement Netexit is owed additional cash ranging from $10 million to $20 million. Since the Debtor filed its Disclosure Statement, Netexit and Avaya reached a settlement as to the working capital adjustment. The settlement provided that Netexit was paid an additional $17.5 million by Avaya and the Debtor will have continuing indemnification obligations as provided for in the closing documents and as approved by the Court in that certain Order Authorizing the Debtor to Incur and Perform Obligations under the Expanets, Inc. Asset Purchase Agreement and all Ancillary Documents and Granting Related Relief entered on November 24, 2003. The proceeds received from the sale to Avaya are Netexit's only remaining assets.

   On May 4, 2004, Netexit and its subsidiaries filed for protection under Chapter 11 of the Bankruptcy Code. The Debtor does not believe that the bankruptcy filings by the Netexit entities will have a material effect on the Debtor's Plan. The proceeds received by Netexit from the sale of Expanets' assets will be used to pay and resolve claims and interests asserted against Netexit. In particular, Netexit must resolve the following claims, among others, prior to distributing any proceeds to the Debtor: (i) state tax liability claims; (ii) minority shareholder litigation, styled Cohen v. Northwestern Growth Corporation, et al., Case Number 04-4043, United States District Court, District of South Dakota, Southern Division (the "Minority Shareholder Litigation"); (iii) wage and hour litigation filed with the Supreme Court of the State of New York, County of Bronx (the "Wage and Hour Litigation"); and (iv) certain employee claims (the "Employee Claims"). The plaintiffs in the Minority Shareholder Litigation assert that the defendants violated the Securities Act of 1933, 15 U.S.C. § 771(a)(2), Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and certain rules promulgated thereunder, and certain state securities laws and common law theories of fraud, unjust enrichment and breach of fiduciary duty and seek damages in excess of $20 million. The plaintiffs in the Wage and Hour Litigation assert violations of New York's prevailing wage laws, breach of contract, unjust enrichment, willful failure to pay wages, race, ethnicity, national origin and/or age discrimination and retaliation. The plaintiffs in the Wage and Hour Litigation seek damages in the collective amount of $40 million. In addition, Netexit has been named as defendants in actions by former employees. Netexit has resolved some of these actions but believes that additional actions may be filed in the future.

**A807**

## G.    Sale of Blue Dot Assets

As of February 6, 2004, Blue Dot had sold 53 of the 62 retail locations it had on January 1, 2003. Blue Dot repaid its credit facility from sales proceeds and plans to maintain enough cash on hand to meet working capital purposes and fulfill any remaining claims and obligations. Blue Dot anticipates selling substantially all of its remaining businesses by June 30, 2004. The Debtor hopes to receive in excess of $15 million in cash from Blue Dot during the liquidation of the operations; provided however, that the anticipation of receiving cash from Blue Dot assumes satisfactory resolutions of remaining stock obligations, potential or pending litigation, insurance and bonding reserves, and no new material additional claims or litigation. Furthermore, it assumes that the remaining businesses produce their projected cash proceeds, and that receivables from various sold locations are collectible. If and when the Debtor receives a distribution from Blue Dot, such distribution shall be used to reduce the Debtor's secured debt.

## H.    Extension of Time to Assume or Reject Leases

Pursuant to Section 365(d)(4) of the Bankruptcy Code, the Debtor was required to assume or reject its nonresidential real property leases within sixty (60) days of filing its Chapter 11 petition (i.e., by November 13, 2003) absent an extension of such time period by the Bankruptcy Court. By Order dated October 10, 2003, the Bankruptcy Court extended the time within which the Debtor may assume or reject its nonresidential real property leases through and including January 12, 2004.

## I.    Extension of Exclusive Periods

Pursuant to Section 1121(b) of the Bankruptcy Code, the Debtor's exclusive period to file a plan of reorganization expired on January 12, 2004, and the Debtor's initial 180 day exclusive period to solicit votes on a filed plan expired on March 12, 2004 (together, the "Exclusive Periods"). By order dated January 14, 2004, the Bankruptcy Court extended the Exclusive Periods for an additional 60 days to file a plan through and including March 12, 2004, and of the time to solicit votes thereon through and including May 11, 2004. By separate order dated April 8, 2004, the Bankruptcy Court extended the Exclusive Periods as to the time to solicit votes for acceptance of the Plan through and including July 12, 2004. By separate order dated June 21, 2004, the Bankruptcy Court extended the Exclusive Periods as to the time to solicit votes for acceptance of the Plan through and including September 30, 2004.

## J.    Claims Process and Bar Date

On or about November 4, 2003, the Debtor filed its Schedules of Assets and Liabilities, Statements of Financial Affairs and Schedule of Executory Contracts and Unexpired Leases (which were amended on December 12, 2003). Previously, on October 10, 2003, the Bankruptcy Court, pursuant to Sections 501 and 1111(a) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3), entered an Order: (i) fixing January 15, 2004 (the "Bar Date") as the deadline for all creditors of the Debtor, except governmental units, to file proofs of claim against the Debtor's estate; and (ii) fixing April 15, 2004 as the deadline for all governmental unit creditors of the Debtor to file proofs of claim against the Debtor's estate. The Bar Date order provides, except as set forth therein, that any holder of a Claim that fails to file a timely proof of claim on or before the Bar Date (or solely with respect to governmental units, by the

deadline for governmental claims): (a) shall be forever barred, estopped and permanently enjoined from asserting such claim against the Debtor, its successors or its property (or filing a proof of claim with respect thereto) and the Debtor, its successors and its property shall be forever discharged from any and all indebtedness or liability with respect to such claim; (b) shall not be treated as a creditor for purposes of voting on and Distribution under a plan of reorganization in the Chapter 11 Case with respect to such claim; and (c) shall not be entitled to receive any further notices regarding such claim.

A total of approximately 1,031 Claims were filed against the Debtor's estate with an aggregate asserted liability of approximately $8.8 billion (not including those claims that did not designate a claim amount instead identifying their claims as contingent and unliquidated). After a preliminary review of such Claims and a comparison to its books and records, the Debtor believes that the foregoing Claims include, among other things, invalid, overstated, objectionable and duplicative claims. The Debtor estimates that the approximate amount of Claims[32] as of and arising from the occurrence of the Effective Date per category and Class will be as follows:

| CLASS | DESCRIPTION | ESTIMATED AMOUNT OF CLAIMS AS OF 3/11/04[33] |
|-------|-------------|-----------------------------------------------|
| Class 1 | Priority Claims | $0 |
| Class 2 | Unsecured Priority Claims | $443,874.43 |

---

[32] The Debtor filed the following claims objections on March 17, 2004: (i) First Omnibus Objection to Claims pursuant to 11 U.S.C.§502(b) and Red.R. Bankr. P. 3007 (Late – Filed Claims – Non-Substantive); (ii) Second Omnibus Objection to Claims Pursuant to 11 U.S.C. §502(b) and Fed R. Bankr. P. 3007 (Duplicate Claims – Non Substantive); (iii) Third Omnibus Objection to Claims Pursuant to 11 U.S.C. §502(b) and Fed. R. Bankr. P. 3007 (Amended Claims – Non-Substantive); and (iv) Fourth Omnibus Objection to Claims Pursuant to 11 U.S.C. §502(b) and Fed. R. Bankr. P. 3007 (Equity Claims – Non-Substantive). On or about May 17, 2004, the Bankruptcy Court entered orders granting the Debtor's first, second, third and fourth omnibus objections to claims. On or about May 21, 2004, the Debtor filed the following claims objections: (a) Fifth Omnibus Objection to Claims Pursuant to 11.U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 [Books and Records – Substantive]; (b) Sixth Omnibus Objection to Claims Pursuant to 11 U.S.C. § 502(b) and Fed R. Bankr. P. 3007 [Late – Filed Claims –Non-Substantive]; (c) Seventh Omnibus Objection to Claims Pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 [Amended Claims – Non-Substantive]; (d) Eighth Omnibus Objection to Claims Pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr.P. 3007 [Claim is filed against incorrect party – non-substantive]; and (e) Ninth Omnibus Objection to claims pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 [Re-classified claims – Substantive]. On or about June 21, 2004, the Bankruptcy Court entered orders granting the Debtor's sixth, seventh, eighth and ninth omnibus objection to claims. The fifth omnibus objection to claims has been continued. The Debtor continues to actively reconcile filed proofs of claim with its books and records and anticipates filing additional claims objections. The Debtor believes the Claims set forth above are reasonable and accurate. This amount is likely to change as the claim reconciliation and objection process move forward. In the estimated numbers set forth above, the Debtor has not included or has reduced the filed claim amount for those disputed claims to which the Debtor believes it has strong defenses and to which the Debtor intends to object. Also eliminated from this initial analysis are those disputed liquidated and contingent claims to which the Debtor intends to object and otherwise estimate at zero for voting purposes. The Debtor will amend, supplement and update this Disclosure Statement as and when the Debtor revises its estimates.

[33] The estimated amounts for Classes 4, 5 and 6 are as of the Petition Date.

**A809**

| CLASS | DESCRIPTION | ESTIMATED AMOUNT OF CLAIMS AS OF 3/11/04[33] |
|---|---|---|
| Class 3 | Bank One DIP Financing Claims | $0 |
| Class 4[34] | CSFB Financing Claims | $395,218,146 |
| Class 5[35] | Secured Bondholder Claims | |
| | South Dakota First Mortgage Bond Claims | $115,830,805 |
| | Montana First Mortgage Bond Claims | $173,748,766 |
| | Montana Pollution Control Bond Claims | $173,627,950 |
| | South Dakota Pollution Control Bond Obligations | $21,712,807 |
| | Gas Transition Bond Claims | $49,849,982 |
| Class 6[36] | Other Secured Claims | |
| | Capital Lease Obligations | $9,689,766 |
| | Letters of Credit | $13,750,000 |
| Class 7 | Unsecured Note Claims | |
| | November 1, 1998 Indenture Claims | $857,649,556 |
| | December 1, 1989 Indenture Claims | $40,615,127 |
| Class 8 | Unsecured Subordinated Note Claims | |
| Class 8(a) | August 1, 1995 Indenture Claims | $321,069,383 |
| Class 8(b) | November 1, 1996 Indenture Claims | $69,537,873 |
| Class 9 | General Unsecured Claims | $46,164,330 |

---

[34]     The estimated amount provided for Class 4 is as of the Petition Date.

[35]     The estimated amount provided for Class 5 is as of the Petition Date.

