**D.   Description of Means of Execution and Transactions to be Implemented in Connection with the Plan**

**(1)   Plan Funding.**

The funds utilized to make Cash payments under the Plan have been and/or will be generated from, among other things, the operation of the Debtor's businesses, the sale of certain subsidiary assets and distribution of the proceeds to the Debtor, and cash on hand on the Effective Date. In addition, the Debtor will enter into a new revolving credit facility to be effective upon the Debtor's exit from Chapter 11. On or about August 20, 2004, the Debtor filed its Motion for Order Authorizing the Debtor to Enter Agreements for its Exit Financing Facility (the "Exit Financing Facility") and to Pay Fees and Expenses and Incur Indemnification Obligations in Connection therewith pursuant to Sections 105(a), 107(b) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9018. The Exit Financing Facility shall consist of: (i) $150 million senior secured term loan and (ii) $100 million senior secured revolving credit facility. The Debtor may also pursue additional financing in the form of $200 million of Senior Notes which may be issued pursuant to a Rule 144(a) offering (the "Senior Notes"). The Exit Financing Facility and the Senior Notes will be secured by first mortgage bonds on the Debtor's Montana, Nebraska and South Dakota properties, and will refinance the Debtor's DIP Loan and the CSFB Facility. The Exit Financing Facility and the Senior Notes will have no affect on the Debtor's projected Enterprise Value (as defined below).

The D&O Trust shall be funded by the balance of the remaining proceeds in the D&O Policies after contributions to the Settlement Fund as described in the Plan. The Debtor estimates the remaining proceeds to be approximately $13.0 million. In the event the D&O Trust Funds are exhausted, the Reorganized Debtor shall contribute up to $2.5 million for defense costs of the Debtor's current officers and directors, as determined commencing with the Petition Date, until the SEC Investigation has concluded.

**(2)   Reorganized Debtor Charter.**

On the Effective Date, the Reorganized Debtor Charter and by-laws will become effective. The Reorganized Debtor Charter, together with the provisions of the Plan, shall, as applicable, provide for, among other things, the incorporation of Reorganized Debtor as a "C" corporation, the authorization and issuance of the New Common Stock, and such other provisions as are necessary to facilitate consummation of the Plan, including provisions prohibiting the issuance of non-voting equity securities in accordance with Section 1123(a)(6) of the Bankruptcy Code, all without any further action by the stockholders or directors of the Debtor, Debtor-in-Possession or Reorganized Debtor.

**(3)   New Common Stock.**

On the Effective Date, Reorganized Debtor shall: (i) have authorized capital of 200,000,000 shares of New Debtor Common Stock and 50,000,000 shares of "blank check" preferred stock; and (ii) issue, in accordance with the terms of the Plan, 37,765,957 shares of New Common Stock plus Warrants representing an additional 5,304,598 shares of New Stock upon exercise of all of the Warrants pursuant to their terms. All shares of New Common Stock to be issued pursuant to the Plan shall be, upon issuance, fully paid and non-assessable, and shall be subject to dilution only as may be expressly set forth in the Plan or in the Plan Documents or

**A837**

as may be allowed pursuant to the Reorganized Debtor Charter, and the holders thereof shall have no preemptive or other rights to subscribe for additional shares.

(4)    Cancellation and Surrender of Existing Securities and Agreements.

Except as may otherwise be provided in the Plan, on the date Distributions are made, (i) the promissory notes, share certificates, bonds and other instruments evidencing any Claim or Equity Interest, to the extent not already cancelled shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order or rule; and (ii) the obligations of the Debtor under the certificate of incorporation, agreements, indentures and certificates of designations governing such Claims and Equity Interests, as the case may be, shall be discharged and released; provided, however, that any such indenture or other agreement that governs the rights of the holder of a Claim based on an existing promissory note, bond and other instrument that is administered by an indenture trustee, agent or servicer shall continue in effect solely for the purposes of allowing such indenture trustee, agent, or servicer to make the distributions to be made on account of such Claims under the Plan, as described hereunder, and allowing such indenture trustee to enforce its Indenture Trustee Charging Lien, as provided in Section 5.18 of the Plan. Notwithstanding the foregoing, the Plan provides that the documents and instruments evidencing those Claims that are Reinstated and rendered unimpaired pursuant to Article IV of the Plan, including without limitation the Montana First Mortgage Bond Claims, the South Dakota First Mortgage Bond Claims, the South Dakota Pollution Control Bond Obligations, the Gas Transition Bond Claims and the Montana Pollution Control Bond Obligations, shall not be deemed cancelled.

Except as otherwise provided herein or agreed by Reorganized Debtor, each holder of a promissory note, share, certificate, bond or other instrument evidencing a Claim or Equity Interest, shall surrender such promissory note, share certificate, bond or instrument to Reorganized Debtor (or the Disbursing Agent), or, with respect to indebtedness that is governed by the Unsecured Note Indentures or the Unsecured Subordinated Note Indentures, the respective indenture trustee, agent or servicer, as the case may be. The Plan provides that each holder of a promissory note, share certificate, bond or other instrument evidencing those Claims that are Reinstated and rendered unimpaired pursuant to Article IV of the Plan, including without limitation the Montana First Mortgage Bond Claims, the South Dakota First Mortgage Bond Claims, the South Dakota Pollution Control Bond Obligations, Gas Transition Bond Obligations and the Montana Pollution Control Bond Obligations, shall not be required to surrender such promissory note, share certificate, bond or instrument to Reorganized Debtor (or the Disbursing Agent).

No Distribution of property hereunder shall be made to or on behalf of any holders required to surrender their bonds pursuant to Section 5.5(b) of the Plan unless and until such promissory note, share certificate, bond or instrument is received by Reorganized Debtor (or the Disbursing Agent), or the respective indenture trustee, agent or servicer, as the case may be, or the unavailability of such promissory note, share certificate, bond or instrument is established to the reasonable satisfaction of Reorganized Debtor (or the Disbursing Agent), or such requirement is waived by Reorganized Debtor. Reorganized Debtor may require any holder that is unable to surrender or cause to be surrendered any such promissory notes, share certificates, bonds or instruments to deliver an affidavit of loss and indemnity reasonably satisfactory to Reorganized Debtor. Any holder that fails within the later of one year after the Effective Date and the date of Allowance of its Claim or Equity Interest: (i) to surrender or cause

to be surrendered such promissory note, share certificate, bond or instrument; and (ii) if requested, to execute and deliver an affidavit of loss and indemnity reasonably satisfactory to Reorganized Debtor (or the Disbursing Agent), shall be deemed to have forfeited all rights, Claims and Causes of Action against the Debtor and Reorganized Debtor and shall not participate in any Distribution hereunder.

(5)     Continuation of Bankruptcy Injunction or Stays.

All injunctions or stays provided for in the Chapter 11 Case under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

Each of the injunctions relating to the D&O Proceedings and the D&O Trust as set forth in the Plan shall become effective on the Effective Date and shall continue in effect at all times thereafter unless otherwise provided by the Plan.  Notwithstanding anything to the contrary contained in the Plan, all actions in the nature of those to be enjoined by such injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date.

In the event that the Trustee of the D&O Trust determines that an Injunction Default under the D&O Trust Chaneling Injunction has occurred, the Trustee shall be entitled, by motion or adversary proceeding, in its sole discretion, to seek a determination by the Bankruptcy Court that such Injunction Default has occurred, and the D&O Trust Channeling Injunction shall be of no further force and effect with respect to the Released Parties.

Furthermore, any and all injunctions contemplated by the Plan shall be limited to the extent necessary to permit the Debtor and/or the TA Debtors, or any trustee, agent or committee of creditors acting on behalf of or in the place of the Debtor and/or TA Debtors, to commence and litigate any and all Claims or Causes of Action with respect to alleged ownership interests in the Montana Power Company Policies.

(6)     Revesting of Assets.

Except as otherwise provided by the Plan, upon the Effective Date, title to all properties and assets of the Debtor dealt with by the Plan shall pass from the Debtor to Reorganized Debtor free and clear of all Claims, Liens, encumbrances and interests of creditors and of equity security holders (except those Claims, Liens, encumbrances and interests created or permitted to continue to be retained pursuant to the Plan) and the Confirmation Order shall be a judicial determination of discharge and extinguishment of all Claims, Liens or Equity Interests (except those created or permitted to continue to be retained pursuant to the Plan).  All pre-Effective Date liabilities of the Debtor are treated and/or discharged in accordance with the terms of the Plan and, except as otherwise set forth in the Plan, shall not in any manner be (or be deemed to be) transferred or assumed by Reorganized Debtor.  On the Effective Date, or as soon thereafter as practicable, the Disbursing Agent shall make all Distributions required under the Plan in satisfaction of Allowed Claims against the Debtor including, but not limited to, the following: (i) the consideration described in Section 4.1(b) of the Plan to the holders of Allowed Priority Claims in full and final satisfaction of such Priority Claims; (ii) the consideration described in Section 4.2(b) of the Plan to the holders of Allowed Unsecured Priority Claims in full and final satisfaction of such Unsecured Priority Claims; (iii) the consideration described in Section 4.3(b) of the Plan to the holders of Allowed Bank One DIP Financing Claims in full and

**A839**

final satisfaction of such Bank One DIP Financing Claims; (iv) the consideration described in Section 4.7(c) of the Plan to the holders of Allowed Unsecured Note Claims in full and final satisfaction of such Unsecured Note Claims; (v) the consideration described in Section 4.8(c) of the Plan to the holders of Allowed Unsecured Subordinated Note Claims in full and final satisfaction of such Unsecured Subordinated Note Claims; (vi) the consideration described in Section 4.9(c) of the Plan to the holders of the Allowed General Unsecured Claims in full and final satisfaction of such General Unsecured Claims; and (vii) the consideration described in Section 4.10(b) of the Plan to the holders of the Allowed Unsecured Convenience Claims, in full and final satisfaction of such Unsecured Convenience Claims.

