The condition that a plan be "fair and equitable" with respect to a non-accepting class of Equity Interests includes the requirements that either: (a) the plan provides that each holder of an Equity Interest in such class receive or retain under the plan, on account of such Equity Interest, property of a value, as of the effective date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled, or (iii) the value of such Equity Interest; or (b) if the class does not receive such amount, no class of equity interests junior to the non-accepting class will receive a Distribution under the plan.

**ARTICLE VII**
**VALUATION OF REORGANIZED DEBTOR**

**THE VALUATION INFORMATION CONTAINED IN THIS SECTION WITH REGARD TO REORGANIZED DEBTOR IS NOT A PREDICTION OR GUARANTEE OF THE FUTURE PRICE OF REORGANIZED DEBTOR OR THE NEW COMMON STOCK; SUCH PRICES ARE SUBJECT TO MANY UNFORESEEABLE CIRCUMSTANCES AND THEREFORE CANNOT BE ACCURATELY PREDICTED.**

**A.**    **Overview**

The Debtor has been advised by Lazard Freres & Co. LLC ("Lazard"), with respect to the consolidated enterprise value of the Reorganized Debtor on a going-concern basis. Lazard has undertaken this valuation analysis for the purpose of determining value available for Distribution to creditors and interest holders pursuant to the Plan and to analyze the relative recoveries to creditors and interest holders there under. The estimated total value available for Distribution to creditors and interest holders is comprised of three primary components: (i) an estimated value of the Reorganized Debtor's utility operations on a going concern basis ("Enterprise Value"); (ii) the value of certain expected net operating loss carry forwards ("NOLs") of the Reorganized Debtor; plus (iii) cash available for Distribution to creditors in excess of the Reorganized Debtor's minimum operating cash requirements ("Distributable Cash").

Based in part on information provided by the Debtor, Lazard has concluded that the Enterprise Value of the Reorganized Debtor including the value of its NOLs ranges from $1.415 billion to $1.585 billion, with a midpoint value of $1.500 billion as of an assumed Effective Date of the Plan of September 30, 2004. With assumed pro forma secured debt and capital leases upon emergence from Chapter 11 of approximately $790 million reflecting the application of an estimated $145 million of Distributable Cash to settle certain claims and reduce secured debt, Lazard estimates the range of equity values ("Equity Values") for the Reorganized Debtor between $625 million and $795 million, with a midpoint Equity Value of $710 million. Assuming 35.5 million shares of New Common Stock are distributed pursuant to the Plan, the Equity Value ranges between $17.61 and $22.39 per share with a mid-point estimate of $20.00 per share. These values do not give effect to the potentially dilutive impact of any shares issued (a) upon exercise of the Warrants and (b) under the New Incentive Plan. Lazard's estimate of Enterprise Value does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

**A867**

THE ASSUMED ENTERPRISE VALUE RANGE, AS OF THE ASSUMED EFFECTIVE DATE OF SEPTEMBER 30, 2004, REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD AS OF MAY 10, 2004. ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, LAZARD DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS ESTIMATE.

With respect to the financial projections prepared by the management of the Debtor and included as Exhibit I to this Disclosure Statement, Lazard assumed that such financial projections were reasonably prepared in good faith and on a basis reflecting the Debtor's most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtor. Lazard's Enterprise Value range assumes the Reorganized Debtor will achieve its operating projections in all material respects, including improvements in operating margins, earnings and cash flow. The Reorganized Debtor's forecasted financial performance is better than the recent financial performance of the Debtor. As a result, if the business performs at levels below those set forth in the financial projections, such performance may have a material impact on Enterprise Value.

In estimating the Enterprise Value and Equity Value of the Reorganized Debtor, Lazard: (i) reviewed certain historical financial information of the Debtor for recent years and interim periods; (ii) reviewed certain internal financial and operating data of the Debtor, including the financial projections as described in this Disclosure Statement, which data was prepared and provided to Lazard by the management of the Debtor and which relate to the Reorganized Debtor's business and its prospects; (iii) met with certain members of senior management to discuss the Debtor's operations and future prospects; (iv) reviewed publicly available financial data and considered the market value of public companies that Lazard deemed generally comparable to the operating business of the Debtor; (v) considered precedent transactions in the industry; (vi) considered certain economic and industry information relevant to the operating business; and (vii) conducted such other studies, analysis, inquiries, and investigations as it deemed appropriate. Although Lazard conducted a review and analysis of the Debtor's business, operating assets and liabilities and the Reorganized Debtor's business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtor, as well as publicly available information.

In addition, Lazard did not independently verify management's projections in connection with preparing estimates of Enterprise Value, and no independent valuations or appraisals of the Debtor were sought or obtained in connection herewith. Such valuation estimates were developed solely for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to creditors there under.

Such valuation estimates reflect the application of various valuation techniques and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated Enterprise Value range of the Reorganized Debtor

set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Debtor, Lazard, nor any other person assumes responsibility for their accuracy. In addition, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things, the operating performance of the Debtor, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by pre-petition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis, and other factors which generally influence the prices of securities.

## B.    **Valuation Methodology**

The following is a brief summary of certain financial analyses performed by Lazard to arrive at its estimated range of Enterprise Values for the Reorganized Debtor. Lazard performed certain procedures, including each of the financial analyses described below, and reviewed the assumptions with the management of the Debtor on which such analyses were based. Lazard's valuation analysis must be considered as a whole and selecting just one methodology or portions of the analysis could create a misleading or incomplete conclusion as to Enterprise Value. In determining the Reorganized Debtor's Enterprise Value range, Lazard allotted equal weighting to the valuation ranges derived from each of the valuation techniques employed.

Under the valuation methodologies summarized below, Lazard derived a range of Enterprise Values for the Reorganized Debtor assuming the Reorganized Debtor was a full taxpayer. Lazard separately valued the Debtor's NOLs and added this value to the valuation range for the utility. In addition, Lazard separately valued the Reorganized Debtor's lease interest in Colstrip Unit 4, a 750 megawatt gross-capacity coal-fired power plant located in southeastern Montana and added this value to the valuation range for the utility. Finally, under all valuation approaches, the losses related to the Debtor's qualified facility contracts are excluded and as such the present value of these losses is subtracted from the derived Enterprise Values under the various valuation methodologies.

### (1)    **Comparable Company Analysis**

Comparable company analysis estimates the value of a company based on the implied valuations of other similar companies that are publicly traded. Under this methodology, the Enterprise Values for the selected public companies are typically expressed as multiples of earnings. The analysis also includes a multi-year financial comparison of each company's performance, profitability, operating margins, leverage and business trends are examined. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation statistics as compared to the Reorganized Debtor. The primary valuation metrics applied in this analysis include Enterprise Value to earnings before interest, taxes and depreciation and amortization ("EBITDA"), Enterprise Value to earnings before interest and taxes ("EBIT") and Equity Value to net income (price earnings ratio).

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Reorganized Debtor. Criteria for selecting

comparable companies for the analysis include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, maturity of businesses, location, market presence, size, scale of operations, and regulatory environments.    The selection of truly comparable companies is often difficult and subject to limitations due to sample size and the availability of meaningful market-based information.    However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value.

Lazard selected the following publicly traded companies (collectively, the "Peer Group") deemed generally comparable to the Reorganized Debtor in one or more of the factors described above: Black Hills Corp., Consolidated Edison Inc., Duquesne Light Holdings Inc, Energy East Corp., Northeast Utilities, Inc., Nstar Inc., Pepco Holdings Inc. and Puget Energy Inc.

Lazard calculated Enterprise Value to EBITDA and EBIT multiples by dividing the Enterprise Value of each comparable company by its estimated 2004 EBITDA and EBIT as provided in market research.  Lazard also prepared and considered price to earnings ratios for the Peer Group.

Lazard concluded that it was appropriate to apply a discount to the Peer Group valuation multiples when valuing the Reorganized Debtor to reflect a number of risk factors unique to the Reorganized Debtor.  First, the Debtor serves a market that has historically and is expected prospectively to experience low growth in energy consumption.  In fact, from 1999 through projected 2004, retail gas and electric consumption growth in the markets that the Debtor serves has averaged approximately 1.0% per annum. In addition, the Debtor operates in a challenging regulatory environment that negatively impacts the Reorganized Debtor's valuation. For instance, in 2003, the MPSC denied the Debtor's request to pass through certain gas supply costs on a retrospective basis which reduced the Debtor's EBITDA by approximately $6 million. The Reorganized Debtor remains subject to the risk of retrospective review and disallowance of "pass through" energy supply costs by the MPSC during the Projection Period given the Company's role as the default supplier of energy in Montana.  In addition, rating agencies in their initial evaluation of the potential credit rating of the Reorganized Debtor have highlighted the Debtor's difficult relationship with the MPSC as a primary business risk in the Reorganized Debtor's ability to meet its projected earnings targets. Finally, the Reorganized Debtor will have a much smaller market capitalization relative to its Peer Group upon emergence from bankruptcy which will impact its valuation relative to its larger, better-capitalized peers.

Lazard selected Enterprise Value to EBITDA multiples ranging from 6.5x to 7.5x with a mid-point multiple of 7.0x and EBIT multiples ranging from 9.5x to 10.5x with a mid-point multiple of 10.0x.  Finally, Lazard utilized price to earnings ratios ranging from 12.0x to 13.0x, with a mid-point multiple of 12.5x.  The mid-point multiples reflect a discount of approximately 10% to the average multiples observed for the Peer Group to account for the risk factors discussed above.

These multiples were then applied to the Debtor's normalized projected 2004 EBITDA, EBIT, and net income to determine a range of Enterprise Values.  To calculate "normalized" EBITDA, EBIT, and net income, Lazard adjusted the Debtor's projected 2004

results by several factors including non-recurring expenses, restructuring fees, accelerated pension funding requirements, and other non-recurring charges. As highlighted previously, the normalized earnings numbers also exclude losses related to the out-of-market portion of qualified facility contracts and as such the present value of these out-of-market liabilities is subtracted from the Enterprise Values derived under this approach. The following table shows the derivation of normalized EBITDA, EBIT and net income from forecasted 2004 EBITDA.

### 2004E Normalized EBITDA and EBIT

| | |
|---|---:|
| Business Plan EBITDAR [a] | $207.1 |
| *Less*: Transition Bond Interest Expense [b] | (2.7) |
| *Plus*: Adjustment for pension expense [c] | 1.4 |
| *Plus*: Adjustment to reflect run-rate G&A expense [d] | 9.3 |
| *Less*: 2004E Colstrip 4 EBITDA contribution [e] | (3.8) |
| Normalized 2004 EBITDA | $211.3 |
| | |
| *Less*: D&A | (72.8) |
| Normalized 2004 EBIT | $138.4 |

(a) EBITDA before all restructuring and professional fees.
(b) To reflect that recovery for transition bonds is in EBITDA but not corresponding expense.
(c) To normalize pension expense for higher near term funding.
(d) Estimated 2006 G&A used as proxy for run-rate G&A expense to reflect non-recurring expenses budgeted in 2004.
(e) Excluded EBTIDA contribution of Colstrip 4 and valued the long-term contract separately due to the improving economics of the contract not captured in the Projection period. Lazard derived a $35.0 million value, which was incorporated in the determination of Enterprise Value.