[36]     The estimated amount provided for Class 6 is as of the Petition Date.

| CLASS | DESCRIPTION | ESTIMATED AMOUNT OF CLAIMS AS OF 3/11/04[33] |
|-------|-------------|-----------------------------------------------|
| Class 10 | Unsecured Convenience Claims of $20,000 or Less | $3,022,509 |
| Class 11 | Environmental Claims | $44,000,000<br><br>(assumed and to be paid in ordinary course as and when such claims may arise) |
| Class 12 | D&O Trust Claims | $0<br>(to be channeled to D&O Trust) |
| Class 13 | Other Equity and Interest Holder Claims | $0 |
| Class 14 | Securities Claims | $0 |
| Class 15 | Opt-Out Securities Claims | $0<br>(to be channeled to D&O Trust) |

### K.    Performance Bonuses

In January, 2004, the Debtor filed a motion to approve amendments to an existing Employee Incentive Plan (as so amended, the "Employee Incentive Plan"). The Debtor believes that the commencement of the Chapter 11 case engendered uncertainty and anxiety among the Debtor's employees, particularly their critical senior and mid-level management employees. Accordingly, to prevent the departure of management and employees, and the concomitant disruption to the Debtor's operations and reorganization efforts occasioned thereby, the Debtor amended its existing Employee Incentive Plan to provide incentives to employees and to reduce costs. An order approving the amendments to the existing Employee Incentive Plan was entered on February 3, 2004.[37]

### L.    Proposed Equity Committee

On March 24, 2004, RCG Carpathia Master Fund, Ltd., Performance Capital and Smith Management LLC (the "Movants") filed their motion for the appointment of an official equity security holders committee. The Movants assert that an official committee is necessary to assure adequate representation of common stockholders. In particular, the Movants assert that the valuation prepared by the Debtor's financial advisors understates the Reorganized Debtor's value. The Debtor, the United States Trustee and the Creditors' Committee objected to the

---

[37]    The MPSC asserts that the MPSC Order 6474a explicitly requires the Debtor to seek MPSC approval prior to adopting any incentive plans for key executives. The Debtor disagrees that this provision of MPSC Order 6474a remains enforceable.

appointment of an official equity committee. The Movants' motion was denied by court order entered on May 13, 2004.

**M.    Litigation – Pending and Asserted**

(1)    AEP Adversary. On or about November 24, 2003, the Debtor filed an adversary complaint against American Electric Power Company, Inc., American Electric Power Service Corporation and Ohio Power Corporation (collectively, "AEP"). The Debtor and AEP are parties to a Letter of Confirmation entered on or about December 3, 2002 for the sale by the Debtor of a certain quantity of power to AEP. The Debtor contends AEP breached this contract by improperly terminating. The Debtor also contends AEP violated the automatic stay by attempting to collect additional funds post-petition. On or about May 28, 2004, the Debtor filed a motion to approve the settlement with AEP. The Court entered an Order approving the settlement with AEP on or about June 21, 2004.

(2)    Cornerstone and Mewhinney Litigation. The Debtor, and certain of its present and former officers and directors, are named as defendants in certain complaints filed against CornerStone Propane Partners LP, and other defendants filed in the United States District Court for the Northern District of California. This litigation is stayed as to the Debtor.

(3)    Hydrodynamics Litigation. On or about April 9, 2003, Hydrodynamics, Inc. ("Hydrodynamics") commenced a state court action against the Debtor styled Hydrodynamics, Inc. v. NorthWestern Corporation, Case No. DV-03-36, Montana Sixth Judicial District, Park County (the "Hydrodynamics Litigation"). In the Hydrodynamics Litigation, Hydrodynamics asserts breach of contract, breach of the duty of good faith and fair dealing, waiver and estoppel, breach of fiduciary duties and misrepresentation in connection with two (2) Cogeneration and Small Power Production Long-Term Power Purchase Agreements, dated as of October 31, 1984 and as of November 15, 1984 (collectively, the "Hydrodynamics Agreements"). On or about March 19, 2004, Hydrodynamics filed its motion for relief from the automatic stay. At the request of Hydrodynamics, on or about April 1, 2004, the Debtor filed its motion to assume the Hydrodynamics Agreements. On June 21, 2004, the Court entered an order approving the assumption of the Hydrodynamics Agreements. The Debtor and Hydrodynamics are currently negotiating a final settlement agreement which addresses the cure amount and other issues as between the Debtor and Hydrodynamics.

(4)    Hylland Arbitration. On April 30, 2003, Mr. Richard Hylland filed a demand for arbitration of contract claims under his employment agreement, as well as tort claims for defamation, infliction of emotional distress and tortious interference and a claim for punitive damages. The arbitration has been stayed by the Debtor's bankruptcy filing and Mr. Hylland's motion seeking lifting of the automatic stay was denied by the Bankruptcy Court pursuant to a written Memorandum Order. On or about January 23, 2004, Mr. Hylland filed a notice of

appeal of the Bankruptcy Court's order denying his motion for relief from stay.[38] The Debtor has filed a motion to dismiss Mr. Hylland's appeal. In connection with the settlement of the Securities Litigation, the Debtor and Mr. Hylland reached an agreement whereby Mr. Hylland will dismiss his claims against the Debtor asserted in the Debtor's bankruptcy proceeding, except for those claims arising from Mr. Hylland's employment, Mr. Hylland and the Debtor shall attempt to negotiate a liquidated amount and if such negotiations are successful, Mr. Hylland will withdraw his pending appeal in the Debtor's bankruptcy proceeding. If an agreed liquidated amount cannot be reached, Mr. Hylland may continue to pursue his appeal and the pending arbitration of his employment claim.

Mr. Hylland asserts total claims in excess of $30.0 million, of which he asserts he is owed $4.0 million in fully vested retirement benefits under the Supplemental Income Security Plan ("SISP") and over $1.4 million for damages relating to administration and/or termination of the Debtor's Family Protector Plan. In connection with his employment agreement, Mr. Hylland further asserts that the Debtor breached specific employment contract provisions, defamation, and other tortious conduct. Mr. Hylland asserts that the Debtor repeatedly subjected Mr. Hylland to "fundamental change conduct" and pursuant to the employment agreement, Mr. Hylland could terminate his employment at any time after providing the Debtor with notice of the fundamental change conduct and a reasonable period of time for the Debtor to cure the fundamental change. The Debtor strongly disagrees with Mr. Hylland's assertions and intends to object to Mr. Hylland's claims.

On or about April 30, 2004, Mr. Hylland filed his Second Motion for Relief from the Automatic Stay to Continue Pre-Petition Arbitration (the "Second Motion"). On May 17, 2004, the Court denied Mr. Hylland's Second Motion without prejudice.

(5)    Lewis Adversary. On April 22, 2004, Merle D. Lewis filed an adversary proceeding asserting that the Debtor (i) impermissibly cutback Mr. Lewis' qualified benefits and breached its fiduciary duty to protect the plan benefits, (ii) impermissibly alienated Mr. Lewis' qualified benefits, and (iii) failed to provide consistent treatment to plan recipients. The Debtor believes Mr. Lewis' claims are without merit and intends to timely respond to and vigorously defend the adversary proceeding.

(6)    McGreevey, et al. v. The Montana Power Company (the "McGreevey Litigation"). The Debtor is one of several defendants in the McGreevey Litigation now pending in federal court in Montana. The lawsuit was filed by former stockholders of The Montana Power Company (most of whom became stockholders of Touch America Holdings, Inc. as a result of a corporate

---

[38]    Mr. Hylland has filed numerous claims totaling approximately $61.2 million of which $30.6 million are duplicative. The Debtor intends to strongly object to all of Mr. Hylland's claims.

reorganization of The Montana Power Company). The parties to the McGreevey Litigation proposed to mediate before a federal court judge in Montana. On April 8, 2004, the Court entered an order approving a stipulation granting relief from stay to the extent necessary to permit the Debtor to participate in the mediation. The plaintiffs in the McGreevey Litigation also filed a joinder to the motion of Magten Asset Management Corporation ("Magten") for an Order Granting Relief from the Automatic Stay to Commence Adversary Proceeding Seeking to Avoid Fraudulent Transfer. The Bankruptcy Court denied the joinder of the plaintiffs in the McGreevey Litigation. On April 27, 2004, the McGreevey plaintiffs filed a motion for relief from stay to commence adversary proceeding relating to assets upstreamed to the Debtor by Clark Fork and Blackfoot, LLC ("Clark Fork"). On May 12, 2004, the Debtor filed its objection to the motion for relief from stay. The motion was heard at the May 17, 2004 hearing, and on or about June 16, 2004, the Bankruptcy Court entered an order granting the McGreevey Plaintiffs relief from stay. On July 10, 2004, certain parties to the McGeevey Litigation participated in a mediation before Antonio Piazza of Gregoria, Haldeman, Piazza, Rotman & Matityahu. As a result of the mediation, the parties entered into a memorandum of understanding. On or about August 13, 2004, the Debtor filed a Motion to Approve a Memorandum of Understanding (the "McGreevey MOU") entered into by certain parties to the McGreevey Litigation. The McGeevey MOU contains the material terms of a proposed settlement under which the Debtor will receive a full release and discharge, and withdrawal of any and all claims and causes of actions asserted or filed and which could have been asserted or filed with respect to the McGreevey Litigation. Under the proposed settlement, the Debtor shall give up whatever rights it may have had as a beneficiary under the insurance policies purchased by the Montana Power Company listed on Exhibit C to the Plan as "Disputed Policies." A stipulation of settlement is currently being finalized. The Debtor will file the stipulation of settlement with the Bankruptcy Court prior to a hearing on the McGreevey MOU.

The plaintiffs to the McGreevey Litigation timely filed two (2) proofs of claim in the Debtor's bankruptcy proceeding, claim nos. 691 and 744. In claim no. 691, the plaintiffs claim $3,000,000,000 in connection with the Debtor's agreement to be responsible for any judgment which might be entered in the McGreevey Litigation against NorthWestern Energy, LLC to the extent that NorthWestern Energy, LLC (n/k/a Clark, Fork and Blackfoot, LLC) might not have sufficient assets to satisfy such judgment. Claim No. 691, to the extent Allowed, shall be treated as a D&O Trust Claim only to the extent that such claim is covered by the D&O Policies. In the event that a judgment and/or settlement is reached, Claim No. 691, to the extent it is Allowed, shall be treated as a General Unsecured Claim, Class 9. In the event that the McGreevey Litigation is not resolved by mediation, the Debtor intends to object to the claims prior to the Confirmation Hearing.

In claim no. 744, the plaintiffs claim $600,000,000 asserting that the assets of NorthWestern Energy, LLC were transferred to the Debtor in violation of

**A814**

Montana fraudulent transfer law. Both the claims filed by the McGreevey Plaintiffs would be resolved as part of the settlement.