Nothing in the Plan or Confirmation Order releases or nullifies any liability to a governmental entity under police and regulatory statutes and regulations that any entity would be subject to as the owner or operator of property after the Effective Date. Nothing in the Plan or Confirmation Order shall release, discharge, or preclude any Claim that arises after the Effective Date that the United States Environmental Protection Agency or any state environmental agency may have against the Debtor or any remedies of the United States Environmental Protection Agency or state environmental agencies that are not within the definition of Claim as set forth in Section 101(5) of the Bankruptcy Code.

(7)    Revesting of Railroad Licenses in Reorganized Debtor's Name.

On November 15, 2002, the Debtor acquired certain utility operating assets previously held by the Montana Power Company from Northwestern Energy, LLC, including certain railroad permits. Consistent with the terms of the underlying transaction, the Debtor obtained blanket assignments of permits for a fee of $1,000 from Union Pacific Railroad. On the Effective Date, or as soon thereafter as practicable, the Disbursing Agent shall pay $1,000 to Burlington Northern Santa Fe Railroad Company, Montana Rail Link, Inc., Montana Western Railway Company, and Rarus Railway Company and the Reorganized Debtor shall receive blanket assignment of all permits currently held in the name of Montana Power Company or NorthWestern Energy, LLC.

(8)    General Release of Liens.

Except as otherwise provided in the Plan, or in any contract, instrument, indenture or other agreement or document created in connection with the Plan or the implementation thereof, on the Effective Date, all mortgages, deeds of trust, Liens or other security interests against property of the Estate are hereby released and extinguished, and all the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests will revert to Reorganized Debtor as applicable, and the successors and assigns thereof.

(9)    Full and Final Satisfaction.

All payments and all Distributions hereunder shall be in full and final satisfaction, settlement, release and discharge of all Claims and Equity Interests, except as otherwise provided in the Plan.

(10)    Waiver of Avoidance Actions.

As of the Petition Date, the Debtor was paying in the ordinary course and was current on its general trade claims. During the Chapter 11 Case, the Debtor sought and the Court granted approval for the Debtor to pay certain pre-petition claims. During the 90 days immediately preceding the Petition Date, the Debtor made payments of approximately

$290,691,167.28. In addition, within one year immediately preceding the Petition Date, the Debtor made payments of approximately $1,765,404.65 on behalf of Affiliates and approximately $17,715,940.61 to officers, directors and relatives of officers or directors of the Debtor and its Affiliates. Any recovery pursuant to an Avoidance Action shall be retained by the Debtor, or the Reorganized Debtor, and will not effect Distributions to the Debtor's creditors provided for in the Plan.

The Debtor continues to analyze Avoidance Actions, and shall provide notice of any Avoidance Actions 30 days prior to the voting deadline and shall initiate them within 180 days of the Effective Date.[57] After such date, the Debtor and Reorganized Debtor, for and on behalf of themselves and their Estate, hereby waive and release any Avoidance Actions; provided, however, that the foregoing waiver and release shall not apply to any such causes of Action that are pending on such date.

(11)    Termination of Subordination Rights.

Except as otherwise provided in the Plan, the classification and manner of satisfying all Claims and Equity Interests under the Plan take into consideration all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, Sections 510(b) and (c) of the Bankruptcy Code or otherwise, that a holder of a Claim or Equity Interest may have against other Claim or Equity Interest holders with respect to any Distribution made pursuant to the Plan. On the Effective Date, all contractual, legal or equitable subordination rights that a holder of a Claim or Equity Interest may have with respect to any Distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined and Distributions pursuant to the Plan shall not be subject to payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment or other legal process by any beneficiary of such terminated subordination rights.

(12)    No Successor Liability; No Liability for Certain Released Claims.

Except as otherwise expressly provided in the Plan, with respect to the Debtor, Reorganized Debtor and the D&O Trust, the Debtor, Reorganized Debtor, the other Released Parties, and the D&O Trust do not, pursuant to the Plan, assume, agree to perform, pay, or indemnify creditors for any liabilities or obligations of the Debtor relating to or arising out of the operations of or assets of the Debtor whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Confirmation Date. Neither the Released Parties, Reorganized Debtor, nor the D&O Trust is, or shall be, a successor to the Debtor by reason of any theory of law or equity, and none shall have any successor or transferee liability of any kind or character, except that Reorganized Debtor and the D&O Trust shall assume the obligations specified in the Plan and the Confirmation Order.

Except as otherwise expressly provided in the Plan, effective automatically on the Effective Date, the Released Parties, their respective representatives and the Additional Indemnitees shall not be released from any and all Claims and Causes of Action arising under Section 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code or similar Claims

---

[57]    On or about July 1, 2004, the Debtor filed its schedule of possible Avoidance Actions for which it is preserving its rights to pursue.

**A841**

arising under state or any other law, including, if applicable, Claims in the nature of fraudulent transfer, successor liability, corporate veil piercing, or alter ego-type Claims, as a consequence of transactions, events, or circumstances involving or affecting the Debtor (or any of its predecessors) or any of their respective businesses or operations that occurred or existed prior to the Effective Date.

**(13)**    Effect of Convenience Class Election.

By voting to accept the Plan and marking the Ballot in the space provided for electing treatment as a Convenience Claim in accordance with Section 4.10 of the Plan, the holder of an Allowed General Unsecured Claim of $20,000 or more may elect to reduce the amount of such holder's Allowed Claim to $20,000 and only receive treatment as an Allowed Convenience Claim having a value of $20,000 on the terms provided in Section 4.10 of the Plan. Such an election constitutes a waiver of the amount of such holder's Allowed General Unsecured Claim in excess of $20,000, and such holder shall be deemed to release the Debtor and Reorganized Debtor from any and all liability for such excess amount. In order to be treated as an Allowed Convenience Claim, the holder of an Allowed General Unsecured Claim must vote to accept the Plan and mark its ballot in the space provided for electing treatment as a Convenience Claim.

**(14)**    Administration Pending Effective Date.

Prior to the Effective Date, the Debtor shall continue to operate its businesses as a debtor-in-possession, subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules. After the Effective Date, Reorganized Debtor may operate its businesses, and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, but subject to the continuing jurisdiction of the Bankruptcy Court as set forth in Article XIII of the Plan.

**(15)**    Setoffs.

Nothing contained in the Plan shall constitute a waiver or release by the Debtor of any rights of setoff the Debtor may have against any Person unless otherwise agreed in writing by the Debtor prior to the Effective Date or Reorganized Debtor after the Effective Date.

**(16)**    Post-Confirmation Fees, Final Decree.

Reorganized Debtor shall be responsible for the payment of any post-confirmation fees due pursuant to 28 U.S.C. § 1930(a)(6) and the filing of post-confirmation reports, until a final decree is entered. A final decree shall be entered as soon as practicable after Distributions have commenced under the Plan.

**(17)**    Section 1145 Exemption.

The issuance of the New Common Stock, the Warrants and other securities that may be deemed to be issued pursuant to the Plan shall be exempt from registration requirements in accordance with Section 1145 of the Bankruptcy Code.

**(18)**    Indenture Trustee Charging Liens.

On the Effective Date, Reorganized Debtor will pay the Indenture Trustees' Fees and Expenses in full and in Cash, in an amount to be agreed upon among the Debtor and each of the Indenture Trustees. In the event that the parties cannot reach an agreement on the amount

thereof, any disputed amount shall be determined by the Bankruptcy Court, pursuant to Section 503 of the Bankruptcy Code, and in accordance with the terms of the applicable Indenture. Otherwise, the Indenture Trustees shall not be required to file an application with the Bankruptcy Court for payment of Indenture Trustees' Fees and Expenses. Upon receipt of payment by any Indenture Trustee of Indenture Trustees' Fees and Expenses, any Indenture Trustee Charging Lien under the applicable Indenture shall automatically be deemed released to the extent of payment on account of Indenture Trustees' Fees and Expenses; to the extent any Indenture Trustees' Fees and Expenses are not paid by the Reorganized Debtor (whether as a result of disagreement between the Indenture Trustee and the Reorganized Debtor, and/or following determination by the Bankruptcy Court) the Indenture Trustee Charging Lien of such Indenture Trustee shall not be impaired. Such payments shall be in full and final satisfaction of all pre- and post-petition Claims of the Indenture Trustees. Subject to Reorganized Debtor's obligations under this Section, distributions to holders of Unsecured Notes, Unsecured Subordinated Notes, the South Dakota Pollution Control Bond Claims, Gas Transition Bond Claims or the Montana Pollution Control Bond Claims pursuant to the Plan will not be reduced on account of payments made to the Indenture Trustees, as applicable, on account of the Indenture Trustee Charging Liens.

Notwithstanding the above, on the Effective Date, and subject only to the review of the fee auditor appointed in this Chapter 11 Case, the Debtor shall pay to Harbert and Wilmington Trust an aggregate amount of $2.25 million on account of their legal, advisory, consulting and other professional fees and expenses, which amount shall be allocated among Harbert and Wilmington Trust by agreement between Harbert and Wilmington Trust. Notwithstanding anything set forth herein, the fees of Goldin Associates shall not be subject to review by the fee auditor appointed in this Chapter 11 Case. Neither Wilmington Trust nor Harbert shall be required to file an application with the Bankruptcy Court for payment of such fees and expenses, provided that to the extent that the aggregate legal, advisory, consulting and other professional fees and expenses incurred by Harbert and Wilmington Trust exceed $2.25 million, Harbert and Wilmington Trust (and their professionals) may seek reimbursement of such fees and expenses by submitting an application to the Bankruptcy Court pursuant to Section 503(b) of the Bankruptcy Code, provided that the Creditor's Committee reserves the right to object to such application or applications. Notwithstanding anything set forth herein, if the fees and expenses of Wilmington Trust are not reimbursed in full by the estate, the deficiency shall be paid out of the distributions received by Wilmington Trust on behalf of the Class 8(a) Claims. Moreover, the Debtor agrees (and the Plan shall provide) that Wilmington Trust shall have the right (but not the obligation) to sell in the public market that portion of the 6.60% of the New Common Stock distributed to Class 8(a) and received by Wilmington Trust as a distribution to the extent necessary to pay legal and advisory fees and expenses incurred by Wilmington Trust that are not otherwise reimbursed by the estate.