### 2004E Normalized Net Income

| | |
|---|---:|
| EBITDA [a] | $214.0 |
| *Plus*: Other Income | 2.1 |
| *Less*: D&A | (72.8) |
| *Less*: Interest Expense [b] | (51.4) |
| *Less*: Non-cash Interest Expense [c] | (2.4) |
| *Less*: Tax Provision @ 38.5% | (34.5) |
| Normalized 2004 Net Income | $55.1 |

(a) Normalized EBITDA excludes transition bond adjustment since offsetting expense is included in interest expense figure.
(b) Based on pro forma debt of $790 million and 6.5% interest rate.
(c) Reflects amortization of financing costs.

An additional adjustment was made to the resulting enterprise value derived under this approach to incorporate additional cash flow resulting from expected working capital improvements in 2005 and 2006 due to reduced cash deposit and restricted cash requirements. The present value of the cash flows in these years is estimated to be $25.0 million as of the assumed Effective Date.

The Comparable Company Analysis valuation methodology yielded an Enterprise Valuation range of $1.400 to $1.550 billion with a mid-point of value $1.475 billion.

### (2)    Precedent Transactions Analysis

Precedent transactions analysis estimates the value of a company based on the implied valuations of merger and acquisition transactions in the target company's industry. Valuation multiples for these transactions are calculated based on the purchase price (including any debt assumed where appropriate) paid for the acquired company as a multiple of EBITDA, EBIT, and net income.

Lazard evaluated various merger and acquisition transactions that have occurred in the utility industry between 1998 and 2003 and focused where possible on transactions involving utilities with significant energy transmission and distribution operations in their business mix. Similar to the comparable company analysis, Lazard applied a discount to the observed precedent transaction valuation multiples in consideration of: (i) the Debtor's relatively low growth profile given the market it serves; (ii) the challenging regulatory environment in which the Debtor operates, and (iii) its relatively small market capitalization as more fully described previously.

Based on this approach, Lazard derived an Enterprise Value to 2004 EBITDA multiple range of 6.25x to 7.25x, with a mid-point of 6.75x. Similarly, Lazard assumed an Enterprise Value to 2004 EBIT multiples range from 10.0x to 11.0x, with a mid-point of 10.5x. Lastly, Lazard assumed price to earnings multiples ranging from 13.5x to 14.5x, with a midpoint of 14.0x. The mid-point multiples reflect a discount of approximately 10% to the average multiples observed for the precedent transactions analysis.

These multiples were then applied to the Debtor's normalized projected 2004 EBITDA, EBIT, and net income as shown except for adjustments for transition bond interest expense to determine a range of Enterprise Values. Similar to the Comparable Company Analysis, Lazard made the same working capital adjustment of $25.0 million to the Enterprise Value range derived under this approach. The Precedent Transaction Analysis valuation methodology yielded an Enterprise Valuation range of $1.450 to $1.600 billion with a mid-point value of $1.525 billion.

### (3)    Discounted Cash Flow Analysis

The discounted cash flow ("DCF") methodology values a business by determining the current value of the estimated future cash flows to be generated by that business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated blended rate of return debt and equity investors would require to invest in the business based on its capital structure. The value of the firm is determined by calculating the present value of the Reorganized Debtor's

un-levered after-tax free cash flows provided in the Debtor's business plan (five-year projection) plus a proxy for the value of the firm beyond the projection period known as the terminal value. The terminal value is derived by applying a multiple to the Debtor's projected EBITDA in the year following the Projection Period.

To estimate the Discount Rate, Lazard estimated the cost of equity and the after-tax cost of debt for the Reorganized Debtor, assuming a capital structure comprised of approximately 55% debt and 45% equity. The cost of equity was estimated based on the Capital Asset Pricing Model, which assumes that the required equity return is a function of the risk-free cost of capital and the correlation ("Beta") of a publicly traded stock's performance to the return on the broader market. To estimate the cost of debt, Lazard considered a number of factors including the likely credit rating associated with the Reorganized Debtor's post-emergence debt, the expected terms of such debt, and the effective yield for publicly traded debt securities for comparable companies with comparable debt ratings in the industry.

Though formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments. With respect to the Reorganized Debtor, Lazard considered: (i) its relatively low growth profile given the market it serves; (ii) the challenging regulatory environment in which it operates; and (iii) its relatively small market capitalization as more fully described previously. Given these considerations, Lazard's DCF valuation was based upon a range of Discount Rates between 6.5% and 7.5%, with a mid-point of 7.0% and an EBITDA multiple range used to derive a terminal value of 6.25x to 7.25x, with a mid-point of 6.75x . The EBITDA multiple reflects the mid-point multiple derived from the precedent transaction analysis net of a 10% discount to reflect the risk factors discussed herein.

In applying the above methodology, Lazard utilized management's financial projections for the fourth quarter of 2004 through December 31, 2008 to derive un-levered after-tax cash flows. Free cash flow includes sources and uses of cash not reflected in the income statement, such as changes in working capital and capital expenditures. For purposes of the DCF, the Reorganized Debtor is assumed to be a full taxpayer and the value of its NOLs is calculated separately. The Reorganized Debtor's unlevered after-tax cash flows along with the terminal value are discounted back to the Effective Date using the range of Discount Rates described above to arrive at a range of Enterprise Values. The resulting Enterprise Valuation range using the DCF methodology is $1.575 billion to $1.750 billion with a mid-point value of $1.663 billion.

### (4)   Distributable Cash

When calculating expected recoveries pursuant to the Plan, Lazard added Distributable Cash to Enterprise Value to derive the total distributable value available to satisfy Claims ("Total Distributable Value"). Pro forma Distributable Cash as of the Effective Date is estimated at approximately $145.0 million. Distributable Cash includes excess cash from operations and estimated proceeds from the sale of non-core assets. Excess cash from operations reflects the Debtor's projected unrestricted cash balance as of September 30, 2004 of

**A873**

approximately $81 million plus an estimated $97 million in asset sale proceeds[70] less approximately $35 million of minimum cash to be retained by the Reorganized Debtor as a liquidity cushion.

The following table details the latest estimate of the timing and dollar value of asset sale proceeds.

| ($ in millions) | Q4 2004 | Q1 2005 | Total |
|---|---|---|---|
| NetExit | - | $40.0 | $40.0 |
| Blue Dot | $15.0 | - | 15.0 |
| MFM | 30.0 | - | 30.0 |
| Cornerstone Note Receivable | - | 15.0 | 15.0 |
| Total | $45.0 | $55.0 | $100.0 |

Under the Plan, Distributable Cash is used to satisfy certain claims and reduce secured debt.

### (5)    Net Operating Losses

The Reorganized Debtor is expected to have approximately $655 million of NOLs prior to emergence from bankruptcy which will be reduced by an estimated $460 million of cancellation-of-debt (COD) income generated by the extinguishment of Unsecured Notes and Subordinated Notes. The resulting NOL balance of $195 million should significantly reduce the Reorganized Debtor's current tax liability over the Projection Period. Lazard valued the NOLs by calculating the present value of the tax savings provided relative to the taxes the Reorganized Debtor would otherwise pay absent application of such NOLs. These cash flows are discounted at the Reorganized Debtor's estimated cost of equity of 10.25%. Based on this approach, Lazard arrived at a valuation of the Reorganized Debtor's NOLs of approximately $45.0 million.

The summary set forth above does not purport to be a complete description of the analyses performed by Lazard. The preparation of an estimate involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily suitable to summary description. In performing its analyses, Lazard and the Debtor made numerous assumptions with respect to industry performance, business and economic conditions and other matters. The analyses performed by Lazard are not necessarily indicative of actual values or future results, which may be significantly more or less favorable than suggested by such analyses.

---

[70]    In order to determine the cash available for distribution as of the assumed Effective Date of the Plan of Reorganization, Lazard has calculated the present value of the estimated asset sale proceeds as of September 30, 2004 using the Reorganized Debtor's Discount Rate of 7%.

**A874**

AS A RESULT, THE ESTIMATE OF THE RANGE OF THE ENTERPRISE VALUE OF REORGANIZED DEBTOR'S BUSINESS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATE IS INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER REORGANIZED DEBTOR, LAZARD, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR ITS ACCURACY. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES SUCH AS THE REORGANIZED DEBTOR'S NEW COMMON STOCK IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.[71]

Many of the analytical assumptions upon which these valuations are based are beyond the Debtor's control, and accordingly, there will be variations between such assumptions and the actual results. These variations may be material and thus the New Common Stock is likely to trade at levels that differ from any values indicated by this analysis. In the event that the estimated values of Reorganized Debtor are different from its actual value after the Effective Date, actual recoveries realized by one or more of the classes of creditors may be significantly higher or lower than estimated in the Disclosure Statement. Actual market prices of such securities at issuance will depend upon, among other things, prevailing interest rates, conditions in the financial markets, the anticipated initial securities holdings of pre-petition creditors, some of which may prefer to liquidate their investment rather than hold it on a long-term basis, and the factors that generally influence the prices of securities.

The valuation of the Reorganized Debtor presented in this Section VII is disputed by Wilmington Trust, Harbert and, as previously noted, certain of the Debtor's existing common equity holders. Each of the aforementioned assert that there is value in the Reorganized Debtor which would result in 100% recovery on account of all creditor claims including the claims of holders of the TOPRs Notes and the QUIPS and provide some distribution to the Debtor's current shareholders. The Debtor strongly disputes the valuation assertions presented by Wilmington Trust, Harbert and certain of the Debtor's common equity holders, and believes the valuation presented herein and the methodologies employed to derive such estimate of value are correct.

## ARTICLE VIII
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan to holders of the Class 7, Class 8 and Class 9 Unsecured Claims (referred to in this

---

[71] The Debtor has used generally accepted accounting principles and relied on specific financial accounting standards in presenting the financial projections set forth in Exhibit I to the Disclosure Statement. The regulatory accounting conventions that may determine the Debtor's future revenues may not ascribe value to certain presentations of the Debtor's projected future financial condition. Therefore, the presentation of the Debtor's assets as related to post reorganization goodwill determined in accordance with Statement of Financial Accounting Standard No 142 and AICPA Statement of Position 90-7 may differ from the rate regulatory treatment that may be afforded the Debtor by regulatory authorities, in particular, the MPSC.