(7)    QUIPS Litigation. On April 16, 2004, Law Debenture Company of New York as a Trustee ("Law Debenture") under the QUIPS Indenture and Magten Asset Management Corporation ("Magten") a QUIPS holder, commenced an adversary proceeding (the "QUIPS Litigation") seeking, among other things, to avoid the transfer of the Montana Operations assets of Clark Fork and Blackfoot LLC (f/k/a NorthWestern Energy LLC) to the Debtor in November 2002 pursuant to what is generally referred to as the "going flat" transaction. In the QUIPS Litigation, Law Debenture and Magten contend that the "going flat" transaction was a fraudulent transfer and seek to recover the Montana Operations assets on behalf of all QUIPS holders. Law Debenture and Magten assert that if a judgment is obtained against the Debtor in the QUIPS Litigation, the obligations evidenced by the QUIPS could be paid in full, with interest and in Cash.[39] Not only does the Debtor intend to vigorously defend the QUIPS Litigation but the Debtor also strongly disagrees with Law Debenture's and Magten's analysis of the treatment of any recovery in connection with such litigation. The Debtor believes that the Second Amended Plan provides that any recovery in the QUIPS Litigation would be treated as a Class 9 General Unsecured Claim.

On or about May 15, 2004, the Debtor filed a motion to dismiss the complaint in the QUIPS Litigation. As stated in the motion, the Debtor believed that: (a) Law Debenture and Magten lacked standing to bring the fraudulent transfer claims asserted against the Debtor because the QUIPS holders were no longer creditors of Clark Fork and Blackfoot LLC; (b) the transfer of the Montana assets were expressly allowed by the documents governing the QUIPS holders' claim; and (c) the trustee to the QUIPS waived any right to object to the transfer of assets because of a failure to object at the time of each transfer. In response, Law Debenture and Magten asserted that: (a) the QUIPS holders continue to be creditors of Clark Fork and Blackfoot LLC because any purported release of their claims against Clark Fork and Blackfoot LLC under the QUIPS Indenture or otherwise was obtained by fraud and, therefore, ineffective; (b) the Debtor's attempt to assume Clark Fork and Blackfoot LLC's obligations under the QUIPS Indenture was part of a fraudulent scheme to obtain the Montana assets; and (c) at the time of the "going flat" transaction, the Debtor intentionally and fraudulently concealed, among other things, that its financial conditions were much worse than publicly reported. On August 20, 2004, the Bankruptcy Court entered a decision on the Debtor's motion to dismiss (the "QUIPS Litigation Decision"). The

---

[39]    Magten has indicated that in the event Class 8(b), as a Class, votes to reject the Second Amended Plan, Magten intends to prosecute the QUIPS Litigation. Magten has indicated that it will seek to require the Debtor to place into escrow cash equal to the face amount of the QUIPS plus interest. The Debtor believes that the Second Amended Plan provides that any recovery related to the QUIPS Litigation will be treated as a Class 9 General Unsecured Claim. On or about August 20, 2004, the Debtor filed its Motion Pursuant to Sections 105(a), 363(b) and 502(c) of the Bankruptcy Code for Estimation of Magten Asset Management's Claim and to Establish Disputed Claim Reserve. The motion is currently scheduled to be heard on September 15, 2004.

Bankruptcy Court held that Law Debenture and Magten lack standing as creditors of Clark Fork and Blackfoot LLC to pursue a fraudulent conveyance action against the Debtor because of the release provided in Section 1102 of the QUIPS Indenture, unless Law Debenture and Magten can prove under applicable law that the release was obtained through actual fraud or as part of a fraudulent scheme.[40] To the extent Law Debenture and Magten can prove under applicable law that the release was obtained through actual fraud or as part of fraudulent scheme, Law Debenture and Magten assert that the release may be ineffective and Law Debenture and Magten may be able to pursue the fraudulent transfer claims which have been asserted on behalf of the QUIPS Notes. The Debtor will continue to strongly oppose any continued prosecution of such fraudulent transfer claims.

(8)     <u>Magten Montana Action.</u> In addition to the QUIPS Litigation, Magten filed an action in the United States District Court of Montana, Butte Division styled as Civil Action File No. CO-04-26-BU-RFC (the "<u>Magten Montana Action</u>") against certain former officers of Clark Fork at the time of the going flat transaction and has asserted in such action breach of fiduciary obligations owed to Magten in allowing the going flat transaction to be completed. The defendants have moved to dismiss this action.

The Debtor and the defendants in the Magten Montana Action intend to vigorously defend the positions asserted by Magten. The Debtor believes that Magten and holders of the QUIPS are not creditors of Clark Fork but are creditors solely of the Debtor and, as a result, neither Magten nor Law Debenture has standing to pursue the Magten Montana Action. If Magten is a creditor only of the Debtor, it also does not have standing to pursue a breach of fiduciary duty case against the Defendants in the Magten Montana Action.

(9)     <u>Debtor's Motion to Estimate Magten Claim and Other Action.</u> Magten also disputes the treatment of its claim under the Debtor's Plan and asserts that its claims are senior to all unsecured creditors. As the documents supporting Magten's claim fail to provide for the priority treatment asserted by Magten, the Debtor disagrees with Magten's assertion of its priority status. On or about August 20, 2004, the Debtor filed its Motion Pursuant to Sections 105(a), 363(b) and 502(c) of the Bankruptcy Code for Estimation of Magten Asset Management's Claim and to Establish Disputed Claim Reserve (the "Estimation Motion"). The motion requests that the Bankruptcy Court estimate the amount of Magten's claim for all purposes, including for purposes of distribution under the Second Amended Plan. The Estimation Motion is currently scheduled to be heard on September 15, 2004.

The Debtor also filed its complaint initiating an adversary proceeding styled, NorthWestern Corporation v. Magten Asset Management Corporation, and Talton R. Embry, Adv. Proc. No. 04-55051 (the "<u>NorthWestern Magten Adversary</u>"). In

---

[40]    A copy of the QUIPS Litigation Decision is attached to the Second Amended Disclosure Statement as <u>Exhibit P</u>.

**A816**

the NorthWestern Magten Adversary, the Debtor seeks damages and equitable relief relating to Magten's alleged improper trading activity post-Chapter 11. In particular, the Debtor seeks damages (including disgorgement of any ill-gotten gains) to compensate itself and its creditors for Magten's alleged breach of fiduciary duty, breach of contract, and violation of an express Bankruptcy Court order prohibiting the very trading activity in which Magten engaged. The Debtor also seeks subordination of Magten's claim in the Chapter 11 Case under Section 510(c) of the Bankruptcy Code. The Debtor anticipates that Magten will vigorously defend against the Estimation Motion and the NorthWestern Magten Adversary.

(10)  Comanche Park Lift Stay Motion. Comanche Park LLC ("Comanche Park") had filed a complaint against the Debtor and the predecessor-in-interest to Clark Fork prior to the Debtor's filing its Chapter 11 case. Like the plaintiffs in the McGreevey Litigation, Comanche Park also filed a joinder to Magten's motion seeking relief from the automatic stay to pursue the QUIPS Litigation. As with the plaintiffs in the McGreevey Litigation, the Bankruptcy Court denied Comanche Park's joinder. On April 29, 2004, Comanche Park filed its own motion for relief from stay to commence adversary proceeding relating to the assets upstreamed to the Debtor by Clark Fork. On May 12, 2004, the Debtor filed its opposition to Comanche Park's lift stay motion. Comanche Park's motion was heard at the May 17, 2004 hearing and on or about June 16, 2004 the Bankruptcy Court entered an order denying Comanche Park's motion for relief from stay. By order dated August 4, 2004, the Bankruptcy Court approved a compromise and settlement between the Debtor and Comanche Park resolving all of Comanche Park's claims against the Debtor by providing for a $750,000 Allowed Class 9 General Unsecured Claim for Comanche Park.

(11)  Milltown Dam. On September 10, 2003, Atlantic Richfield Company ("ARCO") and NorthWestern Energy executed a confidential settlement agreement ("Milltown Settlement"). On October 17, 2003, the Debtor filed a motion with the Bankruptcy Court seeking approval of the Milltown Settlement.[41] Under the terms of the Milltown Settlement, consistent with the Milltown Stipulation described below, commencing the month following Bankruptcy Court approval of such settlement and each month thereafter, the Debtor is to pay $500,000 into an escrow account until the total settlement amount of $10.0 million ($7.5 million for the benefit of ARCO and $2.5 million for the benefit of the government parties) is fully funded. No interest is to accrue on the unpaid settlement amount. The escrow account is to remain funded until a final, nonappealable consent decree is entered by the United States District Court. If a consent decree acceptable to all parties is not

---

[41]  The United States of America, on behalf of the United States Environmental Protection Agency and the United States Department of the Interior, has asserted that the Debtor, as the alter-ego of Clark Fork, was and still is the owner and operator of the Milltown Site. The State of Montana has asserted that the Debtor and Clark Fork may be substantively consolidated. The State of Montana asserts that in the event the Debtor and Clark Fork are substantively consolidated, the distribution to the Debtor's creditors may be diluted.

implemented, the escrowed funds are to continue to be held in escrow pending further order from the Bankruptcy Court. The Debtor currently has a 10-year, $100 million environmental insurance policy, effective as of May 31, 2002, to mitigate the risk of future environmental liabilities arising from catastrophic failure of Milltown Dam caused by an act of God.

Following the filing of the motion to approve the Milltown Settlement, the Debtor and its wholly owned subsidiary, Clark Fork, have been in active negotiations with ARCO, the United States on behalf of the U.S. Environmental Protection Agency and the U.S. Department of the Interior, the State of Montana and the Confederated Salish and Kootenai Tribes regarding a resolution of the United States and the State of Montana's objections to the Debtor's motion for approval of the Milltown Settlement and a final consent decree acceptable to all of the parties. These negotiations have been successful and on April 7, 2004, a stipulation of settlement (the "Milltown Stipulation") was prepared and finalized.

The Milltown Stipulation provides that the Debtor, with some anticipated funding from Clark Fork, shall contribute $3.9 million (consisting of $2.5 million under the Milltown Settlement and $1.4 million additional) for restoration work within the Milltown Reservoir superfund site. The Debtor shall also make the $7.5 million payment to ARCO under the Milltown Settlement. In addition, the Debtor and/or Clark Fork, shall pay $50,000 in satisfaction of all their historical mitigation obligations arising from demolition of FERC-licensed structures at the Milltown Reservoir site in accordance with the terms and conditions established in the final consent decrees for the site. The Milltown Stipulation along with the Milltown Settlement provides the foundation for such a final consent decree. The Debtor filed a motion seeking approval of the Milltown Stipulation with the Bankruptcy Court on May 10, 2004. On or about July 13, 2004, the Bankruptcy Court entered an order approving the Milltown Stipulation and Milltown Settlement.

In the event that (a) the consent decree is not entered after it is lodged with the courts, (b) the consent decree does not become fully effective pursuant to the conditions of the final decree, or (c) after entry of the consent decree, the consent decree is overturned on appeal and subsequent negotiations are required, and any of the parties to the Milltown Stipulation assert that the negotiations have irretrievably broken down, then the Milltown Settlement shall be deemed void *ab initio*, and all funds paid pursuant to the Milltown Settlement and the Milltown Stipulation into the designated escrow account shall continue to be held in trust in such account pending further order of the Bankruptcy Court.