If the fees and expenses of the respective Indenture Trustees are not reimbursed in full by the Debtor, then any deficiency may be paid out of the distributions received by the respective Indenture Trustee on behalf of their respective class claimants. The Indenture Trustee shall have the right, but not the obligation, to sell into the public market any portion of the New Common Stock distributed to its respective class claimants and received by the Indenture Trustee as a distribution to the extent necessary to pay legal and advisory fees and expenses incurred by the Indenture Trustee that are not otherwise reimbursed by the Debtor.

Notwithstanding anything to the contrary herein, Reorganized Debtor shall pay in the ordinary course of the Reorganized Debtor's business the reasonable fees and expenses of the Indenture Trustees incurred after the Effective Date in connection with the Distributions to holders of the Unsecured Notes, the Unsecured Subordinated Notes, the South Dakota Pollution Control Bond Claims, Gas Transition Bond Claims or the Montana Pollution Control Bond Claims under the Plan. Nothing in Section 5.17 of the Plan shall be deemed to limit the obligations of the Reorganized Debtor to the trustees under the indentures with respect to any Secured Bonds which are Reinstated under the provisions of the Plan.[58]

E.    **Distributions and Treatment of Disputed, Contingent and Unliquidated Claims and Equity Interests**

  (1)    Disbursement of Funds and Delivery of Distribution

Subject to Bankruptcy Rule 9010, all Distributions under the Plan, other than with respect to Secured Bondholder Claims which are Reinstated pursuant to the Plan, on account of D&O Trust Claims, South Dakota Pollution Control Bond Claims, Gas Transition Bond Claims and the Montana Pollution Control Bond Claims, shall be made by Reorganized Debtor (or the Disbursing Agent) to the holder of each Allowed Claim at the address of such holder as listed in the Debtor's books and records or on the Schedules as of the Confirmation Date, unless the Debtor or Reorganized Debtor has been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address for such holder different from the address reflected on the Schedules; provided however, all Distributions to the DIP Lenders under Section 4.3 of the Plan shall be made by Reorganized Debtor (or the Disbursing Agent) to Bank One, N.A. for disbursement to the DIP Lenders. With respect to D&O Trust Claims, Distributions to holders of D&O Trust Claims shall be made in accordance with the terms of the D&O Trust Documents. With respect to the South Dakota Pollution Control Bond Claims, Gas Transition Bond Claims and the Montana Pollution Control Bond Claims, Distributions to holders of South Dakota Pollution Control Bond Claims, Gas Transition Bond Claims or Montana Pollution Control Bond Claims, as the case may be, shall be made to the respective Indenture Trustees. Each Indenture Trustee shall, in turn, administer the distribution to the holders of the debt issues under the applicable indenture in accordance with the terms of such Indenture. The reasonable fees and expenses of each Indenture Trustee incurred on or after the Effective Date in connection with the Distributions described herein, including the reasonable fees and expenses of the Indenture Trustee's professionals and agents incurred in connection with the Distributions, shall be paid by the Reorganized Debtor without further application to or order of the Bankruptcy Court if the Debtor and the respective indenture trustee cannot agree on the amount of fees and expenses to be paid.

---

[58]    The Debtor has been advised that MBIA Insurance Corporation ("MBIA") intends to seek payment of MBIA's costs and expenses incurred by its legal and financial advisors and certain alleged advisory services of MBIA by virtue of certain financial guarantee insurance policies issued by MBIA in connection with the Montana Pollution Control Bond Obligations and/or the South Dakota Pollution Control Bond Obligations. The Debtor intends to object to paying any such costs, expenses and fees, but will do so if otherwise ordered by the Court.

**A844**

Any payment of Cash made by Reorganized Debtor (or the Disbursing Agent) pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer; provided that all Distributions of Cash to the DIP Lenders shall be made by Reorganized Debtor (or the Disbursing Agent) to Bank One, N.A. by wire transfer of immediately available funds for disbursement to the DIP Lenders.

Any payment or Distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day. Whenever any payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (rounding down in the case of $.50 or less and rounding up in the case of more than $.50).

No fractional shares of New Common Stock shall be distributed under the Plan. When any Distribution on account of an Allowed Claim pursuant to the Plan would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, such fractional interests shall be combined into as many whole shares as possible and shall be redistributed to holders of Allowed Claims with fractional interests, in descending order, until all such whole shares are distributed.

As of the close of business on the Confirmation Date, the claims register (for Claims) and the transfer ledgers (for Secured Notes and Unsecured Notes) shall be closed, and there shall be no further changes in the record holders of any Claims or Equity Interests. The Debtor, Reorganized Debtor, the Unsecured Note Trustee and the Unsecured Subordinated Note Trustees shall have no obligation to recognize any transfer of any Claims or Equity Interests occurring after the close of business on the Confirmation Date, and shall instead be entitled to recognize and deal for all purposes under the Plan (except as to voting to accept or reject the Plan pursuant to Section 7.1 of the Plan) with only those holders of record as of the close of business on the Confirmation Date.

(2)     Objections to and Resolutions of Administrative Expense Claims, Claims and Equity Interest

Except as to applications for allowance of compensation and reimbursement of expenses under Sections 330 and 503 of the Bankruptcy Code (with respect to which procedures respecting objections shall be governed by Section 2.2(b) of the Plan and the Confirmation Order or other Final Order), any party in interest may file objections to the allowance of any Administrative Expense Claims, Claims and Equity Interests subsequent to the Confirmation Date. All objections shall be litigated to Final Order; provided, however, that the Reorganized Debtor shall have the authority to compromise, settle, otherwise resolve or withdraw any objections filed by Reorganized Debtor. Unless otherwise ordered by the Bankruptcy Court, all objections to the allowance of Administrative Expense Claims, Claims or Equity Interests that are the subject of proofs of claim or requests for payment filed with the Bankruptcy Court (other than applications for allowances of compensation and reimbursement of expenses), shall be filed and served upon the holder of the Administrative Expense Claim, Claim or Equity Interest as to which the objection is made as soon as is practicable, but in no event later than ninety (90) days after the Effective Date or such later date as may be approved by the Bankruptcy Court.

**A845**

(3)    Disputed Claims Reserve

The Plan provides that Reorganized Debtor shall maintain a Disputed Claims Reserve equal to the aggregate of any distributable amounts of Cash and New Common Stock equal to the relevant percentage of the Distributions to which holders of Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim Amounts or such lesser amount as required by a Final Order. For the purposes of effectuating the provisions of the Plan and the Distributions to holders of Allowed Claims, the Bankruptcy Court, on or prior to the Effective Date or such date or dates thereafter as the Bankruptcy Court shall set, may fix or liquidate the amount of Disputed Claims pursuant to Section 502(c) of the Bankruptcy Code, in which event the amounts so fixed or liquidated shall be deemed the allowed amounts of the Disputed Claims for purposes of Distribution under the Plan. In lieu of fixing or liquidating the amount of any Disputed Claim, the Bankruptcy Court may determine the amount to be reserved for such Disputed Claim (singularly or in the aggregate), or such amount may be fixed by agreement in writing by and between the Debtor and the holder of a Disputed Claim.

(4)    Distributions Upon Allowance of Disputed Claims

The holder of a Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date shall receive Distributions from the Disputed Claims Reserve as soon as practical following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order. Such Distributions shall be made in accordance with the Plan based upon the Distributions that would have been made to such holder under the Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date plus any interest, dividends or other Distributions earned thereon. No holder of a Disputed Claim shall have any Claim against the Disputed Claims Reserve or Reorganized Debtor with respect to such Claim until such Disputed Claim shall become an Allowed Claim, and no holder of a Disputed Claim shall have any right to interest, dividends or other Distribution on such Disputed Claim except as provided in Section 7.6 of the Plan.

(5)    Surplus Distribution

The following assets constitute Surplus Distributions: (i) Unclaimed Property and (ii) to the extent that a Disputed Claim is not Allowed or becomes an Allowed Claim in an amount less than the amount of the Disputed Claim, the excess of the amount of Cash or New Common Stock in the Disputed Claims Reserve attributable to such Disputed Claim over the amount of Cash or New Common Stock actually distributed on account of such Disputed Claim, plus any interest, dividends or other Distributions earned thereon. On each Subsequent Distribution Date, the holders of Allowed Claims shall receive a Pro Rata Share in the Surplus Distributions attributable to such holders' Class; provided, however that Reorganized Debtor shall not be under any obligation to make Surplus Distributions on a Subsequent Distribution Date unless the aggregate market value of the Surplus Distributions to be distributed on such Subsequent Distribution Date exceeds $50,000 in any Class; provided, further that if the final distribution required under the Plan is less than $25,000 aggregate market value in any Class such Surplus Distributions shall revest in Reorganized Debtor.

**A846**

(6)    Aggregation of Claims.

Subject to Article VIII of the Plan, each and every General Unsecured Claim filed or to be filed in the Chapter 11 Case of a single holder against the Estate of the Debtor shall be aggregated and deemed one single Claim filed in Class 9.

(7)    Distributions Relating to Allowed Insured Claims.

Distributions under the Plan to each holder of an Allowed Insured Claim shall be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Insured Claim is not satisfied from proceeds payable to the holder thereof under any pertinent insurance policies and applicable law. Nothing contained in this Section shall constitute or be deemed a waiver of any Cause of Action that the Debtor or any entity may hold against any other entity, including, without limitation, insurers under any policies of insurance.