**A875**

section as the "Class 7, 8 and 9 Claims"), Class 10 Unsecured Convenience Claims ("Class 10 Claims"), Class 12 D&O Trust Claims ("Class 12 Claims"), and Class 15 Opt-Out Securities Claims ("Class 15 Claims") (collectively referred to as the "Class 7, 8, 9, 10, 12 and 15 Claims") and to the Debtor and Reorganized Debtor. This summary is based on the Internal Revenue Code of 1986, as amended ("Tax Code"), existing and proposed Treasury Regulations issued thereunder, and administrative and judicial interpretations all as in effect on the date hereof and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas and various factual determinations, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, Debtor and Reorganized Debtor do not intend to seek a ruling from the IRS as to any of such tax consequences other than a private letter ruling regarding the D&O Trust as described above in IV.I(2), and there can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below. The summary below shall not constitute nor be construed as an admission of any fact or liability.

This summary does not apply to holders of Class 7, 8, 9, 10, 12 and 15 Claims that are not United States persons (as defined in the Tax Code) or that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, investors in pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, regulated investment companies, and holders who hold Class 7, 8, 9, 10, 12 and 15 Claims as part of a hedge, straddle, constructive sale, or conversion transaction). The following discussion assumes that all holders of Class 7, 8, 9, 10, 12 and 15 Claims discussed herein hold such Class 7, 8, 9, 10, 12 and 15 Claims as "capital assets" within the meaning of Section 1221 of the Tax Code. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to Debtor and to holders of Class 7, 8, 9, 10, 12 and 15 Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under state, local, and/or foreign tax law. Accordingly, there may be material foreign, state or local tax consequences to special classes of taxpayers, in each case, not discussed herein.

THE FOLLOWING SUMMARY IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED ON THE PARTICULAR CIRCUMSTANCES OF EACH HOLDER OF CLASS 7, 8, 9, 10, 12 and 15 CLAIMS. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL INCOME TAX CONSEQUENCES, AS WELL AS ANY APPLICABLE STATE, LOCAL, AND/OR FOREIGN TAX CONSEQUENCE, OF THE PLAN.

A.    Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Class 7, 8 and 9 Claims

Pursuant to the Plan, each holder of a Class 7, 8 and 9 Claim shall receive on the Effective Date, on account of such Class 7, 8 and 9 Claim, shares of New Common Stock (subject to dilution as set forth in the Plan), subject to the terms and conditions set forth in Section IV.C above.

A876

The U.S. federal income tax consequences to a holder of Class 7, 8 and 9 Claims of the respective transactions described above will depend on: (a) whether the debt instruments constituting the surrendered Class 7, 8 and 9 Claims are treated as "securities;" (b) the manner in which the holder acquired such debt instruments; (c) the length of time such debt instruments have been held by the holder; (d) whether such debt instruments were acquired at a discount; (e) whether the holder had previously included in gross income any accrued but unpaid interest with respect to such debt instruments; (f) whether the holder had previously claimed a bad debt deduction with respect to such debt instrument; and (g) the holder's method of tax accounting.

    (1)    <u>Treatment of a Debt Instrument as a "Security"</u>. Whether an instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued.

    (2)    <u>Treatment if Debt Instrument is a Security</u>. If debt instruments constituting surrendered Class 7, 8 and 9 Claims are treated as securities, the exchange of a holder's Class 7, 8 and 9 Claims for New Common Stock, should be treated as a recapitalization under the Tax Code. In such case, a holder should not recognize either gain or loss in exchange for New Common Stock pursuant to the Plan, except as described below with respect to amounts treated as accrued interest. A holder should obtain an aggregate tax basis in the New Common Stock equal to the tax basis of the debt instrument constituting the Class 7, 8 and 9 Claim surrendered therefor, and should have a holding period for the New Common Stock that includes the holding period for the debt instrument constituting the surrendered Class 7, 8 and 9 Claim; provided that the aggregate tax basis of any New Common Stock treated as received in satisfaction of accrued interest should equal the amount of such accrued interest, and the holding period for such New Common Stock should not include the holding period of the debt instrument constituting the surrendered Class 7, 8 and 9 Claim.

    (3)    <u>Treatment if Debt Instrument is not a Security</u>. If a debt instrument constituting a surrendered Class 7, 8 and 9 Claim is not treated as a security, a holder of such a Claim should be treated as exchanging its Class 7, 8 and 9 Claim for New Common Stock, in a fully taxable exchange. A holder of a Class 7, 8 and 9 Claim who is subject to fully taxable exchange treatment should recognize gain or loss equal to the difference between: (i) the fair market value as of the Effective Date of the New Common Stock received as of the Effective Date that is not allocable to accrued interest; and (ii) the holder's adjusted basis in the debt instrument constituting the surrendered Class 7, 8 and 9 Claim. Such gain or loss should be capital in nature (subject to the "market discount" rules and accrued interest described below) and should be long-term capital gain or loss if the debt instruments constituting the surrendered Class 7, 8 and 9 Claims were held for more than one year.

(4)    <u>Accrued Interest</u>. To the extent that a portion of the New Common Stock received in the exchange is received in discharge for a claim for interest accrued during the period the holder owned such debt instrument constituting a surrendered Class 7, 8 and 9 Claim, the holder will be required to recognize ordinary income equal to the fair market value as of the Effective Date of the New Common Stock received in respect of such claim. Conversely, if the exchange is a taxable exchange, a holder of a surrendered Class 7, 8 and 9 Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest claimed was previously included in the holder's gross income but was not paid in full by Debtor. Such loss may be ordinary, but the tax law is unclear on this point. A holder's tax basis in the New Common Stock received should equal the fair market value of the New Common Stock as of the Effective Date. A holder's holding period for the New Common Stock should begin on the day following the Effective Date.

The extent to which the consideration received by a holder of a surrendered Class 7, 8 and 9 Claim will be attributable to accrued interest on the debts constituting the surrendered Class 7, 8 and 9 Claim is unclear. Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. If, however, an allocation is reflected in the plan of reorganization, the Report of the House Ways and Means Committee on the Bankruptcy Tax Act of 1980 indicates that both the debtor and creditor must utilize such allocation. However, the IRS could take the view that consideration received pursuant to a plan of reorganization must be allocated proportionately between the portion of a claim representing principal and the portion of the claim representing interest. Pursuant to the Plan, all Distributions in respect of any Claim will be allocated first to the principal amount of such Claim, to the extent otherwise permitted and as determined for federal income tax purposes, and thereafter to the remaining portion of such Claim, if any.

(5)    <u>Market Discount</u>. Under the "market discount" provisions of Sections 1276 through 1278 of the Tax Code, some or all of the gain recognized, if any, by a holder exchanging the debt instruments constituting its Class 7, 8 and 9 Claim for New Common Stock may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debts constituting the surrendered Class 7, 8 and 9 Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with OID, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a holder on the taxable disposition of debt instruments constituting the surrendered Class 7, 8 and 9 Claim (determined as described above) that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the holder (unless the holder elected to include market discount in income as it accrued). To the extent that the debt instruments constituting the surrendered Class 7, 8 and 9 Claim that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for New

Common Stock (as may occur here), any gain recognized on the subsequent sale, exchange, redemption or other disposition of such New Common Stock may thereby be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument constituting the surrendered Class 7, 8 and 9 Claim.

**B.    Certain U.S. Federal Income Tax Consequences of the Plan to Certain Holders of Class 9 Claims and Class 10 Claims that Receive Cash.**

Pursuant to the Plan, holders of the Class 9 Unsecured Claims that are $20,000 or less and that elect to participate in Class 10 Claims and Class 10 Claims (the "Class 9 and 10 Claims") may receive cash on the Effective Date, on account of such Class 9 and 10 Claims. In such case, the holders of such Class 9 and 10 Claims will recognize gain or loss to the extent of the differences between such holder's basis in its Class 9 and 10 Claims and the amount of cash received. Such gain or loss will be ordinary in nature to the extent that the Claim arose in the ordinary course of a trade or business for services rendered or from the sale of inventory to the Debtor. Otherwise, such gain or loss should be capital in nature, and (subject to the rules relating to accrued interest and market discount described above in "Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Class 7, 8 and 9 Claims") should be long term capital gain or loss if the Class 9 and 10 Claims were held for more than one year.

**C.    Certain U.S. Federal Income Tax Consequences of the Plan to the Holders of Class 12 Claims and Class 15 Claims**

The Holders of Class 12 Claims and Class 15 Claims that receive cash from the D&O Trust Fund in exchange for such Claim should recognize gain or loss on the exchange equal to the difference between the amount of cash received over their tax basis in such Claim, if any. Such gain or loss should be ordinary to the extent that the Claim arose from the ordinary course of a trade or business for services rendered or from the sale of inventory to the Debtor.

**D.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtor**

**(1)    Cancellation of Indebtedness and Reduction of Tax Attributes**

As a result of the Plan, Debtor's aggregate outstanding indebtedness will be substantially reduced. In general, absent an exception, a debtor will recognize cancellation of debt income ("CODI") upon discharge of its outstanding indebtedness for an amount less than its adjusted issue price. The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness discharged, over (b) the sum of the issue price of any new indebtedness of the taxpayer issued, the amount of cash paid and the fair market value of any other consideration (including stock of Debtor) given in exchange for such indebtedness at the time of the exchange.

A debtor is generally not, however, required to include any amount of CODI in gross income if such debtor is under the jurisdiction of a court in a Title 11 bankruptcy proceeding and the discharge of debt occurs pursuant to that proceeding. Instead, the debtor must reduce its tax attributes by the amount of CODI which would have been included in gross income. As a general rule, tax attributes will be reduced in the following order until CODI is exhausted: (a) net operating losses ("NOLs"), (b) general business credits, (c) alternate minimum

tax credits, (d) capital losses, (e) its tax basis in assets (but not below the amount of liabilities to which the debtor remains subject), and (f) foreign tax credits. A debtor with CODI may elect first to reduce the basis of its depreciable assets under Section 108(b)(5) of the Tax Code. Losses (and tax credits) are reduced only after the debtor's tax liability for the current year is determined (with, in each case, current-year losses being reduced before any carryforwards from prior years), and its tax basis is reduced as of the first day of the succeeding year. A debtor's tax basis in its assets will not be reduced below the amount of its liabilities (as defined) outstanding immediately after the CODI is recognized. Any CODI remaining after exhausting available tax attributes is simply eliminated.

The amount of CODI (and accordingly the amount of tax attributes required to be reduced), will depend, among other things, on the issue prices of the debt instruments issued under the Plan, and on the fair market value of the New Common Stock to be issued. These values cannot be known with certainty until after the Effective Date. Thus, although it is expected that a reduction of tax attributes will be required, the exact amount of such reduction cannot be predicted.