The Debtor and Clark Fork will continue to comply with any remaining FERC administrative orders and dam safety and operating requirements relating to ongoing site operations, including dam operation, which shall continue until the removal of the Milltown Dam and related structures is completed.

(12)    National Union Adversary Proceeding. The Debtor is the plaintiff in an adversary proceeding styled NorthWestern Corporation v. National Union Fire Insurance Company of Pittsburgh, P.A., Adv. Proc. No. 04-53072 (CGC) (the "National

**A818**

Union Adversary Proceeding"). In the National Union Adversary Proceeding, the parties dispute whether the Debtor has a right to coverage arising from or under Commercial Umbrella Policy, number BE-932-96-74, with a policy period of September 1, 1999 through September 1, 2000, issued to Montana Power Company by National Union Fire Insurance Company of Pittsburgh, P.A. (the "National Union Policy").

The parties intend that only a final binding order or settlement agreement entered in the National Union Adversary Proceeding shall control the parties' respective rights and obligations arising from or under the National Union Policy. As such, nothing contained in the Plan or Confirmation Order, including the Debtor's assumption of executory contracts under Section 8.1 through 8.3 of the Plan, shall affect coverage under the National Union Policy or National Union's rights, defenses, limitations and/or exclusions to be raised in the National Union Adversary Proceeding.

(13)   QF Adversary Proceedings. On or about January 28, 2004, Colstrip Energy Limited Partnership ("CELP") and Yellowstone Energy Limited Partnership ("YELP") each filed complaints initiating adversary proceedings in the Debtor's bankruptcy case. On or about February 27, 2004, the Debtor filed its answers to both the CELP and YELP complaints. The Debtor has also served discovery demanding from CELP and YELP a written FERC determination of past and continuing "Qualifying Facility" status. The Debtor filed responsive pleadings in the adversary proceedings. In the CELP proceeding, the parties have agreed to an informal stay of litigation to pursue settlement negotiations. On or about June 22, 2004, the Debtor filed a motion to assume the YELP contract, as ameneded, and approve the settlement of YELP's claim. On or about July 23, 2004, the Bankruptcy Court entered an order approving the Debtor's motion to assume the YELP contract, as amended, and settling YELP's claim.

(14)   PPL Montana, LLC. The Debtor is pursuing various claims against PPL Montana, LLC ("PPL") arising from PPL's refusal to purchase certain assets under a certain asset purchase agreement (the "APA"). PPL, in turn, has asserted a number of counterclaims against the Debtor (and Clark Fork and Blackfoot, LLC) based, in large part, upon PPL's claim that The Montana Power Company and/or NorthWestern Energy, LLC breached two Wholesale Transition Service Agreements and certain indemnification obligations under the APA. The Debtor moved to transfer venue to the Federal District Court of Delaware and hearing on the Debtor's Motion was held on March 19, 2004. In connection with PPL Montana's Motion to lift stay PPL Montana and the Debtor stipulated that the case will proceed in the Federal District Court of Delaware if the Debtor's Motion to transfer venue was granted or before Judge Samuel E. Haddon if the Motion was denied. At the hearing Judge Haddon denied the Debtor's Motion and held that, while he had authority to transfer PPL's counterclaims to the Federal District Court of Delaware, the discretionary factors weighed against such a partial transfer that would split the litigation in two different courts. The litigation is currently moving forward before Judge Haddon. Notwithstanding anything to the contrary in the Plan or Disclosure Statement, PPL's indemnification claims under

the APA, including those claims set forth in PPL's proof of claim, dated January 13, 2004, will not be channeled to the D&O Trust.[42]

(15)    Securities and Exchange Commission Investigation.  In December 2003, the SEC notified the Debtor that it had issued a formal order of private investigation relating to questions regarding the restatements and other accounting and financial reporting matters.  If the investigation was to result in a regulatory proceeding or action against the Debtor, the Debtor's business and financial operations could be harmed.  The Debtor is fully cooperating with the SEC investigation and is providing requested information on an ongoing basis as expeditiously as possible.

(16)    Securities Litigation and Proposed Class Settlement (the "Securities Litigation").  The Debtor and various non-debtors (collectively, the "Contributors") have tentatively agreed, to settle the Securities Litigation which provides for a settlement fund (the "Settlement Fund") in the amount of $41 million, $37 million of which is being contributed by certain of the D&O Policies[43] and $4 million of which is being contributed by other persons and parties.  In addition, the plaintiffs in the Securities Litigation will receive a liquidated claim against Netexit in the amount of $20 million as if the plaintiffs' securities claims asserted in the Securities Litigation had been resolved to judgment.  No concession has been made by the parties regarding the priority of such liquidated claim against Netexit.  The parties involved in the Securities Litigation have executed a memorandum of understanding with respect to the settlement.  On April 28, 2004 the Debtor filed a motion for an order seeking approval for the memorandum of understanding and authorizing the Debtor to enter into the Stipulation of Settlement.  In connection with the memorandum of understanding, the Debtor and Richard Hylland entered into a separate agreement whereby the parties agree to release their contribution and indemnity claims in and relating to the Securities Litigation.  Mr. Hylland has agreed to dismiss certain claims against the Debtor asserted in the Chapter 11 Case, except for claims arising from Mr. Hylland's employment.  The agreement with Mr. Hylland was filed with the Court in connection with the Debtor's motion for approval of the memorandum of understanding.  On or about June 16, 2004, the Debtor filed the Stipulation of Settlement with both the Bankruptcy Court and the District Court and copies of the Stipulation of Settlement were served on certain notice parties.  The presiding

---

[42]    PPL Montana amended its proof of claim on or about August 3, 2004.

[43]    Attached as Exhibit C to the Plan is a list of the D&O insurance policies that the Debtor is aware of at this time.  As a successor-in-interest to The Montana Power Company, the Debtor has an interest in The Montana Power Company insurance policies listed on Exhibit C of the Plan.  The TA Debtors and the plaintiffs to the McGreevey Litigation and the In re Touch America ERISA Litigation dispute the Debtor's status as an insured under, and its entitlement to any proceeds from, such Disputed Policies.  Nothing in the Plan is intended to determine the Debtor's interest, if any, in the Disputed Policies and the Debtor agrees that in any proceeding to determine the Debtor's interest in, or its right to proceeds of, any of the Disputed Policies it will not assert any defense based on res judicata, collateral estoppel, or any other similar preclusion doctrine as a result of entry by the Bankruptcy Court of an order confirming the Plan (as filed or thereafter amended) except to the extent that the matters are specifically addressed in the confirmation process or by separate order entered in the Chapter 11 Case.

**A820**

District Court judge in the Securities Litigation shall retain jurisdiction to resolve any disputes over the settlement and its enforcement. On or about July 19, 2004, the District Court Judge granted preliminary approval of the settlement subject to approval by the Bankruptcy Court and set October 8, 2004 as the hearing date for final approval of the settlement. The October 8, 2004 hearing date before the District Court is currently being rescheduled.

(17)   Cornerstone Claims. Cornerstone has filed a number of claims against the Debtor's estate, the most significant of which attempts to assert a claim in the approximate amount of $130 million for an alleged capital account deficiency either existing prior to or resulting from the deconsolidation of the Debtor's interests in Cornerstone. The Debtor disputes that there was any capital account deficiency with respect to Cornerstone that will result in any claim for which the Debtor be responsible. Cornerstone also has asserted that the entire deconsolidation transaction should be "unwound" and that the Debtor, as a result of its asserted improper dominion and control over Cornerstone and its operations, should be responsible for certain of Cornerstone's obligations. Cornerstone further asserts any claim the Debtor has against Cornerstone should be offset against Cornerstone's claims as to the Debtor. The Debtor filed its objection to Cornerstone's claims on or about July 13, 2004 and intends to vigorously defend any efforts to unwind the deconsolidation transaction or to deny recovery on its claims against Cornerstone.

(18)   Gas Appeal. On July 3, 2003, the MPSC issued Order No. 6468c, denying the Debtor's request to recover approximately $12 million in natural gas costs through rates collected from Montana retail ratepayers. The Debtor petitioned for judicial review of that Order to Montana's First Judicial District Court, Lewis and Clark County, in a matter entitled *NorthWestern Energy v. Montana Department of Public Service Regulation*, Montana Public Service Commission, Cause No. CDV 2003-443. The appeal was initially stayed by the Debtor pending the bankruptcy proceedings. Settlement discussions occurred, but they have not produced a settlement. The stay was then lifted, and the Debtor and MPSC have agreed to a briefing schedule that will be completed on June 29, 2004, prior to the Debtor's anticipated emergence from bankruptcy. The MPSC contends that any reversal of its Order will trigger the provision in 11 U.S.C. § 1129(a)(6) requiring explicit regulatory approval of rate changes as a condition of Plan confirmation. The Debtor disputes the MPSC's position because any rate change will be limited to natural gas costs and not be a change of base retail rates collected from Montana retail rate payers.

## N.    Inquiries to Purchase Debtor's Assets

Since the initiation of the Debtor's Chapter 11 proceedings, from time to time, the Debtor and its advisors have received unsolicited statements of interest, subject to conditions such as completion of due diligence, to purchase some or all of the Debtor's assets and operations. The Debtor has undertaken an extensive review of these indications of interest and has consulted with the Creditors' Committee with respect to such proposals. It is the Debtor's conclusion that the indications of interest presented thus far either did not equal the value

**A821**

distributable to creditors pursuant to the Debtor's Plan or did not present a significant premium over such value to justify the time, costs and expense to pursue a sale of the Debtor's assets during its Chapter 11 proceeding.

More recently, the Debtor has received separate unsolicited statements of interest for its South Dakota and Nebraska operations, and for its Montana assets and operations. The Debtor is currently evaluating and analyzing these more recent proposals.

## ARTICLE IV
## OVERVIEW OF THE PLAN

### A. General

The following is a summary intended as a brief overview of the Plan and is qualified in its entirety by reference to the full text of the Plan and any supplement to the Plan which may be filed. Holders of Claims and Equity Interests are respectfully referred to the relevant provisions of the Bankruptcy Code and are encouraged to review the Plan and this Disclosure Statement with their counsel.

In general, a Chapter 11 plan of reorganization must: (i) divide claims and equity interests into separate categories and classes; (ii) specify the treatment that each category and class is to receive under such plan; and (iii) contain other provisions necessary to implement the reorganization of a debtor. A Chapter 11 plan may specify that the legal, equitable, and contractual rights of the holders of claims or equity interests in certain classes are to remain unchanged by the reorganization effectuated by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to vote to accept the plan. Accordingly, it is not necessary to solicit votes from holders of claims or equity interests in such "unimpaired" classes. Pursuant to Section 1124(1) of the Bankruptcy Code, a class of claims or interests is "impaired," and entitled to vote on a plan, unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."