**F.    Executory Contracts and Unexpired Leases; Indemnification Claims; and Retiree Benefits**

(1)    Executory Contracts and Unexpired Leases

Any unexpired lease or executory contract subject to Section 8.1(b) of the Plan and, not including the Milltown Settlement or Milltown Stipulation, that has not been expressly rejected by the Debtor or treated in the Plan with the Bankruptcy Court's approval on or prior to the Confirmation Date shall, as of the Effective Date, be deemed to have been assumed by the Debtor unless there is pending before the Bankruptcy Court on the Effective Date a motion to reject such unexpired lease or executory contract (including, but not limited to, any collective bargaining agreements) or such executory contract or unexpired lease is otherwise designated for rejection (including, but not limited to, any collective bargaining agreements), provided, that (a) such lease or executory contract is ultimately rejected, (b) the filing of the Confirmation Order shall be deemed to be a rejection of all then outstanding unexercised stock options, warrants and similar rights and (c) in accordance with Section 1123(a)(5)(G) of the Bankruptcy Code, on the Effective Date or within ninety (90) days of the Effective Date, or such other time as may be agreed to by the Reorganized Debtor and the claimant, Reorganized Debtor shall cure all defaults under any executory contract or unexpired lease assumed pursuant to Section 8.1 of the Plan by making a Cash payment in an amount agreed to between Reorganized Debtor and the claimant, or as otherwise fixed pursuant to a Final Order.

At least fifteen (15) days prior to the Voting Deadline (or such later date as the Bankruptcy Court may fix), the Debtor shall file schedules setting forth each of its executory contracts and unexpired leases to be assumed and assigned under the Plan and identifying those contracts and leases to be rejected, and the Person to which such executory contract or unexpired lease shall be assigned, together with the cure amount(s), if any, to be paid respecting such executory contracts and leases.[59] Any party who disputes the proposed cure amount must file an objection not later than the date fixed for filing objections to confirmation of the Plan and any dispute respecting such cure amounts will be determined by the Bankruptcy Court at the

---

[59]    On or about July 16, 2004, the Debtor filed its notice of contracts which it intends to assume and/or reject. On or about August 9, 2004, the Debtor filed an amendment to the July 16, 2004 notice.

Confirmation Hearing or on such later date as the Bankruptcy Court may fix. Notwithstanding the foregoing, the Debtor reserves the right, until five (5) days prior to the Confirmation Hearing, to seek to reject any executory contract or unexpired lease included on the schedule, to assume subject to the other contract party's right to (a) receive notice of the rejection, (b) object to the Debtor's rejection and (c) change its vote on the Debtor's Plan.[60] The listing of a contract or lease on the foregoing schedules shall not constitute an admission by the Debtor that such agreement is an executory contract or an unexpired lease or that the Debtor has any liability thereunder.

The Debtor is a party to two (2) separate lease agreements (the "Leases") with The Bank of New York and Louis P. Young, as owner trustees (collectively, the "Owner Trustees") in connection with the coal-fired steam electric generating unit located in Colstrip Montana, known as Colstrip Unit 4 and certain common facilities. The Debtor is current on its payments under the Leases and anticipates continuing to make payments as and when such payments are due. The Debtor filed a motion to assume the Leases on or about June 29, 2004 and the Bankruptcy Court entered an order approving the assumption on or about July 14, 2004. During the Debtor's Chapter 11 Case, certain parties to the Leases and the related indenture incurred significant fees and expenses. To the extent that there are any outstanding payments of attorneys' fees and expenses with respect to the Leases and related documents, the Debtor will pay such fees and expenses in accordance with the provisions of such Leases and related documents and applicable law.

 (2) Claims Deadline for Filing Proofs of Claims Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.

Claims arising out of the rejection of an executory contract or unexpired lease designated for rejection under the Plan or pursuant to the Confirmation Order, must be filed with the Bankruptcy Court and served upon the Debtor or Reorganized Debtor by no later than thirty (30) days after the notice of entry of an order approving such rejection or as otherwise may be provided in the Confirmation Order. Any Claims not filed within such time will be forever barred from assertion against the Debtor, its Estate, Reorganized Debtor and its property, and the holders thereof shall not be entitled to any Distribution under the Plan or otherwise from the Debtor or Reorganized Debtor. Unless otherwise ordered by the Bankruptcy Court, all Claims arising from the rejection of executory contracts and unexpired leases shall be treated as General Unsecured Claims under the Plan.

 (3) Insurance Policies.

Each of the Debtor's insurance policies (except for the proceeds of certain D&O Policies being assigned to the D&O Trust) and any agreements, documents or instruments relating thereto, including, without limitation, any retrospective premium rating plans relating to such policies, are treated as executory contracts under the Plan. Notwithstanding the foregoing, distributions under the Plan to any holder of a Claim covered by any such insurance policies and related agreements, documents or instruments that are assumed hereunder, shall be in accordance with the treatment provided under Article IV and Article VI of the Plan. Each of the D&O

---

[60] At this time the Debtor intends to reject fewer than seven (7) executory contracts or unexpired leases and the damages in connection with such rejections are not material. The Debtor reserves the right, however, to revise this analysis.

**A848**

Policies being assigned to the D&O Trust and any agreements, documents or instruments relating thereto, including, without limitation, any retrospective premium rating plans relating to such policies, are treated as assumed under the Plan. Nothing contained in this Section shall constitute or be deemed a waiver of any Cause of Action that the Debtor may hold against any Person, including, without limitation, the insurer under any of the Debtor's policies of insurance.

Notwithstanding anything to the contrary, nothing contained in the Plan or Confirmation Order, including the Debtor's assumption of executory contracts under Section 8.1 through 8.3 of the Plan, shall affect coverage under the National Union Policy or National Union's rights, defenses, limitations and/or exclusions to be raised in the National Union Adversary Proceeding.

**(4)** <u>Indemnification Claims</u>

Indemnity claims not channeled to the D&O Trust shall be paid: (i) if Allowed on the Effective Date, in full in cash on the Effective Date; and (ii) if not then Allowed, such indemnity claim shall be assumed and paid in the ordinary course when such claim is Allowed. Any indemnification claim of Avaya under the Expanet's asset purchase agreement shall be treated according to subclause (ii) of the immediately preceding sentence.[61]

**(5)** <u>Compensation and Benefit Programs</u>

Except as otherwise provided in the Plan or subsequent motion prior to the Effective Date, all employment plans, practices, programs and policies maintained by the Debtor as of the Effective Date shall remain in full force and effect following the Effective Date, subject to any and all rights of the Debtor under applicable non-bankruptcy law to amend or terminate such plans, practices, programs and policies.[62]

**(6)** <u>Retiree Benefits</u>

Payment of any Retiree Benefits (as such benefits may have been modified during the Chapter 11 Case) shall be continued solely to the extent, and for the duration of the period, the Debtor is contractually or legally obligated to provide such benefits, subject to any and all rights of the Debtor under applicable law (including, without limitation, the Debtor's right to amend or terminate such benefits prior to or after the Effective Date).

The Debtor has established and maintained two (2) pension plans for its employees, known as the NorthWestern Energy Pension Plan and the NorthWestern Pension Plan (collectively, the "<u>Pension Plans</u>"). The Pension Plans are single employer defined benefit plans covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"), 29 U.S.C. § 1301 *et seq.* The Pension Plans will not be terminated during the Debtor's Chapter 11 Case and the Debtor will continue to sponsor the Pension Plans after emerging from Chapter 11, assuming the Plan is confirmed.

---

[61]    The Debtor continues to review the Indemnification Claims that have been filed. The Debtor intends to seek an estimation of the Indemnification Claims prior to the Confirmation Hearing.

[62]    The MPSC asserts that MPSC Order 6474a explicitly requires the Debtor to seek MPSC approval prior to adopting any incentive plans for key executives. The Debtor disagrees that this provision of MPSC Order 6474a remains enforceable.

**A849**

76

The Pension Benefit Guaranty Corporation ("PBGC"), a United States Government corporation which guarantees the payment of certain pension benefits upon termination of a pension plan, has asserted that the Pension Plans may be underfunded on a termination basis. The PBGC has filed contingent claims against the Debtor for unfunded benefit liabilities under 29 U.S.C. §§ 1362 and 1368; for unpaid minimum funding contributions under 29 U.S.C. § 1082 and 26 U.S.C. § 412; and for unpaid premiums under 29 U.S.C. § 1307. The PBGC has asserted that portions of these claims may be entitled to priority. PBGC's claims are contingent upon termination of the Pension Plans during the Chapter 11 Case.

(7)     QF Agreements

As of the Petition Date, the Debtor was party to approximately fourteen (14) power purchase agreements giving rise to the QF Claims as defined herein. As of the filing of the Plan, the Debtor has elected not to file a motion seeking to request the rejection of any of the QF agreements. Unless the Debtor files a motion to reject any of the QF agreements on or before the Confirmation Date, as of the Effective Date, such QF agreements shall be deemed assumed by the Reorganized Debtor. At this time the Debtor intends to assume the QF agreements, but reserves the right to give notice of rejection consistent with cure amounts as reflected by claims filed by the QF's or when no claim was filed as scheduled by the Debtor totalling approximately $17,903,357.65. The Debtor has provided for payment of cure amounts in its projections.[63]

## G.     Corporate Governance and Management

(1)     Management of Reorganized Debtor.

On the Effective Date, the management, control and operation of Reorganized Debtor shall become the general responsibility of the board of directors of Reorganized Debtor (the "New Board"), which shall, thereafter, have responsibility for the management, control and operation of Reorganized Debtor in accordance with applicable law.[64]

(2)     Directors and Officers of Reorganized Debtor.

a.     BOARD OF DIRECTORS OF REORGANIZED DEBTOR.