Pursuant to temporary regulations issued by the United Stated Treasury Department in August 2003, any required reduction in tax attributes of a member of a consolidated group applies first to any tax attributes attributable to the debtor realizing the CODI at issue. To the extent the debtor reduces its tax basis in the stock of another member of the consolidated group, such other member is required to reduce its tax attributes by an equivalent amount. In addition, if the amount of CODI exceeds the tax attributes subject to reduction attributable to such debtor, the regulations require the reduction of consolidated tax attributes (other than tax basis in assets) attributable to other members of the debtor's consolidated group.

### (2)    Limitation of Net Operating Loss Carryovers and Other Tax Attributes

Section 382 of the Tax Code generally imposes an annual limitation on a corporation's use of its NOLs (and may limit a corporation's use of certain built-in losses and deductions recognized within a five-year period following an ownership change) that may be used to offset future taxable income if a corporation undergoes an "ownership change." This discussion describes the limitation determined under Section 382 of the Tax Code in the case of an "ownership change" as the "Section 382 Limitation". The annual Section 382 Limitation on the use of pre-change losses (the NOLs and built-in losses recognized within the five year post-ownership change period) in any "post change year" is generally equal to the product of the fair market value of the loss corporation's outstanding stock immediately before the ownership change with certain adjustments multiplied by the long term tax-exempt rate in effect for the month in which the ownership change occurs. The long-term tax-exempt rate is published monthly by the IRS and is intended to reflect current interest rates on long-term tax-exempt debt obligations. Section 383 of the Tax Code applies a similar limitation to capital loss carryforward and tax credits. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

In general, an ownership change occurs when the percentage of the corporation's stock owned by certain "5 percent shareholders" increases by more than 50 percentage points in the aggregate over the lowest percentage owned by them at any time during the applicable "testing period" (generally, the shorter of (a) the 36-month period preceding the testing date or

**A880**

(b) the period of time since the most recent ownership change of the corporation). A "5 percent shareholder" for this purpose includes, generally, an individual or entity that directly or indirectly owns 5 percent or more of a corporation's stock during the relevant period and one or more groups of shareholders that own less than 5 percent of the value of the corporation's stock. Under applicable Treasury Regulations, an ownership change with respect to an affiliated group of corporations filing a consolidated return that have consolidated NOLs is generally measured by changes in stock ownership of the parent corporation of the group.

The issuance under the Plan of New Common Stock, along with the cancellation of existing Equity Interests in Debtor through the Plan, is expected to cause an ownership change to occur with respect to Debtor's consolidated group on the Effective Date. As a result, the Section 382 Limitation will be applicable to the utilization by Debtor's consolidated group of their NOLs and built-in losses following the Effective Date. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of CODI. Similarly, the ability of Debtor's consolidated group to use any remaining capital loss carryforwards and tax credits will also be limited.

Section 382(l)(5) of the Tax Code provides a special rule applicable in the case of a bankruptcy reorganization (the "Section 382(l)(5) Rule"). If a corporation qualifies for the Section 382(l)(5) Rule, the annual Section 382 Limitation will not apply to the corporation's NOL on account of an ownership change occurring as a result of the bankruptcy reorganization. The Section 382(l)(5) Rule does, however, require that the corporation's NOL and credit carryovers be computed without taking into account the aggregate amount of all interest deductions in respect of debt exchanged for the corporation's stock during the three prior taxable years and the portion of the current taxable year ending on the date of the ownership change (such interest hereinafter called "Disqualified Interest"). The corporation will qualify under the Section 382(l)(5) Rule if the corporation's pre-bankruptcy historic shareholders and holders of certain debt ("Qualifying Debt") own at least 50% of the total voting power and value of the stock of the corporation after the bankruptcy reorganization, and the corporation does not elect not to apply the Section 382(l)(5) Rule. Qualifying Debt is a claim which (i) was held by the same creditor for at least 18 months prior to the bankruptcy filing or (ii) arose in the ordinary course of a corporation's trade or business and has been owned, at all times, by the same creditor. Indebtedness will be treated as arising in the ordinary course of a corporation's trade or business if such indebtedness is incurred by the corporation in connection with the normal, usual or customary conduct of the corporation's business. For the purpose of determining whether a claim constitutes Qualifying Debt, special rules may in some cases apply to treat a subsequent transferee as the transferor creditor.

If the exchanges contemplated by the Plan qualify for tax treatment under the Section 382(l)(5) Rule, Debtor's NOL carryover will be available for future use without any Section 382 Limitation (after reduction of Debtor's NOLs by Disqualified Interest). However, under the Section 382(l)(5) Rule, if there is a second ownership change during the two-year period immediately following consummation of the Plan, the Section 382 Limitation after the second ownership change shall be zero. The determination of the application of the Section 382(l)(5) Rule is highly fact specific and dependent on circumstances that are difficult to assess accurately, and thus, Debtor is uncertain whether it will qualify for the Section 382(l)(5) Rule. If

**A881**

the Debtor does qualify for the Section 382(l)(5) Rule, the Debtor is uncertain whether it will elect out of the Section 382(l)(5) Rule.

If the exchanges do not qualify for tax treatment under the Section 382(l)(5) Rule or Debtor elects not to utilize the Section 382(l)(5) Rule, Debtor's use of NOLs to offset taxable income earned after an ownership change will be subject to the annual Section 382 Limitation. Since Debtor is in bankruptcy, however, Section 382(l)(6) of the Tax Code will apply. Section 382(l)(6) of the Tax Code provides that, in the case of an ownership change resulting from a bankruptcy proceeding of a debtor, the value of the debtor's stock for the purpose of computing the Section 382 Limitation will generally be calculated by reference to the net equity value of debtor's stock immediately after the ownership change (rather than immediately before the ownership change, as is the case under the general rule for non-bankruptcy ownership changes). Accordingly, under this rule the Section 382 Limitation would generally reflect the increase in the value of a debtor's stock resulting from the conversion of debt to equity in the proceeding. Although it is impossible to predict what the net equity value of Debtor will be immediately after the exchanges contemplated by the Plan, Debtor's use of NOLs is expected to be substantially limited after those exchanges.

(3)    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMT, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in 2001 and 2002 which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. Additionally, under Section 56(g)(4)(G) of the Tax Code, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation (determined under Section 382(h) of the Tax Code) immediately before the ownership change. Any AMT a corporation pays will generally be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to AMT.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**A882**

**E.    Backup Withholding and Reporting**

The Debtor will withhold all amounts required by law to be withheld from payments of interest and dividends. Debtor will comply with all applicable reporting requirements of the Tax Code.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

**F.    Deloitte & Touche LLP**

Cornerstone Propane Partners LP have made certain allegations regarding potential conflict of interest with DT's representation of the Debtor. No motion to disqualify has been filed. The Debtor does not believe there is an actual conflict of interest and disqualification of DT is remote. Should DT be disqualified, the Debtor would retain another accounting firm to provide fresh start accounting services and other services currently being provided by DT to the Debtor.

**ARTICLE IX**
**RISK FACTORS**

**A.    Regulated Industry**

The Debtor's and Reorganized Debtor's operations are subject to extensive governmental regulation that could impose significant costs or change rates charged to consumers. Changes in existing regulations, and future deregulation may have a detrimental effect on the business and could increase competition.

The operations of the Debtor and Reorganized Debtor are and will be subject to extensive federal, state and local laws and regulations concerning service areas, tariffs, taxes, issuance of securities, employment, occupational health and safety and other matters.

The Debtor is required to obtain and comply with a wide variety of licenses, permits and other approvals in order to operate its facilities. Reorganized Debtor will be subject to the same requirements. In the course of complying with these requirements, the Debtor and Reorganized Debtor may incur significant costs and the failure to comply with these requirements could result in civil or criminal liability and the imposition of liens or fines. In addition, existing regulations may be revised or reinterpreted, new laws and regulations may be adopted or become applicable to the Debtor and Reorganized Debtor or their facilities and future changes in laws and regulations may have a detrimental on the utility business.

The Debtor's and Reorganized Debtor's utility businesses are and will be regulated by FERC and certain state commissions, such as the Public Service or Utility Commissions of Montana, South Dakota and Nebraska. FERC and the identified commissions are generally vested with the supervision, regulation and control of public utilities pursuant to their respective federal and state laws and grants of authority, whatever they may be, with respect to the Debtor's and the Reorganized Debtor's utility business within a respective state. This supervision, regulation and control of the Debtor's and Reorganized Debtor's utility businesses could result, *inter alia*, in negative adjustments to regulated rates which could have a negative prospective impact on Reorganized Debtor's projected revenue, or in the imposition of other regulatory requirements that could significantly affect the assumptions on which the Plan is predicated.

The United States electric utility and natural gas industries are currently experiencing increasing competitive pressures as a result of consumer demands, technological advances, deregulation, greater availability of natural gas-fire generation and other factors. Competition for various aspects of electric and natural gas services are being introduced throughout the country that will open these markets to new providers of some or all traditional electric utility and natural gas services. Competition is likely to result in the further unbundling of electric utility and natural gas services as has occurred in Montana for electricity and Montana, South Dakota and Nebraska for natural gas. Separate markets may emerge for generation, transmission, distribution, meter reading, billing and other services currently provided by the electric utility and natural gas providers as a bundled service. As a result, significant additional competitors could become active in the generation, transmission and distribution segments of the Debtor and Reorganized Debtor's industry.

Proposals have been introduced in Congress to repeal the PUHCA. To the extent competitive pressures increase and the price and sale of electricity assume more characteristics of commodity business, the economics of domestic independent power generation products may come under increasing pressure.

## B.    PUHCA Compliance

Harbert and Wilmington Trust have in the past asserted that the Debtor failed to comply with PUHCA in that the Debtor's U-1 application with the SEC in February 2002 failed to accurately disclose the Debtor's standing under PUHCA and that, accordingly, the Debtor's claimed exemption from complying with PUHCA was not made in good faith. Harbert and Wilmington Trust also asserted that because the Debtor's claimed exemption from PUHCA was not made in good faith, any debt incurred by the Debtor after the claimed exemption is void. If those assertions were correct, then the priority of claims under the CSFB Financing and the $250 million of 7.875% Senior Notes due 2007 and the $470 million of Senior Notes due 2012 could be questioned.