The Debtor believes that: (i) under the Plan, holders of impaired Claims will obtain a greater recovery than they would otherwise obtain if the assets of the Debtor were liquidated under Chapter 7 of the Bankruptcy Code; and (ii) the Plan will enable the Debtor to emerge from Chapter 11 as a viable and competitive enterprise, and enhance the Debtor's ability to effect a return to profitability.

### B. Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims and equity interests of a debtor's creditors and equity interest holders. In compliance with Section 1122, the Plan divides the holders of Claims into sixteen (16) Classes, and sets forth the treatment offered to each Class. These Classes take into account the differing nature and priority of Claims against the Debtor. Section 101(5) of the Bankruptcy Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is

reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured." 11 U.S.C. §101(5). A "Claim" against the Debtor also includes a Claim against property of the Debtor, as provided in Section 102(2) of the Bankruptcy Code. 11 U.S.C. § 102(2). An interest is an equity interest in a debtor.

For the holder of a Claim to participate in a reorganization plan and receive the treatment offered to the class in which it is classified, its Claim must be "Allowed." Under the Plan, an Allowed Claim is defined as: (a) a Claim that has been listed by the Debtor in its Schedules, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009, and (i) is not listed as disputed, contingent or unliquidated, and (ii) is not a Claim as to which a proof of claim has been filed; (b) a Claim as to which a timely proof of Claim has been filed as of the Bar Date in a sum certain and either (i) no objection thereto, or application to estimate, equitably subordinate, reclassify or otherwise limit recovery, has been made on or before any applicable deadline, or (ii) if an objection thereto, or application to estimate, equitably subordinate, reclassify or otherwise limit recovery, has been interposed, the extent to which such Claim (whether in whole or in part) has been allowed by a Final Order; (c) a Claim arising from the recovery of property under Section 550 or 553 of the Bankruptcy Code and allowed in accordance with Section 502(h) of the Bankruptcy Code; (d) any Claim expressly allowed under the Plan; or (e) any Claim expressly allowed by Final Order.

## C.     Treatment of Claims and Equity Interests Under the Plan

The Plan segregates the various Claims against, and Equity Interests in, the Debtor into holders of Priority Claims in Class 1, Unsecured Priority Claims in Class 2, Bank One DIP Financing Claims in Class 3, CSFB Financing Claims in Class 4, Secured Bondholder Claims in Class 5, Other Secured Claims in Class 6, Unsecured Note Claims in Class 7, Unsecured Subordinated Note Claims represented by TOPrS Notes in Class 8(a), Unsecured Subordinated Note claims represented by QUIPS Notes in Class 8 (b), General Unsecured Claims in Class 9, Unsecured Convenience Claims each of $20,000 or Less in Class 10, Environmental Claims in Class 11, D&O Trust Claims in Class 12, Other Equity and Interest Holders in Class 13, Securities Claims in Class 14 and Opt-out Securities Claims in Class 15.

Under the Plan, Classes 1, 2, 3, 4, 5, 6, 10, 11, and 14 are unimpaired, and Classes 7, 8, 9, 12, 13 and 15 are impaired. Class 15 may or may not be impaired depending on the treatment of Allowed Claims elected by the Debtor. In the Debtor's opinion, the treatment accorded to the impaired Classes of Claims and Equity Interests under the Plan represents the best treatment that can be provided to such Classes under the circumstances and is superior to the treatment that would be afforded to such Classes in the event of a liquidation of the Debtor. Set forth below is a summary of the Plan's treatment of the various categories and Classes of Claims and Equity Interests. This summary is qualified in its entirety by the full text of the Plan. In the event of an inconsistency between the Plan and the description contained herein, the terms of the Plan shall govern. The Plan is complicated and substantial. Time should be allowed for its analysis and consultation with a legal and/or financial advisor is recommended and should be considered.

The Debtor has filed the following claims objections: (i) First Omnibus Objection to Claims pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 (Late-Filed Claims – Non-Substantive); (ii) Second Omnibus Objection to Claims Pursuant to 11 U.S.C. § 502(b) and Fed R. Bankr. P. 3007 (Duplicate Claims – Non Substantive); (iii) Third Omnibus Objection to

Claims Pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 (Amended Claims – Non-Substantive); (iv) Fourth Omnibus Objection to Claims Pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 (Equity Claims – Non-Substantive); (v) Fifth Omnibus Objection to Claims Pursuant to 11.U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 [Books and Records – Substantive]; (vi) Sixth Omnibus Objection to Claims Pursuant to 11 U.S.C. § 502(b) and Fed R. Bankr. P. 3007 [Late – Filed Claims –Non-Substantive]; (vii) Seventh Omnibus objection to Claims Pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 [Amended claims – Non-Substantive]; (viii) Eighth Omnibus Objection to Claims Pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr.P. 3007 [Claim is filed against incorrect party – non-substantive]; and (ix) Ninth Omnibus Objection to claims pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 [Re-classified claims – Substantive]. The Debtor continues to actively reconcile filed proofs of claim with its books and records and anticipates filing additional omnibus and individual claim objections.

  (1) <u>Classes of Claims</u>

    a. CLASS 1 — PRIORITY CLAIMS

    Priority Claims are Claims constituting a cost or expense of administration of the Chapter 11 Case allowed under Sections 503(b) and 507(a)(1) of the Bankruptcy Code. Priority Claims include all costs incurred in the operation of the Debtor's businesses after the Petition Date, the fees and expenses of Professionals retained by the Debtor and the Creditors' Committee, and the fees due to the United States Trustee pursuant to 28 U.S.C. § 1930. Under the Plan, all Allowed Priority Claims shall be paid in full, in cash, in such amounts as: (a) are incurred in the ordinary course of business by the Debtor when and as such Claims become due and owing; (b) are Allowed by the Bankruptcy Court upon the later of the Effective Date, the date upon which there is a Final Order allowing such Priority Claim or any other date specified in such order; or (c) may be agreed upon between the holder of such Priority Claim and the Debtor or Reorganized Debtor, as the case may be. The Debtor estimates that Priority Claims to be paid on the Effective Date will aggregate approximately $0.

    All entities seeking an award by the Bankruptcy Court of Professional Fees, or of compensation for services rendered to the Debtor or the Creditors' Committee or reimbursement of expenses incurred in this representation through and including the Confirmation Date under Sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code, (a) shall file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date within sixty (60) days after the Confirmation Date, and (b) if granted such an award by the Bankruptcy Court, shall be paid in full in such amounts as are allowed by the Bankruptcy Court (i) on the later of the Effective Date or the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable, (ii) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Claim and the Debtor or, on and after the Effective Date, Reorganized Debtor, or (iii) in accordance with the terms of any applicable administrative procedures order entered by the Bankruptcy Court. Parties-in-interest shall have thirty (30) days after the filing of a final fee application to object to such fee application. All Professional Fees for services rendered in connection with the Chapter 11 Case and the Plan after the Confirmation Date, including, without limitation, those relating to the occurrence of the Effective Date, the prosecution of Causes of Action preserved under the Plan and the resolution of Disputed Claims, shall be paid by Reorganized Debtor upon receipt of an invoice therefor, or

on such other terms as Reorganized Debtor may agree to, without the need for further Bankruptcy Court authorization or entry of a Final Order. If Reorganized Debtor and any Professional cannot agree on the amount of post-Confirmation Date fees and expenses to be paid to such Professional, such amount shall be determined by the Bankruptcy Court.

      b.      CLASS 2 — UNSECURED PRIORITY CLAIMS.

Unsecured Priority Claims are Unsecured Claims entitled to priority status pursuant to Section 507 of the Bankruptcy Code. Each holder of an Allowed Unsecured Priority Claim shall receive Cash in an amount equal to such Allowed Unsecured Priority Claim on the later of (i) the Effective Date and (ii) the date such Unsecured Priority Claim becomes an Allowed Unsecured Priority Claim or as soon thereafter as is practicable, unless the holder of an Allowed Unsecured Priority Claim and the Debtor or Reorganized Debtor, as the case may be, agree to a different treatment thereof.

The Debtor estimates that Unsecured Priority Claims to be paid on the Effective Date will aggregate approximately $443,874.43.

      c.      CLASS 3 — BANK ONE DIP FINANCING CLAIMS.

Bank One DIP Financing Claims are the Claims of Bank One, N.A., as agent, or any successor agent thereto, under the DIP Financing Order and DIP Loan Documents. Each holder of an Allowed Bank One DIP Financing Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge thereof, of such Allowed Bank One DIP Financing Claim distributions pursuant to the DIP Financing Order and the DIP Loan Documents on Effective Date, unless the holder of the Allowed Bank One DIP Financing Claim and the Debtor or Reorganized Debtor, as the case may be, agree to a different treatment thereof. The Debtor estimates that the Bank One DIP Financing Claims to be paid on Effective Date will be approximately $0.[44]

      d.      CLASS 4 — CSFB FINANCING CLAIMS.

CSFB Financing Claims are the Claims of Credit Suisse First Boston, as agent, under the CSFB Order and the CSFB Financing Documents. Each holder of an Allowed CSFB Financing Claim shall receive full satisfaction and settlement thereof through the continuation of such Allowed CSFB Financing Claim pursuant to the CSFB Order and the CSFB Financing Documents. The Debtor estimates that the principal amount of the CSFB Financing Claim to be Reinstated on the Effective Date will be approximately $383,175,000.00.

      e.      CLASS 5 — SECURED BONDHOLDER CLAIMS.

Secured Bondholder Claims are Claims of the holder of any of the Gas Transition Bonds, the South Dakota First Mortgage Bonds, the Montana First Mortgage Bonds, the Montana Pollution Control Bonds, or the South Dakota, Nebraska and Iowa Pollution Control Bond Obligations. The holder of an Allowed Secured Bondholder Claims shall receive in full satisfaction and settlement thereof through the full Reinstatement of such Allowed Secured

---

[44]    As of the date of the First Amended Plan, the Debtor had not drawn any funds under the DIP Loan Agreement. However, as of the date of the First Amended Plan, $12.9 million in letters of credit have been issued under the DIP Loan Agreement.

Bondholder Claims. The Debtor estimates that the Secured Bondholder claims to be Reinstated on the Effective Date will be as set forth below:

| Class 5 | Secured Bondholder Claims | |
|---|---|---|
| | South Dakota First Mortgage Bond Claims | $115,830,805 |
| | Montana First Mortgage Bond Claims | $173,748,766 |
| | Montana Pollution Control Bond Claims | $173,627,950 |
| | South Dakota, Nebraska and Iowa Pollution Control Bond Claims | $21,712,807 |
| | Gas Transition Bond Claims | $42,450,000 |

  f.  CLASS 6 — OTHER SECURED CLAIMS.