The initial New Board of Reorganized Debtor shall consist of seven (7) members of which six (6) shall be designated by the Creditors' Committee and one (1) of which shall be the Chief Executive Officer of the Reorganized Debtor. It is anticipated that a number of members of the New Board will have experience and expertise in the regulated utility industry. The Debtor intends to advise the MPSC, the MCC, the SDPUC and the NPSC regarding the

---

[63]     In the event the Debtor rejects certain QF agreements, holders of QF Claims may have claims for rejection damages. The State of Montana asserts that any rejection damages would be significant and could lead to substantial dilution of the distribution to the Debtor's creditors. In addition, in the event the QF agreement with the State of Montana is rejected, the State of Montana asserts that it is prohibited from accepting stock for payment of its damages which could result in further dilution of the claims of the Debtor's creditors. The Debtor does not necessarily agree with these assertions.

[64]     Attached hereto as Exhibit G is a list of anticipated senior management. In the event there are changes to the Debtor's proposed management, the Debtor will submit a revised exhibit prior to the Confirmation Hearing.

**A850**

process used to nominate members of the New Board. The designation of the board members for Reorganized Debtor shall be filed with the Bankruptcy Court on or prior to fifteen (15) business days prior to the commencement date of the Confirmation Hearing, or such other date as the Bankruptcy Court may establish.[65] On the Effective Date, the authority, power and incumbency of the persons then acting as directors of the Debtor shall be terminated and such directors shall be deemed to have been removed by unanimous vote of stockholders, and the directors of Reorganized Debtor that are selected in accordance with Section 9.2 of the Plan shall be deemed to have been elected by unanimous vote of the stockholders and shall have responsibility for the management, control and operations of Reorganized Debtor.

     b.     OFFICERS OF REORGANIZED DEBTOR.

On the Effective Date, the officers of the Debtor immediately prior to the Effective Date shall serve as the officers of Reorganized Debtor. After the Effective Date, the officers of Reorganized Debtor shall be determined by the New Board in accordance with Delaware law.

     (3)     Corporate Action, New Incentive Plan and Management.

     a.     Pursuant to Section 303 of the Delaware General Corporation Law, all terms of the Plan may be put into effect and carried out without further action by the directors or stockholders of the Debtor or Reorganized Debtor, who shall be deemed to have unanimously approved the Plan and all agreements and transactions provided for or contemplated herein, including, without limitation: (i) the adoption of the Reorganized Debtor Charter and by-laws; (ii) removal of existing directors and the initial selection of directors and officers of Reorganized Debtor; and (iii) the distribution of Cash and the issuance and distribution of New Common Stock and Warrants pursuant to the Plan; and (iv) implementation of the New Incentive Plan.

     b.     Notwithstanding the forgoing, 2,265,957 shares of New Common Stock representing 6% on a fully diluted basis of the shares to be issued and outstanding of Reorganized Debtor shall be reserved for any New Incentive Plan to be established by the New Board; provided, however, that 228,320 shares of the reserved New Common Stock will be allocated and delivered to those management employees set forth on Schedule 9.3 to the Plan as special recognition grants ("Special Recognition Grants"). The Special Recognition Grants shall vest according to the following schedule: (i) 50% on the Effective Date of the Plan; and (ii) 50% over the ensuing two to three years following the Effective Date, such vesting period to be determined by the New Board. Additionally, the Special Recognition Grants not then vested shall vest immediately upon a "change of control" as determined by the New Board. With respect to any employee of the Reorganized Debtor receiving a Special Recognition Grant any grant not vested shall vest immediately upon termination of such employee following the Effective Date; provided, however, that if such employee is terminated for cause such employee shall forfeit any remaining portion of his or her Special Recognition Grant.

     c.     Other than as provided in subparagraph (b) above, the New Board in its sole discretion, will decide all other issues related to the New Incentive Plan and management compensation including, but not limited to, employment agreements, base salaries, change of

---

[65]     On or about August 10, 2004, the Debtor filed its notice of designation of board members for the New Board.

**A851**

control provisions, short and long-term incentives, benefits and the like as is normal and customary for senior management of corporations similar to Reorganized Debtor.

    (4)    <u>Reorganized Debtor Corporate Structure</u>

        Under the Terms of the Stipulation and Settlement Agreement among the Debtor, the MPSC and the Montana Consumer Counsel, Reorganized Debtor's regulated energy and utility businesses and assets will be "ring fenced" in that such assets and businesses will be owned by Reorganized Debtor as the parent company. All of the Debtor's and Reorganized Debtor's non-regulated energy related or other business will be held in wholly owned subsidiaries of Reorganized Debtor. These wholly owned subsidiaries have, and are anticipated to have, no employees of their own, but will be served by Reorganized Debtor's utility employees whose costs will be charged to the non-regulated subsidiaries through intercompany transfer pricing, which pricing mechanisms will be subject to review by the regulatory commission having jurisdiction over Reorganized Debtor's rates. Any debt incurred by the non-regulated subsidiaries' operations will be incurred at the subsidiary level and will be non-recourse to Reorganized Debtor.

## H.    **Exculpation; Release; Injunctions; and Discharge**

    (1)    <u>Exculpation.</u>

        None of the Debtor, Reorganized Debtor, the DIP Lenders, the Creditors' Committee or any of their respective Affiliates, Officers or Directors, or any of their respective present or former stockholders, members, employees, advisors, attorneys, financial advisors, agents or Professionals in their capacities as such (collectively, the "<u>Exculpated Parties</u>") shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Case, the preparation or formulation of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; <u>provided</u>, <u>however</u>, that nothing in the Plan shall, or shall be deemed to, release the Exculpated Parties from, or exculpate the Exculpated Parties with respect to, their respective obligations or covenants arising pursuant to the Plan.

    (2)    <u>Release of General Released Parties.</u>

        As of the Effective Date, in consideration for, and as part of the treatment afforded to the holders of Claims and Equity Interests under the Plan, and for other valuable consideration, each of the Debtor, Reorganized Debtor, the DIP Lenders, the Creditors' Committee, and each of their respective parents, subsidiaries, Affiliates, Officers or Directors, or any of their former or present stockholders, members, employees, advisors, attorneys, financial advisors, accountants, auditors, agents or Professionals in their capacities as such (collectively, the "<u>General Released Parties</u>") shall be deemed forever released and discharged from any and all known and unknown Causes of Action of any nature that any Person (including, without limitation, any holder of Claims and Equity Interests under the Plan) may have asserted, could have asserted, or could in the future assert, directly or indirectly, against any of the General Released Parties based on any act or omission relating to the Chapter 11 Case on or prior to the Effective Date, excluding gross negligence and willful misconduct; <u>provided</u>, <u>however</u>, that the

foregoing release and discharge shall not apply to Causes of Action that arise from obligations or rights created under or in connection with the Plan or any agreement provided for or contemplated in the Plan.[66]

Notwithstanding any language to the contrary in the Debtor's Plan, nothing in the Plan shall be construed as releasing, discharging, or otherwise relieving the Debtor or any other party who may be a fiduciary with respect to the Pension Plans of any potential liability for breaches of fiduciary duties owed to the Pension Plans under ERISA.

Notwithstanding any language to the contrary in the Debtor's Plan, nothing in the Plan shall be construed as releasing, discharging or otherwise relieving officers and directors of the former Montana Power Company in their capacities as such.

    (3)    <u>Mutual Releases by General Released Parties.</u>

As of the Effective Date, each of the General Released Parties hereby unconditionally forever releases, waives and discharges all known and unknown Causes of Action of any nature that such General Released Party has asserted, may have asserted, could have asserted, or could in the future assert, directly or indirectly, against any of the other General Released Parties based on any act or omission relating to the Debtor or the Debtor's business operations (including, without limitation, the organization or capitalization of the Debtor or extensions of credit and other financial services and accommodations made or not made to the Debtor) or the Chapter 11 Case on or prior to the Effective Date; <u>provided</u>, <u>however</u>, that the foregoing release, waiver and discharge shall not apply to Causes of Action that arise from obligations or rights created under or in connection with the Plan or any agreement provided for or contemplated in the Plan.

    (4)    <u>Discharge.</u>

Except as otherwise expressly provided in Section 1141 of the Bankruptcy Code or the Plan, the Distributions made pursuant to and in accordance with the applicable terms and conditions of the Plan are in full and final satisfaction, settlement, release and discharge as against the Debtor of any Debt that arose before the Effective Date, and any Debt of a kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, and all Claims and Equity Interests of any nature, including, without limitation, any interest accrued thereon from and after the Petition Date, whether or not (i) a proof of claim or Equity Interest based on such Debt, obligation or equity interest is filed or deemed filed under Section 501 of the Bankruptcy Code, (ii) such Claim or Equity Interest is Allowed under Section 502 of the Bankruptcy Code or (iii) the holder of such Claim or Equity Interest has accepted the Plan.

    (5)    <u>Injunctions.</u>

        a.    INJUNCTION RELATED TO DISCHARGE.

As of the Effective Date and subject to its occurrence, all Persons that have held, currently hold or may have asserted, directly, indirectly, derivatively or otherwise, a Claim, a Cause of Action or an Equity Interest or other right of a holder of an Equity Interest that is discharged, released or terminated pursuant to the Plan, are hereby permanently enjoined from

---

[66]    <u>Exhibit E-2</u> identifies the General Released Parties. The Debtor reserves the right to amend or modify <u>Exhibit E-2</u> to add or remove names as may be appropriate prior to Confirmation.

ATL/1053554.14

commencing or continuing, in any manner or in any place, any action or other proceeding, enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order, creating, perfecting or enforcing any lien or encumbrance, asserting a set-off, right or subrogation or recoupment of any kind against any Debt, liability or obligation due to any such releasing Person, and from commencing or continuing any action, in any manner or in any place where the foregoing does not comply with or is inconsistent with the provisions of the Plan, and the Confirmation Order shall provide for such injunctions.

          b.      INJUNCTION RELATING TO EXCULPATION AND RELEASE.