The Debtor believes that its filing for an exemption from complying with PUHCA was made in good faith and was not challenged either by the SEC or Wilmington Trust during the seventeen (17) months that the application for an exemption was pending. The Debtor further believes that: (i) there is no basis to void in any manner senior debt claims as otherwise asserted by Harbert and Wilmington Trust; (ii) any effort to void the senior debt claims would

**A884**

require an investigation by the SEC into the facts and circumstances surrounding the Debtor's filing of its claim for exemption under PUHCA; (iii) there is no private right of action for voiding the debt claims as asserted by the Harbert and Wilmington Trust; and (iv) PUHCA requires a finding of actual knowledge on the part of senior debt claimants of bad faith to alter the senior debt holders' contractual rights. On April 29, 2004, Harbert and Wilmington Trust filed a motion for relief of automatic stay seeking the right to file a petition with the SEC. Harbert and Wilmington Trust assert that an individual may bring a right of action under PUHCA either before the SEC or in any federal court, and that such proceeding must be resolved prior to confirming the Plan. The Debtor does not believe that there is a private right to assert causes of action under PUHCA. The Debtor and the Creditors' Committee strongly oppose the relief requested in Harbert's and Wilmington Trust's lift stay motions. A hearing on the motion was held on May 17, 2004 and on or about June 16, 2004 entered a memorandum decision denying Harbert's and Wilmington Trust's lift stay motion. If it becomes necessary, the Debtor intends to vigorously defend as to the propriety of its claimed exemption from complying with PUHCA and to vigorously defend the validity and the enforceability with respect to Debt incurred by the Debtor after the date of such filing. The Debtor strongly disputes Harbert's assertion that, if successful, the Debtor's senior debt holders would be impaired.[72]

## C.    Relationship With Montana Public Service Commission and Montana Consumer Counsel

Public utilities, such as the Debtor, benefit from government-set prices that assure the utility a reasonable opportunity to earn a fair return. The regulators, in turn, must ensure that public utilities meet their public service obligations. In so doing, the regulators have the power to supervise, regulate, and control public utilities.

The majority of the Debtor's income flows from Montana assets and Montana retail consumers. The Debtor's five-year business plan projects that the Debtor's Montana Operations will contribute no less than 71 percent of the Debtor's operating income over the period. Accordingly, while three states and four regulatory commissions supervise the Debtor, the MPSC contends it necessarily has a pre-eminent role among the three states. In addition, the results of the Financial Investigation initiated by the MCC, discussed in detail in Section II.D, could have far-reaching implications for the Debtor as it emerges from bankruptcy in the event it is not settled or otherwise resolved as described in Section II.D. hereof.

Montana's default supply customers are primarily residential and small business consumers who do not have the ability to choose a company other than the Debtor as their electric utility. In 2003, more than 303,000 of the Debtor's Montana retail customers fell into this category. The MPSC has an obligation to ensure that these captive customers' interests are protected. On January 20, 2004, the Debtor filed its Electric Default Supply Resource Procurement Plan ("Default Supply Plan") with the MPSC, as required by applicable state law.

---

[72]    The Summary Disclosure Statement outlines a compromise and settlement with Harbert and Wilmington Trust incorporated in the Plan, as amended. The compromise and settlement, among other things, resolves the issues raised by Harbert and Wilmington Trust regarding the Debtor's compliance with, and claimed exemption from, PUHCA.

**A885**

The MPSC has provided comments on the Default Supply Plan; however, the Debtor can give no assurances as to when or if the Default Supply Plan will be implemented.

In addition, the MPSC asserts that its jurisdiction over the Debtor specifically includes, but it is not limited to, the following:

- The authority to approve or reject the Debtor's issuance of stock pursuant to the Plan;

- The authority to approve or reject the Debtor's plan to incur debt;

- The authority to approve or reject transactions for the sale of public utility assets by the Debtor located in Montana;

- The authority to approve or reject the transfer of an ownership interest in a public utility;

- The authority to determine the Debtor's costs that may be recovered through rates paid by Montana retail consumers;

- The authority to determine the value of the Debtor's assets used and useful for inclusion in Montana rate base; and

- The authority to determine the appropriate, allowable rate of return for the Debtor.

The MPSC asserts that under Montana law the Debtor has a public service obligation to provide adequate service at reasonable rates. Symmetrically, the MPSC asserts that Montana law imposes on the MPSC the duty to assure the Debtor's compliance with its public service obligations in Montana. Utility regulation generally encompasses four main categories: rates, quality of service, corporate structure, and capital structure. The MPSC has statutory authority, it contends, over all four areas as to the Debtor. Post-confirmation, the MPSC maintains that it has the authority to impose a structural framework that protects the Debtor's Montana public utility operations from any non-utility obligations.

The Debtor has disclosed that investments in non-utility businesses—Blue Dot, Expanets, and Cornerstone—created many of the financial problems that led to its bankruptcy. On January 27, 2003, the MPSC, upon the application of the Debtor, entered Order No. 6474a authorizing the Debtor to issue $390 million in First Mortgage Bonds to secure the CSFB Facility debt but conditioning such approval by placing restrictions on the Debtor. For example, the MPSC Order January 27 placed a number of conditions upon the issuance of the securities and recommended that the Debtor pursue its stated goal of "mov[ing] in the direction of a pure energy distribution business." Among the MPSC conditions imposed by Order No. 6474a was a requirement that the Debtor limit the Debtor's investment in and lending to non-utility affiliates, a requirement that the Debtor commit to fully fund utility operations in Montana to maintain safe, adequate, and reliable utility service and, a requirement that the Debtor re-examine its dividend and executive compensation policies.

Faced with a conflict between the Debtor's non-utility business investments and its public service obligations in Montana, the MPSC maintains that it will enforce the public service obligations, even if that enforcement is adverse to the Debtor's financial interests, narrowly defined. The Plan, the MPSC maintains, does not provide for structural protection

commensurate with the potential for conflicts. The Plan instead allows continued investment in non-utility businesses without limit on their magnitude, their risk level, or their dependence on and interaction with the utility. A distinct possibility exists that actual conflicts could lead the MPSC, acting under its state statutory obligations, to take actions adverse to the Debtor's financial interests post-confirmation.

While MPSC approval of the Plan is not a literal condition precedent to confirmation of the Plan, MPSC contends that at least three key elements of the Plan cannot go into effect without explicit MPSC approval, including: (a) issuance of new stock, (b) the organized Debtor's assumption of the Debtor's remaining debt; and (c) the creation of liens on utility assets in Montana. Without explicit MPSC approval for these Plan elements, even if the Plan is confirmed over the MPSC's objections, the MPSC contends that the Debtor will be unable to implement its Plan once it emerges from bankruptcy. The practical effect of the Debtor's status as a regulated public utility, the MPSC believes, is that the Plan cannot be successful if it does not address the MPSC's concerns. The Debtor strongly disagrees with the MPSC's contentions and believes the terms and provisions of the Bankruptcy Code preempt the MPSC's position.

The Debtor, the MPSC and the MCC reached an agreement in principle to resolve the MPSC's and the MCC's objections to the Debtor's Disclosure Statement and concerns with respect to the Plan and which resulted in a stipulation of settlement and separate resolution of the Financial Investigation. See Exhibit F-1. The Debtor, the MPSC and the MCC entered into a stipulation and settlement agreement resolves the issues by and among them and which was presented to the Bankruptcy Court by way of a compromise and settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure. See Exhibit F-2. The Bankruptcy Court entered an order approving the stipulation and settlement agreement on or about July 15, 2004. See Exhibit F-3.

The Debtor disagrees with certain of the MPSC's assertions of its jurisdiction over the Debtor, specifically including the assertion that the MPSC must approve the issuance of stock in exchange for debt obligations previously approved by the MPSC, in part, in accordance with the Plan. The litigation which could result over this and other similar confirmation issues could, however, delay either the confirmation or implementation of the Plan.

### D.    Commodity Price and Supply Risks

The Debtor's wholesale costs for electricity and natural gas are recovered through various pass-through mechanisms in each of the states its serves. These cost tracking mechanisms are based on varying prospective or historic averages, so a rapid increase in supply costs would not be immediately reflected in rates.

Also, to the extent not covered by long-term fixed price purchase contracts, the Debtor is exposed to changes in the price and availability of coal because most of its generating capacity is coal-fired. Changes in the cost of coal and changes in the relationship between those costs and the market prices of power may affect its financial results. In addition, natural gas and electricity are commodities; the market price of which can be subject to volatile changes in response to changes in crude oil markets, refinery operations, fuel supply, power plant outages, weather conditions, market supply and prices or other market conditions.

State regulatory authorities set the rates at which the Debtor sells electricity and natural gas, and may modify the costs that the Debtor may pass through cost adjustments. As a result, the Debtor may not be able to immediately pass on to its retail customers rapid increases in energy supply costs, which could negatively impact liquidity.

The Debtor does not own any natural gas reserves and does not own electric generation assets to service its Montana operations. The Debtor owns interests in generation assets that substantially cover its electric supply requirements in South Dakota. As a result, the Debtor is required to procure its entire natural gas supply and all of its Montana electricity supply pursuant to contracts with third party suppliers. In light of this reliance on third party suppliers, the Debtor is exposed to certain risks in the event a third party supplier is unable to satisfy its contractual obligation.

### E.     Seasonal and Quarterly Energy Demand Fluctuations.

The Debtor's electric and gas utility business is seasonal and weather patterns can have a material impact on operating performance. Demand for electricity is often greater in the summer and winter months associated with cooling and heating. Because natural gas is heavily used for residential and commercial heating, the demand for this product depends heavily upon weather patterns throughout the Debtor's market areas, and a significant amount of natural gas revenues are recognized in the first and fourth quarters related to the heating season. Accordingly, the Debtor's operations have historically generated less revenues and income when weather conditions are milder in the winter and cooler in the summer. In the event that the Debtor experiences unusually mild winters or summers in the future, its results of operations and financial condition could be adversely affected. In addition, exceptionally hot summer weather could add significantly to working capital needs to fund higher than normal power purchases to meet customer demand for electricity.

### F.     Dependence on Key Personnel

The Debtor is dependent upon the continued services of certain senior executives and certain key technical and engineering personnel. The Debtor believes that the loss of the services of key individuals could have a material adverse effect on Reorganized Debtor.

### G.     Compliance With Environmental Laws

The Debtor's operations are governed by a variety of federal, state and local environmental, safety and health laws and requirements with regard to the environment, including environmental regulations relating to air and water quality, solid waste disposal and other environmental considerations. Many of these environmental laws and regulations create permit and license requirements and provide for substantial civil and criminal fines which, if imposed, could result in material costs or liabilities. The Debtor regularly monitors its operations to prevent adverse environmental impacts and to assess potential environmental liabilities, but the Debtor cannot predict with certainty the occurrence of a private tort allegation or government claim for damages associated with specific environmental conditions. The Debtor may be required to make significant expenditures in connection with the investigation and remediation of alleged or actual spills, personal injury or property damage claims, and the repair and upgrade of its facilities in order to meet future requirements and obligations under

environmental laws. To the extent that the Debtor's environmental liabilities are greater than its reserves or the Debtor is unsuccessful in recovering anticipated insurance proceeds under relevant policies, its results of operations and financial condition could be adversely affected.