    Other Secured Claims are any Secured Claims, exclusive of Priority Claims, Bank One DIP Financing Claims, CSFB Financing Claims and Secured Bondholder Claims. Holders of an Allowed Other Secured Claim shall receive in full satisfaction and settlement thereof through full Reinstatement of such Allowed Other Secured Claim. The Debtor estimates that the Other Secured Claims to be Reinstated on the Effective Date will be approximately $9,689,766 plus contingent and unliquidated claims.[45]

    The Debtor is not in default under any existing executory contract or expired lease under Class 6. As of the date hereof, the Debtor intends to assume all executory contracts and unexpired leases with holders of Class 6 Claims. The Debtor will provide notice of the assumption as set forth in the procedures described in Article IV(F)(1) of this Disclosure Statement.

  g.  CLASS 7 — UNSECURED NOTE CLAIMS.

    Unsecured Note Claims are Claims by the holder of any Unsecured Note. On the Effective Date, the Unsecured Notes shall be cancelled, annulled and extinguished.[46] On the Effective Date, or as soon thereafter as practicable, each holder of an Allowed Unsecured Note Claims and Class 9 General Unsecured Claims, shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Allowed Claim its Pro Rata Share of: 32,660,000 shares of New Common Stock (such 32,660,000 shares representing 92% of the New Common Stock issued and outstanding on the Effective Date prior to any dilution resulting from shares of New Common Stock issued pursuant to the New Incentive Plan and exercise of the warrants to

---

[45] The Debtor has capital lease obligations and letters of credit in total approximate amount as of the Petition Date of $23,439,766. As of the date hereof, the letters of credit have all expired or been replaced with letters of credit under the Debtor's DIP Loan Agreement.

[46] Any securities held by the Debtor for Unsecured Note Claims, Class 7, shall be cancelled, annulled and extinguished. The Debtor will not share in any Distributions on account of such holdings.

purchase additional shares of New Common Stock allocated to the Class 8 holders described below (the "Warrants" and the agreement pursuant to which such Warrants are to be issued, the "Warrant Agreement"), plus (b) the 505,591 shares of New Common Stock allocated to Class 8(b), if Class 8(b), as a class, votes to reject the Plan. The Debtor estimates that the Unsecured Note Claims to be converted to equity shall be in the aggregate approximately $898,264,683 and Class 9 General Unsecured Claims to be converted to equity shall be in the aggregate approximately $46,164,330 plus contingent and unliquidated claims. The total estimate of both Unsecured Note Claims and General Unsecured Claims to be converted to equity shall be in the aggregate approximately $944,429,013. The New Common Stock issued pursuant to Section 4.7(c) of the Plan shall be subject to dilution by any shares of New Common Stock issued and distributed in accordance with exercise of the Warrants, the New Incentive Plan and such other shares as may be authorized and issued pursuant to the Reorganized Debtor Charter.[47]

As of the Effective Date, (i) all Unsecured Notes, shall be cancelled and deemed null and void and of no further force and effect, and (ii) all obligations of any Person under the Unsecured Notes, the Unsecured Note Indentures and all other agreements, instruments and documents evidencing the Unsecured Notes and the rights of the holders thereof, shall be cancelled and deemed null and void and of no further force and effect (all without further act or action by any Person), except that such Unsecured Notes Indentures and other agreements that govern the rights of holders of the Unsecured Notes shall continue in effect solely for the purposes of allowing the indenture trustee, agent or servicer thereunder to make the distributions to be made on account of such Claims under the Plan, as provided herein, and allowing such indenture trustee to enforce its Indenture Trustee Charging Lien, as more particularly described in Section 5.18 of the Plan. Without limiting the foregoing, each holder of an Unsecured Note Claim shall be deemed to consent to the cancellation and release of any guarantee, instrument, agreement or other documents respecting payment of the Unsecured Notes and the release of any and all Claims it may have with respect to any property or assets of the Debtor and/or Reorganized Debtor.

h.      CLASS 8 — UNSECURED SUBORDINATED NOTE CLAIMS.

(i)      Class 8(a) – Unsecured Subordinated Note Claims – Represented by TOPrs Notes. Class 8(a) Claims are Claims by the holder of an Unsecured Subordinated Note represented by TOPrS Notes. On the Effective Date, the Unsecured Subordinated Note Claims represented by the TOPrS Notes shall be deemed Allowed in the aggregate amount of $321,069,399, which includes accrued and unpaid interest on the TOPrS Notes relating to the period up to but not including the Petition Date. On the Effective Date the Unsecured Subordinated Notes represented by the TOPrS Notes shall be automatically cancelled, annulled and extinguished.[48] On the Effective Date, or as soon thereafter as practicable, each holder of an Unsecured Subordinated Note Claim represented by the TOPrS Notes shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim a Pro Rata Share

---

[47]    The New Incentive Plan is in the process of being developed. Once the proposed New Incentive Plan is finalized, the extent of any dilution of shareholder interests will be disclosed in a motion seeking Court approval of the New Incentive Plan.

[48]    Any securities held by the Debtor for Unsecured Subordinated Note Claims in Class 8(a) shall be cancelled, annulled, and extinguished. The Debtor will not share in any Distributions on account of such holdings.

of: (i) 2,334,409 shares of New Common Stock (such 2,334,409 shares representing 6.6% of the New Common Stock to be issued and outstanding on the Effective Date prior to any dilution resulting from shares of New Common Stock issued pursuant to the New Incentive Plan and exercise of the Warrants); plus (ii) the Warrants exercisable for an additional 10.7% of New Common Stock. The New Common Stock issued pursuant to Section 4.8(a)(ii) of the Plan shall be subject to dilution by shares of New Common Stock issued and distributed in accordance with exercise of the Warrants, the New Incentive Plan and such other shares as may be authorized and issued pursuant to the Reorganized Debtor Charter as the same may be amended from time to time. The Warrants to be issued pursuant to Section 4.8(a)(ii) shall be exercised, if at all, no later than three years following the Effective Date and shall have such terms and conditions as more particularly set forth on Schedule 4.8 to the Plan.

As of the Effective Date, (i) all Unsecured Subordinated Notes represented by the TOPrS Notes shall be cancelled and deemed null and void and of no further force and effect, and (ii) all obligations of any Person under or in respect of the Unsecured Subordinated Notes represented by the TOPrS Notes, the TOPrS Indentures and all other agreements, instruments and documents evidencing the Unsecured Subordinated Notes represented by the TOPrS Notes and the rights of the holders thereof, including, but not limited to, any related Claims and Causes of Action, including, but not limited to, fraudulent transfer claims against the Debtor, shall be cancelled and deemed null and void and of no further force and effect (all without further act or action by any Person), except that such TOPrS Indentures and other agreements that govern the rights of the holders of the Unsecured Subordinated Notes represented by the TOPrS Notes shall continue in effect solely for the purposes of allowing the indenture trustee, agent or servicer thereunder to make the distributions to be made on account of such Claims under the Second Amended Plan, as described herein, and allowing such indenture trustee to enforce its Indenture Trustee Charging Lien, as more particularly described in Section 5.18 of the Second Amended Plan. Without limiting the foregoing, each holder of an Unsecured Subordinated Note Claim represented by the TOPrS Notes shall be deemed to consent to the cancellation and release of any guarantee, instrument, agreement or other documents respecting payment of the Unsecured Subordinated Notes represented by the TOPrS Notes and the release of any and all Claims it may have with respect to any property or assets of the Debtor and/or Reorganized Debtor.

(ii)    Class 8(b) Unsecured Subordinated Note Claims represented by QUIPS Notes. Class 8(b) Claims are Claims by the holder of an unsecured subordinated Note Claim represented by QUIPS Notes. Unless the Debtor or another party-in-interest either objects or specifically reserves the right to object to claims of a specific holder of Unsecured Subordinated Note Claims represented by the QUIPS Notes, then on the Effective Date, the Unsecured Subordinated Note Claims represented by the QUIPS Notes shall be deemed Allowed in the aggregate amount of $69,537,873, which includes accrued and unpaid interest on the QUIPS Notes relating to the period up to but not including the Petition Date. The Debtor specifically reserves the right to object to all the claims and recoveries of Magten Asset Management Corporation, as a holder of Claims and Causes of Action pursuant to the QUIPS Notes.

**A828**

On the Effective Date, or as soon thereafter as practicable,[49] each holder of an Unsecured Subordinated Note Claim represented by the QUIPS Notes and related Claims and Causes of Action who accepts or rejects the Plan may opt to receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim either, but not both:

(1)     a Pro Rata Share of 505,591 shares of New Common Stock (such 505,591 shares representing 1.4% of the New Common Stock to be issued and outstanding on the Effective Date prior to any dilution resulting from shares of New Common Stock issued pursuant to the New Incentive Plan and exercise of the Warrants), plus Warrants exercisable for an additional 2.3% of New Common Stock (collectively, "Option 1"); or

(2)     a Pro Rata Share of recoveries, if any, upon resolution of the QUIPS Litigation ("Option 2").

If a holder of a Class 8(b) Unsecured Subordinated Note Claim votes to accept or reject the Plan and chooses Option 1, then: (i) such holder will receive its Pro Rata Share of the Distribution provided for under Option 1; and (ii) such Distribution will be in lieu of and release of any claims and rights the holder may have with respect to the QUIPS Litigation. If a holder of a Class 8(b) Unsecured Subordinated Note Claim votes to accept or reject the Plan and chooses Option 2, then: (i) such holder's claim shall be treated as a Class 9 General Unsecured Claim, subject to estimation and reserves for Disputed Claims as provided for by Section 7.5 of the Plan, with Distributions to holders of Class 8(b) Unsecured Subordinated Note Claims which choose Option 2 being made, if at all, only upon entry of a Final Order resolving the QUIPS Litigation (unless otherwise agreed to by the Debtor and the Committee); and (ii) any New Common Stock which otherwise would have been distributable to such holder if such holder had chosen Option 1, shall be distributed, pro rata to Class 7 and Class 9, and the Warrants which otherwise would have been distributable will be canceled. If a holder of a Class 8(b) Unsecured Subordinated Note Claim votes to accept the Plan and does not designate its choice of Option 1 or Option 2, or designates both Option 1 and Option 2, such holder shall be deemed to have chosen Option 1 and its receipt of its Pro Rata Share of the Distribution provided for under Option 1 will be in lieu of and release of any claims and rights to recoveries such holder may have with respect to the QUIPS Litigation.

If a holder of a Class 8(b) Unsecured Subordinated Note Claim does not vote either to accept or reject the Plan but Class 8(b), as a Class, votes to accept the Plan, then such non-voting holder shall be deemed to have chosen Option 1 and its receipt of its Pro Rata Share of the Distribution provided by Option 1 will be in lieu of and release of any claims and rights to recoveries such holder may have with respect to the QUIPS Litigation. If a holder of a Class 8(b) Unsecured Subordinated Note Claim does not vote either to accept or reject the Plan but Class 8(b), as a Class, votes to reject the Plan then: (i) such non-voting holder shall be deemed to have chosen Option 2, with Distributions to such holders being made, if at all, only upon entry of a Final Order resolving the QUIPS Litigation (unless otherwise agreed to by the Debtor and the

---

[49] Any securities held by the Debtor for Unsecured Subordinated Note Claims in Class 8(b) shall be cancelled, annulled, and extinguished. The Debtor will not share in any Distributions on account of such holdings.