As of the Effective Date, except as otherwise provided in the Plan, all Persons are hereby permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, whether directly, derivatively or otherwise against any or all of the Exculpated Parties or General Released Parties, on account of or respecting any Claims, Debts, rights, Causes of Action or liabilities exculpated, released or discharged pursuant to the Plan, and the Confirmation Order shall provide for such injunctions.

          c.      MUTUAL RELEASES WITH RESPECT TO WILMINGTON TRUST AND HARBERT.

As of the Effective Date and other than with respect to distributions provided for in Section 4.8 of the Plan on account of their respective allowed Unsecured Subordinated Note Claims and as part of the compromise and settlement with respect to Distributions to Class 8(a) provided for in the Plan, any and all Claims and Causes of Action both known and unknown on behalf of Harbert and Wilmington Trust, individually and collectively on the one hand, and the Debtor, the Reorganized Debtor and the Creditors' Committee on the other hand, and each of the foregoing respective affiliates and their parents, subsidiaries, officers, directors or any of their former or present stockholders, members (in their capacity as members only), employees, advisors, attorneys, financial advisors, accountants, auditors, agents or Professionals in their capacities as such, shall be deemed forever mutually released and discharged from any and all known and unknown Causes of Action of any nature that any Person may have asserted, could have asserted or could in the future assert, directly or indirectly, against each of Harbert, Wilmington Trust, the Debtor. the Reorganized Debtor and the Creditors' Committee respectively, specifically including but not limited to claims and issues, which have been raised by Harbert and Wilmington Trust concerning the Debtor's filings with respect to and claims of an exemption under the Public Utility Holding Company Act of 1935; provided, however, that any claims which Wilmington Trust may have in respect of an Indenture Trustees Charging Lien or that Wilmington Trust and/or Harbert may have pursuant to Section 5.18 herein are excluded form the forgoing releases subject to any objections that the Debtor, the Reorganized Debtor or the Creditors' Committee may assert thereto.

        (6)     Officers and Directors' Contributions to Plan

The Plan provides for the discharge of the Officers and Directors from further liability related to the D&O Proceedings. In exchange for such discharge, the Officers and Directors: (i) unconditionally forever release, waive and discharge all known and unknown Causes of Action of any nature that such Officer and Director has, may have asserted, could have asserted, or could in the future assert, directly or indirectly, against the Debtor or its Affiliates based on any act or omission relating to the D&O Proceedings; (ii) consent to all indemnification

claims related to the D&O Proceedings being channeled into the D&O Trust; and (iii) consent to the use of D&O Insurance Proceeds to fund the Securities Settlement and D&O Trust.[67]

(7)     Limitations on Releases, Exculpation, Discharge and Injunction

Except as specifically provided for in the Plan, the releases, exculpation, discharge and injunction (other than the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction) with respect to litigation as to non-Debtor third-parties shall be effective only to those holders of Claims and Interest which vote to accept the Plan and mark their respective ballots in the place provided consenting and agreeing to the release, exculpation, discharge and injunction provisions of the Plan. The releases, exculpation, discharge and injunctions provided for in the Plan also shall not be effective with respect to those releases and settlement of claims proposed to be released and settled under the Class Action Settlement Documents in the event that both the Bankruptcy Court and the District Court do not approve such proposed settlement by final, non-appealable judgment and/or order (see Article X.N hereof), or approve the settlement on the condition that the Debtor limit the parties to whom the Debtor may give releases pursuant to such Class Action Settlement Documents.

I.    **Confirmation and Effectiveness of Plan**

(1)     Condition to Confirmation.

It is a condition to the entry of the Confirmation Order that the following conditions have been satisfied or waived pursuant to Section 11.3 of the Plan:

a.    the Confirmation Order shall be in form and substance reasonably satisfactory to the Debtor and the Creditors' Committee;

b.    the Bankruptcy Court shall have made findings and determinations, among others, substantially to the effect as follows:

(iii)    The D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction are to be implemented in accordance with the Plan and the D&O Trust;

(iv)    As of the Petition Date, the Debtor has been named as a defendant in securities actions seeking damages to which the Debtor is entitled to reimbursement from the D&O Policies;

(v)    The D&O Trust is to use its assets and income to pay D&O Trust Claims;

(vi)    The Debtor may be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the D&O Trust Claims, which are addressed by the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction;

---

[67]     Exhibit E-1 identifies those Officers and Directors that are to be released in connection with the Class Action and related D&O Proceedings. The Debtor reserves the right to amend or modify Exhibit E-1 to add or delete Released Parties as may be appropriate prior to Confirmation.

**A855**

(vii)    The actual amounts, numbers, and timing of demands cannot be determined;

(viii)    Pursuit of demands outside the procedures prescribed by the Plan and the TDP is likely to threaten the Plan's purpose to deal equitably with D&O Trust Claims;

(ix)    The terms of the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction, including any provisions barring actions against third parties, are set out in the Plan and described in the Disclosure Statement;

(x)    Pursuant to court orders, the TDP, or otherwise, the D&O Trust shall operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of D&O Trust Claims or other comparable mechanisms, that provide reasonable assurance that the D&O Trust shall value, and be in a financial position to pay, D&O Trust Claims that involve similar D&O Trust Claims in substantially the same manner;

(xi)    The D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction are essential to the Plan and the Debtor's reorganization efforts;

(xii)    An identity of interests exists among the Debtor and the Released Parties such that a Claim asserted against any of the Released Parties gives rise to a Claim against the Debtor by the operation of the law of indemnity and contribution;

(xiii)    In light of the benefits provided, or to be provided, to the D&O Trust on behalf of each Released Party, the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction are fair and equitable with respect to the persons that might subsequently assert demands that would constitute D&O Trust Claims against any Released Party; and

(xiv)    The Plan and its acceptance otherwise comply with Section 105 of the Bankruptcy Code;

      c.    the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction shall have been implemented in connection with the D&O Trust and the Plan; and

      d.    the D&O Trust shall have the sole and exclusive authority as of the Effective Date to defend all D&O Trust Claims.

**(2)**    Conditions Precedent to Effective Date of the Plan.

The Plan shall not become effective unless and until the following conditions shall have been satisfied or waived pursuant to Section 11.3 of the Plan:

      a.    the Confirmation Order, in form and substance reasonably acceptable to the Debtor and the Creditors' Committee, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

      b.    the Bankruptcy Court shall have entered or affirmed an order or orders entering the D&O Trust Channeling Injunction and the D&O Entity Injunction;

**A856**

c.  each of the Plan Documents and the New Common Stock, in form and substance reasonably acceptable to the Debtor and the Creditors' Committee, shall have been effected or executed and delivered, and shall be validly issued and outstanding;

d.  the Debtor shall have distributed on the Effective Date to each holder of an Allowed Bank One DIP Financing Claim the amount of such Allowed Claim pursuant to the DIP Financing Order and the DIP Loan Documents in full satisfaction, settlement, release, extinguishment and discharge of such Allowed Claim, unless the holder of the Allowed Bank One DIP Financing Claim and the Debtor or Reorganized Debtor, as the case may be, agree to a different treatment thereof;

e.  all outstanding fees of Professionals retained by the Debtor and the Creditors' Committee that are due and payable and have been authorized to be paid as of the Effective Date pursuant to an order of the Bankruptcy Court shall have been paid, and a reserve, sufficient to pay the reasonable estimated post-Effective Date fees and expenses of such Professionals shall have been established by the Debtor for the benefit of such Professionals. Payment of fees and expenses pursuant to this provision shall include the payment of fees and expenses of the MPSC and the Montana Consumer Counsel pursuant to the stipulation and settlement agreement between the Debtor, the MPSC and the Montana Consumer Counsel and approved by the Bankruptcy Court on July 19, 2004;

f.  all actions, other documents, and agreements necessary to implement the Plan shall have been effected or executed and delivered;

g.  the D&O Trust Channeling Injunction and the D&O Insurance Entity Injunction shall be in full force and effect;

h.  the Debtor and all applicable Trustees shall have executed the D&O Trust Agreement;

i.  the D&O Insurance Entities shall have executed and delivered counterparts of the Insurance Assignment Agreement and such agreement shall be in full force and effect;

j.  all Trust Assets that are to be delivered to the D&O Trust on the Effective Date shall have been delivered to the D&O Trust in accordance with the requirements of all applicable Plan Documents;

k.  the Reorganized Debtor Charter shall be in full force; and

l.  the Debtor shall have obtained either (i) a private letter ruling establishing that the D&O Trust is a "qualified settlement fund" pursuant to Section 468B of the Internal Revenue Code and the regulations issued pursuant thereto, or (ii) other decisions, opinions, or assurances regarding the tax consequences of the Plan satisfactory to the Debtor and the Creditors' Committee.

**A857**

(3)    Waiver of Conditions.

One or more of the conditions contained in Sections 11.1 and 11.2 of the Plan may be waived by the execution of a written consent by or on behalf of the Debtor and the Creditors' Committee in its judgment reasonably exercised.

(4)    Effect of Failure of Conditions.

In the event that one or more of the conditions specified in Section 11.2 of the Plan have not occurred on or before 120 days after the Confirmation Date, upon notification submitted by the Debtor to the Bankruptcy Court, counsel for the Creditors' Committee, counsel for the DIP Lenders, and counsel for the CSFB Lenders (a) the Confirmation Order shall be vacated, (b) no Distributions under the Plan shall be made, (c) the Debtor and all holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (d) the Debtor's obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any person in any further proceedings involving the Debtor.

**J.    Regulation**

The Debtor is subject to both federal and state regulation.  The Debtor's utility operations shall continue to be regulated by: (i) FERC; (ii) the MPSC in accordance with the Montana Public Utilities Law, the MPSC's policies and practices, and any other laws and regulations applicable to investor-owned utilities in the State of Montana with respect to the Debtor's Montana assets and operations; (iii) the SDPUC in accordance with South Dakota Public Utilities Law, the SDPUC's policies and procedures, and any other laws, regulations and orders applicable to investor-owned utilities in the State of South Dakota with respect to the Debtor's South Dakota assets and operations; and (iv) the NPSC in accordance with the Nebraska State Gas Regulation Act and the NPSC's rules and regulations applicable to jurisdictional utilities in the State of Nebraska with respect to the Debtor's Nebraska assets and operations.