## H.    Projected Financial Information

The Debtor failed to operate profitably for an extended period preceding the Chapter 11 filing. The financial projections annexed as <u>Exhibit I</u> to this Disclosure Statement are dependent upon the successful implementation of the business plan and the validity of the other assumptions contained therein. These projections reflect numerous assumptions, including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Debtor, industry performance, expected market pricing for key products, results of cost savings programs, technical process improvements, certain assumptions with respect to competitors of the Debtor, general business and economic conditions, and other matters, many of which are beyond the control of the Debtor. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual financial results of the Debtor. Although the Debtor believes that the projections are reasonably attainable, variations between the actual financial results and those projected may occur and may be material.

## I.    Lack of Market for Securities Issued Pursuant to the Plan

There is no currently existing market for the New Common Stock and there can be no assurance that an active trading market will develop. There can also be no assurance as to the degree of price volatility in any such particular market. Accordingly, no assurance can be given that a holder of securities issued pursuant to the Plan will be able to sell such securities in the future or as to the price at which any such sale may occur. If such market were to exist, the liquidity of the market for such securities and the prices at which such securities will trade will depend upon many factors, including the number of holders, investor expectations for the Debtor, and other factors beyond the Debtor's control.

## J.    Delay in Distributing Asset Sale Proceeds to Debtor and Adequate Liquidity

The Debtor can give no assurance as to when or if net proceeds received from the sale of Blue Dot's and Expanets' assets may be available for distribution to the Debtor. As of January 31, 2004, Blue Dot was holding approximately $6.0 million in net proceeds received from the sale of its assets. Netexit was holding approximately $67.0 million in net proceeds received from the sale of its assets. Each of Blue Dot and Netexit have direct claims against them being asserted by various creditors and other interest holders. Before any of the asset sales net proceeds can be distributed to the Debtor, either on account of intercompany claims owed by Blue Dot and Netexit, respectively, to the Debtor or by way of distribution on the equity interests in Blue Dot and Netexit ultimately owned by the Debtor, direct claims against Blue Dot and Netexit will have to be resolved.

The Debtor can also give no assurance as to when proceeds may be received by the Debtor concerning the Montana First Megawatts ("MFM") project. The Debtor is attempting to sell the MFM generation project. In an effort to facilitate the timely sale of such project and its ultimate development at its current location in Great Falls, Montana, the Debtor had filed a

**A889**

power sales agreement with FERC on August 18, 2003 requesting that the FERC accept for filing the cost-based power sales agreement between Montana Megawatts I, LLC and its affiliate, NWE. The MPSC and MCC moved to intervene and protested such agreement. The Debtor has been attempting to work with the MPSC, MCC, FERC staff and the FERC-appointed settlement judge to resolve MPSC's and MCC's opposition and concerns in a timely manner. However, it appears that no such resolution will be forthcoming and the Debtor, in the exercise of its business judgment, will proceed to liquidate the MFM project and assets. The Debtor can give no assurance when MFM's assets may be liquidated and the value received from such liquidation.

The implementation of the Plan also assumes that there will be sufficient liquidity on the Effective Date to fund payments under the Plan and to meet the Debtor's ongoing working capital needs. The Debtor currently projects that as of the Effective Date it will have on hand either through cash generated from operations and/or borrowings available under a working capital facility liquidity of at least $75 million. The failure of the Debtor to achieve this level of liquidity or to maintain adequate working capital resources may impair the Debtors ability to implement the Plan and could require further restructuring of the Debtor.

**K.    Fraudulent Conveyance Litigation**

The QUIPS Litigation and the potential litigation which may be filed by the plaintiffs in the McGreevey Litigation concerning the going flat transaction could take time to resolve. While the Debtor believes that Law Debenture, Magten and the plaintiffs in the McGreevey Litigation do not have standing to pursue a claim for a fraudulent transfer, resolution of this litigation may take some time and the outcome of such litigation is unknown at this time. The Debtor has filed on or about August 13, 2004 its Motion to Approve a Memorandum of Understanding (the "McGreevey MOU") entered into by certain parties to the McGreevey Litigation. The McGreevey MOU contains the material terms of a proposed settlement under which the Debtor will receive a full release and discharge and withdrawal of any and all claims and causes of actions asserted or filed and which could have been asserted or filed with respect to the McGreevey Litigation. A stipulation of settlement in connection with the McGreevey MOU is currently being finalized.

The State of Montana has also asserted that the Debtor operates and continues to operate the Debtor and Clark Fork as a single economic entity. The fraudulent conveyance claims asserted by various parties if successful may effect the priorities between the unsecured creditors of the Debtor and the creditors of Clark Fork as well as distributions under the Debtor's Plan.

**L.    Disputes Under Certain Insurance Policies**

Certain parties, including the TA Debtors and Cornerstone dispute the Debtor's status as an insured under, and the Debtor's entitlements to any proceeds from, certain policies, the Disputed Policies, identified on Exhibit C to the Plan, namely the Montana Power Company Policies and the Cornerstone Propane Partners LP Policies. The Debtor disagrees with these assertions and intends to enforce its right to coverage under the Disputed Policies. No provision in the Plan (as filed or thereafter amended) nor any confirmation order presented or proposed to, or entered by, the Bankruptcy Court, shall (i) determine whether the Debtor is an insured or

otherwise entitled to any of the benefits or proceeds of the Disputed Policies, or (ii) prejudice or in any way impair any parties rights with respect to the Disputed Policies and their proceeds. The dispute regarding the Debtor's interest in the Disputed Policies and their proceeds must be determined either consensually or by a court of competent jurisdiction.

Nothing in the Plan is intended to determine the Debtor's interest, if any, in the Disputed Policies and the Debtor agrees that in any proceeding to determine the Debtor's interest in, or its right to proceeds of, any of the Disputed Policies it will not assert any defense based on res judicata, collateral estoppel, or any other similar preclusion doctrine as a result of entry by the Bankruptcy Court of an order confirming the Plan (as filed or thereafter amended) except to the extent that the matters are specifically addressed in the confirmation process or by separate order entered in the Chapter 11 Case.

Nothing in the Plan or Confirmation Order is intended to channel the Disputed Polices to the D&O Trust. In addition, notwithstanding any language to the contrary, no provision of the Plan or Confirmation Order enjoins, releases or otherwise impairs any claims that Goldman Sachs & Co. or Milbank Tweed Hadley & McCloy LLP against any person or entity other than the Debtor and the Reorganized Debtor or otherwise limits any defense, setoff, counterclaim or cross claim either may have against any person or entity, except that any recovery by Goldman Sachs & Co. or Milbank Tweed Hadley & McCloy LLP on such counterclaim or cross claim against the Debtor or Reorganized Debtor shall be limited by the Plan.

## M.    Cornerstone Asserted Claims

Cornerstone has filed significant claims against the Debtor's estate and has advised the Debtor that it will seek to unwind the deconsolidation of the Debtor's interest in Cornerstone completed in November 2002. Moreover, Cornerstone has asserted that any claim the Debtor has against Cornerstone in the form of a promissory note held by the Debtor should either be set off against Cornerstone's Claims against the Debtor's estate or equitably subordinated to all creditors and other parties-in-interest claims against Cornerstone. While the Debtor believes that the assertions and allegations by Cornerstone are without merit and the Debtor should recover on its promissory note against Cornerstone in the same manner as similarly situated Cornerstone creditors, the Debtor can give no assurances when and if these issues will be resolved.

## N.    Securities Class Action Settlements

The Debtor's Plan incorporates various compromises and settlements, which, to the extent not already approved by order of the Bankruptcy Court, will be made operative and effective under Section 1123(b)(3)(A) of the Bankruptcy Code. That section expressly permits a plan of reorganization to provide for the settlement of any claim or any interest belonging to the debtor or to the estate. However, each of the compromises and settlements incorporated into the Plan, including settlement of several class action lawsuits and shareholder derivative actions commenced in or removed to federal court naming the Debtor and certain of its present and former officers and directors, is subject to the approval of the Bankruptcy Court. The Bankruptcy Court must make an independent determination that each of the settlements is fair and equitable and is in

the best interests of the Debtor's estate. To the extent not already approved by prior order of the Bankruptcy Court, the Debtor will seek approval of the Securities Class Action Settlements pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code.

The Debtor believes that each of the settlements incorporated into the Plan is fair and reasonable, and thus should be approved by the Bankruptcy Court as part of confirmation of the Plan, if not previously approved by prior order of the Bankruptcy Court.

Holders of Securities Claims may elect not to participate in and be bound by the Class Action Settlement Documents by timely submitting Opt-Out Forms, in which case they will be treated as Class 15 Claimants under the Plan, and upon submission of a D&O Proceedings Final Order, shall be channeled to the D&O Trust. Class 15 Claimants shall receive the same treatment as Class 12 Claimants. Opt-Out Securities Claimants may also pursue their claims against non-Debtor defendants in the class action and derivative actions which may give rise to claims for indemnification by such defendants against Reorganized Debtor.

No assurances can be given as to the outcome of the Class Action or as to the magnitude of any liability of Reorganized Debtor to the Opt-Out Securities Claimants and to the officers, directors, employees and agents of the Debtor and its subsidiaries with respect to the Debtor's indemnification obligations, including any such indemnification obligations with respect to claims which may be asserted by Opt-Out Securities Claimants against non-Debtor defendants in the Class Action. Liabilities arising under the opt-out provisions could be substantial and the Class Action Settlement could fail if more than 5% of the Securities Claimants Opt-Out.

In the event the Settlement is not approved and does not become effective:

(a)     The Plan and any proposed Order confirming the Plan (i) will not release any non-Debtor defendants in the Securities Litigation or any non-debtor for that matter, from the claims asserted or to be asserted in the Securities Litigation; and (ii) will not affect, in any way, the Class Claimants' rights to obtain relief for their claims in the Securities Litigation;

(b)     The Lead Plaintiffs and the Class Claimants shall retain their rights to pursue their claims and access the proceeds of any available D&O Policies that provide coverage for the claims asserted in the Securities Litigation; and

(c)     The Debtors' current and former officers and directors, financial advisors, accountants, auditors, agents or professionals will not be released and discharged from any cause of action in connection with the Class Action.

## O.     **Certain Bankruptcy Related Considerations**

### (1)     Risk of Non-Confirmation of the Plan

Although the Debtor believes that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can also be no assurance that modifications of the Plan will not be required for Confirmation, that such negotiations would not adversely affect the

holders of the Allowed Claims or that such modifications would not necessitate the re-solicitation of votes.

### (2) Nonconsensual Confirmation

In the event any impaired class of claims or equity interests does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan of reorganization at the proponent's request if at least one impaired class has accepted the plan of reorganization (with such acceptance being determined without including the acceptance of any "insider" in such class) and, as to each impaired class which has not accepted the plan of reorganization, the bankruptcy court determines that the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to non-accepting impaired classes. In the event that any impaired Class of Claims or Equity Interests fails to accept the Plan in accordance with Section 1129(a)(8) of the Bankruptcy Code, the Debtor reserves the right to request nonconsensual Confirmation of the Plan in accordance with Section 1129(b) of the Bankruptcy Code.