A829

Committee); and (ii) any New Common Stock which otherwise would have been distributable to such holder if such holder had accepted the Plan and chosen Option 1, shall be distributed pro rata to Class 7 and Class 9, and the Warrants which otherwise would have been distributable will be canceled.

The New Common Stock issued pursuant to Section 4.8 of the Plan shall be subject to dilution by shares of New Common Stock issued and distributed in accordance with exercise of the Warrants, the New Incentive Plan and such other shares as may be authorized and issued pursuant to the Reorganized Debtor Charter as the same may be amended from time to time. The Warrants to be issued pursuant to Section 4.8 of the Plan shall be exercised, if at all, no later than three years following the Effective Date and shall have such terms and conditions as more particularly set forth on Schedule 4.8 to the Plan.

As of the Effective Date, (i) all Unsecured Subordinated Notes represented by the QUIPS Notes shall be cancelled and deemed null and void and of no further force and effect, and (ii) all obligations of any Person under or in respect of the Unsecured Subordinated Notes represented by the QUIPS Notes, the Unsecured Subordinated Note Indentures and all other agreements, instruments and documents evidencing the Unsecured Subordinated Notes represented by the QUIPS Notes and the rights of the holders thereof, including, but not limited to, any related Claims and Causes of Action, including, but not limited to, the QUIPS Litigation against the Debtor (at least with respect to those holders of Unsecured Subordinated Notes represented by the QUIPS Notes that have been chosen or are deemed to have chosen Option 1) shall be cancelled and deemed null and void and of no further force and effect (all without further act or action by any Person), except that such Unsecured Subordinated Notes Indentures and other agreements that govern the rights of the holders of the Unsecured Subordinated Notes represented by the QUIPS Notes shall continue in effect solely for the purposes of allowing the Indenture Trustee, agent or servicer thereunder to make the distributions to be made on account of such Claims under the Second Amended Plan, as described herein, and allowing such indenture trustee to enforce its Indenture Trustee Charging Lien, as more particularly described in Section 5.18 of the Second Amended Plan. Without limiting the foregoing, each holder of an Unsecured Subordinated Note Claim shall be deemed to consent to the cancellation and release of any guarantee, instrument, agreement or other documents respecting payment of the Unsecured Subordinated Notes represented by the QUIPS Notes and the release of any and all Claims it may have with respect to any property or assets of the Debtor and/or Reorganized Debtor.

i.    CLASS 9—GENERAL UNSECURED CLAIMS

General Unsecured Claims shall mean any Claim that is not an Administrative Claim, Fee Claim, Priority Tax Claim, Priority Claim, Unsecured Priority Claim, Bank One DIP Financing Claim, CSFB Financing Claim, Secured Claim, Unsecured Note Claim, Unsecured Subordinated Note Claim, Unsecured Convenience Claim, D&O Trust Claim, Other Equity Interest, Securities Claim, Opt-Out Securities Claim or Environmental Claim, but shall specifically include an Allowed QF Claim.

On the Effective Date, or as soon thereafter as practicable, each holder of an Allowed General Unsecured Claim, along with holders of Class 7 Unsecured Note Claims, shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Claim its

Pro Rata Share of: (a) 32,660,000 shares of New Common Stock (such 32,660,000 shares representing 92% of the New Common Stock issued and outstanding on the Effective Date prior to any dilution resulting from shares of New Common Stock issued pursuant to the New Incentive Plan and exercise of the Warrants), plus (b) the 505,591 shares of New Common Stock allocated to Class 8(b) if Class 8(b), as a class, votes to reject the Plan. The Debtor estimates that the Unsecured Note Claims to be converted to equity shall be in the aggregate approximately $898,264,683 and Class 9 General Unsecured Claims to be converted to equity shall be in the aggregate approximately $46,164,330 plus contingent and unliquidated claims.[50] The total estimate of both Unsecured Note Claims and General Unsecured Claims to be converted to equity shall be in the aggregate approximately $944,429,013. The New Common Stock issued pursuant to Section 4.19(c) of the Plan shall be subject to dilution by any shares of New Common Stock issued and distributed in accordance with the exercise of the Warrants, the New Incentive Plan and such other shares as may be authorized and issued pursuant to the Reorganized Debtor Charter.

As described above, the rejection of non-qualified plans may lead to General Unsecured Claims[51] held by certain of the Debtor's Insiders. Insider Claims related to employment with the Debtor are also included in Class 9 – General Unsecured Claims.[52] The rejection, termination or modification of any non-qualified plan will be by separate motion to the Bankruptcy Court providing interested parties the opportunity to object. To the extent that Insiders have claims for indemnification, advancements, and/or legal fees and expenses channeled under the Plan and D&O Trust Documents such claims shall be included in Class 12 – D&O Trust Claims.[53]

j.    CLASS 10— UNSECURED CONVENIENCE CLAIMS EACH OF $20,000 OR LESS

Unsecured Convenience Claims are Unsecured Claims that are $20,000 or less and held by a Person that is not an Insider. Holders of Allowed General Unsecured Claims of up to $20,000 or less in Class 9, may elect to participate in Class 10 up to $20,000 by voting to

---

[50]    A significant portion of the Class 9 General Unsecured Claims consists of claims related to ongoing litigation. The holders of these litigation-related claims include: (i) Cornerstone Propane Partners LLP; (ii) Douglas Nelson and Shila Fisher; (iii) Estate of Orval Meyer; (iv) Harold and Rynee Steward; (v) Jim Gilman Excavating; (vi) Paladin Associates; and (vii) a workers' compensation class action. The estimates of Class 9 General Unsecured Claims provided in this Disclosure Statement are based on the Debtor's risk assessments, litigation analysis and book values.

[51]    The Debtor intends to terminate and/or reject the nonqualified plans as discussed above and will be filing a motion seeking an order implementing the proposed termination and/or rejection. The Debtor intends to reject the following non-qualified plans: (i) NorthWestern Corporation Traditional Pension Equalization Plan; (ii) NorthWestern Energy Executive Long-Term Incentive Plan; (iii) NorthWestern Corporation Cash Balance Supplemental Executive Retirement Plan; and (iv) Montana Power Benefit Restoration Plan for the Board of Directors and the NorthWestern Corporation Executive Benefits Trust. The Debtor intends to assume the remaining non-qualified plans.

[52]    Richard Hylland filed a claim in the amount of $30.4 million in connection with his employment with the Debtor and benefits under the Debtor's non-qualified benefit plans. Mr. Hylland's claims, if allowed, would fall into a number of Classes, including Class 9 and Class 12. The Debtor intends to object to Mr. Hylland's claims.

[53]    The Debtor is currently reviewing claims filed by Insiders and reserves all rights to object to such claims.

**A831**

accept the Plan and marking the Ballot in the space provided. Holders of Allowed General Unsecured Claims in excess of $20,000 may elect to reduce the amount of such holders Allowed Claim to $20,000 and participate in the Distributions to be paid to Class 10 Convenience Claims. Such an election constitutes a waiver of the amount of such holder's Allowed General Unsecured Claim in excess of $20,000, and such holder shall be deemed to release the Debtor and Reorganized Debtor from any and all liability for such excess amount.

Each holder of an Allowed Convenience Claim shall receive in full satisfaction, settlement, release, extinguishment and discharge of such Convenience Claim, one of the following forms of treatment:

(i) Cash equal to the amount of the Allowed Convenience Claim up to $20,000, on or as soon as practicable after the later of (1) the Effective Date and (2) the date that is ten (10) Business Days after a Class 2 Unsecured Priority Claim becomes an Allowed Convenience Claim by a Final Order; or

(ii) Such other treatment as the Debtor and such holder shall have agreed upon in writing. The Debtor estimates that the payments to be made to Holders of Class 10 shall be approximately $3,022,509.

k.    CLASS 11 — ENVIRONMENTAL CLAIMS

Environmental Claims are all Claims against the Debtor, including, but not limited to, the Claims listed on Attachments 17(a), (b), and (c) of the Debtor's Statement of Financial Affairs, as may be amended from time to time, arising from (i) any accusation, allegation, notice of violation, action, claim, environmental Lien, demand, abatement or other order, restriction or direction (conditional or otherwise) by any governmental entity or other Person for personal injury (including, but not limited to, sickness, disease or death), tangible or intangible property damage, punitive damages, damage to the environment, nuisance, pollution, contamination or other adverse effect on the environment or costs (to the extent recoverable under applicable non-bankruptcy law) of any governmental entity related thereto, in each case resulting from or based upon (a) the existence, or the continuation of the existence, of a release of (including, but not limited to, sudden or non-sudden accidental or non-accidental releases), or exposure to, any hazardous or deleterious material, substance, waste, pollutant or contaminant, odor or audible noise in, into or onto the environment (including, but not limited to, the air, soil, surface water or groundwater) at, in, by, from or related to any property (including any vessels or facilities of the Debtor) presently or formerly owned, operated or leased by the Debtor, or one of its non-debtor subsidiaries, to the extent the Debtor may have liability on behalf of such subsidiary, or any activities or operations thereof, (b) the transportation, storage, treatment or disposal of any hazardous or deleterious material, substance, waste, pollutant or contaminant in connection with any property (including any vessels or facilities of the Debtor) presently or formerly owned, operated or leased by the Debtor, or one of its non-debtor subsidiaries, to the extent the Debtor may have liability on behalf of such subsidiary, its operation or facilities, or (c) the violation or alleged violation, of any environmental law, order or environmental permit or license of or from any governmental entity relating to environmental matters connected with any property (including any vessels or facilities of the Debtor) presently or formerly owned, operated or leased by the Debtor or one of its non-debtor subsidiaries, to the extent the Debtor may have liability on behalf of such subsidiary (including, without limitation, any FERC license pertaining to any environmental matter); and (ii) any claim for indemnification or contribution (whether

**A832**

based on contract, statute or common law) against the Debtor by any third party, where such indemnification or contribution claim of such third party is based on a claim against such third party that if asserted directly against the Debtor would be a claim included within the immediately preceding clause (i); provided, however, that Environmental Claims shall not include any Claims (other than the Claims of Atlantic Richfield Company addressed in the Milltown Settlement) fully settled, liquidated or determined by a final order of an appropriate court or a binding award, agreement or settlement, which has become fully effective on the terms of such final order, binding award, agreement or settlement, prior to the Petition Date for amounts payable by the Debtor for damages or other obligations in a fixed dollar amount payable in a lump sum or by a series of payments.

Holders of an Allowed Environmental Claim shall receive in full satisfaction and settlement thereof full Reinstatement of such Allowed Environmental Claim; provided however, that Claims related to the Milltown Settlement and Stipulation shall be treated as provided for in the Milltown Settlement, Milltown Stipulation, the final consent decree and FERC order related to Milltown Dam.