No provision in the Plan is intended, as to Debtor's regulated utility operation, to impair, alter, modify, increase or decrease any pre-petition or post-petition: (i) rate, tariff, regulatory order or regulatory proceeding of FERC, MPSC, SDPUC or NPSC; (ii) agreement relating to any such rate, tariff, order or proceeding; (iii) right of appeal, action or collateral challenge with respect to any of the foregoing; or (iv) the regulatory authority or jurisdiction of FERC, MPSC, SDPUC or NPSC.  The Debtor entered into a stipulation and settlement agreement with the MPSC and Montana Consumer Counsel and the parties agreed to entry of a consent order in MPSC Docket D2003.8.109, in part, to address the state regulators' concerns that the Plan may have limited the Debtor's regulatory obligations.  To the extent that this paragraph conflicts with the terms of the stipulation and settlement agreement, contemplated by the agreement in principle, the stipulation and settlement agreement will control.

In addition, the Debtor is subject to federal and state environmental laws and regulation and the Debtor intends to continue to comply with its pre- and post-petition environmental and regulatory obligations, in general.  No provision in the Plan is intended to

**A858**

impair, alter, modify, increase or decrease these obligations, and all of the Debtor's environmental and regulatory obligations shall be unaffected by the Plan and shall become obligations of the Reorganized Debtor, except for those obligations otherwise dealt with by the Plan such as provided in the Milltown Settlement and the Milltown Stipulation and the stipulation and settlement agreement, contemplated by the agreement in principle, with the MCC and MPSC. In the event of any conflict between Plan provisions and those settlement documents, the settlement documents will control.

Upon emerging from Chapter 11 Reorganized Debtor is not anticipated to be engaged in any non-energy business except for the few Blue Dot locations Blue Dot, as a wholly owned subsidiary of Reorganized Debtor, will continue to own. Reorganized Debtor will, however, own through wholly owned subsidiaries a few non-regulated energy ventures that are not material to Reorganized Debtor as a whole. These operations include the non-regulated gas marketing operations with respect to South Dakota and Nebraska, the non Blue Dot HVAC operation with respect to South Dakota and Nebraska; (iii) the non-regulated intrastate pipeline assets located in South Dakota and Nebraska; and (iv) the pipeline assets owned by Reorganized Debtor's Canadian-Montana pipeline subsidiary. To the extent that assets owned by Montana First Megawatts, LLC have not otherwise been disposed of prior to the Effective Date then these assets will continue to be owned by Reorganized Debtor through its wholly owned subsidiary Montana First Megawatts, LLC.

All of the non-regulated, energy related businesses will continued to be held in wholly owned subsidiaries of Reorganized Debtor. These companies have and will have no employees of their own but are served and will continue to be served by the Debtor and Reorganized Debtor employees whose costs are and will continue to be charged to the non-regulated subsidiaries by intercompany transfers. The transfer pricing mechanisms have been established with the approval of the SDPUC.

## K.     Retention of Jurisdiction

Following the Effective Date, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:[68]

a.    to hear and determine any and all objections to the allowance of any Claims or any controversies as to the classification of any Claims;

b.    to hear and determine any and all applications by Professionals for compensation and reimbursement of reasonable fees and expenses;

c.    to hear and determine any and all pending applications for the rejection and disaffirmance of executory contracts (including, without limitation,

---

[68]     In connection with the Milltown Settlement and Milltown Stipulation, to the extent that a final Consent Decree (as defined in the Milltown Stipulation) and a final FERC order has not been entered, the Bankruptcy Court shall retain exclusive jurisdiction, or in the alternative, concurrent jurisdiction to hear and determine the claims related to the Milltown Dam.

**A859**

any collective bargaining agreements) and unexpired leases, and fix and allow any Claims resulting therefrom;

d.  to liquidate any Disputed Claim;

e.  to enforce the provisions of the Plan, including the injunction, exculpation and releases provided for in the Plan;

f.  to enable the Debtor to prosecute any and all proceedings which have been or may be brought prior to the Effective Date, or subsequent to the Effective Date, to set aside liens or encumbrances and to recover any transfers, assets, properties, or damages to which the Debtor may be entitled under applicable provisions of the Bankruptcy Code or any federal state, or local laws;

g.  to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out the purpose and the intent of the Plan;

h.  to determine any Claim or liability to a governmental unit which may be asserted as a result of the transactions as set forth in the Disclosure Statement and Plan;

i.  to hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505 and 1146 of the Bankruptcy Code;

j.  to hear and determine any matters or disputes respecting the Debtor under the Sections 1113 and 1114 of the Bankruptcy Code;

k.  to hear and determine matters arising under or related to the D&O Trust; and

l.  to determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code.

## ARTICLE V
## SUMMARY OF CERTAIN MATERIAL DOCUMENTS TO BE EXECUTED OR IMPLEMENTED IN CONNECTION WITH THE PLAN[69]

The following is a brief summary of the documents and agreements to be executed in connection with the Plan.

### A.  Reorganized Debtor Corporate Charter

(1)  Authorized Stock

The Reorganized Debtor Charter will authorize the issuance of up to 200 million shares of common stock and 50 million shares of preferred stock.  However, the Reorganized

---

[69]  The descriptions of the agreements set forth herein are qualified in all respects to the terms and conditions of the agreements themselves.

**A860**

Debtor will be prohibited from issuing nonvoting stock to the extent that such issuance is prohibited by Sections 1123 and 365 of the Bankruptcy Code.

### (2)    Board of Directors

The Reorganized Debtor Charter will provide that the New Board will consist of seven (7) directors.

### (3)    Amendments to Reorganized Debtor Charter and Bylaws

Generally, amendments to (I) the provisions of the Reorganized Debtor Charter addressing directors, stockholders, liability and indemnity, compromises with creditors, amendments to the Reorganized Debtor Charter, and (II) the amended and restated Bylaws must be approved by at least a majority of the voting power of the outstanding shares entitled to vote on the election of directors, voting together as a single class.

### (4)    Interested Stockholder Transactions

Generally, any merger with or transfer of assets to an interested stockholder (i.e., a stockholder who beneficially owns 15% of the Reorganized Debtor's voting shares) must be approved by a majority of the disinterested directors. If a majority of the disinterested directors do not approve the transaction, then the transaction must be approved by at least 66 2/3% of the voting power of the outstanding shares entitled to vote on the election of directors, voting together as a single class, excluding the shares held by the interested stockholder.

## B.    The New Incentive Plan

Other than as provided for in Section 9.3 of the Plan, the New Board in its sole discretion, will decide all other issues related to the New Incentive Plan and management, compensation including, but not limited to, employment agreements, base salaries, change of control provisions, short and long-term incentives, benefits and the like as is normal and customary for senior management of corporations similar to Reorganized Debtor. The MPSC has asserted that the New Incentive Plan requires MPSC approval prior to taking effect.

## C.    Registration Rights Agreement

Pursuant to the Plan, the Reorganized Debtor will enter into a registration rights agreement with certain entities providing for the registration of the New Common Stock including New Common Stock issuable pursuant to the Warrants. Only holders entitled to receive distributions pursuant to the Plan of New Common Stock (or Warrants which, when exercised, would entitle such holder to receive New Common Stock) representing at least five (5%) percent of the aggregate New Common Stock issuable pursuant to the Plan (collectively, "Eligible Security Holders") will be entitled to enter into the registration rights agreement. Under the registration rights agreement, during the period commencing on the Effective Date and ending on the first date on which there are no registrable securities, the Reorganized Debtor will be required, subject to certain black-out periods, to effect a customary number of demand registrations covering the resale by the Eligible Security Holders under the Securities Act of the shares of New Common Stock received by such Eligible Security Holders under the Plan.

### D.    Public Utility Holding Company Act

The Plan contemplates the issuance of New Common Stock to certain holders of Allowed Claims. A holder of New Common Stock may become a "holding company" under PUHCA, 15 U.S.C. § 79a *et seq.* Under PUHCA, an entity that owns, controls, or holds with the power to vote ten percent (10%) or more of the outstanding "voting securities" of a "public-utility company" is presumptively a "holding company."

A "public-utility company" includes *inter alia* "any company which owns or operates facilities used for generation, transmission, or distribution of electric energy for sale." The Reorganized Debtor will be a "public-utility company" under the PUHCA.

A holder of ten percent (10%) or more of the New Common Stock would become a holding company under PUHCA absent a contrary order by the SEC. A holder of less than ten percent (10%) of the New Common Stock would not be a holding company unless the SEC determines that such holder, alone or with others, exercises such a "controlling influence" over the public utility "as to make it necessary or appropriate in the public interest or for the protection of investors or consumers" to deem the holder to be a holding company.

All public utility holding companies must register with the SEC under section 5 of PUHCA and are subject to extensive regulation of their affairs under PUHCA by the SEC unless the holding company is exempted. Under section 3 of PUHCA, the SEC must exempt holding companies that meet any of five defined categories, unless it finds the exemption "detrimental to the public interest or the interest of investors or consumers." These five categories include an entity that is "temporarily a holding company solely by reason of the acquisition of securities for purposes of liquidation or distribution in connection with a bona fide debt previously contracted or in connection with a bona fide arrangement for the underwriting or distribution of securities." This exemption would be available to holders of Allowed Claims that become holding companies by acquiring New Common Stock in exchange for previously contracted bona fide debt pursuant to the Plan. In order to obtain this exemption, such holders of New Common Stock must submit an application to the SEC. Prior SEC orders indicate that such an applicant would have to demonstrate that it intends to hold such voting securities for investment purposes only, temporarily and for purposes of liquidation, and will reduce its holdings to less than ten percent (10%) of the outstanding voting securities of the Reorganized Debtor as soon as financially reasonable, consistent with any fiduciary obligations the applicant may have to its investors. The SEC has approved exemptions for periods of up to three (3) years from the date of acquisition of such voting securities to provide an opportunity for a reorganized public-utility company to increase earnings and improve the market price of its securities. A holder of an Allowed Claim that would acquire ten percent (10%) or more of the outstanding shares of New Common Stock pursuant to the Plan should consult with counsel and arrange for the filing of an appropriate application for an exemption with the SEC.