### (3) Risk That Conditions to Effectiveness Will Not Be Satisfied

Article XI of the Plan contains certain conditions precedent to the effectiveness of the Plan. Included, among others, are the conditions that Reorganized Debtor shall have credit availability under the CSFB Facility to provide Reorganized Debtor with financing sufficient to meet their Cash obligations under the Plan. There can be no assurances that the conditions contained in Article XI of the Plan will be satisfied.

## P.    **Dividends**

The Debtor presently intends to begin paying a dividend on the New Common Stock upon emergence; however, there is no certainty as to when Reorganized Debtor will pay Cash or other dividends on any shares of New Common Stock.

## Q.    **Potential Treatment as Public Utility Holding Company**

The Plan contemplates the issuance of New Common Stock to certain holders of Allowed Claims. A holder of New Common Stock may become a "holding company" under the PUHCA, 15 U.S.C. § 79a *et seq.* Under PUHCA, an entity that owns, controls, or holds with the power to vote ten percent or more of the outstanding "voting securities" of a "public-utility company" is presumptively a "holding company."

A "public-utility company" includes *inter alia* "any company which owns or operates facilities used for generation, transmission, or distribution of electric energy for sale." The Reorganized Debtor will be a "public-utility company" under PUHCA.

A holder of ten percent (10%) or more of the New Common Stock would become a holding company under PUHCA absent a contrary order by the SEC. A holder of less than ten percent (10%) of the New Common Stock would not be a holding company unless the SEC determines that such holder, alone or with others, exercises such a "controlling influence" over the public utility "as to make it necessary or appropriate in the public interest or for the protection of investors or consumers" to deem the holder to be a holding company.

**A893**

All public utility holding companies must register with the SEC under section 5 of PUHCA and are subject to extensive regulation of their affairs under PUHCA by the SEC unless the holding company is exempted. Under section 3 of PUHCA, the SEC must exempt holding companies that meet any of five defined categories, unless it finds the exemption "detrimental to the public interest or the interest of investors or consumers." These five categories include an entity that is "temporarily a holding company solely by reason of the acquisition of securities for purposes of liquidation or distribution in connection with a bona fide debt previously contracted or in connection with a bona fide arrangement for the underwriting or distribution of securities." This exemption would be available to holders of Allowed Claims that become holding companies by acquiring New Common Stock in exchange for previously contracted bona fide debt pursuant to the Plan. In order to obtain this exemption, such holders of New Common Stock must submit an application to the SEC. Prior SEC orders indicate that such an applicant would have to demonstrate that it intends to hold such voting securities for investment purposes only, temporarily and for purposes of liquidation, and will reduce its holdings to less than ten percent (10%) of the outstanding voting securities of the Reorganized Debtor as soon as financially reasonable, consistent with any fiduciary obligations the applicant may have to its investors. The SEC has approved exemptions for periods of up to three (3) years from the date of acquisition of such voting securities to provide an opportunity for a reorganized public-utility company to increase earnings and improve the market price of its securities. A holder of an Allowed Claim that would acquire ten percent (10%) or more of the outstanding shares of New Common Stock pursuant to the Plan should consult with counsel and arrange for the filing of an appropriate application for an exemption with the SEC.

In addition, a holder of New Common Stock may be required to seek approval from the SEC under section 9(a)(2) of PUHCA to acquire securities of the Reorganized Debtor. Section 9(a)(2) requires SEC approval under the standards of section 10 for the acquisition of any security of any public-utility company by "any person" who is, or will by virtue of an acquisition become, an "affiliate" of two or more public-utility companies. For purposes of section 9(a)(2), an "affiliate" is any person that directly or indirectly owns five percent (5%) or more of the outstanding voting securities of a public-utility company. Section 10 in turn, directs the SEC to consider the potential anticompetitive effects of a utility acquisition, the adequacy of the consideration, and the effect of the acquisition upon the system, the public interest and the interest of investors and consumers. The SEC must also be satisfied that there is compliance with relevant state laws. In addition, under section 10(c)(1), the SEC cannot approve an acquisition that "is unlawful under the provisions of section 8 or detrimental to the carrying out of the provisions of section 11," and, under section 10(c)(2), the SEC must find that a proposed acquisition "serve[s] the public interest by tending towards the economical and efficient development of an integrated public-utility system." Section 8 prohibits ownership interests in electric and gas utility properties serving the same territory in violation of state law, and section 11 requires the integration and simplification of holding company systems. Because the acquisition of securities in the Reorganized Debtor pursuant to the Plan does not change the utility operations of the Reorganized Debtor, compliance with sections 10(c), 8, and 11 would not appear to be an issue if section 9(a)(2) approval must be obtained. A holder of an Allowed Claim that would acquire five percent or more of the outstanding shares of New Common Stock pursuant to the Plan should consult with counsel to determine if section 9(a)(2) approval must be obtained and if so arrange for the filing of an appropriate application with the SEC.

## ARTICLE X
## EXEMPTIONS FROM SECURITIES ACT REGISTRATION;
## REGISTRATION RIGHTS

The Plan contemplates the issuance of certain securities to holders of Allowed Claims. Section 1145 of the Bankruptcy Code creates certain exemptions from the registration and licensing requirements of federal and state securities laws with respect to the issuance and distribution of securities by a debtor under a plan of reorganization to holders of claims or interests wholly or principally in exchange for those claims or interests.

**A.    Issuance of New Securities Pursuant to the Plan**

With respect to the New Common Stock to be issued on the Effective Date, the Debtor intends to rely upon the exemption from the registration requirements of the Securities Act (and the equivalent state securities or "blue sky" laws) provided by Section 1145(a)(1) of the Bankruptcy Code. Generally, Section 1145(a)(1) of the Bankruptcy Code exempts the issuance of securities from the requirements of the Securities Act and the equivalent state securities and "blue sky" laws if the following conditions are satisfied: (i) the securities are issued by a debtor, an affiliate participating in a joint plan of reorganization with the debtor, or a successor of the debtor under a plan of reorganization, (ii) the recipients of the securities hold a claim against, an interest in, or a claim for an administrative expense against, the debtor, and (iii) the securities are issued entirely in exchange for the recipient's claim against or interest in the debtor, or are issued "principally" in such exchange and "partly" for Cash or property. The Debtor believes that the issuance of securities contemplated by the Plan will satisfy the aforementioned requirements and therefore is exempt from federal and state securities law, although as discussed in Section B below, under certain circumstances, subsequent transfers of such securities may be subject to registration requirements under such securities laws.

**B.    Subsequent Transfer of Securities Issued Under the Plan**

The securities issued pursuant to the Plan may be resold by the holders thereof without restriction unless, as more fully described below, any such holder is deemed to be an "underwriter" with respect to such securities, as defined in Section 1145(b)(1) of the Bankruptcy Code. Generally, Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who (1) purchases a claim against, or interest in, a bankruptcy case, with a view towards the distribution of any security to be received in exchange for such claim or interest, (2) offers to sell securities issued under a bankruptcy plan on behalf of the holders of such securities, (3) offers to buy securities issued under a bankruptcy plan from persons receiving such securities, if the offer to buy is made with a view towards distribution of such securities, or (4) is an issuer as contemplated by Section 2(11) of the Securities Act. Although the definition of the term "issuer" appears in Section 2(4) of the Securities Act, the reference (contained in Section 1145(b)(1)(D) of the Bankruptcy Code) to Section 2(11) of the Securities Act purports to include as "underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract or otherwise. Accordingly, an officer or director of a reorganized debtor (or its successor) under a

plan of reorganization may be deemed to be a "control person," particularly if such management position is coupled with the ownership of a significant percentage of the Debtor's (or successor's) voting securities. Moreover, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns at least 10% of the voting securities of a reorganized debtor may be presumed to be a "control person."

Because certain holders of Claims who will receive New Common Stock under the Plan may be considered "control persons" of the Debtor, pursuant to the Plan the Reorganized Debtor will enter into a registration rights agreement with such holders to register under the Securities Act resale(s) of New Common Stock to be received by such holders.

**THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTOR MAKES NO REPRESENTATIONS CONCERNING, AND DOES NOT HEREBY PROVIDE ANY OPINION OR ADVICE WITH RESPECT TO, THE SECURITIES LAW AND BANKRUPTCY LAW MATTERS DESCRIBED ABOVE. IN LIGHT OF THE COMPLEX AND SUBJECTIVE INTERPRETIVE NATURE OF WHETHER A PARTICULAR RECIPIENT OF SECURITIES UNDER THE PLAN MAY BE DEEMED TO BE AN "UNDERWRITER" WITHIN THE MEANING OF SECTION 1145(b)(1) OF THE BANKRUPTCY CODE AND/OR AN "AFFILIATE" OR "CONTROL PERSON" UNDER APPLICABLE FEDERAL AND STATE SECURITIES LAWS AND, CONSEQUENTLY, THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND EQUIVALENT STATE SECURITIES AND "BLUE SKY" LAWS, THE DEBTOR ENCOURAGES POTENTIAL RECIPIENTS OF NEW COMMON STOCK TO CONSIDER CAREFULLY AND CONSULT WITH HIS, HER, OR ITS OWN LEGAL ADVISOR(S) WITH RESPECT TO SUCH (AND ANY RELATED) MATTERS.**

**ARTICLE XI**
**ALTERNATIVES TO THE PLAN AND CONSEQUENCES OF REJECTION**

Among the possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan are the following: (1) an alternative plan could be proposed or confirmed; or (2) the Chapter 11 Case could be converted to a liquidation case under Chapter 7 of the Bankruptcy Code.

**A.    Alternative Plans**

As previously mentioned, with respect to an alternative plan, the Debtor and its professional advisors have explored various alternative scenarios including, but not limited to, the sale of the Debtor's businesses as a going concern or otherwise, and believe that the Plan enables the holders of Claims and Equity Interests to realize the maximum recovery under the circumstances. The Debtor believe the Plan is the best plan that can be proposed and serves the best interests of the Debtor and other parties-in-interest.

**A896**

**B.     Chapter 7 Liquidation**

As discussed above in Section VI(b)(2), with respect to each Class of impaired Claims or Equity Interests, either each holder of a Claim or Equity Interest of such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code. In a Chapter 7 liquidation, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no lower class receiving any payments until all amounts due to senior classes have either been paid in full or payment in full is provided for: (i) first to secured creditors (to the extent of the value of their collateral), (ii) next to priority creditors, (iii) next to unsecured creditors, (iv) next to debt expressly subordinated by its terms or by order of the Bankruptcy Court, and (v) last to holders of equity interests. Based on the liquidation analysis annexed hereto as Exhibit H, the Debtor believes that if the Chapter 11 Case were converted to a Chapter 7 liquidation, holders of Unsecured Note Claims, General Unsecured Claims, Environmental Claims and D&O Trust Claims would receive less than they would under the Plan and holders of Unsecured Subordinated Note Claims and all other Claims and Equity Interests would receive no Distributions under the Plan.