The Debtor intends to continue to comply with all of its pre- and post-petition environmental and regulatory obligations. The Plan provides that these obligations will be unaffected by the Plan and will become obligations of the Reorganized Debtor and its affiliates. These obligations include obligations under the stipulation and settlement agreement with the MPSC and MCC. The Debtor believes that absent such treatment of these obligations, the ability of the Reorganized Debtor to conduct its ongoing business operations would be jeopardized.

The Debtor has reviewed the scope of its anticipated environmental liabilities and is evaluating the acquisition of insurance coverage to address the potential risks associated with certain of Debtor's known environmental liabilities. As of the filing of this Disclosure Statement the Debtor estimates that it has environmental liabilities of approximately $44 million which includes the $6,815,843.12 claim filed by the Montana Department of Environmental Quality for environmental compliance obligations for sites other than Milltown Dam.[54] The Debtor is seeking insurance coverage for approximately $28 million of this liability.

The Debtor's environmental liabilities include certain liabilities related to a hydroelectric dam located approximately five (5) miles southeast of Missoula, Montana at the confluence of the Clark Fork River and Blackfoot River at Milltown, Montana known as the Milltown Dam (the "Milltown Dam"). On November 15, 2002, the Debtor entered into that certain Environmental Liabilities Support Agreement (the "Environmental Support Agreement") with NorthWestern Energy, LLC ("NWE LLC"), the Debtor's wholly-owned subsidiary, which is the operator and FERC licensee of the Milltown Dam. Pursuant to the Environmental Support Agreement, the Debtor's maximum liability to NWE LLC for environmental liabilities is limited

---

[54]    With regard to Milltown Dam, the United States of America, on behalf of the United States Environmental Protection Agency and the United States Department of the Interior, filed its proof of claim, Claim No. 1054, in an amount in excess of $100,000,000. The State of Montana filed its proof of claim, Claim No. 104, in an approximate amount of $135,280,000. The Confederated Salish and Kootenai Tribes filed their proof of claim, Claim No. 1053, in the amount of $60,000,000.

**A833**

to a maximum cumulative amount of $10.0 million.[55] NWE LLC was subsequently renamed Clark Fork and Blackfoot LLC. As discussed in detail above in Section III (M)(9), the Debtor is seeking approval of various matters relating to Milltown Dam. Claims related to the Milltown Settlement and Milltown Stipulation shall be treated in accordance with the Milltown Settlement, Milltown Stipulation and consent decree related to the Milltown Dam site. In the event that the Debtor's Plan is confirmed and the Effective Date occurs before a consent decree is entered or becomes fully effective, and if such consent decree is subsequently not entered or does not become fully effective, then all of the United States, the State of Montana, and the Confederated Salish and Kootenai Tribes, and Atlantic Richfield's rights, claims, arguments and objections shall be preserved. In the event that (a) the consent decree is not entered after it is lodged with the court, (b) the consent decree does not become fully effective pursuant to the conditions in the consent decree, or (c) after entry of the consent decree, the consent decree is overturned on appeal and subsequent negotiations are required, and any of the parties to the Milltown Stipulation assert that the negotiations have irretrievably broken down, then the Milltown Settlement shall be deemed void *ab initio*, and all funds paid pursuant to the Milltown Settlement into the escrow account shall continue to be held in trust in such account pending further order of the Bankruptcy Court.

The Debtor has excluded from this analysis Environmental Claims (other than the Claims of Atlantic Richfield Company addressed in the Milltown Settlement) that have been fully settled, liquidated or determined by a final order of an appropriate court or a binding award, agreement or settlement, which has become fully effective on the terms of such final order, binding award, agreement or settlement, prior to the Petition Date for amounts payable by the Debtor for damages or other obligations in a fixed dollar amount payable in a lump sum or by a series of payments.

l.    CLASS 12 — D&O TRUST CLAIMS

D&O Trust Claims are all claims related to Defense Costs or a Final Award apportioned to an individual plaintiff in any D&O Proceeding in accordance with any court order fully and finally awarding a judgment to the plaintiffs in any D&O Proceeding. The holders of D&O Trust Claims are either insureds party to a D&O Proceeding or individual plaintiffs who have received a Final Award.

D&O Trust Claims shall include the amount of any Final Award apportioned to an individual plaintiff in any D&O Case in accordance with any court order fully and finally awarding a judgment to the plaintiffs in any D&O Case unless addressed by another court order and for example, any order approving settlement of the Securities Litigation. D&O Trust Claims shall be paid from the D&O Trust in FIFO order based on the date of entry of the D&O Proceeding Final Order providing for a Final Award in the D&O giving rise to such D&O Trust Claim. Among D&O Trust Claims created by the same D&O Proceeding Final Order, D&O Trust Claims will be paid in accordance with the D&O Proceeding Final Order giving rise to such D&O Trust Claim. In addition, post confirmation, on a monthly basis Reorganized Debtor and any other Insured (as defined in the Defense Cost Motion) shall submit

---

[55]    The United States through the Environmental Protection Agency does not concede that the Debtor's environmental liability is so limited. This possible dispute, however, is resolved if final consent decrees are entered following the Milltown Stipulation and Milltown Settlement.

**A834**

to the Trustee a notice setting forth the amount of Debtor Defense Costs approved and incurred during the previous month, together with all documentation necessary to reasonably satisfy the Trustee of the validity of such Debtor Defense Costs (collectively, the "Defense Cost Notice"). The Trustee shall reimburse the Debtor and any other Insureds promptly upon the submission of a Defense Cost Notice and the Trustee's determination that such Debtor Defense Costs are valid.

The D&O Trust shall be funded by the balance of the remaining proceeds in the D&O Policies after contributions to the Settlement Fund as described above. The Debtor estimates the remaining proceeds to be approximately $13.0 million. In the event the D&O Trust funds are exhausted, the Reorganized Debtor shall contribute up to $2.5 million for defense costs of the Debtor's current officers and directors, as determined commencing with the Petition Date, until the SEC Investigation has concluded.

m.    CLASS 13 — OTHER EQUITY INTEREST CLAIMS

Other Equity Interest Claims are claims of holders of (a) a share in the Debtor, whether or not transferable or denominated "stock" or a similar security, or (b) an option, warrant, or a right, other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph (a) of this paragraph, whether vested or unvested, exercised or outstanding. On the Effective Date, all Equity Interests shall be canceled, annulled and extinguished and holders of Equity Interests shall not be entitled to receive or retain any property or interest in property under the Plan on account of such Equity Interests. Class 13 is deemed to have rejected the Plan, and therefore, shall not be entitled to vote to accept or reject the Plan.[56]

RCG Carpathia Master Fund, Ltd. and Kellogg Capital Group, LLC f/k/a Performance Capital, holders of the Debtor's common equity, have disputed the valuation of the Reorganized Debtor provided in this Disclosure Statement. Moreover, the parties have indicated that they intend to object to the Plan on the grounds that they believe the holders of unsecured claims in Classes 7, 8, and 9 are receiving property in excess of 100% of their claims and that the proposed distributions to Class 13 represent less than the value of their equity interest. The Debtor vigorously disputes the assertion that there is any value to be recovered by Debtor's common stockholders.

n.    CLASS 14 – SECURITIES CLAIMS

Class 14 Claims are claims of holders of claims pursuant to the proposed Stipulation of Settlement to be entered in the Class Action. Pursuant to the Plan and the Stipulation of Settlement, the Debtor and various D&O Insurance Contributors will establish a settlement fund (the "Settlement Fund") in the amount of $41 million (of which approximately $37 million is to be contributed from the D&O Policies, excluding the Cornerstone and Montana Power Company policies identified on Exhibit C of the Plan, and $4 million is to be contributed from other Persons and parties) to settle the Class Action.

---

[56]    As discussed in greater detail in Article VI of this Disclosure Statement, Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan, even if such plan has not been accepted by all impaired classes entitled to vote on such plan, provided that such plan has been accepted by at least one impaired class. If any impaired classes reject or are deemed to have rejected the Plan, the Debtor reserves its right to seek the application of the statutory requirements set forth in Section 1129(b) of the Bankruptcy Code for confirmation of the Plan despite the lack of acceptance by all impaired classes.

Class 14 Claims will be discharged and the Holders thereof shall be forever barred from seeking to recover any payment on their Securities Claims from the Debtor, Reorganized Debtor, or the Released Parties.

Holders of Securities Claims may elect to refuse to accept the proposed treatment provided in the Class Action Settlement Documents (the "Opt-Out Election"). The holders of Securities Claims who exercise the Opt-Out Election and preserve their rights to proceed against the Debtor in the District Court in accordance with the requirements of the Class Action Settlement Documents, shall be holders of Class 15 Claims.

Holders of Securities Claims who do opt-out and become holders of Class 15 Claims shall not be entitled to any Distributions under the Plan and Class 15 Claims when liquidated and a D&O Proceedings Final Order obtained shall be channeled to the D&O Trust.

Distributions from the Settlement Fund shall be made in the amounts, at the times and in the manner provided for in the Class Action Settlement Documents, which shall also govern requirements for qualifying for distributions, the manner and time of the giving of notices, the forms of the documents to be filed by holders of Securities Claims and all other matters concerning the Class Action and its settlement other than as specifically provided for in the Plan. Neither the Debtor nor Reorganized Debtor shall have any responsibility with respect to the Class Action Settlement Documents or the disposition of the Settlement Fund, other than to cooperate in certain respects in the gathering of certain information with respect thereto and coordinating with the carriers of the D&O Policies regarding payment.

The defendants in the Class Action have the option, in their sole discretion, to terminate the Stipulation of Settlement if the amount of the securities as to which an Opt-Out Election is properly exercised exceeds five percent (5%) of such securities, or an amount otherwise agreed to by the defendants in the Class Action.

If the option to terminate the Stipulation of Settlement is not exercised, each holder of a Class 14 Claim will, pursuant to the Class Action Settlement Documents, release all Securities Claims such holder may have against the D&O Protected Parties and the other defendants in the Class Action. Class 14 Claims are unimpaired, and therefore, shall not be entitled to vote to accept or reject the Plan.

o.    CLASS 15  OPT-OUT SECURITIES CLAIMS

On the Effective Date, all holders of Opt-Out Securities Claims upon receipt of a D&O Proceeding Final Order shall be channeled to the D&O Trust and shall receive the same treatment as Class 12. Holders of Class 15 Claims shall not be entitled to receive or retain any property or interest in property under the Plan. In order to preserve any Securities Claim it may have against the Debtor, each holder of an Opt-Out Securities Claim must execute an Opt-Out Form. Submission of an Opt-Out Form that does not indicate to the contrary, will be deemed to be an election to preserve such Claim in the District Court sitting in bankruptcy and seek a D&O Proceedings Final Order from the District Court.

**A836**