In addition, a holder of New Common Stock may be required to seek approval from the SEC under section 9(a)(2) of the PUHCA to acquire securities of the Reorganized Debtor. Section 9(a)(2) requires SEC approval under the standards of section 10 for the acquisition of any security of any public-utility company by "any person" who is, or will by virtue of an acquisition become, an "affiliate" of two or more public-utility companies. For

purposes of section 9(a)(2), an "affiliate" is any person that directly or indirectly owns five percent (5%) or more of the outstanding voting securities of a public-utility company. Section 10 in turn, directs the SEC to consider the potential anticompetitive effects of a utility acquisition, the adequacy of the consideration, and the effect of the acquisition upon the system, the public interest and the interest of investors and consumers. The SEC must also be satisfied that there is compliance with relevant state laws. In addition, under section 10(c)(1), the SEC cannot approve an acquisition that "is unlawful under the provisions of section 8 or detrimental to the carrying out of the provisions of section 11," and, under section 10(c)(2), the SEC must find that a proposed acquisition "serve[s] the public interest by tending towards the economical and efficient development of an integrated public-utility system." Section 8 prohibits ownership interests in electric and gas utility properties serving the same territory in violation of state law, and section 11 requires the integration and simplification of holding company systems. Because the acquisition of securities in the Reorganized Debtor pursuant to the Plan does not change the utility operations of the Reorganized Debtor, compliance with sections 10(c), 8, and 11 would not appear to be an issue if section 9(a)(2) approval must be obtained. A holder of an Allowed Claim that would acquire five percent (5%) or more of the outstanding shares of New Common Stock pursuant to the Plan should consult with counsel to determine if section 9(a)(2) approval must be obtained and if so arrange for the filing of an appropriate application with the SEC.

## ARTICLE VI
## ACCEPTANCE AND CONFIRMATION OF THE PLAN

The following is a brief summary of the provisions of the Bankruptcy Code respecting acceptance and confirmation of a plan of reorganization. Holders of Claims and Equity Interests are encouraged to review the relevant provisions of the Bankruptcy Code and/or to consult their own attorneys.

### A.    Acceptance of the Plan

This Disclosure Statement is provided in connection with the solicitation of acceptances of the Plan. The Bankruptcy Code defines acceptance of a plan of reorganization by a class of Claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of the allowed Claims of that class that have actually voted or are deemed to have voted to accept or reject a plan. The Bankruptcy Code defines acceptance of a plan of reorganization by a class of interests as acceptance by at least two-thirds in amount of the allowed interests of that class that have actually voted or are deemed to have voted to accept or reject a plan.

If one or more impaired Classes rejects the Plan, the Debtor may, in its discretion, nevertheless seek confirmation of the Plan if the Debtor believes that it will be able to meet the requirements of Section 1129(b) of the Bankruptcy Code for confirmation of the Plan (which are set forth below), despite lack of acceptance by all impaired classes.

### B.    Confirmation

#### (1)    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. Notice of the Confirmation Hearing of the

Plan will be provided to all known holders of Claims and Equity Interests or their representatives along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform with the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, must set forth the name of the objectant, the nature and amount of Claims or Equity Interests held or asserted by the objectant against the Debtor's Estate or property, and the basis for the objection and the specific grounds in support thereof. Such objection must be filed with the Bankruptcy Court, with a copy forwarded directly to the Chambers of the Honorable Charles G. Case, II, United States Bankruptcy Court, 844 N. King Street, Wilmington, DE 19801 together with proof of service thereof, and served upon: (a) counsel to the Debtor, Paul, Hastings, Janofsky & Walker, LLP, 600 Peachtree Street, N.E., Suite 2400, Atlanta, Georgia 30308, Attn: Jesse H. Austin, III, Esq. and Karol K. Denniston, Esq. and Greenberg Traurig, LLP, The Brandywine Building, 1000 West Street, Suite 1540, Wilmington, Delaware 19801, Attn: Scott D. Cousins, Esq., Victoria Watson Counihan, Esq. and William Chipman, Esq.; (b) counsel to the Creditors' Committee, Paul Weiss Rifkind Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Attn: Alan W. Kornberg, Esq. and Ephraim Diamond, Esq. and The Bayard Firm, 222 Delaware Avenue, Wilmington, Delaware 19801, Attn: Neil B. Glassman, Esq. and Charlene D. Davis, Esq.; (c) counsel to Bank One, N.A., Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Chicago, Illinois 60606, Attn: Timothy R. Pohl, Esq.; (d) counsel to CSFB, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104, Attn: Mark B. Joachim, Esq.; and (e) the Office of the United States Trustee, 844 King Street, Suite 2313, Lockbox 35, Wilmington, Delaware 19801, Attn: Mark Kenney, Esq. so as to be received no later than the date and time designated in the notice of the continued Confirmation Hearing.

(2)    Statutory Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Debtor will request that the Bankruptcy Court determine that the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code. If so, the Bankruptcy Court shall enter an order confirming the Plan. The applicable requirements of Section 1129 of the Bankruptcy Code are as follows:

a.    The Plan must comply with the applicable provisions of the Bankruptcy Code;

b.    The Debtor must have complied with the applicable provisions of the Bankruptcy Code;

c.    The Plan has been proposed in good faith and not by any means forbidden by law;

d.    Any payment made or promised to be made by the Debtor under the Plan for services or for costs and expenses in, or in connection with, this Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any

such payment made before Confirmation of the Plan is reasonable, or if such payment is to be fixed after Confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

e.  The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor under the Plan. Moreover, the appointment to, or continuance in, such office of such individual, is consistent with the interests of holders of Claims and Equity Interests and with public policy, and the Debtor has disclosed the identity of any insider that Reorganized Debtor will employ or retain, and the nature of any compensation for such insider;

f.  <u>Best Interests of Creditors Test.</u>  With respect to each Class of impaired Claims or Equity Interests, either each holder of a Claim or Equity Interest of such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor was liquidated on such date under Chapter 7 of the Bankruptcy Code. In a Chapter 7 liquidation, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no lower class receiving any payments from the Debtor's estate until all amounts due to senior classes have either been paid in full or payment in full is provided for: (i) first to secured creditors (to the extent of the value of their collateral), (ii) next to priority creditors, (iii) next to unsecured creditors, (iv) next to debt expressly subordinated by its terms or by order of the Bankruptcy Court, and (v) last to holders of equity interests. Annexed hereto as <u>Exhibit H</u> is a liquidation analysis prepared by the Debtor. As set forth therein, in light of the foregoing priority, the Debtor believes that if the Chapter 11 Case were converted to a Chapter 7 liquidation, holders of Claims in Classes 7, 8, 9, 10, 11, and 12 would receive less than they will receive under the Plan and holders of all other Claims and Equity Interests would receive no Distributions under the Plan;

g.  All impaired Claims that will receive a Distribution under the Plan are as set forth above at Section IV.

h.  Each class of Claims or Equity Interests has either accepted the Plan or is not impaired under the Plan;

i.  Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Allowed Priority Claims (other than Allowed Priority Tax Claims) will be paid in full on the Effective Date and that Allowed Priority Tax Claims will receive on account of such Claims deferred Cash payments, over a period not exceeding six (6) years after the date of assessment of such Claim, of a value, as of the Effective Date, equal to the Allowed amount of such Claim;

**A865**

j.    At least one impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any Insider holding a Claim of such class; and

k.    Feasibility. Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan. Annexed hereto as Exhibit I are projections for approximately five (5) years following confirmation and a pro forma balance sheet as of the Effective Date which demonstrate that, given estimated expenses and income, and taking into account Cash reserves, Reorganized Debtor will be able to satisfy its obligations under the Plan, as well as its obligations arising in connection with its ongoing business operations.

The MPSC asserts that the Plan is not feasible without the MPSC's approval of the Plan's elements that are subject to its jurisdiction or, in the alternative, the MPSC's statement that it does not object to the Plan. The Debtor disagrees with this assessment. The stipulation and settlement agreement with the MPSC and the MCC provides that the MPSC agrees not to file an objection to the Plan.

(3)    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a Bankruptcy Court to confirm a plan, even if such plan has not been accepted by all impaired classes entitled to vote on such plan, provided that such plan has been accepted by at least one impaired class. If any impaired classes reject or are deemed to have rejected the Plan, the Debtor reserves its right to seek the application of the statutory requirements set forth in Section 1129(b) of the Bankruptcy Code for confirmation of the Plan despite the lack of acceptance by all impaired classes.

Section 1129(b) of the Bankruptcy Code provides that notwithstanding the failure of an impaired class to accept a plan of reorganization, the plan shall be confirmed, on request of the proponent of the plan, in a procedure commonly known as "cram-down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of Claims or interests that is impaired under and has not accepted the plan.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of secured Claims includes the requirements that (a) the holders of such secured Claims retain the liens securing such Claims to the extent of the allowed amount of the Claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan, and (b) each holder of a secured Claim in the class receive deferred Cash payments totaling at least the allowed amount of such Claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the Debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured Claims includes the requirement that either: (a) such class receive or retain under the plan property of a value as of the effective date of the plan equal to the allowed amount of such Claim; or (b) if the class does not receive such amount, no class junior to the non-accepting class will receive a Distribution under the plan from the Debtor's estate.

**A866**