**ARTICLE XII**
**RECOMMENDATION AND CONCLUSION**

The Debtor and its professional advisors have analyzed different scenarios and believe that the Plan will provide for a larger Distribution to holders of Allowed Claims than would otherwise result if an alternative restructuring plan were proposed or the assets of the Debtor were liquidated. In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in potentially smaller Distributions to the holders of Allowed Claims. Accordingly, the Debtor recommends confirmation of the Plan and urges all holders of impaired Claims to vote to accept the Plan, and to evidence such acceptance by returning their Ballots so that they will be received by no later than the Voting Deadline.

**[SIGNATURE PAGE FOLLOWS]**

**A897**

Date: Wilmington, Delaware
August _18_, 2004

NorthWestern Corporation
Debtor and Debtor-in-Possession

By: _~~signature~~_
     William M. Austin
     Chief Restructuring Officer

PAUL, HASTINGS,
JANOFSKY & WALKER , LLP
By: _~~signature~~_

Jesse H. Austin, III
Karol K. Denniston
Carolyn Chayavadhanangkur
600 Peachtree Street, N.E.
Suite 2400
Atlanta, Georgia  30308
Telephone:  (404) 815-2400

- and-

GREENBERG TRAURIG, LLP

By: _~~signature~~_

Scott D. Cousins
Victoria Watson Counihan
William E. Chipman, Jr.
The Brandywine Building
1000 West Street, Suite 1540
Wilmington, DE 19801
Telephone:  (302) 661-7000

Co-Counsel to the Debtor and Debtor-in-
Possession

DISCLOSURE STATEMENT

**A898**

## LIST OF EXHIBITS

**EXHIBIT A**     Debtor's Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

**EXHIBIT B**     Disclosure Statement Approval Order

**EXHIBIT C**     Resolicitation Order

**EXHIBIT D**     Debtor's Pre-petition Debt Structure

**EXHIBIT E-1**   Proposed Released Parties – Securities Litigation Releases in connection with Class Action

**EXHIBIT E-2**   Proposed Released Parties – General Released Parties

**EXHIBIT F-1**   Agreement in Principle by and among NorthWestern Corporation, the Montana Public Service Commission and the Montana Consumer Counsel dated May 14, 2004

**EXHIBIT F-2**   Stipulation and Settlement Agreement among NorthWestern Corporation, the Montana Public Service Commission and the Montana Consumer Counsel dated July 8, 2004

**EXHIBIT F-3**   Bankruptcy Court Order Approving Stipulation and Settlement Agreement among Debtor, Montana Public Service Commission and Montana Consumer Counsel Pursuant to Sections 105(a) and 1129(a)(4) of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules

**EXHIBIT G**     Management

**EXHIBIT H**     NorthWestern Corporation Liquidation Analysis

**EXHIBIT I**     NorthWestern Corporation 2004-2008 Financial Projections

**EXHIBIT J**     NorthWestern Corporation Form 10-Q for the Fiscal Quarter Ended June 30, 2004

**EXHIBIT K**     NothWestern Corporation Form 10-Q for the Fiscal Quarter Ended March 31, 2004

**EXHIBIT L**     NorthWestern Corporation Form 10-K, and Accompanying Audited Financial Statements, for the Fiscal Period Ended December 31, 2003

**EXHIBIT M**     NorthWestern Corporation Form 10-Q for the Fiscal Quarter Ended

**A899**

September 30, 2003

**EXHIBIT N**    Reorganized NorthWestern Corporation Charter

**EXHIBIT O**    Debtor's Projected Balance Sheet as of September 30, 2004

**EXHIBIT P**    QUIPS Adversary Decision

**A900**

# EXHIBIT A

## Debtor's Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | Case No. 03-12872 (CGC) |
| | : | |
| Debtor. | : | |
| | : | |
| | : | |

## DEBTOR'S SECOND AMENDED AND RESTATED PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**PAUL, HASTINGS, JANOFSKY &**
**WALKER LLP**
Jesse H. Austin, III
Karol K. Denniston
Carolyn Chayavadhanangkur
600 Peachtree Street, N.E.
Suite 2400
Atlanta, Georgia 30308
(404) 815-2400

**GREENBERG TRAURIG, LLP**
Scott D. Cousins
Victoria Watson Counihan
William E. Chipman, Jr.
The Brandywine Building
1000 West Street
Suite 1540
Wilmington, DE 19801
(302) 661-7000

Co-Counsel to the Debtor and Debtor-in-Possession

Dated: August 18, 2004
        Wilmington, Delaware

ATL/1005339.47

ARTICLE I        DEFINITIONS AND CONSTRUCTION OF TERMS...................... 1

ARTICLE II       TREATMENT OF ALLOWED ADMINISTRATIVE
                 CLAIMS AND ALLOWED PRIORITY TAX CLAIMS ................ 29

ARTICLE III      CLASSIFICATION OF CLAIMS AND EQUITY
                 INTERESTS ........................................................................ 31

ARTICLE IV       TREATMENT OF CLAIMS AND EQUITY INTERESTS ............ 32

ARTICLE V        MEANS OF IMPLEMENTATION AND EFFECT OF
                 CONFIRMATION OF PLAN ............................................... 45

ARTICLE VI       IMPLEMENTATION OF THE D&O TRUST ................................. 53

ARTICLE VII      VOTING AND DISTRIBUTIONS; AND TREATMENT OF
                 DISPUTED, CONTINGENT AND UNLIQUIDATED
                 CLAIMS AND EQUITY INTERESTS............................................ 57

ARTICLE VIII     EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
                 INDEMNIFICATION CLAIMS; AND RETIREE BENEFITS ....... 61

ARTICLE IX       CORPORATE GOVERNANCE, MANAGEMENT  AND
                 STRUCTURE OF REORGANIZED DEBTOR................................. 64

ARTICLE X        EXCULPATION, INJUNCTIONS, AND DISCHARGE................ 65

ARTICLE XI       EFFECTIVENESS OF THIS PLAN ..................................... 71

ARTICLE XII      REGULATION.................................................................... 75

ARTICLE XIII     RETENTION OF JURISDICTION.................................... 75

ARTICLE XIV      MISCELLANEOUS PROVISIONS.................................. 76

SCHEDULES

SCHEDULE 4.5  WARRANT TERM SHEET

SCHEDULE 4.9  SPECIAL RECOGNITION GRANTS

EXHIBITS
EXHIBIT A        CERTIFICATE OF INCORPORATION OF REORGANIZED
                 DEBTOR

EXHIBIT B        FORM OF INSURANCE ASSIGNMENT AGREEMENT

EXHIBIT C        D&O POLICIES

EXHIBIT D        D&O PROTECTED PARTIES SETTLEMENT
                 AGREEMENT

EXHIBIT E          NORTHWESTERN CORPORATION D&O TRUST AGREEMENT

EXHIBIT F          NORTHWESTERN CORPORATION D&O TRUST DISTRIBUTION PROCEDURES

EXHIBIT G         WARRANT AGREEMENT

EXHIBIT H         REGISTRATION RIGHTS AGREEMENT

A904

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | :   Chapter 11 |
| | : |
| NORTHWESTERN CORPORATION, | :   Case No. 03-12872 (CGC) |
| | : |
| Debtor. | : |
| | : |
| | : |

### DEBTOR'S SECOND AMENDED AND RESTATED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

NorthWestern Corporation, the above captioned debtor and debtor-in-possession, proposes the following second amended and restated plan of reorganization (the "Plan") under Sections 1121(a) and 1127(a) of title 11 of the United States Code:

### ARTICLE I

### DEFINITIONS AND CONSTRUCTION OF TERMS

Definitions; Interpretation; Application of Definitions and Rules of Construction. For purposes of this Plan, the following terms shall have the meanings specified in this Article I. A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code and the rules of construction contained in Section 102 of the Bankruptcy Code shall apply to the construction hereof. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter. Unless otherwise specified, all section, article, schedule or exhibit references in this Plan are to the respective Section in, Article of, Schedule to, or Exhibit to, this Plan and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular Section, sub-Section or clause contained in this Plan.

1.1   "Additional Indemnitees" shall mean each past, present and future member of the TAC.

1.2   "Administrative Claim" shall mean a right to payment under Sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estate or administering the Chapter 11 Case as authorized and approved by a Final Order, (b) any actual and

necessary costs and expenses incurred after the Petition Date in the ordinary course of the Debtor's business, (c) fees and expenses of Professionals to the extent allowed by Final Order under Sections 330, 331, or 503 of the Bankruptcy Code, and (d) all fees and charges assessed against the Estate pursuant to 28 U.S.C. § 1930.

1.3    "Administrative Claim Bar Date" shall mean the last date established for filing Administrative Claims, as ordered by the Bankruptcy Court.

1.4    "Affiliate" shall have the meaning set forth in 11 U.S.C. § 101(2).

1.5    "Allowed" shall mean, with reference to any Claim: (a) a Claim that has been listed by the Debtor in its Schedules, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009, and (i) is not listed as disputed, contingent or unliquidated, and (ii) is not a Claim as to which a proof of claim has been filed; (b) a Claim as to which a timely proof of claim has been filed as of the Bar Date in a sum certain and either (i) no objection thereto, or application to estimate, equitably subordinate, reclassify or otherwise limit recovery, has been made on or before any applicable deadline, or (ii) if an objection thereto, or application to estimate, equitably subordinate, reclassify or otherwise limit recovery, has been interposed, the extent to which such Claim (whether in whole or in part) has been allowed by a Final Order; (c) a Claim arising from the recovery of property under Section 550 or 553 of the Bankruptcy Code and allowed in accordance with Section 502(h) of the Bankruptcy Code; (d) any Claim expressly allowed under this Plan; or (e) any Claim expressly allowed by Final Order.

1.6    "Allowed Class Designation/Type" shall mean an Allowed Claim of a specified class or of a specified type.

1.7    "Avoidance Action" shall mean an action brought pursuant to Section 544, 547, 548, 549, 550 or 553 of the Bankruptcy Code by or on behalf of the Debtor.

1.8    "Ballot" shall mean the form or forms distributed to each holder of an impaired Claim entitled to vote on this Plan upon which an acceptance or rejection of this Plan shall be indicated in accordance with the instructions specified in such form or forms.

1.9    "Bank One DIP Financing Claims" shall mean the Claims of Bank One, N.A., as agent, or any successor agent thereto, under the DIP Financing Order and the DIP Loan Documents.

1.10    "Bankruptcy Code" shall mean the Bankruptcy Reform Act of 1978, as codified in Title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Chapter 11 Case.